ACCEPTED
05-15-01513-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/11/2015 4:54:22 PM
LISA MATZ
CLERK

**Oral Argument Requested**

**No. 05-15-_____-CV**

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/11/2015 4:54:22 PM
LISA MATZ
Clerk

_____

**COURT OF APPEALS
for the
FIFTH DISTRICT OF TEXAS**

_____

**In re VSDH Vaquero Venture, Ltd. and Douglas M. Hickok,**

*Relators*.

_____

**Original Mandamus Proceeding from
County Court at Law Number One
of Dallas County, Texas
Cause No. CC-09-05232-A**
*Honorable D'Metria Benson Presiding*

_____

**MANDAMUS RECORD
(Tabs 1-29)**

_____

**J. Carl Cecere**
State Bar No. 24050397
**Cecere PC**
6035 McCommas Blvd.
Dallas, Texas 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

**Jeffrey S. Levinger**
State Bar No. 12258300
**Levinger PC**
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Telephone: 214-855-6817
Facsimile: 214-855-6808
jlevinger@levingerpc.com

*Attorneys for Relators*

**Evan Lane (Van) Shaw**
State Bar No. 18140500
**Law Offices of Van Shaw**
2723 Fairmont Street
Dallas, Texas 75201
Telephone: 214-754-7110
Facsimile: 214-754-7115
Email: van@shawlaw.net

*Attorney for VSDH Vaquero Venture, Ltd.*

**Kenneth B. Chaiken**
State Bar No. 04057800
**Chaiken & Chaiken, PC**
5801 Tennyson Parkway
Suite 440
Plano, Texas 75204
Telephone: 214-265-0250
Facsimile: 214-265-1537
Email: kchaiken@chaikenlaw.com

*Attorney for Douglas M. Hickok*

# INDEX TO MANDAMUS RECORD

**Volume 1**

Certificate of Service

Verification of J. Carl Cecere

Plaintiff's Original Petition (July 2, 2009) ............................................... tab 1

Van Shaw's Petition in Intervention (July 7, 2009) ................................ tab 2

Doug Hickok's Petition in Intervention (July 7, 2009) ........................... tab 3

Original Answer to Defendants/Counter-Plaintiffs' Counterclaim (October 5, 2009) ...................................................................................... tab 4

Ken Gross' and Betsy Gross' First Amended Counter-Claim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglass M. Hickok, and Original Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (February 16, 2010) ................................................................................................ tab 5

First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim (March 29, 2010) ................................................................ tab 6

Plaintiff's First-Amended Petition (April 30, 2010) ................................ tab 7

Ken Gross' and Betsy Gross' Second Amended Counterclaim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw, and Douglas M. Hickok and First Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (June 2, 2010) ................................................................................................ tab 8

Counter-Defendants' Second Supplemental Answer as An Addition to Counter-Defendants' First Supplemental Answer and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim ........................................ tab 9

Intervenor/Counter-Defendant Douglas M. Hickok's Amended and Supplemental Answer to Defendants/Counter-Plaintiffs' Counterclaim (April 28, 2011) ............................................................ tab 10

i

Order Partially Granting Intervenor Evan L. Shaw's No-Evidence Motion for Summary Judgment (April 22, 2011).................... tab 11

Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd.'s Third Supplemental Answer as an Addition to Counter-Defendants' First and Second Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim (April 29, 2011)............. tab 12

Ken Gross' and Betsy Gross' Third Amended Counter-Claim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickok and Second Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (April 15, 2013)................................................................... tab 13

Defendants/Counter-Plaintiffs Ken Gross and Betsy Gross' Witness List (November 26, 2013 ......................................... tab 14

Plaintiff's Motion for Continuance (December 6, 2013) ....................... tab 15

Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd.'s Fourth Supplemental Answer as An Addition to Counter-Defendants' First, Second and Third Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim (January 24, 2014)........................................................ tab 16

Ken Gross and Betsy Gross' Motion to Disqualify Evan L. Shaw (February 27, 2014)........................................................ tab 17

Notice of Hearing (June 2, 2014)........................................................ tab 18

Transcript of the hearing on Ken and Betsy Gross' Motion to Disqualify Evan L. Shaw (June 18, 2014. ............................................. tab 19

Memorandum Opinion (August 29, 2014) ........................................... tab 20

Order Vacating Oral Ruling on Motion to Disqualify Evan L. Shaw (September 18, 2014)................................................................. tab 21

Van Shaw's Motion to Withdraw and Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd.'s Motion for Mistrial (June 16, 2015)................................................................. tab 22

Ken Gross and Betsy Gross' Brief on VSDH's Motion for Mistrial (June 16, 2015) .................................................................. tab 23

Trial Transcript, vol. 2: Proceedings on June 10, 2015 .......................... tab 24

Trial Transcript, vol. 3: Proceedings on June 15, 2015 .......................... tab 25

Trial Transcript, vol. 4: Proceedings on June 16, 2015 .......................... tab 26

Trial Transcript, vol. 5: Proceedings on June 17, 2015 .......................... tab 27

Trial Transcript, vol. 6: Proceedings on June 18, 2015 .......................... tab 28

Trial Transcript, vol. 7: Proceedings on June 19, 2015 .......................... tab 29

The Grosses' Trial Exhibits ...................................................................... tab 30

VSDH's Trial Exhibits................................................................................ tab 31

Charge of the Court (June 19, 2015)........................................................ tab 32

Motion for Judgment (July 17, 2015) ...................................................... tab 33

Douglas M. Hickok's Motion for Entry of Judgment (July 22, 2015) ....................................................................................................... tab 34

Gross' Motion for New Trial (July 29, 2015).......................................... tab 35

Transcript of the hearing on the motion for new trial and motions for judgment (August 26, 2015)................................................ tab 36

Order Granting Gross' Motion for New Trial (August 31, 2015).......... tab 37

Douglas M. Hickok's Objections to the Proposed Order Granting the Grosses' Motion for New Trial (August 31, 2015)........... tab 38

Motion to Vacate August 31, 2015 Order Granting Gross' Motion for New Trial and Motion for Hearing on the Record, on Hickok's Objection to Such Order as A Proposed Order (September 3, 2015)................................................................................. tab 39

Motion to Vacate August 31, 2015 Order Granting Gross' Motion for New Trial and Motion for Hearing on the Record, on

Evan L. Shaw's Objection to Such Order as A Proposed Order
(September 4) ................................................................................... tab 40

Order Granting Intervenor Shaw's Unopposed Motion for
Continuance (October 7, 2015) ........................................................ tab 41

Respectfully submitted,

*/s/ Jeffrey S. Levinger*

|  |  |
|---|---|
| **J. Carl Cecere** | **Jeffrey S. Levinger** |
| State Bar No. 24050397 | State Bar No. 12258300 |
| **Cecere PC** | **Levinger PC** |
| 6035 McCommas Blvd. | 1445 Ross Avenue, Suite 2500 |
| Dallas, Texas 75206 | Dallas, Texas 75202 |
| Telephone: 469-600-9455 | Telephone: 214-855-6817 |
| Email: ccecere@cecerepc.com | Facsimile: 214-855-6808 |
|  | Email: jlevinger@levingerpc.com |

*Attorneys for Relators*

**Evan Lane (Van) Shaw**
State Bar No. 18140500
**Law Offices of Van Shaw**
2723 Fairmont Street
Dallas, Texas  75201
Telephone: 214-754-7110
Facsimile: 214-754-7115
Email: van@shawlaw.net

*Attorney for VSDH Vaquero Venture, Ltd.*

**Kenneth B. Chaiken**
State Bar No. 04057800
**Chaiken & Chaiken, PC**
5801 Tennyson Parkway
Suite 440
Plano, Texas  75204
Telephone: 214-265-0250
Facsimile: 214-265-1537
Email: kchaiken@chaikenlaw.com

*Attorney for Douglas M. Hickok*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of this Mandamus Record was served on all counsel of record via the Court's electronic filing system on this 11th day of December, 2015.

Steven E. Aldous
Forshey & Prostok, LLP
500 Crescent Court, Suite 240
Dallas, Texas  75201


*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## VERIFICATION

STATE OF TEXAS           §
                                  §

COUNTY OF DALLAS      §

Before me the undersigned authority, on this day personally appeared J. Carl Cecere, who being by me sworn, deposed and stated as follows:

My name is J. Carl Cecere. I am over the age of 18 years and am competent to make this verification. I am one of the attorneys for the Relators in this matter, and I have read the foregoing Petition for Writ of Mandamus. The Mandamus Record includes true and correct copies of every document that is material to the Relators' claim for relief and each document was filed in the underlying proceeding. All of the pleadings included in the Mandamus Record are true and correct copies of the originals on file in the trial court, and all of the hearing transcripts and exhibits included in the Mandamus Record are true and correct copies of the originals prepared by the official court reporter.

_____

J. Carl Cecere

Subscribed and sworn to before me on this _10th_ day of December, 2015.

_____
Notary Public, State of Texas
Name: _Veronica A. Hodges_
Commission Expires: _7/2/2018_

NOTARY PUBLIC
VERONICA ANNE HODGES
My Commission Expires
July 2, 2018
STATE OF TEXAS

3

# TAB 1

CAUSE NO. <u>CC-09-05232-A</u>

FILED

2009 JUL -2 PM 5: 15

JOHN ... EH
CLERK
DALLAS COUNTY

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| V. | § | AT LAW NUMBER ___1___ |
| | § | |
| KEN GROSS and BETSY GROSS | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, VSDH VAQUERO VENTURE, LTD., complaining of KEN GROSS and BETSY GROSS, hereinafter called Defendants, and for cause of action would respectfully show unto the Court the following:

### I.
### DISCOVERY CONTROL PLAN

Discovery is intended to be conducted under Discovery Control Plan Level 2 as set forth in the Texas Rules of Civil Procedure.

### II.
### PARTIES

Plaintiff is a Texas limited partnership.

Defendant, KEN GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

Defendant, BETSY GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

### III.
### VENUE

Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Civil Practice & Remedies Code.

# IV.
## STATEMENT OF FACTS

Upon information and belief, Plaintiff asserts the following Statement of Facts which, in addition to other facts, support Plaintiff's causes of actions set out herein.

Defendants made demand on Plaintiff to perform pursuant to what Defendants claim is Plaintiff's obligation to perform. Defendants failed to adhere to their approval obligations and have caused damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

# V.
## CAUSES OF ACTION AS TO DEFENDANTS

### Count A – Negligence

Plaintiff would show that the occurrence made the basis of this lawsuit referred to in this Petition and Plaintiff's resulting damages were proximately caused by the negligent conduct of the Defendants. Said negligence proximately caused the occurrence made the basis of this action and Plaintiff's damages in excess of the minimum jurisdictional limits of the Court.

### Count B – Breach of Contract

Plaintiff would show that the foregoing allegations constitute breach of contract and said breach has caused Plaintiff damage as a direct, proximate, producing cause and responsibility thereof in an amount in excess of the minimum jurisdictional limits of this Court.

# VI.
## PREJUDGMENT/POST-JUDGMENT INTEREST

Plaintiff would further show the Court that many of its damages may be determined by known standards of value and accepted rules of interest as damages from the date of loss and/or the date such damages can be determined prior to judgment, or as the Court otherwise directs, calculated at the legal rate, or as otherwise set by law.

# VII.
## ALTERNATIVE PLEADING

Plaintiff incorporates by reference and re-alleges all preceding sections of this Petition and would further show that all pleadings herein, if deemed inconsistent, are made and should be construed in accordance with Rule 48 of the TEXAS RULES OF CIVIL PROCEDURE.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that upon final trial hereof, Plaintiff recovers judgment against the Defendants for the following:

1.  Judgment against Defendants for actual damages;

2.  Pre-judgment interest;

3.  Post-judgment interest;

4.  Court costs; and

5.  Such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled, both in law and in equity.

Respectfully submitted,

EVAN LANE (VAN) SHAW
State Bar No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF

# LAW OFFICES
# OF
# VAN SHAW

ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
----------
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
LORI G. MOORE
APRIL S. SUMNER

FILED
2009 JUL -2 PM 5: 16

Mr. John F. Warren
County Clerk
509 Main St.
Records Building
Dallas, TX 75202

July 2, 2009
**VIA HAND DELIVERY**

RE:    VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Dear Mr. Warren:

Enclosed via hand delivery please find Plaintiff's Original Petition in the above-styled cause. Please file the same with the Court's records and return a file-marked copy to the undersigned.

Further, please prepare and return citations for service to be obtained on the following Defendants:

Defendant, KEN GROSS, at 2004 White Wing Cove, Westlake, Texas; and

Defendant, BETSY GROSS, at 2004 White Wing Cove, Westlake, Texas.

Also, enclosed is a check in the amount of $267.00 for filing, jury and bailiff's fees.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosures – hand delivery

VS.ltr2Ct.Pet

# TAB 2

CAUSE NO. CC-09-05232-A

| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| V. | § | AT LAW NUMBER 1 |
| | § | |
| KEN GROSS and BETSY GROSS | § | DALLAS COUNTY, TEXAS |



## VAN SHAW'S PETITION IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Intervenor, VAN SHAW, and files this his Petition in Intervention and would respectfully show unto the Court as follows:

### I.

### DISCOVERY CONTROL PLAN / PARTIES

Discovery is intended to be conducted under Discovery Control Plan Level 2 as set forth in the Texas Rules of Civil Procedure.

Intervenor is an individual.

Plaintiff is a Texas limited partnership.

Defendant, KEN GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

Defendant, BETSY GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

### II.

### VENUE

Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Civil Practice & Remedies Code.

# III.

## INTERVENOR'S CAUSE(S) OF ACTION

Defendants have made claims of indemnity on Intervenor that are not accurate.

# IV.

## NEGLIGENCE

The occurrence made the basis of this lawsuit referred to above and Intervenor's resulting damages were proximately caused by the negligent conduct of the Defendants. Said actions constituted negligence which proximately caused the occurrence made the basis of this action and Intervenor's damages in an amount in excess of the minimum jurisdictional limits of the Court.

# V.

## PREJUDGMENT/POST-JUDGMENT INTEREST

Intervenor would further show the Court that many of his damages may be determined by known standards of value and accepted rules of interest as damages from the date of loss and/or the date such damages can be determined prior to judgment, or as the Court otherwise directs, calculated at the legal rate, or as otherwise set by law.

# VI.

## ALTERNATIVE PLEADING

Plaintiff incorporates by reference and re-alleges all preceding sections of this Petition and would further show that all pleadings herein, if deemed inconsistent, are made and should be construed in accordance with Rule 48 of the TEXAS RULES OF CIVIL PROCEDURE.

WHEREFORE, PREMISES CONSIDERED, Intervenor asks upon final hearing, he recover judgment for:

1.  Actual damages in an amount in excess of the minimum jurisdictional limits of the Court;

2.  Pre-judgment interest and post-judgment interest at the maximum legal amount allowed by law;

3.  Court costs; and

4.  Such other and further relief, both at law and in equity, to which Intervenor may be justly entitled, both in law and in equity.

Respectfully submitted,

EVAN LANE (VAN) SHAW
State Bar No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE

--------

* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

July 7, 2009
**VIA HAND DELIVERY**
---Phone (214/653-7556)---

RE:     Cause No. CC-09-05232-A;
        VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Madam:

Enclosed via hand delivery is the following:

1)      Van Shaw's Petition in Intervention.

Please file the same with the Court's records and return a file-marked copy to the undersigned. By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Further, please prepare and return citations for service to be obtained on the following Defendants:

        Defendant, KEN GROSS, at 2004 White Wing Cove, Westlake, Texas; and
        Defendant, BETSY GROSS, at 2004 White Wing Cove, Westlake, Texas.

Also, enclosed is a check in the amount of Forty-Three Dollars ($43.00) for your filing ($35.00) and issuance ($8.00) issuance fees.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosure – hand delivery
VS.ltr2Ct.Pet.Interv.VS

# TAB 3

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| V. | § | AT LAW NUMBER 1 |
| | § | |
| KEN GROSS and BETSY GROSS | § | DALLAS COUNTY, TEXAS |

## DOUG HICKOK'S PETITION IN INTERVENTION



TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Intervenor, DOUG HICKOK, and files this his Petition in Intervention and would respectfully show unto the Court as follows:

### I.

### DISCOVERY CONTROL PLAN / PARTIES

Discovery is intended to be conducted under Discovery Control Plan Level 2 as set forth in the Texas Rules of Civil Procedure.

Intervenor is an individual.

Plaintiff is a Texas limited partnership.

Defendant, KEN GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

Defendant, BETSY GROSS, is an individual who may be served with process at 2004 White Wing Cove, Westlake, Texas.

### II.

### VENUE

Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Civil Practice & Remedies Code.

## III.

## INTERVENOR'S CAUSE(S) OF ACTION

Defendants have made claims of indemnity on Intervenor that are not accurate.

## IV.

## NEGLIGENCE

The occurrence made the basis of this lawsuit referred to above and Intervenor's resulting damages were proximately caused by the negligent conduct of the Defendants. Said actions constituted negligence which proximately caused the occurrence made the basis of this action and Intervenor's damages in an amount in excess of the minimum jurisdictional limits of the Court.

## V.

## PREJUDGMENT/POST-JUDGMENT INTEREST

Intervenor would further show the Court that many of his damages may be determined by known standards of value and accepted rules of interest as damages from the date of loss and/or the date such damages can be determined prior to judgment, or as the Court otherwise directs, calculated at the legal rate, or as otherwise set by law.

## VI.

## ALTERNATIVE PLEADING

Plaintiff incorporates by reference and re-alleges all preceding sections of this Petition and would further show that all pleadings herein, if deemed inconsistent, are made and should be construed in accordance with Rule 48 of the TEXAS RULES OF CIVIL PROCEDURE.

WHEREFORE, PREMISES CONSIDERED, Intervenor asks upon final hearing, he recover judgment for:

1. Actual damages in an amount in excess of the minimum jurisdictional limits of the Court;

2. Pre-judgment interest and post-judgment interest at the maximum legal amount allowed by law;

3. Court costs; and

4. Such other and further relief, both at law and in equity, to which Intervenor may be justly entitled, both in law and in equity.

Respectfully submitted,

EVAN LANE (VAN) SHAW
State Bar No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF



ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
----------
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
----------
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

July 7, 2009
**VIA HAND DELIVERY**
---Phone (214/653-7556)---

RE:     Cause No. CC-09-05232-A;
        VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Madam:

Enclosed via hand delivery is the following:

1)      Doug Hickok's Petition in Intervention.

Please file the same with the Court's records and return a file-marked copy to the undersigned. By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Further, please prepare and return citations for service to be obtained on the following Defendants:

        Defendant, KEN GROSS, at 2004 White Wing Cove, Westlake, Texas; and
        Defendant, BETSY GROSS, at 2004 White Wing Cove, Westlake, Texas.

Also, enclosed is a check in the amount of Forty-Three Dollars ($43.00) for your filing ($35.00) and issuance ($8.00) issuance fees.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosure – hand delivery
VS.ltr2Ct.Pet.Interv.VS

# TAB 4

CAUSE NO. CC-09-05232-A

| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

## ORIGINAL ANSWER TO
## DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Come now the Plaintiff/Counter-Defendant, VSDH VAQUERO VENTURE, LTD., Intervenor/Counter-Defendant EVAN L. SHAW and Intervenor/Counter-Defendant DOUGLAS M. HICKOK, jointly and hereinafter referred to as "Counter-Defendants" and file this their Original Answer to Defendants/Counter-Plaintiff's Counterclaim and in support thereof would respectfully show the Court as follows:

### I.

The Counter-Defendants enter a general denial and demand a trial by jury of every material issue of fact in this lawsuit.

### II.

Counter-Defendants would show the Court that there is a defect in the parties in that DOUGLAS M. HICKOK and EVAN L. SHAW are not proper Counter-Defendants in this cause of action.

**COUNTER-DEFENDANTS' ORIGINAL ANSWER** - Page 1
Ans.Cclaim

## III.

Further answering, Counter-Defendants would show the Court that there is a defect in the parties in that Counter-Defendants DOUGLAS M. HICKOK and EVAN L. SHAW did not individually execute the contract in issue.

## IV.

Further answering, Counter-Defendant DOUGLAS M. HICKOK denies executing any written agreement made the basis of this suit in his individual capacity.

## V.

Further answering, Counter-Defendant EVAN L. SHAW denies executing any written agreement made the basis of this suit in his individual capacity.

## VI.

Further answering, Counter-Defendants assert Counter-Plaintiffs failed to comply with conditions precedent.

## VII.

Further answering, Counter-Defendants assert that Counter-Plaintiffs are estopped from and have waived any right for making a claim and/or for recovery herein.

## VIII.

The Counter-Defendants adopt by reference all defenses and affirmative defenses set forth in their Original Petition and any subsequent petition filed herein.

## IX.

Further answering, Counter-Defendants would show that Counter-Plaintiffs' claims for declaratory judgment are not proper as a counter petition.

Ans.Cclaim

# X.

## ALTERNATIVE PLEADING

All defenses herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Counter-Defendants pray that Counter-Plaintiffs take nothing by reason of their suit and Counter-Defendants go hence without day and with their costs in this behalf expended and for such other and further relief to which Counter-Defendants may be justly entitled, both in law and in equity.

Respectfully submitted,

_____
EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF/
INTERVENORS/COUNTER-DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of October, 2009.

_____
VAN SHAW

# VERIFICATION

STATE OF TEXAS      )
                            )

COUNTY OF DALLAS  )

       BEFORE ME, the undersigned Notary Public, on this day personally appeared DOUGLAS M. HICKOK, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is a Counter-Defendant in the above-entitled and numbered cause; that he has read the above and foregoing Counter-Defendants' Original Answer, and that every statement contained in Paragraphs II, III and IV is within his personal knowledge and is true and correct.

_____
DOUGLAS M. HICKOK

       SUBSCRIBED AND SWORN TO BEFORE ME on the __29th__ day of September, 2009, to certify which witness my hand and official seal.



Notary Public in and for the
State of Texas

My commission expires __May 7, 2010__.

JENNIFER LEE SATTERFIELD
MY COMMISSION EXPIRES
May 7, 2010

COUNTER-DEFENDANTS' ORIGINAL ANSWER - Page 4
Ans.Cclaim

## VERIFICATION

STATE OF TEXAS )
)
COUNTY OF DALLAS )

BEFORE ME, the undersigned Notary Public, on this day personally appeared EVAN L. SHAW, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is a Counter-Defendant in the above-entitled and numbered cause; that he has read the above and foregoing Counter-Defendants' Original Answer and Jury Demand; and that every statement contained in Paragraphs II, III and V is within his personal knowledge and is true and correct.

_____
EVAN L. SHAW

SUBSCRIBED AND SWORN TO BEFORE ME on the ___5th___ day of October, 2009, to certify which witness my hand and official seal.

LORI G. MOORE
Notary Public, State of Texas
My Commission Expires
May 23, 2012

My commission expires 5\23\2012

_____
Notary Public in and for the
State of Texas

# LAW OFFICES
# OF
# VAN SHAW

2009 OCT -5 PH 3:39

VAN SHAW*
JANET R. RANDLE
---------
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

ATTORNEYS AT LAW

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
---------
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

October 5, 2009
**VIA HAND DELIVERY**
---Phone (214/653-7556)---

RE:  Cause No. CC-09-05232-A;
VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Madam:

Enclosed via hand delivery is the following:

1)  Original Answer to Defendants/Counter-Plaintiffs' Counterclaim.

Please file the same with the Court's records and return a file-marked copy to the undersigned.

By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosure -- hand delivery

cc:  See attached Service List.

VS.ltr2Ct.Ans2Cclaim

# SERVICE LIST

Mr. R. Brent Cooper                    **Via Facsimile (214/712-9540)**
Ms. Jana Starling Reist                ----Phone (214/712-9500)---
900 Jackson Street, Suite 100
Dallas, Texas 75202

    Attorney for Defendants Kenneth P. Gross and Betsy L. Gross

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Van Shaw represents Plaintiff VSDH VAQUERO VENTURE, LTD, Intervenor, DOUG HICKOK and Intervenor, VAN SHAW

# TAB 5

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., | § | IN THE COUNTY COURT |
| Plaintiffs/Counter-Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | |
| Defendants/Counter-Plaintiffs, | § | AT LAW NUMBER 1 |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors/Counter-Defendants. | § | DALLAS COUNTY, TEXAS |
| | § | |

---

**KEN GROSS' AND BETSY GROSS' FIRST AMENDED COUNTER-CLAIM AGAINST VSDH VAQUERO VENTURE, LTD., EVAN L. SHAW AND DOUGLAS M. HICKOK AND ORIGINAL THIRD-PARTY PETITION AGAINST VSDH VAQUERO HOMES, INC. AND VSDH HOMES, INC.**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW**, Kenneth P. Gross and Betsy L. Gross, Defendants/Counter-Plaintiffs/Third-Party Plaintiffs (collectively referred to as "the Grosses"), and hereby files their First Amended Petition Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickock (collectively referred to as "Counter-Defendants") and Original Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (collectively referred to as "Third-Party Defendants"), and for such would respectfully show the Court as follows:

**I.**
**DISCOVERY CONTROL PLAN**

1.      The parties have entered into an Agreed Level 3 Discovery Control Plan pursuant to Tex. R. Civ. P. 190.4.

---

## II.
## PARTIES AND SERVICE

2.	Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. is a Texas Limited Partnership who is represented by Evan L. Shaw in this action.

3.	Defendant/Counter-Plaintiff/Third-Party Plaintiff Kenneth P. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

4.	Defendant/Counter-Plaintiff/Third-Party Plaintiff Betsy L. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

5.	Intervenor/Counter-Defendant Douglas M. Hickok ("Hickok") is a Texas resident and may be served with process by serving his last known address at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

6.	Intervenor/Counter-Defendant Evan L. Shaw ("Shaw") is a Texas resident and may be served with process by serving his last known address at 4646 Cherokee Trail, Dallas, Dallas County, Texas 75209.

7.	Third-Party Defendant VSDH Vaquero Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

8.	Third-Party Defendant VSDH Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its Registered Agent and President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

## III.
## JURISDICTION AND VENUE

9. The subject matter in controversy is within the jurisdiction limits of this Court. The Court has jurisdiction over VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. because they are Texas general partnerships.

10. Venue is proper with regard to this third-party action under section 15.062 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, as the transaction giving rise to this third-party action arises out of the same transaction, occurrence, or series of actions or occurrences.

## IV.
## FACTS

11. On or about June 4, 2006, the Grosses entered into a New Home Contract ("Contract"), promulgated by the Texas Real Estate Commission, with Counter-Defendants and Third-Party Defendants for the purchase of 2004 White Wing Cove, Westlake, Texas 76262 ("the Property"), in the amount of $2,851,871.00. (A copy of the Contract has been attached hereto as Exhibit "1," and is incorporate herein by reference for all pertinent purposes).

12. The Grosses purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants agreed to enter into a "Buy Back Option" with the Grosses.

13. According to paragraph 1 ("Buy Back Option") of Addendum A of the Contract, VSDH Vaquero Venture, Ltd. granted to the Grosses, as Buyers of the Property, the "the option . . . to put the Property to Seller [VSDH Vaquero Venture, Ltd.] (i.e. require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller . . . ." *See* Addendum A to Exhibit 1.

14.     Hickok and Shaw are limited partners of VSDH Vaquero Venture, Ltd. and participated and controlled Counter-Defendants and Third-Party Defendants sell of the Property to the Grosses and benefitted from the sell to the Grosses.

15.     Further, according to paragraph 4 of Addendum A, Hickok and Shaw both agreed to be personally responsible, jointly and severally, in the event VSDH Vaquero Venture, Ltd. does not fully perform under the terms of the Buy Back Option.

16.     Under the signature line of the Contract, VSDH Homes, Inc. is listed as the general partner of VSDH Vaquero Venture, Ltd. However, according to the Texas Secretary of State's office, VSDH Vaquero Homes, Inc. is listed as VSDH Vaquero Venture, Ltd.'s general partner.

17.     In accordance with the terms of the Buy Back Option, the Grosses exercised the Buy Back Option by delivering written notice to Shaw and Hickok before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants.

18.     However, Shaw and Hickok communicated to the Grosses that Counter-Defendants and Third-Party Defendants do not intend to buy the Property back and perform their contractual obligations as required under Addendum A to the Contract. Counter-Defendants and Third-Party Defendants failed to purchase the property back.

19.     The Grosses therefore seek construction of the Contract, including Addendum A, to determine whether or not Counter-Defendants and Third-Party Defendants breached the Contract by refusing and failing to buy the Property back from the Grosses pursuant to the Contract for the original sales price of $2,851.871.00.

20.     In an effort to mitigate their damages and avoid foreclosure of the home, the Grosses sold their home for $2,415,600.

# V.
## DECLARATORY JUDGMENT

21. All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

22. This is an action for declaratory judgment pursuant to the Texas Declaratory Judgment Act, Ch. 37.001 et. seq. of the TEX. CIV. PRAC. & REM. CODE, for the purpose of determining an actionable and justiciable controversy between the parties, as hereinafter more fully appears. The controversy involves Counter-Defendants' and Third-Party Defendants' duty to perform their obligations arising under the "Buy Back Option," Addendum A, to the Contract.

23. Based upon the clear terms of Addendum A to the Contract (Exhibit 1), Counter-Defendants and Third-Party Defendants were obligated to buy the Property back from the Grosses pursuant to the terms of the Contract for the original sales price of $2,851.871.00.

24. Accordingly, the Grosses seek a declaration from this Court, as follows:

   1. VSDH Vaquero Venture, Ltd. was obligated to buy the Property back from Kenneth P. Gross and Betsy L. Gross on or before September 1, 2009 for the original sales price of $2,851,871.00

   2. In the event VSDH Vaquero Venture, Ltd. failed to timely buy the Property back from Kenneth P. Gross and Betsy L. Gross, Douglas M. Hickok and Evan L. Shaw were personally responsible, jointly and severally, to buy the Property back on or before September 1, 2009 for the original sales price of $2,851,871.00.

# VI.
## BREACH OF CONTRACT

25. All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

26. As stated above, the Grosses entered into a valid and enforceable contract with Counter-Defendants and Third-Party Defendants. *See* Exhibit 1. The Grosses have fulfilled all requirements, statutorily and in accordance with the terms of the Buy Back Option, by delivering

written notice to Hickok and Shaw before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants. Counter-Defendants and Third-Party Defendants have materially breached the Contract in that they have repudiated the contract and failed to proceed with the purchase of the Property. Counter-Defendants' and Third-Party Defendants' breach has proximately caused the Grosses' damages.

27.     The Grosses request that a judgment be entered against Counter-Defendants and Third-Party Defendants for actual damages. As a direct and proximate result of Counter-Defendants' and Third-Party Defendants' failure to perform under the Contract, the Grosses have been damaged in an amount in excess of the jurisdictional limits of the Court, for which they seeks appropriate judicial relief.

## VII.
## FRAUD IN A REAL ESTATE TRANSACTION

28.     All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

29.     The Grosses will show that Counter-Defendants' and Third-Party Defendants' conduct constitutes fraud in a real estate transaction as defined by Section 27.01 of the TEXAS BUSINESS & COMMERCE CODE. Counter-Defendants' and Third-Party Defendants' made a false representation that they would buy the property back pursuant to the Buy Back Option in order to induce the Grosses to enter into the Contract. The Grosses entered into the Contract and purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants and Third-Party Defendants made the false representation that they would buy the property back pursuant to the "Buy Back Option." The Grosses' reliance directly and proximately caused them substantial injury, as set out above, for which they seek appropriate judicial relief.

## A. Attorneys' Fees

30. The Grosses have retained the law firm of Cooper & Scully, P.C. to represent them in this action and have agreed to pay the firm reasonable and necessary attorneys' fees.

31. The Grosses are entitled to recover reasonable and necessary attorney fees that are equitable and just under TEXAS CIVIL PRACTICE & REMEDIES CODE § 37.009 because this is a suit for declaratory judgment, under TEXAS CIVIL PRACTICE & REMEDIES CODE § 38.001 because it is a suit for breach of a written contract, and under TEXAS BUSINESS & COMMERCE CODE §27.01(e) because this is an suit for statutory fraud. All conditions precedent to the collection of attorneys' fees have been satisfied.

## B. Conditions Precedent

32. All conditions precedent to the Grosses claims for relief have been performed or have occurred.

**WHEREFORE, PREMISES CONSIDERED,** Defendants Kenneth P. Gross and Betsy L. Gross pray that their counterclaims against VSDH Vaquero Venture, Ltd., Shaw and Hickok and third third-party claims against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. be granted; that upon final hearing of this matter, a declaratory judgment is entered as enumerated above; that the Grosses have and recover damages in an amount within the jurisdictional limits of this Court; pre- and post-judgment interest at the highest lawful rate; attorneys' fees and court costs; exemplary damages; and such other and further relief, whether special or general, to which the Grosses may show themselves justly entitled.

Respectfully submitted,

COOPER & SCULLY, P.C.

By: *[signature: Jana S. Reist]*

R. BRENT COOPER
State Bar No. 04783250
**JANA STARLING REIST**
State Bar No. 24056890

Founders Square
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Facsimile: (214) 712-9540

**ATTORNEYS FOR DEFENDANTS
KEN GROSS AND BETSY GROSS**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded to all counsel of record herein via facsimile, on this the 12th day of February 2010 as follows:

Evan Lane (Van) Shaw *(via facsimile and CMRRR)*
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
*Attorney for Counter-Defendants*

*[signature: Jana S. Reist]*

JANA S. REIST


**Cooper & Scully**
A Professional Corporation

**JANA S. REIST**

214-712-9571
Jana.Reist@cooperscully.com

February 12, 2010

**VIA CERTIFIED MAIL**

John Warren
County Court Clerk
300 Records Bldg.
509 Main Street
Dallas, Texas 75202

    Re:    *VSDH Vaquero Venture, Ltd. v. Kenneth P. Gross and Betsy L. Gross*, Cause No.
        CC-09-05232-A, on file in the County Court at Law No. 1, Dallas County, Texas
        Our File No.: 1903-17168

Dear Mr. Warren:

    Enclosed please find an original and one (1) copy of *Ken Gross' and Betsy Gross' First Amended Counter-Claim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickok and Original Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc.* for filing in the above referenced matter. A check in the amount of $35.00 is enclosed for filing fee. Please return via the enclosed self-stamped envelope a filed stamped copy of the Petition for our file. Plaintiff's counsel will receive a copy of this document via facsimile and certified mail.

    If you have any questions, do not hesitate to contact the undersigned.

                   Sincerely yours,

                   Jana S. Reist

Founders Square  900 Jackson Street, Suite 100 Dallas, TX 75202
Telephone (214) 712-9500   Fax (214) 712-9540
www.cooperscully.com

Houston Office (713) 236-6800         San Francisco Office (415) 956-9700         Sherman Office (903) 813-3900
D/759162.1

February 12, 2010
Page 2

JSR/tsh
Enclosures

Cc: Evan Lane (Van) Shaw *(via facsimile 214.754.7115 and certified mail)*
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
*Attorney for Plaintiff*

D/759162.1

# TAB 6

CAUSE NO. CC-09-05232-A

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | AT LAW |
| | § | NO. 1 |
| | § | |
| v. | § | BY _____ |
| | § | DEPUTY |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

## FIRST AMENDED ANSWER TO
## DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Come now the Plaintiff/Counter-Defendant, VSDH VAQUERO VENTURE, LTD., Intervenor/Counter-Defendant EVAN L. SHAW and Intervenor/Counter-Defendant DOUGLAS M. HICKOK, jointly and hereinafter referred to as "Counter-Defendants" and file this their First Amended Original Answer to Defendants/Counter-Plaintiff's Counterclaim and in support thereof would respectfully show the Court as follows:

### I.

The Counter-Defendants enter a general denial and demand a trial by jury of every material issue of fact in this lawsuit.

### II.

Counter-Defendants would show the Court that there is a defect in the parties in that DOUGLAS M. HICKOK and EVAN L. SHAW are not proper Counter-Defendants in this cause of action and are not liable for the claims made the basis of this suit.

COUNTER-DEFENDANTS' FIRST AMENDED ANSWER - Page 1
Ans.Cclaim.Amd1

## III.

Further answering, Counter-Defendants would show the Court that there is a defect in the parties in that Counter-Defendants DOUGLAS M. HICKOK and EVAN L. SHAW did not individually execute the contract in issue and are not liable for the claims made the basis of this suit.

## IV.

Further answering, Counter-Defendant DOUGLAS M. HICKOK denies executing any written agreement made the basis of this suit in his individual capacity.

## V.

Further answering, Counter-Defendant EVAN L. SHAW denies executing any written agreement made the basis of this suit in his individual capacity.

## VI.

Further answering, Counter-Defendants deny Counter-Plaintiffs' allegation that all conditions precedent have been performed or have occurred, in that the following conditions precedent have not been performed or have not occurred:

1. Counter-Defendants EVAN L. SHAW and DOUGLAS M. HICKOK have not been established to have executed the contract in issue; and deny that said contract was executed by these individual defendants;

2. Counter-Plaintiffs KEN GROSS and BETSY GROSS did not obtain written and required approval for improvements to the property in issue; and

3. Counter-Plaintiffs KEN GROSS and BETSY GROSS have not established any exception to the statute of frauds.

## VII.

Further answering, Counter-Defendants assert that Counter-Plaintiffs are estopped from and have waived any right for making a claim and/or for recovery herein.

## VIII.

The Counter-Defendants adopt by reference all defenses and affirmative defenses set forth in their Original Petition and any subsequent petition filed herein.

## IX.

Further answering, Counter-Defendants would show that Counter-Plaintiffs' claims for declaratory judgment are not proper as a counter petition.

## X.

Further answering, Counter-Defendants would show that Counter-Defendants are not liable to Counter-Plaintiffs because the agreement does not comply with the requirements of the statute of frauds.

## XI.

Further answering, Counter-Defendants would show that Counter-Defendants are not liable to Counter-Plaintiffs because Counter-Plaintiffs failed to mitigate their damages.

## XII.

## ALTERNATIVE PLEADING

All defenses herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Counter-Defendants pray that Counter-Plaintiffs take nothing by reason of their suit and Counter-Defendants go hence without day and with their costs in this behalf expended and for such other and further relief to which Counter-Defendants may be justly entitled, both in law and in equity.

Respectfully submitted,

_____

EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115
ATTORNEY FOR PLAINTIFF/
INTERVENORS/COUNTER-DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of March, 2010.

_____

VAN SHAW

## VERIFICATION

STATE OF TEXAS        )
                              )
COUNTY OF ~~DALLAS~~ Collin    )

BEFORE ME, the undersigned Notary Public, on this day personally appeared DOUGLAS M. HICKOK, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is a Counter-Defendant in the above-entitled and numbered cause; that he has read the above and foregoing Counter-Defendants' First Amended Answer, and that every statement contained in Paragraphs II, III and IV is within his personal knowledge and is true and correct.

_____
DOUGLAS M. HICKOK

SUBSCRIBED AND SWORN TO BEFORE ME on the 26 day of March, 2010, to certify which witness my hand and official seal.

_____
Notary Public in and for the
State of Texas

My commission expires May 7, 2010

JENNIFER LEE SATTERFIELD
MY COMMISSION EXPIRES
May 7, 2010

COUNTER-DEFENDANTS' FIRST AMENDED ANSWER - Page 5
Ans.Cclaim.Amd1

# VERIFICATION

STATE OF TEXAS        )
                                )
COUNTY OF DALLAS     )

BEFORE ME, the undersigned Notary Public, on this day personally appeared EVAN L. SHAW, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is a C ounter-Defendant in t he above-entitled and numbered cause; that he has read the above and foregoing Counter-Defendants' First Amended Answer and Jury Demand; and that every statement contained in Paragraphs II, III and V is within his personal knowledge and is true and correct.

_____
EVAN L. SHAW

SUBSCRIBED AND SWORN TO BEFORE ME on the 29th day of March, 2010, to certify which witness my hand and official seal.

_____
Notary Public in and for the
State of Texas

**LORI G. MOORE**
Notary Public, State of Texas
My Commission Expires
May 23, 2012

My commission expires 5|23|2012

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY TEXAS

2010 MAR 29 PM 4:08

BY_____

## LAW OFFICES
## OF
## VAN SHAW

ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE

———

* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

OF COUNSEL
DANIEL K. HAGOOD

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

March 29, 2010
**VIA HAND DELIVERY**
---Phone (214/653-7556)---

RE:     Cause No. CC-09-05232-A;
        VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Madam:

Enclosed via hand delivery is the following:

1)     First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim.

Please file the same with the Court's records and return a file-marked copy to the undersigned.

By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosure – hand delivery

cc:     See attached Service List.

VS.ltr2Ct.Ans2Cclaim

## SERVICE LIST

Mr. R. Brent Cooper
Ms. Jana Starling Reist
COOPER & SCULLY
900 Jackson Street, Suite 100
Dallas, Texas 75202

FAX (214/712-9540)
= PH (214/712-9500) =
brent.cooper@cooperscully.com
jana.reist@cooperscully.com

Attorney for Defendants Kenneth P. Gross and Betsy L. Gross

*******************************

Van Shaw represents Plaintiff VSDH VAQUERO VENTURE, LTD, Intervenor, DOUG HICKOK, Intervenor, VAN SHAW and Third-Party Defendants VSDH VAQUERO HOMES, INC. and VSDH HOMES, INC.

# TAB 7

| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| V. | § | AT LAW NUMBER 1 |
| | § | |
| KEN GROSS and BETSY GROSS | § | DALLAS COUNTY, TEXAS |



## PLAINTIFF'S FIRST-AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, VSDH VAQUERO VENTURE, LTD., complaining of KEN GROSS and BETSY GROSS, hereinafter called Defendants, and for cause of action would respectfully show unto the Court the following:

### I.
### DISCOVERY CONTROL PLAN

Discovery is intended to be conducted under Discovery Control Plan Level 2 as set forth in the Texas Rules of Civil Procedure.

### II.
### PARTIES

Plaintiff is a Texas limited partnership.

Defendant, KEN GROSS, is an individual who has been previously served and has appeared by filing an answer in this lawsuit.

Defendant, BETSY GROSS, is an individual who has been previously served and has appeared by filing an answer in this lawsuit.

### III.
### VENUE

Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Civil Practice & Remedies Code.

# IV.
## STATEMENT OF FACTS

Upon information and belief, Plaintiff asserts the following Statement of Facts which, in addition to other facts, support Plaintiff's causes of actions set out herein.

In June of 2007, Plaintiff, VSDH VAQUERO VENTURE, LTD and Defendants entered into a contract for the purchase of the property located at 2004 White Wing Cove, Westlake, Texas. (the "Property"). See **Exhibit 1.**[1] A First Amendment to the contract on June 12, 2007 is attached at **Exhibit 2.**

Subsequent to the purchase of the Property, Defendants breached the contract by commencing construction and proceeding to make major improvements to the property without first obtaining the consent of Plaintiff as required and thereafter made wrongful demands for monies owed. Defendants also failed to timely comply with the contract's buy-back notice provisions and thereafter sold the Property and incurred commissions and other costs that would not have been incurred had the notice provisions and been complied with accompanied by a timely triggered buy-back.

As a result of Defendants' breach, Plaintiff has incurred attorneys' fees related to this legal proceeding related to the contract.

# V.
## CAUSES OF ACTION AS TO DEFENDANTS

### Breach of Contract

Plaintiff would show that the foregoing allegations constitute breach of contract and said breach has caused Plaintiff damage as a direct, proximate, producing cause and responsibility thereof in an amount in excess of the minimum jurisdictional limits of this Court, including but not limited to attorneys fees under the contract.

# VI.
## PREJUDGMENT/POST-JUDGMENT INTEREST

Plaintiff would further show the Court that many of its damages may be determined by known standards of value and accepted rules of interest as damages from the date of loss and/or the date such damages can be determined prior to judgment, or as the Court otherwise directs, calculated at the legal rate, or as otherwise set by law.

---

[1] By attaching these documents as Exhibits 1 and 3 Plaintiff does not waive any defenses to claims raised or to be raised by Defendants with respect to any allegation made by Defendants/Counterclaimants regarding these documents.

# VII.
## ALTERNATIVE PLEADING

Plaintiff incorporates by reference and re-alleges all preceding sections of this Petition and would further show that all pleadings herein, if deemed inconsistent, are made and should be construed in accordance with Rule 48 of the TEXAS RULES OF CIVIL PROCEDURE.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that upon final trial hereof, Plaintiff recovers judgment against the Defendants for the following:

1. Judgment against Defendants for actual damages including attorneys' fees;

2. Pre-judgment interest;

3. Post-judgment interest;

4. Court costs; and

5. Such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled, both in law and in equity.

Respectfully submitted,

EVAN LANE (VAN) SHAW
State Bar No. 18140500
JANET R. RANDLE
State Bar No. 00792216
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF

# NEW HOME CONTRACT
### (Completed Construction)
NOTICE: Not For Use For Condominium Transactions or Closings Prior to Completion of Construction

1. **PARTIES:** _____ **VSDH Vaquero Venture Ltd** _____ (Seller)
   agrees to sell and convey to **Kenneth P. Gross and Betsy L. Gross** _____
   _____ (Buyer) and Buyer agrees to buy from Seller the Property described below.

2. **PROPERTY:** Lot ____**11**____ , Block ____**F**____ , _____ **Vaquero Residential** _____
   Addition, City of _____**Westlake**_____ , County of _____**Tarrant**_____ , Texas, known as
   **2004 White Wing Cove** _____ **76262** (address/zip code), or as described on
   attached exhibit, together with: (i) improvements, fixtures and all other property located thereon; and (ii) all rights,
   privileges and appurtenances thereto, including but not limited to: permits, easements, and cooperative and
   association memberships. All property sold by this contract is called the "Property".

3. **SALES PRICE:**
   A. Cash portion of Sales Price payable by Buyer at closing ........................................ $ __**2,851,871.00**__
   B. Sum of all financing described below (excluding any loan funding fee
      or mortgage insurance premium) ........................................................................ $ _____
   C. Sales Price (Sum of A and B) ................................................................................ $ __**2,851,871.00**__

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)
   ☐ A. **THIRD PARTY FINANCING:** One or more third party mortgage loans in the total amount of
      $ _____ (excluding any loan funding fee or mortgage insurance premium).
      (1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s),
          this contract will terminate and the earnest money will be refunded to Buyer.
      (2) Financing Approval: (Check one box only)
          ☐ (a) This contract is subject to Buyer being approved for the financing described in the attached Third
             Party Financing Condition Addendum.
          ☐ (b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA
             financing.
   ☐ B. **ASSUMPTION:** The assumption of the unpaid principal balance of one or more promissory notes described in
      the attached TREC Loan Assumption Addendum.
   ☐ C. **SELLER FINANCING:** A promissory note from Buyer to Seller of $ _____ ,
      secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached
      TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller
      with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by both parties, Buyer shall deposit $ **50,000.00** ____
   as earnest money with _____**Chicago Title Company**_____ , as escrow agent, at
   _____ **6688 N. Central #560, Dallas, TX 75206** _____
   (address). Buyer shall deposit additional earnest money of $ _____ with escrow agent within
   _____ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by
   this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**
   A. **TITLE POLICY:** Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title
      insurance (Title Policy) issued by **Chicago Title Company** _____
      _____ (Title Company) in the amount of
      the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy,
      subject to the promulgated exclusions (including existing building and zoning ordinances) and the following
      exceptions:
      (1) Restrictive covenants common to the platted subdivision in which the Property is located.
      (2) The standard printed exception for standby fees, taxes and assessments.
      (3) Liens created as part of the financing described in Paragraph 4.
      (4) Utility easements created by the dedication deed or plat of the subdivision in which the Property is located.
      (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
      (6) The standard printed exception as to marital rights.
      (7) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
      (8) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines,
          encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the
          exception amended to read, "shortages in area".
   B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to
      Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive

Initialed for Identification by Buyer ____ ____ and Seller ____          TREC NO. 24-6
(TAR-1604) 2-13-06                                                         Page 1 of 9
Vaquero Residential Realty 1405 Fountain Grass Ct., Westlake TX 76262     Phone: 8174306600     Fax: 817-430-6601     VSDH Vaquero V
Vaquero Residential Realty, LL          Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

**EXHIBIT**

Contract Concerning           **2004 White Wing Cove**
                                 **Westlake, TX 76262**                     Page 2 of 9   02-13-06
                                       (Address of Property)

covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier.

C. SURVEY: The survey must be made by a registered professional land surveyor acceptable to the Title Company and any lender. (Check one box only)

☒ (1) Within _____7_____ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (Affidavit). If the existing survey or Affidavit is not acceptable to Title Company or Buyer's lender, Buyer shall obtain a new survey at ☐ Seller's ☒ Buyer's expense no later than 3 days prior to Closing Date. If Seller fails to furnish the existing survey or Affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.

☐ (2) Within _____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.

☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense, shall furnish a new survey to Buyer.

D. OBJECTIONS: Buyer may object in writing to defects, exceptions, or encumbrances to title: disclosed on the survey other than items 6A(1) through (7) above; disclosed in the Commitment other than items 6A(1) through (8) above; or which prohibit the following use or activity: _____

Buyer must object not later than (i) the Closing Date or (ii) _____7_____ days after Buyer receives the Commitment, Exception Documents, and the survey, whichever is earlier. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. TITLE NOTICES:

(1) ABSTRACT OR TITLE POLICY: Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) MANDATORY OWNERS' ASSOCIATION MEMBERSHIP: The Property ☒ is ☐ is not subject to mandatory membership in an owners' association. If the Property is subject to mandatory membership in an owners' association, Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community in which the Property is located, you are obligated to be a member of the owners' association. Restrictive covenants governing the use and occupancy of the Property and a dedicatory instrument governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instrument may be obtained from the county clerk. You are obligated to pay assessments to the owners' association. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property. If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in an Owner's Association should be used.

(3) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) TIDE WATERS: If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(5) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

Initialed for identification by Buyer _____ _____ and Seller _____        TREC NO. 24-6
(TAR-1604) 2-13-06                                                 Page 2 of 9

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.ziplorm.com         VSDH Vaquero V

(6) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

7. **PROPERTY CONDITION:**
   A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller shall pay for turning on existing utilities for inspections.
   B. ACCEPTANCE OF PROPERTY CONDITION: Buyer accepts the Property in its present condition; provided Seller, at Seller's expense, shall complete the following specific repairs and treatments; and make the following improvements: <u>All items written on inspection report as non-functional; seller will repair.</u>
   C. WARRANTIES: Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties. Seller shall assign to Buyer at closing all assignable manufacturer warranties.
   D. INSULATION: As required by Federal Trade Commission Regulations, the information relating to the insulation installed or to be installed in the improvements at the Property is: (check only one box below)
      ☐ (1) as shown in the attached specifications.
      ☐ (2) as follows:
         a) Exterior walls of improved living areas: insulated with _____ Insulation to a thickness of _____ inches which yields an R-Value of _____ .
         b) Walls in other areas of the home: insulated with _____ Insulation to a thickness of _____ inches which yields an R-Value of _____ .
         c) Ceilings in improved living areas: insulated with _____ Insulation to a thickness of _____ inches which yields an R-Value of _____ .
         d) Floors of improved living areas not applied to a slab foundation: insulated with insulation to a thickness of _____ inches which yields an R-Value of _____ .
         e) Other insulated areas: insulated with _____ insulation to a thickness of _____ inches which yields an R-Value of _____ .
      All stated R-Values are based on information provided by the manufacturer of the insulation.
   E. LENDER REQUIRED REPAIRS AND TREATMENTS: Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.
   F. COMPLETION OF REPAIRS, TREATMENTS, AND IMPROVEMENTS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs, treatments, and improvements (Work) prior to the Closing Date. All required permits must be obtained, and Work must be performed by persons who are licensed or otherwise authorized by law to provide such Work. At Buyer's election, any transferable warranties received by Seller with respect to the Work will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed Work prior to the Closing Date, Buyer may do so and receive reimbursement from Seller at closing. The Closing Date will be extended up to 15 days, if necessary, to complete Work.

Initialed for identification by Buyer _____ _____ and Seller _____ _____          TREC NO. 24-6
(TAR-1604) 2-13-06                                                                          Page 3 of 9
Produced with ZipForm™ by RE FormsNet, LLC 18026 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com          VSDH Vaquero V

G. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

H. SELLER'S DISCLOSURE: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:

(1) any flooding of the Property which has had a material adverse effect on the use of the Property;

(2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;

(3) any environmental hazards or conditions materially affecting the Property;

(4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;

(5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or

(6) any threatened or endangered species or their habitat affecting the Property.

I. RESIDENTIAL SERVICE CONTRACTS: Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $_____ . Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:**

A. The closing of the sale will be on or before _____ June 12 _____, 2007 ___, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.

B. At closing:

(1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.

(2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.

(3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents required of them by this contract, the Commitment or law necessary for the closing of the sale and the issuance of the Title Policy.

C. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

D. All covenants, representations and warranties in this contract survive closing.

10. **POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☒ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. **Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.**

11. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)

4) See Addendum "A" and Addendum "B"

5) Not withstanding anything contained herein, the Buyer's Earnest Money is non refundable at 5:00 pm CST, on Monday, June 4, 2007.

Initialed for Identification by Buyer ___ KG ___ and Seller ___
(TAR-1604) 2-13-06
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

TREC NO. 24-6
Page 4 of 9
VSDH Vaquero V

**12. SETTLEMENT AND OTHER EXPENSES:**

A. The following expenses must be paid at or prior to closing:

(1) Expenses payable by Seller (Seller's Expenses):

(a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.

(b) Seller shall also pay an amount not to exceed $ __—0—__ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Housing Assistance Program or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.

(2) Expenses payable by Buyer (Buyer's Expenses):

(a) Loan origination, discount, buy-down, and commitment fees (Loan Fees).

(b) Appraisal fees; loan application fees; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; mortgagee title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; and other expenses payable by Buyer under this contract.

B. Buyer shall pay Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender.

C. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Housing Assistance Program or other governmental loan program regulations.

**13. PRORATIONS AND ROLLBACK TAXES:**

A. PRORATIONS: Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.

B. ROLLBACK TAXES: If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property results in additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may ~~(a)~~ terminate this contract and the earnest money will be refunded to Buyer ~~(b)~~ extend the time for performance up to 15 days and the Closing Date will be extended as necessary or ~~(c)~~ accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. ~~If, due to factors~~ beyond Seller's control, Seller fails within the time allowed to ~~make any non-casualty repairs~~ or deliver the Commitment, or survey, ~~if required of Seller,~~ Buyer may (a) extend the time for performance up to 15 days and the Closing ~~Date will be~~ extended as necessary or (b) terminate this contract as the sole remedy and receive the ~~earnest money~~. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, ~~seek such other relief as may be provided by law, or both,~~ or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

**16. MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Subject to applicable law, any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☒ will ☐ will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

*[handwritten margin note: Is its sole and exclusive remedys either]*

**17. ATTORNEY'S FEES:** The prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding incurred by the prevailing party.

**18. ESCROW:**

A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may require payment of unpaid expenses incurred on behalf of the parties and a written release of liability of escrow agent from all parties.

C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages of three times the amount of the earnest money.

E. NOTICES: Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** Seller represents that as of the Closing Date there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

| To Buyer at: | To Seller at: |
|---|---|
| 1430 Eagle Bend Drive | 5305 Village Creek |
| Southlake, TX 76092 | Plano, TX 75093 |
| | |
| Telephone: (817) 421-4834 | Telephone: (972) 732-1155 |
| Facsimile: | Facsimile: 972-732-4644 |
| E-mail: | E-mail: chickole@marquisgroup.Net |

Initialed for Identification by Buyer _____ _____ and Seller _____

**22. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☐ Third Party Financing Condition Addendum

☐ Seller Financing Addendum

☒ Addendum for Property Subject to Mandatory Membership in an Owners' Association

☐ Buyer's Temporary Residential Lease

☐ Addendum for Sale of Other Property by Buyer

☐ Addendum for "Back-Up" Contract

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Addendum for Coastal Area Property

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☒ Other (list): __Addendum "A" &__
__Addendum "B"__

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $ ___N/A___ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _N/A_ days after the effective date of this contract. If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐ will ☐ will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** Real estate licensees cannot give legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's
Attorney is: ___MACK ZIMMERMAN___

Telephone: ___817-845-1241___

Facsimile: _____

E-mail: _____

Seller's
Attorney is: ___Leonard A (Hap) Stern, II___
___4678 N. Central Expwy., Suite 550___
___Dallas, TX 75206___

Telephone: ___214-739-0604___

Facsimile: ___214-739-0608___

E-mail: ___hstern@ssflaw.com___

Initialed for Identification by Buyer _____ _____ and Seller _____
(TAR-1604) 2-13-06
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

TREC NO. 24-6
Page 7 of 9
VSDH Vaquero V

EXECUTED the _____ day of _____ , _____ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

This contract is subject to Chapter 27 of the Texas Property Code. The provisions of that chapter may affect your right to recover damages arising from the performance of this contract. If you have a complaint concerning a construction defect arising from the performance of this contract and that defect has not been corrected through normal warranty service, you must provide the notice required by Chapter 27 of the Texas Property Code to the contractor by certified mail, return receipt requested, not later than the 60th day before the date you file suit to recover damages in a court of law or initiate arbitration. The notice must refer to Chapter 27 of the Texas Property Code and must describe the construction defect. If requested by the contractor, you must provide the contractor an opportunity to inspect and cure the defect as provided by Section 27.004 of the Texas Property Code.

Buyer Kenneth P. Gross

Buyer Betsy L. Gross

Seller VSDH Vaquero Venture Ltd.
VSDH Hmes, Inc-GP

Seller

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 24-6. This form replaces TREC NO. 24-5.

## BROKER INFORMATION AND RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker _____**N/A**_____ of the total sales price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

| | | | |
|---|---|---|---|
| Other Broker | License No. | Vaquero Residential Realty, LLC — Listing Broker | 0298573 — License No. |

represents  ☐ Buyer only as Buyer's agent
☐ Seller as Listing Broker's subagent

represents  ☒ Seller and Buyer as an intermediary
☐ Seller only as Seller's agent

| | | | |
|---|---|---|---|
| Associate | Telephone | Listing Associate | **(817) 430-6600** Telephone |

Broker's Address — **1405 Fountain Grass Court** Listing Associate's Office Address — **(817) 430-6601** Facsimile

| | | | | | |
|---|---|---|---|---|---|
| City | State | Zip | **Westlake** City | **TX** State | **76262** Zip |

Facsimile — Email Address

Email Address — Selling Associate — Telephone

Selling Associate's Office Address — Facsimile

City — State — Zip

Email Address

## OPTION FEE RECEIPT

Receipt of $ _____ (Option Fee) in the form of _____ is acknowledged.

Seller or Listing Broker — Date

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☒ Contract and ☒ $ _50,000 --_ Earnest Money in the form of _check_
is acknowledged.
Escrow Agent: _Chicago Title_    Date: _6/4/07_

By: _[signature]_
_6688 N Central #500_    Email Address _GSOMMER...@SOMMER...LAW.COM_
Telephone: _214-361-6771_
Address _Dallas_    _TX_    _75206_    Facsimile: _214-361-4169_
City    State    Zip



# SUBDIVISION INFORMATION, INCLUDING
# RESALE CERTIFICATE FOR PROPERTY SUBJECT TO MANDATORY
# MEMBERSHIP IN AN OWNERS' ASSOCIATION
### (Section 207.003, Texas Property Code)

### (NOT FOR USE WITH CONDOMINIUMS)

Resale Certificate concerning the Property (Including any common areas assigned to the Property) located at _____ 2004 White Wing Cove _____ (Street Address), City of _____ Westlake _____ , County of _____ Tarrant _____ , Texas, prepared by the property owners' association (the Owners' Association).

A. The Property ☐ is ☐ is not subject to a right of first refusal or other restraint contained in the restrictions or restrictive covenants that restricts the owner's right to transfer the owner's property.

B. The current regular assessment for the Property is $ 1,581.00 _____ per _____ Semi-annually _____ .

C. A special assessment for the Property due after the date the resale certificate was prepared is $ _____ payable as follows _____ .

D. The total of all amounts due and unpaid to the Owners' Association that are attributable to the Property is $ _____ .

E. The capital expenditures approved by the Owners' Association for its current fiscal year are $ _____ .

F. The amount of reserves for capital expenditures is $ _____ .

G. Unsatisfied judgments against the Owners' Association total $ _____ .

H. There ☐ are ☐ are not any suits pending against the Owners' Association. The style and cause number of each pending suit is: _____
_____
_____ .

I. The Owners' Association's board ☐ has actual knowledge ☐ has no actual knowledge of conditions on the Property In violation of the restrictions applying to the subdivision or the bylaws or rules of the Owners' Association. Known violations are: _____
_____
_____ .

J. The Owners' Association ☐ has ☐ has not received notice from any governmental authority regarding health or building code violations with respect to the Property or any common areas or common facilities owned or leased by the Owners' Association. A summary or copy of each notice is attached.

K. The Owners' Association fees resulting from the transfer of the Property are $ _____ . payable to _____ .

Initialed for identification by Buyer _____ and Seller _____                TREC NO. 37-2
(TAR-1923) 2-13-06                                                                Page 1 of 2

L. The Owners' Association's managing agent is __Diane Meyers, RTI Community Management Assoc,__
(Name of Agent)

__1500 N. Norwood Dr., Bldg C., Suite 300, Hurst, TX 76054__
(Mailing Address)

__(817) 215-7188__        __(817) 215-7153__
(Telephone Number)        (Fax Number)

M. The restrictions ☒ do ☐ do not allow foreclosure of the Owners' Association's lien on the Property for failure to pay assessments.

REQUIRED ATTACHMENTS:

1. Restrictions

2. Rules

3. Bylaws

4. Current Balance Sheet

5. Current Operating Budget

6. Certificate of Insurance concerning Property and Liability Insurance for Common Areas and Facilities

7. Any Governmental Notices of Health or Housing Code Violations

**NOTICE: This Subdivision Information may change at any time.**

__Vaquero Homeowner's Association__
Name of Owners' Association

By: _____

Title: _____

Mailing Address: _____

E-mail: _____

Date: _____

This form has been approved by the Texas Real Estate commission for use only with similarly approved or promulgated contract forms. No representation is made as to the legal validity or adequacy of any provision in any specific transaction. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 37-2. This form replaces TREC No. 37-1.

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com     VSDII Vaquero V



# ADDENDUM FOR PROPERTY SUBJECT TO
# MANDATORY MEMBERSHIP IN AN OWNERS' ASSOCIATION
## (NOT FOR USE WITH CONDOMINIUMS)
### ADDENDUM TO CONTRACT CONCERNING THE PROPERTY AT

__2004 White Wing Cove_____ __Westlake__
(Street Address and City)

_____Vaquero Homeowner's Association_____
(Name of Owners' Association)

**A. SUBDIVISION INFORMATION:** "Subdivision Information" means: (i) the restrictions applying to the subdivision, (II) the bylaws and rules of the Owners' Association, and (iii) a resale certificate, all of which were provided by the Owners' Association in compliance with Section 207.003 of the Texas Property Code.
(Check only one box):

☒ 1. ~~Within~~ ___7___ ~~days after the effective date of the contract, Seller shall at Seller's expense deliver~~ the Subdivision Information to Buyer. If Buyer, does not receive the ~~Subdivision Information~~, Buyer may terminate the contract at any time prior to closing and ~~the earnest money~~ will be refunded to Buyer. If Seller delivers the Subdivision ~~Information, Buyer may~~ terminate the contract for any reason within 7 days after Buyer ~~receives the Subdivision~~ Information or prior to closing, whichever first occurs, and the earnest ~~money will be refunded to Buyer.~~

☒ 2. Buyer has received and approved the Subdivision Information before signing the contract.

☐ 3. Buyer does not require delivery of the Subdivision Information.

If Seller becomes aware of any material changes in the Subdivision Information, Seller shall immediately give notice to Buyer. Buyer may terminate the contract prior to closing by giving written notice to Seller if: (i) any of the Subdivision Information provided was not true; or (ii) any material adverse change in the Subdivision Information occurs prior to closing, and the earnest money will be refunded to Buyer.

**B. FEES:** Buyer shall pay any Owners' Association fees resulting from the transfer of the Property, ~~not to exceed~~ $ ~~$945.99~~ ~~and Seller shall pay any excess~~.

**NOTICE TO BUYER REGARDING REPAIRS BY THE OWNERS' ASSOCIATION:** The Owners' Association may have the sole responsibility to make certain repairs to the Property. If you are concerned about the condition of any part of the Property which the Owners' Association is required to repair, you should not sign the contract unless you are satisfied that the Owners' Association will make the desired repairs.


_Kenneth G Gross_____        _____ -V.P._
Buyer Kenneth P. Gross               Seller VSDH Vaquero Venture Ltd.
                                        VSDH Homes, Inc - GP

_Betsy L Gross_____        _____
Buyer Betsy L. Gross                   Seller

The form of this addendum has been approved by the Texas Real Estate Commission for use only with similarly approved or promulgated forms of contracts. Such approval relates to this contract form only. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 36-4. This form replaces TREC No. 36-3.

Vaquero Residential Realty 1405 Fountain Grass Ct., Westlake TX 76262
Phone: 8174306600       Fax: 817-430-6601       Vaquero Residential Realty, LL           VSDH Vaquero V
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

<u>ADDENDUM A</u>

1.  BUY BACK OPTION: VSDH Vaquero Venture Ltd. (VSDH), as Seller, hereby grants to Kenneth P. and Betsy L. Gross (Gross), as Buyer, of 2004 White Wing Cove in Vaquero subdivision, Westlake, Texas (the Property) the option (the "Buy Back Option") to put the Property to Seller (i.e., require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller, in writing (the "Buy Back Date"), subject to the following terms and conditions:

    (a) DECLARATION DATE: On or before May 1, 2009, (the "Declaration Date"), Buyer must exercise the Buy Back Option by delivering written notice thereof to Seller (the "Buy Back Option Notice"). If, for any reason, Seller has not received the Buy Back Option Notice, on or before 5:00, local time in Dallas/Fort Worth, Texas, on the Declaration Date, then Buyer shall have waived the Buy Back Option and same shall be null avoid.

    (b) BUYER EXERCISES THE BUY BACK OPTION: If Buyer timely and properly exercises the Buy Back Option, then the following shall apply: (i) Buyer may not sell or convey any right, title or interest in and to the Property to any third party unless Seller breaches its obligation to repurchase the Property pursuant to the Buy Back Option due to no fault of Buyer; (ii) Seller may commence marketing the Property for sale on May 2, 2009, and Buyer agrees to fully cooperate with all marketing efforts of Seller; and (iii) on or before September 1, 2009, unless Buyer and Seller agree upon another stated date in writing, Buyer shall vacate the Property and deliver full possession thereof to Seller, and the Property shall be in the same condition as existed on the original Closing Date, plus any Seller approved improvements, less reasonable wear and tear, with all mechanical, electrical, plumbing and other systems and components in good working order and in a "broom-clean" condition. Prior to the Declaration Date, the Buyer can enter into a contract to the sell the Property and will be entitled to all proceeds from such sale. Should the Buyer enter into a contract to sell the property, the Buy Back Option will immediately terminate and will no longer be available to Buyer. If, however, Buyer timely and properly elects to invoke the Buy Back Option and the closing of the repurchase takes place, then Buyer waives and relinquishes any and all claims they may have to any proceeds from the subsequent sale of the Property by Seller, and Buyer shall not be liable for any loss incurred by Seller from the subsequent sale of the Property.

    (c) CASUALTY: If the Property is damaged by fire or other casualty the cost of which to repair is equal to or greater than $100,00.00, then, ~~Seller may, at its option, elect to either (i) declare~~ the Buy-Back Option null and void, becomes

If the cost to repair is less than $100,000, then Buyer shall, at Buyer's sole cost and expense, repair and restore the home to its prior condition in order for Buyer to have the right to exercise the repurchase option. If Buyer fails to timely and properly repair and restore the Property prior to Buy Back option date, then Seller may terminate the Buy Back Option.

2.  BUYER"S IMPROVEMENTS: Before commencing construction, Buyer will review with Seller the plans and specification and receive general consent (consent not to be unreasonably withheld) to proceed with the improvements. Buyer will periodically (on a reasonable basis) update Seller regarding progress and timelines on completing the improvements. Seller understands that Buyer has the right to make minor changes and decisions during the process of completing the improvements provided they are in the best interest of completing the improvements in the most logical and reasonable manner. Buyer will also complete the improvements (i) in a good workmanlike manner, free from material defects, (ii) in accordance with all laws, ordinances, statutes, rules, regulations and any and all restrictions and other matters of record applicable thereto; and (iii) free of any liens or claims of any kind or character, and Buyer shall absolutely and unconditionally save, defend, or indemnify and hold harmless Seller from and against any and all reasonable attorney's fees and disbursements and all damages which may arise by reason of Buyer's performance of any work thereto or Buyer's failure to do as required hereby or the Escrow Agreement (hereinafter defined).

3.  ESCROW AGREEMENT: The attached Addendum B is a spreadsheet of improvements and costs proposed by the Buyer to be made to the Property. A total of $156,871.00 of these improvements has been incorporated into the $2,851,871.00 Sales Price. Buyer agrees to escrow funds totaling $156,871.00 with the Title Company and enter into an Escrow Agreement (herein so called), acceptable to Seller and Buyer, that outlines the proposed improvements to the property and the disbursement of such funds. Buyer accepts risk of any improvement cost overruns in excess of $156,871.00, however, if improvements costs do not exceed the $156,871.00 allocated budget, Buyer may use the remaining funds and apply to other improvements not specified in Addendum B.

4.  Douh Hickok and Van Shaw as partners in VSDH Vaquero Venture Lts. Each hereby personally guaranty Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to perform fully under the terms of the Buy Back Option, each of its partners set forth herin above shall be personally responsible, jointly and severally, to perform the obligations of VSDH under the Buy Back Option.

Page 2 of 3

5.  Buyer reserves the right to cancel Buy Back Option after the declaration date provided that Seller has not entered into a purchase contract with a third party on 2004 White Wing.

In addition, in paragraph 15 in the body of the contract under DEFAULT, Seller reinstates language stricken "seek such other relief as may be provided by law, or both:"

**ADDENDUM B**

**2004 White Wing - 1092 Sq Ft Addition - Casita w/ FR, Bedroom, Shared Pool Bath**

| Prep Work - Misc | Unit | $ | Addition | Other | Buyer Option |
|---|---|---|---|---|---|
| Sprinkler - Rework | 1 | 1500 | 1,500 | | |
| Move Pool Equipment | 1 | 2000 | 2,000 | | |
| Bench & Prep Lot | 1 | 1750 | 1,750 | | |
| Architect | 1 | 800 | 800 | | |
| Engineeer | 1 | 500 | 500 | | |
| Permit | 1 | 1500 | 1,500 | | |
| Trash Haul | 1 | 1000 | 1,000 | | |
| **Concrete** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Slab | 546 | 8 | 4,368 | | |
| Piers 8' x 24" | 19 | 200 | 3,800 | | |
| Step | 1 | 200 | 200 | | |
| Pump Truck - Estimate | 1 | 1500 | 1,500 | | |
| Front Patio | 156 | 3 | | 468 | |
| Back Patio to Pool | 522 | 3 | | 1,566 | |
| Pool to Casita | 390 | 3 | | 1,170 | |
| **Flagstone** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Flagstone Material & Labor - Rear Deck & Casita | 912 | 12 | | 10,944 | |
| **Framing** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Framing - Labor | 1 | 15000 | 15,000 | | |
| Framing - Material | 1092 | 10.0 | 10,920 | | |
| Framing - Material - Cedar Pergola | 1 | 2000 | | 2,000 | |
| **Roof** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Roof Material & Labor | 10.101 | 750 | 7,576 | | |
| **Windows & Doors** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Windows & Doors - Material & Labor | 1 | 5000 | 5,000 | | |
| **Gutters** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Gutters | 52 | 20 | 1,040 | | |
| Down Spouts | 30 | 20 | 600 | | |
| **Mechanicals** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Heat / A/C - Change Condenser & Handler | 1 | 7000 | 7,000 | | |
| Plumbing | 1 | 5000 | 5,000 | 1,000 | |
| Electrical | 1092 | 6 | 6,552 | | |
| Electrical - Additional Art Cans / Switches | 15 | 185 | | 2,775 | |
| Lightening Rods | 1 | 750 | 750 | | |

| A/V / Alarm / Door Bell / Intercom | 1 | 2000 | 2,000 | | |
|---|---|---|---|---|---|
| **Stone** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Stone Material (tons) | 25 | 145 | 3,625 | | |
| Stone Labor - Casita | 831 | 6 | 4,986 | | |
| Stone Labor - Wall-Off A/C | 72 | 6 | | 432 | |
| Stone Border Around Front Patio | 45 | 10 | | 450 | |
| Stone for Front Patio Gate - Material & Labor | 1 | 300 | | 300 | |
| **Insulation - Drywall** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Insulation | 1 | 1500 | 1,500 | | |
| Drywall - Hand Troweled | 1092 | 5 | 5,460 | | |
| **Trim** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Trim - Labor | 546 | 4 | 2,184 | | |
| Trim - Material | 546 | 5 | 2,730 | | |
| Build Over Fireplace - Labor | 1 | 1200 | | 1,200 | |
| Build Over Fireplace - Material | 1 | 1500 | | 1,500 | |
| **Cabinets** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| 14 Linear Feet in Great Room | 14 | 275 | | | 3,850 |
| 10 Linear Feet in Game Room | 10 | 250 | | 2,500 | |
| 10 Linear Feet in Casita | 10 | 250 | 2,500 | | |
| **Paint & Stain** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Paint & Stain - Addition & New Cabinets | 1092 | 6 | 6,552 | | |
| Paint - Master | 1 | 500 | | | 500 |
| Paint - Foyer | 1 | 600 | | | 600 |
| Paint - FR | 1 | 700 | | | 700 |
| Paint - Halls | 1 | 600 | | | 600 |
| Paint - Stairs | 1 | 300 | | | 300 |
| Paint - BR # 4 & Bath | 1 | 400 | | | 400 |
| Faux for Above Rooms | 1 | 3000 | | | 3,000 |
| **Tile & Flooring** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Wood - Casita Down | 486 | 8 | 3,888 | | |
| Slate - Pool Bath | 60 | 6 | 360 | | |
| Carpet - Casita Bedroom and Media | 546 | 5 | 2,730 | | |
| Pool Bath Shower | 1 | 1500 | 1,500 | | |
| **Allowances** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Plumbing Fixtures | 1 | 1500 | 1,500 | 1,000 | |
| Electrical Fixtures | 1 | 1000 | 1,000 | | |
| Appliances | 1 | 3000 | 3,000 | 1,500 | |

| Granite | 24 | 40 | 480 | 480 | |
|---|---|---|---|---|---|
| Shower Door | 1 | 500 | 500 | | |
| **Iron** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Iron Gate & Motor | 1 | 3500 | | | 3,500 |
| Iron Fence | 35 | 21 | | 735 | |
| Iron Gate for Front Patio | 1 | 275 | | | 275 |
| Iron Gate to A/C units | 1 | 275 | | | 275 |
| **Landscape** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Drains | 1 | 500 | 500 | | |
| Landscape | 1 | 1500 | 1,500 | | |
| | | | 126,851 | 30,020 | 14,000 |

Base Price   2,695,000
Addition   126,851
Remodel   30,020
Purchase Price   2,851,871

Purchase Price or Contract Price to be: 2,851,871
Seller to pay for improvements totaling: 156,871
Any improvments over 156,871 are at Buyer's expense
If improvmenets cost less than 156,871, Buyer wil be refunded the difference



## TEXAS ASSOCIATION OF REALTORS®
## INTERMEDIARY RELATIONSHIP NOTICE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2004

**To:** _____ VSDH Vaquero Venture Ltd. _____ **(Seller or Landlord)**

**and** _____ Kenneth P. Gross _é Betsy L. Gross_ **(Prospect)**

**From:** _____ **(Broker's Firm)**

**Re:** 2004 White Wing Cove
Westlake, TX 76262 _____ **(Property)**

**Date:** _____

A. Under this notice, "owner" means the seller or landlord of the Property and "prospect" means the above-named prospective buyer or tenant for the Property.

B. Broker's firm represents the owner under a listing agreement and also represents the prospect under a buyer/tenant representation agreement.

C. In the written listing agreement and the written buyer/tenant representation agreement, both the owner and the prospect previously authorized Broker to act as an intermediary if a prospect who Broker represents desires to buy or lease a property that is listed by the Broker. When the prospect makes an offer to purchase or lease the Property, Broker will act in accordance with the authorizations granted in the listing agreement and in the buyer/tenant representation agreement.

D. Broker ☐ will ☒ will not appoint licensed associates to communicate with, carry out instructions of, and provide opinions and advice during negotiations to each party. If Broker makes such appointments, Broker appoints:

_____ to the owner; and

_____ to the prospect.

E. By acknowledging receipt of this notice, the undersigned parties reaffirm their consent for broker to act as an intermediary.

F. Additional information: (Disclose material information related to Broker's relationship to the parties, such as personal relationships or prior or contemplated business relationships.)

The undersigned acknowledge receipt of this notice

_____     _____
Seller or Landlord                                   Date
**VSDH Vaquero Venture Ltd.**

_____     _____
Seller or Landlord                                   Date

_____     _____
Prospect                                               Date
**Kenneth P. Gross**

_____     _____
Prospect                                               Date
**Betsy L. Gross**

(TAR-1409) 1-7-04                                                      Page 1 of 1

## ADDENDUM A

I.  BUY BACK OPTION: VSDH Vaquero Venture Ltd. (VSDH), as Seller, hereby grants to Kenneth P. and Betsy L. Gross (Gross), as Buyer, of 2004 White Wing Cove in Vaquero subdivision, Westlake, Texas (the Property) the option (the "Buy Back Option") to put the Property to Seller (i.e., require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller, in writing (the "Buy Back Date"), subject to the following terms and conditions:·

   (a)· DECLARATION DATE: On or before May 1, 2009, (the "Declaration Date"), Buyer must exercise the Buy Back Option by delivering written notice thereof to Seller (the "Buy Back Option Notice"). If, for any reason, Seller has not received the Buy Back Option Notice, on or before 5:00, local time in Dallas/Fort Worth, Texas, on the Declaration Date, then Buyer shall have waived the Buy Back Option and same shall be null avoid.

   (b) BUYER EXERCISES THE BUY BACK OPTION: If Buyer timely and properly exercises the Buy Back Option, then the following shall apply: (i) Buyer may not sell or convey any right, title or interest in and to the Property to any third party unless Seller breaches its obligation to repurchase the Property pursuant to the Buy Back Option due to no fault of Buyer; (ii) Seller may commence marketing the Property for sale on May 2, 2009, and Buyer agrees to fully cooperate with all marketing efforts of Seller; and (iii) on or before September 1, 2009, unless Buyer and Seller agree upon another stated date in writing, Buyer shall vacate the Property and deliver full possession thereof to Seller, and the Property shall be in the same condition as existed on the original Closing Date, plus any Seller approved improvements, less reasonable wear and tear, with all mechanical, electrical, plumbing and other systems and components in good working order and in a "broom-clean" condition. Prior to the Declaration Date, the Buyer can enter into a contract to the sell the Property and will be entitled to all proceeds from such sale. Should the Buyer enter into a contract to sell the property, the Buy Back Option will immediately terminate and will no longer be available to Buyer. If, however, Buyer timely and properly elects to invoke the Buy Back Option and the closing of the repurchase takes place, then Buyer waives and ·relinquishes any and all claims they may have to any proceeds from the subsequent sale of the Property by Seller, and Buyer shall not be liable for any loss incurred by Seller from the subsequent sale of the Property.

   (c) CASUALTY: If the Property is damaged by fire or other casualty the cost of which to repair is equal to or greater than $100,00.00, then, ~~Seller may, at its option, elect to either (i) declare~~ the Buy-Back Option null and void,

C:\Documents and Settings\doug\Local Settings\Temporary Internet Files\OLK6A\Addendum A to Gross Contract v3 052307(SSPN).doc

If the cost to repair is less than $100,000, then Buyer shall, at Buyer's sole cost and expense, repair and restore the home to its prior condition in order for Buyer to have the right to exercise the repurchase option. If Buyer fails to timely and properly repair and restore the Property prior to Buy Back option date, then Seller may terminate the Buy Back Option.

2. BUYER"S IMPROVEMENTS: Before commencing construction, Buyer will review with Seller the plans and specification and receive general consent (consent not to be unreasonably withheld) to proceed with the improvements. Buyer will periodically (on a reasonable basis) update Seller regarding progress and timelines on completing the improvements. Seller understands that Buyer has the right to make minor changes and decisions during the process of completing the improvements provided they are in the best interest of completing the improvements in the most logical and reasonable manner. Buyer will also complete the improvements (i) in a good workmanlike manner, free from material defects, (ii) in accordance with all laws, ordinances, statutes, rules, regulations and any and all restrictions and other matters of record applicable thereto; and (iii) free of any liens or claims of any kind or character, and Buyer shall absolutely and unconditionally save, defend, or indemnify and hold harmless Seller from and against any and all reasonable attorney's fees and disbursements and all damages which may arise by reason of Buyer's performance of any work thereto or Buyer's failure to do as required hereby or the Escrow Agreement (hereinafter defined).

3. ESCROW AGREEMENT: The attached Addendum B is a spreadsheet of improvements and costs proposed by the Buyer to be made to the Property. A total of $156,871.00 of these improvements has been incorporated into the $2,851,871.00 Sales Price. Buyer agrees to escrow funds totaling $156,871.00 with the Title Company and enter into an Escrow Agreement (herein so called), acceptable to Seller and Buyer, that outlines the proposed improvements to the property and the disbursement of such funds. Buyer accepts risk of any improvement cost overruns in excess of $156,871.00, however, if improvements costs do not exceed the $156,871.00 allocated budget, Buyer may use the remaining funds and apply to other improvements not specified in Addendum B.

4. Douh Hickok and Van Shaw as partners in VSDH Vaquero Venture Lts. Each hereby personally guaranty Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to perform fully under the terms of the Buy Back Option, each of its partners set forth herin above shall be personally responsible, jointly and severally, to perform the obligations of VSDH under the Buy Back Option.

Page 2 of 3

5.     Buyer reserves the right to cancel Buy Back Option after the declaration date provided that Seller has not entered into a purchase contract with a third party on 2004 White Wing.

In addition, in paragraph 15 in the body of the contract under DEFAULT, Seller reinstates language stricken "seek such other relief as may be provided by law, or both;"

# FIRST AMENDMENT TO NEW HOME CONTRACT

THIS FIRST AMENDMENT TO NEW HOME CONTRACT (the "Amendment") is entered into by and between **VSDH VAQUERO VENTURE, LTD., a Texas limited partnership** (the "Seller"), and **KENNETH P. GROSS and BETSY L. GROSS** (collectively, the "Purchaser").

## WITNESSETH:

WHEREAS, Seller and Purchaser entered into that certain New Home Contract dated effective as of June 4, 2007 (the "Contract"), providing for the sale by Seller to Purchaser of a tract of land located at 2004 White Wing Cove, Westlake, Tarrant County, Texas (the "Property") and being more particularly described in the Contract; and

WHEREAS, Seller and Purchaser desire to amend the Contract as hereinafter set forth.

NOW, THEREFORE, based on these facts and in consideration of the mutual benefits to be obtained by this Amendment, Seller and Purchaser agree as follows:

1. Amending Provisions. The Contract is hereby amended as follows:

(a) Paragraph 9.A. of the Contract is hereby amended to provide that the date and time for the closing to be fully consummated and funded shall be extended to occur on or before noon on Friday, June 29, 2007 (the new "Closing Date"); provided, however, that as a Condition Precedent (herein so called) to such extension, Purchaser and Seller hereby agree that Purchaser shall deliver to the Title Company the following: (i) a fully executed copy of this Amendment; (ii) a or a wire transfer or cashier's check made payable to the Title Company, in the amount of Fifty Thousand and No/100 Dollars ($50,000.00), which shall be added to and comprise a portion of the earnest money being held under the Contract; (iii) a cashier's check made payable to Seller, or a wire transfer to the Title Company in care of Seller, in the amount of Eight Thousand, Five Hundred and No/100 Dollars ($8,500.00) as a non-refundable extension fee which shall not be credited toward the Sales Price (the "Extension Fee"). In addition, the Extension Fee shall be increased by Five Hundred and No/100 Dollars ($500.00) for each day after June 29th that passes until the closing is fully consummated and funded, and Purchaser shall pay same to Seller no later than at closing.

(b) Inasmuch as Purchaser was not ready, willing or able to consummate the closing as and when required by the Contract and Seller has already tendered full performance of its closing obligations, this Amendment constitutes an offer by Seller to extend the Closing Date, and if this Amendment is not fully executed and delivered by Purchaser to Seller and the Condition Precedent is not fully satisfied on or before 4:00 p.m. local time in Dallas, Texas on June 20, 2007, then the following shall automatically apply: (i) Seller's offer to extend the Closing Date shall be fully rescinded, (ii) Purchaser shall be in default under the Contract, (iii) Seller shall be deemed to have terminated the Contract and entitled to retain all of the earnest money on deposit with the Title Company, and (iv) Purchaser shall vacate the Property.

(c) There are no other amendments.

2. Consequence of Amendment. Nothing in this Amendment affects or modifies any of the provisions of the Contract, except as expressly provided herein. The Contract, as amended by this Amendment, will continue in full force and effect and is ratified and affirmed by Seller and Purchaser as if originally written as herein amended.

C:\Documents and Settings\doug\Local Settings\Temporary Internet Files\OLK6A\1st Amendment to Contract v2 061907(SSFN).doc

**EXHIBIT**

_2_

3.    Miscellaneous.

(a)    The section headings contained in this Amendment are for convenience of reference only and are not intended to delineate or limit the meaning of any provision of this Amendment or to be considered in construing or interpreting the provisions of this Amendment. Capitalized terms used in this Amendment which are not otherwise defined herein shall have the same meaning as given to them in the Contract.

(b)    This Amendment may be executed in any number of counterparts, separately or together, by Seller and Purchaser. If counterparts hereof are executed separately by Purchaser and Seller, when taken together, same will constitute one (1) original. If the same counterparts are executed by Purchaser and Seller, then each such counterpart shall constitute an original. Seller and/or Purchaser may execute and deliver this Amendment by telephone facsimile transmission, and the receiving party may rely fully thereon as an original.

(c)    This Amendment embodies the entire agreement and understanding between Purchaser and Seller with respect to its subject matter and supersedes all prior agreements and understandings, written or oral, between Purchaser and Seller related to that subject matter. This Amendment may be amended, waived or discharged only by an instrument in writing executed by the party against which enforcement of the amendment, waiver or discharge is sought.

(d)    The determination that any provision of this Amendment is invalid or unenforceable will not affect the validity or enforceability of the remaining provisions or of that provision under other circumstances. In the event of any determination of invalidity or unenforceability, this Amendment will be construed as if the invalid or unenforceable provision were not included in this Amendment.

EXECUTED as of (although not necessarily on) the 12th day of June, 2007.

**SELLER:**

VSDH VAQUERO VENTURE, LTD.,
a Texas limited partnership

By:    VSDH Homes, Inc.,
       a Texas corporation, its General Partner

By: _____
       Douglas M. Hickok, Vice President

EXECUTED as of (although not necessarily on) the 12th day of June, 2007.

PURCHASER:

_____
KENNETH P. GROSS

_____
BETSY L. GROSS

C:\Documents and Settings\doug\Local Settings\Temporary Internet Files\OLK6A\1st Amendment to Contract v2 061907(SSFN).doc

## ADDENDUM A

1. BUY BACK OPTION: VSDH Vaquero Venture Ltd. (VSDH), as Seller, hereby grants to Kenneth P. and Betsy L. Gross (Gross), as Buyer, of 2004 White Wing Cove in Vaquero subdivision, Westlake, Texas (the Property) the option (the "Buy Back Option") to put the Property to Seller (i.e., require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller, in writing (the "Buy Back Date"), subject to the following terms and conditions:

    (a) DECLARATION DATE: On or before May 1, 2009, (the "Declaration Date"), Buyer must exercise the Buy Back Option by delivering written notice thereof to Seller (the "Buy Back Option Notice"). If, for any reason, Seller has not received the Buy Back Option Notice, on or before 5:00, local time in Dallas/Fort Worth, Texas, on the Declaration Date, then Buyer shall have waived the Buy Back Option and same shall be null avoid.

    (b) BUYER EXERCISES THE BUY BACK OPTION: If Buyer timely and properly exercises the Buy Back Option, then the following shall apply: (i) Buyer may not sell or convey any right, title or interest in and to the Property to any third party unless Seller breaches its obligation to repurchase the Property pursuant to the Buy Back Option due to no fault of Buyer; (ii) Seller may commence marketing the Property for sale on May 2, 2009, and Buyer agrees to fully cooperate with all marketing efforts of Seller; and (iii) on or before September 1, 2009, unless Buyer and Seller agree upon another stated date in writing, Buyer shall vacate the Property and deliver full possession thereof to Seller, and the Property shall be in the same condition as existed on the original Closing Date, plus any Seller approved improvements, less reasonable wear and tear, with all mechanical, electrical, plumbing and other systems and components in good working order and in a "broom-clean" condition. Prior to the Declaration Date, the Buyer can enter into a contract to the sell the Property and will be entitled to all proceeds from such sale. Should the Buyer enter into a contract to sell the property, the Buy Back Option will immediately terminate and will no longer be available to Buyer. If, however, Buyer timely and properly elects to invoke the Buy Back Option and the closing of the repurchase takes place, then Buyer waives and relinquishes any and all claims they may have to any proceeds from the subsequent sale of the Property by Seller, and Buyer shall not be liable for any loss incurred by Seller from the subsequent sale of the Property.

    (c) CASUALTY: If the Property is damaged by fire or other casualty the cost of which to repair is equal to or greater than $100,00.00, then, ~~Seller may, at its option, elect to either (i) declare~~ the Buy-Back Option null and void,

Page 1 of 3

If the cost to repair is less than $100,000, then Buyer shall, at Buyer's sole cost and expense, repair and restore the home to its prior condition in order for Buyer to have the right to exercise the repurchase option. If Buyer fails to timely and properly repair and restore the Property prior to Buy Back option date, then Seller may terminate the Buy Back Option.

2. BUYER"S IMPROVEMENTS: Before commencing construction, Buyer will review with Seller the plans and specification and receive general consent (consent not to be unreasonably withheld) to proceed with the improvements. Buyer will periodically (on a reasonable basis) update Seller regarding progress and timelines on completing the improvements. Seller understands that Buyer has the right to make minor changes and decisions during the process of completing the improvements provided they are in the best interest of completing the improvements in the most logical and reasonable manner. Buyer will also complete the improvements (i) in a good workmanlike manner, free from material defects, (ii) in accordance with all laws, ordinances, statutes, rules, regulations and any and all restrictions and other matters of record applicable thereto; and (iii) free of any liens or claims of any kind or character, and Buyer shall absolutely and unconditionally save, defend, or indemnify and hold harmless Seller from and against any and all reasonable attorney's fees and disbursements and all damages which may arise by reason of Buyer's performance of any work thereto or Buyer's failure to do as required hereby or the Escrow Agreement (hereinafter defined).

3. ESCROW AGREEMENT: The attached Addendum B is a spreadsheet of improvements and costs proposed by the Buyer to be made to the Property. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Buyer agrees to escrow funds totaling $156,871.00 with the Title Company and enter into an Escrow Agreement (herein so called), acceptable to Seller and Buyer, that outlines the proposed improvements to the property and the disbursement of such funds. Buyer accepts risk of any improvement cost overruns in excess of $156,871.00, however, if improvements costs do not exceed the $156,871.00 allocated budget, Buyer may use the remaining funds and apply to other improvements not specified in Addendum B.

4. Douh Hickok and Van Shaw as partners in VSDH Vaquero Venture Lts. Each hereby personally guaranty Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to perform fully under the terms of the Buy Back Option, each of its partners set forth herin above shall be personally responsible, jointly and severally, to perform the obligations of VSDH under the Buy Back Option.

Page 2 of 3

| A/V / Alarm / Door Bell / Intercom | 1 | 2000 | 2,000 | | |
|---|---|---|---|---|---|
| **Stone** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Stone Material (tons) | 25 | 145 | 3,625 | | |
| Stone Labor - Casita | 831 | 6 | 4,986 | | |
| Stone Labor - Wall-Off A/C | 72 | 6 | | 432 | |
| Stone Border Around Front Patio | 45 | 10 | | 450 | |
| Stone for Front Patio Gate - Material & Labor | 1 | 300 | | 300 | |
| **Insulation - Drywall** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Insulation | 1 | 1500 | 1,500 | | |
| Drywall - Hand Troweled | 1092 | 5 | 5,460 | | |
| **Trim** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Trim - Labor | 546 | 4 | 2,184 | | |
| Trim - Material | 546 | 5 | 2,730 | | |
| Build Over Fireplace - Labor | 1 | 1200 | | 1,200 | |
| Build Over Fireplace - Material | 1 | 1500 | | 1,500 | |
| **Cabinets** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| 14 Linear Feet in Great Room | 14 | 275 | | | 3,850 |
| 10 Linear Feet in Game Room | 10 | 250 | | 2,500 | |
| 10 Linear Feet in Casita | 10 | 250 | 2,500 | | |
| **Paint & Stain** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Paint & Stain - Addition & New Cabinets | 1092 | 6 | 6,552 | | |
| Paint - Master | 1 | 500 | | | 500 |
| Paint - Foyer | 1 | 600 | | | 600 |
| Paint - FR | 1 | 700 | | | 700 |
| Paint - Halls | 1 | 600 | | | 600 |
| Paint - Stairs | 1 | 300 | | | 300 |
| Paint - BR # 4 & Bath | 1 | 400 | | | 400 |
| Faux for Above Rooms | 1 | 3000 | | | 3,000 |
| **Tile & Flooring** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Wood - Casita Down | 486 | 8 | 3,888 | | |
| Slate - Pool Bath | 60 | 6 | 360 | | |
| Carpet - Casita Bedroom and Media | 546 | 5 | 2,730 | | |
| Pool Bath Shower | 1 | 1500 | 1,500 | | |
| **Allowances** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Plumbing Fixtures | 1 | 1500 | 1,500 | 1,000 | |
| Electrical Fixtures | 1 | 1000 | 1,000 | | |
| Appliances | 1 | 3000 | 3,000 | 1,500 | |

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

VAN SHAW*
JANET R. RANDLE
----------
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT



DANIEL K. HAGOOD
OF COUNSEL
----------
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

April 30, 2010
**VIA HAND DELIVERY**
---Phone (214/653-7556)---

RE: Cause No. CC-09-05232-A;
VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross

Madam:

Enclosed via hand delivery is the following:

1) *Plaintiff's First-Amended Petition.*

Please file the same with the Court's records and return a file-marked copy to the undersigned.

By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Thank you for your assistance.

Yours very truly,

JANET R. RANDLE
Enclosure – hand delivery

cc: See attached Service List.

VS.ltr2Ct.Ans2Cclaim

## SERVICE LIST

Mr. R. Brent Cooper                  FAX (214/712-9540)
Ms. Jana Starling Reist              = PH (214/712-9500) =
COOPER & SCULLY                      brent.cooper@cooperscully.com
900 Jackson Street, Suite 100        jana.reist@cooperscully.com
Dallas, Texas 75202

      Attorney for Defendants Kenneth P. Gross and Betsy L. Gross

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Van Shaw represents Plaintiff VSDH VAQUERO VENTURE, LTD, Intervenor, DOUG HICKOK, Intervenor, VAN SHAW and Third-Party Defendants VSDH VAQUERO HOMES, INC. and VSDH HOMES, INC.

# TAB 8

VSDH VAQUERO VENTURE, LTD.,  §
    Plaintiffs/Counter-Defendant,  §
                      §
v.  §
                      §
KEN GROSS and BETSY GROSS  §
    Defendants/Counter-Plaintiffs,  §
                      §
v.  §
                      §
EVAN L. SHAW and DOUGLAS M.  §
HICKOK  §
    Intervenors/Counter-Defendants.  §
                      §

IN THE COUNTY COURT

AT LAW NUMBER 1

DALLAS COUNTY, TEXAS



---

**KEN GROSS' AND BETSY GROSS' SECOND AMENDED COUNTER-CLAIM AGAINST VSDH VAQUERO VENTURE, LTD., EVAN L. SHAW AND DOUGLAS M. HICKOK AND FIRST AMENDED THIRD-PARTY PETITION AGAINST VSDH VAQUERO HOMES, INC. AND VSDH HOMES, INC.**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Kenneth P. Gross and Betsy L. Gross, Defendants/Counter-Plaintiffs/Third-Party Plaintiffs (collectively referred to as "the Grosses"), and hereby files their Second Amended Petition Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickock (collectively referred to as "Counter-Defendants") and First Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (collectively referred to as "Third-Party Defendants"), and for such would respectfully show the Court as follows:

## I.
### DISCOVERY CONTROL PLAN

1.    The parties have entered into an Agreed Level 3 Discovery Control Plan pursuant to Tex. R. Civ. P. 190.4.

---

## II.
## PARTIES AND SERVICE

2. Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. is a Texas Limited Partnership who is represented by Evan L. Shaw in this action.

3. Defendant/Counter-Plaintiff/Third-Party Plaintiff Kenneth P. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

4. Defendant/Counter-Plaintiff/Third-Party Plaintiff Betsy L. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

5. Intervenor/Counter-Defendant Douglas M. Hickok ("Hickok") is a Texas resident who has appeared in this action and is represented by Evan L. Shaw in this action.

6. Intervenor/Counter-Defendant Evan L. Shaw ("Shaw") is a Texas resident who has appeared in this action and who is representing himself in this action.

7. Third-Party Defendant VSDH Vaquero Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

8. Third-Party Defendant VSDH Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its Registered Agent and President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

## III.
## JURISDICTION AND VENUE

9. The subject matter in controversy is within the jurisdiction limits of this Court. The Court has jurisdiction over VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. because they are Texas general partnerships.

10.     Venue is proper with regard to this third-party action under section 15.062 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, as the transaction giving rise to this third-party action arises out of the same transaction, occurrence, or series of actions or occurrences.

## IV.
## FACTS

11.     On or about June 4, 2006, the Grosses entered into a New Home Contract ("Contract"), promulgated by the Texas Real Estate Commission, with Counter-Defendants and Third-Party Defendants for the purchase of 2004 White Wing Cove, Westlake, Texas 76262 ("the Property"), in the amount of $2,851,871.00. (A copy of the Contract has been attached hereto as Exhibit "1," and is incorporate herein by reference for all pertinent purposes).

12.     The Grosses purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants agreed to enter into a "Buy Back Option" with the Grosses.

13.     According to paragraph 1 ("Buy Back Option") of Addendum A of the Contract, VSDH Vaquero Venture, Ltd. granted to the Grosses, as Buyers of the Property, the "the option . . . to put the Property to Seller [VSDH Vaquero Venture, Ltd.] (i.e. require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller . . . ." *See* Addendum A to Exhibit 1.

14.     Hickok and Shaw are limited partners of VSDH Vaquero Venture, Ltd. and participated and controlled Counter-Defendants and Third-Party Defendants sell of the Property to the Grosses and benefitted from the sell to the Grosses.

15.     Further, according to paragraph 4 of Addendum A, Hickok and Shaw both agreed to be personally responsible, jointly and severally, in the event VSDH Vaquero Venture, Ltd. does not fully perform under the terms of the Buy Back Option.

16.     Under the signature line of the Contract, VSDH Homes, Inc. is listed as the general partner of VSDH Vaquero Venture, Ltd. However, according to the Texas Secretary of State's office, VSDH Vaquero Homes, Inc. is listed as VSDH Vaquero Venture, Ltd.'s general partner.

17.     In accordance with the terms of the Buy Back Option, the Grosses exercised the Buy Back Option by delivering written notice to Shaw and Hickok before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants.

18.     However, Shaw and Hickok communicated to the Grosses that Counter-Defendants and Third-Party Defendants do not intend to buy the Property back and perform their contractual obligations as required under Addendum A to the Contract. Counter-Defendants and Third-Party Defendants failed to purchase the property back.

19.     The Grosses therefore seek construction of the Contract, including Addendum A, to determine whether or not Counter-Defendants and Third-Party Defendants breached the Contract by refusing and failing to buy the Property back from the Grosses pursuant to the Contract for the original sales price of $2,851.871.00.

20.     In an effort to mitigate their damages and avoid foreclosure of the home, the Grosses sold their home for $2,415,600.

## V.
## DECLARATORY JUDGMENT

21.     All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

22. This is an action for declaratory judgment pursuant to the Texas Declaratory Judgment Act, Ch. 37.001 et. seq. of the TEX. CIV. PRAC. & REM. CODE, for the purpose of determining an actionable and justiciable controversy between the parties, as hereinafter more fully appears. The controversy involves Counter-Defendants' and Third-Party Defendants' duty to perform their obligations arising under the "Buy Back Option," Addendum A, to the Contract.

23. Based upon the clear terms of Addendum A to the Contract (Exhibit 1), Counter-Defendants and Third-Party Defendants were obligated to buy the Property back from the Grosses pursuant to the terms of the Contract for the original sales price of $2,851.871.00.

24. Accordingly, the Grosses seek a declaration from this Court, as follows:

1. VSDH Vaquero Venture, Ltd. was obligated to buy the Property back from Kenneth P. Gross and Betsy L. Gross on or before September 1, 2009 for the original sales price of $2,851,871.00

2. In the event VSDH Vaquero Venture, Ltd. failed to timely buy the Property back from Kenneth P. Gross and Betsy L. Gross, Douglas M. Hickok and Evan L. Shaw were personally responsible, jointly and severally, to buy the Property back on or before September 1, 2009 for the original sales price of $2,851,871.00.

## VI.
## BREACH OF CONTRACT

25. All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

26. As stated above, the Grosses entered into a valid and enforceable contract with Counter-Defendants and Third-Party Defendants. *See* Exhibit 1. The Grosses have fulfilled all requirements, statutorily and in accordance with the terms of the Buy Back Option, by delivering written notice to Hickok and Shaw before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants. Counter-Defendants and Third-Party Defendants have materially breached the Contract in that they have repudiated the contract and

failed to proceed with the purchase of the Property. Counter-Defendants' and Third-Party Defendants' breach has proximately caused the Grosses' damages.

27. The Grosses request that a judgment be entered against Counter-Defendants and Third-Party Defendants for actual damages. As a direct and proximate result of Counter-Defendants' and Third-Party Defendants' failure to perform under the Contract, the Grosses have been damaged in an amount in excess of the jurisdictional limits of the Court, for which they seeks appropriate judicial relief.

## VII.
## FRAUD IN A REAL ESTATE TRANSACTION

28. All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

29. The Grosses will show that Counter-Defendants' and Third-Party Defendants' conduct constitutes fraud in a real estate transaction as defined by Section 27.01 of the TEXAS BUSINESS & COMMERCE CODE. Counter-Defendants' and Third-Party Defendants' made a false representation that they would buy the property back pursuant to the Buy Back Option in order to induce the Grosses to enter into the Contract. The Grosses entered into the Contract and purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants and Third-Party Defendants made the false representation that they would buy the property back pursuant to the "Buy Back Option." The Grosses' reliance directly and proximately caused them substantial injury, as set out above, for which they seek appropriate judicial relief.

### A. Attorneys' Fees

30. The Grosses have retained the law firm of Cooper & Scully, P.C. to represent them in this action and have agreed to pay the firm reasonable and necessary attorneys' fees.

31.     The Grosses are entitled to recover reasonable and necessary attorney fees that are equitable and just under TEXAS CIVIL PRACTICE & REMEDIES CODE § 38.001 because it is a suit for breach of a written contract, and under TEXAS BUSINESS & COMMERCE CODE §27.01(e) because this is an suit for statutory fraud. All conditions precedent to the collection of attorneys' fees have been satisfied.

## B.      Conditions Precedent

32.     All conditions precedent to the Grosses claims for relief have been performed or have occurred.

**WHEREFORE, PREMISES CONSIDERED**, Defendants Kenneth P. Gross and Betsy L. Gross pray that their counterclaims against VSDH Vaquero Venture, Ltd., Shaw and Hickok and third third-party claims against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. be granted; that upon final hearing of this matter, a declaratory judgment is entered as enumerated above; that the Grosses have and recover damages in an amount within the jurisdictional limits of this Court; pre- and post-judgment interest at the highest lawful rate; attorneys' fees and court costs; exemplary damages; and such other and further relief, whether special or general, to which the Grosses may show themselves justly entitled.

Respectfully submitted,

COOPER & SCULLY, P.C.

By: _____

      R. BRENT COOPER
      State Bar No. 04783250
      **JANA STARLING REIST**
      State Bar No. 24056890

Founders Square
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Facsimile: (214) 712-9540

**ATTORNEYS FOR DEFENDANTS**
**KEN GROSS AND BETSY GROSS**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded to all counsel of record herein, on this the 2ND day of June 2010 as follows:

Evan Lane (Van) Shaw *(via facsimile and CMRRR)*
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
*Attorney for Counter-Defendants*

_____
JANA S. REIST

1. **PARTIES:** _____ VSDH Vaquero Venture Ltd _____ (Seller)
   agrees to sell and convey to **Kenneth P. Gross and Betsy L. Gross**
   _____ (Buyer) and Buyer agrees to buy from Seller the Property described below.

2. **PROPERTY:** Lot __11__, Block __F__, __Vaquero Residential__
   Addition, City of __Westlake__, County of __Tarrant__, Texas, known as
   **2004 White Wing Cove** __76262__ (address/zip code), or as described on
   attached exhibit, together with: (i) improvements, fixtures and all other property located thereon; and (ii) all rights,
   privileges and appurtenances thereto, including but not limited to: permits, easements, and cooperative and
   association memberships. All property sold by this contract is called the "Property".    2,695,000.00

3. **SALES PRICE:**
   A. Cash portion of Sales Price payable by Buyer at closing ............................................ $ ~~2,851,871.00~~
   B. Sum of all financing described below (excluding any loan funding fee
      or mortgage insurance premium) ............................................................................ $ ~~2,695,000.00~~
   C. Sales Price (Sum of A and B) .................................................................................. $ ~~2,851,871.00~~

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)
   ☐ A. **THIRD PARTY FINANCING:** One or more third party mortgage loans in the total amount of
      $ _____ (excluding any loan funding fee or mortgage insurance premium).
      (1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s),
          this contract will terminate and the earnest money will be refunded to Buyer.
      (2) Financing Approval: (Check one box only)
          ☐ (a) This contract is subject to Buyer being approved for the financing described in the attached Third
               Party Financing Condition Addendum.
          ☐ (b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA
               financing.
   ☐ B. **ASSUMPTION:** The assumption of the unpaid principal balance of one or more promissory notes described in
      the attached TREC Loan Assumption Addendum.
   ☐ C. **SELLER FINANCING:** A promissory note from Buyer to Seller of $ _____,
      secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached
      TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller
      with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by both parties, Buyer shall deposit $50,000.00
   as earnest money with __Chicago Title Company__, as escrow agent, at
   __6688 N. Central #560, Dallas, TX 75206__
   (address). Buyer shall deposit additional earnest money of $ _____ with escrow agent within
   _____ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by
   this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**
   A. **TITLE POLICY:** Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title
      Insurance (Title Policy) issued by __Chicago Title Company__
      _____ (Title Company) in the amount of
      the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy,
      subject to the promulgated exclusions (including existing building and zoning ordinances) and the following
      exceptions:
      (1) Restrictive covenants common to the platted subdivision in which the Property is located.
      (2) The standard printed exception for standby fees, taxes and assessments.
      (3) Liens created as part of the financing described in Paragraph 4.
      (4) Utility easements created by the dedication deed or plat of the subdivision in which the Property is located.
      (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
      (6) The standard printed exception as to marital rights.
      (7) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
      (8) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines,
          encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the
          exception amended to read, "shortages in area".
   B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to
      Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive

Initialed for Identification by Buyer _____ _____ and Seller _____    TREC NO. 24-6
(TAR-1604) 2-13-06    Page 1 of 9
Vaquero Residential Realty 1405 Zoutsle Grass Ct, Westlake TX 76162    Phone: 8174305600    Fax: 817-430-6601    YSDH Vaquero V
Vaquero Residential Realty, LL    Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

EXHIBIT
1
tabbies'

covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier.

C. SURVEY: The survey must be made by a registered professional land surveyor acceptable to the Title Company and any lender. (Check one box only)

☒ (1) Within ___7___ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (Affidavit). If the existing survey or Affidavit is not acceptable to Title Company or Buyer's lender, Buyer shall obtain a new survey at ☐ Seller's ☒ Buyer's expense no later than 3 days prior to Closing Date. If Seller fails to furnish the existing survey or Affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.

☐ (2) Within _____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.

☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense, shall furnish a new survey to Buyer.

D. OBJECTIONS: Buyer may object in writing to defects, exceptions, or encumbrances to title: disclosed on the survey other than items 6A(1) through (7) above; disclosed in the Commitment other than items 6A(1) through (8) above; or which prohibit the following use or activity: _____

_____

Buyer must object not later than (i) the Closing Date or (ii) ___7___ days after Buyer receives the Commitment, Exception Documents, and the survey, whichever is earlier. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. TITLE NOTICES:

(1) ABSTRACT OR TITLE POLICY: Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) MANDATORY OWNERS' ASSOCIATION MEMBERSHIP: The Property ☒ is ☐ is not subject to mandatory membership in an owners' association. If the Property is subject to mandatory membership in an owners' association, Seller notifies Buyer under §5.012, Texas Property Code, that, as a purchaser of property in the residential community in which the Property is located, you are obligated to be a member of the owners' association. Restrictive covenants governing the use and occupancy of the Property and a dedicatory instrument governing the establishment, maintenance, and operation of this residential community have been or will be recorded in the Real Property Records of the county in which the Property is located. Copies of the restrictive covenants and dedicatory instrument may be obtained from the county clerk. You are obligated to pay assessments to the owners' association. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of the Property. If Buyer is concerned about these matters, the TREC promulgated Addendum for Property Subject to Mandatory Membership in an Owner's Association should be used.

(3) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(4) TIDE WATERS: If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(5) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

Initialed for Identification by Buyer ___ ___ and Seller ___ ___     TREC NO. 24-6
(TAR-1604) 2-13-06     Page 2 of 9

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com    VSDH Vaquero V

(6) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(7) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

7. PROPERTY CONDITION:
A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller shall pay for turning on existing utilities for inspections.

B. ACCEPTANCE OF PROPERTY CONDITION: Buyer accepts the Property in its present condition; provided Seller, at Seller's expense, shall complete the following specific repairs and treatments; and make the following improvements: All items written on inspection report as non-functional: seller will repair.

C. WARRANTIES: Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties. Seller shall assign to Buyer at closing all assignable manufacturer warranties.

D. INSULATION: As required by Federal Trade Commission Regulations, the information relating to the insulation installed or to be installed in the improvements at the Property is: (check only one box below)
☐ (1) as shown in the attached specifications.
☐ (2) as follows:
    a) Exterior walls of improved living areas: insulated with _____
    Insulation to a thickness of _____ inches which yields an R-Value of _____ .
    b) Walls in other areas of the home: insulated with _____
    Insulation to a thickness of _____ inches which yields an R-Value of _____ .
    c) Ceilings in improved living areas: insulated with _____
    Insulation to a thickness of _____ inches which yields an R-Value of _____ .
    d) Floors of improved living areas not applied to a slab foundation: insulated with insulation to a thickness of _____ inches which yields an R-Value of _____ .
    e) Other insulated areas: insulated with _____ insulation to a thickness of _____ inches which yields an R-Value of _____ .
All stated R-Values are based on information provided by the manufacturer of the insulation.

E. LENDER REQUIRED REPAIRS AND TREATMENTS: Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

F. COMPLETION OF REPAIRS, TREATMENTS, AND IMPROVEMENTS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs, treatments, and improvements (Work) prior to the Closing Date. All required permits must be obtained, and Work must be performed by persons who are licensed or otherwise authorized by law to provide such Work. At Buyer's election, any transferable warranties received by Seller with respect to the Work will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed Work prior to the Closing Date, Buyer may do so and receive reimbursement from Seller at closing. The Closing Date will be extended up to 15 days, if necessary, to complete Work.

Initialed for Identification by Buyer _____ and Seller _____     TREC NO. 24-6
(TAR-1604) 2-13-06     Page 3 of 9
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com     VSDH Vaquero V

G. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

H. SELLER'S DISCLOSURE: Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
(1) any flooding of the Property which has had a material adverse effect on the use of the Property;
(2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;
(3) any environmental hazards or conditions materially affecting the Property;
(4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;
(5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or
(6) any threatened or endangered species or their habitat affecting the Property.

I. RESIDENTIAL SERVICE CONTRACTS: Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $_____ . Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.

8. BROKERS' FEES: All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. CLOSING:
A. The closing of the sale will be on or before _____ June 12 _____, 2007 ___, or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.
B. At closing:
(1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6 and furnish tax statements or certificates showing no delinquent taxes on the Property.
(2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.
(3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents required of them by this contract, the Commitment or law necessary for the closing of the sale and the issuance of the Title Policy.
C. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.
D. All covenants, representations and warranties in this contract survive closing.

10. POSSESSION: Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☒ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.

11. SPECIAL PROVISIONS: (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)
A) See Addendum "A" and Addendum "B"

B) Not withstanding anything contained herein, the Buyer's Earnest Money is non refundable at 5:00pm CST, on Monday, June 4, 2007.

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com     VSDH Vaquero V

**12. SETTLEMENT AND OTHER EXPENSES:**

A. The following expenses must be paid at or prior to closing:

   (1) Expenses payable by Seller (Seller's Expenses):

     (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.

     (b) Seller shall also pay an amount not to exceed $ ____ 0 ____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Housing Assistance Program or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.

   (2) Expenses payable by Buyer (Buyer's Expenses):

     (a) Loan origination, discount, buy-down, and commitment fees (Loan Fees).

     (b) Appraisal fees; loan application fees; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; mortgagee title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan; and other expenses payable by Buyer under this contract.

B. Buyer shall pay Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender.

C. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Housing Assistance Program or other governmental loan program regulations.

**13. PRORATIONS AND ROLLBACK TAXES:**

A. PRORATIONS: Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.

B. ROLLBACK TAXES: If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property results in additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, ~~but in any event by the Closing Date. If Seller fails~~ to do so due to factors beyond Seller's control, Buyer may ~~(a)~~ terminate this contract and the earnest money will be refunded to Buyer ~~(b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c)~~ accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

**15. DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. ~~If due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, or survey, if required of Seller, Buyer may (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money.~~ If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, ~~seek such other relief as may be provided by law, or both,~~ or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

*[handwritten margin note: Ks its sole and exclusive remedy either]*

**16. MEDIATION:** It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Subject to applicable law, any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☒ will ☐ will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

**17. ATTORNEY'S FEES:** The prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding incurred by the prevailing party.

**18. ESCROW:**

A. **ESCROW:** The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. **EXPENSES:** At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may require payment of unpaid expenses incurred on behalf of the parties and a written release of liability of escrow agent from all parties.

C. **DEMAND:** Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. **DAMAGES:** Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages of three times the amount of the earnest money.

E. **NOTICES:** Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** Seller represents that as of the Closing Date there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

| To Buyer at: | To Seller at: |
|---|---|
| 1430 Eagle Bend Drive | 5305 Village Creek |
| Southlake, TX 76092 | Plano, TX 75093 |
| Telephone: (817) 421-4834 | Telephone: (972) 732-1155 |
| Facsimile: | Facsimile: 972-732-6644 |
| E-mail: | E-mail: _chickole@ marquisgroup.net_ |

Initialed for identification by Buyer _____ and Seller _____
(TAR-1604) 2-13-06

TREC NO. 24-6
Page 6 of 9
VSDH Vaquero V

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

22. **AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are  (check all applicable boxes):

☐ Third Party Financing Condition Addendum                ☐ Addendum for "Back-Up" Contract

☐ Seller Financing Addendum                                       ☐ Environmental Assessment, Threatened or
                                                                                    Endangered Species and Wetlands
                                                                                    Addendum

☒ Addendum for Property Subject to                           ☐ Addendum for Coastal Area Property
   Mandatory Membership in an Owners'
   Association

☐ Buyer's Temporary Residential Lease                       ☐ Addendum for Property Located Seaward of
                                                                                    the Gulf Intracoastal Waterway

☐ Addendum for Sale of Other Property by                   ☒ Other (list): ___Addendum "A" &___
   Buyer                                                                           ___Addendum "B"___

23. **TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $ ___N/A___ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within ___N/A___ days after the effective date of this contract. If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐ will ☐ will not be credited to the Sales Price at closing. Time is of the essence for this paragraph and strict compliance with the time for performance is required.

24. **CONSULT AN ATTORNEY:** Real estate licensees cannot give legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's
Attorney is: ___MACK ZIMMERMAN___

Seller's
Attorney is: ___Leonard A (Hap) Steen, II___
___4678 N. Central Expwy., Suite 570___
___Dallas, TX 75206___

Telephone: ___817-845-1241___

Telephone: ___214-739-0604___

Facsimile: _____

Facsimile: ___214-739-0607___

E-mail: _____

E-mail: ___hsteen@ssflaw.com___

Initialed for Identification by Buyer ___ and Seller ___

TREC NO. 24-6

p.2

8174311889

Jul 30 09 08:11a    Gross

EXECUTED the _____ day of _____ , _____ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

This contract is subject to Chapter 27 of the Texas Property Code. The provisions of that chapter may affect your right to recover damages arising from the performance of this contract. If you have a complaint concerning a construction defect arising from the performance of this contract and that defect has not been corrected through normal warranty service, you must provide the notice required by Chapter 27 of the Texas Property Code to the contractor by certified mail, return receipt requested, not later than the 60th day before the date you file suit to recover damages in a court of law or initiate arbitration. The notice must refer to Chapter 27 of the Texas Property Code and must describe the construction defect .If requested by the contractor, you must provide the contractor an opportunity to inspect and cure the defect as provided by Section 27.004 of the Texas Property Code.

Buyer Kenneth P. Gross

Buyer Betsy D. Gross

_____ -VP
Seller VSDH Vaquero Venture, Ltd.
YSDH Hma, Inc- GP

Seller

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 24-6. This form replaces TREC NO. 24-5.

p.3          8174311889          Gross          Jul 30 09 08:11a

2004 White Wing Cove
Westlake, TX 76262
(Address of Property)

## BROKER INFORMATION AND RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker _____ N/A _____ of the total sales price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

| Other Broker | License No. | Vaquero Residential Realty, LLC | 0298573 |
| --- | --- | --- | --- |
| | | Listing Broker | License No. |

represents   ☐ Buyer only as Buyer's agent
· ☐ Seller as Listing Broker's subagent

represents   ☒ Seller and Buyer as an intermediary
☐ Seller only as Seller's agent

| | | (817) 430-6500 |
| --- | --- | --- |
| Associate | Telephone | Listing Associate    Telephone |

1405 Fountain Grass
Court                          (817) 430-6601

| Broker's Address | | Listing Associate's Office Address    Facsimile |
| --- | --- | --- |

Westlake                          TX     75252

| City | State | Zip | City    State    Zip |
| --- | --- | --- | --- |

| Facsimile | Email Address |
| --- | --- |

| Email Address | Selling Associate    Telephone |
| --- | --- |

| | Selling Associate's Office Address    Facsimile |
| --- | --- |

| | City    State    Zip |
| --- | --- |

Email Address

## OPTION FEE RECEIPT

Receipt of $ _____ (Option Fee) in the form of _____ is acknowledged.

| Seller or Listing Broker | Date |
| --- | --- |

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☒ Contract and ☒ $ 50,000 — Earnest Money in the form of _check_ is acknowledged.
Escrow Agent: _Chicago Title_                          Date: 6/4/07

By: _Gerard Sommerfeld_                          GSOMMERFELD@SONMERFELD.COM
6688 N. Central #700                          Email Address
Address                                         Telephone: 214-361-6771
Dallas                    TX      75206        Facsimile: 214-361-4169
City                      State      Zip

# FIRST AMENDMENT TO NEW HOME CONTRACT

THIS FIRST AMENDMENT TO NEW HOME CONTRACT (the "Amendment") is entered into by and between **VSDH VAQUERO VENTURE, LTD.**, a Texas limited partnership (the "Seller"), and **KENNETH P. GROSS** and **BETSY L. GROSS** (collectively, the "Purchaser").

## WITNESSETH:

WHEREAS, Seller and Purchaser entered into that certain New Home Contract dated effective as of June 4, 2007 (the "Contract"), providing for the sale by Seller to Purchaser of a tract of land located at 2004 White Wing Cove, Westlake, Tarrant County, Texas (the "Property") and being more particularly described in the Contract; and

WHEREAS, Seller and Purchaser desire to amend the Contract as hereinafter set forth.

NOW, THEREFORE, based on these facts and in consideration of the mutual benefits to be obtained by this Amendment, Seller and Purchaser agree as follows:

1.    _Amending Provisions_. The Contract is hereby amended as follows:

(a)    Paragraph 9.A. of the Contract is hereby amended to provide that the date and time for the closing to be fully consummated and funded shall be extended to occur on or before noon on Friday, June 29, 2007 (the new "Closing Date"); provided, however, that as a Condition Precedent (herein so called) to such extension, Purchaser and Seller hereby agree that Purchaser shall deliver to the Title Company the following: (i) a fully executed copy of this Amendment; (ii) a or a wire transfer or cashier's check made payable to the Title Company, in the amount of Fifty Thousand and No/100 Dollars ($50,000.00), which shall be added to and comprise a portion of the earnest money being held under the Contract; (iii) a cashier's check made payable to Seller, or a wire transfer to the Title Company in care of Seller, in the amount of Eight Thousand, Five Hundred and No/100 Dollars ($8,500.00) as a non-refundable extension fee which shall not be credited toward the Sales Price (the "Extension Fee"). In addition, the Extension Fee shall be increased by Five Hundred and No/100 Dollars ($500.00) for each day after June 29th that passes until the closing is fully consummated and funded, and Purchaser shall pay same to Seller no later than at closing.

(b)    Inasmuch as Purchaser was not ready, willing or able to consummate the closing as and when required by the Contract and Seller has already tendered full performance of its closing obligations, this Amendment constitutes an offer by Seller to extend the Closing Date, and if this Amendment is not fully executed and delivered by Purchaser to Seller and the Condition Precedent is not fully satisfied on or before 4:00 p.m. local time in Dallas, Texas on June 20, 2007, then the following shall automatically apply: (i) Seller's offer to extend the Closing Date shall be fully rescinded, (ii) Purchaser shall be in default under the Contract, (iii) Seller shall be deemed to have terminated the Contract and entitled to retain all of the earnest money on deposit with the Title Company, and (iv) Purchaser shall vacate the Property.

(c)    There are no other amendments.

2.    _Consequence of Amendment_. Nothing in this Amendment affects or modifies any of the provisions of the Contract, except as expressly provided herein. The Contract, as amended by this Amendment, will continue in full force and effect and is ratified and affirmed by Seller and Purchaser as if originally written as herein amended.

3. Miscellaneous.

(a)    The section headings contained in this Amendment are for convenience of reference only and are not intended to delineate or limit the meaning of any provision of this Amendment or to be considered in construing or interpreting the provisions of this Amendment. Capitalized terms used in this Amendment which are not otherwise defined herein shall have the same meaning as given to them in the Contract.

(b)    This Amendment may be executed in any number of counterparts, separately or together, by Seller and Purchaser. If counterparts hereof are executed separately by Purchaser and Seller, when taken together, same will constitute one (1) original. If the same counterparts are executed by Purchaser and Seller, then each such counterpart shall constitute an original. Seller and/or Purchaser may execute and deliver this Amendment by telephone facsimile transmission, and the receiving party may rely fully thereon as an original.

(c)    This Amendment embodies the entire agreement and understanding between Purchaser and Seller with respect to its subject matter and supersedes all prior agreements and understandings, written or oral, between Purchaser and Seller related to that subject matter. This Amendment may be amended, waived or discharged only by an instrument in writing executed by the party against which enforcement of the amendment, waiver or discharge is sought.

(d)    The determination that any provision of this Amendment is invalid or unenforceable will not affect the validity or enforceability of the remaining provisions or of that provision under other circumstances. In the event of any determination of invalidity or unenforceability, this Amendment will be construed as if the invalid or unenforceable provision were not included in this Amendment.

EXECUTED as of (although not necessarily on) the 12th day of June, 2007.

SELLER:

VSDH VAQUERO VENTURE, LTD.,
a Texas limited partnership

By:    VSDH Homes, Inc.,
       a Texas corporation, its General Partner

By: _____
       Douglas M. Hickok, Vice President

Page 2 of 3

EXECUTED as of (although not necessarily on) the 12th day of June, 2007.

PURCHASER:

_____
KENNETH P. GROSS

_____
BETSY L. GROSS

C:\Documents and Settings\doug\Local Settings\Temporary Internet Files\OLK6A\1st Amendment to Contract v2 061907(SSFN).doc

<u>ADDENDUM A</u>

1. BUY BACK OPTION: VSDH Vaquero Venture Ltd. (VSDH), as Seller, hereby grants to Kenneth P. and Betsy L. Gross (Gross), as Buyer, of 2004 White Wing Cove in Vaquero subdivision, Westlake, Texas (the Property) the option (the "Buy Back Option") to put the Property to Seller (i.e., require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller, in writing (the "Buy Back Date"), subject to the following terms and conditions:·

   (a)· DECLARATION DATE: On or before May 1, 2009, (the "Declaration Date"), Buyer must exercise the Buy Back Option by delivering written notice thereof to Seller (the "Buy Back Option Notice"). If, for any reason, Seller has not received the Buy Back Option Notice, on or before 5:00, local time in Dallas/Fort Worth, Texas, on the Declaration Date, then Buyer shall have waived the Buy Back Option and same shall be null avoid.

   (b) BUYER EXERCISES THE BUY BACK OPTION: If Buyer timely and · properly exercises the Buy Back Option, then the following shall apply: (i) Buyer may·not sell or convey any right, title or interest in and to the . Property to any third party unless Seller breaches its obligation to repurchase the Property pursuant to the Buy Back Option due to no fault of Buyer; (ii) Seller may commence marketing the Property for sale on May 2, 2009, and Buyer agrees to fully cooperate with all marketing efforts of Seller; and (iii) on or before September 1, 2009, unless Buyer and Seller agree upon another stated date in writing, Buyer shall vacate the Property and deliver full possession thereof to Seller, and the Property shall be in the same condition as existed on the original Closing Date, plus any Seller approved improvements, less reasonable wear and tear, with all mechanical, electrical, plumbing and other systems and components in good working order and in a "broom-clean" condition. Prior to the Declaration Date, the Buyer can enter into a contract to the sell the Property and will be entitled to all proceeds from such sale. Should the Buyer enter into a contract to sell the property, the Buy Back Option will immediately terminate and will no longer be available to Buyer. If, however, Buyer timely and properly elects to invoke the Buy Back Option and the closing of the repurchase takes place, then Buyer waives and · relinquishes any and all claims they may have to any proceeds from the subsequent sale of the Property by Seller, and Buyer shall not be liable for any loss incurred by Seller from the subsequent sale of the Property.

   (c) CASUALTY: If the Property is damaged by fire or other casualty the cost of which to repair is equal to or greater than $100,00.00, then, ~~Seller may, at its option, elect to either (i) declare~~ the Buy-Back Option null and void,

If the cost to repair is less than $100,000, then Buyer shall, at Buyer's sole cost and expense, repair and restore the home to its prior condition in order for Buyer to have the right to exercise the repurchase option. If Buyer fails to timely and properly repair and restore the Property prior to Buy Back option date, then Seller may terminate the Buy Back Option.

2. BUYER'S IMPROVEMENTS: Before commencing construction, Buyer will review with Seller the plans and specification and receive general consent (consent not to be unreasonably withheld) to proceed with the improvements. Buyer will periodically (on a reasonable basis) update Seller regarding progress and timelines on completing the improvements. Seller understands that Buyer has the right to make minor changes and decisions during the process of completing the improvements provided they are in the best interest of completing the improvements in the most logical and reasonable manner. Buyer will also complete the improvements (i) in a good workmanlike manner, free from material defects, (ii) in accordance with all laws, ordinances, statutes, rules, regulations and any and all restrictions and other matters of record applicable thereto; and (iii) free of any liens or claims of any kind or character, and Buyer shall absolutely and unconditionally save, defend, or indemnify and hold harmless Seller from and against any and all reasonable attorney's fees and disbursements and all damages which may arise by reason of Buyer's performance of any work thereto or Buyer's failure to do as required hereby or the Escrow Agreement (hereinafter defined).

3. ESCROW AGREEMENT: The attached Addendum B is a spreadsheet of improvements and costs proposed by the Buyer to be made to the Property, ~~███████████████████████████████~~ ~~███████████████████████████~~. Buyer agrees to escrow funds totaling $156,871.00 with the Title Company and enter into an Escrow Agreement (herein so called), acceptable to Seller and Buyer, that outlines the proposed improvements to the property and the disbursement of such funds. Buyer accepts risk of any improvement cost overruns in excess of $156,871.00, however, if improvements costs do not exceed the $156,871.00 allocated budget, Buyer may use the remaining funds and apply to other improvements not specified in Addendum B.

4. Douh Hickok and Van Shaw as partners in VSDH Vaquero Venture Ltd. Each hereby personally guaranty Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to perform fully under the terms of the Buy Back Option, each of its partners set forth herin above shall be personally responsible, jointly and severally, to perform the obligations of VSDH under the Buy Back Option.

Page 2 of 3

5.     Buyer reserves the right to cancel Buy Back Option after the declaration date provided that Seller has not entered into a purchase contract with a third party on 2004 White Wing.

In addition, in paragraph 15 in the body of the contract under DEFAULT, Seller reinstates language stricken "seek such other relief as may be provided by law, or both."

| | Unit | $ | Addition | Other | Buyer Option |
|---|---|---|---|---|---|
| A/V / Alarm / Door Bell / Intercom | 1 | 2000 | 2,000 | | |
| **Stone** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Stone Material (tons) | 25 | 145 | 3,625 | | |
| Stone Labor - Casita | 831 | 6 | 4,986 | | |
| Stone Labor - Wall-Off A/C | 72 | 6 | | 432 | |
| Stone Border Around Front Patio | 45 | 10 | | 450 | |
| Stone for Front Patio Gate - Material & Labor | 1 | 300 | | 300 | |
| **Insulation - Drywall** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Insulation | 1 | 1500 | 1,500 | | |
| Drywall - Hand Troweled | 1092 | 5 | 5,460 | | |
| **Trim** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Trim - Labor | 546 | 4 | 2,184 | | |
| Trim - Material | 546 | 5 | 2,730 | | |
| Build Over Fireplace - Labor | 1 | 1200 | | 1,200 | |
| Build Over Fireplace - Material | 1 | 1500 | | 1,500 | |
| **Cabinets** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| 14 Linear Feet in Great Room | 14 | 275 | | | 3,850 |
| 10 Linear Feet in Game Room | 10 | 250 | | 2,500 | |
| 10 Linear Feet in Casita | 10 | 250 | 2,500 | | |
| **Paint & Stain** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Paint & Stain - Addition & New Cabinets | 1092 | 6 | 6,552 | | |
| Paint - Master | 1 | 500 | | | 500 |
| Paint - Foyer | 1 | 600 | | | 600 |
| Paint - FR | 1 | 700 | | | 700 |
| Paint - Halls | 1 | 600 | | | 600 |
| Paint - Stairs | 1 | 300 | | | 300 |
| Paint - BR # 4 & Bath | 1 | 400 | | | 400 |
| Faux for Above Rooms | 1 | 3000 | | | 3,000 |
| **Tile & Flooring** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Wood - Casita Down | 486 | 8 | 3,888 | | |
| Slate - Pool Bath | 60 | 6 | 360 | | |
| Carpet - Casita Bedroom and Media | 546 | 5 | 2,730 | | |
| Pool Bath Shower | 1 | 1500 | 1,500 | | |
| **Allowances** | **Unit** | **$** | **Addition** | **Other** | **Buyer Option** |
| Plumbing Fixtures | 1 | 1500 | 1,500 | 1,000 | |
| Electrical Fixtures | 1 | 1000 | 1,000 | | |
| Appliances | 1 | 3000 | 3,000 | 1,500 | |



Cooper&Scully
*A Professional Corporation*

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY TEXAS

2010 JUN -2 PH 3:53

COUNTY COURT AT LAW
NO. 1

BY _____
DEPUTY

JANA S. REIST

214-712-9571
Jana.Reist@cooperscully.com

June 2, 2010

**VIA HAND DELIVERY**

John Warren
County Court Clerk
300 Records Bldg.
509 Main Street
Dallas, Texas 75202

Re: *VSDH Vaquero Venture, Ltd. v. Kenneth P. Gross and Betsy L. Gross*, Cause No. CC-09-05232-A, on file in the County Court at Law No. 1, Dallas County, Texas
Our File No.: 1903-17168

Dear Mr. Warren:

Attached please find an original and one (1) copy of *Ken Gross' and Betsy Gross' Second Amended Counter-Claim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw, and Douglas M. Hickok and First Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc.* for filing in the above referenced matter. Please return via the waiting courier a copy of the filed stamped copy for our file. Plaintiff's counsel will receive a copy of this filing via facsimile and certified mail.

If you have any questions, do not hesitate to contact the undersigned.

Sincerely yours,

Jana S. Reist

Founders Square   900 Jackson Street, Suite 100 Dallas, TX  75202
Telephone (214) 712-9500   Fax (214) 712-9540
www.cooperscully.com

Houston Office (713) 236-6800          San Francisco Office (415) 956-9700          Sherman Office (903) 813-3900
D/767483.1

June 2, 2010
Page 2

JSR/tsh
Attachment

Cc:   Evan Lane (Van) Shaw *(via certified mail & facsimile 214.754.7115)*
      Law Offices of Van Shaw
      2723 Fairmount Street
      Dallas, Texas 75201
      *Attorney for Plaintiff*

# TAB 9

✔ POSTED

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. | § | |
| HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

## COUNTER-DEFENDANTS' SECOND SUPPLEMENTAL ANSWER AS AN ADDITION TO COUNTER-DEFENDANTS' FIRST SUPPLEMENTAL ANSWER AND COUNTER-DEFENDANTS' FIRST AMENDED ANSWER TO DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Come now Plaintiff VSDH VAQUERO VENTURE, LTD., Intervenor/Counter-Defendant EVAN L. SHAW and Intervenor/Counter-Defendant DOUGLAS M. HICKOK, jointly and hereinafter referred to as "Counter-Defendants", and file this their Second Supplemental Answer as an Addition to Counter-Defendants' First Supplemental Answer and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim, and would respectfully show unto the Court the following:

### I.

The pleadings and assertions set forth herein supplement and are in addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and Counter-Defendants' First Supplemental Answer in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim. None of the contentions, assertions nor defenses set forth in Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and/or Counter-Defendants' First Supplemental Answer in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim are withdrawn. This is to be read in addition to and in conjunction with Counter-Defendants' First

Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and Counter-Defendants' First Supplemental Answer in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim.

## II.

Further answering, Counter-Defendants would show that Defendants/Counter-Plaintiffs KEN GROSS and BETSY GROSS first breached the contract made the basis of this suit and, as such, released Counter-Defendants from all responsibility thereunder.

## III.

## ALTERNATIVE PLEADING

All defenses herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Counter-Defendants pray that Counter-Plaintiffs take nothing by reason of their suit and Counter-Defendants go hence without day and with their costs in this behalf expended and for such other and further relief to which Counter-Defendants may be justly entitled, both in law and in equity.

Respectfully submitted,

EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF/
INTERVENORS/COUNTER-DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of October, 2010.

_____
VAN SHAW

**LAW OFFICES
OF
VAN SHAW**

ATTORNEYS AT LAW

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

VAN SHAW*
JANET R. RANDLE
ERIC GREEN
————
* CERTIFIED PUBLIC
ACCOUNTANT

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

October 21, 2010
**VIA HAND DELIVERY**
= PH (214/653-7556) =

RE:     Cause No. CC-09-05232-A;
        *VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross*

Madam:

Enclosed via hand delivery are the following:

1)     Counter-Defendants' Second Supplemental Answer as an Addition to Counter-Defendants' First Supplemental Answer and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim; and

2)     Counter-Defendants' Objection to the Affidavit of Kenneth P. Gross attached to Counter-Plaintiffs' Partial Motion for Summary Judgment Against VSDH Vaquero Venture, Ltd. and Douglas M. Hickok on Counter-Plaintiffs' Breach of Contract Claim and Declaratory Judgment Action

Please file the same with the Court's records and return a file-marked copy to the undersigned.

By copy of this letter, a true and correct copy of the above instrument was this date forwarded to all counsel of record.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosures – hand delivery

cc:     See attached *Service List.*
        Mr. Doug Hickok, Via E-Mail (dhickok@marquisgroup.net)
        Ms. Darcy Topolski, Via E-Mail (dtopolski@marquisgroup.net)

## SERVICE LIST

R. Brent Cooper
Jana Starling Reist
COOPER & SCULLY
900 Jackson Street, Suite 100
Dallas, Texas 75202

FAX (214/712-9540)
= PH (214/712-9500) =
brent.cooper@cooperscully.com
jana.reist@cooperscully.com

Attorney for Defendants Kenneth P. Gross and Betsy L. Gross

Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas  75240

FAX (214/265-1537)
=PH (214/265-0250)=
kchaiken@chaikenlaw.com

Attorney for Intervenor DOUG HICKOK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Van Shaw represents Plaintiff VSDH VAQUERO VENTURE, LTD, Intervenor, VAN SHAW and Third-Party Defendants VSDH VAQUERO HOMES, INC. and VSDH HOMES, INC.

# TAB 10

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| V. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants/Counter-Plaintiffs, | § | |
| | § | |
| V. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors/Counter-Defendants, | § | DALLAS COUNTY, TEXAS |

### INTERVENOR/COUNTER-DEFENDANT DOUGLAS M. HICKOK'S AMENDED AND SUPPLEMENTAL ANSWER TO DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM

TO THE HONORABLE JUDGE:

Intervenor/Counter-Defendant Douglas M. Hickok ("Hickok") files this Amended and Supplemental Answer to Defendants/Counter-Plaintiffs' Ken Gross' and Betsy Gross' Counterclaim, and respectfully shows as follows:

1.     Hickok previously has asserted (and he continues to assert) the following affirmative defenses and/or specific denials to the Grosses' counterclaims:

a.     The Grosses breached the subject contract and released Hickok from responsibility thereunder;

b.     The Grosses' counterclaims and third-party claims are barred by the economic loss doctrine;

c.     There is a defect in the parties, Hickok is not a proper party and is not liable in the capacity in which he has been sued;

d. There is a defect in the parties in that Hickok did not individually execute the contract made the basis of this suit and is not liable for the claims made the basis of this suit;

e. Hickok denied execution of any written agreement made the basis of this lawsuit in his individual capacity;

f. Hickok denies the Grosses' alleged compliance with conditions precedent, and he pleads failure of conditions precedent, including:

    i. denial of execution of the subject contract;

    ii. failure of the Grosses to obtain written and required approval for the improvements of the property; and,

    iii. failure to establish exceptions to the statute of frauds;

g. Estoppel and waiver;

h. Negligence;

i. Failure to state a viable claim for declaratory relief;

j. Claims bar under the statute of frauds; and,

k. Failure to mitigate.

2. Based upon issues and facts raised by the Grosses in briefs filed within the past two weeks, and upon certain summary judgment rulings made by the Court in that time period and as recently as April 22nd, pleading further or alternatively as may be necessary, Hickok pleads as follows:

a. The Grosses' counterclaims to enforce the alleged guaranty made the basis of this lawsuit against Hickok are barred by the doctrine of impossibility of performance;

b. The Grosses' counterclaims to enforce the alleged buy-back provision made the basis of this lawsuit are barred by the doctrine of illusory contracts or promises;

c. The Grosses' counterclaims to enforce the alleged guaranty made the basis of this lawsuit against Hickok are barred by a failure of or incomplete execution of the alleged guaranty agreement by one of the alleged guarantors;

d. The Grosses' counterclaims to enforce the alleged guaranty and the buy-back obligation made the basis of this lawsuit are both barred by lack of consideration and/or a failure of consideration;

e. To the extent the alleged guaranty obligation is found to be enforceable against Hickok (which he continues to deny), any recovery from Hickok is limited to his limited partner's contribution at the time the alleged guaranty was made; and,

f. The Grosses counterclaims for fraud or breaches of alleged off-contract understandings are barred, in whole or in part, by the doctrine of merger.

WHEREFORE, Counter-Defendant Douglas M. Hickok prays that Counter-Plaintiffs take nothing by their suit against him, and that he be discharged with costs of court, attorney's fees, and such other and further relief to which he may be entitled.

Respectfully submitted,

Kenneth B. Chaiken
State Bar No. 04057800

**CHAIKEN & CHAIKEN, P.C.**
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
(214) 265-0250 telephone
(214) 265-1537 facsimile

**ATTORNEY FOR INTERVENOR/**
**COUNTER-DEFENDANT**
**DOUGLAS M. HICKOK**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Intervenor/Counter-Defendant Douglas M. Hickok's Second Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim has been served upon all counsel of record by facsimile and certified mail on this 28th day of April, 2011.

_____
Kenneth B. Chaiken

## VERIFICATION

STATE OF TEXAS             §
                          §
COUNTY OF DALLAS           §

BEFORE ME, the undersigned authority, on this day personally appeared, Douglas M. Hickok, being by me duly sworn on his oath, deposed and said that he has read paragraphs 1(c), 1(d), 1(e), 1(f) and 2(d) in the above and foregoing amended and supplemental answer, and every statement contained therein is within his knowledge and is true and correct.

_____
Douglas M. Hickok

Subscribed and sworn to before me this the 28th day of April, 2011, to certify which witness my hand and seal of office.



SARA LONGMORE
Notary Public
STATE OF TEXAS
My Comm. Exp. Feb. 27, 2013

_____
Notary Public in and for the State of Texas

# TAB 11

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. | § | |
| HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

## ORDER *PARTIALLY* GRANTING INTERVENOR EVAN L. SHAW'S NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

Came on to be heard on the *22ⁿᵈ* day of April, 2011, Intervenor Evan L. Shaw's

*No Evidence Motion for Summary Judgment,* and the Court, after review of pleadings on

file and hearing the argument of counsel, is of the opinion same should be GRANTED *as to*
*KEN GROSS and BETSY GROSS' BREACH OF CONTRACT CAUSE OF ACTION, and*
IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Intervenor

Evan L. Shaw's *No Evidence Motion for Summary Judgment* is GRANTED in ~~its entirety~~. *Part will reserve its ruling on Fraud in a Real Estate Contract, subsequent to further briefing due in judges chambers no later than 3 pm April 28*

IT IS SO ORDERED.

Signed this *22ⁿᵈ* day of April, 2011.

_____
JUDGE D'METRIA BENSON

**Upon Entry, Please Return to:**
Law Offices of Van Shaw
2723 Fairmount
Dallas, Texas 75201
214/754-7110

*Order – Page 1 of 1*

# TAB 12

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |



### PLAINTIFF/COUNTER-DEFENDANT VSDH VAQUERO VENTURE, LTD.'S THIRD SUPPLEMENTAL ANSWER AS AN ADDITION TO COUNTER-DEFENDANTS' FIRST AND SECOND SUPPLEMENTAL ANSWERS AND COUNTER-DEFENDANTS' FIRST AMENDED ANSWER TO DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

Come now Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. hereinafter referred to as "Counter-Defendant" or "VSDH" and files this its Third Supplemental Answer as an Addition to Counter-Defendants' First and Second Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim, and would respectfully show unto the Court the following:

**I.**

The pleadings and assertions set forth herein supplement and are in addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and Counter-Defendants' First and Second Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim. None of the contentions, assertions nor defenses set forth in Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and/or Counter-Defendants' First and Second Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to

Defendants/Counter-Plaintiffs' Counterclaim are withdrawn. This is to be read in addition to and in conjunction with Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and Counter-Defendants' First and Second Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim.

## II.

Based upon issues and facts raised by the Grosses in briefs filed within the past two weeks, and upon certain summary judgment rulings made by the Court in that time period and as recently as April 22nd, pleading further or alternatively as may be necessary, VSDH pleads as follows:

a.  The Grosses' counterclaims to enforce the alleged guaranty made the basis of this lawsuit against Shaw/Hickok are barred by the doctrine of impossibility of performance;

b.  The Grosses' counterclaims to enforce the alleged buy-back provision made the basis of this lawsuit are barred by the doctrine of illusory contracts or promises;

c.  The Grosses' counterclaims to enforce the alleged guaranty made the basis of this lawsuit against Shaw/Hickok are barred by a failure of or incomplete execution of the alleged guaranty agreement by one of the alleged guarantors;

d.  The Grosses' counterclaims to enforce the alleged guaranty and the buy-back obligation made the basis of this lawsuit are both barred by lack of consideration and/or a failure of consideration;

e.  To the extent the alleged guaranty obligation is found to be enforceable against Shaw/Hickok, any recovery from Shaw/Hickok is limited to their limited partner's contribution at the time the alleged guaranty was made; and

f.  The Grosses' counterclaims for fraud or breaches of alleged off-contract understandings are barred, in whole or in part, by the doctrine of merger.

## III.
## ALTERNATIVE PLEADING

All defenses herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Counter-Defendant VSDH prays that Counter-Plaintiffs take nothing by their suit against it, and that it be discharged with costs of court, attorney's fees, and such other and further relief to which it may be entitled.

Respectfully submitted,

_____
EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115

ATTORNEY FOR PLAINTIFF/
INTERVENOR/COUNTER-DEFENDANT

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this ____ day of April, 2011.

_____
VAN SHAW

## VERIFICATION

STATE OF TEXAS        )
                             )

COUNTY OF DALLAS    )

      BEFORE ME, the undersigned Notary Public, on this day personally appeared EVAN L. SHAW, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is an authorized agent of Counter-Defendant VSDH VAQUERO VENTURE, LTD. in the above-entitled and numbered cause; that he has read the above and foregoing Third Supplemental Answer as an Addition to Counter-Defendants' First and Second Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim; and that every statement contained in Paragraphs II (d) is within his personal knowledge and is true and correct.

                                              _____
                                              EVAN L. SHAW

      SUBSCRIBED AND SWORN TO BEFORE ME on the _____ day of April, 2011, to certify which witness my hand and official seal.

LORI G. MOORE
Notary Public, State of Texas
My Commission Expires
May 23, 2012

_____
Notary Public in and for the
State of Texas

My commission expires _____

# LAW OFFICES
# OF
# VAN SHAW

ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
ERIC GREEN

----------

*MEMBER OF COLLEGE
OF THE STATE BAR OF TEXAS
*CERTIFIED PUBLIC ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL

----------

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

County Court at Law No. 1
509 Main Street
Records Building
Dallas, TX 75202

April 29, 2011
**VIA HAND DELIVERY**
= PH (214/653-7556) =

RE:     Cause No. CC-09-05232-A;
        *VSDH Vaquero Venture, Ltd. v. Ken Gross and Betsy Gross*

Madam:

Enclosed via hand delivery are the following:

1)      Intervenor/Counter-Defendant SHAW's Third Supplemental Answer as an Addition to Counter-Defendants' First and Second Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim; and

2)      Plaintiff/Counter-Defendant VSDH's Third Supplemental Answer as an Addition to Counter-Defendants' First and Second Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim

Please file the same with the Court's records and return a file-marked copy to the undersigned.

By copy of this letter, true and correct copies of the above instruments were this date forwarded to all counsel of record.

Thank you for your assistance.

Yours very truly,

Van Shaw
VS/lm
Enclosures – hand delivery
cc:     See attached *Service List.*
        Mr. Doug Hickok, Via E-Mail (dhickok@marquisgroup.net)
        Ms. Darcy Topolski, Via E-Mail (dtopolski@marquisgroup.net)

## SERVICE LIST

R. Brent Cooper
Jana Starling Reist
COOPER & SCULLY
900 Jackson Street, Suite 100
Dallas, Texas 75202

FAX (214/712-9540)
= PH (214/712-9500) =
brent.cooper@cooperscully.com
jana.reist@cooperscully.com

      Attorney for Defendants Kenneth P. Gross and Betsy L. Gross

Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas  75240

FAX (214/265-1537)
=PH (214/265-0250)=
kchaiken@chaikenlaw.com

      Attorney for Intervenor DOUG HICKOK

*********************************

Van Shaw represents Plaintiff VSDH VAQUERO VENTURE, LTD, Intervenor, VAN SHAW and Third-Party Defendants VSDH VAQUERO HOMES, INC. and VSDH HOMES, INC.

# TAB 13

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., | § | IN THE COUNTY COURT |
| Plaintiffs/Counter-Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | |
| Defendants/Counter-Plaintiffs, | § | AT LAW NUMBER 1 |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| Intervenors/Counter-Defendants. | § | DALLAS COUNTY, TEXAS |
| | § | |

---

**KEN GROSS' AND BETSY GROSS' THIRD AMENDED COUNTER-CLAIM AGAINST VSDH VAQUERO VENTURE, LTD., EVAN L. SHAW AND DOUGLAS M. HICKOK AND SECOND AMENDED THIRD-PARTY PETITION AGAINST VSDH VAQUERO HOMES, INC. AND VSDH HOMES, INC.**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Kenneth P. Gross and Betsy L. Gross, Defendants/Counter-Plaintiffs/Third-Party Plaintiffs (collectively referred to as "the Grosses"), and hereby files their Second Amended Petition Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickock (collectively referred to as "Counter-Defendants") and First Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. (collectively referred to as "Third-Party Defendants"), and for such would respectfully show the Court as follows:

**I.**
**DISCOVERY CONTROL PLAN**

1. The parties have entered into an Agreed Level 3 Discovery Control Plan pursuant to Tex. R. Civ. P. 190.4.

---

## II.
## PARTIES AND SERVICE

2.      Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. is a Texas Limited Partnership who is represented by Evan L. Shaw in this action.

3.      Defendant/Counter-Plaintiff/Third-Party Plaintiff Kenneth P. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

4.      Defendant/Counter-Plaintiff/Third-Party Plaintiff Betsy L. Gross is an individual who has appeared in this action and is represented by the undersigned counsel.

5.      Intervenor/Counter-Defendant Douglas M. Hickok ("Hickok") is a Texas resident who has appeared in this action and is represented by Evan L. Shaw in this action.

6.      Intervenor/Counter-Defendant Evan L. Shaw ("Shaw") is a Texas resident who has appeared in and who is representing himself in this action.      The Grosses recognize that Shaw has been given a summary judgment in this case and are continuing to name him in this pleading so as to avoid any confusion should there be an appeal that they wish to continue to pursue their claims against him.

7.      Third-Party Defendant VSDH Vaquero Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

8.      Third-Party Defendant VSDH Homes, Inc. is a Texas General Partnership whose principal place of business is at 5305 Village Creek, Plano, Texas 75093. It may be served with process by serving its Registered Agent and President, Douglas M. Hickok at 5305 Village Creek Drive, Plano, Collin County, Texas 75093.

## III.
## JURISDICTION AND VENUE

9.  The subject matter in controversy is within the jurisdiction limits of this Court. The Court has jurisdiction over VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. because they are Texas general partnerships.

10.  Venue is proper with regard to this third-party action under section 15.062 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, as the transaction giving rise to this third-party action arises out of the same transaction, occurrence, or series of actions or occurrences.

## IV.
## FACTS

11.  On or about June 4, 2006, the Grosses entered into a New Home Contract ("Contract"), promulgated by the Texas Real Estate Commission, with Counter-Defendants and Third-Party Defendants for the purchase of 2004 White Wing Cove, Westlake, Texas 76262 ("the Property"), in the amount of $2,851,871.00. (A copy of the Contract has been attached hereto as Exhibit "1," and is incorporate herein by reference for all pertinent purposes).

12.  The Grosses purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants agreed to enter into a "Buy Back Option" with the Grosses.

13.  According to paragraph 1 ("Buy Back Option") of Addendum A of the Contract, VSDH Vaquero Venture, Ltd. granted to the Grosses, as Buyers of the Property, the "the option . . . to put the Property to Seller [VSDH Vaquero Venture, Ltd.] (i.e. require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller . . . ." *See* Addendum A to Exhibit 1.

14. Hickok and Shaw are limited partners of VSDH Vaquero Venture, Ltd. and participated and controlled Counter-Defendants and Third-Party Defendants sell of the Property to the Grosses and benefitted from the sell to the Grosses.

15. Further, according to paragraph 4 of Addendum A, Hickok and Shaw both agreed to be personally responsible, jointly and severally, in the event VSDH Vaquero Venture, Ltd. does not fully perform under the terms of the Buy Back Option. Neither Hickok nor Shaw conditioned his personal guaranty on the other being liable as well. Neither Hickok, Shaw nor anyone else ever informed the Grosses that their personal liability was conditioned on the other guarantor's liability.

The "Buy Back Option" provides the following:

> VSDH Vaquero Venture Ltd (VSDH), as Seller, hereby grants to Kenneth P. and Betsy L. Gross (Gross), as Buyer, of 2004 White Wing Cove in Vaquero subdivision, Westlake, Texas (the Property) the option (the "Buy Back Option") to put the Property to Seller (i.e. require Seller to repurchase the Property for the original "Sales Price" of $2,851,871.00) on September 1, 2009, or such earlier date as may be mutually agreed between Buyer and Seller, in writing (the "Buy Back Date"), subject to the following terms and conditions.

The Buy Back Option further provides requirements and deadlines on how the Grosses would exercise the Option. The Grosses followed those requirements.

Further, according to paragraph 4 of Addendum A, Hickok personally guaranteed the Buy Back Option. Paragraph 4 provides the following:

> Doug Hickok and Van Shaw as partners in VSDH Vaquero Venture, Ltd. each hereby personally guarantee [sic] Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to perform fully under the terms of the Buy Back Option, each of its partners set forth herein [sic] above shall be personally responsible, jointly and severally, to perform the obligations of VSDH under the Buy Back Option.

The Contract further required the Grosses to construct improvements on the Property. The Grosses constructed over $150,000 worth of improvements to the home.

The Grosses timely exercised the Buy Back Option, putting Hickok on notice of the Grosses' intent to the sell the Property back to VSDH. Hickok has testified that VSDH has "absolutely not" been insolvent since this transaction. In any event, VSDH, Shaw and Hickok failed to buy the Property back and perform their contractual obligations as required under the Contract.

Only after VSDH, Hickok and Shaw had affirmatively represented that they had no intention of honoring the Buy Back Option, did the Grosses sell the Property in August 2009 for $2,415,600 in an effort to mitigate their damages and avoid foreclosure of the home. VSDH and Hickok's breach and fraud has cost the Grosses actual damages of over $550,000 for the difference between the bargained-for "guaranteed" buy-back value and the amount of the actual sale, realtor fees, closing costs, and fees associated with the sale of the Property.

16. Under the signature line of the Contract, VSDH Homes, Inc. is listed as the general partner of VSDH Vaquero Venture, Ltd. However, according to the Texas Secretary of State's office, VSDH Vaquero Homes, Inc. is listed as VSDH Vaquero Venture, Ltd.'s general partner.

17. In accordance with the terms of the Buy Back Option, the Grosses exercised the Buy Back Option by delivering written notice to Shaw and Hickok before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants.

18. However, Shaw and Hickok communicated to the Grosses that Counter-Defendants and Third-Party Defendants do not intend to buy the Property back and perform their

contractual obligations as required under Addendum A to the Contract. Counter-Defendants and Third-Party Defendants failed to purchase the property back.

19.     The Grosses therefore seek construction of the Contract, including Addendum A, to determine whether or not Counter-Defendants and Third-Party Defendants breached the Contract by refusing and failing to buy the Property back from the Grosses pursuant to the Contract for the original sales price of $2,851.871.00.

20.     In an effort to mitigate their damages and avoid foreclosure of the home, the Grosses sold their home for $2,415,600.

## V.
## DECLARATORY JUDGMENT

21.     All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.

22.     This is an action for declaratory judgment pursuant to the Texas Declaratory Judgment Act, Ch. 37.001 et. seq. of the TEX. CIV. PRAC. & REM. CODE, for the purpose of determining an actionable and justiciable controversy between the parties, as hereinafter more fully appears. The controversy involves Counter-Defendants' and Third-Party Defendants' duty to perform their obligations arising under the "Buy Back Option," Addendum A, to the Contract.

23.     Based upon the clear terms of Addendum A to the Contract (Exhibit 1), Counter-Defendants and Third-Party Defendants were obligated to buy the Property back from the Grosses pursuant to the terms of the Contract for the original sales price of $2,851.871.00.

The provision of the personal guaranty in the Contract addendum states the following:

> Doug Hickok and Van Shaw as partners in VSDH Vaquero Venture, Ltd. each hereby personally guaranty Seller's obligations under the Buy Back Option granted from VSDH to Buyer hereunder. In the event VSDH fails to fully perform under the terms of the Buy Back Option, each of its partners set forth herein above shall be personally

> responsible, jointly and severally, to perform the obligations of VSDH
> under the Buy Back Option

"Jointly and severally" means that liability may be apportionable either among two or more parties **or to only one**; together and **in separation**. BLACK'S LAW DICTIONARY (Second Pocket Edition, 2001) (emphasis added). The fact that the guaranty provides the terms "jointly and severally" only further obligates Hickok's own personal liability, whether or not Shaw is liable. The Texas Supreme Court has stated that "when the obligation of the sureties is joint and several, the discharge of one of them does not release the others from payment of their proper proportion of the claim." *Glasscock v. Hamilton*, 62 Tex. 143, 150 (1884). The Texas Supreme Court has further offered the following analysis:

> When a plaintiff alleges that two parties to a contract made him a promise, although under the rule at common law as to joint and several contracts, that is a joint promise, yet the allegation necessarily means that each of them promised. Hence we see no good reason why, although he has alleged the promise of the two, he should not recover against one upon proof that he promised, although he may fail to prove the promise of the other.

*McDonald v. Cabiness*, 100 Tex. 615, 616, 102 S.W. 721, 722 (1907). Thus, looking to the plain language of the personal guaranty, Hickok is obligated to it whether or not Shaw is obligated.

Texas law requires that (1) the surety (Hickok) signed the guaranty on a condition that another (Shaw) was to sign, and (2) the obligee (the Grosses) to the personal guaranty had knowledge of such a condition. Hickok did not sign on the condition that Shaw would also sign the guaranty. Hickok did not inform the Grosses of such a condition to his signing. Hickok has denied even signing in his personal capacity, and cannot now argue that he signed personally in a conditional capacity.

Hickok cannot claim that he signed it on a condition that Shaw was to sign it. Hickok first raised this legal argument a few days before the first trial setting, but even then never affirmatively claimed that he signed the personal guaranty on the condition that Shaw was to also

sign it. At Hickok's deposition, he testified that he is not liable because he never "signed on behalf of [our] personal beings." He never made any such contention that Shaw's signature was a required factor. Also, there is no language in the personal guaranty or the entire Contract that states such a condition exists.

Further, the Grosses were never made aware that such a condition existed. The first time the Grosses were even aware that Hickok was making such a contention was a few days before the first trial setting in May of 2011. Hickok has no evidence that the Grosses were aware that such a condition existed.

There is no language in this provision, or appearing anywhere else in the Contract, requiring both Hickok and Shaw's signatures on the Contract or personal guaranty before either can become personally liable. The plain language of the agreement states that the personal guaranty may be enforced as to both or only one partner.

The language of the provision itself can only be reasonably interpreted to mean what it says – that Hickok agreed personally to perform the Buy Back Option in the event VSDH failed to perform. The description of "partner," does not limit Hickok's liability. To do so ignores the clear language of the "personal" guaranty. Texas case law has firmly held that a designation in a personal guaranty is only to point out the person intended and not to limit such individual's liability.

The language of the guaranty provision in this case only states that Hickok is a "partner" in VSDH, but does NOT state that his "personal" guarantee is limited to his capacity as a partner (limited partner language is nowhere in guaranty). The words "guaranty" and "guarantor" have distinct legal meanings, i.e., a guaranty is an undertaking by one person to answer for the payment of a debt or performance of a contract or duty of another.

Hickok's status as a limited partner, which is not even stated in the personal guaranty provision, does not mean he cannot personally obligate himself for the obligations of the limited partnership. Texas law has found that a limited partner can personally obligate himself for liabilities of his limited partnership. Further, even if the language on the guaranty did not provide that Hickok made a personal guaranty (which it clearly did), Hickok's designation as "partner" in the guaranty and his control over the transaction personally obligates him under TEXAS BUSINESS ORGANIZATIONS CODE § 153.102. Under Texas Business Organizations Code § 153.102(a), a limited partner can be liable for the obligations of a limited partnership if the limited partner participates in the control of the business. "If the limited partner participates in the control of the business, the limited partner is liable only to a person who transacts business with the limited partnership reasonably believing, based on the limited partner's conduct, that the limited partner is a general partner." *Id.* 153.102(b). Hickok was the individual who negotiated the Contract and participated in the control of this agreement. Further, the term "partner" in the personal guaranty and Hickok's conduct would lead the Grosses to reasonably believe he was in fact a partners, i.e. general partners, of VSDH.

24. Accordingly, the Grosses seek a declaration from this Court, as follows:

1. VSDH Vaquero Venture, Ltd. was obligated to buy the Property back from Kenneth P. Gross and Betsy L. Gross on or before September 1, 2009 for the original sales price of $2,851,871.00

2. In the event VSDH Vaquero Venture, Ltd. failed to timely buy the Property back from Kenneth P. Gross and Betsy L. Gross, Douglas M. Hickok and Evan L. Shaw were personally responsible, jointly and severally, to buy the Property back on or before September 1, 2009 for the original sales price of $2,851,871.00.

## VI.
## BREACH OF CONTRACT

25.     All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.   The Grosses adopt herein the arguments made above.

26.     The Grosses adopt herein the arguments made above.   As stated above, the Grosses entered into a valid and enforceable contract with Counter-Defendants and Third-Party Defendants.  *See* Exhibit 1.   The Grosses have fulfilled all requirements, statutorily and in accordance with the terms of the Buy Back Option, by delivering written notice to Hickok and Shaw before May 1, 2009 of the Grosses' intent to sell the Property back to Counter-Defendants and Third-Party Defendants.   Counter-Defendants and Third-Party Defendants have materially breached the Contract in that they have repudiated the contract and failed to proceed with the purchase of the Property.   Counter-Defendants' and Third-Party Defendants' breach has proximately caused the Grosses' damages.

27.     The Grosses request that a judgment be entered against Counter-Defendants and Third-Party Defendants for actual damages.   As a direct and proximate result of Counter-Defendants' and Third-Party Defendants' failure to perform under the Contract, the Grosses have been damaged in an amount in excess of the jurisdictional limits of the Court, for which they seeks appropriate judicial relief.

## VII.
## FRAUD IN A REAL ESTATE TRANSACTION

28.     All factual allegations set forth elsewhere in this petition are incorporated by reference in support of this section.  The Grosses adopt herein the arguments made above.

29.     The Grosses will show that Counter-Defendants' and Third-Party Defendants' conduct constitutes fraud in a real estate transaction as defined by Section 27.01 of the TEXAS BUSINESS & COMMERCE CODE.  Counter-Defendants' and Third-Party Defendants' made a false

representation that they would buy the property back pursuant to the Buy Back Option in order to induce the Grosses to enter into the Contract. The Grosses entered into the Contract and purchased the Property at the full listed price of $2,851,871.00, even though the Property had been listed for two years, due to the fact that Counter-Defendants and Third-Party Defendants made the false representation that they would buy the property back pursuant to the "Buy Back Option." The Grosses' reliance directly and proximately caused them substantial injury, as set out above, for which they seek appropriate judicial relief.

## A. Attorneys' Fees

30. The Grosses have retained the law firm of Cooper & Scully, P.C. to represent them in this action and have agreed to pay the firm reasonable and necessary attorneys' fees.

31. The Grosses are entitled to recover reasonable and necessary attorney fees that are equitable and just under TEXAS CIVIL PRACTICE & REMEDIES CODE § 38.001 because it is a suit for breach of a written contract, and under TEXAS BUSINESS & COMMERCE CODE §27.01(e) because this is an suit for statutory fraud. All conditions precedent to the collection of attorneys' fees have been satisfied.

## B. Conditions Precedent

32. All conditions precedent to the Grosses claims for relief have been performed or have occurred.

**WHEREFORE, PREMISES CONSIDERED,** Defendants Kenneth P. Gross and Betsy L. Gross pray that their counterclaims against VSDH Vaquero Venture, Ltd., Shaw and Hickok, joint and several, and third third-party claims against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. be granted; that upon final hearing of this matter, a declaratory judgment is entered as enumerated above; that the Grosses have and recover damages in an amount within the jurisdictional limits of this Court; pre- and post-judgment interest at the highest lawful rate;

attorneys' fees and court costs; exemplary damages; and such other and further relief, whether special or general, to which the Grosses may show themselves justly entitled.

Respectfully submitted,

COOPER & SCULLY, P.C.

By: _____

R/BRENT COOPER
State Bar No. 04783250
GORDON K. WRIGHT
State Bar No. 22029600
JANA STARLING REIST
State Bar No. 24056890

Founders Square
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Facsimile: (214) 712-9540

ATTORNEYS FOR DEFENDANTS
KEN GROSS AND BETSY GROSS

CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing document was forwarded to all counsel of record herein as specified below, on this the 15th day of April 2013, as follows:

Evan Lane (Van) Shaw *(via CMRRR and facsimile)*
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
*Attorney for VSDH and Evan L. Shaw*

Kenneth B. Chaiken *(via CMRRR and facsimile)*
Chaiken & Chaiken, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
*Attorney for Douglas M. Hickok*

_____

JANA S. REIST



## Cooper Scully

A Professional Corporation

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2013 APR 15 PM 4: 22

**JANA S. REIST**

214-712-9571
Jana.Reist@cooperscully.com

April 15, 2013

## VIA HAND DELIVERY

John Warren
County Court Clerk
George L. Allen Courts Building
600 Commerce Street, 5th Floor
Dallas, Texas 75202

    Re:    *VSDH Vaquero Venture, Ltd. v. Kenneth P. Gross and Betsy L. Gross*, Cause No.
CC-09-05232-A, on file in the County Court at Law No. 1, Dallas County, Texas
Our File No.: 1903-17168

Dear County Clerk:

    Enclosed please find an original and one (1) copy of *Ken Gross' and Betsy Gross' Third Amended Counter-Claim Against VSDH Vaquero Venture, Ltd., Evan L. Shaw and Douglas M. Hickok and Second Amended Third-Party Petition Against VSDH Vaquero Homes, Inc. and VSDH Homes, Inc.* for filing in the above referenced matter. All counsel of record will receive a copy of this document via certified mail and facsimile.

    If you have any questions, please do not hesitate to contact me.

                  Yours truly,

                  Jana S. Reist

JSR/tsh
Attachments

Founders Square  900 Jackson Street, Suite 100 Dallas, TX 75202
Telephone (214) 712-9500  Fax (214) 712-9540
www.cooperscully.com

Houston Office (713) 236-6800       San Francisco Office (415) 956-9700       Sherman Office (903) 813-3900
D/877312.1

April 15, 2013
Page 2


cc:     Evan Lane (Van) Shaw
        Law Offices of Van Shaw
        2723 Fairmount Street
        Dallas, Texas 75201
        *Attorney for Van Shaw and VSDH Vaquero Venture, Ltd.*
        *via certified mail and facsimile*

        Kenneth B. Chaiken
        Chaiken & Chaiken, P.C.
        One Galleria Tower
        13355 Noel Road, Suite 600
        Dallas, Texas 75240
        *Attorney for Douglas M. Hickok*
        *via certified mail and facsimile*

D/877312.1

# TAB 14

Scanned & Saved by: _____

Scan Checked by: _____

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., Plaintiffs/Counter-Defendant, | § § § § | IN THE COUNTY COURT |
| v. | § § | |
| KEN GROSS and BETSY GROSS Defendants/Counter-Plaintiffs, | § § § | AT LAW NUMBER 1 |
| v. | § § § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK Intervenors/Counter-Defendants. | § § § § § | DALLAS COUNTY, TEXAS |

## DEFENDANTS/COUNTER-PLAINTIFFS KEN GROSS AND BETSY GROSS' WITNESS LIST

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Kenneth P. Gross and Betsy L. Gross (hereinafter referred to as "the Grosses"), Defendants/Counter-Plaintiffs in the above-entitled and numbered cause, and files this their Witness List and designate the following witnesses who may be called to testify at the time of trial. The below list represents the Grosses good faith effort to set out a witness list in advance of trial. Pre-trial preparations and/or trial may necessitate the calling of additional witnesses not set out on the below list. To that end, the Grosses reserve the right to call and/or examine any individual identified as a witness on any party's witness list or a person with knowledge of relevant facts in any answer to Request for Disclosure or Interrogatories in this case. The Grosses reserve the right to designate further witnesses based upon the designations of the Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants. The Grosses also reserve the right to supplement this list in order to rebut testimony elicited by Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants during trial.

---

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST    Page 1

EXHIBIT
A

Plaintiffs also reserve the right to call as a witness at trial the expert witnesses whom Defendants and/or Third-Party Defendants have designated as experts in this case.

## I.
## PLAINTIFFS' WITNESS LIST

Kenneth P. Gross
c/o his attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Betsy L. Gross
c/o her attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Roxann Taylor
Realty Executives – The Roxann Taylor Team
640 North Carroll Avenue
Southlake, Texas 76092
**The Grosses' real estate agent for subsequent sale of property**

Brent Cooper
Jana S. Reist
Gordon Wright
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
(214) 712-9500
**The Grosses' counsel**

Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**The Grosses' counsel**

## II.
## PERSONS WHO MAY BE CALLED AS AN ADVERSE WITNESS

Van Shaw, individually and as a representative of
VSDH Vaquero Venture, Ltd.
2723 Fairmount Street
Dallas, Texas 75201

Doug Hickok, individually and as a representative of
VSDH Vaquero Venture, Ltd.
c/o his attorney of record:
Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
13355 Noel Road, Ste. 600
Dallas, Texas 75240

## III.
## OTHER WITNESSES

In addition, the Grosses reserve the right to supplement this list pursuant to the Texas Rules of Civil Procedure and incorporates by reference any and all individuals and/or entities listed by the other parties in their respective Responses to Requests for Disclosures. Further, the Grosses hereby incorporate by reference any additional persons who are identified in documents produced in the current lawsuit.

Respectfully submitted,

STEVEN E. ALDOUS
State Bar No. 00982100
saldous@bvalaw.com
**BRADEN, VARNER & ALDOUS, P.C.**
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax

*Attorney for Defendants/Counter Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the following attorneys of record in accordance with Rule 21a of the Texas Rules of Civil Procedure on the 26th day of November, 2013.

Kenneth B. Chaiken
Chaiken & CHaiken, P.C.
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024

Evan Lane (Van) Shaw
Law Offices of Van Shaw
2723 Fairmont Street
Dallas, Texas 75201

STEVEN E. ALDOUS

11/26/2013  15:52  2147400217  BRADEN VARNER ALDOUS  PAGE 05/05

# TAB 15

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. | § | |
| HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S MOTION FOR CONTINUANCE

### CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of the items presented to the Court in this Motion and counsel for respondent advises he does not oppose this Motion.

CERTIFIED to the _____ day of December, 2013 by_____.

Van Shaw

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, VSDH VAQUERO VENTURE, LTD, and files this its Motion for Continuance and in support thereof would respectfully show the Court as follows:

**I.**

This matter is currently set for trial on December 9, 2013.

On or about November 26, 2013, Plaintiff received *Defendants/Counter-Plaintiffs Ken Gross and Betsy Gross' Witness List*, a true and correct copy of which is attached hereto as Exhibit A. The same identifies VAN SHAW as a "person who may be called as an adverse witness."

On December 2, 2013, Mr. Shaw wrote attorney Steve Aldous requesting that Mr. Aldous inform Mr. Shaw whether or not Mr. Aldous would be calling Mr. Shaw, and informing Mr.

Aldous that if Mr. Shaw is called to testify, then Mr. Shaw will have to find different counsel. A true and correct copy of said letter is attached hereto as Exhibit B.

Having not heard from Mr. Aldous as to whether or not Mr. Aldous would be calling Mr. Shaw to testify at trial, on December 5, 2013, Mr. Shaw wrote Mr. Aldous again asking if Mr. Aldous would be calling Mr. Shaw as a witness, and advising Mr. Aldous that if Mr. Shaw is called as a witness, then Mr. Shaw would need to find different counsel. A true and correct copy of said letter is attached hereto as Exhibit C.

Further, on December 5, 2013, Mr. Shaw had a conversation with Defendants' counsel, Mr. Aldous, during which Mr. Aldous represented to Mr. Shaw that Mr. Aldous could not confirm whether or not Defendants would be calling Mr. Shaw as a fact witness.

## II.

Mr. Shaw will be prohibited from serving as trial counsel for Plaintiff if Defendants call Mr. Shaw as a fact witness at trial pursuant to Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct, which states as follows:

> **(a)** A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:
>
> **(1)** the testimony relates to an uncontested issue;
>
> **(2)** the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
>
> **(3)** the testimony relates to the nature and value of legal services rendered in the case;
>
> **(4)** the lawyer is a party to the action and is appearing pro se; or
>
> **(5)** the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.
>
> **(b)** A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure.

**(c)** Without the client's informed consent, a lawyer may not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter.

## IV.

Because Defendants are unable to definitively advise as to whether Defendants intend to call Mr. Shaw as a fact witness at trial, and because Plaintiff will be forced to seek other counsel pursuant to Rule 3.08 if Mr. Shaw is called as a fact witness, Plaintiff requests a continuance of trial in this matter until such time as it can be determined whether or not Defendants will be calling Mr. Shaw as a fact witness.

Additionally, in the event that Defendants decide they will be calling Mr. Shaw as a fact witness, Plaintiff will require a reasonable amount of time to locate and engage new counsel, and said counsel will require a reasonable amount of time to familiarize himself with the case and prepare for trial.

Requiring Plaintiff to go to trial on December 9, 2013, would be extremely prejudicial to Plaintiff as it would effectively allow Defendant to call Mr. Shaw as a witness and have Mr. Shaw disqualified as Plaintiff's counsel in the middle of trial. This would not only operate as a deprivation to the Plaintiff of Plaintiff's right to its attorney of choice, it would also leave Plaintiff unrepresented in the middle of trial.

## V.

This continuance is not sought for delay only, but so that justice may be done.

WHEREFORE PREMISES CONSIDERED, Plaintiff respectfully requests that trial in this matter be continued until such time as Defendants advise as to whether or not Defendants are going to call Van Shaw as a fact witness, and, if Defendants do intend to call Mr. Shaw as a fact witness, until such time as Plaintiff is able to locate and engage new counsel, and said counsel is able to familiarize himself with the case and prepare for trial, and for such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

EVAN LANE (VAN) SHAW
Bar Card No. 18140500
COLLEN R. MEYER
Bar Card No. 24074709
LAW OFFICES OF VAN SHAW
2723 Fairmount
Dallas, Texas 75201
Telephone:     (214) 754-7110
Facsimile:     (214) 754-7115
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of December, 2013.

_____
VAN SHAW

# VERIFICATION

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS         §

     EVAN LANE SHAW, being duly sworn, states that he is the attorney of record for Plaintiff in the above entitled case and that he has read the foregoing Motion for Continuance and that each statement of fact contained therein is true and correct to the best of his knowledge.

_____
EVAN LANE (VAN) SHAW

     SUBSCRIBED AND SWORN TO BEFORE ME, on this the _____ day of December, 2013.



LETICIA BEATRIZ BOTELLO
MY COMMISSION EXPIRES
September 20, 2014

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____

Scanned & Saved by: _____

Scan Checked by: _____

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., Plaintiffs/Counter-Defendant, | § § § § | IN THE COUNTY COURT |
| v. | § § | |
| KEN GROSS and BETSY GROSS Defendants/Counter-Plaintiffs, | § § § | AT LAW NUMBER 1 |
| v. | § § § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK Intervenors/Counter-Defendants. | § § § § § | DALLAS COUNTY, TEXAS |

## DEFENDANTS/COUNTER-PLAINTIFFS
## KEN GROSS AND BETSY GROSS' WITNESS LIST

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Kenneth P. Gross and Betsy L. Gross (hereinafter referred to as "the Grosses"), Defendants/Counter-Plaintiffs in the above-entitled and numbered cause, and files this their Witness List and designate the following witnesses who may be called to testify at the time of trial. The below list represents the Grosses good faith effort to set out a witness list in advance of trial. Pre-trial preparations and/or trial may necessitate the calling of additional witnesses not set out on the below list. To that end, the Grosses reserve the right to call and/or examine any individual identified as a witness on any party's witness list or a person with knowledge of relevant facts in any answer to Request for Disclosure or Interrogatories in this case. The Grosses reserve the right to designate further witnesses based upon the designations of the Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants. The Grosses also reserve the right to supplement this list in order to rebut testimony elicited by Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants during trial.

---

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST     Page 1

EXHIBIT
A

Plaintiffs also reserve the right to call as a witness at trial the expert witnesses whom

Defendants and/or Third-Party Defendants have designated as experts in this case.

## I.
## PLAINTIFFS' WITNESS LIST

Kenneth P. Gross
c/o his attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Betsy L. Gross
c/o her attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Roxann Taylor
Realty Executives – The Roxann Taylor Team
640 North Carroll Avenue
Southlake, Texas 76092
**The Grosses' real estate agent for subsequent sale of property**

Brent Cooper
Jana S. Reist
Gordon Wright
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
(214) 712-9500
**The Grosses' counsel**

11/26/2013  15:52  2147400217  BRADEN VARNER ALDOUS  PAGE  03/05

Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**The Grosses' counsel**

## II.
## PERSONS WHO MAY BE CALLED AS AN ADVERSE WITNESS

Van Shaw, individually and as a representative of
VSDH Vaquero Venture, Ltd.
2723 Fairmount Street
Dallas, Texas 75201

Doug Hickok, individually and as a representative of
VSDH Vaquero Venture, Ltd.
c/o his attorney of record:
Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
13355 Noel Road, Ste. 600
Dallas, Texas 75240

## III.
## OTHER WITNESSES

In addition, the Grosses reserve the right to supplement this list pursuant to the Texas Rules of Civil Procedure and incorporates by reference any and all individuals and/or entities listed by the other parties in their respective Responses to Requests for Disclosures. Further, the Grosses hereby incorporate by reference any additional persons who are identified in documents produced in the current lawsuit.

Respectfully submitted,

STEVEN E. ALDOUS
State Bar No. 00982100
saldous@bvalaw.com
**BRADEN, VARNER & ALDOUS, P.C.**
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax

*Attorney for Defendants/Counter Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the following attorneys of record in accordance with Rule 21a of the Texas Rules of Civil Procedure on the 26th day of November, 2013.

Kenneth B. Chaiken
Chaiken & CHaiken, P.C.
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024

Evan Lane (Van) Shaw
Law Offices of Van Shaw
2723 Fairmont Street
Dallas, Texas 75201

STEVEN E. ALDOUS

PAGE 05/05                    BRADEN VARNER ALDOUS                    2147400217     15:52     11/26/2013

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
——————
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
——————
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous                                December 2, 2013
ATTORNEY AT LAW                           FAX (214*740-0217)
703 McKinney Avenue, Suite 400        = PH 214*740-0212 =
Dallas, Texas 75202


Re: VSDH V. Gross

Dear Mr. Aldous:

I received your List of Witnesses and Notice that I am listed as a possible witness by you. If I am to be called I cannot then be counsel for VSDH and will need time to find other counsel

Please let me know if you will / will not be calling me so that I can make plans accordingly.

Thanks,

Van Shaw
VS/rv

Cc: Ken Chaiken          email



```
TRANSMISSION VERIFICATION REPORT
```

```
                                    TIME  : 12/02/2013 07:27
                                    NAME  : LAW OFFICE OF V SHAW
                                    FAX   : 2147547115
                                    TEL   : 2147547110
                                    SER.# : BROA0J127259
```

```
DATE,TIME             12/02  07:27
FAX NO./NAME          2147400217
DURATION              00:00:16
PAGE(S)               01
RESULT                OK
MODE                  STANDARD
                      ECM
```

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE

———

* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 2, 2013
FAX (214*740-0217)
= PH 214*740-0212 =

Re: VSDH V. Gross

Dear Mr. Aldous:

I received your List of Witnesses and Notice that I am listed as a possible witness by you. If I am to be called I cannot then be counsel for VSDH and will need time to find other counsel

Please let me know if you will / will not be calling me so that I can make plans accordingly.

Thanks,

Van Shaw

Scanned & Saved by: _____

Scan Checked by: _____

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
——————
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

**2723 FAIRMOUNT**
**DALLAS, TEXAS 75201**
**(214) 754-7110**
**FAX NO. (214) 754-7115**
**www.shawlawoffice.com**

DANIEL K. HAGOOD
OF COUNSEL
——————
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 5, 2013
FAX (214*740-0217)
= PH 214*740-0212 =
saldous@bvalaw.com

Re: VSDH v. Gross

Dear Mr. Aldous:

I called you to discuss a moment ago and left a message as you were unavailable. I have not heard from you in reply to my fax as to whether of not you will / will not be calling me as a witness at trial. I need to know asap as if you will call me, I cannot be counsel if I am to be a witness.

Please advise asap.

Thanks,

Van Shaw
VS/rv

Cc: Ken Chaiken          email



**EXHIBIT**

**C**

| TRANSMISSION VERIFICATION REPORT | |
|---|---|

Scanned & Saved by: _____

Scan Checked by: _____

```
TIME  : 12/05/2013 11:11
NAME  : LAW OFFICE OF V SHAW
FAX   : 2147547115
TEL   : 2147547110
SER.# : BROA0J127259
```

| DATE,TIME | 12/05  11:11 |
|---|---|
| FAX NO./NAME | 2147400217 |
| DURATION | 00:00:15 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
———
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
———
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 5, 2013
FAX (214*740-0217)
= PH 214*740-0212 =
saldous@bvalaw.com

Re: VSDH v. Gross

Dear Mr. Aldous:

I called you to discuss a moment ago and left a message as you were unavailable. I have not heard from you in reply to my fax as to whether of not you will / will not be calling me as a witness at trial. I need to know asap as if you will call me, I cannot be counsel if I am to be a witness.

Please advise asap.

Thanks,

# TAB 16

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

**PLAINTIFF/COUNTER-DEFENDANT VSDH VAQUERO VENTURE, LTD.'S FOURTH SUPPLEMENTAL ANSWER AS AN ADDITION TO COUNTER-DEFENDANTS' FIRST, SECOND AND THIRD SUPPLEMENTAL ANSWERS AND COUNTER-DEFENDANTS' FIRST AMENDED ANSWER TO DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIM**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. hereinafter referred to as "Counter-Defendant" or "VSDH" and files this its Fourth Supplemental Answer as an Addition to Counter-Defendants' First, Second and Third Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim, and would respectfully show unto the Court the following:

**I.**

The pleadings and assertions set forth herein supplement and are in addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and Counter-Defendants' First, Second and Third Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim. None of the contentions, assertions nor defenses set forth in Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim and/or Counter-Defendants' First, Second and Third Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim are withdrawn. This is to be read in addition to and in conjunction with Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs'

1

Counterclaim and Counter-Defendants' First, Second and Third Supplemental Answers in Addition to Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim.

## II.

Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. asserts (and it continues to assert by amendment or supplement if necessary) the following affirmative defenses and/or specific denials to the Grosses' counterclaims:

a. The Grosses breached the subject contract and released Plaintiff/Counter-Defendant from responsibility (if any under the contract, which is denied) thereunder pursuant to the doctrine of first material breach;

b. The Grosses' counterclaims and third-party claims are barred by the economic loss doctrine;

c. Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. denies the Grosses' alleged compliance with conditions precedent and pleads failure of conditions precedent, including:

  i. failure of the Grosses to obtain written and required approval for the improvements of the property; and,

  ii. failure to establish exceptions to the statute of frauds.

d. The Grosses' claims are barred by estoppel and waiver;

e. The Grosses' claims are barred by failure to state a viable claim for declaratory relief or other relief;

f. The Grosses' claims are barred by the claims bar under the statute of frauds;

g. The Grosses' claims are barred by their failure to mitigate;

h. The Grosses' claims are barred by lack of privity;

i. The Grosses' claims are barred by lack of presentment or demand;

j. The Grosses' counterclaims for damages for breach of the alleged guaranty made the basis of this lawsuit against Plaintiff/Counter-Defendant are barred by the doctrine of impossibility of performance;

k.     The Grosses' counterclaims for damages due to an alleged breach of the buy-back provision made the basis of this lawsuit are barred by the doctrine of illusory contracts or promises;

l.     The Grosses' counterclaims for damages for alleged breach of the alleged guaranty made the basis of this lawsuit against Plaintiff/Counter-Defendant are barred by a failure of or incomplete execution of the alleged guaranty agreement by at least one of the alleged guarantors;

m.     The Grosses' counterclaims for damages for alleged breach of the alleged guaranty or the buy-back obligation made the basis of this lawsuit are both barred by lack of consideration and/or a failure of consideration; and

n.     To the extent the alleged guaranty obligation is found to be enforceable against Plaintiff/Counter-Defendant (which Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. continues to deny), any recovery from Plaintiff/Counter-Defendant is limited to Plaintiff/Counter-Defendant's limited partner's contribution at the time the alleged guaranty was made.

## III.

Pleading further to the extent necessary, Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. asserts the following additional defenses by supplementation:

a.     The Grosses' claims against Plaintiff/Counter-Defendant for damages are barred by their agreement to seek exclusive remedies, not including damages, from Plaintiff/Counter-Defendant in the event of a breach of the alleged buy-back provision in the subject contract;

b.     The Grosses' claims against Plaintiff/Counter-Defendant are barred under the doctrine of election of remedies; and,

c.     If any person/entity guaranteed anything in the subject contract, at most said person/entity guaranteed a buy-back obligation, and not any obligation by the Seller to pay damages.

## IV.

## ALTERNATIVE PLEADING

All defenses herein, if inconsistent, are made pursuant to Rule 48 of the Texas Rules of Civil Procedure.

## V.

## NOTICE OF INTENT

Plaintiff/Counter-Defendant hereby gives notice of intent to utilize items produced in discovery in the trial of this matter and the authenticity of such items is self-proven per the Texas Rules of Civil Procedure, 193.7.

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. prays that Counter-Plaintiffs take nothing by their claims against Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD., and that Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. be discharged with costs of court, attorney's fees, and such other and further relief to which Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. may be entitled, both in law and in equity.

Respectfully submitted,

_____
EVAN LANE (VAN) SHAW
Bar Card No. 18140500
LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
FAX NO. (214) 754-7115
Email – van@shawlaw.net

ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of January, 2014.

_____
VAN SHAW


## VERIFICATION

STATE OF TEXAS       )
                           )
COUNTY OF DALLAS    )

BEFORE ME, the undersigned Notary Public, on this day personally appeared EVAN L. SHAW, who being by me duly sworn on his oath deposed and said that he is over 21 years of age, of sound mind and capable of making this Affidavit; that he is an authorized agent of Plaintiff/Counter-Defendant VSDH VAQUERO VENTURE, LTD. in the above-entitled and numbered cause; that he has read the above and foregoing Fourth Supplemental Answer as an Addition to Counter-Defendants' First, Second and Third Supplemental Answers and Counter-Defendants' First Amended Answer to Defendants/Counter-Plaintiffs' Counterclaim; and that every statement contained in Paragraph II(m) is within his personal knowledge and is true and correct.

_____
EVAN L. SHAW

SUBSCRIBED AND SWORN TO BEFORE ME on the 24th day of January, 2014, to certify which witness my hand and official seal.

LORI G. MOORE
MY COMMISSION EXPIRES
May 23, 2016

_____
Notary Public in and for the
State of Texas

My commission expires 5/23/16

# TAB 17

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., Plaintiffs/Counter-Defendant, | § § § § | IN THE COUNTY COURT |
| v. | § § | |
| KEN GROSS and BETSY GROSS Defendants/Counter-Plaintiffs, | § § § | AT LAW NUMBER 1 |
| v. | § § § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK Intervenors/Counter-Defendants. | § § § § § | DALLAS COUNTY, TEXAS |

## KEN GROSS AND BETSY GROSS' MOTION
## TO DISQUALIFY EVAN L. SHAW

TO THE HONORABLE JUDGE BENSON:

COMES NOW, Kenneth P. Gross and Betsy L. Gross (hereinafter referred to as "the Grosses"), and file this motion to disqualify Evan L. Shaw ("Shaw") as counsel for VSDH Vaquero Venture, Ltd. ("VSDH") and would respectfully show the following:

### ARGUMENT AND AUTHORITIES

This case was previously set for trial on December 9, 2013. On December 6, 2013, Shaw filed a motion for continuance on behalf of VSDH on the grounds that Shaw could be called as a witness in the trial and, as such, Shaw would be prohibited by the Disciplinary Rules of Professional Conduct from acting as trial counsel for VSDH. (A copy of the motion for continuance is attached as Exhibit 1). During the various hearings held by the Court prior to passing the setting, counsel for Douglas M. Hickok indicated that Shaw would likely be called as a witness in the case.

---

**Ken Gross and Betsy Gross' Motion**
**to Disqualify Evan L. Shaw:**                                                    **Page 1 of 3**

As of today's date, Shaw has not withdrawn from representing VSDH. This matter is currently specially set for trial on July 7, 2014. Nothing has changed in terms of the likelihood that Shaw will be called as a witness in the trial of this case. The trial court has the power and the duty to disqualify counsel when representation of the client is prohibited by the Texas Disciplinary Rules of Professional Conduct. *See Ayres v. Canales*, 790 S.W.2d 554, 557 n.2 (Tex. 1990). Tex. Disciplinary R. Prof. Conduct 3.08 was amended in 1994 to prohibit "employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding." Tex. Disciplinary R. Prof. Conduct 3.08(a). As a result, Shaw is not permitted to act as an advocate before this Court during the pendency of this case.

WHEREFORE, PREMISES CONSIDERED, the Grosses respectfully request that their motion to disqualify Evan L. Shaw be GRANTED, and that they have and recover all other relief to which they are entitled in law or equity.

Respectfully submitted,

*/s/ Steven E. Aldous*
**Steven E. Aldous**
State Bar No. 00982100
saldous@forsheyprostok.com
**FORSHEY & PROSTOK LLP**
500 Crescent Court
Suite 240
Dallas, Texas 75201
Telephone: (214) 716-2101
Facsimile: (214) 740-2115

*Attorney for Defendants/Counter Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the following attorneys of record in accordance with Rule 21a of the Texas Rules of Civil Procedure or through the electronic filing system on the 27th day of February, 2014.

Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024

Evan Lane (Van) Shaw
Law Offices of Van Shaw
2723 Fairmont Street
Dallas, Texas 75201

*/s/ Steven E. Aldous*
STEVEN E. ALDOUS

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD. | § | IN THE COUNTY COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | AT LAW NUMBER 1 |
| | § | |
| Defendants | § | |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. HICKOK | § | |
| | § | |
| Intervenors | § | DALLAS COUNTY, TEXAS |

*H-E DOCS OPPOSE*

## PLAINTIFF'S MOTION FOR CONTINUANCE

### CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of the items presented to the Court in this Motion and counsel for respondent advises he does ~~not~~ oppose this Motion.

CERTIFIED to the ____ day of December, 2013 by_____.

Van Shaw

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, VSDH VAQUERO VENTURE, LTD, and files this its Motion for Continuance and in support thereof would respectfully show the Court as follows:

**I.**

This matter is currently set for trial on December 9, 2013.

On or about November 26, 2013, Plaintiff received *Defendants/Counter-Plaintiffs Ken Gross and Betsy Gross' Witness List*, a true and correct copy of which is attached hereto as Exhibit A. The same identifies VAN SHAW as a "person who may be called as an adverse witness."

On December 2, 2013, Mr. Shaw wrote attorney Steve Aldous requesting that Mr. Aldous inform Mr. Shaw whether or not Mr. Aldous would be calling Mr. Shaw, and informing Mr.



EXHIBIT
1

Aldous that if Mr. Shaw is called to testify, then Mr. Shaw will have to find different counsel. A true and correct copy of said letter is attached hereto as Exhibit B.

Having not heard from Mr. Aldous as to whether or not Mr. Aldous would be calling Mr. Shaw to testify at trial, on December 5, 2013, Mr. Shaw wrote Mr. Aldous again asking if Mr. Aldous would be calling Mr. Shaw as a witness, and advising Mr. Aldous that if Mr. Shaw is called as a witness, then Mr. Shaw would need to find different counsel. A true and correct copy of said letter is attached hereto as Exhibit C.

Further, on December 5, 2013, Mr. Shaw had a conversation with Defendants' counsel, Mr. Aldous, during which Mr. Aldous represented to Mr. Shaw that Mr. Aldous could not confirm whether or not Defendants would be calling Mr. Shaw as a fact witness.

## II.

Mr. Shaw will be prohibited from serving as trial counsel for Plaintiff if Defendants call Mr. Shaw as a fact witness at trial pursuant to Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct, which states as follows:

> (a) A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:

> (1) the testimony relates to an uncontested issue;

> (2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;

> (3) the testimony relates to the nature and value of legal services rendered in the case;

> (4) the lawyer is a party to the action and is appearing pro se; or

> (5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.

> (b) A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure.

(c) Without the client's informed consent, a lawyer may not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter.

### IV.

Because Defendants are unable to definitively advise as to whether Defendants intend to call Mr. Shaw as a fact witness at trial, and because Plaintiff will be forced to seek other counsel pursuant to Rule 3.08 if Mr. Shaw is called as a fact witness, Plaintiff requests a continuance of trial in this matter until such time as it can be determined whether or not Defendants will be calling Mr. Shaw as a fact witness.

Additionally, in the event that Defendants decide they will be calling Mr. Shaw as a fact witness, Plaintiff will require a reasonable amount of time to locate and engage new counsel, and said counsel will require a reasonable amount of time to familiarize himself with the case and prepare for trial.

Requiring Plaintiff to go to trial on December 9, 2013, would be extremely prejudicial to Plaintiff as it would effectively allow Defendant to call Mr. Shaw as a witness and have Mr. Shaw disqualified as Plaintiff's counsel in the middle of trial. This would not only operate as a deprivation to the Plaintiff of Plaintiff's right to its attorney of choice, it would also leave Plaintiff unrepresented in the middle of trial.

### V.

This continuance is not sought for delay only, but so that justice may be done.

WHEREFORE PREMISES CONSIDERED, Plaintiff respectfully requests that trial in this matter be continued until such time as Defendants advise as to whether or not Defendants are going to call Van Shaw as a fact witness, and, if Defendants do intend to call Mr. Shaw as a fact witness, until such time as Plaintiff is able to locate and engage new counsel, and said counsel is able to familiarize himself with the case and prepare for trial, and for such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

EVAN LANE (VAN) SHAW
Bar Card No. 18140500
COLLEN R. MEYER
Bar Card No. 24074709
LAW OFFICES OF VAN SHAW
2723 Fairmount
Dallas, Texas 75201
Telephone:    (214) 754-7110
Facsimile:    (214) 754-7115
ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Rules of Civil Procedure, on this _____ day of December, 2013.

_____
VAN SHAW

## VERIFICATION

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS          §

EVAN LANE SHAW, being duly sworn, states that he is the attorney of record for Plaintiff in the above entitled case and that he has read the foregoing Motion for Continuance and that each statement of fact contained therein is true and correct to the best of his knowledge.

_____
EVAN LANE (VAN) SHAW

SUBSCRIBED AND SWORN TO BEFORE ME, on this the ___ day of December, 2013.

LETICIA BEATRIZ BOTELLO
MY COMMISSION EXPIRES
September 20, 2014

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____

Scanned & Saved by: _____

Scan Checked by: _____

## CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., | § | IN THE COUNTY COURT |
| Plaintiffs/Counter-Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS and BETSY GROSS | § | |
| Defendants/Counter-Plaintiffs, | § | AT LAW NUMBER 1 |
| | § | |
| v. | § | |
| | § | |
| EVAN L. SHAW and DOUGLAS M. | § | |
| HICKOK | § | |
| Intervenors/Counter-Defendants. | § | DALLAS COUNTY, TEXAS |
| | § | |

## DEFENDANTS/COUNTER-PLAINTIFFS KEN GROSS AND BETSY GROSS' WITNESS LIST

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Kenneth P. Gross and Betsy L. Gross (hereinafter referred to as "the Grosses"), Defendants/Counter-Plaintiffs in the above-entitled and numbered cause, and files this their Witness List and designate the following witnesses who may be called to testify at the time of trial. The below list represents the Grosses good faith effort to set out a witness list in advance of trial. Pre-trial preparations and/or trial may necessitate the calling of additional witnesses not set out on the below list. To that end, the Grosses reserve the right to call and/or examine any individual identified as a witness on any party's witness list or a person with knowledge of relevant facts in any answer to Request for Disclosure or Interrogatories in this case. The Grosses reserve the right to designate further witnesses based upon the designations of the Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants. The Grosses also reserve the right to supplement this list in order to rebut testimony elicited by Plaintiffs/Counter-Defendants and Intervenors/Counter-Defendants during trial.

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST     Page 1

**EXHIBIT A**

Plaintiffs also reserve the right to call as a witness at trial the expert witnesses whom

Defendants and/or Third-Party Defendants have designated as experts in this case.

## I.
## PLAINTIFFS' WITNESS LIST

Kenneth P. Gross
c/o his attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Betsy L. Gross
c/o her attorneys of record:
Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**Defendant/Counter-Plaintiff**

Roxann Taylor
Realty Executives – The Roxann Taylor Team
640 North Carroll Avenue
Southlake, Texas 76092
**The Grosses' real estate agent for subsequent sale of property**

Brent Cooper
Jana S. Reist
Gordon Wright
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
(214) 712-9500
**The Grosses' counsel**

---

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST      Page 2

Steven E. Aldous
Braden, Varner & Aldous, P.C.
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax
**The Grosses' counsel**

## II.
## PERSONS WHO MAY BE CALLED AS AN ADVERSE WITNESS

Van Shaw, individually and as a representative of
VSDH Vaquero Venture, Ltd.
2723 Fairmount Street
Dallas, Texas 75201

Doug Hickok, individually and as a representative of
VSDH Vaquero Venture, Ltd.
c/o his attorney of record:
Kenneth B. Chaiken
Chaiken & Chaiken, P.C.
13355 Noel Road, Ste. 600
Dallas, Texas 75240

## III.
## OTHER WITNESSES

In addition, the Grosses reserve the right to supplement this list pursuant to the Texas Rules of Civil Procedure and incorporates by reference any and all individuals and/or entities listed by the other parties in their respective Responses to Requests for Disclosures. Further, the Grosses hereby incorporate by reference any additional persons who are identified in documents produced in the current lawsuit.

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST    Page 3

Respectfully submitted,

STEVEN E. ALDOUS
State Bar No. 00982100
saldous@bvalaw.com
**BRADEN, VARNER & ALDOUS, P.C.**
703 McKinney Avenue, Suite 400
Dallas, Texas 75202
(214) 740-0212
(214) 740-0217 fax

*Attorney for Defendants/Counter Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon the following attorneys of record in accordance with Rule 21a of the Texas Rules of Civil Procedure on the 26th day of November, 2013.

Kenneth B. Chaiken
Chaiken & CHaiken, P.C.
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024

Evan Lane (Van) Shaw
Law Offices of Van Shaw
2723 Fairmont Street
Dallas, Texas 75201

STEVEN E. ALDOUS

DEFENDANTS/COUNTER-PLAINTIFFS' KEN GROSS AND BETSY GROSS' WITNESS LIST     Page 4

# LAW OFFICES
# OF
# VAN SHAW

## ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
———————
* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
————
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 2, 2013
FAX (214*740-0217)
= PH 214*740-0212 =

Re: VSDH V. Gross

Dear Mr. Aldous:

I received your List of Witnesses and Notice that I am listed as a possible witness by you.
If I am to be called I cannot then be counsel for VSDH and will need time to find other
counsel

Please let me know if you will / will not be calling me so that I can make plans
accordingly.

Thanks,

Van Shaw
VS/rv

Cc: Ken Chaiken        email


EXHIBIT
B

```
TRANSMISSION VERIFICATION REPORT
```

```
                                          TIME   : 12/02/2013 07:27
                                          NAME   : LAW OFFICE OF V SHAW
                                          FAX    : 2147547115
                                          TEL    : 2147547110
                                          SER.#  : BROA0J127259
```

| | |
|---|---|
| DATE,TIME | 12/02  07:27 |
| FAX NO./NAME | 2147400217 |
| DURATION | 00:00:16 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE
———
*BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL
———
CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 2, 2013
FAX (214*740-0217)
= PH 214*740-0212 =

Re: VSDH V. Gross

Dear Mr. Aldous:

I received your List of Witnesses and Notice that I am listed as a possible witness by you. If I am to be called I cannot then be counsel for VSDH and will need time to find other counsel

Please let me know if you will / will not be calling me so that I can make plans accordingly.

Thanks,

Van Shaw

Scanned & Saved by:

Scan Checked by:

# LAW OFFICES
# OF
# VAN SHAW

ATTORNEYS AT LAW

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

VAN SHAW*
JANET R. RANDLE

* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 5, 2013
FAX (214*740-0217)
= PH 214*740-0212 =
saldous@bvalaw.com

Re: VSDH v. Gross

Dear Mr. Aldous:

I called you to discuss a moment ago and left a message as you were unavailable. I have not heard from you in reply to my fax as to whether of not you will / will not be calling me as a witness at trial. I need to know asap as if you will call me, I cannot be counsel if I am to be a witness.

Please advise asap.

Thanks,

Van Shaw
VS/rv

Cc: Ken Chaiken     email



```
┌─────────────────────────────────────────┐      Scanned & Saved by: _____
│  TRANSMISSION VERIFICATION REPORT        │      Scan Checked by: _____
└─────────────────────────────────────────┘

                                    TIME  : 12/05/2013 11:11
                                    NAME  : LAW OFFICE OF V SHAW
                                    FAX   : 2147547115
                                    TEL   : 2147547110
                                    SER.# : BROA0J127259
```

```
DATE,TIME            12/05  11:11
FAX NO./NAME         2147400217
DURATION             00:00:15
PAGE(S)              01
RESULT               OK
MODE                 STANDARD
                     ECM
```

# LAW OFFICES
# OF
# VAN SHAW

### ATTORNEYS AT LAW

VAN SHAW*
JANET R. RANDLE

* BOARD CERTIFIED IN
PERSONAL INJURY
* CERTIFIED PUBLIC
ACCOUNTANT

2723 FAIRMOUNT
DALLAS, TEXAS 75201
(214) 754-7110
FAX NO. (214) 754-7115
www.shawlawoffice.com

DANIEL K. HAGOOD
OF COUNSEL

CERTIFIED PARALEGALS
RHONDA VINCENT
LORI G. MOORE
APRIL S. SUMNER

Mr. Steve Aldous
ATTORNEY AT LAW
703 McKinney Avenue, Suite 400
Dallas, Texas 75202

December 5, 2013
FAX (214*740-0217)
= PH 214*740-0212 =
saldous@bvalaw.com

Re: VSDH v. Gross

Dear Mr. Aldous:

I called you to discuss a moment ago and left a message as you were unavailable. I have not heard from you in reply to my fax as to whether of not you will / will not be calling me as a witness at trial. I need to know asap as if you will call me, I cannot be counsel if I am to be a witness.

Please advise asap.

Thanks,

# ProDoc®eFiling 2

logged in as janet@shawlaw.net

Click Here to go to ProDoc eFiling 1

| Home | Submit Filing | My Filings | Firm Management | Resources | Help |

| Filing Progress | |
|---|---|

## *Proof of Filing*

**1.** Case Information
**2.** Upload Documents
**3.** Filing Services
**4.** eService
**5.** Review Filing
**6.** Process Filing
**7.** Acknowledgement

**Start a New Filing**

**Your submission was successful!** Your trace number is **54667**. The details of your filing are shown below.

You can monitor the status of this filing by going to the "My Filings" area.

The date and time below will be the official timestamp when this filing is accepted by the clerk.

| Filed Date & Time | |
|---|---|
| **Date:** | **Time | Time Zone:** |
| Friday, December 06, 2013 | 11:41:30 AM |

**Bookmark This Page**      **Privacy Policy**      **www.ProDoc.com**      **Contact Us**

This site and all contents Copyright ©2003-2013 Thomson Reuters. All rights reserved.

# TAB 18

CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| VSDH VAQUERO VENTURE, LTD., | § | IN THE COUNTY COURT |
| | § | |
| *Plaintiff/Counter-Defendant* | § | |
| | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| KEN GROSS AND BETSY GROSS, | § | AT LAW NUMBER 1 |
| | § | |
| *Defendants/Counter-Plaintiffs* | § | |
| | § | |
| v. | § | |
| | § | |
| DOUGLAS M. HICKOK, | § | |
| | § | |
| *Intervenor/Counter-Defendant.* | § | DALLAS COUNTY, TEXAS |

## <u>NOTICE OF HEARING</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

A hearing on *Ken Gross and Betsy Gross' Motion to Disqualify Evan L. Shaw* will be held on Wednesday, June 18, 2014, at 8:30 a.m., in the County Court at Law No. 1, Dallas County, Texas.

Respectfully submitted,

/s/  Steven E. Aldous
Steven E. Aldous
State Bar No. 00982100
**FORSHEY PROSTOK, LLP**
500 Crescent Court, Suite 240
Dallas, TX 75201
(214) 716.2100
(214) 716.2115
saldous@forsheyprostok.com

*Attorney for Defendants/Counter-Plaintiffs*
*Ken Gross and Betsy Gross*

<u>Notice of Hearing:</u>                                                                                          **Page 1 of 2**

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2014, a true and correct copy of the foregoing document was served, via email, through the Electronic Filing Manager in accordance with the Texas Rules of Civil Procedure, to all counsel of record.

*/s/   Steven E. Aldous*

# TAB 19

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD.,)   IN THE COUNTY COURT
        Plaintiff/          )
        Counter-Defendant, )
                            )
V.                          )
                            )
KEN GROSS and BETSY GROSS, )
        Defendants/         )   AT LAW NO. 1
        Counter-Plaintiffs )
                            )
V.                          )
                            )
EVAN L. SHAW and DOUGLAS M.)
HICKOK,                     )
        Intervenors/        )
        Counter-Defendants, )   DALLAS COUNTY, TEXAS

------------------------------------------------------------

**KEN GROSS AND BETSY GROSS' MOTION
TO DISQUALIFY EVAN L. SHAW**
------------------------------------------------------------

On the 18th day of June, 2014, the following proceedings came on to be heard outside the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.  Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MS. JANET R. RANDLE**
SBN 00792216
Law Offices of Van Shaw
2723 Fairmount
Dallas, Texas 75201
(214)754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE,LTD.

        - AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, P.C.
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, Texas 75024
(214)265-0250
ATTORNEY FOR COUNTER-DEFENDANT
DOUGLAS M. HICKOK

        - AND -

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey & Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2101
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS AND BETSY GROSS

**INDEX**

**JUNE 18, 2014**                                   PAGE    VOL.

PROCEEDINGS...............................    4      1

COURT'S RULING ...........................   15      1

ORAL MOTION FOR CONTINUANCE.............   16      1

COURT'S RULING...........................   17      1

END OF PROCEEDINGS.......................   21      1

REPORTER'S CERTIFICATE...................   22      1

**EXHIBIT INDEX (NONE)**

**PROCEEDINGS**

June 18, 2014

THE COURT: This is Cause No. 09-05232-A, VSDH Vaquero Venture, LTD versus Ken Gross and Betsy Gross. Please make your announcements for the record

MR. ALDOUS: Steve Aldous for the Grosses.

MS. RANDLE: Janet Randle appearing for Van Shaw, the attorney being -- attempting to be disqualified, and also counsel for VSDH.

MR. CHAIKEN: Kenneth Chaiken for Douglas Hickok.

THE COURT: Okay. You may proceed, Mr. Aldous.

MR. ALDOUS: Your Honor, if you recall, we were set for trial in December on this very case, and Mr. Shaw showed up, asked for a continuance at that time saying that he may and likely would be a witness in the case and that he was seeking a continuance on that basis. And if you recall, he had Mr. Hagood come to pick the jury in the event we were to proceed to the jury. We didn't proceed to the jury. I then sent an email to Mr. Shaw asking him if he will agree to withdraw based upon his statements to the Court. He said, "no." So I filed this motion.

The motion basically says if you -- if the

lawyer is going to be a witness, the new rule says you can't act as an advocate before the Court. That means anything. And as a result, Your Honor, we're moving to dismiss him as a result of him being a witness.

THE COURT: Ms. Randle?

MS. RANDLE: Well, yes, Your Honor. First of all, let's talk about the delay. Our argument is in terms of the setting of this motion, this motion is six months after counsel has known about the issue. The issue was first raised in December. And at that time, it wasn't Mr. Shaw saying he was going to testify; it was Mr. Shaw contacting counsel because Mr. Shaw appeared on counsel's witness list -- or defendants' witness list.

Mr. Shaw -- and it's in the record. Counsel has attached it to different correspond -- letters from Mr. Shaw saying, "Tell me what it is. Are you going to call me or aren't you going to call me?" And Mr. Shaw -- the evidence before the Court in those letters is that counsel refused to give Mr. Shaw an answer. So Mr. Shaw did not withdraw. It wasn't Mr. Shaw's testimony that he was going to testify on behalf of himself. And I can't recall if at that time, Your Honor, Mr. Shaw was still a defendant. And I really don't recall when the summary judgment was

granted.

MR. ALDOUS: He was not a defendant at the time.

MS. RANDLE: Okay. Well, I appreciate counsel, and I'll assume counsel's correct.

MR. CHAIKEN: That is correct

MS. RANDLE: So anyway, Your Honor, we have counsel coming before the Court today, less than three weeks before trial -- again, the trial is set in July -- when counsel filed this motion back in February and here we are in June hearing a motion that should have been heard sooner if there was an issue. It should have been filed in December when counsel just told you that he was advised Mr. Shaw was not going to withdraw voluntarily on his own.

THE COURT: Well, it was filed in February, correct?

MS. RANDLE: Correct, Your Honor. It's now June.

THE COURT: It's not like it was filed yesterday.

MS. RANDLE: Well, I understand that. But, you know, February to June, it's almost been four months.

MR. ALDOUS: I think the delay here is not

my delay but Mr. Shaw's delay. And I know that counsel wasn't here when Mr. Shaw told the Court and what he told the Court and Mr. Chaiken's statement that he would be calling Mr. Shaw as a witness as well. And even to this day, I cannot confirm that I will call Mr. Shaw, but I can say that it's more than a 50 percent chance. So, you know, I just don't want him -- I don't care what he does.

Counsel, you can say whatever. I mean, I don't care if he's a lawyer or not for the case. The question is the rule. The rule says that he's not supposed to do it. If he wants to do it, fine. I just don't want him using it as an excuse for a continuance like he did back in December.

MR. CHAIKEN: Can I make one comment?

THE COURT: You may, Mr. Chaiken.

MR. CHAIKEN: Thank you. Because I was here. First of all, I'm a little surprised that we are here at this juncture because I -- and maybe it's just my own mind at work. I thought, given that the motion was filed in February and then there was no attempt to set it until recently, that the issue was basically a dead issue. But I guess I was mistaken on that. So I'm a little troubled by the timing of it all. But, nevertheless, I just want to be clear on the record. I

have never said that I am going to call Mr. Shaw as a witness. I said that I may need to call Mr. Shaw as a witness. And if I do call Mr. Shaw as a witness, it will be simply to rebut testimony that has been offered by Mr. Gross or his -- testimony given by Mr. Gross regarding certain interactions that he has had with Mr. Shaw.

THE COURT: So those would be factual issues.

MR. CHAIKEN: They would be factual issues because he was a fact witness to alleged conversations that occurred outside the scope of litigation and prior to litigation. But, again, I don't know how the trial's going to shape up in terms of what the Court's going to let into evidence and not let into evidence.

And the other thing that I wanted to mention is -- because that issue, that last issue, to me is probably the most critical one. There have been recently filed cross-motions for summary judgment, which, from my point of view and I think from Mr. Aldous' point of view from our conversations, would, depending on the Court's rulings on those, significantly not only narrow the scope of the trial depending on the rulings, but at least shape those issues for trial purposes, which will have a bearing on whether or not,

if there is a trial left, Mr. Shaw would be a witness or not be a witness.

And so we, unfortunately, filed these motions about the same time and haven't been able to obtain a setting on those motions. And so my only issue would be that -- that if there's a way that we can get the summary judgments heard and ruled on before the current trial date, which I know is a difficult proposition because I understand that Your Honor is going to be gone the week before the July 4th -- or unavailable, I don't know about gone, the week before the July 4th weekend or week.

THE COURT: No. I'm planning to be here that week.

MR. CHAIKEN: I had been informed when I attempted to get a setting that you had no availability. Maybe -- is there a judicial conference or something going on or --

THE COURT: No. Maybe we just have a full docket.

MR. CHAIKEN: Maybe it's a full docket, but I had understood that you were unavailable for a reason other than a busy schedule, but I could be mistaken.

MS. RANDLE: Your Honor --

THE COURT: The week of the 4th --

MS. RANDLE: -- I would also like to continue.

THE COURT: Just a second. The week of the 4th of July?

MR. CHAIKEN: The week of the 4th, yeah.

THE COURT: No. That's a different issue.

MR. CHAIKEN: Okay.

THE COURT: There's a conference during that week.

MR. CHAIKEN: Okay. That might have been where I got confused in terms of what the lack of availability was about, but I don't know. If there's a way to possibly postpone the start date of the trial and hear the summary judgment and then defer the ruling based upon the outcome, I think it may help shape the question. I don't know. Steve and I talked about -- excuse me. Mr. Aldous and I talked about bringing that to your attention and seeing if there's a way that we might be able to address that question.

THE COURT: Have you been to mediation since Mr. Aldous has been on the case?

MR. ALDOUS: We have, Your Honor.

MR. CHAIKEN: Since you got involved?

MR. ALDOUS: Yes.

MR. CHAIKEN: Who did --

MR. ALDOUS: Judge Stanton.

MR. CHAIKEN: Oh, that's right. Yeah, we sure did.

THE COURT: And he was unable to resolve this with you?

MR. ALDOUS: He was.

THE COURT: Ms. Randle?

MS. RANDLE: Yes, Your Honor. I'd like to finish my arguments. I started with this idea that there is essentially a waiver. And the case I'd like to cite to the Court on that is a case -- it's BP AM Production Company versus Zaffirini 419 S.W.3d 485. And that is a San Antonio 2013 case. And in that case, the time period's a little longer. It was an affidavit of the attorney that was filed, and the opposing counsel waited seven months before the opposing counsel set it for hearing. And it happened to be three days before a summary judgment, and the Court said you essentially -- it's too late. You've waived it.

Now that's not my only argument. Counsel indicated that the rule is any time an attorney is going to testify, and I disagree. That isn't the rule. The rule that's been moved on is the Rule of Professional Conduct 3.08. And that rule requires defendant to come

into this court with evidence that Mr. Shaw in his testimony that is alleged to have been -- whatever it is he's going to testify to has to be an essential fact to the case, and it has to be something that the -- that cannot be obtained by anyone else.

There is no evidence before this Court to that affect. Counsel has not met the burden of coming forward and establishing that information The rule is not that an attorney cannot testify. There is also an exception that an attorney can testify if they're a defendant. Now Mr. Shaw was a defendant, and now -- but Mr. Shaw is also an owner of VSDH.

THE COURT: Which is a corporate entity, correct?

MS. RANDLE: It's a corporate entity but I'm just saying --

MR. CHAIKEN: I believe it's a limited partnership just for clarity.

MS. RANDLE: But there is -- I don't have a case that says that. But my argument is that there is a situation with respect to a self-interest. If you're going to say that you can't testify or you can testify if you are strictly a defendant, the question becomes: What is the purpose of that rule?

So my position today is, Your Honor, that

the motion before the Court does not present this Court with any evidence of what Mr. Shaw's testimony is that counsel suggests triggers under Rule 3.08 a responsibility for this Court to disqualify him.

THE COURT: Where in the rule do you find a requirement that they have to present evidence of that testimony?

MS. RANDLE: Well, Your Honor, they're the moving party. There are exceptions.

THE COURT: I'm looking at the rule. I don't see anything that says that they have to present testimony about what the --

MS. RANDLE: Well, Your Honor, all --

THE COURT: -- what the lawyer would -- we can't talk at the same time.

MS. RANDLE: I'm sorry.

THE COURT: -- what the lawyer would testify to. I did ask whether or not he would be testifying as to fact issues, which I think is important.

MS. RANDLE: Fact issues, but, Your Honor, it's not just fact issues. The rule requires them to be essential fact issues that only Shaw can testify to. If there's a source that you can get that fact issue from someone else -- you know, there's no evidence that Shaw

APX 30

is going to testify to that. That's the problem here. Counsel has not indicated he's going to call Shaw. No one has come before this Court to say, "Mr. Shaw is going to testify to fact A. Mr. Shaw is the only person who can testify to that fact. It's essential to the case; therefore, Mr. Shaw needs to be disqualified."

There are -- the majority of cases that are cited that are -- that are the note cases are cases overruling the trial Court's denial or granting of the motion based upon those very issues of evidence not provided by the moving party seeking disqualification. And that is something that counsel has not provided to this Court at all, and counsel first knew about this issue in December. It's now six months later, and you still -- this Court has no idea what is the testimony that is going to be at issue. No one has presented that to the Court.

THE COURT: Mr. Chaiken just said that he would be asking Mr. Shaw questions with regard to the testimony of Mr. Gross. And if he does that, then I assume that Mr. Aldous will have questions as well.

MS. RANDLE: Well, Your Honor, I guess --

THE COURT: Now, I think the way to resolve this is that Mr. Shaw may not represent VSDH pursuant to the section in the rule, the note -- it's

Note 8 -- that says, "The rule does not prohibit the attorney who may or will be a witness from participating in the preparation of a matter for presentation to a tribunal. However, to minimize the possibility of unfair prejudice to an opposing party, the rule prohibits any testifying lawyer who could not serve as an advocate from taking an active role before the tribunal in the presentation of the matter."

So he may stay on the case, but he may not make any presentations before the Court.

MS. RANDLE: Well, Your Honor, on what -- on what testimony, though? That's -- I guess that's the question. What is the testimony that is being used to prohibit Mr. Shaw from --

THE COURT: The problem is we don't know, but we do know that he is likely to be a witness in this case. And that's what the rule addresses. It says, "A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact."

MS. RANDLE: "An essential fact," that's my point, Your Honor. And that's what --

THE COURT: Well, "knows or believes that

APX 32

he may be," and therein lies the rub. So my ruling is my ruling. He may continue to represent; he just may not represent before this tribunal.

MS. RANDLE: Okay. Your Honor, I then ask for a continuance at this time because Mr. Shaw has been sitting here waiting. Just as Mr. Chaiken said, everyone thought this issue was gone. Now we have a motion set seven -- three weeks before trial. So I'm asking for a continuance of the trial to allow --

THE COURT: This is a 2009 case.

MS. RANDLE: Your Honor, I understand that.

THE COURT: It's been pending on the docket of the Court for an excessive amount of time. The last time Mr. Shaw did appear before the Court, he did appear with Mr. Hagood -- the Court has a specific recollection of that -- with the specific intent that Mr. Hagood would conduct the trial portion of the proceedings and that he would be here in an advisory capacity. And so the Court's ruling is that's what's going to happen.

MS. RANDLE: Okay. Your Honor, just to note, since that time, as Mr. Chaiken said, everything has gone away. And now we have a motion filed, but I haven't heard the Court render any discussion regarding

the delay in now filing a motion and now three weeks before trial. I don't even know if Mr. Hagood is even available now.

THE COURT: Mr. Hagood was informed of the time of the trial as was Mr. Shaw, correct?

MR. ALDOUS: Yes, Your Honor.

MS. RANDLE: Yes. But the question is: Was he informed of the trial with respect to being trial counsel, actual counsel?

THE COURT: He was here in that capacity.

MS. RANDLE: So, Your Honor, I'd just move for a continuance to allow at least, you know --

THE COURT: The Court is disinclined to allow another continuance in a 2009 case.

MR. ALDOUS: I object to not getting three-days' notice of the motion, Your Honor.

MS. RANDLE: Your Honor, I understand. I'm just moving for the continuance to allow Mr. Hagood to prepare for trial now that counsel has filed a motion three weeks before trial raising the issue before this Court.

THE COURT: The testimony before the Court was that Mr. Aldous asked Mr. Shaw some months ago whether or not he would be proceeding and that no response was provided.

APX 34

MS. RANDLE: Your Honor, I --

THE COURT: The Court has made its ruling.

MR. ALDOUS: Thank you, Your Honor.

MR. CHAIKEN: Your Honor, can I just ask one question? I had raised the possibility of getting some of your time to consider those cross-motions.

THE COURT: I'll have to look at the docket, Mr. Chaiken. I can't just tell you off the bat.

MR. CHAIKEN: Well, my only question is: Would the Court be inclined to allow the shortening of the 21-day notice period, assuming we agree to that?

MR. ALDOUS: We do agree to that.

THE COURT: I still have to look at the docket.

MR. ALDOUS: Right.

MR. CHAIKEN: Okay. And if we could do that, I'd appreciate it, just kind of figuring that out one way or the other so that I can close the loop on that.

MS. RANDLE: Your Honor, I'm not making any representation before the Court as to any agreement as to any extension at this time. I just want it to be clear.

THE COURT: Would these be summary judgment motions involving VSDH, or would it just be

involving the Grosses and Mr. Hickok?

MR. CHAIKEN: Mr. Hickok was the first movant for summary judgment, and then it's not really a cross -- well, it is. It's related to some of the issues. So in effect, it's a cross-motion filed by the Grosses, but it's as between the claims involving the Grosses and Mr. Hickok as a guarantor, not VSDH per se.

MR. ALDOUS: It's just related to construction of the contract --

MR. CHAIKEN: Well, it -- no.

MR. ALDOUS: -- essentially.

MR. CHAIKEN: Mine also involves one additional issue, which is whether or not there -- as a matter of law, the buy-back obligation, whether owed by VSDH or a guarantor, could have been performed. That's the second issue that's raised in my summary judgment motion.

MR. ALDOUS: But I thought that was based upon the wording of the contract.

MR. CHAIKEN: That is the remedies portion. But, yeah. But anyway, it would certainly help things if we can get it done. And if the Court can't do it, I certainly understand that timing is what it is.

THE COURT: Well, I can't tell you right

now is what I'm telling you.

MR. CHAIKEN: No, no, I understand.

THE COURT: I'll just have to get back with you on that.

MR. ALDOUS: Are we released, Your Honor?

THE COURT: Who's going to -- you're going to present an order, Mr. Aldous?

MR. ALDOUS: I will.

THE COURT: Circulate it.

MR. ALDOUS: Based upon your ruling, I'll have to change it.

MS. RANDLE: Your Honor, I'd like to see the order before it's presented to the Court.

THE COURT: I just told him to circulate it, Ms. Randle.

MS. RANDLE: I understand, but I said before it's presented to the Court.

THE COURT: That's what "circulate" means.

MS. RANDLE: I just want to be clear. It's not always clear to some counsel, Your Honor.

THE COURT: All right.

MR. CHAIKEN: Do you want us to go check the docket to see what's available or --

THE COURT: No. We'll get back with you.

MR. CHAIKEN: Okay. Fair enough. Sure.

Thanks.

MS. RANDLE:  Are we excused, Your Honor?

THE COURT:  You're excused.

MR. CHAIKEN:  Thanks, Judge.

(Proceedings concluded)

STATE OF TEXAS )

COUNTY OF DALLAS )

I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $220.00 and will be paid by the Law Offices of Van Shaw.

Witness MY OFFICIAL HAND this the 20th day of June, 2014.

/S/CATHYE G. MORENO, CSR
Cathye G. Moreno, Texas CSR #6076
Expiration Date: 12/31/14
Official Court Reporter
County Court at Law No. 1
600 Commerce Street, Suite 550
Dallas, Texas 75202
  cathyemoreno@sbcglobal.net
  (214)653-7496

APX 39

# TAB 20


FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

Conditionally Grant and Opinion Filed August 28, 2014

2014 AUG 29 AM 11: 59



In The

# Court of Appeals
## Fifth District of Texas at Dallas

---

### No. 05-14-00958-CV

---

## IN RE VSDH VAQUERO VENTURE, LTD., Relator

---

### Original Proceeding from the County Court at Law No. 1
### Dallas County, Texas
### Trial Court Cause No. CC-09-05232-A

---

## MEMORANDUM OPINION
Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Francis

Relator VSDH Vaquero Venture, Ltd. filed this mandamus proceeding after the trial court made an oral ruling disqualifying Evan L. Shaw as its counsel on the ground he may be a witness in the case. To obtain mandamus relief, relator must show both that the trial court abused its discretion and that it has no adequate appellate remedy. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). VSDH has met its burden. We therefore conditionally grant the writ of mandamus.

Real parties in interest Kenneth and Betsy Gross are counter-plaintiffs below. The following facts are taken from their counterclaim and VSDH's motion for continuance. The Grosses purchased residential property from VSDH; Shaw and Douglas M. Hickok are limited partners in VSDH. The contract contained a "buy back" option requiring VSDH to repurchase the property subject to particular terms and conditions. According to the Grosses, they exercised

the option. The Grosses allege that after VSDH, Shaw, and Hickok "affirmatively represented" they would not "honor" the provision, the Grosses sold the property to a third party. VSDH filed a declaratory judgment action contending it did not breach the contract, and the Grosses counterclaimed against Shaw, Hickok, and VSDH for damages for breach of contract and fraud.[1]

Two weeks before the case was set to go to trial, VSDH received the Grosses' witness list identifying VSDH's counsel, Shaw, as a "person who may be called as an adverse witness." By this time, Shaw was no longer a defendant in the suit. Shaw wrote to the Grosses' counsel twice to determine if he planned to call Shaw as a witness at trial. When the Grosses' counsel refused to say one way or the other, Shaw filed a motion to continue the case until the Grosses decided whether they were calling him as a witness and, if they decided they would be calling him, additional time to locate and engage new counsel to represent VSDH. The trial was reset for July 2014.

Two and a half months later, the Grosses filed a motion to disqualify Shaw asserting that Shaw had not withdrawn from representing VSDH and that "[n]othing had changed in terms of the likelihood that Shaw will be called as a witness in the trial of this case." Relying on rule 3.08 of the Texas Disciplinary Rules of Professional Conduct, they asserted Shaw should not be permitted to act as an advocate in the case. As the trial date neared, the Grosses set the motion for a hearing on June 18, 2014. At the hearing, the Grosses presented no evidence to support their motion, only argument. Counsel for the Grosses would not confirm whether he would call

---

[1] Our record does not contain VSDH's petition, only the Grosses' counterclaim. The absence of the petition does not impair our ability to consider the issue in this proceeding. *See* TEX. R. APP. P. 52.7(a).

Shaw as a witness but said he believed it was "more than a 50 percent chance." He also represented that counsel for real party Hickok had previously represented he would call Shaw as a witness, but Hickok's counsel disputed that assertion, saying he may need to call him "simply to rebut testimony that has been offered by Mr. Gross . . . regarding certain interactions he has had with Mr. Shaw." In response, VSDH complained the Grosses had failed to produce evidence to trigger disqualification under rule 3.08(a). In particular, they asserted the Grosses failed to show that Shaw would be testifying to an essential fact that could not be obtained by other evidence. The trial court disagreed that evidence needed to be presented as to "what the lawyer would testify to" and orally ruled that Shaw "may stay on the case, but he may not make any presentations before the Court."

An oral ruling may be subject to mandamus review if the ruling is clear, specific, enforceable, and adequately shown by the record. *See In re Penney*, No. 05-14-00503-CV, 2014 WL 2532307, at *2 n.3 (Tex. App.—Dallas June 14, 2014, orig. proceeding) (mem. op.). An appellate court can determine whether an oral ruling meets these criteria by reviewing the reporter's record. *Id.* We conclude the oral ruling in this case meets the criteria.

Because disqualification is a severe remedy, courts must adhere to exacting standards when considering motions to disqualify so they are not used as a trial tactic. *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding). Here, the Grosses relied on rule 3.08(a) of the disciplinary rules of professional conduct to disqualify Shaw. While the disciplinary rules are not controlling as standards governing motions to disqualify, they serve as guidelines that "articulate considerations relevant to the merits of such motions." *Id.* The burden is on the movant to establish with specificity a violation of the disciplinary rules. *Id.*

Rule 308(a) of the disciplinary rules provides in relevant part: "A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending

—3—

adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client" except under certain circumstances. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.08(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (WEST 2013) (TEX. STATE BAR R. art. X, § 9). A party seeking disqualification of a lawyer under rule 3.08(a) must present evidence that the testimony of the lawyer is necessary, that it goes to an "essential fact," and that the party will be prejudiced if the opposing lawyer is permitted to serve in dual roles. *See In re Lavizadeh*, 353 S.W.3d 903, 904 (Tex. App.—Dallas 2011, orig. proceeding); *see also In re Bahn*, 13 S.W.3d 865, 872 (Tex. App.—Fort Worth 2000, orig. proceeding). An attorney's testimony is not considered necessary if there is no unqualified, positive intent to call the attorney as a witness. *See In Interest of A.M.*, 974 S.W.2d 857, 864 (Tex. App.—San Antonio 1998, no pet.) (citing *Spears*, 797 S.W.2d at 658). If relying on rule 3.08(a), the moving party must further show that the fact to be established by the attorney's testimony is essential to the testifying attorney's own client's case as opposed to another's party's case. *In re Lavizadeh*, 353 S.W.3d at 904. Finally, the moving party must show the trial court lacks any means other than disqualification to remedy the harm to the opposing party. *In re Bivins*, 162 S.W.3d 415, 421 (Tex. App.—Waco 2005, orig. proceeding). Where a party fails to present evidence to support all of these matters, the party seeking disqualification fails to carry its burden and the trial court cannot reasonably conclude the attorney's testimony is necessary to establish an essential fact to the party's case. *In re Lavizadeh*, 353 S.W.3d at 904; *Gilbert McClure Enters. v. Burnett*, 735 S.W.2d 309, 311 (Tex. App.—Dallas 1987, orig. proceeding).

Here, the Grosses did not present any evidence to support their motion to disqualify. Consequently, based on the record before us, the trial court could not have reasonably concluded that Shaw's testimony was necessary to establish an essential fact of VSDH's case. *See In re*

*Lavizadeh*, 353 S.W.3d at 904; *Gilbert McClure Enters.*, 735 S.W.2d at 311. In reaching this conclusion, we reject the Grosses' argument that the trial court could take judicial notice of the contents of its file in making its decision. We note, first, that no party requested the court to take judicial notice of any document. Second, nothing in the record reflects that the trial court took judicial notice of any document. To the contrary, the record suggests the trial court did not know what essential fact Shaw's testimony would establish or how the Grosses would be prejudiced if permitted to testify to those facts. When VSDH's counsel asked what testimony was "being used to prohibit" Shaw from representing VSDH, the trial court responded, "The problem is we don't know, but we do know that he is likely to be a witness in this case. And that's what the rule addresses. . . ."

Appeal is an inadequate remedy for the improper disqualification of Shaw. *See Spears*, 797 S.W.2d at 657–58. Accordingly, we conditionally grant the relator's petition for writ of mandamus and direct the trial court to vacate its oral order granting the Grosses' motion to disqualify and to enter a written order denying the motion. A writ will issue only in the event the trial court fails to comply.

140958F.P05

/Molly Francis/
_____
MOLLY FRANCIS
JUSTICE

–5–

FILE COPY

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2014 AUG 29 AM 11: 59

CHIEF JUSTICE
  CAROLYN WRIGHT

JUSTICES
  DAVID L. BRIDGES
  MICHAEL J. O'NEILL
  KERRY P. FITZGERALD
  MOLLY FRANCIS
  DOUGLAS S. LANG
  ELIZABETH LANG-MIERS
  ROBERT M. FILLMORE
  LANA MYERS
  DAVID EVANS
  DAVID LEWIS
  ADA BROWN

LISA MATZ
CLERK OF THE COURT
(214) 712-3450
theclerk@5th.txcourts.gov

GAYLE HUMPA
BUSINESS ADMINISTRATOR
(214) 712-3434
gayle.humpa@5th.txcourts.gov

FACSIMILE
(214) 745-1083

INTERNET
HTTP://5TH.TXCOURTS.GOV



## Court of Appeals
## Fifth District of Texas at Dallas

600 COMMERCE STREET, SUITE 200
DALLAS, TEXAS 75202
(214) 712-3400

August 28, 2014

Evan Lane (Van) Shaw
Law Offices of Van Shaw
2723 Fairmount St
Dallas, TX 75201-1912
* DELIVERED VIA E-MAIL *

Steven E. Aldous
Forshey Prostok
500 Crescent Ct
STe. 240
Dallas, TX 75201
* DELIVERED VIA E-MAIL *

Kenneth B. Chaiken
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway, Suite 440
Plano, TX 75024
* DELIVERED VIA E-MAIL *

RE:   Court of Appeals Number:   05-14-00958-CV
      Trial Court Case Number:   CC-09-05232-A

Style:  In Re: VSDH Vaquero Venture, Ltd.


Please find attached the opinion that issued in the above cause today.

Respectfully,

/s/ Lisa Matz, Clerk of the Court

cc:   Dallas County Court Clerk, County Court At Law No. 1 (DELIVERED VIA E-MAIL)
      Justice Mary L. Murphy (DELIVERED VIA E-MAIL)
      D'Metria Benson (DELIVERED VIA E-MAIL)

# TAB 21

| | |
|---|---|
| **VSDH VAQUERO VENTURE LTD,** | **IN THE COUNTY COURT** |
| *Plaintiff(s),* | |
| v. | **AT LAW NO. 1** |
| **KEN GROSS, BETSY GROSS,** | |
| | **DALLAS COUNTY, TEXAS** |
| *Defendant(s),* | |

## ORDER VACATING ORAL RULING ON MOTION TO DISQUALIFY EVAN L. SHAW

On June 18, 2014, an oral ruling was made to disqualify attorney Evan L. Shaw from the above-styled case, specifically that Shaw "may stay on the case, but he may not make any presentations before the Court". The Court now VACATES that oral ruling and enters this Order DENYING the Grosses' Motion to Disqualify Evan L. Shaw.

IT IS ORDERED, ADJUDGED AND DECREED that the oral ruling made on June 18, 2014 on the Motion to Disqualify Evan L. Shaw is VACATED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion to Disqualify Evan L. Shaw is DENIED.

Signed this _18th_ day of _September_, 2014

_____
Presiding Judge



CC-09-05232-A
MCMO
ORDER - MISCELLANEOUS
661162

# TAB 22

## CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| **VSDH VAQUERO VENTURE, LTD.** | § | **IN THE COUNTY COURT** |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **KEN GROSS and BETSY GROSS** | § | **AT LAW NUMBER 1** |
| | § | |
| **Defendants/Counter-Plaintiffs,** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **EVAN L. SHAW and DOUGLAS M.** | § | |
| **HICKOK** | § | |
| | § | |
| **Intervenors/Counter-Defendants.** | § | **DALLAS COUNTY, TEXAS** |

## VAN SHAW'S MOTION TO WITHDRAW AND PLAINTIFF/COUNTER-DEFENDANT VSDH VAQUERO VENTURE, LTD.'S MOTION FOR MISTRIAL

TO THE HONORABLE JUDGE:

Now come Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. ("VSDH") and its counsel, Van Shaw, and file this Motion to Withdraw and Motion for Mistrial, and respectfully shows as follows:

### I.
### MOTION TO WITHDRAW

Texas Rule of Professional Conduct 3.08(b) states as follows: *"A lawyer **shall not** continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure."*(emphasis added)

---

VAN SHAW'S MOTION TO WITHDRAW AND PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD.'S MOTION FOR MISTRIAL      **Page 1**
MORP Pltf Mot2 Withdraw and Mot4 Mistrial

1

On June 15, 2015, during the first day of trial in the above-styled matter, Van Shaw came to believe that Van Shaw would be compelled to furnish testimony that will be substantially adverse to his client. Counsel for Mr. and Mrs. Gross expressed his intention to call Mr. Shaw as a witness at approximately 2:50 p.m. in chambers with the Court. Immediately thereafter, counsel for Defendant Mr. Hickock advised of his intent to call Mr. Shaw as a witness as well. Immediately prior to counsel advising the intent to call Shaw as a witness, Doug Hickock (first witness) was questioned by counsel for Grosses as to the "solvency of VSDH" and the matters relating to the 'first breach' defense of VSDH. Defendant set up conflicting testimony by Van Shaw that will advsersly impact VSDH – to that end:

(a)    Hickock testified that Shaw was wrong to advise Grosses that VSDH was "insolvent". Shaw will now be required to testify as to why VSDH was insolvent, why the representation by the VSDH G.P. (Hickock) was wrong and that will substantially and adversely affect VSDH in that the same will be undermined as to credibility and its financial position will jeopardize its first breach defense. The evidence will prejudice its first breach defense.

(b)    Hickock testified that Hickock "referred" all dealings with the Grosses to Shaw in dealing with the Gross' buy-back issue. Shaw will now be required to testify as to the same. Those facts are material and will substantially and adversely affect VSDH and the testimony by Van Shaw as to the first breach issues will prejudice VSDH.

Pursuant to Texas Rule of Professional Conduct 3.08(b), Mr. Shaw is now **required** to discontinue his representation of Plaintiff/Counter-Defendant VSDH.

**VAN SHAW'S MOTION TO WITHDRAW AND PLAINTIFF/COUNTER-DEFENDANT**
**VSDH VAQUERO VENTURE, LTD.'S MOTION FOR MISTRIAL**                    **Page 2**
MORP Pltf Mot2 Withdraw and Mot4 Mistrial

2

Therefore, Mr. Shaw respectfully requests that the Court GRANT Mr. Shaw's Motion to Withdraw.

## II.
## MOTION FOR MISTRIAL

As a result of Mr. Shaw's sudden *requirement* to discontinue his representation of VSDH after the start of trial in this matter, VSDH respectfully requests that the Court declare a mistrial and re-set this matter for trial after a reasonable period of time to allow VSDH to retain new counsel and prepare for trial.

A mere continuance of the trial will not be sufficient, as a new jury should be selected.

The current jury has already seen Mr. Shaw in action as counsel for VSDH. If this trial is only continued, then this same jury will undoubtedly be very confused as to why the man the jury thought was counsel for VSDH – Mr. Shaw – is no longer sitting at counsel's table in the courtroom, but is now taking the stand and offering material factual testimony.

Such confusion will greatly prejudice VSDH and cause irreparable harm to VSDH.

Therefore, VSDH respectfully requests the court declare a mistrial, and re-set this matter for trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. and its counsel, Van Shaw, respectfully request that the Court DECLARE a mistrial in this matter, GRANT Van Shaw's Motion to Withdraw, and re-set this matter for hearing after a reasonable period of time to allow Plaintiff/Counter-Defendant VSDH Vaquero Venture, Ltd. to obtain new counsel and prepare for trial, and grant Plaintiff/Counter-Defendant

**VAN SHAW'S MOTION TO WITHDRAW AND PLAINTIFF/COUNTER-DEFENDANT**
**VSDH VAQUERO VENTURE, LTD.'S MOTION FOR MISTRIAL**                    **Page 3**
MORP Pltf Mot2 Withdraw and Mot4 Mistrial

3

VSDH Vaquero Venture, Ltd. any and all further relief to which they may be entitled, both at law and in equity.

Respectfully submitted,

/s/ Van Shaw

Evan Lane (Van) Shaw
State Bar No. 18140500
van@shawlaw.net
Janet R. Randle
State Bar No. 00792216
janet@shawlaw.net
Collen Meyer
State Bar No. 24074709
collen@shawlaw.net

LAW OFFICES OF VAN SHAW
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110 telephone
(214) 754-7115 facsimile

ATTORNEYS FOR PLAINTIFF/COUNTER-DEFENDANT VSDH VAQUERO VENTURE, LTD.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of foregoing Motion has been served upon all counsel of record pursuant to the Texas Rules of Civil Procedure on this 16th day of June, 2015.

/s/ Van Shaw

Evan Lane (Van) Shaw

VAN SHAW'S MOTION TO WITHDRAW AND PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD.'S MOTION FOR MISTRIAL                    Page 4
MORP Pltf Mot2 Withdraw and Mot4 Mistrial

4

# TAB 23

## CAUSE NO. CC-09-05232-A

| | | |
|---|---|---|
| **VSDH VAQUERO VENTURE, LTD.,** | § | **IN THE COUNTY COURT** |
| **Plaintiffs/Counter-Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KEN GROSS and BETSY GROSS** | § | |
| **Defendants/Counter-Plaintiffs,** | § | **AT LAW NUMBER 1** |
| | § | |
| **v.** | § | |
| | § | |
| **EVAN L. SHAW and DOUGLAS M.** | § | |
| **HICKOK** | § | |
| **Intervenors/Counter-Defendants.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |

### KEN GROSS AND BETSY GROSS' BRIEF ON VSDH'S MOTION FOR MISTRIAL

**TO THE HONORABLE JUDGE BENSON:**

**COMES NOW,** Kenneth P. Gross and Betsy L. Gross (hereinafter referred to as "the Grosses"), and file this brief related to VSDH's motion for mistrial and would respectfully show the following:

### ARGUMENT AND AUTHORITIES

VSDH is attempting to use Texas Rule of Professional Conduct 3.08 as a tactical weapon to avoid trial and subvert the purpose of rule 3.08. On December 6, 2013, three days before trial of this matter, VSDH filed a motion for continuance asserting that continuance was necessary because Shaw might be a fact witness in this case and rule 3.08 prohibited his participation as counsel and a witness. The Court granted that motion. After months passed and Shaw did not substitute new counsel for VSDH, the Grosses filed a motion to disqualify Shaw based upon his representations contained in his motion for continuance. Shaw opposed the motion. The Court granted the motion and Shaw sought relief from the order with the court of appeals. When Shaw

---

**KEN AND BETSY GROSS' BRIEF** **Page 1**

filed his mandamus, it made the parties miss another trial setting. The court of appeals conditionally granted the writ of mandamus because the record lacked evidence that Shaw's testimony would relate to an essential fact that would prejudice a party if Shaw served as both witness and lawyer. (Memorandum Op. p. 4). Now, more than one and half years after initially raising the issue, using the issue to get a continuance on two occasions, VSDH claims this trial should be halted and Shaw permitted to withdraw. The motion should be denied and trial should continue.

Rule 3.08 provides:

(a) A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client, unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;

(3) the testimony relates to the nature and value of legal services rendered in the case;

(4) the lawyer is a party to the action and is appearing pro se; or

(5) the lawyer has promptly notified opposing counsel that the lawyer expects to testify in the matter and disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full disclosure. First, the defense is an affirmative defense which must be pleaded.

(c) Without the client's informed consent, a lawyer may not act as advocate in an adjudicatory proceeding in which another lawyer in the lawyer's firm is prohibited by paragraphs (a) or (b) from serving as advocate. If the lawyer to be called as a witness could not also serve as an advocate under this Rule, that lawyer shall not take an active role before the tribunal in the presentation of the matter.

Comment 2 to the rule provides that "[o]ne important variable in this context is the anticipated tenor of the lawyer's testimony. If that testimony will be substantially adverse to the client, paragraphs (b) and (c) provide the governing standard. In other situations, paragraphs (a) and (c) control." Comment 10 to the rule states that the rule should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice because reducing the rule to such a use would subvert its purpose.

In the present case, neither Hickok nor the Grosses have moved to disqualify Shaw under rule 3.08. At most, Hickok has announced his intention to call Shaw as a witness. However, "[a] mere announcement by an adversary of his intention to call opposing counsel as a witness is insufficient to orchestrate counsel's disqualification." *Gilbert McClure Enterprises v. Burnett,* 735 S.W.2d 309, 311 (Tex. App.—Dallas 1987, orig. proceeding). "There must be [evidence of] a genuine need for the attorney's testimony, which should be material to the movant's case as well as prejudicial to the interests of the attorney's client before disqualification is required." *Id.* Shaw has not identified any evidence that he may provide which is material (in the sense of rule3.08) to this case. Likewise, Hickok has not identified any evidence that will be sought from Shaw that will be material. Furthermore, Shaw has not offered anything to show that any testimony he will provide will be prejudicial to the interest of VSDH.

The evidence admitted at trial shows that Hickok was the point person for VSDH in the negotiation and consummation of the contract at issue in this case. Shaw did not become involved until the Grosses exercised their buy-back option. For all of Shaw's dealings with the Grosses, there are emails which reflect those conversations. In fact, there is evidence of only one substantive meeting with Shaw after the Grosses exercised their buy-back option.

At this point, there is no evidence before the Court that any evidence which might be sought from Shaw is material in the sense that it will have any bearing on the ultimate decisions to be made by the jury. If Hickok wishes to call Shaw as a witness to set up a defense that is not material, such a tactic is not prohibited by the rule. In addition, Shaw himself has not offered any evidence to the Court about whether or why any testimony he might give would be prejudicial to his client. As a result, the Court should deny the motion.

WHEREFORE, PREMISES CONSIDERED, the Grosses respectfully request that VSDH's motion for mistrial be Denied and that they have and recover all other relief to which they are entitled in law or equity.

Respectfully submitted,

*/s/ Steven E. Aldous*
**Steven E. Aldous**
State Bar No. 00982100
saldous@forsheyprostok.com
**FORSHEY & PROSTOK, LLP**
500 Crescent Court, Suite 240
Dallas, TX 75201
Ph. 214.716.2100
Fx. 817.877-4151

*Attorney for Defendants/Counter Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing instrument was served upon all attorneys of record in accordance with Rule 21a of the Texas Rules of Civil Procedure on the 16th day of June, 2015.

*/s/Steven E. Aldous___*
STEVEN E. ALDOUS

# TAB 24

REPORTER'S RECORD
VOLUME 2 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD. )IN THE COUNTY COURT
)
 Plaintiff/Counter-Defendant, )
)
V. )
)
KEN GROSS and BETSY GROSS )AT LAW NO. 1
)
 Defendants/Counter-Plaintiffs, )
)
V. )
)
EVAN L. SHAW and DOUGLAS M. )
HICKOK )
)
 Intervenors/Counter-Defendants,)DALLAS COUNTY, TEXAS

-----------------------------------------------------------

**TRIAL ON THE MERITS**

-----------------------------------------------------------

On the 10th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable EMILY TOBOLOWSKY, sitting for the Honorable D'METRIA BENSON, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine. Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

     - AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

     - AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
**MR. DANIEL K. HAGOOD**
SBN 08698300
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.


ALSO PRESENT:  Ms. Jane Fraser, Jury Consultant

**INDEX**

JUNE 10, 2015                                      PAGE    VOL.

PROCEEDINGS................................  4       2

VOIR DIRE BY MR. ALDOUS.…...............  13       2

VOIR DIRE BY MR. HAGOOD................  75       2

VOIR DIRE BY MR. CHAIKEN................  85       2

STRIKES FOR HARDSHIPS...…............. 114       2

STRIKES FOR CAUSE...................... 138       2

SEAT THE JURY AND SWEAR IN THE JURY.... 148       2

END OF PROCEEDINGS....................... 151       2

REPORTER'S CERTIFICATE................... 152       2

**EXHIBIT INDEX (NONE)**

**PROCEEDINGS**

June 10, 2015

(Jury panel enters the courtroom)

THE COURT: Please be seated.

Good morning, ladies and gentlemen First of all, I should tell you that I am not Judge D'Metria Benson. My name is Judge Emily Tobolowsky. And I'm the judge of the 298th District Court. Unfortunately, Judge Benson doesn't have a voice today. She has a little bit of laryngitis, and so I am pinch hitting as it were during this jury selection time.

I wanted to make sure that all of you have had an opportunity to take the oath as potential jurors downstairs. Did anybody miss taking the oath?

Okay. Those of you who missed taking the oath, would you please raise your right hands? Would you raise your right hand?

(Potential jurors sworn)

THE COURT: Thank you.

Mr. -- 29?

VENIREPERSON VILLANUEVA: I'm no --

THE COURT: You don't speak English well?

VENIREPERSON VILLANUEVA: I don't understand.

THE COURT: Okay. Can you read English?

VENIREPERSON VILLANUEVA:  No.

THE COURT:  Can you write English?

VENIREPERSON VILLANUEVA:  No.  I only understand a little bit.

THE COURT:  Okay.  If you'll sit back down, we'll -- we will deal with it.  We will talk to you a little later.  Okay?

VENIREPERSON VILLANUEVA:  Okay.

VENIREPERSON CANTU:  I'm in the same situation.  I mean, I understand a little bit of English, but I don't know I can write or --

THE COURT:  Okay.  We'll talk to you also.  That's Number 1 and Number 29; is that correct?

VENIREPERSON VILLANUEVA:  Yeah.

THE COURT:  All right.  Counsel, if you all will also make note of that.

Anybody else concerned about any ability to read or write or understand English?

Yes, ma'am

VENIREPERSON DIMEFF:  I have a minor -- like a hearing problem that I can't understand some people's voices.  And I'm saying like the bottom third of my hearing.

THE COURT:  All right.  Well, we'll -- you'll hear the lawyers speak during this first portion

of the trial, and you'll need to let us know whether you're having any difficulty as we proceed through the morning.

As I indicated to you, I am Judge Tobolowsky. And, first of all, I know I speak on behalf of Judge Benson when I thank you for answering your summons for jury services and also for cooling your heels this morning while we were getting you up here and getting ready for you. I've heard it said, though I'm sure it's not true of any of you, that some people do not do a happy dance when they get a summons for jury service.

And in all seriousness, I want to tell you that I think you're going to have a very interesting experience. I want to remind you that we tend to take trial by jury for granted in this country. We grew up with this, those of us who did grow up here; and we tend to think of this as just -- you know, this is how it is. This is how it is all over the world. Well, it's not. In fact, this is one of the relatively few countries worldwide that has trial by jury and even fewer that have trial by jury in civil cases.

Because you are in this courthouse, you will not be hearing a criminal case. This will be a civil case. Nobody will be going to jail if you're

chosen to be a juror. But I want to remind you that this right to trial by jury is so important to our democracy that it's in our constitution. I mean, we don't have a whole lot of things in our constitution, but the right to trial by jury is in our constitution.

So I trust and hope that you will give this serious consideration, that you will listen carefully; that you will answer the questions that the lawyers ask you carefully and be reminded that this is a great privilege, but also responsibility that you undertake.

We are here to choose a jury of six of you. And even if you're not chosen, we thank you for being here. Has everybody turned off all of their telephones or other electronic devices?

Thank you.

While you're in the courtroom, you may not communicate, even the lawyers may not communicate using any electronic device or by telephone, text, email, chatroom, blog, or social networking websites, such as Facebook, Twitter, Instagram, Myspace, if it still exists. And do not record or photograph these proceedings, as that also is prohibited by law.

If you are chosen to serve on the jury, your very important role will be to decide the factual

matters in this case. The judge isn't empowered to weigh the facts and to decide who they believe. That's your job, and the judge's job is just to make sure that the case is tried in accordance with the law.

This is a lawsuit that was brought by Ken and Betsy Gross, and they are represented today by Steve Aldous.

Mr. Aldous, you may introduce yourself and whomever else you'd like to introduce.

MR. ALDOUS: Thank you, Your Honor.

Here with me today is Jane Fraser and also Sarah Irish over here.

THE COURT: Thank you, Mr. Aldous.

MR. ALDOUS: Thank you, Judge.

THE COURT: And the Grosses have brought suit against VSDH Vaquero Venture, Ltd., and that entity is represented by Van Shaw.

Mr. Shaw, you may stand and introduce yourself and whomever else you'd like.

MR. SHAW: Thank you, Your Honor.

Good morning. I'm Van, last name Shaw. And I'm here today with Dan Hagood today. And I'm going to be pinch lawyer.

MR. HAGOOD: Good morning.

THE COURT: Thank you, Mr. Shaw.

And the Grosses have also brought suit against an individual named Douglas Hickok, and he is represented today by Ken Chaiken.

Mr. Chaiken, you may stand and introduce yourself and anybody else you'd like.

MR. CHAIKEN: Good morning. My name is Kenneth Chaiken. And it is my honor and privilege to introduce to you my client, Mr. Douglas Hickok, who's here today as well.

THE COURT: Thank you, Mr. Chaiken.

MR. CHAIKEN: Thank you, Judge.

THE COURT: There are some instructions I'm about to give, and you need to abide by them during jury selection. And, please, listen very carefully. If you're chosen to serve on a jury, you're going to hear some of them again. But every juror must obey the instructions. If you don't obey the instructions you could be called to testify about potential juror misconduct, which then would mean we'd have to start this process all over again. And that wouldn't be fun for the next group of people and it wouldn't be fun for this group and their clients and it would be expensive for the county. So please obey my instructions.

To avoid looking like you are friendly with one side of the case, do not mingle or talk with

the lawyers, the witnesses, the parties, or anyone else involved in the case. Pardon me. You may exchange casual greetings like "hello" or "good morning" Other than that, do not talk about -- do not talk to them at all. They have to follow these same instructions, so you'll understand it when they do.

I apologize. Anybody else suffering from allergies this time of year?

Do not accept any favors from the lawyers, the witnesses, the parties, or anyone else involved in the case and do not do any favors for them. This could be something as simple as giving somebody a ride or giving them food. Do not discuss the case with anyone, not even your spouse, a friend, or anyone else, including by either in person or by phone, by text, by email, chatroom, blog, or social networking websites, such as Facebook, Twitter, or Myspace.

And do not allow anyone to discuss the case with you or in your hearing. If anyone tries to discuss the case with you or in your hearing, please tell me or a bailiff at once. The reason for this is we do not want you influenced by anything you hear that is not evidence in this case. So anything that should come to you from outside of this courtroom is something we don't want you influenced by.

Right after I'm finished with these instructions, the parties, through their attorneys, have the right to ask you questions about your background, experiences, and attitudes. They are not trying to meddle in your affairs, but they are trying to thoroughly determine who could be a fair juror in a case like this. And you will hear the words perhaps "bias" and "prejudiced" used. And we don't mean prejudiced in some other manner in which you might think it applies. But the lawyers in this first portion of the trial are just trying to determine who can be fair.

Now in the state of Texas, we call this first portion of the trial voir dire. If anyone speaks French, you know that's terrible. That's a Texanism of a French phrase. I'm fond of saying we're closer to Paris, France --closer to Paris, Texas, than we are to Paris, France. Hence, the Texas version of voir dire.

Please remember that you took an oath to tell the truth, and so that oath means that if you're answering questions that are asked to you by these lawyers, you need to give a complete answer. In that connection, you all have numbers, and it is easier for me and for the lawyers to see your numbers than it is to figure out what number you are.

So if you have an answer to a question, if

you would, pull up and keep holding up your number until you've been acknowledged in some way. And at the same time, the lawyers probably will all ask questions of you as a group and ask, you know, you to identify yourselves if you want to speak in connection with a group question. So keep those numbers raised until you've been acknowledged

But if there's a question that's asked that you really don't want to talk about in front of your new 29 best friends, if you would let us know, we can arrange for you to speak privately in front of me and in front of the lawyers in connection with your answer.

One other thing that I have failed to tell you is that the trial for which we are picking a jury today will not actually start until next Monday. So because next Monday at the courthouse is a non-jury week, the lawyers are making this and the judge arranged for you to be called down today to make other selections of the jury today. But the trial will not start until next Monday at 9:30.

I'm sure some of you are going to want to talk to us about your availability, and you'll have an opportunity to do that. But I did want you to know that when we are finished with this process, you will not be

needed the rest of the week. But you will be needed beginning on Monday.

Does anybody -- does everybody understand these instructions?

All right. We're going to begin with voir dire. And, Mr. Aldous, you may proceed.

MR. ALDOUS: Thank you, Your Honor.

Good morning everybody. So the reality is, I talk pretty loud, so you won't have any problems hearing me. But, occasionally, if you start to talk, I may remind you -- bless you -- that the court reporter up here is taking down what you have to say. So I may say, gee, what did you say and have you repeat.

I always think it's kind of unfair when we start up here asking you questions because, you know, I've got your jury information cards, and y'all don't know a hill of beans about me. So I'm going to tell you what my card would say, but I'm not going to give you my middle name.

Steve Aldous, 2525 Carlisle, Dallas, 75021. I've lived in Dallas County for over 20 years, but I couldn't add it up. And since I'm not really getting paid, I don't donate. My date of birth is 8/27/62. I see somebody 8/25/72. I've got six kids. I'm married. It's a blended Brady Bunch thing. And

I've never served on a jury. I'm a lawyer obviously. Forshey & Prostok is the name of my law firm. My spouse is employed by a place called Soft Surroundings out in Southlake. I've never been on a jury. Nobody will ever pick me, and I have been a party to a lawsuit. So now you know as much about me as I know about you.

So part of this process is for us to get to know you. In order for us to get to know you, you've kind of got to speak up. So if I ask you a question, it's not that I'm picking on you; I'm trying to find out some things to see whether or not you'd be a good juror for here, or maybe there's another case somewhere else in the courthouse that you'd be a better juror in.

So, first of all, let me just start off by saying this is a breach of contract case concerning a house. All right. So with that said, I'm going to give you a list of names, and these people are either going to be witnesses or they're going to be referred to in the case. And if you hear me call out the name, then put your number up, if you don't mind.

First, of course, you've got Dan Hagood and Van Shaw who represent VSDH Joint Venture. Does anybody know Dan or Van?

All right. Mr. Chaiken and his client, Mr. Hickok, does anybody know those folks?

And, as the Court told you, as the judge told you, I represent Ken and Betsy Gross. I specifically asked them not to be here this morning because I don't want you holding back on what you have to say just because my clients are here, and they may not want to hear it. So I asked them not to be here. So does anybody know Ken and Betsy Gross? They live out in Coppell or Southlake.

All right. Does anybody know a lawyer who may testify named Brent Cooper of Cooper & Scully?

All right. What about Paul Kramer, who's a builder? Does anybody know Roxann Taylor, who's a real estate agent in the Southlake area?

No? You see I was looking at the real estate agent. See, like I said, there, Mrs. Dimeff -- no, Ms. Jackson. Ms. Jackson, when I looked at you, it was because you're the only person in real estate here. So I knew partly you wouldn't want to put it on the card, so I was wondering if you knew Ms. Taylor. No? Okay.

So a lawyer named Hap Stern? A fellow that worked out at Vaquero, who's named John Buttemiller, but I don't think he lives there anymore. And then, finally, another lawyer named Mack Zimmerman, anybody know him?

Now I'm not saying all these people are going to be witnesses. All I'm saying is that they may be referred to in the case.

All right. So the other thing, too, is, does anybody know anybody from -- connected with my law firm that has an office in Fort Worth and Dallas, Forshey & Prostok, a good Louisiana lawyer?

All right. Great. So does anybody here watch, like, law shows on TV? Oh, we've got a nodder right here. So, let's see. Now, you're Ms. Pearson. What show -- what's your favorite law show?

VENIREPERSON PEARSON: Law and Order.

MR. ALDOUS: Law and Order, okay. That's the one where they say in the criminal justice system, blah-blah-blah.

And did anybody else -- oh, Ms. Watts, what's your favorite.

VENIREPERSON WATTS: Criminal Minds.

MR. ALDOUS: That's also a criminal show. So all you folks that watch criminal shows, you know, what is the burden of proof they always talk about? Beyond a reasonable doubt, right?

All right. We all know that. We've heard that on TV at times. There was only one person that I saw on their information sheet who said that they were

on a criminal jury, and I can't remember who it was. If you've ever served on a jury that was a criminal trial, please raise your hand. All right. So Mr. Cirone, did I say that correctly?

VENIREPERSON CIRONE: You said it right.

MR. ALDOUS: All right. Before we get any further, I have a question for you. Were you really born on 11/11/1911?

VENIREPERSON CIRONE: No.

MR. ALDOUS: That would make you over 100 years old. So I'm assuming that your information card is not accurate; is that right?

VENIREPERSON CIRONE: Yeah, you're right about that.

MR. ALDOUS: Okay. Good, because I was going, wow, this would be the first. I've never had somebody on the jury over 100 years old. No, but --

(Venire panel laughing)

MR. ALDOUS: I don't think I heard you. That's selected deafness, you know, married a little bit. So you were on a criminal jury?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: Do you recall how long ago it was approximately?

VENIREPERSON CIRONE: About 15 years ago.

MR. ALDOUS: All right. Did y'all actually go to a verdict, render a verdict?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: Do you remember the judge telling you at that time you have to find that the burden that the prosecutor has to find is beyond a reasonable doubt. Do you remember that?

VENIREPERSON CIRONE: Yes, I do.

MR. ALDOUS: Has anybody else served on a criminal jury? Well, the good thing about it is, forget all that. This is a civil case. And because we aren't talking about putting somebody in jail or we're not talking about the power of the state to bring a case, this has a different, what we call, burden of proof. And there's a -- the lawyers call it the burden of persuasion is -- is what we talk about in a civil case. And it's a preponderance of the evidence.

Who knows what that means? What it really means is more likely true than not. That's it. It's just more likely true than not. It's whether or not you tip the scale one way or the other. It's okay in civil cases to have all kinds of doubts as long as when you weigh them out, you say it's more likely true than not.

Now, some people say, "But I don't like that. That's too low." So what I want to know is if

there's anybody here who has a feeling about that burden of proof and say, you know what, I think that's just too low? How about you, Ms. Jackson? You think it's okay.

I noticed a couple of y'all have been involved in civil suits, and I'm assuming that whoever it was involved in a civil suit had a similar situation where they recognized the burden of proof was lower than a criminal case. Did anybody have a bad experience in regard to a case that they previously had?

Okay. Mr. Machen?

VENIREPERSON MACHEN: Machen.

MR. ALDOUS: Go ahead and tell me what you're thinking.

VENIREPERSON MACHEN: I was just wanting clarification on that because I was involved in a civil suit against our home builder.

MR. ALDOUS: Okay. So when you were involved in a civil suit against your home builder, did it go all the way to a jury trial?

VENIREPERSON MACHEN: No. It went just in front of the judge.

MR. ALDOUS: All right. And was there a trial in front of the judge?

VENIREPERSON MACHEN: Yes.

MR. ALDOUS: So what happens is, like in

your civil suit, people have to make judgment calls as to who's telling the truth, who's not telling the truth, and the burden is by a preponderance of the evidence Did you have the same way in your trial?

VENIREPERSON MACHEN:  Yes.

MR. ALDOUS:  You know, some people say, oh, yeah, I hear preponderance of the evidence and it's okay, and they've just really got to convince me.  And that's really not what the law requires. And so if anybody has any kind of -- what about you, Mr. Rodgers? When you were playing for the Packers and y'all were winning Super Bowls --

VENIREPERSON RODGERS:  That was the wrong one.

MR. ALDOUS:  Sorry about that.  But do you have any problem applying that same kind of a standard, you know, just making calls about who's more likely right from wrong?

VENIREPERSON RODGERS:  No.

MR. ALDOUS:  All right.  What about you, sir, Mr. Kozak.

VENIREPERSON KOZAK:  Yes, sir.

MR. ALDOUS:  Any problem with that?

VENIREPERSON KOZAK:  No, sir, not at all.

MR. ALDOUS:  Okay.  And then, Mrs. Evans,

you were a party to a civil case it says, according to your jury card, right?

VENIREPERSON EVANS:  Yes.

MR. ALDOUS:  And is that the same kind of way it was going with your case in terms of what -- did you have to go to a trial?

VENIREPERSON EVANS:  No.

MR. ALDOUS:  Okay. So if you settled, you didn't really get that far, right?

VENIREPERSON EVANS:  No.

MR. ALDOUS:  All right.  So -- and by the way, Mrs. Dimeff, did I say that right?

VENIREPERSON DIMEFF:  Dimeff.

MR. ALDOUS:  Am I talking loud enough for you?

VENIREPERSON DIMEFF:  It's not the loudness; it's the pitch.

MR. ALDOUS:  All right. How's my pitch?

VENIREPERSON DIMEFF:  You're good.

MR. ALDOUS:  Mr. Berg, do you have any problem with the way the civil system is set up?

VENIREPERSON BERG:  No, sir.

MR. ALDOUS:  So, let me just ask if there -- this way.  How many of you don't think it's fair if for any reason that -- that it's so unfair that you

couldn't follow the Court's instruction on what a preponderance of the evidence is and just say it's more likely true than not? Anybody?

Boy, are y'all still -- does anybody like some coffee or something, a Jolt Cola?

All right. So let's move on then. So I'm assuming that nobody here has any opinions about lawsuits in general. How about you, Number 12 juror, Ms. Gonzales?

VENIREPERSON GONZALES: Honestly, I think it just depends on what it is. I mean, I think some are good. Some are not.

MR. ALDOUS: All right. Who feels like Ms. Gonzales, you know, there's some that are probably good, some that are probably bad? Okay. We've got lots of numbers holding up here. Has anybody had a particular bad experience in the civil justice system that would make it to where it's difficult for you to sit on this jury? That's just a broad question. Nobody?

Okay. We're moving along. We're just doing really good. These are my notes. Sorry. So, if you've been a plaintiff, that is a person bringing a claim in a lawsuit, if you would, just raise your number up.

Okay. We've got Mrs. Evans. Mrs. Evans is Number 3.

Anybody -- yes, Mr. Machen.

All right. Anybody else? Ms. Watts?

MR. CHAIKEN: What numbers, please?

MR. ALDOUS: Number 17. Number 10 and Number 17.

Do you have a question, Ms. Watts?

VENIREPERSON WATTS: Well, we were in a classified lawsuit thing. I don't know if I should warn you about that.

MR. ALDOUS: All right. So if it is something that you would like to talk about privately, we can do that.

VENIREPERSON WATTS: Okay.

MR. ALDOUS: All right. So why don't we just make a note of it.

THE COURT: And I'm sorry. Is that 17?

MR. ALDOUS: Number 17, Your Honor.

THE COURT: Thank you.

MR. ALDOUS: Anyone else? All right. So let me just ask you, Mrs. Evans, just generally, what type of case it was. Number 3.

VENIREPERSON EVANS: Oh, what kind of case it was?

MR. ALDOUS: Yes. Was it a personal injury or --

VENIREPERSON EVANS: It was a personal injury.

MR. ALDOUS: Okay. And, Mr. Machen, what type of case? Was it against your builder?

VENIREPERSON MACHEN: Yes.

MR. ALDOUS: And was that because you felt like the builder didn't do what he said he was going to do?

VENIREPERSON MACHEN: It was worse than that. But, yes, sir.

MR. ALDOUS: That's a mild understatement of what went on?

VENIREPERSON MACHEN: Right.

MR. ALDOUS: All right. So, Mr. Machen, if it doesn't -- I don't want to, you know, get into your business too much. But if you would, just tell us what happened in your situation.

VENIREPERSON MACHEN: Well, we would pay our -- write checks out to him, and he was not paying his -- his people. So at the time of closing, those contractors put a lien on our house, and we had to fork over a ton of money to get the lien off our house so we could close.

MR. ALDOUS: I see. How long ago was this?

VENIREPERSON MACHEN: That was 2008, '09.

MR. ALDOUS: Okay. And how was it in terms of the resolution? Were you satisfied with it, unsatisfied?

VENIREPERSON MACHEN: Well, we won. But he didn't show up for court, and we never were able to collect.

MR. ALDOUS: Anyone else on the second row been a party to lawsuit that is either way of them -- Ms. Watts, we're going to talk to you later.

Anyone? And then anyone on the last row?

Now I'm going to change the question just a little bit. I'm going to ask: Has anybody who has a family member or a very close friend who's been a party to a lawsuit? If you would, raise your hand.

Let's see, Mrs. Ortiz; is that correct, Number 18. And then we've got Mrs. Evans, Number 3. We've got Mr. Cirone, Number 28. Anyone else? Oh, Number 20, Mr. Pearle; is that right?

All right. Let me start with you, Mrs. Evans. Could you tell me what -- if a family member or close friend has been a party to a lawsuit?

VENIREPERSON EVANS: Yes.

MR. ALDOUS: Is it a different lawsuit than the one you were talking about?

VENIREPERSON EVANS: Yes.

MR. ALDOUS: Okay. Can you just tell me a little bit about it?

VENIREPERSON EVANS: Well, I'd rather not. I'll talk to you in private.

MR. ALDOUS: All right. You can talk to us in private.

Number 3, Your Honor.

And then, Mrs. Ortiz, could you tell me a little bit about it?

VENIREPERSON ORTIZ: Yes. I mean, my dad owned a company and he was the franchiser. And one of the franchisees left the company and started his own. And he took all of his customers with him. And so he had to go sue him and, you know, so it was a big deal at work.

MR. ALDOUS: Where was that geographically?

VENIREPERSON ORTIZ: It was -- I believe it was in Pennsylvania, but he had lawyers here and up there.

MR. ALDOUS: And what type of business was your dad in?

VENIREPERSON ORTIZ: Marble restoration.

MR. ALDOUS: I'm sorry?

VENIREPERSON ORTIZ: Marble restoration

MR. ALDOUS: Oh, okay. Anything about your service in that -- in that situation that might cause you to go one way or the other before you ever start in this case?

VENIREPERSON ORTIZ: No.

MR. ALDOUS: Okay. Mr. Pearle, if you don't mind, could you tell us a little bit about your situation you were referring to when you raised your card?

VENIREPERSON PEARLE: Yeah. It was -- it was my ex-wife. She's an interior designer, and it was something that was less than $10,000. And it was -- it pretty much just went away. We kind of got hosed.

MR. ALDOUS: All right. So there was like two things wrong with your answer. One, you started off by saying, "my ex-wife." And then at the end, you were saying, "We got hosed."

VENIREPERSON PEARLE: On both ends.

MR. ALDOUS: Anything about -- and you're juror Number 20, right? I'm just making sure. So anything about your experience in there that would keep you from being a juror in this case?

VENIREPERSON PEARLE:  No.

MR. ALDOUS:  And then on the back row I had Mr. Cirone.

VENIREPERSON CIRONE:  My dad owned a grocery store on the corner of Luke and McKinney Avenue here in Dallas.  We've lived here all our lives.  And during a storm, heavy rain and wind, the roof fell out.  So we went to court to try to get the insurance company to pay for it and they didn't do it.

MR. ALDOUS:  Is there anything about his experience in that regard that would cause you to --

VENIREPERSON CIRONE:  I'm a little bitter because -- and they didn't pay a cent, and so we had to close his business up because of it.

MR. ALDOUS:  How long ago was that?

VENIREPERSON CIRONE:  I guess I was in my 20s, so a long time ago, 40 years ago.

MR. ALDOUS:  If you were somehow reached and asked to sit on this jury and the judge told you to put all of that stuff aside, could you do that?

VENIREPERSON CIRONE:  Considering he lost his business over that, I kind of -- it still bothers me a little bit.

MR. ALDOUS:  All right.  Thank you, sir.

Now, Ms. Haggerty?

VENIREPERSON HAGGERTY: Yes.

MR. ALDOUS: Have you been a -- you or a family member or close friend been a party to a lawsuit in your -- Number 27?

VENIREPERSON HAGGERTY: Yes.

MR. ALDOUS: You have?

VENIREPERSON HAGGERTY: I have.

MR. ALDOUS: Do you -- would you mind telling me what type of case it was.

VENIREPERSON HAGGERTY: My husband was in an accident.

MR. ALDOUS: Okay.

VENIREPERSON HAGGERTY: Just made a settlement.

MR. ALDOUS: I'm sorry?

VENIREPERSON HAGGERTY: We made a settlement.

MR. ALDOUS: Okay.

VENIREPERSON HAGGERTY: So we didn't get to a jury or anything.

MR. ALDOUS: Anything about your experience that might keep you from being what I call fair or impartial to both sides in this case?

VENIREPERSON HAGGERTY: Well, depending on maybe the person's age, you know. Like then, I was very

young and I didn't get too much input on, you know, what I should do or what shouldn't I do. So now, you know, I think back then, you know, since I got older, I think I was maybe shortchanged, you know.

MR. ALDOUS: All right. Thank you, Ms. Haggerty.

This case is going to have some issues in it relating to contracts. Does anybody here feel like that they have any special expertise or knowledge about just contracts in general? If you do, just raise your hand.

Okay. Ms. Gonzales, Number 12?

Anyone else? Oh, we've got Ms. Doty. Did I say that right?

VENIREPERSON DOTY: You got it right.

MR. ALDOUS: Number 21.

Mrs. Jackson, Number 5, real estate.

Anyone else?

Now, I will say this. Everybody, all of us make contracts, you know. We might go to work and we don't get paid until the end of the pay period. We expect to get paid. That's really a contract. But in this situation, it's a -- there's some written contracts.

So let me ask you, Mrs. Gonzales. Could

you tell us about your experience with contracts?

VENIREPERSON GONZALES: Well, I was working at AT&T. I worked in the legal department. And the gentleman that I supported was -- that's what we did. We did contracts with various vendors, whether it was Microsoft or Verizon or cable companies as to what they could and could not do.

MR. ALDOUS: Did you -- were you part of the team that assisted in reviewing those types of contracts?

VENIREPERSON GONZALES: Absolutely.

MR. ALDOUS: All right.

VENIREPERSON GONZALES: I was the assistant though.

MR. ALDOUS: Did you -- were y'all generally -- like, somebody would send you a contract and then y'all would change it up a little bit, and add some language to it?

VENIREPERSON GONZALES: We did both. We originated contracts and we did review contracts that they originated.

MR. ALDOUS: And when you say that they were with all types of people, were they all types of contracts, you know, like vendor contracts, software contracts, all of that?

VENIREPERSON GONZALES: Yes.

MR. ALDOUS: Okay. So in this case, the judge is going to instruct you, I believe, at the end of the case to make a determination whether or not a party's breached a contract or not. Is there anything about your experience that would keep you from following the Court's instructions in this case? Nothing? Sometimes you've got to speak out.

VENIREPERSON GONZALES: Oh, no.

MR. ALDOUS: The court reporter is sitting there going, nodding, and shaking her head.

VENIREPERSON GONZALES: Sorry.

MR. ALDOUS: I'm sorry. Who else? Ms. Doty, what was your -- what is your experience with regard to contracts?

VENIREPERSON DOTY: Just with my job. I work in advertising and I write the master service agreements and -- with my -- or with our clients.

MR. ALDOUS: All right. So, would you -- would you just say that almost all of what you're working on with regard to contracts is related to advertising services?

VENIREPERSON DOTY: Yes.

MR. ALDOUS: Is there anything about that experience that you believe might impact you in

reviewing contracts between these parties?

VENIREPERSON DOTY: No.

MR. ALDOUS: No?

VENIREPERSON DOTY: No, not that I can think of.

MR. ALDOUS: Mrs. Jackson, Number 5. And were you referring to the fact that you're a real estate agent?

VENIREPERSON JACKSON: Yeah. I deal with the -- you know, buying, selling of residences and things that go along with the contract.

MR. ALDOUS: And do you use the standard form?

VENIREPERSON JACKSON: Yes.

MR. ALDOUS: So this case is going to -- at least a portion of the contract is a standard real estate form contract put out by the Texas --

VENIREPERSON JACKSON: Real Estate Commission.

MR. ALDOUS: -- Real Estate Commission. There you go. During this process, there was some changes to it. But during this process, there is going to be people who testify. And I believe at the end of the case, the judge is going to say you should really make your decision based on what the evidence is in this

case rather than your own personal experiences. Do you think you're going to be able to do that? Is that a, "yes"?

VENIREPERSON JACKSON: That is a, "yes"

MR. ALDOUS: So, you know, I always do that because of the court reporter.

VENIREPERSON JACKSON: I understand

MR. ALDOUS: Okay. Sorry. Thank you for your answer.

Anybody else with the contracts? Okay. juror Number 17, Ms. Watts?

VENIREPERSON WATTS: I worked at -- I did contracts for an apartment complex

MR. ALDOUS: All right. Was it for, like, leases?

VENIREPERSON WATTS: Yes.

MR. ALDOUS: Okay. Anything about that experience that you can think of that would effect you or keep you from being a fair juror in this case?

VENIREPERSON WATTS: Based on that company, yes. I'm just going to be honest.

MR. ALDOUS: Okay. Let me restate it. Assuming that the company that you worked for isn't involved in this case and has nothing to do with it, will it effect you in this case?

VENIREPERSON WATTS:   No.

MR. ALDOUS:  Okay.   Thank you.

Anyone else?   What about other than Mrs. Jackson, anybody else have any particular expertise or any experience in real estate?

Nobody's raising their hand.   Nobody's raising their hand.

Mr. Villanueva?

VENIREPERSON VILLANUEVA:   Right.

MR. ALDOUS:  And there's two Villanuevas, but I'm referring to juror Number 8, right?

VENIREPERSON VILLANUEVA:   Right.

MR. ALDOUS:  You work for DART; is that right?

VENIREPERSON VILLANUEVA:   Right.

MR. ALDOUS:  And as a field supervisor, do you have to deal with acquiring right-of-ways or anything like that?

VENIREPERSON VILLANUEVA:   No.  My job is basically contract compliance for the provider of fair transit services.  So I pretty much go out into the field and make sure the drivers pick up our customers or compliance with what they've agreed on, but it's --

MR. ALDOUS:  Well, when you're doing that, do you create your own checklist of the things they have

to comply with based upon the contract, or do you get that from someone else?

VENIREPERSON VILLANUEVA: I get that from my employees I supervise.

MR. ALDOUS: All right. Thank you, Mr. Villanueva.

MR. ALDOUS: Yes, Number 20, Mr. Pearle?

VENIREPERSON PEARLE: You mentioned right-of-ways. I have a contract with some farmland right now dealing with some pipeline right-of-ways. I didn't know if that's relevant or not, but --

MR. ALDOUS: Well, it could be. But who do you work for, Mr. Pearle?

VENIREPERSON PEARLE: I don't work for anybody right now.

MR. ALDOUS: Well, when you say you were working on the --

VENIREPERSON PEARLE: I have a farm and we have -- an association would come in and wants to put a pipe across our farm. So it's an easement deal.

MR. ALDOUS: I was asking Mr. Villanueva about that. But I don't think that an easement is necessarily going to be involved.

But has anybody had any experience with a buyback provision in a real estate contract, meaning

I'll buy this, but then after a certain period of time, you may buy it back? Anybody ever had that? No one?

Okay. Let me ask you this then. Does anybody have any experience as a title agent or with a title company? Okay, nobody.

What about being in residential construction? Okay. Let's see, Number 4, Mrs. Dimeff?

VENIREPERSON DIMEFF: I'm an interior designer. And when I lived in Ohio for 20 years, I worked with contractors building houses, choosing finishes and designing.

MR. ALDOUS: What about working with the actual contracts themselves? You know, like a general contractor might sign off and then give a list of specifications that they say they won't comply with. Do you have any experience in that regard?

VENIREPERSON DIMEFF: A change order?

MR. ALDOUS: It could be a change order or it could be the original contract.

VENIREPERSON DIMEFF: A little bit. You know, if there's a change order, it's not charged.

MR. ALDOUS: Could you tell me a little bit more about your interior design work?

VENIREPERSON DIMEFF: Basically back then, it was strictly residential. I would be with the buyer

for like a year working -- helping build the home in terms of choosing everything the buyer had to choose for the house, whether it's the tile, the door knobs, molding. So I usually would work with one client each year, you know.

MR. ALDOUS: Would you have a written contract to do that work?

VENIREPERSON DIMEFF: I had my own contract with my client.

MR. ALDOUS: Okay. And then now do you still do that work?

VENIREPERSON DIMEFF: I do more decorating than designing, so not as much building.

MR. ALDOUS: Okay. I think I understand. Let me -- is your spouse a physician?

VENIREPERSON DIMEFF: Yes.

MR. ALDOUS: What type of physician is your spouse?

VENIREPERSON DIMEFF: Sports medicine.

MR. ALDOUS: And where does he work?

VENIREPERSON DIMEFF: UT Southwestern

MR. ALDOUS: Thank you. Let's see. Where was I? Oh, title companies. And nobody else raised their hands, right?

Okay. Let me ask you this. Does anybody

work or has worked as a financial planner or advisor, CPA? Nobody's raising their hand. Okay, great.

Now, who owns a business with three or more employees, anybody?

Mr. Pearle, Number 20. Anyone else?

All right. So let me ask you a -- Mr. Pearle, tell me about your type of business.

VENIREPERSON PEARLE: I had a commercial photography studio. We had about five people working for us. And then we had an art company that was kind of part of it.

MR. ALDOUS: So you said photography and then art?

VENIREPERSON PEARLE: Yes.

MR. ALDOUS: Okay. I was just -- were you able to catch that?

And let's see. How long did you have that business?

VENIREPERSON PEARLE: About 20 years.

MR. ALDOUS: When did you quit doing that business?

VENIREPERSON PEARLE: I mean, I still do it to some extent, but I kind of shut the studio down around, oh, 2001 or '02.

MR. ALDOUS: All right. Thank you,

Mr. Pearle. Go ahead. Oh, I thought you were going to say something. I thought you were going to add something to it.

So, how many folks here said that they were on the jury before? Could you just raise your hand again? So Mr. -- Number -- let me put it by number. Number 28, Number 12, any kind of jury, Mr. Palmer 23, and is it Adeboye? Did I say that correctly?

VENIREPERSON ADEBOYE: Yes.

MR. ALDOUS: Number 30. Anyone else?

For those of you that did serve on a jury, were any of you the presiding juror? That means the one who's like -- has to answer the questions for the judge and all that. Anybody?

VENIREPERSON GONZALES: Is that like the foreman?

MR. ALDOUS: Yes.

VENIREPERSON GONZALES: Yes.

MR. ALDOUS: You know, because we're all correct now, it's not a foreman. I'll have you know that it's presiding juror.

VENIREPERSON GONZALES: Now you know how long it's been.

MR. ALDOUS: So, Ms. Gonzales, you were.

VENIREPERSON GONZALES: Yes.

MR. ALDOUS: And what type of case was it?

VENIREPERSON GONZALES: It was a breaking and entering case.

MR. ALDOUS: And were you able to reach a verdict?

VENIREPERSON GONZALES: Yes.

MR. ALDOUS: All right. Anyone else, presiding juror? Nobody's raising their hand.

All right. So I've got some questions for about a couple of you. Mr. Machen?

VENIREPERSON MACHEN: Yes.

MR. ALDOUS: Now you said on your juror information card that while you and your spouse both work at Southwest Airlines, she is a solutions architect. Now I was thinking, well, that means she's an architect. But then I thought, well, maybe at Southwest that means something else.

VENIREPERSON MACHEN: Well, we are both in technology. So she's an architect of the systems.

MR. ALDOUS: Oh, okay. Database?

VENIREPERSON MACHEN: Right, server, databases, just networking.

MR. ALDOUS: Is that what you do too?

VENIREPERSON MACHEN: No. I'm a business analyst.

MR. ALDOUS:  Okay.

VENIREPERSON MACHEN:  But I'm in technology, so she would be part of my team if I was like --

MR. ALDOUS:  Would you mind describing for me what you do, what you work with?

VENIREPERSON MACHEN:  So I'm in technology and I work with our internal customers.  And I have technology teams to develop requirements for internal applications and requirements based off of our internal customer's wants.  And those requirements are passed on to the development team, and they take that and start their software development processes.

MR. ALDOUS:  Thank you.

Mr. Richie, you're from sales with Andrews Distributing

VENIREPERSON RICHIE:  Right.

MR. ALDOUS:  Can you tell me what you do or what type of sales?

VENIREPERSON RICHIE:  (Inaudible).

THE REPORTER:  I can't hear you.

MR. ALDOUS:  Here.  You know what? I've got this thing.  So you get to be the first one.

VENIREPERSON RICHIE:  All right.

MR. ALDOUS:  So if you would, we're doing

karaoke numbers.  Pick your own song.

What were you saying now?

VENIREPERSON RICHIE:  I distribute alcohol for 7-11, RaceTrac, QuikTrip, your local convenience stores around the Dallas/Fort Worth metroplex.

MR. ALDOUS:  Thank you.

THE COURT:  Courthouses?

MR. ALDOUS:  I don't know that song.

Mr. Rodgers -- and forgive me.  What do you do for a living?

VENIREPERSON RODGERS:  I'm the training manager at Equinox Health Club.

MR. ALDOUS:  Okay.  Do you float between clubs or whatever?

VENIREPERSON RODGERS:  I don't float, but I've worked in Chicago, Miami, and now here.

MR. ALDOUS:  Okay.  Thank you, sir.

And Mrs. Evans, what were you doing -- what is your -- kind of your background in terms of work?

VENIREPERSON EVANS:  Okay.  I was working for Citigroup, and I got hurt.  I told you I got injured.  It was my spine and I had my knee replacement and put on disability.

MR. ALDOUS:  Okay.  And how long ago was

that?

VENIREPERSON EVANS: In 2005.

MR. ALDOUS: All right. Thank you.

Mrs. Dimeff, how -- are you still doing design?

VENIREPERSON DIMEFF: Yes.

MR. ALDOUS: And forgive me. You know, I wanted to ask you this, but I didn't want to really sound stupid. You said that you don't really do the interior design much. You do --

VENIREPERSON DIMEFF: Decorating.

MR. ALDOUS: Decorating?

VENIREPERSON DIMEFF: In Texas, you need a special license to call yourself an interior designer, and I don't have that. So when I moved here, my company is my name Interiors, not interior designer. So officially I cannot be designing.

MR. ALDOUS: How long have you been in Texas?

VENIREPERSON DIMEFF: Five years.

MR. ALDOUS: And prior to that, you were in Ohio?

VENIREPERSON DIMEFF: Yes.

MR. ALDOUS: What part of Ohio?

VENIREPERSON DIMEFF: Cleveland, Maple

Heights.

MR. ALDOUS: Okay. And then, Mrs. Jackson, your husband is a lawyer; is that right?

VENIREPERSON JACKSON: That's correct.

MR. ALDOUS: I wanted to see if you would admit it out loud. And does your husband do this sort of law where we're picking a jury and so forth?

VENIREPERSON JACKSON: He does family law and so I assume he does. I would imagine.

MR. ALDOUS: Okay. Now, so you go home today and your husband says, hey, what did you do? And you go I had jury service. And he goes, hey, tell me about that.

VENIREPERSON JACKSON: I'll say, "no."

MR. ALDOUS: It was a trick question. You'll be able to, I assume, not have any problem controlling your husband, right?

VENIREPERSON JACKSON: I won't. I will not speak to him about it.

MR. ALDOUS: All right. Now, Mr. Lejia, what do you do currently?

VENIREPERSON LEJIA: I work at a hotel as a receptionist.

MR. ALDOUS: That's right, at Hampton --

VENIREPERSON LEJIA: Hampton Inn.

MR. ALDOUS: Okay. And, you know, I was trying to -- I was trying to go through these information cards real fast, and I don't do math well. And so I was trying to add up everybody's age. And the only ones I got right were the ones that were close to mine. So how old are you?

VENIREPERSON LEJIA: Nineteen.

MR. ALDOUS: Nineteen. It's very -- it's very problematic for those of us over 50 who couldn't grow a beard like that even then. I'm very upset. Thank you, sir.

And then, Ms. McCoy, are you -- I think you said you were retired?

VENIREPERSON MCCOY: Not retired, but my husband is deceased I said.

MR. ALDOUS: What did your husband do before he passed away?

VENIREPERSON MCCOY: He worked at saw mills.

MR. ALDOUS: Saw mills?

VENIREPERSON MCCOY: Yeah.

MR. ALDOUS: How long have you lived in the Dallas area?

VENIREPERSON MCCOY: This year, maybe 15 years.

MR. ALDOUS: Fifteen years  Where -- are you from Louisiana originally?

VENIREPERSON MCCOY:  Louisiana.

MR. ALDOUS:  What part of Louisiana?

VENIREPERSON MCCOY:  Winnfield.  I don't know if you-all know where it is. It's about a four-hour drive from here.

MR. ALDOUS:  Thank you, ma'am.

And then, Mr. Villanueva, how long have you been a field supervisor at DART?

VENIREPERSON VILLANUEVA:  About three years.

MR. ALDOUS:  Three years.  And you seem like a very young guy.  I didn't add it up.  How old are you?

VENIREPERSON VILLANUEVA:  Thirty-nine.

MR. ALDOUS:  That's just unfair.  You look younger than that, but that's a compliment.  So, thank you, sir.

Ms. Pearson, what is it -- what is your field of work?

VENIREPERSON PEARSON:  I'm a sales associate at Carter's Children's clothing store.

MR. ALDOUS:  Where is that store?

VENIREPERSON PEARSON:  I work at the one

over at Firewheel in Garland

MR. ALDOUS: Firewheel. How long have you been there?

VENIREPERSON PEARSON: I just started in February.

MR. ALDOUS: Okay. And, Ms. Gonzales, are you still with AT&T?

VENIREPERSON GONZALES: No, I retired December 21st.

MR. ALDOUS: Congratulations. And I know better than to ask their age.

VENIREPERSON GONZALES: Because I'm older than you.

MR. ALDOUS: Mr. Kozak, it says here that you work for Walmart.

VENIREPERSON KOZAK: Yes, sir.

MR. ALDOUS: How long have you worked there?

VENIREPERSON KOZAK: A year and a half.

MR. ALDOUS: All right. And are you -- did you go to high school here in Dallas?

VENIREPERSON KOZAK: Mesquite.

MR. ALDOUS: Mesquite, I say here in the Dallas area. And I know that you're not very old. Nineteen?

VENIREPERSON KOZAK: No.

MR. ALDOUS: Twenty-one?

VENIREPERSON KOZAK: Twenty.

MR. ALDOUS: Twenty, split the difference. Thank you, sir.

VENIREPERSON KOZAK: You're welcome.

MR. ALDOUS: Mrs. George, it says here on your information card that you were on a civil jury. Did you serve on a civil jury before?

VENIREPERSON GEORGE: No.

MR. ALDOUS: Okay. Just sometimes they don't transcribe it right. And then it says also that your husband is a -- is an evangelist?

VENIREPERSON GEORGE: Yes.

MR. ALDOUS: Now, what type of -- what religion?

VENIREPERSON GEORGE: Christian.

MR. ALDOUS: I mean, any particular group or denomination?

VENIREPERSON GEORGE: Pentecostal.

MR. ALDOUS: Okay. Thank you.

Mr. Berg, what do you do for fun, actually for a living?

VENIREPERSON BERG: For a living, I'm a public works superintendent for the city.

MR. ALDOUS:  Is it Red Oak?

VENIREPERSON BERG:  Yes, sir.

MR. ALDOUS:  Okay.  I did remember that. How long have you been doing that?

VENIREPERSON BERG:  That particular job, about six years.

MR. ALDOUS:  All right.  Thank you, sir.

Now, Mr. Maguire?

VENIREPERSON MAGUIRE:  Yes.

MR. ALDOUS:  So what does it mean to be a research analyst?

VENIREPERSON MAGUIRE:  It's a C-Suite recruiting for a big -- big companies.  So we -- they ask us, hey, we need a new chief marketing officer and we go find those people.  And I do like all the internal stuff.

MR. ALDOUS:  So you're a recruiter?

VENIREPERSON MAGUIRE:  Yes.

MR. ALDOUS:  Did you say C-Sweep?

VENIREPERSON MAGUIRE:  Yeah, C-Suite.

MR. ALDOUS:  Oh, C-Suite.  A lot of rock and roll when I was a young guy, and I can't hear very well.  So when you say "C-Suite," what does that mean to you?

VENIREPERSON MAGUIRE:  That's just the top

decision makers of the company.

MR. ALDOUS: How long have you been doing that?

VENIREPERSON MAGUIRE: Eight months.

MR. ALDOUS: Eight months. And where did you go to school?

VENIREPERSON MAGUIRE: SMU.

MR. ALDOUS: Are you originally from Dallas?

VENIREPERSON MAGUIRE: Chicago.

MR. ALDOUS: Okay. Is it warmer here than Chicago?

VENIREPERSON MAGUIRE: Sure.

MR. ALDOUS: And, Ms. Watts, I think we already talked to you Well, what did you do for your work?

VENIREPERSON WATTS: I was an assistant property manager

MR. ALDOUS: That's right, with the apartment complex that will remain unnamed?

VENIREPERSON WATTS: Yes.

MR. ALDOUS: Okay. Thank you, ma'am.

Mrs. Ortiz, you work for Pfizer in sales? Are you assigned a particular medication?

VENIREPERSON ORTIZ: Uh-huh.

MR. ALDOUS: Is that a, "yes"?

VENIREPERSON ORTIZ: Yes.

MR. ALDOUS: Okay. And how long have you worked for Pfizer?

VENIREPERSON ORTIZ: For 14 years.

MR. ALDOUS: What medications are you assigned?

VENIREPERSON ORTIZ: Lyrica and Embeda and Flector Patch.

MR. ALDOUS: And what?

VENIREPERSON ORTIZ: Flector Patch

MR. ALDOUS: Okay. Thank you. And your husband's a recruiter?

VENIREPERSON ORTIZ: Yes, he is.

MR. ALDOUS: What type of recruiter?

VENIREPERSON ORTIZ: IT.

MR. ALDOUS: Does he work for a company here in town or is he independent?

VENIREPERSON ORTIZ: In town.

MR. ALDOUS: Who does he work for?

VENIREPERSON ORTIZ: Prestige Staffing.

MR. ALDOUS: Okay. Thank you.

Mr. Ramirez, I wrote down here that you work at Bluebonnet Healthcare?

VENIREPERSON RAMIREZ: I work in the

office.

MR. ALDOUS: Sir, could you just tell us a little bit about your job so that -- because I'm not sure what that means?

VENIREPERSON RAMIREZ: We get referrals from doctors and hospitals and verify insurance. If everything verifies, we take the patient. The nurse goes in and sees the patient, does an evaluation, and then some come in end of life and we take them hospice.

MR. ALDOUS: And how long have you been with them?

VENIREPERSON RAMIREZ: Four years.

MR. ALDOUS: Are you originally from Dallas?

VENIREPERSON RAMIREZ: No.

MR. ALDOUS: Where are you originally from?

VENIREPERSON RAMIREZ: Odessa.

MR. ALDOUS: Odessa? Do you hate Midland High?

VENIREPERSON RAMIREZ: Lee.

MR. ALDOUS: Lee, I'm sorry. See, you knew which one to hate.

Mr. Pearle, are you farming right now?

VENIREPERSON PEARLE: I have it leased

out.

MR. ALDOUS: You have it leased out. So somebody else is cultivating whatever you've got?

VENIREPERSON PEARLE: Yes.

MR. ALDOUS: All right. Thank you, sir.

Ms. Doty, we talked earlier about you doing advertising and contracts. But I didn't really ask you what you do in advertising.

VENIREPERSON DOTY: I'm an account manager, so I work on four different accounts. And I do the planning and strategy and manage the daily execution.

MR. ALDOUS: Okay. So you have particular people that you help them do their advertising stuff?

VENIREPERSON DOTY: Yes.

MR. ALDOUS: Thank you.

And then, Mr. Pina.

VENIREPERSON PINA: Yes, sir.

MR. ALDOUS: It says here that you're a truck driver. Are you independent or are you --

VENIREPERSON PINA: I currently work for a company.

MR. ALDOUS: So if you were asked to serve on a jury, it would be -- let me say it differently. I know independent truck drivers, they don't make money if

they're not driving.  Is that the same way with you?

VENIREPERSON PINA:  Yes, sir.

MR. ALDOUS:  It is the same way?

VENIREPERSON PINA:  Yes, sir.

MR. ALDOUS:  All right.  I'll ask about this in a minute.

Okay.  Mr. Palmer, you're a professor of some sort of medicine at UT Southwestern?

VENIREPERSON PALMER:  I'm an nephrologist.

MR. ALDOUS:  How long have you been with UT?

VENIREPERSON PALMER:  About 30 years.

MR. ALDOUS:  Thirty years.  I notice that you recently got married?

VENIREPERSON PALMER:  Remarried, yes.

MR. ALDOUS:  Remarried.  And she lives somewhere at Cedars Siani?

VENIREPERSON PALMER:  Yes.  She was at UT Southwestern but was recruited and is now at Cedars Siani.

MR. ALDOUS:  So how does that work out long distance?

VENIREPERSON PALMER:  We're trying to make it work.

MR. ALDOUS:  I imagine that's tough.  And

that's in Los Angeles, right?

VENIREPERSON PALMER: Beverly Hills.

MR. ALDOUS: Thank you, Mr. Palmer.

Ms. Ellender?

VENIREPERSON ELLENDER: Uh-huh.

MR. ALDOUS: It says here that you're a programmer.

VENIREPERSON ELLENDER: Uh-huh.

MR. ALDOUS: Is that a, "yes"?

VENIREPERSON ELLENDER: Yes.

MR. ALDOUS: How long have you been a programmer?

VENIREPERSON ELLENDER: Twenty-five years.

MR. ALDOUS: Twenty-five years. I've always admired programmers because to me it's kind of like voodoo. You put the lines together and it comes into the computer and it works. Who do you currently work for?

VENIREPERSON ELLENDER: DISD.

MR. ALDOUS: Thank you, ma'am.

Mrs. Duffey, Number 25, I have to get back there to you. You're kind of hiding behind somebody over there. What do you do for a living?

VENIREPERSON DUFFEY: I'm retired. I was a Texas Instruments employee in process control.

MR. ALDOUS:  Oh, great.  And congratulations on being retired.  Thank you.

And then, Mr. Perez, it says here that you do dispatch at AT&T, is it?

VENIREPERSON PEREZ:  Time Warner right now.

MR. ALDOUS:  Time Warner?

VENIREPERSON PEREZ:  Yes, sir.

MR. ALDOUS:  So I'm going to try to get you to speak up a little bit.  Tell me what you do as a dispatcher.

VENIREPERSON PEREZ:  Currently I'm -- like you said, I'm a dispatcher.  I drive the tanks and help them with their issues and that's pretty much it right now.

MR. ALDOUS:  All right.  Thank you

Mrs. Haggerty, I don't remember.  Did I ask you what you do?

VENIREPERSON HAGGERTY:  No, you did not.

MR. ALDOUS:  What do you do?

VENIREPERSON HAGGERTY:  Customer service.

MR. ALDOUS:  Did you work at Neiman Marcus?

VENIREPERSON HAGGERTY:  I do work at Neiman Marcus

MR. ALDOUS: You do work at Neiman Marcus. I knew my memory was in there somewhere. And when you say customer service, is that any particular department?

VENIREPERSON HAGGERTY: Well, it's -- right now it's all in one. Inbound calls come in and we take the calls from the stores or whatever.

MR. ALDOUS: Okay. Thank you, ma'am.

Mr. Cirone?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: In addition to being over 100 years old --

VENIREPERSON CIRONE: Tough life.

MR. ALDOUS: -- you do medical sonograms?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: At Doctors Hospital; is that right?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: Now, how long have you been doing that?

VENIREPERSON CIRONE: Forty-two years.

MR. ALDOUS: Do you have to have a license for this?

VENIREPERSON CIRONE: Yes. You have to be registered with the state and keep it current

MR. ALDOUS: So you have continuing

education and all that?

VENIREPERSON CIRONE:  Yes.

MR. ALDOUS:  Thank you, sir.

Mr. Villanueva, Number 29, you indicated to the judge that you have difficulty with English?

VENIREPERSON VILLANUEVA:  I understand a little bit.  I'm working forklift driver for a company four or five years.

MR. ALDOUS:  We'll talk to you with the judge because I'm sure that we're going to call you up later.

And, Mr. Adeboye, you work in sales at Home Depot?

VENIREPERSON ADEBOYE:  Yes, sir.

MR. ALDOUS:  How long have you been doing that?

VENIREPERSON ADEBOYE:  Fourteen years.

MR. ALDOUS:  And were you a party to a civil lawsuit?

VENIREPERSON ADEBOYE:  Yes.

MR. ALDOUS:  Do you recall what --

VENIREPERSON ADEBOYE:  I served on a jury. I served on a jury

MR. ALDOUS:  Oh, you served on a jury. You were part of the jury?

VENIREPERSON ADEBOYE:  Yes.

MR. ALDOUS:  How long ago was that?

VENIREPERSON ADEBOYE:  Three years.

MR. ALDOUS:  Three years ago.

VENIREPERSON ADEBOYE:  Yes.

MR. ALDOUS:  All right.  Thank you, sir.

So, Mrs. Jackson, have you -- in conjunction with your real estate business, have you ever had people who have not followed through with their contracts that they agreed on?

VENIREPERSON JACKSON:  I mean, there is a clause where you can terminate during an option period, which is -- you know, there's an option to terminate in ten days.

MR. ALDOUS:  Right.

VENIREPERSON JACKSON:  They terminated them, but I've never had anybody blatantly breach their sales contract.

MR. ALDOUS:  Okay.  I'm assuming that you've had plenty of experience with closing?

VENIREPERSON JACKSON:  Uh-huh.

MR. ALDOUS:  Is that a, "yes"?

VENIREPERSON JACKSON:  Yes.

MR. ALDOUS:  So what is your experience -- I mean, whether or not closing happens all at the same

time; in other words, all the people come in at the same time?

VENIREPERSON JACKSON:  No, no.

MR. ALDOUS:  How does it happen now in your experience?

VENIREPERSON JACKSON:  Well, I mean, I've had where the sellers have signed the papers and basically closed first, and where the buyers closed first.  I've had it where it's happened in a couple of days before the other party has closed, or they could be out of town, you know, and we have to have out-of-town closing, something like that.

MR. ALDOUS:  Have you ever had a situation where -- well, in your experience, who made sure that everybody signs the right thing and does the right thing in order for the deal to be done?

VENIREPERSON JACKSON:  Are you talking about at the closing table?

MR. ALDOUS:  Yes.

VENIREPERSON JACKSON:  There's an escrow officer there at the table that will go through the paperwork and answer questions, if either party has questions about any of the paperwork.

MR. ALDOUS:  Is that usually somebody who works for the title company?

VENIREPERSON JACKSON:   The title company. You know, if my client has a question that I can answer real estate wise, then I will do it.

MR. ALDOUS:   Then you would be involved in that?

VENIREPERSON JACKSON:   Uh-huh.

MR. ALDOUS:   Do you usually attend the closing?

VENIREPERSON JACKSON:   Yes, unless they're out of state.

MR. ALDOUS:   Do you do closing now by electronic signature, you know, where you --

VENIREPERSON JACKSON:   No.

MR. ALDOUS:   I wondered if they'd gotten there.

VENIREPERSON JACKSON:   I have not -- not electronically, no.   There's always been somebody there to sign.

MR. ALDOUS:   Do you ever have a situation where you may represent an individual, but there's a company on the other side, like the seller or builder or something?

VENIREPERSON JACKSON:   I have done it where it's an investor that has purchased a home and so it's basically his own company to flip the home.   He

owns it, the company. But, you know, if that's what you mean. Yeah, for an investor.

MR. ALDOUS: So some of your clients are investors?

VENIREPERSON JACKSON: Uh-huh.

MR. ALDOUS: I watch HGTV a lot about that. In any event, flip or flop, you know.

VENIREPERSON JACKSON: Right, right.

MR. ALDOUS: Is that what you're kind of talking about?

VENIREPERSON JACKSON: Uh-huh.

MR. ALDOUS: Okay. I'm going to ask you kind of a question. And instead of saying -- you know, giving an explanation for your answer, I'm going to see if I can get you to say just "yes" or "no." And that's just because this is the way -- then we can talk about it later. But see if you can say "yes" or "no."

If someone was seriously harmed in a business deal that they think went bad, would you bring a case? Juror Number 1?

VENIREPERSON CANTU: No.

MR. ALDOUS: Why is that?

VENIREPERSON CANTU: I mean, really I say "no" because it's like -- I don't know what the question -- I mean, some words I don't understand. And one word

for me can change everything. And I told you earlier I don't know enough English to speak English. With one word can change everything, and I don't want to give you the wrong answer.

MR. ALDOUS: You're absolutely right, Mr. Cantu. We'll talk about that later. All right?

What about you, Mr. Rodgers? Did you hear me?

VENIREPERSON RODGERS: Yes.

MR. ALDOUS: If you or a loved one were seriously harmed in a business dispute, would you file a lawsuit?

VENIREPERSON RODGERS: In a business dispute?

MR. ALDOUS: Yes, sir.

VENIREPERSON RODGERS: I suppose I would, yes.

MR. ALDOUS: What about you, Mrs. Evans, juror Number 3?

VENIREPERSON EVANS: Uh-huh.

MR. ALDOUS: And what about you, Mrs. Dimeff?

VENIREPERSON DIMEFF: Yes.

MR. ALDOUS: What about you, Mrs. Jackson?

VENIREPERSON JACKSON: Yes.

MR. ALDOUS: What about you, Mr. Leija? Did I say that right?

VENIREPERSON LEIJA: Yes.

MR. ALDOUS: Sorry.

Mrs. McCoy?

VENIREPERSON MCCOY: Would you repeat that?

MR. ALDOUS: Sure. If you or a loved one was seriously injured or harmed in a business dispute, would you file a lawsuit?

VENIREPERSON MCCOY: (Inaudible).

MR. ALDOUS: She said, "yes." And I was saying that so that she could hear you, the court reporter.

Isn't that right, Mrs. McCoy? Is that a "yes"?

VENIREPERSON MCCOY: Yes.

MR. ALDOUS: Thank you.

Mr. Villanueva?

VENIREPERSON VILLANUEVA: Yeah.

MR. ALDOUS: What about you, Mrs. Pearson?

VENIREPERSON PEARSON: Yes.

MR. ALDOUS: What about you, Mr. Machen?

VENIREPERSON MACHEN: I've done that. Yes.

MR. ALDOUS: Thank you, sir.

Mr. Richie?

VENIREPERSON RICHIE: Yes.

MR. ALDOUS: What about you, Mrs. Gonzales?

VENIREPERSON GONZALES: Yes.

MR. ALDOUS: What about you, Mr. Kozak?

VENIREPERSON KOZAK: Yes.

MR. ALDOUS: What about you, juror Number 14, Mrs. George?

VENIREPERSON GEORGE: Yes.

MR. ALDOUS: What about you, Mr. Berg?

VENIREPERSON GEORGE: Yes.

MR. ALDOUS: What about you, Mr. Maguire?

VENIREPERSON MAGUIRE: I just want to clarify. Is this harm like physically or financially?

MR. ALDOUS: Financially.

VENIREPERSON MAGUIRE: Probably.

MR. ALDOUS: I mean -- all right.

Mrs. Watts?

VENIREPERSON WATTS: Yes.

MR. ALDOUS: What about you, Mrs. Ortiz?

VENIREPERSON ORTIZ: Yes.

MR. ALDOUS: What about you, Mr. Ramirez?

VENIREPERSON RAMIREZ: Yes.

MR. ALDOUS: Mr. Pearle?

VENIREPERSON PEARLE: Yes.

MR. ALDOUS: Mrs. Doty?

VENIREPERSON DOTY: Yes.

MR. ALDOUS: You're smiling. I'm not sure. I'll ask you later

VENIREPERSON DOTY: I had the same question as he did.

MR. ALDOUS: Okay. Mr. Pina?

VENIREPERSON PINA: Yes.

MR. ALDOUS: What about you, Mr. Palmer?

VENIREPERSON PALMER: Yes.

MR. ALDOUS: What about you, Mrs. Ellender?

VENIREPERSON ELLENDER: Yes.

MR. ALDOUS: And then we have Mrs. Duffey.

VENIREPERSON DUFFEY: Yes.

MR. ALDOUS: And Mr. Perez?

VENIREPERSON PEREZ: Yes.

MR. ALDOUS: Ms. Haggerty?

VENIREPERSON HAGGERTY: Yes.

MR. ALDOUS: Mr. Cirone?

VENIREPERSON CIRONE: Yes.

MR. ALDOUS: Mr. Villanueva?

VENIREPERSON VILLANUEVA: Yes.

MR. ALDOUS: And then, Mr. Adeboye?

VENIREPERSON ADEBOYE: Yes.

MR. ALDOUS: All right. Let me ask you to go back just a -- there was a couple of -- I think Mr. Maguire and also Mrs. Ellender, you both said as long as it's not personal injury or -- you made a comment, were you talking about personal injury or business. If it was personal injury, would you feel differently than if it was a business dispute, a financial thing?

VENIREPERSON MAGUIRE: I think I'd be more likely to sue in a case that was physical rather than if it was financial.

MR. ALDOUS: Thank you. What did you mean, Ms. Ellender, when you had that question? I didn't mean that you --

VENIREPERSON ELLENDER: Oh, I didn't -- I didn't have one.

MR. ALDOUS: Oh, Ms. Doty, Number 21. You know what? I'm sorry.

VENIREPERSON ELLENDER: That's okay.

MR. ALDOUS: Ms. Doty, Number 21, what about the difference between personal injury versus business injury would matter or financial injury?

VENIREPERSON DOTY: I mean, it would

probably be -- it would be "yes" either way, but more for physical.

MR. ALDOUS: Okay. Yes, Mr. Pearle?

VENIREPERSON PEARLE: I think it would probably be based on the amount.

MR. ALDOUS: So you talked earlier about the lawsuit your ex-wife brought for 10,000 or less. Are you saying that there's a certain amount at which you believe the dispute needs to be before you'll follow through with it?

VENIREPERSON PEARLE: It needs to be more than that.

MR. ALDOUS: So, I mean, I think we can probably all agree that if it doesn't meet your standard of serious financial harm, you probably wouldn't do it? And what might be serious financial harm for each one of us might be less for some and more for others. Does everybody agree with that?

So in terms of this case, though -- I mean, in terms of my question, nobody here had a problem with the fact that bringing a lawsuit, if they had to, to recover financial harms as a result of a business deal that they felt like they got wronged in, right?

VENIRE PANEL: Right.

MR. ALDOUS: Thank you.

How much time do I have left, Judge?

THE COURT: You have four minutes.

MR. ALDOUS: Thank you. Your Honor, did you want me to do the hardships or do you do the hardships?

THE COURT: I'll handle it.

MR. ALDOUS: All right. Thank you.

Now I do have questions. One of the issues that might be involved in this case is that sometimes under the law, people are allowed to recover their attorney's costs, the cost of hiring their attorneys, their attorney's fees. Does anyone have a feeling about that one way or the other? If you do, raise your number.

Oh, Mrs. Ortiz, it started to come up. She said -- Number 18, maybe.

VENIREPERSON ORTIZ: When my dad had his lawsuit, he actually kind of turned on to two teams of lawyers; one here in Dallas, then one in Pennsylvania or wherever it was. And, basically, each were charging. It went up so high, the bill was astronomical that he basically got out of it. He told each other -- I don't know how he did it, but I thought it was pretty interesting how much the lawyers were charging to basically do the little work they were doing. And each

of them were charging. They were each working on it, but one at a time. But the other was still charging. It was just ridiculous. So the bill got ridiculous. I just was turned off by that whole process.

MR. ALDOUS: Well, you know, most lawyers couldn't afford themselves, and that's the way, kind of, the market goes. But is there anything else about your work experience through your dad's stuff that would cause you to say, "I can't follow the judge's instructions and award attorney's fees to a prevailing party just because of what happened to my dad?"

VENIREPERSON ORTIZ: No. I mean, I think if someone's found guilty, they should pay for the other's attorney's fees.

MR. ALDOUS: I think -- are you saying that you might look hard at the bills or something?

VENIREPERSON ORTIZ: Definitely.

MR. ALDOUS: Mr. Pearle, you --

Thank you, ma'am.

You started to raise your number.

VENIREPERSON PEARLE: (Inaudible).

MR. ALDOUS: Okay. Anyone else want to throw down and say something about that? All right.

So, the one last thing that I have to talk about is the stuff that we hear about in TV all the

time. You know, they talk about circumstantial evidence versus, you know, eyewitness testimony. You know, it's a big deal on TV. And, you know, the -- I believe it's in this case. The judge is going to instruct you that circumstantial evidence is just as good as direct evidence. And so I always kind of wondered, so what does that really mean? So here's the difference, the way I always explain it.

So if you see it snowing, then that's direct evidence that it's snowing. If you go to sleep and there's no snow on the ground and you wake up in the morning and there's snow on the ground, that's circumstantial evidence because you didn't see it snowing, but you know it must have snowed because the snow's on the ground.

Now, I don't -- the question I really have is: Does anybody have a problem with that concept and saying that, "No, I can't -- I can't do a verdict on circumstantial evidence. I need direct evidence"? Does anybody feel that way? Okay. Great.

So, now the judge is going to ask each one of you whether or not you have some issues personally about acting as a juror in this case. And the good thing -- there's really some good news. The good news is that you will not be sequestered at a hotel or

something, and it will not last for two months. It's probably going to be a three-day trial, and it's starting on Monday. So if anybody does have an issue -- Mr. Pina, I believe that you said, you know, you may have an issue about finances or spending time out and that sort of thing.

Please raise it with the judge because, you know, for -- as you can imagine, for Ken and Betsy Gross, this is an important case for them. And we don't want anybody to feel financial pressure with having to sit on the jury to have that effect the way that they are feeling in this case because it's an important case for them. So if you will raise that with the judge, I would appreciate it.

And the other thing that I'd like to say is thank you for your time and thank you for your attention. And I hope I didn't pry too much into your business. Thank you.

THE COURT: Thank you, Mr. Aldous.

Ladies and gentleman, I have some questions for you. It's now 12:25. I know you-all have been down here since about 8:30 this morning. The defendants in this case will also have an opportunity to ask you some questions about your qualifications. Usually the questions that they ask are not as long

simply because some of the issues have been covered already. But they are entitled. Bless you. They are entitled to a combined hour. And then we would have some discussion before we know exactly who's going to be asked to stay.

So would you-all like to keep moving, or would you like to take a brief lunch break and come back?

VENIRE PANEL: Keep moving.

THE COURT: Okay. Is everybody okay? Nobody have a health issue that they need to eat? Some people do.

VENIREPERSON EVANS: My leg is cramping up real bad.

THE COURT: Okay. Why don't we take about a five-minute stretch break, restroom break. And we'll just keep moving.

(Venire panel exits the courtroom)

(Brief recess taken)

(Venire panel enters the courtroom)

THE COURT: Other than the fact that Mrs. Evans or panel member Number 3 is standing up, is anybody missing anybody who was sitting next to them? Okay. Terrific. You may be seated.

Mrs. Evans, if it makes you more

comfortable, you can stand up over there.

VENIREPERSON EVANS: Thank you.

THE COURT: We'll let the interns sit, and then we'll ask Mr. Hagood to come forward.

All right. Mr. Hagood, you may proceed.

MR. HAGOOD: Thank you, Judge.

Good afternoon folks. It's already afternoon. So good afternoon to you-all. As the judge said, I'm Dan Hagood. I won't read your jury card. When I sit on the plaintiff's side, I always read my jury card. By the time it comes to me, it seems so contrived that I won't do it.

I'll be very quick, frankly. The defense (sic) covered a lot of ground I would have covered. I want to ask you this question. I want to kind of pick up where Mr. Aldous left off. If you had a close friend or yourself, a family member, who had signed a written contract, negotiated and signed, and then did not follow that contract precisely to the letter, would you sue someone for not following the contract if you were the first one who did not honor the contract?

Do you understand what I'm saying? I've got a contract. It requires A, B, C, D, and E, parts A, B, C, D, and E for both parties. The party one, me, I don't honor that contract. I don't follow exactly what

my contract required me to do. But I sue the other party for not -- I first don't follow. They know it, and then the second party doesn't follow. Without -- would you, as the first party, sue the second party if you're the first one to not honor the contract?

It's a little different question than the question you were asked earlier. The question you were asked earlier: Would you sue if you, you know, were seriously harmed in a business transaction?

I'm asking a much different question. If you were the first one that caused harm, would you sue someone that you say harmed you?

So, Number 1, I want a "yes" or "no," just the same as Mr. Aldous, if it's possible.

VENIREPERSON CANTU: I don't understand

MR. HAGOOD: Okay. I'm sorry, sir I apologize.

Number 2?

VENIREPERSON RODGERS: I don't think I can give you a "yes" or "no." I think it depends upon the case and the varying degrees of how bad it is.

MR. HAGOOD: I understand

Number 3?

VENIREPERSON EVANS: I'm like Number 2.

MR. HAGOOD: Four?

VENIREPERSON DIMEFF:  Basically, no.

MR. HAGOOD:  Five?

VENIREPERSON JACKSON:  Did I knowingly do it?

MR. HAGOOD:  Oh, yeah.

VENIREPERSON JACKSON:  Oh, I did it on purpose?

MR. HAGOOD:  You're going to have to decide that.  There's no question it's going to be -- under the question I'm posing to you, you are the one who did not honor the contract first.  Would you sue someone for not honoring the contract themselves?

VENIREPERSON JACKSON:  I don't know.  I don't know that.  I can't say "yes" or "no."

MR. HAGOOD:  Okay.  That's fine.

Six?

VENIREPERSON LEIJA:  No.

MR. HAGOOD:  Seven?

VENIREPERSON MCCOY:  No.

MR. HAGOOD:  Eight?

VENIREPERSON VILLANUEVA:  No.

MR. HAGOOD:  Nine?

VENIREPERSON PEARSON:  No.

MR. HAGOOD:  Ten?

VENIREPERSON MACHEN:  No.

MR. HAGOOD: Eleven?

VENIREPERSON RICHIE: No.

MR. HAGOOD: Twelve?

VENIREPERSON GONZALES: No.

MR. HAGOOD: Thirteen?

VENIREPERSON KOZAK: It just depends on the situation.

MR. HAGOOD: Okay. Fair enough, sir. Fourteen?

VENIREPERSON GEORGE: I don't know.

MR. HAGOOD: Fifteen?

VENIREPERSON BERG: No.

MR. HAGOOD: Sixteen?

VENIREPERSON MAGUIRE: Situational.

MR. HAGOOD: Seventeen?

VENIREPERSON WATTS: Situational.

MR. HAGOOD: Eighteen?

VENIREPERSON ORTIZ: Situational.

MR. HAGOOD: Nineteen?

VENIREPERSON RAMIREZ: No.

MR. HAGOOD: Twenty.

VENIREPERSON PEARLE: No.

MR. HAGOOD: Twenty-one?

VENIREPERSON DOTY: Situational.

MR. HAGOOD: Okay. Very well. Thank you.

ma'am.

Twenty-two?

VENIREPERSON PINA:  No.

MR. HAGOOD:  Twenty-three?

VENIREPERSON PALMER:  No.

MR. HAGOOD:  Twenty-four?

VENIREPERSON ELLENDER:  No.

MR. HAGOOD:  Twenty-five?

VENIREPERSON DUFFEY:  Depends on the circumstances

MR. HAGOOD:  Yes, ma'am.  Thank you.

Twenty-six?

VENIREPERSON PEREZ:  No.

MR. HAGOOD:  Twenty-seven?

VENIREPERSON HAGGERTY:  Circumstantial.

MR. HAGOOD:  Yes, ma'am.

Twenty-eight?

VENIREPERSON CIRONE:  No.

MR. HAGOOD:  Twenty-nine?

VENIREPERSON VILLANUEVA:  No.

MR. HAGOOD:  Thirty?

VENIREPERSON ADEBOYE:  No.

MR. HAGOOD:  Okay.  Fair enough.  Thank you.  I've only got a couple of more questions. The way the process works is the plaintiff goes first.  And what

always scares me when I'm on the defense side of the room is that people make up their minds quick. It's psychological phenomenon called recency. Once I hear something, I kind of jump on it. And, really, the way facts come out in a courtroom is like an assembly line. Plaintiff goes first, so here's the first pack. It comes out. Here's the second pack. It comes out. Here's the third pack. It comes out.

The defense packs are way back here because we go second. And it's so scary to me that people might make up their mind as the facts come tumbling into a courtroom before they've heard all the facts. And I really want to caution people not to do that. I want to ask if there -- if some people are just predisposed and say, "Hey, Dan, I'm a person that makes up my mind quick. I'm very decisive, and once I make up my mind, I don't change my mind."

I just need to discover if someone here is like that. Only you know inside your heart of hearts. So I need to ask you for-- have a fair representation of my client because it would be unfair, I think you'd all agree, if you made a decision before you heard all the evidence. That's all the Court's requiring.

So, Number 2, would you have a problem with that?

VENIREPERSON RODGERS: I don't have a problem with that.

MR. HAGOOD: Number three?

VENIREPERSON EVANS: No.

MR. HAGOOD: Number 4, are you a decisive, "I make my mind up quick" person?

VENIREPERSON DIMEFF: I am, but then it could be changed with the next level.

MR. HAGOOD: Okay. So I call them -- I don't mean it in a bad way -- flip flop. Is that fair?

VENIREPERSON DIMEFF: Yes.

MR. HAGOOD: Fair enough. Thank you.

Five?

VENIREPERSON JACKSON: No.

MR. HAGOOD: Six?

VENIREPERSON LEIJA: No.

MR. HAGOOD: Seven?

VENIREPERSON MCCOY: No.

MR. HAGOOD: Eight?

VENIREPERSON VILLANUEVA: No.

MR. HAGOOD: Nine?

VENIREPERSON PEARSON: No, sir.

MR. HAGOOD: Ten?

VENIREPERSON MACHEN: No.

MR. HAGOOD: Eleven?

VENIREPERSON RICHIE: No.

MR. HAGOOD: Twelve?

VENIREPERSON GONZALES: No.

MR. HAGOOD: Thirteen?

VENIREPERSON KOZAK: No.

MR. HAGOOD: Fourteen?

VENIREPERSON GEORGE: No.

MR. HAGOOD: Fifteen?

VENIREPERSON BERG: No.

MR. HAGOOD: Sixteen?

VENIREPERSON MAGUIRE: No.

MR. HAGOOD: Seventeen?

VENIREPERSON WATTS: Yes.

MR. HAGOOD: Yes, ma'am. I thank you.
Eighteen?

VENIREPERSON ORTIZ: No.

MR. HAGOOD: Okay. Nineteen?

VENIREPERSON RAMIREZ: No.

MR. HAGOOD: Twenty?

VENIREPERSON PEARLE: No.

MR. HAGOOD: Twenty-one?

VENIREPERSON DOTY: No.

MR. HAGOOD: Twenty-two?

VENIREPERSON PINA: No.

MR. HAGOOD: Twenty-three?

VENIREPERSON PALMER:  No.

MR. HAGOOD:  Twenty-four?

VENIREPERSON ELLENDER:  No.

MR. HAGOOD:  Twenty-five?

VENIREPERSON DUFFEY:  No.

MR. HAGOOD:  Twenty-six?

VENIREPERSON PEREZ:  No.

MR. HAGOOD:  Twenty-seven?

VENIREPERSON HAGGERTY:  No.

MR. HAGOOD:  Twenty-eight?

VENIREPERSON CIRONE:  No.

MR. HAGOOD:  Thank you, sir.

Twenty-nine?

VENIREPERSON VILLANUEVA:  No.

MR. HAGOOD:  Thirty?

VENIREPERSON ADEBOYE:  No.

MR. HAGOOD:  Other than -- I don't mean it disrespectful.  Other than the flip-floppers and Number 17, I can count on you-all, y'all are going to promise me you'll hold your fire until you've had all the evidence and until you all get back in the jury room and deliberate together before you make up your mind?  Can y'all promise me that?

Okay.  Last area of inquiry.  I represent and Mr. Shaw represents an entity, a business entity.

It's a -- frankly, it's a partnership. It's called VSDH Ventures -- a couple of other words behind it -- Partnership. And that's a business entity under the law. And Mr. Hickok here was a partner, and he is an individual. So he's here individually. I'm here representing the partnership.

Now, has anyone ever had experience with forming or working in partnerships or LLCs, limited liability companies, limited liability partnerships, anything like that? In the first row, anyone with experience in that area?

Number 3, what is your experience, ma'am?

VENIREPERSON EVANS: With our family, we have land and we're going through that.

MR. HAGOOD: Yes, ma'am. So you have some experience working in -- working inside a partnership?

VENIREPERSON EVANS: Well, the whole family's included, the whole heir family.

MR. HAGOOD: Yes, ma'am.

VENIREPERSON EVANS: We're all kind of included.

MR. HAGOOD: All right. Thank you.

VENIREPERSON EVANS: We were born into it.

MR. HAGOOD: Thank you, ma'am.

Anyone else on the first row?

On the second row? Number 20, yes, sir?

VENIREPERSON PEARLE: We have development companies with some partners and our company has partners.

MR. HAGOOD: Okay. You understand there were second -- the partnership is a second -- a separate business entity, a separate human being for the purposes of this courtroom. It's not the same as Mr. Hickok. Partnership's different. Mr. Hickok is different. They're separate entities. Everybody understand that?

Okay. Last row, anybody have any experience in the partnership area? All right.

I want to thank you. You're all a great bunch of people. I look forward to working in front of you. And thank you very much.

THE COURT: Thank you, Mr. Hagood.

Mr. Chaiken? You need to take some water up there with you?

MR. CHAIKEN: I think I'm okay. There's some in here now. I appreciate it, Judge. I'm suffering an allergy problem too.

My name is Ken Chaiken. And as I mentioned earlier today, it is my privilege today to represent Mr. Douglas Hickok, who's sitting in the room. You heard Mr. Aldous tell you that this is a very

important case to Mr. and Mrs. Gross, who are not here presently. But it is also a very important case for Mr. Hickok. Mr. Hickok finds it to be a very important case because he is the involuntary participant in this room today. He was sued. Does everybody understand that he was sued and that's why he is here today? Does anybody not understand that?

Okay. Now, this may sound like a silly question, but I'm going to ask it anyway. Is there anybody among the group of you that believes that a party who has been sued doesn't have a right to defend themselves? Anybody at all?

So can I assume that you all agree that when somebody has been sued, they have a right to defend themselves? Yes?

And they have a right to rely upon who to decide whether or not the suit against them is meritorious or not meritorious? Could you tell me who? Who do they have a right to rely upon to decide those issues?

UNIDENTIFIED VENIREPERSON: A jury.

MR. CHAIKEN: A jury, you folks. Yes.

And what is the one fundamental thing that somebody who has been sued, who believes that they have the right to defend themselves, believes that they have

a good defense, is entitled to expect from the members of the jury who are ultimately selected to sit in the box over there?  Can you tell me?  You've been on a jury.

VENIREPERSON GONZALES:  To be open-minded, to hear everything and not pick and choose what you want to hear.

MR. CHAIKEN:  Have you heard the words preconceived notions?

VENIREPERSON GONZALES:  Yes.

MR. CHAIKEN:  Would you agree with me that what somebody like Mr. Hickok has a right to expect is not only that jurors who are called upon to decide the case against them are open-minded, but they don't come with a preconceived notion about what the case involves or whether somebody's a good person or a bad person or those kind of things?  Would you agree me?

VENIREPERSON GONZALES:  I would.

MR. CHAIKEN:  Is there anybody that disagrees with that?  Anybody at all?

Do you agree with that, that somebody who's been sued has a right to come into court and ask for open-minded citizens, without preconceived notions, to come in and listen to the case from beginning to end and decide the case based upon the evidence?  Is that a

fair assumption?  Right to defend themselves, no problem?  Is that right?

UNIDENTIFIED VENIREPERSON: Yes.

MR. CHAIKEN:  Okay. Thank you.

Now, I represent plaintiffs, who are people who sue people, sometimes.  And I represent defendants, people who are sued, sometimes. Kind of an equal-opportunity lawyer.  I represent people who have a need for my legal services  Now, it's Mrs. Jackson who's the real estate agent, right?

VENIREPERSON JACKSON:  Yes.

MR. CHAIKEN:  Are you an equal-opportunity realtor?  You represent buyers and sellers?

VENIREPERSON JACKSON:  That's right.

MR. CHAIKEN:  No distinction between the two; no preference for one over the other?

VENIREPERSON JACKSON:  No.

MR. CHAIKEN:  Is there anybody who thinks -- and I'm going to pick on Mr. Machen over here because he has graciously informed us that he's been involved in a lawsuit that he served as plaintiff in.  Mr. Machen, do you believe that just because somebody files a lawsuit, there must be something to it?

VENIREPERSON MACHEN:  No, not necessarily.

MR. CHAIKEN:  Okay.  And just because the

lawsuit reaches the stage where we have to call upon fine citizens like you to come down and make decisions, if it made it this far, there must be something to it? Anything like that?

VENIREPERSON MACHEN: Well, if you made it this far, it must be needing a solution from the jury.

MR. CHAIKEN: Okay. And I'll agree with you. It does need a solution from the jury. But is there anything about the fact that it has made it this far that causes you to think, "Well, you know, he filed a lawsuit. There must be something to it because, otherwise, we wouldn't be here"?

VENIREPERSON MACHEN: Well, not necessarily. No.

MR. CHAIKEN: So you understand that there are some lawsuits that have merit.

VENIREPERSON MACHEN: Right.

MR. CHAIKEN: Like you believe yours had merit, correct?

VENIREPERSON MACHEN: Yes.

MR. CHAIKEN: And I assume that the party who you sued at some point in time believed that they had a defense, correct?

VENIREPERSON MACHEN: They didn't show up in Court, but --

MR. CHAIKEN: They never even -- they never even announced. I know you said that it was a default, but did they ever offer a defense at all for part of the case?

VENIREPERSON MACHEN: No.

MR. CHAIKEN: No, okay.

Has anybody been involved in a suit where they saw a defense offered? Anybody at all?

I'm going to come back to you again, okay, Mrs. Jackson, because you have seen real estate contracts, contracts for the purchase and sale of residential real estate.

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: Have you ever seen contracts that impose mutual obligations on the parties?

VENIREPERSON JACKSON: What do you mean?

MR. CHAIKEN: Do you understand what mutual obligations mean?

VENIREPERSON JACKSON: No.

MR. CHAIKEN: Let's look at it this way. When you are representing a seller and the buyer and seller enter into a contract.

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: There are obligations on the party to sell it, correct, that are spelled out in the

contract; is that right?

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: One of those obligations might be, if I receive X number of dollars, I will sell the property, correct?

VENIREPERSON JACKSON: Correct.

MR. CHAIKEN: All right. And then there are also obligations on the part of the buyer, right? I will obtain a survey. I will pay X number of dollars in order to obtain title to the property, right?

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: Okay. And that's commonplace in real estate contracts, isn't it?

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: That's what I mean by mutual obligation.

VENIREPERSON JACKSON: Yes.

MR. CHAIKEN: And you're aware that when parties enter into contracts, they are called upon to perform their obligations; is that right?

VENIREPERSON JACKSON: Correct.

MR. CHAIKEN: So if you have a contract that has mutual obligations, then both parties are expected to perform.

VENIREPERSON JACKSON: Right.

MR. CHAIKEN: You understand that, right?

All right. And there was some discussion earlier with you-all about, you know, if -- if somebody brings a suit under a contract where they were required to perform and they breached first, okay, or they didn't perform first, we have a problem with them bringing the suit. You-all recall that conversation a little while ago, right?

My question is a little bit different. Okay. My question -- and I'm going to start by asking -- I'm bad at remembering names, so forgive me.

Mr. Rodgers, I won't do any discount type of check, comments, or -- well, factors comments. But I'm going to start with you. Do you think it's important when you're analyzing whether somebody's performed under a contract or not or whether they're required to perform under a contract or not and look at everybody's obligations to be performed?

VENIREPERSON RODGERS: Yeah.

MR. CHAIKEN: And if you were instructed in this case that one party's failure to perform excused another party's failure to perform, could you follow that instruction if the Court said you are instructed that if one party failed to perform first, the other party's obligations are excused? Could you follow that

instruction?

VENIREPERSON RODGERS: I guess if that was mandated, yeah.

MR. CHAIKEN: Well, you seem to have concern about that. What would be your concern?

VENIREPERSON RODGERS: Not a concern. I guess I'm just trying to follow. But if one person -- I guess I'm thinking two wrongs don't make a right. So if one person does something wrong and it's excused, the other person does something wrong and it's mutually agreed that both are excused, that's one thing.

But if one person does something wrong and it's not excused and another person does something wrong that's also not excused, they're both wrong.

MR. CHAIKEN: My question's a little bit different.

VENIREPERSON RODGERS: Okay.

MR. CHAIKEN: My question to you is: If the judge -- that will be Judge Benson because Judge Tobolowsky won't be here with us once we get started in the trial. If the judge were to instruct you that if you found that the party suing failed to perform a contract first --

VENIREPERSON RODGERS: Uh-huh.

MR. CHAIKEN: -- okay, and that excused

the other party, who was alleged to have not performed under the contract, would you be able to comply with that instruction?

VENIREPERSON RODGERS: Yeah.

MR. CHAIKEN: Okay. And would you be able to comply with that instruction even if you felt like, you know, the party that didn't perform first still got hurt and they got damage and I kind of feel sorry, would you still follow the instruction?

MR. ALDOUS: Your Honor, let me object to this line of questioning because it doesn't give the full aspect of what the Court might charge and it's delving into the facts of the case.

THE COURT: Sustained.

MR. CHAIKEN: I'll move along.

Has anybody ever been involved in a transaction where somebody signed a guaranty? Anybody at all? Does anybody know what a guaranty is?

Are you raising your hand? You are Mr. Maguire, right?

VENIREPERSON MAGUIRE: Yes. I feel like everyone here has, but they may or may not know that, but --

MR. CHAIKEN: Okay. What is a guaranty based on your understanding?

VENIREPERSON MAGUIRE: I mean, if you buy a vacuum cleaner or something has a money-back guarantee, and it doesn't work or, you know, if you purchase some other sort of product, there's a warranty.

MR. CHAIKEN: Okay. That's one form of guaranty.

I'm going to pick on you again, and I'm sorry. But you -- Mrs. Jackson, have you ever seen -- do you deal with banks and lenders when you're involved in real estate transactions?

VENIREPERSON JACKSON: Yes, I agree we deal with them.

MR. CHAIKEN: Have you ever encountered a buyer who didn't really have sufficient credit to make the transaction, but a family member may have agreed to cosign a loan?

VENIREPERSON JACKSON: Yes.

MR. CHAIKEN: Or put a little bit differently, sign a document called a guaranty that guaranteed repayment for performance of the obligations?

VENIREPERSON JACKSON: I would say I've had a client do that. But she did that mainly with her lender, and the lender had to get those forms signed separate, you know, money that was coming to her.

MR. CHAIKEN: So, but you were familiar

with the concept of somebody who --

VENIREPERSON JACKSON: Yes.

MR. CHAIKEN: -- guaranteed the performance of another client, right?

VENIREPERSON JACKSON: Correct.

MR. CHAIKEN: Okay. And has anybody else encountered a situation where somebody else was asked to guaranty performance of a contract obligation of a third party?

You're nodding your head back there. And I want to call you Mr. Adeboye, but I know that's not right.

VENIREPERSON ADEBOYE: For example, I work at Home Depot. Okay. You come out and buy some lock for your house. You see, that is guaranty.

MR. CHAIKEN: And you stand behind it?

VENIREPERSON ADEBOYE: I stand behind that lock.

MR. CHAIKEN: But has anybody ever been involved -- Mr. Pearle?

VENIREPERSON PEARLE: Yes, sir. In my prior business, I would hire different -- like a food stylist or a clothing stylist or a makeup person. So the whole job hinges on that. And I'm kind of guaranteeing their showing up for work and doing the

job. I mean, I don't know if that's really what you're wanting.

MR. CHAIKEN: My question is a little bit different. Has anybody encountered a situation where one party said, "I will guaranty the performance of the contract obligation that somebody else is required to perform if they don't perform it?

VENIREPERSON ORTIZ: Like a cosigner?

MR. CHAIKEN: A cosigner, yes. That's what I'm talking about, cosigner, yes. Have you been involved in one of those, Mrs. Ortiz?

VENIREPERSON ORTIZ: My husband has.

MR. CHAIKEN: Your husband has?

VENIREPERSON ORTIZ: Uh-huh.

MR. CHAIKEN: Do you mind if I ask what the nature of that is based

VENIREPERSON ORTIZ: It's just when he was younger, growing up, and wanting to get a truck, and his dad cosigned for the truck

MR. CHAIKEN: Cosigned a note

VENIREPERSON ORTIZ: Yes.

MR. CHAIKEN: So, in other words, he guaranteed that he would pay for the note payments if your husband didn't make payments; is that right?

VENIREPERSON ORTIZ: Correct.

MR. CHAIKEN: And did you understand that in order for the lender in that situation to recover from the guarantor, who would have been your husband's father, your husband would have had to not pay first, right?

VENIREPERSON ORTIZ: Right.

MR. CHAIKEN: Does anybody have any difficulty with that concept, you know, that there are occasions where an individual may guaranty the performance of another party's contract obligations? Anybody have any issues about that? Anybody find that complex or bothersome or anything like that? Yes, ma'am? You're Mrs. Evans, right?

VENIREPERSON EVANS: Uh-huh. I kind of went through that with my granddaughter. When she finished high school, she wanted to buy a car. I said I can't afford to buy you a car. But she asked me would I cosign. Now, at first I was hesitant, because, you know, I wasn't working. And I said, well, you know, it's going to fall back on me.

But one time she got late on her payment. Instead of calling her, they called me. So it makes you feel like, well, somehow if she's not able to pay for this car, it sets in that you're going to have another car payment if they don't pay for it, just like you are

still being held responsible.

MR. CHAIKEN: But you wouldn't -- you wouldn't have a problem, would you, if the bank called you and said, hey, we're calling on you to make the payments but -- was it your daughter or your granddaughter?

VENIREPERSON EVANS: Granddaughter.

THE COURT: But your granddaughter, you found out she made the payment. Would you have a problem with that?

VENIREPERSON EVANS: She made the payment?

MR. CHAIKEN: Okay. But if you had found out that your granddaughter made the payment, okay, but the bank was saying, "Well, you're the guarantor. We want you to pay"

VENIREPERSON EVANS: But that's what they were going to tell me.

MR. CHAIKEN: Oh, they were. And you had a problem with that, right?

VENIREPERSON EVANS: Well, I didn't have a problem with it. I just realized sometimes you don't really realize what you're doing, you know, because you're so happy they graduated and she was responsible. She was working. And, you know, but you don't never know if their job -- you know, not have a job next week.

If they don't pay, you got to pay.

MR. CHAIKEN: Right. Well, my question to you is a little different. When the bank called you and said, "Well, we want you to pay for her," even though she had already paid, do you think that was wrong?

VENIREPERSON EVANS: Of course, if she already paid.

MR. CHAIKEN: Okay. So, it would have been wrong for them to look to you as the guarantor and say, "Well, you're the guarantor. We're just going to ask you to pay anyway." That's not right. Do you agree with that?

VENIREPERSON EVANS: That's not right.

MR. CHAIKEN: Okay. Anybody else ever find themselves in a situation where -- where either they asked somebody to guaranty or cosign one of their obligations or they were asked to do so?

Yes, ma'am. You are Ms. Doty? Yes?

VENIREPERSON DOTY: Yes.

MR. CHAIKEN: Okay, 21.

VENIREPERSON DOTY: Apartment after college, it was right out of college.

MR. CHAIKEN: Right.

VENIREPERSON DOTY: My dad cosigned for my apartment.

MR. CHAIKEN: And so your dad agreed to do that for you?

VENIREPERSON DOTY: Yes.

MR. CHAIKEN: Okay. And you wouldn't have expected your dad to have to honor the guarantee of your payment obligations unless you breached your obligation to pay; is that right?

VENIREPERSON DOTY: Correct.

MR. CHAIKEN: So, in other words, the guarantee is only enforceable when the circumstances giving rise to it have occurred; is that a fair statement?

MR. ALDOUS: Your Honor, let me object to that particular question as going beyond the scope of voir dire.

THE COURT: Sustained.

MR. CHAIKEN: I'm just trying to find the biases on guarantors, if there are any. I'll move on.

THE COURT: Mr. Chaiken, please move along.

MR. CHAIKEN: Does anybody think that just because somebody allegedly signs a guarantee, they're automatically responsible for the obligations of somebody else?

MR. ALDOUS: Your Honor, let me object to

that question also and for the same reason.

THE COURT: Sustained.

MR. CHAIKEN: I'll move along, Judge.

If you're a party to a contract, as your clients are, your clients expect the other party to comply with the requirements of the contract that they signed and agreed to; is that true?

VENIREPERSON DOTY: Uh-huh.

MR. CHAIKEN: And would anybody find it difficult to say, well, a party comes in and is suing to enforce a contract, but they don't want to comply with all the requirements of the contract if they don't find them favorable to themselves, but they want the other person to be held responsible for the contract.

MR. ALDOUS: Your Honor, I object to that question as going into the facts of the case.

MR. CHAIKEN: I'm not going into the facts of the case.

MR. ALDOUS: It's improper for voir dire, Your Honor.

THE COURT: I'm going to ask you to move on, Mr. Chaiken.

MR. CHAIKEN: You were asked questions earlier about the difference between people and entities. You-all recall that conversation?

Corporations are -- are they alive? Are they alive, sir? I mean, are they -- can you see them and touch them and hear them?

THE REPORTER: I didn't hear him.

MR. CHAIKEN: My question to you, sir, is: You understand what a business entity is? You talked about that earlier in response to some questions by Mr. Hagood. Do you remember that?

UNIDENTIFIED VENIREPERSON: Okay.

MR. CHAIKEN: And you know what a corporation is; it's a business. Okay. Do you understand that corporations act through individuals, individuals that work for the company or who represent the company. You understand that concept?

UNIDENTIFIED VENIREPERSON: Yes.

MR. CHAIKEN: But you understand that when those people are acting, they may be acting for the entity. Do you understand that?

UNIDENTIFIED VENIREPERSON: Yes.

MR. CHAIKEN: Okay. Mrs. Ortiz, you were shaking your head, yes. Do you understand that if a contract -- if a corporation or a business entity or a partnership is involved in signing a contract, somebody, a human being, has to sign the contract on behalf of the company?

VENIREPERSON ORTIZ: Correct.

MR. ALDOUS: Your Honor, let me object to that question as also being outside the scope of voir dire.

THE COURT: Overruled.

MR. CHAIKEN: Thank you.

And do you have any difficulty distinguishing the idea that where the human being who signs the document on behalf of the business entity does so, they may only be acting on behalf of that entity?

VENIREPERSON ORTIZ: Correct.

MR. CHAIKEN: Okay. Do you have any belief or any preconceived notion that if they sign their name to it on behalf of a company or a corporation, they intended by placing their personal name on the document to be personally responsible for the obligations that are owed by the company?

MR. ALDOUS: Your Honor, I object. That's going into the --

THE COURT: Sustained.

MR. CHAIKEN: Mr. Rodgers, can you be a fair and impartial juror in this case?

VENIREPERSON RODGERS: Uh-huh.

MR. CHAIKEN: Is there anything about what you've heard today that causes you to have any concern

about your ability to be open-minded and fair and impartial --

VENIREPERSON RODGERS: No.

MR. CHAIKEN: -- and to wait until the end of the evidence to make a decision as to who's wrong and who's right?

VENIREPERSON RODGERS: No.

MR. CHAIKEN: What about you, Mrs. Evans?

VENIREPERSON EVANS: I mean, ask the question again.

MR. CHAIKEN: Is there anything that you've heard so far today that causes you to have concern about whether you can be a fair and impartial juror in this case?

VENIREPERSON EVANS: I can't.

MR. CHAIKEN: You can't? Okay.

What about you, Mrs. Dimeff, can you be a fair and impartial juror?

VENIREPERSON DIMEFF: I can.

MR. CHAIKEN: You can listen to the evidence from beginning to end?

VENIREPERSON DIMEFF: Yes.

MR. CHAIKEN: No preconceived notions about who's wrong or who's right by virtue of who sued whom?

VENIREPERSON DIMEFF: Well, I sort of do, but -- I sort of have a preconceived notion.

MR. CHAIKEN: Okay. What's your preconceived notion?

VENIREPERSON DIMEFF: Well, I don't want to say it in front of everybody.

MR. CHAIKEN: Okay. Can we talk to you about that privately afterwards?

VENIREPERSON DIMEFF: Yes.

MR. CHAIKEN: Okay. Mrs. Jackson, what about you? Can you be a fair and impartial juror?

VENIREPERSON JACKSON: Yes.

MR. CHAIKEN: Can you listen to all of the evidence from beginning to end before deciding who's wrong and who's right? And you aren't influenced by who sued whom in terms of arriving at that decision?

VENIREPERSON JACKSON: No.

MR. CHAIKEN: Thank you.

Mr. Leija, what about you? Can you be a fair and impartial juror if you're selected on this -- to serve as a juror on this case?

VENIREPERSON LEIJA: Yes.

THE REPORTER: I heard, "yes." But I didn't hear anything after that.

MR. CHAIKEN: He said, "Yes, if he

understands the concept."

Mr. Leija, can you come to your jury service with an open mind without preconceived notions as to who's wrong and who's right?

VENIREPERSON LEIJA: Yes.

MR. CHAIKEN: Okay. What about you, Ms. McCoy?

VENIREPERSON MCCOY: Yes.

MR. CHAIKEN: You can be fair and impartial?

VENIREPERSON MCCOY: Yes.

MR. CHAIKEN: And you can listen to the evidence from beginning to end, and you can give Mr. Hickok the opportunity to provide his defense without forming any decisions before he's done so?

VENIREPERSON MCCOY: Yes.

MR. CHAIKEN: Okay. Thank you.

Mr. Villanueva, how about you?

VENIREPERSON VILLANUEVA: Yes.

MR. CHAIKEN: Same thing?

VENIREPERSON VILLANUEVA: Uh-huh.

MR. CHAIKEN: Okay. Ms. Pearson, what about you?

VENIREPERSON PEARSON: Yes.

MR. CHAIKEN: Mr. Machen?

VENIREPERSON MACHEN: Yes.

MR. CHAIKEN: Okay. Mr. Richie, I haven't picked on you at all. How about you? Can you be fair and impartial, open-minded, and serve as a juror without preconceived notions as to who's wrong and who's right?

VENIREPERSON RICHIE: Sure.

MR. CHAIKEN: Ms. Gonzales, what about you?

VENIREPERSON GONZALES: Absolutely.

MR. CHAIKEN: Okay. Mr. Kozak, what about you, sir?

VENIREPERSON KOZAK: Yes.

MR. CHAIKEN: All right. Mrs. George?

VENIREPERSON GEORGE: Yes.

MR. CHAIKEN: All right. Mr. Berg?

VENIREPERSON BERG: Yes.

MR. CHAIKEN: Mr. Maguire?

VENIREPERSON MAGUIRE: Yes.

MR. CHAIKEN: Ms. Watts?

VENIREPERSON WATTS: I tend to jump to conclusions. I can sit and listen, but I could jump to conclusions in the beginning.

MR. CHAIKEN: Okay. Do you think that effects your ability to be fair and impartial and to sit and listen to all the evidence from beginning to end

before deciding who's wrong and who's right?

VENIREPERSON WATTS: Yes.

MR. CHAIKEN: It does?

VENIREPERSON WATTS: Yes, it does.

MR. CHAIKEN: Okay. Thank you for your honesty. I appreciate it.

Mrs. Ortiz, what about you?

VENIREPERSON ORTIZ: I'm kind of in the same boat as her, but I'm willing to -- I think that earlier I flip flopped back.

MR. CHAIKEN: Well, when you say you're kind of in the same boat, the boat that I understood Ms. Watts to be in is that she doesn't believe that she can be fair and impartial because of her preconceived beliefs about the situation. What about you? Can you be fair and impartial, notwithstanding the fact that you tend to jump to conclusions and then maybe flip flop, or what?

VENIREPERSON ORTIZ: I think I can be fair and impartial.

MR. CHAIKEN: So you can wait to listen to everything, follow the instructions of the Court, and then decide who's right or who's wrong?

VENIREPERSON ORTIZ: Yes.

MR. CHAIKEN: Okay. What about you? Is

it -- you're Mr. Ramirez. Sorry. Can you be fair and impartial from beginning to end?

VENIREPERSON RAMIREZ: Yes.

MR. CHAIKEN: Without preconceived notions as to who's wrong and who's right?

VENIREPERSON RAMIREZ: My mind may wander a little.

MR. CHAIKEN: Okay. Is there anything that effects your ability to be fair and impartial --

VENIREPERSON RAMIREZ: No.

MR. CHAIKEN: -- and be attentive and to follow the instructions of the Court

VENIREPERSON RAMIREZ: No.

MR. CHAIKEN: Okay. I appreciate that.

Mr. Pearle, what about you, sir?

VENIREPERSON PEARLE: I can be fair and impartial.

MR. CHAIKEN: From beginning to end without forming an opinion in advance as to who's wrong and who's right?

VENIREPERSON PEARLE: Correct.

MR. CHAIKEN: Okay. Thank you, sir.

Ms. Doty, how about you?

VENIREPERSON DOTY: I can be.

MR. CHAIKEN: Okay. From beginning to end?

VENIREPERSON DOTY: Yes.

MR. CHAIKEN: All right.

Tell me your name. I'm sorry.

VENIREPERSON PINA: Pina.

MR. CHAIKEN: Mr. Pina, I'm sorry. My writing is bad and I don't have my reading glasses on. Like Mr. Aldous, I'm kind of getting up there in age.

All right. Can you be fair and impartial from beginning to end?

VENIREPERSON PINA: Yes.

MR. CHAIKEN: You can approach the case with an open mind, without preconceived notions or judgments about who's wrong and who's right?

VENIREPERSON PINA: Yes.

MR. CHAIKEN: Okay. Thank you, sir.

Mr. Palmer or is it Dr. Palmer?

VENIREPERSON PALMER: Doctor.

MR. CHAIKEN: Dr. Palmer, how about you, sir?

VENIREPERSON PALMER: Yes. I can be fair and impartial from beginning to end.

MR. CHAIKEN: Okay. And there's nothing about what you've heard that causes you any concern about your ability to be fair and impartial and follow the instructions of the Court?

VENIREPERSON PALMER:  No.

MR. CHAIKEN:  Thank you.

Ms. Ellender, how about you?

VENIREPERSON ELLENDER:  Yes.

MR. CHAIKEN:  You can be?

VENIREPERSON ELLENDER:  Yes.

MR. CHAIKEN:  Okay. From beginning to end?

VENIREPERSON ELLENDER:  Yes.

MR. CHAIKEN:  No preconceived notions as to who's wrong and who's right?

VENIREPERSON ELLENDER:  No.

MR. CHAIKEN:  Thank you.

Is there anybody else who feels like Ms. Watts, that, you know, they just are kind of quick out of the gates to make a decision and, you know, they find that it will effect their ability to be -- and I appreciate her honesty, by the way; but we need you all to be honest on this.

Is there anybody else who feels the same way, that they just don't think they can be fair and impartial from the beginning to end?

Anybody else, the back row in particular because I haven't singled you all out?  Anybody, anybody else?  If I ask the question a little bit differently, it causes you to think a little bit different about it.

Anybody?  Yes, ma'am, you raised your hand in the back.

UNIDENTIFIED VENIREPERSON:  Not from the beginning to the end because circumstances change within a process.  And even before we hear from the beginning, I might think something.  And as the process goes along, it may not be what I thought it was, not from the beginning to the end.

MR. CHAIKEN:  So you cannot be fair and impartial from beginning to end?

UNIDENTIFIED VENIREPERSON:  Not from the beginning to the end

MR. CHAIKEN:  So at some point in the process --

UNIDENTIFIED VENIREPERSON:  I can be impartial, but not from the beginning to the end

MR. CHAIKEN:  Okay.  So at some point in time, you will form your opinion without waiting for all of the evidence and you'll sit with it --

UNIDENTIFIED VENIREPERSON:  I'll wait, but it still can change within that time.  I can wait to hear everything in that time.

MR. CHAIKEN:  Ladies and gentlemen, I appreciate the time that you have taken out of your busy days to be here and fulfill this important service as jurors.  Without you, the process doesn't work.  Without

you, people like my client don't have the ability to have their day in court and have a fair and full opportunity to have issues of concern to them resolved. So thank you for your time and attention.

THE COURT: Thank you, Mr. Chaiken.

Ladies and gentlemen, we're going to excuse you in a moment out into the hallway while the attorneys and I have some further discussions that will lead to the selection of the jury.

You have heard me say that you will not be coming back this week, that you will be coming back on Monday. And you have heard an estimate that the trial would be approximately three days. Since this is not my case, I know no more about it than you do. So assuming we're talking about a three-day case, I'm going to ask you a question, but I want you to listen to the qualifiers that I'm going to put on this question before everybody throws their card in the air.

I recognize everybody works. Everybody has family responsibilities. It's hard to be away from your day-to-day obligations. I understand that totally. I'm not asking about that. But I am asking, with regard to next week, does anybody have surgery scheduled, a doctor's appointment, non-refundable tickets to somewhere? And, if you do, would you raise your hand?

Okay. I need -- I'm sorry -- Number 1 -- hold on. One, 2, 19, 23 -- I'm sorry. Are you 25?

VENIREPERSON DUFFEY: Twenty-five.

THE COURT: Twenty-five, I've got 23 already. Anybody else who cannot -- who wants to talk to me about whether or not they can be here?

Okay. Number 3, I was already going to talk to you.

And, Number 20, you understand the parameters I've put on this?

UNIDENTIFIED VENIREPERSON: And then we're going to be here?

THE COURT: I'm going to get to you in just a minute.

Number 20, your answer is within the scope that I talked about?

VENIREPERSON PEARLE: I will put my card down.

THE COURT: Okay. And, Number 27, is your problem within the scope I talked about?

VENIREPERSON HAGGERTY: Yes.

THE COURT: All right.

VENIREPERSON RODGERS: Can I talk about my scope real quick? I'm leaving town Thursday. So, if it's a three-day trial, it wouldn't be an issue. But if

it's going to --

THE COURT: You know, I don't know I'm going to have to verify with the lawyers. When would you be leaving town Thursday, in the morning or in the evening?

VENIREPERSON RODGERS: First flight out on Thursday morning.

THE COURT: Okay. Thank you.

All right. What I would like to do then is ask -- okay. We know what the issue is with Panel Member Number 2. So I'm not going to ask you to stay behind, but I would ask Panel Member Number 1, Number 3, Number 4, Number 17, Number 19, Number 23, Number 25, Number 27, and Number 29 to remain here in the courtroom in your seats.

Otherwise, if you would, please leave your numbers in your chairs and go out in -- when I tell you to, go out into the hallway. Please remember my instructions Do not discuss the case. Do not do any independent investigation No Googling, texting, tweeting, blogging, Facebooking. If you need to let your employer know that you are still here, you certainly may do that. But don't discuss anything more than that.

So, other than the ones whose numbers I've

called and asked to stay here, if the rest of you will go out into the hallway. Please don't get too far away -- you can go to the restroom or whatever -- in case we need to speak with you. But we are going to be working on who is going to be a juror in this case. Thank you. Those whose number I did not call may go out in the hallway.

(Venire panel exits the courtroom)

THE COURT: Counsel, do you-all want to come up to the bench?

Jose Cantu, would you come up here, please? Mr. Cantu, you have indicated that you have some difficulty with English.

VENIREPERSON CANTU: Uh-huh.

THE COURT: And I didn't -- don't recall. I may have asked you these questions. And if I have, please forgive me. Can you read English?

VENIREPERSON CANTU: Well, I don't -- I read, but I don't know enough.

THE COURT: You don't know enough?

VENIREPERSON CANTU: No.

THE COURT: Have you understood what we've been talking about here?

VENIREPERSON CANTU: But, like I said, some words I don't understand. So it's too hard for me

to get a decision because I don't want to get a wrong decision. One word can change everything for me.

THE COURT: Okay. And remind me what you do.

VENIREPERSON CANTU: I work for a company. I'm a machine operator.

THE COURT: Okay. And how long have you lived -- where were you born?

VENIREPERSON CANTU: I was born in Mexico.

THE COURT: And how long have you lived here in this country?

VENIREPERSON CANTU: Twenty-six years.

THE COURT: And do you speak English on your job or Spanish on your job?

VENIREPERSON CANTU: So, so. I mean, maybe half.

THE COURT: Okay. Counsel I tend to err on the side of caution and would be inclined to excuse Panel Member Number 1.

MR. CHAIKEN: No objection.

MR. HAGOOD: No objection.

MR. ALDOUS: No objection.

THE COURT: Thank you, sir. If you will leave your juror badge -- I don't know where our bailiff is. But if you will just leave it there on the ledge,

you may go back to work or go home. And thank you very much for your service.

VENIREPERSON CANTU: Thank you.

THE COURT: Cathye, can you hear me?

THE REPORTER: Yes, ma'am.

THE COURT: All right. I'm going to try to get the language people out of the way first.

MR. ALDOUS: Juror Number 29.

THE COURT: Yes.

MR. CHAIKEN: We'd agree, Your Honor.

THE COURT: Okay. All right.

Senor Villanueva?

VENIREPERSON VILLANUEVA: I'm sorry for --

THE COURT: I understand and we understand that. Thank you. You may go back to work or you may go back home. If you will leave us your badge --

VENIREPERSON VILLANUEVA: I'm sorry.

THE COURT: -- and your number. That's quite all right.

MR. CHAIKEN: Thank you, sir.

THE COURT: Thank you.

Sheriff, we've excused Number one and Number 29 for language reasons.

Okay. I think they were the only language people.

Then Number 2, we know has a flight out Thursday morning. I'm not familiar with your case, so we -- y'all can just -- I'm just holding that out there. And, you know, obviously, you don't want to seat somebody that may have to disappear even if you're going to have an alternate. So that's just FYI. If you want to excuse him now out of an abundance of caution and you want to agree to that, that's fine.

MR. ALDOUS: Would it be possible to have him come and explain whether or not it's a definite deal or whether or not it's something he could reschedule with work?

THE COURT: Sure. I will do that, but I'm not going to do that at this moment.

MR. ALDOUS: Okay. That's fine.

THE COURT: Okay.

MR. CHAIKEN: And, Judge, just in case it comes up again, we don't necessarily share Mr. Aldous' view that it's a three-day trial. And so we think it will probably take the better part of, if not all of, next week. Just so you're aware.

THE COURT: All right. Mrs. Evans?

This is Panel Member Number 3.

Come on up. Mrs. Evans, you were asked some questions earlier, and you said you kind of wanted

not to talk in front of everybody. Do you remember what that was about?

VENIREPERSON EVANS: Yeah. He asked me did I know of somebody that had a lawsuit against a family or friend. And I just had a friend that did have a lawsuit. And, well, I didn't think it was a fair lawsuit. But, you know, they said it was because she did get injured pretty bad.

THE COURT: But you had some question in your own mind about whether it was a fair lawsuit?

VENIREPERSON EVANS: Yeah. But wasn't nothing I could do about it. You know, they went in -- it ain't like she had a jury, you know, trial or anything.

THE COURT: Was there anything -- is there anything about that or anything you've done previously in the legal system that would make you think you could not be fair as a juror in this case?

VENIREPERSON EVANS: No way. I think I could be a good juror.

THE COURT: Okay. Now you said you were having a problem with your leg falling asleep or something. Do you have some physical problems, or was it just for the moment?

VENIREPERSON EVANS: I have physical

problems. I have disability in my spine and my knee. I had knee replacement. I've got to have another knee replacement. And it seems like my other leg is going out, and I can't sit very long.

THE COURT: Now if you are seated as a juror, you're going to be in these more comfortable chairs over here where the interns are. And I know there will be breaks during the day. I'm sure there will be at least one break during the morning. There will be a lunch break. There will be at least one break in the afternoon. I don't know how many breaks Judge Benson normally has, but I can promise you that it will be at least that. Do you think that will be enough, or are you concerned about your ability to sit?

VENIREPERSON EVANS: I may have to stand up. That's the only problem because my -- I was cramping up.

THE COURT: Right.

VENIREPERSON EVANS: But I would love to be a juror. I've never been a juror, and I would love to if I -- if it just weren't for my little injuries that I have.

THE COURT: All right. Counsel, anybody else have any questions for Number 3?

MR. ALDOUS: Ma'am, if you were allowed to

just stand up if your leg started feeling a little gimpy on you and you were able to stand up in the jury box, could you serve?

VENIREPERSON EVANS: I sure could.

MR. ALDOUS: Thank you, ma'am.

THE COURT: Anything else from you guys?

MR. CHAIKEN: I don't have anything Judge.

THE COURT: Okay. Thank you so much. Will you go back out in the hallway for us?

VENIREPERSON EVANS: All right.

MR. CHAIKEN: Thank you, Mrs. Evans.

THE COURT: All right. Mrs. Dimeff?

Okay. When Mr. Chaiken was asking his questions --

VENIREPERSON DIMEFF: Uh-huh.

THE COURT: -- you said, well, you might have a preconceived notion about how you feel about the case.

VENIREPERSON DIMEFF: I do. I can't help it. And I'm under oath, so I had to say.

THE COURT: Okay. So talk to me about that.

VENIREPERSON DIMEFF: What is my notion, my preconceived notion?

THE COURT: Yes.

VENIREPERSON DIMEFF: Well, as a designer, I've worked with a lot of contractors and subcontractors. And a lot of them do sort of unethical things. And so I'm just sort of picturing this whole case, and I'm picturing that this couple hired this company. This company did not follow through. And so now the company is saying, well, we didn't follow through because you didn't do this.

And then, secondly, I feel like then they're trying to kind of weasel out of it by saying -- by saying you can't sue him. You have to sue this company, which is an LLC. That is just what I'm thinking in my mind and I can't help it.

THE COURT: All right. I have no earthly idea what the facts are in this case. I have no idea what the facts are in this case and neither do you. You haven't been presented with any facts. And I recognize that you have a scenario in your mind about what the facts are. So, do you think you could listen to the facts and be fair and impartial, or are you already down the road about what you think happened?

VENIREPERSON DIMEFF: I'm a normal person. I could listen, but I just want to be fair to the defendant too. That's all. And I'm just being honest,

and I hate even standing here.

THE COURT: Well, I understand.

VENIREPERSON DIMEFF: I would be happy to serve as a juror. I have no problem with that, but I'm just trying to be honest.

THE COURT: Okay. And is your -- I mean, if these were to be the facts -- fortunately for me, I have no clue -- is your belief about who should win and who should lose already set before you've heard any evidence?

VENIREPERSON DIMEFF: No, no.

THE COURT: Okay.

VENIREPERSON DIMEFF: It's not like, oh, the people building the house should always win. No.

THE COURT: Okay. You understand that your job as a juror would be to listen to the case and find the facts. You would evaluate the credibility of the witnesses, and you would decide what you think the facts are. And you would answer questions that were given to you by the judge. And the judge would decide what the law is that applies. So do you have any unshakeable beliefs about any of the small number of issues you've heard about from the lawyers today that will just make you --

VENIREPERSON DIMEFF: Nothing unshakeable.

THE COURT: Okay. Anything, Mr. Aldous?

MR. ALDOUS: No, Your Honor.

THE COURT: Anything, Mr. Chaiken?

MR. CHAIKEN: I do have a couple of questions.

Mrs. Dimeff, I heard you say that you had concerns about your ability to be fair to the defendant.

VENIREPERSON DIMEFF: Well, based on the preconceived notion that I have right now, this is -- I'm just being honest with you with what I'm thinking.

MR. CHAIKEN: Sure. Well, I appreciate your honesty, and I don't mean to put you on the spot. I just want to understand where you're coming from so that we can make an informed decision about your ability to be on the jury.

Would it be fair to say that based on what you've heard today and because of your preconceived notions, the defendant -- I don't know which defendant you're talking about, but whichever one you're talking about is starting sort of behind the starting block a little bit in your eyes in this case, not on equal footing?

VENIREPERSON DIMEFF: They are. Just by what I've heard today, yes.

MR. CHAIKEN: Okay. And your concerns of

those preconceived notions are such that you won't be able to divorce yourself from those notions and serve from beginning to end as a fair and impartial juror?

VENIREPERSON DIMEFF: I could -- I mean, like I said, I probably -- I know I know nothing about it. But I could flip flop if there were just all these facts that say otherwise. I mean, I am fair.

MR. CHAIKEN: But you -- but you have a preconceived bias against certain parties who are members of the industry that you have just indicated earlier just based upon your personal experience?

VENIREPERSON DIMEFF: I do a little bit.

MR. CHAIKEN: Would you say that those biases do effect your ability to come into the courtroom with an open mind, to listen to everybody from beginning to end, and to separate those biases out and just decide the case based on the evidence?

VENIREPERSON DIMEFF: I think I could. I mean, if I heard a strong reason to -- that would convince me otherwise, of course, I would listen to that.

MR. CHAIKEN: I have nothing else.

THE COURT: Mr. Hagood, anything from you?

MR. HAGOOD: No.

THE COURT: Thank you, madam. You may go

back out in the hallway.

Okay. I think the next person who indicated the she needed to speak with us is Number 17, Ms. Watts.

Ms. Watts, would you come on up?

I'm just trying to get through the people who said they have hardships, but Ms. Watts had also said she wanted to speak privately with us.

Good afternoon, Ms. Watts. Much earlier on, you said you wanted to speak privately with us about an issue.

VENIREPERSON WATTS: It's about a lawsuit that I'm currently involved in.

THE COURT: Okay. And what kind of case is that?

VENIREPERSON WATTS: It's a Fun 5 lotto ticket.

THE COURT: I'm sorry. It's a what?

VENIREPERSON WATTS: It's a Fun 5 lotto ticket.

THE COURT: Oh, a lotto ticket. Okay. And did you bring the lawsuit against the lotto people?

VENIREPERSON WATTS: Well, I mean, a group.

THE COURT: There's a group of you who are

suing the lotto people?

VENIREPERSON WATTS: Yes.

THE COURT: They didn't pay you something you thought you should have gotten?

VENIREPERSON WATTS: Right.

THE COURT: Okay. Is there anything about that lawsuit and your being a party to that lawsuit that you think would make you unable to listen to the facts of this lawsuit?

VENIREPERSON WATTS: Well, I'm one of the people that jumps to conclusions.

THE COURT: Right, right.

VENIREPERSON WATTS: And it's kind of hard for me to change my mind.

THE COURT: Okay. So you just don't think you could be fair?

VENIREPERSON WATTS: I don't think so.

THE COURT: Okay. Well, I appreciate it.

All right. Anybody have any questions for her?

MR. ALDOUS: No, Your Honor.

MR. HAGOOD: No, Your Honor.

THE COURT: Okay. You may go back out in the hallway. Thank you, ma'am.

Okay. The next person who asked to speak

with us is 19.

Michael Ramirez, come on down. Good afternoon.

VENIREPERSON RAMIREZ: Hi, how are you?

THE COURT: What's your time problem?

VENIREPERSON RAMIREZ: I have a doctor's appointment on Wednesday of next week. I just recently switched over to a medication, and I have labs due Wednesday. The following week, my doctor calls me in for a conference. And the following week, I go to Hawaii and get married, so I would have to wait a number of months.

THE COURT: Oh, goodness.

VENIREPERSON RAMIREZ: I have labs done to see if the medication is two a day or one a day.

THE COURT: Okay. And anybody have any questions for Mr. Ramirez?

MR. ALDOUS: What time of day is your appointment?

VENIREPERSON RAMIREZ: At 9:00.

MR. ALDOUS: And do you know how long it typically lasts?

VENIREPERSON RAMIREZ: Usually about an hour. He wants to talk to me and make sure everything is going good, everything -- you know. I usually have

to wait for labs. I have to get in line and wait for labs and they draw blood.

MR. ALDOUS: But -- and part of the reason I'm asking is I've been informed that Judge Benson will hear her docket in the mornings. So she starts hearings at 9:00. And if she doesn't start court until 10:00, does that -- is that okay with your schedule?

VENIREPERSON RAMIREZ: I could probably be here at 10:30 or 11:00.

MR. ALDOUS: Okay.

THE COURT: That's Wednesday of next week.

VENIREPERSON RAMIREZ: That's Wednesday of next week. That would be the issue.

MR. ALDOUS: So if that time issue, that one block of time, got resolved, would you have any problems serving as a juror otherwise?

VENIREPERSON RAMIREZ: No, none.

MR. ALDOUS: All right. Thank you.

VENIREPERSON RAMIREZ: That's why my mind is wandering about the wedding and 50 people. That's on my mind.

THE COURT: That's a lot to have on your mind.

VENIREPERSON RAMIREZ: It is a lot.

MR. CHAIKEN: Could I ask a question?

THE COURT: Sure.

MR. CHAIKEN: And I don't mean to pry. I've gone to new doctors before. I've never had an experience going to their offices and a lot of times I have an appointment set at 9:00 o'clock and I don't get seen until 2:00. Do you know anything about this doctor; for instance, whether or not you'll actually be seen at the time of your appointment?

VENIREPERSON RAMIREZ: I usually get seen in 20 minutes.

MR. CHAIKEN: Okay. And is it fair to say because this is your first appointment, you're not really sure how long it's going to last?

VENIREPERSON RAMIREZ: It's the same doctor. It's just a different medication.

MR. CHAIKEN: Oh, I thought you said you were going to a new doctor.

VENIREPERSON RAMIREZ: No, for new meds. I recently switched meds.

MR. CHAIKEN: Okay. Thank you. Fair enough.

THE COURT: Thank you, sir. You may step out in the hallway.

Okay. Dr. Palmer, come on down. Good afternoon.

VENIREPERSON PALMER: Hi. Yes. I rescheduled for these three days because my schedule is totally clear. But on Monday, I have a full clinic that I'm personally responsible for

THE COURT: You said you're a nephrologist?

VENIREPERSON PALMER: I'm a nephrologist And I start the in-patient dialysis service at Parkland over the weekend through Monday. And then, more importantly, on Tuesday I'm a visiting professor down at the University of Houston. That's been arranged. And on Thursday, I'm a visiting professor out in California.

THE COURT: Goodness.

VENIREPERSON PALMER: Those are things already that have been on the books for several weeks.

THE COURT: Anybody have any questions for him?

MR. ALDOUS: No, Your Honor.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: I don't have any questions.

MR. HAGOOD: No, Your Honor.

THE COURT: Can we have an agreement on him?

MR. ALDOUS: I agree.

MR. CHAIKEN: I have no opposition.

MR. HAGOOD: You don't oppose the agreement?

MR. CHAIKEN: I don't oppose it.

MR. HAGOOD: Whatever Mr. Chaiken wants, I want.

THE COURT: All right. Dr. Palmer, we're going to go ahead and excuse you. If you'll just leave your juror badge. And if you brought your number up, you can just leave it there. And thank you.

VENIREPERSON PALMER: Thank you.

THE COURT: Okay. I think our next person was Number 25; is that correct?

MR. HAGOOD: No, Your Honor. I don't think we're going to get that far.

THE COURT: Well, let's just go ahead and do it anyway.

MR. HAGOOD: Okay.

THE COURT: Come on up, Ms. Duffey. What was your concern about your schedule, please, ma'am?

VENIREPERSON DUFFEY: My concern is I'm a diabetic and I have an insulin three times a day. I'm also raising two grandkids, and one has to go to school also this year. And he has no way of getting there. And today I had to make him miss because I had to be here.

THE COURT: Oh, well, I think that you probably have an excuse.

VENIREPERSON DUFFEY: And the next week following, I have --

THE COURT: You don't need to tell me anymore. I think you actually have an excuse under the law. And we're going to say thank you for being here today. And if you'll just leave us your juror badge, you may be excused.

VENIREPERSON DUFFEY: Thank you.

THE COURT: Thank you very much.

MR. CHAIKEN: Thank you. Good luck to you.

THE COURT: Okay. Ms. Haggerty, come on down. Good afternoon. SO tell me what your concern is about your time.

VENIREPERSON HAGGERTY: Oh, the only thing is I'm getting ready to retire. And I don't know if they're going to pay like they used to, so I need to make a call. At this time I work. If we -- the schedule for like next week that I'll need to be there. I know if you're sick or something, but right now I just need to see -- the company came in, so I don't know that this new company will they do like --

THE COURT: Yes, I understand.

Ms. Haggerty, in all likelihood, since there's a small number of people who are going to be seated, we probably won't need to know the answers to all these things. If we do, we'll give you the high sign, and let's see if you can find out. But right now if you'll go back out in the hallway.

VENIREPERSON HAGGERTY: Okay.

THE COURT: Thank you.

Okay. According to my notes, those we have excused for one reason or another are 1, 23, 25, and 29. Is that everybody else's -- consistent with everybody else's notes.

MR. ALDOUS: Yes, Your Honor.

MR. HAGOOD: Seventeen is also gone.

THE COURT: Oh, is 17 gone?

MR. CHAIKEN: No. You haven't made a decision on that.

THE COURT: Well, we haven't talked about -- I mean, we haven't talked about for the purposes of cause yet. I do have a couple of people I'm sure we'll end up talking about. But right now I was just talking about people who either had language issues or time issues. And so I think we've got those four. And then there was --

MR. ALDOUS: Number 2.

THE COURT: -- Number 2 y'all wanted to talk to and find out how urgent this was.

So, Sheriff, could you ask Aaron Rodgers, Number 2, to come in and talk to us a minute?

Come on up, Mr. Rodgers. I just had a couple of quick questions about your travel schedule next week. You indicated that you would be headed out of town first thing on Thursday, I believe you said.

VENIREPERSON RODGERS: Correct.

THE COURT: And I just wanted to have an understanding of was this business or pleasure, and how etched in stone is it?

VENIREPERSON RODGERS: It's pleasure, but it's for Father's Day. I have a trip planned to go home to Illinois.

THE COURT: Okay. And --

VENIREPERSON RODGERS: It's the whole family all getting together.

THE COURT: All right. Anybody have any questions for him?

MR. ALDOUS: No. No questions.

THE COURT: Any questions, folks?

MR. CHAIKEN: No.

THE COURT: Okay. You can go back out in the hallway.

What do y'all want to do with Number 2? Do you want to agree on him or do you -- what do you want to do?

MR. HAGOOD: We'd agree.

MR. ALDOUS: I'm a father. I'll let him go.

THE COURT: Okay.

MR. CHAIKEN: We'll agree.

THE COURT: All right. So Number 2 is also on the excused list.

So now we're going to start with the plaintiff and ask you for any requested strikes for cause purposes. And I would appreciate it if we would start numerically, you know, one through whatever. And this actually would not be one, but -- and then we'll work through them one at a time.

MR. ALDOUS: None, Your Honor

THE COURT: None, okay. That made that easy.

MR. ALDOUS: Would you like me to do some?

THE COURT: No, no. That made that easy.

Mr. Hagood?

MR. HAGOOD: Number 4, Your Honor and Number 17.

THE COURT: All right. Let's talk about

Number 4 first. What do you think she said that allows you to strike her for cause?

MR. HAGOOD: I think she stated she was biased, Judge. She said that she wouldn't start -- she would not start the plaintiff and the defendant at the same starting line. One would be ahead of the other. She said she had preconceived notions. I just think in the totality of the interrogation of Number 4, she's not a fair and impartial juror. I know she wants to be. I know she'll try, but going into this trial, she doesn't wear the same hat as the other jurors. I just feel that she's not a qualified juror.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: May I comment on that?

THE COURT: Sure.

MR. CHAIKEN: I wrote down she said-- something that struck me. She said you could convince me otherwise with a strong reason. Well, I think that's evidence of her bias right there.

THE COURT: I heard that.

MR. CHAIKEN: I'll go one step further. On behalf of Mr. Hickok, she specifically said in the beginning of the questioning of her that she could not be fair to the defendant. She didn't say which defendant, but she said to the defendant, indicating

that -- again I don't even know which defense is starting far behind. But due to her bias about people in the industry, based on her experience, she already has an idea of why she would not be able to be fair and impartial.

THE COURT: Comment, Mr. Aldous?

MR. ALDOUS: This is why I didn't go into the facts of the case because she was all mixed up on the facts of this case. She said that she --

THE COURT: She made up the facts of the case.

MR. ALDOUS: Well, I mean, she said she didn't have a bias against the contractor. We're the contractor. So I think that you cannot acquire a bias based upon the facts that you're fed during voir dire unless it's an express bias against that particular type of case, breach of contract, and/or a specific party. But they didn't get the party. They got -- they got the contractor, who is us. So I don't believe that they've met the test.

MR. CHAIKEN: I'd like to comment in response if I may. I think that she specifically said is that she had a particular bias against the party who was sued under a contract under a breach of contract in that industry. And her words were specifically -- I

have written them down -- that because a party was sued for breach of contract that she had a concern with people in the industry. She would tend to favor the party who was sued, and that's why she said specifically that she was biased against the defendant from the get go.

THE COURT: Though I do not think that the notion of starting behind is any kind of a test based on the case law, I do believe in the totality of what she said that I'm going to grant the defendant's strike for cause of Number 4.

Mr. -- I'm sorry. Mr. Hagood, who was the other?

MR. HAGOOD: Seventeen, Your Honor.

THE COURT: Any disagreements about 17?

MR. ALDOUS: We don't agree. I mean, the fact that she said that she could --was impressionable, I mean that -- I don't think that that meets any sort of test for being struck for cause.

THE COURT: My concern is that she said it effects her ability to be fair. And those were the words I wrote down.

MR. CHAIKEN: I actually wrote down.

MR. ALDOUS: Would you please not write that kind of stuff down?

MR. CHAIKEN: What I wrote down is at the end of her examination, she said, "I can't be fair," specifically.

MR. ALDOUS: I have this thing in my ear that I cannot hear stuff like that.

THE COURT: I understand. But, unfortunately, I do think she disqualified herself and Number 17, defendant's cause.

Do you have any?

MR. CHAIKEN: What do --

MR. ALDOUS: If he has to start it like that, then --

THE COURT: No. I've already granted the cause for Number 17.

MR. CHAIKEN: I don't have grounds for cause, but I am concerned with -- I think we all should be concerned about Mr. Ramirez, Number 19, and his --

MR. ALDOUS: No, no, no. Look and let me tell you what -- because I know that Judge Benson holds her docket in the morning. And I just don't think it's as big a time crunch as we think.

MR. CHAIKEN: My suspicion is that we'll remind ourselves come Wednesday with a bunch of lawyers and witnesses and jurors waiting around.

THE COURT: You could. You could

MR. CHAIKEN: Waiting around for a guy who's not going to be real thrilled that he was selected to be on a jury.

THE COURT: Sheriff, about when does Judge Benson start her trial on days where she's got hearings first?

THE BAILIFF: It just depends on how long the hearings go, Judge. I can't pinpoint.

THE COURT: Okay. In your experience, has she waited for people who maybe had a doctor's appointment or something and could be here, but --

THE BAILIFF: If they're on the jury, she doesn't have much of a choice unless the attorneys agree to go with a five-panel jury or whatever.

THE COURT: Right. I mean, I certainly don't think that's cause. And if you want to exercise a peremptory, that's certainly your right to do so.

Anything else on request for cause strikes?

MR. CHAIKEN: Defendant Hickok has no other -- well, let me look at one other thing here. No other motions for cause by defendant.

THE COURT: All right. Then let me go back over my notes to tell you who I have as having been excused for one reason or another. Number 1, Number 4,

Number 7 -- Number 2, pardon me -- Number 17, Number 23, Number 25, and Number 29. Is that consistent with everybody else's notes?

MR. CHAIKEN: I may have missed it. I had 1, 2, 4, 17 and then it goes to 23.

THE COURT: That's what I had too.

MR. HAGOOD: And 25 too.

THE COURT: Yes. And 29.

MR. ALDOUS: She just got 2 and 4 --

THE COURT: I did? I got them out of order because I hadn't written them down in order.

Sheriff, how do you do you strikes? Do you have a special strike sheet, or do you have them --

THE BAILIFF: No, we just have them--

THE COURT: Would you-all have -- take the sheriff's lead here since everybody does it differently?

THE BAILIFF: All we need to do is put defense or plaintiff up at the top. And it doesn't matter; you can use just any three things here. Just put the last name and the corresponding number of the jurors that you strike.

THE COURT: All right. And do you all have places to go?

MR. CHAIKEN: How are we doing the alternate?

THE COURT: Once we do -- you guys are splitting your strikes and you have your strikes is my understanding. And once we have I understand you have one alternate. So once we have -- I understand you're having one alternate. So once we figure out who are the six, then the alternate comes from the next three. Would that be right?

MR. ALDOUS: That's right.

THE COURT: Because each of you would get a strike and then we would have one survivor.

MR. ALDOUS: So we wait until after.

THE COURT: Yes. You wait until after. So you're only exercising the normal number of strikes right now. And then once we figure out where you stopped, then it will be the next three in line from whom you will --

MR. HAGOOD: We all agree the panel includes up to 15 -- to and including 15.

MR. ALDOUS: I have up to 15.

MR. CHAIKEN: Your Honor, I need to make a motion for additional strikes on the grounds that there is an antagonist of interest in the case between defendant Hickok and defendant VSDH. More specifically, this is a case that involves a suit alleging breach of a buyback obligation in a contract and an allegation that

Mr. Hickok is liable for damages caused by that breach as a guarantor of the obligation.

There is a provision in the contract that has a sole and exclusive remedy provision that allows only for the recovery of specific performance by striking the typical remedies in the TREC contract. There was language in an addendum that said that one of the parties had agreed to reinstate the stricken remedies. The party that agreed in the addendum to reinstate the stricken remedies, who was the seller, who was defined as VSDH, which is the entity defendant in this case.

There's no agreement by Mr. Hickok. He expressly stated in the reinstatement of the exclusivity remedy provision, and that had been previously stricken that is. And he is nevertheless being sued for damages. His position in the case is even if there is a breach and even if there is liability for damages, he cannot be held liable under the exclusive remedies provision, which will cause his defense to be antagonistic to some degree to that of VSDH. So for the reason that there is antagonism on those grounds, he should be permitted to have additional strikes because the parties are not aligned.

THE COURT: My understanding is that Judge

Benson has heard this motion and has denied this motion. Is that accurate, Counsel?

MR. ALDOUS: That is accurate, Your Honor.

MR. CHAIKEN: Well, the judge heard the motion, but not in the context of having heard voir dire. And my understanding of the law is that if the antagonism has been demonstrated throughout the voir dire process -- which I spent time talking about and trying to talk about guaranty issues specifically that nobody else talked about -- then the Court can consider the motion based upon the antagonism demonstrated during the voir dire process.

THE COURT: Denied.

MR. ALDOUS: Thank you.

THE COURT: Okay.

MR. ALDOUS: How much time you want to give us?

THE COURT: Just make it as quick as you can.

(Recess taken to make strikes)

(Venire panel enters the courtroom)

THE COURT: Ladies and gentlemen, you may be seated.

Ladies and gentlemen of the jury panel, we very much appreciate your patience and cooperation

today. I'm now going to read the names of those of you who have been selected to serve on the jury. As I call your name, please come forward and take your seat in the jury box. Number 1 Juror is, as I understand it from the bailiff, will be sitting here closest to the -- to the court reporter. And that lucky individual is Jose Lejia; Number 2, Shirley McCoy; Number 3, Raul Villanueva; Number 4, Jessica Pearson; Number 5, Christopher Richie; Number 6, Grace Gonzales; and lucky Number 7 is Henry Berg.

All right. When Mr. Berg gets up there, if you-all will raise your right hands as soon as he gets up there, we'll swear you in.

(Swear in the jury)

THE COURT: You may be seated.

Those of you who have not been asked to stay are excused. Please leave your badges and your numbers in your chairs. Oh, I'm sorry. The bailiff needs your badges. Thank you one again for your service here.

Ma'am, I'm sorry. We may have made you a little bit late and I apologize.

Ladies and gentlemen, because the trial is actually going to start on Monday, we're not going to do anything more. But there are a couple of housekeeping

things I wanted to cover with you. There should be a card for the Court there right in front of you. Please take that with you. If for any reason you have a problem being here Monday at 9:30, you need to let the Court know as soon as possible.

Everybody has been given an opportunity to tell me they have a problem, they can't come; so I'm hoping I'm not going to hear any of that or Judge Benson isn't going to hear any of that. If somebody gets sick or something, keep those with you.

And as soon as the -- as soon as he is finished excusing the rest of the panel, he's going to show you where the jury room is, which is back there. But he's going to show you that and tell you a little bit more about the rules of the road for this Court. So if you-all will just wait just a second for him, I know everybody is starving.

Yes, ma'am?

THE COURT.

UNIDENTIFIED JUROR: When it comes to work, what do we tell them?

THE COURT: You can tell them you've been seated on a jury and you have that number. So if your work needs to verify that you, you know, need to be here, they can certainly call and verify that. You may

not -- I do not know whether your individual employers, you know, pay for your jury service; but you, under the law, cannot be terminated for serving on a jury.

Anybody else have any questions?  Yes, ma'am.

JUROR NO. 6:  Do we still get discounts on our parking?  I know we have to turn that in today.

THE COURT:  Right.  My recollection is it was one day.  Is it just one day that they get discounted parking, or do they get discounted parking everyday?

THE BAILIFF:  If you parked under Old Red, these things on your jury summons are only good for one day.  When you come down Monday, you pull that little tab out of the machine.  Just take it down to the central jury room.  They will validate it and it will only cost you $3 because you are technically still on jury duty.

THE COURT:  Okay.  Sheriff, I have told them that you are going to show them around a little bit and give them some more specific instructions.  And so I've sworn at them, and they are yours.  Thank you.

Thank you, ladies and gentlemen.

(Jury exits the courtroom)

THE COURT:  Anything else for the record,

folks --

MR. ALDOUS:  No, Your Honor.

THE COURT:  -- before you come back on Monday?

MR. HAGOOD:  No, Your Honor.

THE COURT:  Thank you.  You may be excused.

(Proceedings concluded for the day)

STATE OF TEXAS          )

COUNTY OF DALLAS        )

       I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

       I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

       WITNESS MY OFFICIAL HAND this the 27th of October, 2015.

                /s/ Cathye G. Moreno

                Cathye G. Moreno, Texas CSR #6076
                Expiration Date:  12/31/16
                Official Court Reporter
                County Court at Law No. 1
                600 Commerce Street, Suite 550
                Dallas, Texas 75202
                cathyemoreno@sbcglobal.net
                (214)653-7496

# TAB 25

REPORTER'S RECORD
VOLUME 3 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD.          )IN THE COUNTY COURT
                                    )
    Plaintiff/Counter-Defendant,    )
                                    )
V.                                  )
                                    )
KEN GROSS and BETSY GROSS           )AT LAW NO. 1
                                    )
    Defendants/Counter-Plaintiffs,  )
                                    )
V.                                  )
                                    )
EVAN L. SHAW and DOUGLAS M.         )
HICKOK                              )
                                    )
    Intervenors/Counter-Defendants, )DALLAS COUNTY, TEXAS

---------------------------------------------------------

**TRIAL ON THE MERITS**

---------------------------------------------------------

On the 15th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine. Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

        - AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

        - AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.

**INDEX**

**JUNE 15, 2015**                                    **PAGE**   **VOL.**

PROCEEDINGS.............................  9       3

EXHIBIT DISCUSSIONS.....................  9       3

OPENING STATEMENTS BY MR. ALDOUS.......  14      3

OPENING STATEMENTS BY MR. SHAW.........  24      3

OPENING STATEMENTS BY MR. CHAIKEN......  31      3


GROSSES'

| WITNESSES | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Douglas Hickok | 39 | -- | -- | 3 |

MOTION FOR MISTRIAL....................  127     3

END OF PROCEEDINGS.....................  132     3

REPORTER'S CERTIFICATE.................. 133     3

**EXHIBIT INDEX**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | May 5, 2007 Fax from Mr. Gross to Buttemiller | 10 | 10 | 3 |
| 3 | New Home Contract, First Amendment, Addendum A & B | 10 | 10 | 3 |
| 4 | Appraisal Invoice and Summary Appraisal Report | 10 | 10 | 3 |
| 5 | Settlement Statement June 28, 2007 | 10 | 10 | 3 |
| 15 | Construction Loan Documents | 10 | 10 | 3 |
| 22 | First Horizon Builder's Soft Cost Draw Request | 10 | 10 | 3 |

**EXHIBIT INDEX CONTINUED**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 24 | October 16, 2008 Fax from Mr. Gross to Hickok Regarding Improvements | 10 | 10 | 3 |
| 25 | October 16, 2008 Fax Confirmation Sheet | 10 | 10 | 3 |
| 26 | June 26, 2008 Fax from Mr. Gross to Kramer Regarding Inspection and Warranty | 10 | 10 | 3 |
| 27 | October 31, 2008 Email from Mr. Gross to Hickok | 10 | 10 | 3 |
| 30 | February 23, 2009 Email from Mr. Gross to Hickok Regarding Addition | 10 | 10 | 3 |
| 31 | April 27, 2009 Fax from the Grosses to VSDH | 10 | 10 | 3 |
| 32 | April 27, 2009 Fax Confirmation | 10 | 10 | 3 |
| 33 | May 1, 2009 Email from the Grosses to Hickok and Confirmation from Hickok | 10 | 10 | 3 |
| 34 | April 27, 2009 Email from Mr. Gross to Hickok Regarding Buyback Option | 10 | 10 | 3 |
| 35 | May 1, 2009 Email Chain between Mrs. Gross and Hickok | 10 | 10 | 3 |
| 38 | June 28, 2009 Email from Mr. Gross to Shaw and Hickok | 10 | 10 | 3 |
| 42 | Settlement Statement August 27, 2009 | 10 | 10 | 3 |
| 43 | Escrow Agreement August 28, 2009 | 10 | 10 | 3 |

**EXHIBIT INDEX CONTINUED**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 44 | General Warranty Deed August 27, 2009 | 10 | 10 | 3 |
| 45 | Affidavit as to Debts and Liens, Parties in Possession and Third Party Claims and Easements with Indemnity Agreement | 10 | 10 | 3 |
| 46 | Payoff Acceptance Affidavit, Non-foreign Person Affidavit, Seller's Affidavit Agreement for Legal Services, Agreement Concerning Association Assessments and Resale Certificate | 10 | 10 | 3 |
| 47 | Real Estate Contract Between the Grosses and Ms. Browning, Addendums and Intermediary Notice | 10 | 10 | 3 |
| 51 | Amendment to Real Estate Contract August 27, 2009 | 10 | 10 | 3 |
| 52 | Residential Real Estate Listing Agreement | 10 | 10 | 3 |
| 54 | Email Chain Ending on June 7, 2009 Between Shaw, Hickok and Mrs. Gross | 116 | 116 | 3 |
| 59 | Email from Mr. Gross to Hickok, Shaw and Mrs. Gross August 18, 2009 Regarding Sale of Home | 10 | 10 | 3 |
| 60 | Letter to Jana Reist to Shaw August 19, 2009 | 10 | 10 | 3 |
| 65 | May 18, 2009 Email Between Shaw and Mrs. Gross | 10 | 10 | 3 |
| 66 | April 29, 2009 Email Chain between Hickok, Shaw, and Mr. Gross | 10 | 10 | 3 |

**EXHIBIT INDEX CONTINUED**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 68 | June 21, 2007 Sommerfelt Email Chain to Hickok, Shaw, Stern and Buttemiller | 10 | 10 | 3 |
| 83 | May 18, 209 Email Chain Between Shaw and Mrs. Gross | 10 | 10 | 3 |
| 84 | Email Ending May 17,2009 Between Shaw and Mrs. Gross | 10 | 10 | 3 |
| 88 | June 7, 2009 Letter from Shaw to Mrs. Gross | 10 | 10 | 3 |
| 89 | Email Chain Ending June 6, 2009 Between Shaw, Hickok, and Mrs. Gross | 10 | 10 | 3 |
| 91 | June 28, 2009 Email from Mr. Gross to Shaw, Hickok and Mrs. Gross | 10 | 10 | 3 |
| 92 | Email Chain Ending April 29, 2009 Between Hickok, Shaw, and Sumner Attaching Contract of Sale | 10 | 10 | 3 |
| 93 | Email Chain Ending April 29, 2009 Between Shaw, Hickok and Sumner Attaching First Amendment | 10 | 10 | 3 |
| 94 | Email Chain Ending April 29, 2009 Between Shaw, Hickok, and Sumner Attaching Changes to Contract | 10 | 10 | 3 |
| 96 | Amendment to Listing | 10 | 10 | 3 |
| 98 | Settlement Statement Between the Grosses and VSDH June 19, 2007 | 10 | 10 | 3 |
| 105 | Email from Hickok to Buttemiller June 20, 2007 | 10 | 10 | 3 |

**EXHIBIT INDEX CONTINUED**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 106 | General Warranty Deed | 10 | 10 | 3 |
| 108 | June 17, 2007 Letter from the Grosses to Hickok | 10 | 10 | 3 |
| 111 | June 19, 2007 Email from Hickok to Mr. Gross | 10 | 10 | 3 |
| 114 | Burgess Property Inspection Report June 6, 2007 | 10 | 10 | 3 |

**VSDH'S**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | May 25, 2007 Fax from Ken Gross to Buttemiller Attaching Addendum A | 9 | 9 | 3 |
| 2 | June 1, 2007 Summary Appraisal Report | 9 | 9 | 3 |
| 6 | New Home Contract | 9 | 9 | 3 |
| 8 | June 12, 2007 First Amendment to New Home Contract | 9 | 9 | 3 |
| 9 | June 17, 2007 Fax from the Grosses to Hickok | 9 | 9 | 3 |
| 10 | June 19, 2007 Email from Hickok to Ken Gross Regarding First Amendment | 9 | 9 | 3 |
| 12 | Residential Construction Loan June 27, 2007 | 9 | 9 | 3 |
| 14 | Assignments of Rights Under Construction Contract | 9 | 9 | 3 |
| 18 | Construction Loan Agreement June 27, 2007 | 9 | 9 | 3 |
| 19 | Construction Loan Rider June 27, 2007 | 9 | 9 | 3 |

**EXHIBIT INDEX CONTINUED**

| **VSDH'S** NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 22 | Mechanic's Lien Contract June 27, 2007 | 9 | 9 | 3 |
| 26 | Affidavit of Completion June 27, 2007 | 9 | 9 | 3 |
| 27 | Builder Soft Cost Draw Request June 28, 2007 | 9 | 9 | 3 |
| 28 | Settlement Statement June 28, 2007 | 9 | 9 | 3 |
| 29 | July 3, 2007 Letter from Mr. Stern to the Grosses Regarding new Home Contract | 9 | 9 | 3 |
| 30 | June 26, 2008 Letter from the Grosses toMr. Kramer Regarding Inspection and Warranty | 9 | 9 | 3 |
| 31 | October 16, 2008 Letter from Ken Gross to Hickok | 9 | 9 | 3 |
| 32 | October 31, 2008Email Chain between Ken Gross and Hickok | 9 | 9 | 3 |
| 33 | February 23, 2009 Email from the Grosses to Hickok | 9 | 9 | 3 |
| 45 | Residential Contract (Resale) August 21, 2009 | 9 | 9 | 3 |
| 46 | Settlement Statement August 27, 2009 | 9 | 9 | 3 |
| 57 | June 18, 2009 Email from the Grosses to Hickok | 9 | 9 | 3 |

**PROCEEDINGS**

June 15, 2015

(Off-the-record discussion held)

THE COURT: All right. We'll go on the record. Plaintiff's Exhibits 1, 2, 6, 8, 9, 10, 12, 14, 18, 19, 22, 26, 27, 28, 29, 30, 31, 32, 33, 44 -- no, excuse me -- 45, 46, and 57 are admitted.

Plaintiff's Exhibits 3, 4, 5, 11, 13, 15, 16, 17, 21, 23, 24, and 58 are denied. Does that comport with everyone's understanding?

MR. ALDOUS: Yes, Your Honor.

MR. CHAIKEN: No, Your Honor. I have one other concern, which is 56, which was the first --

THE COURT: Fifty-six doesn't show up on the list.

MR. CHAIKEN: I know. It was one of the three that we talked about earlier today, which was the draw request.

MR. ALDOUS: It's going to be in as Exhibit 22. If you want to admit it with a defense number, you can; but...

MR. CHAIKEN: Well, I'm just trying to keep track of it. Yeah. I'd like to admit it with a defense number on it. It was 56. We talked about it by agreement. If it's coming in as 22 on the Gross' list,

I mean, it's not a big deal either way.

THE COURT: Well, as long as the document's coming in and it's agreed, then we don't need to add a new one because there was no 56 previously, is what it boils down to.

MR. CHAIKEN: No, I understand. And the only thing I was doing was because we did add those, and we just talked about them. And I had identified it as 56, and I just wanted to make sure that it was admitted as 56. But I didn't know that he was going to put it back on as Gross' 22. So if that's the case, then it's fine either way.

THE COURT: All right. We will leave it as the Gross exhibit, which at this point in time is defendant's exhibits.

All right. Defendant's Exhibits 1, 3, 4, 5, 15, 22, 24, 25, 26, 27, 30, 31, 32, 33, 34, 35, 38, 42, 43, 44, 45, 46, 47, 51, 52, 59, 60, 65, 66, 68, 83, 84, 88, 89, 91, 92, 93, 94, 96, 98, 105, 106, 108, 111, 114 are admitted. Defendant's Exhibits -- let's go off the record for a minute.

(Off-the-record discussion held)

THE COURT: All right. We'll go back on the record. Defendant's Exhibits 2, 6, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 37, 39, 40, 48, 49, 50,

53, 54, 55, 56, 57, 58, 61, 62, 63, 64, 67, 69, 70, 71, 72, 73, 77, 81, 82, 85, 86, 87, 90, 95, 99, 100, 101, 102, 103, 104, 107, 109, 110, 112, 113, 118, 119, 120, 121, 122, 123, and 124 were removed by the defendant.

Does that comport with your recollection, Mr. Aldous?

MR. ALDOUS: Yes, Your Honor.

THE COURT: Okay. There's several items that are either deferred or pending proveup, and we'll deal with those as they arise.

MR. ALDOUS: Your Honor, I just wanted to make sure that this is acceptable to you. With respect to the witness, I have a book that has all the exhibits in it which are admitted, as well as the ones that are deferred. I will not have them refer to the ones that are deferred until it's admitted. It's just for purposes of being complete, I have it all in here.

THE COURT: Both sides or just --

MR. ALDOUS: Just my side.

THE COURT: Okay. Any objection to that, Mr. Shaw and Mr. Chaiken?

MR. SHAW: No objection.

MR. CHAIKEN: No, but I don't know that we've done it that way, which is there were -- as I see it, we have 7, 20, 25, 47 through 55. So we will

probably need to break out --

Sarah, will you come up here, please? We'll need to break out our exhibits the same way so that those which are deferred are in a separate collection to stay consistent.

MR. ALDOUS: If they're deferred --

THE COURT: No, his are in the book

MR. ALDOUS: They're all in here.

THE COURT: He's just not going to reference them with the witness until --

MR. CHAIKEN: Oh, okay. I thought you said you had a separate book for the deferred

MR. ALDOUS: No, no, no. I'm sorry.

MR. CHAIKEN: Understood. I misunderstood, but now I misunderstand

MR. ALDOUS: As long as it's not referred to or not sent to the jury until it's admitted, you know, that's -- I figure that's fine.

MR. CHAIKEN: I'm okay with that

MR. ALDOUS: And I'm okay with y'all doing the same thing

MR. SHAW: I got no problem with that.

THE COURT: Okay. All right.

MR. CHAIKEN: I understand now what you meant.

THE COURT: A little slow on the pick up today, Mr. Chaiken?

MR. CHAIKEN: No. Just this whole plaintiff versus defendant switch thing has got me a little confused, but now I'm good.

THE COURT: Is there anything else we need to do before we bring in the jury?

MR. CHAIKEN: No, Your Honor.

THE COURT: I do have the orders on limine. Have you all had a chance to review them so that you stay within the parameters that have been set?

MR. ALDOUS: Yes, Your Honor.

MR. CHAIKEN: I have no problem with that. Could we have five minutes just to kind of group and run to the restroom and then start?

THE COURT: You may.

MR. CHAIKEN: Thank you.

THE COURT: All right. We stand in recess for five minutes. All rise.

(Recess taken)

THE COURT: All rise. You may bring in the jury.

(Jury enters the courtroom)

(Jury instructions read off the record)

THE COURT: We'll go on the record.

Mr. Aldous, you may make your opening statement.

MR. ALDOUS: Thank you, Your Honor. I believe you gave me 20 minutes. And if you would, just give me a five-minute warning. Thank you.

Good morning. We're essentially here because, in an effort to avoid the responsibilities that the defendants had under a contract, they've begged, they've deceived, they've delayed, they've denied. And that's the way this is going to go in trial, I anticipate.

This all started back in 2007 when Ken and Betsy Gross went -- they wanted to move to Vaquero. Ken builds houses and one of the things that he wanted to do is he wanted to get a home, to build a model home somewhere in Vaquero, which is out in Westlake, north Fort Worth. And he wanted it to be built out there so people would try to use his services. Well, it wasn't working out in terms of finding the lot and getting it started. But Ken knows the home at 2004 White Wing Cove that had sat unpurchased for about two years, even though it had been on sale.

Ken looked at the home and he believed that he knew why it wasn't selling. He thought that it needed a bedroom downstairs and it needed a media room

and some of other things that people, when they buy these high-dollar homes, expect. Ken did some investigation He found out that the builder or the owner of the home was VSDH Vaquero Joint Venture. I'm never going to call them that again. It's just VSDH. And it stands for Van Shaw and Doug Hickok. Those are the two principals of VSDH.

So Ken learned who was the owner of the home, and he had a proposal for them. The proposal was, "I'll pay you for the -- for asking price on the house. My family and I will move in for a couple of years. I will build an addition on to the home. This is about how much it's going to cost. Here are the specifications for it. Here's what it's going to look like. And then if you will, at the end of that period buy the house back from me, you don't have to pay for the addition. I'll pay for it." That was the deal.

In other words, we're going to buy it. We're going to build this addition, but you're going to buy it back from me. Now, Mr. Gross smartly said, "And I want the VS and the DH of VSDH, that is Van Shaw and Doug Hickok, to personally guarantee that this happens."

So we went to the closing. Everybody agreed to this process. We went to the closing in June of 2007. And at that closing, everybody signed off on

it except for Mr. Shaw. So you won't hear me refer to him as responsible under this at all because he did not sign the document. However, Mr. Hickok signed it. And Mr. Hickok agreed, as you will see, what the contract says; that they personally -- personally guaranteed the performance of VSDH on this buyback option. So you may recall that in 2007 things weren't -- they were okay.

And in 2008, the bad stuff started happening with the economy. If you remember, that's when AIG went under, that's when Lehman Brothers went under. It's when nobody could get a loan from anybody. Things turned south. So in October of 2008, Ken starts calling Mr. Hickok to say, "I'm going to start building on the addition. Come on by. Take a look."

There was no response, so he sent a fax. And we have the fax, and we'll show it to you. The fax said, "Hey, listen. Send me your address. I'll send you the plans or come on by and we'll go through everything and I'll show you, you know, we're getting started." Mr. Hickok made an appointment for two weeks later on October 31st, 2008. And then on the morning of the meeting, he sent an email and said, "I won't be showing up today. I'm out of town."

And Ken just is getting along, said, "Hey, no problem. Just let me know when you get back." It

turns out that it was sometime later that Mr. Hickok actually came out and the addition had already started. Now you'll hear from Ken and Betsy Gross, and they'll tell you that Mr. Hickok did not complain one bit about the addition. In fact, he said it looks great. Everything's going according to the plan. But, more importantly, he didn't say that I have a problem with this. I want something moved. I don't like this. I don't like the way you're doing it. It was just like, okay, we'll talk to you later.

Ken went on to finish the addition, added even extra. He went above and beyond. He matched the tiles on the roof so that they'd match the original house. He got all this. He made it look like the original house. And then in February of 2009, Ken finishes the addition. Ken sends a letter back over to Mr. Hickok and says, "Hey, come on out. Take a look. I want to show you what we did." No response.

Then in April of 2009 -- you'll see this contract. The contract says, if you want -- Mr. Gross and Mrs. Gross, if you want the VSDH to buy this back from you, you have to let them know by May 1st, 2009. So on April 27, 2009, Ken and Betty let them know we're exercising the buyback. Let's go ahead and get this done, and you can buy it back, as the contract states.

Now, there was no response originally from them saying, oh, no. We're not going to buy it back because of one, two, three. What it was, was Mr. Hickok then said, "I'm turning this matter over to my friend and partner, Van Shaw, who's also a lawyer."

So now Mr. Shaw is the one that we're going to deal with, and Mr. Shaw's first statements to the Grosses out of the box was, "Hey, we can't perform because VSDH is insolvent." Now Mr. Hickok says that VSDH has never been insolvent, but that's what they said. VSDH is insolvent. Will you take something else? They're like, no, no.

Then we had meetings with them to try to resolve the issue. It didn't work out. So we had a meeting with Van Shaw somewhere around June 28, 2009. It was clear that they were not going to honor the buyback. Mr. Shaw denied that anybody personally guaranteed the responsibilities of VSDH. And so we said, okay. We've got to do something. We listed the home. We then had the home listed and it eventually sold the next month in August of 2009 for a loss.

Now, these are -- this is an expensive home. The original listing price was $2.8 million. We sold it for $2.4 something million. The difference in what we're asking you for in terms of the damages are

about $582,000, plus the attorney's fees we've had to expend in getting there.

Now, you're going to be faced with some excuses that I believe that they'll raise and then evidence as reasons why they didn't do this. One, they'll tell you that the breach -- that we breached an escrow agreement in the original contract. Now you'll see in the original 2007 contract, we said that we would escrow the amount that it would take. That means give to another party, an independent party. Usually it's a bank or an escrow agent. We're going to give them this money.

It's the value of the improvements. And then we'll just take from that money to build the improvements. Well, there was an escrow. Our bank was loaning us money. They had the money in escrow. They doled it out to us as we built the addition. So I don't know where that excuse comes from.

There will be another excuse. We're not personally liable on this. We didn't personally guarantee it. And you'll see the contract. The contract says that "I, Douglas Hickok, personally guarantee the performance of VSDH." I don't understand why, but one of the excuses will be, "Well, I only signed this in my capacity as a member of VSDH, but not

as an individual." The contract doesn't say that, so I don't know where they're coming with that excuse.

MR. CHAIKEN: Your Honor, I object to the argument about he doesn't understand why they're saying things.

THE COURT: No speaking objections.

MR. CHAIKEN: Beyond the scope of opening.

THE COURT: Sustained

MR. ALDOUS: The evidence is going to be that there -- that the contract in it had some deletions from it. In other words, there were some portions in the contract where they crossed through it and then they handwrote some things in. One of the things that I believe will end up coming before you is whether or not we -- that is the Grosses -- said that our only remedy was whether or not we could make them buy the house. And I think you'll find that the evidence, when it's all admitted, will show that we changed that at the time that we wrote this out. So I don't know where that's coming from.

MR. CHAIKEN: Your Honor, same objection.

THE COURT: Counsel approach.

(Sidebar conference held)

THE COURT: You may proceed.

MR. ALDOUS: One of the issues that has

also been raised is that the contract where it said, you know, we had to let them know that we wanted them to buy it back by May 1st, 2009, it says that they have until September 1st, 2009 to actually buy the home back. However, during that period of time, if you recall I was saying that we were visiting with Mr. Shaw, who had taken over the issue from Mr. Hickok. And he clearly let us know that they were not going o perform the buyback.

So in order to protect ourselves, we had to go ahead and sell it to someone else. However, you'll see the evidence that during that entire step, all those steps in the process, we kept them informed and asked them to let us know if they had any objection. At no point in time did they ever say don't do that, don't sell that house, or we're going to disagree with your sale to this woman. So it actually was sold and the closing was in August of 2009. And, as a result, we were able to limit the damages that we're asking for here.

One of the issues, I believe, that will also come forward from the evidence is whether or not we allowed them an opportunity to approve the plans for the addition prior to starting construction I believe the evidence is going to show you that when we originally

entered into the contract, we had three pages of specifications Now I'm told that "specifications" mean like I'm going to spend X dollars on the tile. I'm going to spend X dollars on the bathroom. I'm going to spend X dollars -- it's a detailed list of all the costs that are going to go into the addition.

Also, Mr. Gross will testify that when he was selling the idea of doing the buyback, you know, the purchase and the buyback, he walked the property with Mr. Hickok and explained why he thought it hadn't sold and what he proposed doing and all of that together. In addition to that, we tried to give them the plans before we started, and they weren't interested.

Now at the end of the day, because of the way it was sold and the timing it was sold, it ended up costing Ken and Betsy about $582,000 and some change to -- for the difference between what they would have had if the defendants would have honored this agreement versus the one that we ended up having to do.

In addition to that, you're going to have some evidence of what these attorney's fees cost to get this kind of a case and it's not cheap. I expect that we're going to have testimony from at least two lawyers. I'm not the only lawyer that represented the Grosses. They had another lawyer before me, and I anticipate that

he will testify.

I think what the evidence is really going to show is that after when -- the house that VSDH built, it was called a spec house. What that means is they didn't have a buyer. They built the home in hopes that somebody else would come along and buy it, and it didn't sell for, you know, a long period of time. During that period of time, VSDH is having to pay for the carrying cost of all the costs that went into building the home. I think it's about $1.9 million. And so that they're paying on the upkeep to keep the house going, paying on the note, and all that.

And I think the evidence is going to show that when this deal came along, although it wasn't what they wanted to do, they were going to agree -- that is VSDH and Mr. Hickok were going to agree, and then hope that they never heard from Ken and Betsy Gross again. But when we did what the contract required -- that is Ken and Betsy Gross notified them appropriately and did all the things in compliance with the contract, then they started their strategy to try to avoid responsibility.

MR. SHAW: Your Honor, this is outside the scope of the limine.

THE COURT: Careful, Mr. Aldous.

MR. ALDOUS: Yes, Your Honor.

I believe that the evidence will show you that the excuse --

THE COURT: Five minutes.

MR. ALDOUS: Thank you, Your Honor.

-- the excuses that they have for avoiding the contract are not supported by the evidence. In other words, they're not going to be able to come forward and show you where they are right and we are wrong. Their strategy will continue to play out in this courtroom.

Now we are happy to be finally in front of you. It's been a while since we've been able to get here, and we'll be more than happy to have you decide the facts of this case. I appreciate your attention.

THE COURT: Mr. Shaw?

MR. SHAW: Thank you, Your Honor.

Ladies and gentlemen, I saw you on Wednesday. I did not speak to you. Dan Hagood was here speaking to you in my stead. My name is Van Shaw, and I'm a lawyer for VSDH Venture, Ltd. And I have today Darcy Topolski in the courtroom.

Darcy, could you stand up, please?

She'll be with me in trial as a representative of the company.

Now we hear the rest of the story. As you agreed on Wednesday, you said you'd wait to hear all of the evidence before deciding. And we talked about, hey, the plaintiff gets to go first. They get to open first and we have to tag along. They get to put their evidence on first, and we have to tag along. They even get to close first, and we have to tag along. And so it's important that you wait until all the evidence is in -- and you agreed to do so and I appreciate that -- before you decide. There was a discussion about an assembly line, and that's what the trial is like. It's an assembly line, and we're at the back of the line. So you don't get to hear what we're adding to the pot until the product is way down the line, and that's why it's very important for to you wait.

You also said, and you agree, that contracts are important and that if you breached a contract, you would not then sue for enforcement of the contract.

MR. ALDOUS: Your Honor, I would object because that's beyond the scope of -- I object.

THE COURT: Sustained.

MR. SHAW: The fact of the matter is, and the evidence will show, that if you want to precisely enforce a contract, you must precisely abide by that

contract. That's what the evidence will be in this case. Mr. Gross is a sophisticated builder. Mr. Gross has built many multimillion dollar homes. Mr. Gross -- this is not Mr. Gross' first rodeo. Mr. Gross knows what he's doing and is very sophisticated His lawyer knows what he's doing, but he said things like, VSDH is Van Shaw and Doug Hickok. Well, that's not true.

VSDH Venture, Ltd., is an entity, just like General Motors is an entity or Dell computers is an entity. When Michael Dell signs a contract, Michael Dell is signing a contract for Dell Corporation. And that's what the laws are in this country. It's a great country. We have laws and those laws need to be enforced, and that's why we have things like contracts and legal entities.

But what I want to tell you is about the rest of the story

Your Honor, may I have the Elmo, please?

THE COURT: I'd say keep talking. It's going to be a while before it comes up.

MR. SHAW: I'm sorry?

THE COURT: Keep talking. It will be a while before it comes up.

MR. SHAW: All right. I want to give you a little background I told you that Mr. Gross is not

unsophisticated. And I'll give you a little more background. VSDH is Van Shaw. That's what this fellow said. And DH is Doug Hickok. Well, Doug and I -- Doug's in the courtroom. That's him. Doug and I go back many, many years. We were grade school friends, been friends ever since, so we have a long relationship with each other. Doug is an admiral guy and you'll see that. When Doug testifies, you'll get to determine that for yourself.

But what I've got is -- and you're going to get to see in this case -- is some contracts.

And, Your Honor, this is Exhibit 6.

There's -- the case is going to be mainly about a contract. Okay. There's a contract that the parties entered into, and that's what we're going to be talking about a lot. Okay. This is -- this is the contract, Vaquero Venture, Ltd. -- it's hard to read -- Mr. Gross and Mrs. Gross. Okay. This is what we're talking about. Now, what you did not hear in the opening from the plaintiff and that -- what I wanted to talk to you about a little bit is this. The contracts are entered into and they're there for a reason.

And 22 says -- and it's hard to read -- the content contains the entire agreement of the parties and cannot be changed except by written agreement,

cannot be changed except by written agreement. Everybody agreed to that. Those were the terms. You won't hear one person in this lawsuit tell you otherwise. Then you're going to find some evidence that there's an addendum to the contract, and this is the buyback that they're talking about. Okay. VSDH grants blah-blah-blah the Grosses an option to put the property to the seller. Okay. You've heard some talk about that.

Now, let's look what it says they have to do. It says buyback exercises. They have to do a few things. But in this section, it says the buyer may not sell or convey the title blah-blah-blah. And then it says should the buyer enter into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to the buyer. And that's what happened in this case, no doubt about it. You will see the evidence and hear the evidence that that occurred.

You're going to also see evidence that the same contract said, before commencing the construction improvements that counsel told you about, buyer will review with the seller the plans and specs and receive general consent. Never, ever happened, never. So you're going to see a lot of things that were important

in this case that never happened. You're going to see this section, escrow agreement. Buyer agrees to escrow funds totaling $156,000 with the title company and enter into escrow agreement, blah-blah-blah. Never happened. Buyer never, ever, ever, never did that. And as a result, buyer was sent a letter. Buyer was sent a letter that said you're in violation of the agreement. You've got obligations under the agreement. You're in violation. Not only were those violations not cured, buyer never responded ever, never responded.

So then we come down with the real important facts. If you want to precisely enforce a contract, you must precisely abide by it.

MR. ALDOUS: Your Honor, I object to that being on the Elmo if it's not in evidence.

THE COURT: Sustained.

MR. ALDOUS: I continue to object.

MR. SHAW: Can I use an outline at all, Your Honor, that shows the jury what the evidence will show?

THE COURT: In closing.

MR. SHAW: Okay.

MR. ALDOUS: Thank you.

MR. SHAW: The evidence is going to show you that there was a purchase contract, and it was dated

-- the property was to close on June the 12th, 2007. It didn't happen. Property wasn't bought until about two weeks later, July 27th. But what happened on July 19th -- and the evidence is going to show you that the Grosses moved in to a two-and-a-half-million dollar house without authority, without the knowledge or without the consent of the sellers, never, ever knew it. The property was located -- Mr. Hickok lived in Plano. I lived in Dallas. The property was in Westlake. We learned -- Mr. Hickok was shocked to learn that the Grosses moved into the property, pre-contract, pre-purchase.

Mr. Hickok writes a letter, Exhibit 10. Mr. Hickok says, "I was shocked to hear that you had taken up occupancy of the house prior to closing." You'll see this document in full during the trial. It was very surprising, very unacceptable and shocked. There was the addendum to the contract that Mr. Gross agreed to. We told you about it. Before any construction, the buyer will review with the seller. It never happened. The buyer will escrow $156,000. It never happened. The buyer will wait until September 1, 2009 -- that's the date, the buyback date, September 1, 2009. Prior to that date, Mr. Gross sold the home prior to that date. So, the buyer breached the contract.

It's going to be unequivocal. The buyer breached the contract and there are significant breaches we talked about. You'll hear evidence about that probably ad nauseam. I know your time is important. We don't want to burn your time, but this is a very important case and we want to make sure everybody's clear on it. The bottom line facts from my side is that the Grosses violated the contract. The Grosses say, well, Van Shaw never signed it, so we don't have anything to do with that. Well, they sued Van Shaw on top of everything else.

MR. ALDOUS: Objection, Your Honor. That's -- objection.

THE COURT: Parties approach.

(Sidebar conference held)

THE COURT: You may proceed.

MR. SHAW: This -- so the Grosses have a number of issues that we will talk about. But in the end, the important things are, if you want to precisely abide by the contract, you need to precisely. If you want to enforce it precisely, you need to abide by it precisely. You will hear significant evidence that that never occurred. We thank you for your time.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: Thank you, Your Honor.

Ladies and gentlemen, we spoke briefly on Wednesday of last week when you were participating in the jury-selection process. You may recall that Mr. Hickok was present in the courtroom. I'd like to reintroduce Douglas Hickok.

Doug, will you please stand up?

And it is my privilege to represent Doug. Doug is a long-time client of mine and he is a good friend of mine. And I am tasked with the burden and obligation of establishing for you that Doug has a defense to this case and the case that has been brought against him. What's very important here is that you understand what Mr. Hickok has been sued for. You've already heard the difference between entities and individuals; that human beings sign for entities where -- because a live person has to act for an entity.

And you will see evidence in the form of a contract, the contract that Mr. Shaw put up on the Elmo a few minutes ago that shows that Mr. Hickok signed the contract. Yeah, he's the human being. The signature is there, but his signature was very clearly -- the evidence will show in his capacity as a vice president of the general partner of the VSDH Vaquero entity. The evidence will show that both Mr. and Mrs. Gross, as the buyer identified in the contract, and Mr. Hickok, acting

for the seller -- the seller is specifically identified. There's nobody other than VSDH -- initialed the contract. They did it for what's called identification purposes.

And you'll hear evidence from the witness stand from Mr. Hickok and from his lawyer in the transaction as to what that means and why it was done that way, what initialing for purposes of identification means. And you'll hear evidence from Mr. Hickok that, yes, he had a conversation through a broker about the possibility of there being a personal guarantee by him and Mr. Shaw in this transaction of this buyback obligation that you're hearing about.

But you'll also hear, and the evidence will show, that Mr. Hickok made very clear that when he was considering the possibility of a personal guarantee, he told the broker, "I will only consider a personal guarantee if two things happen. One, Mr. Van Shaw also personally guarantees any such obligations; and, number two, there is a document signed, okay, with my signature on it and Mr. Shaw's signature on it that says we both guarantee any of the obligations of VSDH." And the evidence in this case will be that although Mr. and Mrs. Gross were represented by a lawyer in the transaction, they never took any action to cause that

situation to be properly documented and executed by either Mr. Hickok or Mr. Shaw.

Now, what is a buyback option? Well, a buyback option, the evidence will show, is an understanding in a contract whereby a party who has bought this property, a house, has the opportunity under certain circumstances specified in the contract to sell it back to the party who sold it to them. And the evidence will show that the party who sold the property is not Mr. Hickok and it's not Mr. Shaw, but it was VSDH, the partnership. And that is the party charged with a buyback obligation under the contract.

Now, the evidence in this case is going to show the following: That Mr. and Mrs. Gross only care about contract provisions that benefit them without regard to contract provisions that they don't like. For example, the evidence is going to show that when they purchased the house from VSDH, the Grosses signed a loan agreement with a lender. And the lender's loan agreement that they signed knowingly stated that they were required to commence construction work, this addition that they did, within a very short period of time. I believe it was 30 days after they closed on the purchase of the house.

Now, not only did they move into the house

before they bought it, unbeknownst to the partnership or its partners, the evidence will show that Mr. and Mrs. Gross did not commence construction, okay, until sometime possibly a year-and-a-half later. The first indication that anybody got, and the evidence will show this, that they were commencing construction was an email in October of 2008. They closed their purchase in June of 2007. What you're going to find out through the evidence is that the loan agreement that I just mentioned required them to finish the construction work by December of 2007.

They didn't even attempt to comply with their loan obligation to start construction of the house on a timely basis. But construction was a material part of the agreement and the inducement for the buyback obligation, and that's what the evidence is going to show you. And not only did Mr. and Mrs. Gross fail to meet their obligations under their loan agreement to start and finish construction before the end of 2007, but they got into a fight with their lender. They got into a fight with their lender.

MR. ALDOUS: Your Honor, I object.

MR. CHAIKEN: And they told their lender.

THE COURT: Approach.

(Sidebar conference held)

THE COURT: You may proceed.

MR. ALDOUS: Thank you, Your Honor.

MR. CHAIKEN: But at the end of the day, the Grosses are suing Doug Hickok for breach of the contract they say he personally guaranteed the buyback obligation, and he is required now to pay damages for a failure of the partnership, VSDH, to buy the property back. When you look at the contract -- you can just take my word for it. You'll hold me to this -- you will see that if there was a guarantee in this deal by Mr. Hickok, all he guaranteed was to perform the buyback obligation if, and only if, VSDH did not do so in accordance with the contract.

And the evidence will show you the following: Number one, the buyback option had what is called a buyback date, September 1st, 2009. That was the date upon which VSDH, if it had an obligation to buy the property back, was required to buy it back. You will see that the only time, and the evidence will show, that if Mr. Hickok guaranteed this thing that he could be called upon to perform the guarantee was after September 1st came and went and VSDH had not bought the property back on that date.

But Mr. Hickok couldn't have performed the guarantee obligation if he wanted to once September 1st

of 2009 rolled around because Mr. and Mrs. Gross took it upon themselves to sell the property to a third party. They sold the property to somebody else.

And you want to know what? The very same buyback option that they are trying to enforce against Mr. Hickok says: Once you give notice that you intend to exercise the buyback option, you, the buyers -- meaning Mr. and Mrs. Gross -- shall not sell the property or convey any interest in the title to anybody else. But they did it anyway.

Well, the evidence is going to show you -- and out of Mr. Gross' own words, Mr. Hickok never told him that he wasn't going to perform any buyback obligation. And Mr. Shaw indicated it might be a problem, but he never said that they were not going to perform. And at the end of the day, the contract says that there's only a guarantee obligation, if there is one at all, upon the occurrence of the default, not the possibility of one.

You will see that as of the buyback date, even if there was an enforceable guarantee, Mr. Hickok could not have performed under the guarantee because it would have required the Grosses, in exchange for the buyback price, to deliver title to the property to Mr. Hickok, the supposed guarantor, but; they didn't

have title to the property to deliver to him because they sold the property to somebody else in breach of their contractual obligations not to do so.

THE COURT: Five minutes.

MR. CHAIKEN: You will also see that in the contract when the contract was initially signed, there was a strike through a provision of the contract that talks about what the parties' rights and remedies were if one or the other defaulted. And when I say, "one or the other," I mean the seller or I mean the buyer. Okay. But the Grosses come in here and say Mr. Hickok became a party to the contract. And when this addendum you heard mentioned was put together, there was some language in there that said that the seller, who was VSDH, agreed to reinstate some language that was stricken.

But the evidence will show you in the form of that language itself that if Mr. Hickok was a party to the contract, which we say he was not, he never agreed to reinstate those remedies. And one of the remedies that Mr. and Mrs. Gross struck and they agreed to strike was their ability to sue for damages, but here they are again not honoring their contract and suing for damages.

MR. ALDOUS: Your Honor, objection.

MR. CHAIKEN: And that is what we --

THE COURT: Sustained.

MR. CHAIKEN: We believe the evidence will show you that the suit for damages against Mr. Hickok was waived.

Ladies and gentlemen, as I told you during jury selection, this is a very important case for all of the parties. But it is an important case for my client, Mr. Hickok, who as I told you was brought here against his will, and he'll only ask for the opportunity to defend himself. I thank you for your time.

THE COURT: You may call your first witness, Mr. Aldous.

MR. ALDOUS: Yes, I would call Doug Hickok.

THE COURT: Raise your right hand, please.

(Witness sworn)

THE COURT: You may be seated.

MR. ALDOUS: May I approach, Your Honor?

THE COURT: You may.

**DOUGLAS HICKOK,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. ALDOUS:

Q    Mr. Hickok, just for easy reference, I've got

some stuff around here, and they've got these numbers on them.  And if I'm referring to a number, I'll let you know, and then you can flip to it.  Is that all right?

A    Perfect.

Q    Great. I'll just set that in front of you.

First of all, let's see what we can agree on, right?

A    Sure.

Q    Your name's Doug Hickok?

A    Douglas M. Hickok.

Q    Can we agree on that?

A    Yes, sir.

Q    VSDH, that is the defendant in this case, is VSDH Joint Venture Ltd., right?

A    Yes, sir.

Q    The parties to that agreement, that is who makes up VSDH, that's you, Van Shaw, and VSDH Homes, Inc., correct?

A    Yes, sir.

Q    So are there any other individuals who have an ownership interest in VSDH other than you and Mr. Shaw?

A    No, sir.

Q    So when I say --

A    But let me correct something.

Q    Sure.

A    VSDH Homes, Inc. is not an individual.  They're a corporation

Q    That's right.

A    Okay.

Q    So the only two individuals that have an ownership interest in VSDH are you and Van Shaw?

A    Yes, sir.

Q    Okay.  Now, with respect to VSDH, does the VS stand for Van Shaw and DH Doug Hickok?

A    It probably did.  I can't remember back then, but it probably did.  Sure.

Q    Well, you know, I guess -- is there any other thing that you think that those initials could apply to other than Van Shaw and Doug Hickok?

A    I'm sure I can come up with something, but I -- let's go with Van Shaw and Doug Hickok.

Q    All right. You said that -- I think you told me a long time ago that you've known Mr. Shaw since 6th grade?

A    Yes, sir.

Q    Have you been in ventures with him before, other than VSDH?

A    A venture before we formed VSDH?

Q    Yes, sir.

A    I believe so.  Sure.

Q    Now the contract that we're here about --

MR. ALDOUS:  Your Honor, if you could just a minute -- I've got to grab something out of that room. Do you mind?

THE COURT:  That's fine.

MR. ALDOUS:  You know, I asked Seth if we could get the easel.  I think we forgot.

THE COURT:  Counsel, approach.  And, Mr. Aldous, approach with your exhibits.

MR. ALDOUS:  Okay.

THE COURT:  You may proceed.

Q    (By Mr. Aldous) Mr. Hickok, if you would, please take a look at Number 3, Exhibit 3 in the book there.

THE COURT:  You may be seated, Mr. Aldous.

MR. ALDOUS:  Thanks, Judge.  I'm going to have to flip from page to page

THE COURT:  That's fine.  You can do that seated.  The jury can't see through you.

MR. ALDOUS:  Okay.

Q    (By Mr. Aldous) Exhibit 3 now, is this the contract -- I'm sorry.  I may have ended up with the wrong one.  Do you see the numbers on this Exhibit 3, $2,695,000?

A    Yes, sir.

Q    That's not the agreement that ended up being -- that actually closed, is it?

A    I believe that's the one that did actually close.

Q    Isn't it true that the actual sales price that closed was $2.8 something million?

A    It could have. It either went one way or the other, yes, sir.

Q    All right. Just so that we're clear, at some point in time, the amount that was to go with the improvements actually was part of the contract price, right?

A    Say that one more time. Excuse me. I was looking at something else.

Q    At one point in time, whatever the improvements were going to be made on the house were part of the contract price, right?

A    Yes, sir.

Q    And then another version, it wasn't part of the contract price?

A    Yes, sir.

Q    Okay. So I want to make sure that we get the actual contract that belongs with your -- with the actual agreement, the one that actually got performed. Let me show you -- this is not up there, so I'm going to

have to bring it to you. This is actually Exhibit No. 2 that's been admitted into --

THE COURT: Mr. Aldous?

MR. ALDOUS: May I approach, Your Honor?

THE COURT: You may.

MR. ALDOUS: Thank you.

THE COURT: Court first. The Court first.

MR. ALDOUS: Oh, sorry. This is already admitted as Hickok Exhibit 2.

THE COURT: You may approach.

MR. ALDOUS: Thank you, Your Honor.

Q (By Mr. Aldous) This is what I wanted to show you. So do you recognize this?

A Yes, sir.

Q This exhibit shows that the contract price for the house is 2,851,871, right?

A Yes, sir.

Q Now do you recall actually entering into this contract?

A I don't know if it fully got -I can't remember if it fully got executed, and I don't think it did and went to the title company where everybody signed off. I don't think so, but I'm not sure.

Q Well, just so that we're clear, first of all, when people are going to agree to buy a house or sell a

house, what they do is they enter into a contract, right?

A    Yes, sir.

Q    And that contract says that by a certain amount of time, we're going to do X or Y; and at that time, which is called the closing, that's when the money changes hands, right?

A    Yes, sir.

Q    Now, this house that's reflected on this Exhibit 2 shows -- it says in the city of Westlake 2004 White Wing Cove, right?

A    It does.

Q    That's the house that VSDH had built for it, right?

A    Had built for it.  What's "it"?

Q    For VSDH?

A    Oh, that we had built for our company, sure.

Q    Right.  VSDH built it as a spec home, correct?

A    Yes, sir.

Q    In other words, when you built it, when you set out to build it, you didn't have a buyer particularly in mind?

A    Right.

Q    And you built it in the hopes that you would build the house for X amount of cost, and you'd be able

to sell it for a profit later on?

A    Sure.

Q    That's what the business of VSDH is, that sort of thing, right?

A    Yes, sir.

Q    Now there was one other home in this area that VSDH actually built, correct?

A    Correct.

Q    And that was right next door to this house?

A    Yes, sir.

Q    And didn't -- in fact, didn't a guy that you guys knew actually live in that house, Wally?

A    Wally Maya purchased the home.

Q    What was Wally's full name?

A    Maya.   It's Waldemar D. Maya, M-a-y-a

Q    He purchased the home?

A    Yes, sir.  Well, an -- let us make sure.   An entity that he owns purchased the home.

Q    I see.   And he's also been an investor with you on some other projects, right?

A    Yes, sir.

Q    Would you consider Mr. Maya to be a friend of yours?

A    Sure.

Q    Okay, great.   Now, the agreement that is

Exhibit 2 reflects -- if you would, turn to the page that's marked Gross 0009. See at the bottom of the page, it says right down there that number?

A    Yes, sir.

Q    Now it says special provisions. Do you see that?

A    Yes, sir.

Q    And it says, see Addendum A. See Addendum A and Addendum B. Do you see that?

A    Yes, sir.

Q    Was the sale of this home to Ken and Betsy Gross what you would refer to as standard?

MR. CHAIKEN: Objection, form, calls for speculation as to what is meant by standard.

THE COURT: No speaking objections. And you stand when you address the Court.

MR. CHAIKEN: My apologies, Your Honor. I thought you said we could be seated.

THE COURT: Overruled.

A    I mean, I believe your question was: Is this standard? And I don't think -- there's no two pieces of real estate that are exactly alike ever, and so there's really no standards in real estate is my simple answer.

Q    (By Mr. Aldous) Well, you have a lot of experience buying and selling real estate, don't you?

A    I'm fairly experienced.  Yes, sir.

Q    You've been doing it for quite some period of time?

A    Yes, sir.

Q    Have you ever done real estate projects like this one?

A    I've probably done these two homes.

Q    That's it?

A    Yes, sir.  I'm not in the home building business.

Q    Well, you also owned other residential facilities like condos or something?

A    Condos, apartments, yes, different single-family types.

Q    Have you ever entered into a contract to buy back a house like you did it in this situation?

MR. CHAIKEN:  Your Honor, objection.

THE COURT:  Overruled.

MR. CHAIKEN:  May I state the basis of the objection?

THE COURT:  As long as it's not a speaking objection.

MR. CHAIKEN:  The question is vague in terms of who Mr. Aldous is speaking of as "you."

THE COURT:  Overruled.

A   Could you rephrase -- restate your question, please?

Q   (By Mr. Aldous) Yes, sir.  Have you, either as VSDH or any other entity in which you're involved, ever done a sell with a buyback provision in it other than this situation?

A   You know, I can't think of anything off the top of my head, only because I haven't done a whole lot of this type of residential contracts.  So, no.

Q   Now, the addendum -- so this whole contract that is Exhibit 2 that I'm holding up right here, a lot of this is a form, isn't it?

A   It's a -- I believe it's a promulgated form, which means it's a form that's issued by the Texas Real Estate Commission.  I believe this is the -- yes, it's produced by -- I'm pretty sure it was promulgated.  At the top of the page it says promulgated by the Texas Real Estate Commission. So it's a standard form by the Texas Real Estate Commission.

Q   And if you want to make changes to the standard form, you may cross some places out?

A   Yes, you can.

Q   Or you may add addendums, like was done in this situation, right?

A   Sure.

Q    Let's turn to the addendum, which is at page --

A    I don't see an addendum.

Q    Yeah, I don't either. It doesn't look like it made it into this copy.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  It's previously admitted as Exhibit 6.

THE COURT:  Is this an extra because I don't have one in the notebook that you're giving me?

MR. ALDOUS:  This is Hickok and VSDH's exhibit.

THE COURT:  Okay.

MR. ALDOUS:  Thank you.

THE COURT:  You may approach.

MR. ALDOUS:  Thank you.

Q    (By Mr. Aldous) Just so you have it now.

A    Okay.

Q    Let me show you what's been admitted as Exhibit No. 6.  This has the complete agreement in it, doesn't it?

A    Well, this is not the complete, final agreement.

Q    What is missing from Exhibit 6?

A    Well, this is not -- this was not the contract

that went to the title company.

Q    What makes you think that, sir?

A    Well, I don't believe-- let me just look at something here.  If I remember correctly, there were some other strikeouts in the Addendum A attached.  This is the agreement.  This isn't the final agreement.

Q    When you say "this," can you tell me --

MR. ALDOUS:  Do you mind if I approach, Your Honor?

THE WITNESS:  What you're showing as Exhibit A is not the contractual -- the final contractual agreement that we had -- that VSDH had with the Grosses.

MR. ALDOUS:  Do you mind if I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) Where are you looking?

A    Well, this is.  This is not.

Q    All right.  Let's go ahead and move on then to Exhibit 3 that's been admitted already.  When you say that the -- does this Exhibit 3 that is in the notebook, does it have the addendum as it was reflected and went to closing?

A    It does.  It looks like it's fully executed by all the parties and it has the Addendum A, I believe you

were referring to, attached.

Q    All right.  So what we have with respect to Exhibit 3 are several pages, and then we have the addendums that are attached, correct?

A    Yes, sir.

Q    And in terms of this agreement, you went through and you signed the contract.  Let's turn to that page.  It is the page that is marked as 0028.  Do you see that?

A    Yes, sir.

Q    Now, I know this is kind of hard for you to -- first of all, you see where it says VSDH Homes, Inc, LP?

A    It actually says VSDH Homes, Inc. with my -- with a GP next to it.  That's the general partner of the seller, which is VSDH, Vaquero Venture, Ltd.

Q    Now that line, that horizontal line, and then the -- I mean the vertical line, then follow the horizontal line, is that your signature, sir?

A    That's my signature with a VP for vice president of VSDH Homes, Inc., the GP.

Q    Have you been a doctor before?

A    No.  Unfortunately I sign a lot of checks.

Q    You make it as quickly as possible; is that right?

A    Quickly as possible, painless as possible.

Q    Each page of Exhibit 3 is initialed.  And in terms of the initialing, is this that I'm pointing to here, is that your initial?

A    That's my initial as the seller, which is VSDH, Vaquero Homes, Ltd.  That's me signing on behalf of the seller.

Q    I know you want to --

A    Like Dell Computer or whatever

Q    -- make that distinction

A    I'm making a distinction  Sure.

Q    Right.  But my question is very simple.  Is that your initial?

A    Yes.

Q    Is that you?

A    It is mine --

Q    For whatever capacity?

A    -- mine on behalf of the seller, yes, sir.

Q    And you went through on pretty much every page and did the same thing; isn't that right?  You initialed it?

A    Just like Ken and Betsy Gross did, sure.

Q    Right.  Now when we get to the addendum, which is going to be at the page marked Gross 33, this is where it starts, correct?

A    Yes, sir.

Q    And that's what it looks like?

A    Yes, sir.

Q    Now I have some particular parts of it that are on this agreement, so I want to take it one by one.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Yes, sir.

THE COURT:  You need to move your exhibits away from --

MR. ALDOUS:  All right.  Would it be all right if I put them up here?

THE COURT:  That's fine.

MR. ALDOUS:  Great.

MR. CHAIKEN:  Your Honor, may I make a request?  I'm sorry to interrupt.  Before the additional boards are published to the jury, could I ask that they not be shown to the jury.

THE COURT:  You just want them turned around?

MR. CHAIKEN:  Thank you, Your Honor.

Q    (By Mr. Aldous) The very first paragraph of the addendum, you see that there?  It says, lawyer language, VSDH Vaquero Venture, Ltd., as seller, grants to Ken and Betsy Gross, as buyer, the option to put the property to seller.  I require the seller to purchase the property for the original sales price of $2,851,871 on September

1st, 2009, or such earlier date as may be mutually agreed between buyer and seller. You see that?

A Yes. And it goes on to say, "subject to the following terms and conditions." Sure.

Q Right. So would you agree with me that subject to the other terms and conditions, VSDH agreed to repurchase the home from the Grosses if they exercised it appropriately according to the addendum?

A Yes, sir.

THE COURT: Would you like to approach?

MR. ALDOUS: I was changing this. Is this approaching?

THE COURT: That's approaching.

MR. ALDOUS: May I approach?

THE COURT: You may.

MR. ALDOUS: Thank you.

Q (By Mr. Aldous) The next paragraph is the declaration date. You see that?

A Yes, sir.

Q On or before May 1st, 2009, the declaration date, the buyer must exercise the buyback option by delivering the written notice to the seller. If for any reason they have not exercised the buyback option notice on or before 5:00 p.m., then the buyer waives the buyback option, right?

A    Yes, sir.

Q    So as I understand what this is saying is the Grosses were required to give VSDH notice like this before May 1st, 2009, if they wanted to exercise the buyback?

A    Yes, sir.

Q    You agree with me that Mr. and Mrs. Gross correctly gave notice that they wanted to invoke the buyback?

A    They did, but didn't meet the terms and conditions of the buyback, but they gave notice.

Q    All right.  I understand that you've got a problem with that, but I'm just trying to eliminate some things we can agree on.  You agree they sent you notice?

A    Yes, sir.

Q    And what you disagree with is that they complied with the rest of it?

A    Yes, sir.

Q    So we don't have to ask the jury to get them to find out whether we gave notice.  You agree with that?

A    Yes, sir.

Q    Okay.

        MR. ALDOUS:  May I approach?

        THE COURT:  You may.

        MR. ALDOUS:  I'll get this down pretty

soon.

Q    (By Mr. Aldous) Now, the next paragraph, which is B, it says -- push it up.  It says if -- basically, if the buyer agrees to exercise or exercises the buyback option, then the following things are going to apply. And then it says the buyer will not sell or convey any right, title, or interest in and to the property to any third party unless the seller breaches its obligation to repurchase the property pursuant to the buyback option due to no fault of the buyer.

Now as I understand this is -- would you -- would you agree with me that as long as the seller, being VSDH, has not breached any obligation, then the Grosses have to wait until September 1st, 2009?

A    Yes, sir.

Q    If, as you understand it, VSDH breached the agreement before that date, the Grosses were free to sell it.  Do you agree with that?

A    I'm not a lawyer, so I really can't answer that.

Q    Well, just from your own understanding of the agreement -- first of all, you read this addendum before you signed it, right?

A    Yes, sir.

Q    And you had a lawyer on the deal with you.  In

addition to Mr. Shaw, you had Hap Stern, correct?

A    Yes, sir.

Q    And he's a lawyer that's worked with you on real estate deals before?

A    Yes, sir.

Q    As you understood this, would you agree that your understanding was that if VSDH breached the agreement before September 1st, 2009, then the Grosses were free to sell the property?

A    Again, that's a legal -- you're asking me for a legal answer.  I'm not an attorney.

Q    Well, I'm just asking you for your understanding  I mean, just your understanding, unformed by any legal analysis.

A    You would think so, but I don't know enough about the law.

Q    Okay.  Would it be okay if I said you agree subject to your lawyer overruling?

A    Sure.

Q    Okay.  Then it says the seller may commence marketing the property, the seller being VSDH, right?

A    Yes, sir.

Q    Could commence marketing the property for sale by May 2nd, 2009, and the buyer agrees to cooperate. Now, would you agree with me that VSDH never marketed

this property after the -- the option date where -- I mean, where they selected the buyback, where the Grosses selected the buyback?

A    Correct.

Q    You guys never made any effort during this period of time to market the property on behalf of VSDH?

A    Correct.

Q    Okay.  The buyer agrees to fully cooperate with all marketing efforts of seller.  I think we already talked about that. And then on or before 2009, unless buyer and seller agree upon another stated date in writing, buyer shall vacate the property and deliver possession thereof to the seller, being VSDH, right?

A    Yes, sir.

Q    And the property shall be in the same condition, blah-blah-blah.

Now, here's my question for you.  As of May 1st, 2009, VSDH had no intent to buy this property back; isn't that right?

A    I totally have to disagree with that.

Q    Are you saying, sir, that you, as VSDH, on May 1st were willing and wanted to buy this property back if you were required to by the contract?

A    If I was required to under the contract, sure we could have bought the property back.

Q    Well, I'm asking a little bit different question.   I'm not asking you whether you could have bought the property back.   I'm asking whether you had any intent as of May 1st, 2009, to buy this property?

MR. CHAIKEN:  Objection, Your Honor, objection to the use of the word "you."  It's vague.

THE COURT:  Overruled.

A    VSDH -- my position as the GP of VSDH were the Grosses did not abide by the terms of the contract; therefore, we were not going to buy the contract -- the property back because they didn't abide by the terms of it.

Q    Okay.   So that's what I wanted to hear.

A    Okay.

Q    So, as of May 1st, 2009, it was your position, as VSDH, that the Grosses had not complied with the contract; and, therefore, you had no intent as VSDH to buy back the property?

A    Yes, sir.

Q    So would it be true that as of May 1st, 2009, the Grosses could go out and sell the property because there was no intent on your behalf to buy this back?

A    I don't -- that's not what the contract says. No one asked me my intent.

Q    Let me ask you this.   Is it your position that

you could tell the Grosses that your -- VSDH is not going to comply with this contract and they just have to wait after that, until September 1st, 2009, to sell?

A    I never told the Grosses that we were not going to buy the contract back.

Q    Well, isn't it true, sir, that after the Grosses exercised the buyback option, which you said -- you admitted they did, you said that Van Shaw's handling this matter for me now?

A    Yes, sir.

Q    And that's the way it was going to go.  You were kind of in the mix during the sell, but when it came to dealing with the contract and things, you bowed out and let Mr. Shaw take over?

A    Yes, sir.

Q    And when Mr. Shaw spoke, he spoke for you and VSDH?

A    I would say, yes.

Q    Now, was there any reason that you as VSDH or you as yourself did not tell the Grosses in May of 2009, look, we're not going to do this buyback because we believe you already breached the agreement?

A    Is there any reason why I did not tell them that?

Q    Yes, sir.

A    I had no communication with them.

Q    Well, you had communication with him, you would just say, "I'm referring you to Van Shaw"?

A    I had one phone call with Mr. Gross when I left his house.  No, excuse me.  I had one phone call with Mr. Shaw after I left Mr. Gross' house that I told Mr. Shaw I'm referring it to -- referring all the rest of this matter to you because of the violations in the contract.

Q    So, let me get this straight.  When is it that you believe you referred the matter to Mr. Shaw?

A    On or about -- you know, again, it's -- the date's unclear to me, but it's going to be sometime in 2008 after I visited with Mr. and Mrs. Gross at their home, immediately after on the car on the ride home.

Q    Did you ever express to Mr. and Mrs. Gross that, listen, I believe you violated the contract at this time?

A    Absolutely, when I was in their house.

Q    It's your testimony that you told them that they were in breach of the agreement?

A    I asked them -- I told them I didn't get a chance to review the plans and specs, and I was looking at a half-built house.

Q    I guess we'll get back to that here in a

minute. What I'm really kind of interested in right now is I guess what we could agree with. But you would agree with me -- I'll move on. You will agree with me that Mr. Shaw was handling the buyback if it -- whatever is happening in that regard after May 1st, 2009?

A    Yes, sir.

Q    And you agree with me that as VSDH, you had no intent on following through with the buyback because of your belief that the Grosses had breached the agreement?

A    At that time, I -- in May of 2009, I was -- I had -- I was not in any discussion in May of 2009, me personally, as part of VSDH. Mr. Shaw and the Grosses were in discussions, but not me.

Q    Right. But you told us earlier that it was your belief as of May 1st, 2009, that because the Grosses had breached the contract in your mind, you did not -- were not going to buy this back?

A    Again, I'm speaking on behalf of me and VSDH. But, yes, that's -- I think you could probably say that for Mr. Shaw and myself both. Yes.

Q    Would it be helpful to you if we were to get you two hats, one where you could put --

A    It really would.

MR. CHAIKEN: Objection, Your Honor, argumentative

THE COURT: Sustained.

MR. ALDOUS: I'll withdraw that question.

May I approach, Your Honor?

THE COURT: You may.

Q    (By Mr. Aldous) The next provision of the buyback is a casualty provision, which that really relates to having insurance on the house and that sort of stuff?

A    Yes, sir.

Q    That has nothing to do with what we're fighting about, right?

A    Correct.

Q    Okay.  This Paragraph 2 relates to buyer's improvements.  Do you see that?

A    Yes, sir.

Q    Now it says before commencing construction, buyer will review with seller the plans and specifications and receive general consent, consent not to be unreasonably withheld, to proceed with the improvements.  Do you see that?

A    Yes, sir.

Q    Now as I understand it, you disagree whether or not you were provided an opportunity to review the plans and specifications?

A    I don't disagree.  I know I did not get to look

at the plans and specs.

Q    Well, let's be clear about what you got.  The contract itself had the specifications attached to it, didn't it?  Do you see that?

A    Yes, sir.

Q    This is the Addendum B to the contract that we referred to earlier, right?

A    Yes, sir.

Q    And you see there it says 2004 White Wing, 1092 square-foot addition casita with FR.  What is that?  Family room maybe?

A    It could be.

Q    Bedroom?  You know what a bedroom is, right?

A    Yes, sir.

Q    And then a shared pool bath; do you see that?

A    Yes, sir.

Q    And then for all of the specific work that was going to be completed, it had units and then the cost per unit for -- and the total cost for the addition, right?

A    Yes, sir.

Q    Now, before -- and by the way, that's your --

A    Initial?

Q    -- initial down there, right?

A    Yes, sir.

Q   So, I mean, there's no question that you saw these specifications, right?

A   Yes, sir.

Q   And this is typically what would be attached to a builder's contract whenever -- if you were having a home built, they would say things like this and have the specifications like this, wouldn't it?

A   I think that's a real general -- I mean, it's detailed, but it's pretty general.  Yes, sir.

Q   Detailed but pretty general?

A   Well, what I mean by it is you -- it's got paint, stain, like I'm looking under paint, stain.  Is it going to be bright purple or is it going to be white?  I don't want bright purple on a wall.  I mean, I'm saying it's very -- it's got some detail, but it's general in nature.

Q   Well, let me ask you this.  What is it that you think that you could get from architectural plans that you couldn't get from these specifications?

A   You're going to get architectural plans with more specifications, detailed specifications attached to it from the architect.

Q   Could you describe for me what you mean?

A   When an architect designs -- I'm more coming from the commercial industry.  But when the architect

designs a building or a home or something, they design the floor plan. And then they tell the contractor via specifications what exactly they want them to build. All right. This looks more like a cost breakdown from a contractor of what's going to be built in the house, not, quote, specifications.

Q So is it your contention that the Addendum B attached to the contract is not the specification called for in Paragraph 2?

A Correct.

Q So I didn't see anywhere else in the contract where a specification was actually defined, did you?

A Off the top of my head, no. I just don't remember the contract that well.

Q Well, I did not see anywhere in the contract where it says specification means X, Y, and Z. You don't have any testimony about it right now, do you? I mean, you don't know that there's any kind of definition in there, right?

A No. But I know what specifications are as I explained just a minute ago.

Q You know what specifications are for you as a commercial real estate type person?

A I would say most anybody in the real estate business would know what that is, yes.

Q    And then plans -- in terms of what plans are required, that's not also defined in here, is it?

A    As a -- you know, I think it just uses the term "plans."  So, no.

Q    So would you agree with me that plans can sometimes -- more over time because they start off with a draft and then they go to the next draft and sometimes there's little changes, and so they have revisions.  Do you agree with that?

A    Probably always being revised.  Sure.

Q    Yes.  And so it doesn't say whether you, you know, give approval based upon the first draft or the last draft or any potential revision therein, right?

A    Right.

Q    And then let's go through the next part.  You see the next paragraph says the attached Addendum B is a spreadsheet of improvements and costs proposed by the buyer who made it to the property, right?

A    Yes, that's what we just talked about.  Those were more not specs, but improvements and costs.

Q    Okay.  Buyer agrees to escrow funds totaling $156,871 with the title company and enter into an escrow agreement acceptable to seller and buyer that outlines the proposed improvements to the property and the disbursements of such funds, et cetera.

Now you heard your lawyer stand up and tell the jury or Mr. Hickok --I'm sorry. Mr. Shaw that this was -- never happened. What is it that never happened with regard to an escrow?

A   Well, I think what -- the contract is very clear to me that the buyer, the Grosses, needed to take $156,000, okay, and put it with the title company. And the title company is outlined in this contract also. And the seller, VSDH, and the Grosses needed to enter into what's called an escrow agreement, which basically determines how the funds could move in and out of the title company for their use. And that never happened.

Q   Now, this agreement that -- so when you say that the escrow agreement never occurred, are you referring to the escrow agreement with the title company?

A   It's a separate agreement with the title company between the Grosses, ourselves, and the title company is the agent holding the money. And the title company has to be party to this agreement too as to how the money gets disbursed.

Q   Well, would you agree with me that the escrow agreement was basically to make sure that the money that was earmarked for the building of the addition didn't go to some other purpose but actually went to build the

addition?

A   I'd would say that --

MR. CHAIKEN: Your Honor, relevance. The document speaks for itself.

THE COURT: Overruled.

A   I would say that's the general nature of the agreement, to make sure it's held by a third party as a fiduciary or somebody that's not involved in the transaction.

Q   (By Mr. Aldous) All right. And you're aware that the bank that was loaning the Grosses the money to build the addition acted as the escrow agent for this particular addition?

A   I had no idea that that occurred until well down the road. We thought the money never got put up.

Q   When you say "well down the road," what do you mean?

A   I would say this was supposed to happen right after the agreement was signed, so I'm going to say several months down the road.

Q   Well, this agreement was signed in June of 2007, right?

A   Yes, sir.

Q   The money changed hands in late June 2007, right?

A     Yes, sir.

Q     When the money was changing hands, you knew at that time that the bank that was loaning the Grosses the money to build the addition was acting as its own escrow agent?

A     I had no idea.

Q     If you would, take a look at Exhibit No. 5 in your book there.  First of all, do you recall if you, on behalf of VSDH, went to the closing before or after the Grosses?

A     I don't recall if I even went to the closing.

Q     All right.  So in terms of a closing that occurs, in other words, where the contracts going to be consummated and all the money that's going to change hands, it can happen where one party to the transaction comes in and signs whatever has to happen, then another party comes in and signs.  It doesn't have to happen at the same time, right?

A     No, sir, it doesn't.

Q     And sometimes -- I think you were just alluding to it.  Sometimes you don't even go in.  They bring them to you and you sign them or you do it electronically, right?

A     Or you do it at your lawyer's office or -- yes, sir.

Q    But in this case -- you know that in this type of closing that you get a settlement statement, right?

A    Yes, sir.

Q    And Exhibit 5 is a settlement statement.

MR. ALDOUS:  May I stand to do this thing?

THE COURT:  Just remember the jury can't see through you, which is why I have you stay seated.

MR. ALDOUS:  I'm very thin.

Q    (By Mr. Aldous) If you look at Exhibit 5, this is a settlement statement for the closing of the sale from VSDH to the Grosses, right?

A    Yes, sir.

Q    Now this indicates it was signed by the Grosses down here and the closing agent for the title company on 6-27-07.  Do you see that?

A    Yes, sir.

Q    Now if you will -- I mean, I don't know Apparently somebody in the government created this form, but it's not the easiest thing to read.  But if you will, take a look at the part on the second page, Line number 1303.

A    Yes, sir.

Q    You see that?

A    Yes, sir.

Q    Escrow for construction holdback, 156,871.  And

then they have a holdback of 154,071. Do you see that?

A    Yes, sir.

Q    Is that the type of escrow you were expecting?

A    That is what I was expecting, yes, sir.

Q    Yeah.  Is it -- and the reason that it was only 154,071 is because Ken and Betsy had already spent $2,800 for architectural engineering and permit.  Did you get this also as part of your closing documents? I'm showing you what's been marked as Exhibit No. 22 in the notebook.  If you see there, it says builder's soft cost draw request.  And this was all done at the same time as the closing, 6-28-07.  Do you see that?

A    I see it.  Am I signing that document?  I can't see the bottom.

Q    No.  I didn't see that you signed it, but it was all part of the closing documents, which you would get a package at the end, right?

A    I don't remember seeing this document.  My attorney may have seen it, but I don't remember seeing it.

Q    Well, if you would, turn to Exhibit 98.

A    Excuse me.  Which one?

Q    98.  This is a settlement statement but it has a different date on it.  Do you see that?  It has a settlement date of June 29, 2007.  Do you see this?

A    I'm looking at it.  Yes, sir.  I'm looking for the settlement date.  There it is, June 29.  Yes, sir.

Q    And it has -- this has the summary of the seller's transaction, and then it's got your squiggly line down there at the bottom, right?

A    Yes, sir.

Q    And that's your -- meant to be your signature even though you can't read it?  I mean that says -- to you, that says Doug Hickok, GP, or tell me what that says?

A    It says Douglas M. Hickok as GP for the partnership.

Q    Okay.  Well, so this is the seller's side of the closing statement that was reflected of the buyer's side on Exhibit 5, right?

A    Yes, sir.

Q    So you have two different documents.  You have Exhibit 5, which is the closing from the side of the Grosses, correct?

A    Yes, sir.

Q    And then you have Exhibit 98, which is the closing side for VSDH, right?

A    Yes, sir.

Q    And those two together constitute the closing statement, correct?

A     Yes, sir.

Q     Now, you don't deny that you would have been given a copy of the closing statement signed by the Grosses if they signed it two days before you closed, which provided that they were putting this money into escrow?

A     Not in all cases.  I don't know if I got it or not because you're not -- you normally do not get all the information from the other side's business.  They try to keep it separate.  That's why you have two separate sides, two separate papers.

Q     Let me just rephrase it then.

A     Okay.

Q     After looking at this, you agree that the money was escrowed.  It was just escrowed with the bank rather than the title company?

A     I -- looking at this, I have no idea where this money got escrowed.

Q     All right.

A     It says -- excuse me.  It says escrow for construction holdback.  And I do remember a letter going from my attorney to the Grosses asking them where -- why didn't you put up the money at the title company?

Q     Well, I just want to make sure what we're arguing about.  All right.  So if there really was an

escrow for the holdback and it was done by the lender, you'd have no objection with that, right?

A    Sure I would.

Q    Why is that?

A    Because I have no idea what the agreement is with the lender.

Q    Oh.

A    Is it to do construction two years from now, five years from now?  I don't know what their agreement is.  How did they get the money?  I mean, did they -- you know, the key is this, is that you wanted to make sure that the house got built, the improvements got put in place.

Q    Well, what would happen if the improvements didn't get put in place in this case?

A    Liens go on the house because the contractors don't get paid.

Q    Well, what would you care?  You already sold the house, right?  VSDH is out of it except -- unless they build the addition and exercise the buyback, right?

A    Sure.

Q    So if they don't build the addition -- let's say that they borrowed the money and they used it, I don't know, to go to Shreveport and gamble, do you care?

A    Well, that wasn't the original intent of the

agreement.

Q    Right.  But, I mean, all you do is you say, hey, you didn't use it on the addition.  You can't buy it back.

A    Right.

Q    So really VSDH only had an interest in this if there was actually going to be an addition built and it was going to be something that they wanted to do the buyback, right?

A    I think that's fair.

Q    All right.

THE COURT:  Is that a good stopping point, Mr. Aldous?

MR. ALDOUS:  Yes, Your Honor.

THE COURT:  All right.  It's now 12:15. We'll take a one-hour lunch break.  During this lunch break, the jury is under the same instructions you've been briefly given.  You're not to discuss this case among yourselves or with anyone else until such time as the case has been submitted to you for your deliberations  All rise. The jury is excused.

(Jury exits the courtroom)

THE COURT:  All right.  We stand in recess.            (Lunch recess taken)

THE COURT:  You may bring in the jury.

(Jury enters the courtroom)

THE COURT: You may be seated.

Mr. Aldous, you may continue.

MR. ALDOUS: Thank you, Your Honor.

Q    (By Mr. Aldous) Mr. Hickok, when we left off, we were discussing the settlement statements. So I'm at Exhibit 98, which is your half of the -- that is VSDH's half of the closing statement. All right? You see that all these -- or the slots are numbered? Do you see that?

A    Yes, sir.

Q    So No. 504 says, pay off of first mortgage loan, Chase Bank $1,952,730.89. Do you see that?

A    Yes, sir.

Q    Does that mean that when you guys sold this house to the Grosses that you had to pay off a note; that is, VSDH had to pay off a note in the amount of $1,952.730?

A    Yes, that's true.

Q    Is that a -- the note that was part of the construction cost for building the home originally?

A    That was a portion of it, yes.

Q    And is it true that the home, prior to the Grosses coming and entering into this contract in 2007, had been completed and sat empty for a while?

A    Yes, that's true.

Q    And I believe that --

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  I hate to do this to you, but I think your microphone is turned off.

A    You want me to speak?

Q    (By Mr. Aldous) I was having a little trouble hearing you.

A    Okay.

Q    There you go.

So, while VSDH was waiting for this home to sell, it was paying the carrying cost on the note that is reflected in Exhibit 98, No. 504?

A    Yes.  We had to pay the interest carried to the bank on the loan each month.  Yes, sir.

Q    I think in terms of building a spec home, you wanted to sell relatively soon after you complete a home, right?

A    The sooner the better, sure.

Q    And from your perspective as one of the principals of VSDH, you know, you would theoretically love it to sell while it's in construction, right?

A    Sure, you would, but that doesn't happen very often.

Q    And then even if it doesn't sell during construction, you'd like to sell within 90 days of when the construction ended, right?

A    The sooner the better.

Q    And in this situation, the house did sit empty for a while?

A    Yes, sir.

Q    During the opening statements of Mr. Chaiken, he referred to the Grosses violating the contract and moving into the house.  Do you recall that?

A    Yes, sir.

Q    When that happened -- first of all, assume that the Grosses received the keys or something from the agent; is that right?

A    I have no idea how they got in the house to this day.

Q    Well, suffice it to say, you didn't know that they were moving in, right?

A    VSDH had no idea they were moving into the house.

Q    I'm going to show you what's previously been admitted as Exhibit 10 from your side of the equation. You see here it's an email from you to Ken Gross dated June 19, 2007.  Do you see that?

A    Yes, sir.

Q    And you say, "Ken, I have no interest in rehashing the past, but I must say that I was shocked to hear that you had taken up occupancy in the house prior to closing without notifying the seller for permission. At this time, I'm only interested in the assurance that you will close the sale this week.  Attached, please find an amendment to the contract that requires you to escrow an additional $25,000 of earnest money applicable to the contract price and pay an extension of $500 per day.  As outlined in the amendment, the document must be executed and delivered to my attention by 4:00 central standard time today.  If I am not in receipt of this fully executed amendment, I can only assume that you have no interest in purchasing the property and you will immediately vacate the residence.  Thanks in advance." Did I read that right?

A    Sure.

Q    So as I understand it, you, on behalf of VSDH, said, look, we didn't give permission for you to move in.  But since you did, I want to make sure you're going to close, and so I have this amendment to the contract and you either sign it or otherwise we're going to assume you're not going to close?

A    Yes.

Q    All right.  That Exhibit 3 that's in that book

has an amendment to the contract, right?  It's on page, Gross 00030.

A    I've got it.

Q    Okay.  The amendment says the first amendment to the new home contract is entered into between VSDH and the Grosses and then it has some recitals like saying whereas the seller and blah-blah-blah.  You see all that?

A    Yes, sir.

Q    And then it says amending provision, the contract is hereby amended to provide that the date and time of the closing to be fully consummated and shall be extended to occur on or before noon Friday, June 29th, right?

A    Yes, sir.

Q    Provided, however, that as a condition to the following, they shall deliver to the title company a fully executed copy of this amendment, a wire transfer or cashier's check made payable to the title company in the amount of 50,000, which shall be added to a portion of the earnest money being held -- and earnest money means that's money that the buyer will give to the title company whereas if they don't follow through with it, then the seller gets that money?

A    Yes, sir.

Q   And then a cashier's check made payable to seller or wire transfer to the title company in the amount of $8,500 as a non-refundable extension fee, which shall not be credited towards the sales price.   So that just means $8,500 on top, right?

A   Yes.

Q   And that $8,500 was to correspond for the amount of time that they were going to be in the house prior to closing, right?

A   I don't know if that's the exact way it worked. It might have been from the original closing date and now this contract's being extended.   So I'm not sure if it's for being in the house or not.   I don't know if there's a correlation there.

Q   Well, let me ask it just a little differently. This is the amendment that you referred to in your email that is Exhibit 10, right?

A   That's probably the email that resulted in this amendment.

Q   And this amendment was signed by you on behalf of VSDH, right?

A   It was signed by VSDH.   Yes.

Q   Well, I mean, you signed it on behalf of VSDH, right?

A   Okay.   Yes.

Q   And it was signed by the Grosses, right?

A   Yes, sir.

Q   So if you, that is VSDH, agreed to amend the contract to allow them to extend the closing and knowing that they were in the house, then you're not saying that that's a breach of the contract because the contract was amended, correct?

A   I am saying that -- on behalf of VSDH, I'm saying we came to agreement after they basically jumped in and moved into the house ahead of time, which is very, very unusual.

Q   Well, let me rephrase it because I think we're saying the same thing; that while it was an issue of them moving into the house, for whatever reason, whether they were mistaken, you were mistaken, whatever, it was resolved by the amendment that became part of the contract?

A   The answer to that -- there's no mistake about moving in or moving out -- moving into a house.  You should never move into a house because you don't have rights to do so.  But it did get resolved by this amendment.

Q   Okay.  So that's really not something for the jury to consider one way or the other because it's just been taken care of?

A    I disagree with that.

Q    Well, didn't you agree by this amendment to make that a non-issue?

A    I agreed that -- that this amendment resolved the problem. I don't think that anybody ought to -- when you have an agreement, you don't move into somebody else's property without asking them. Those are two separate matters. But I did resolve it through this agreement.

Q    All right. And wouldn't it be true, sir, that you don't know whether or not the Grosses conversed with Mr. Buttemiller, who was the real estate agent that was representing VSDH in the transaction?

A    I don't know, no. About moving into the house?

Q    Right.

A    I have no idea.

Q    All right. So -- and then let's talk about the rest of the addendum. Just, if you would, I think this might be helpful.

            MR. ALDOUS: May I approach, Your Honor?

            THE COURT: You may.

Q    (By Mr. Aldous) All right. So we agreed that VSDH and the Grosses entered into this contract where VSDH, if certain conditions were met, agreed to buy back this property, right?

A     Right.

Q     And you say that they didn't meet certain of the conditions.  So I want to -- if you would, just tell us what the reasons are why -- I mean, first of all, you agree VSDH did not buy the property back, right?

A     VSDH did not buy the property back.

Q     Okay.  Tell us the reasons why -- why didn't VSDH buy the property back?

A     Well, we could start with the -- the one that's most prevalent to me, being VSDH, is that we had a contractual obligation that they were going to go and improve -- well, they were going to let me review plans and specs before improving the property.  And they went ahead and improved the property without me reviewing plans and specs or VSDH.  Let's make sure when I say "me," in this capacity -- I'll use my name -- I'll use Hickok as the guarantor, but VSDH is -- or when I use this terminology, VSDH is who I'm talking about at all times unless I use my name as Hickok.

Q     Could I just put review plans as one of the reasons why you didn't do it?

A     Right.

Q     All right.  So you contend you didn't review plans and specifications prior to the start of construction?

A     Yes, sir.

Q     All right. Any other reasons why VSDH didn't buy this property back?

A     That's going to be the main reason. There's other reasons, which is they did not put up an escrow account per our agreement. We have a written contractual agreement that they didn't adhere to.

Q     All right. Other than the escrow clause that we've kind of alluded to briefly, anything else? Review plans, escrow?

A     And part of my -- as I'm contemplating to buy back the house, if I have the obligation, if I've determined that I have the obligation to buy back the house, then they've sold the house before the end of the period when I can buy the house back.

Q     September 1, 2009, right?

A     Yes, sir.

Q     Okay. Any other reasons other than the three that I have written up here?

A     Those are the three that come off the top of my head right this minute.

Q     Well, I mean -- and just to be fair to you, I know --

A     There's more. But go ahead.

Q     But, see, that's just it. You know, this is

the one chance I get with you. So I want you to tell me everything that you've got on your mind as to reasons why VSDH didn't buy this house back.

A     Excuse me for a minute. Let me review the contract real quick.

Q     All right. Would you like some Jeopardy music? I take that as a, no.

A     I think we can just rely on those three.

Q     All right. By the way, before we came into trial today, you had previously given testimony outside of court in what's called a deposition, right?

A     I did have my deposition taken. Yes, sir.

Q     And just for clarification, a deposition is when you get sworn in and the lawyer on the other side or whomever gets to ask you questions under oath?

A     Yes, sir.

Q     And even though it's not in court like this, it still counts as testimony under oath, right?

A     Yes, sir.

Q     All right. You had a chance to review your deposition before you came to trial today, right?

A     Yes, sir.

Q     Any recollection that you have from your deposition of anything other than these three things?

A     I'm sorry. I can't think of anything else off

the top of my head right now. You're free to remind me.

Q No. That's all right. I just wanted you to do your thing. Now, in terms of this particular deal, you agree with me that the contract that is -- that's set forth as Exhibit 3 was signed in June of 2007, right?

A Yes, sir.

Q On the page that's marked Page 29, it shows the contract earnest money receipt of $50,000 on 6-4, 2007; is that your recollection?

A That's what the contract -- it looks like the title company stated they received it then.

Q Is that when the contract becomes binding?

A That's when you have consideration between a buyer and a seller. Yes, sir.

Q So would it be okay with you if I said that 6-4-2007 was the contract date?

A Yes, sir.

THE COURT: You may approach.

MR. ALDOUS: I'm sorry, Your Honor. You know what? I forgot. I apologize.

Q (By Mr. Aldous) 6-4-2007 contract date, right? And we just looked at the change in the contract that extended the closing to June 29, 2007, right?

A Yes, sir.

Q So we looked at your closing statement too,

which is Exhibit 98, which shows that you did some things on the 29th, right?

A    Yes, sir.

Q    So we have 6-29-07 is the closing date, okay, right?

A    Yes, sir.

Q    Now, prior to agreeing to the contract where VSDH is selling this home, but agreeing to buy it back, do you recall meeting with Ken Gross?

A    Rephrase that question for me, if you would.

Q    Do you have any recollection of meeting with Ken Gross prior to the time this contract was signed?

A    No, sir.

Q    Now, you know that Mr. Gross remembers meeting with you?

A    Yes, he -- I remember reading that in his deposition.

Q    Is it you just don't have any recollection of it?

A    I have no recollection of that.

Q    Just knowing the type of person that you are and knowing that this is not the standard type deal, wouldn't you want to know what sort of improvement Mr. Gross is counting on in terms of adding to the property?

A     Well, it's outlined in the contract.

Q     All right. Did you -- as you sit here today, and I know it's a long time ago, do you have any recollection of getting any kind of information or input as to what the addition would be except for what was set forth in the contract?

A     No, sir.

Q     In terms of the ways this house was laid out, was there any question in your mind as to where that addition had to go?

A     Well, you could put it a lot -- there was a lot of extra land. You could have done a lot of things to that house.

Q     Well, you -- just a moment. I'm sorry. I have to get my brain to think for me right back here.

So you have no recollection of meeting with Mr. Gross before the sale, and you have -- the only thing that you can recall definitively that you had regarding what addition they were going to build was what was part of the contract?

A     Yes, sir. I had several conversations with the broker, John Buttemiller, who told me Ken Gross was a builder and he would like to buy the house and do some improvements to the house, which subsequently led to all the language in the contract.

Q   Well, you're an experienced real estate investor.   Would you agree with that?

A   Okay.   Yes, sir.

Q   And when somebody's saying they want to make changes to the home and that that's part -- wants to be part of the deal, don't you want to know what those potential changes are?

A   That's exactly why the language is in the contract; that the plans and specs have to be approved by us.

Q   I see.   But before you even agreed to the deal, didn't you want to know what the vision was?   What are you thinking about adding on to the house?

A   As far as VSDH was concerned, Mr. Gross didn't have to do any improvements to the house --

Q   Right.

A   -- as far as we were concerned.   But if he did any improvements to the house, I wanted to know that he was going to do quality improvement if I had to do a buyback on the house

Q   Well, how were the plans going to tell you whether or not it's a quality improvement?

A   Well, the plans laid out -- they give you all of the specs down to the detail, what color the light switches are to what kind of lights you're putting in

the house. And you could put in something that's very -- not very appealing, and you could put in something that is very appealing. And I used the example earlier that you could paint the walls purple or black or something like that, but the plans will say it's going to be a white wall. It's going to be this color of tile. It's going to be real detailed.

Q Is it your belief that architectural plans will show what color paint is going on the walls?

A Absolutely. I just got finished remodeling my house, and I had to have the exact paint color because, you know, you can't put white down. You put down eggshell white by Sherman Williams paint.

Q On the architectural plans?

A On the specs that come as part of the architectural plans. Keep in mind you're using the term "architectural plans." That is plans and specs in my viewpoint.

Q Uh-huh. All right. So, if you would, I want you to turn to Exhibit 24 and 25. Are you there?

A Yes, sir.

Q So Exhibit 24 is the notification -- or a fax from Ken Gross to you, dated October 16, 2008. And the reason Exhibit 25 is in there is to show that you actually -- your fax machine received the fax.

A    Yes, sir.

Q    You don't have any reason to dispute that, do you?

A    No, sir.

Q    All right.  So Exhibit 24 is this fax from Ken Gross to you, Doug Hickok, right?

A    Yes, sir.

Q    And it has your fax number as (972)732-6644 That's your fax number, right?

A    Yes, sir.

Q    And it says, "Subject, White Wing Cove.  Doug, I hope all is well with you and that you enjoyed your summer.  We've run into Van a couple of times at the club, but our paths have not crossed.  I am beginning construction of the addition and wanted to show you the plans for approval.  If you give me an address, I will be happy to send them to you for your review."  You see that?

A    Yes, sir.

Q    Now, I did not see any document that says you sent them your address so that you could get a copy of the plans.  Have you seen that?

A    I don't think I did.

Q    You didn't?

A    No, sir.

Q    Is there any reason why you didn't just give them your address?

A    Well, I think Mr. Gross and I sat up a time to meet at the house --

Q    Okay.

A    -- to look at the plans.

Q    So let's go through that.  But, first of all, I want to just go through this part.  "In addition, I have found the roofing material and it is a very good match." Now you understood that to be the comparison of the roofing material on the main house with what was going to go on the addition?

A    It appears that way, yes.

Q    Is that the way you took it?

A    Probably at the time, sure.

Q    Yeah.  It says, "As you know, this roof is over 80 years old and came off of another home, so we had to go on an extensive search.  You may recall that there is some light green tiles and they were very difficult to find, but I was able to locate those as well.  I wanted to get as close of a match as possible." And that -- you would agree that that's a good thing, right?

A    That's a good thing.

Q    All right.  "We are purchasing the tile from the same company that Paul Kramer used and they

personally inspected the home." Now Paul Kramer is the general contractor that built the home for VSDH originally, correct?

A    Yes, sir.

Q    All right.  They also brought out samples that looked identical, but they obviously do not guarantee an exact match.  Do you want to see the tiles as well?  If so, I could arrange to have them here at your convenience."

Do you recall if you let -- when you set up the time, if you let Mr. Gross know that you'd like to see the tiles there as well?

A    I do not recall.

Q    Okay.  "I also wanted to let you know that I have received little, if any, cooperation from Paul Kramer in completing many of the items that were on the initial inspection report.  Further, he has refused to warranty the home for the required one year on workmanship and material.  I have attached our letter to him with the punch list for your review.  How do you want me to proceed?  We certainly feel that he's obligated to repair all the items on the list, many of which were from the initial inspection."

My question to you regarding that is:  Do you recall ever discussing that with Mr. Kramer?

A    No, sir, I do not.

Q    Did you ever check with Mr. Kramer to see whether or not he completed any sort of repairs out there?

A    No, sir, I did not.

Q    Okay.  So as of October 16, 2008, you have this fax from Ken Gross to you, right?

A    Yes, sir.

Q    And he's saying, hey, you want me to mail it to you?  And you said, no, I'll come out, right?

A    I probably said something along those lines.

Q    Now you set up, I believe, a time to come out and visit for October 31st.  Do you recall that?

A    I believe that was in an email with Mr. Gross.

Q    All right.  So why don't you look at Exhibit No. 27.  Do you see it?  Are you there?

A    Yes.

Q    From you on February -- Friday, October 31, at 8:43 a.m., "I just left you a voice message to inform you that I cannot meet today at 11:00.  Unfortunately, I am out of town this weekend.  In summary, I will give you a call early next week to schedule a time to get together.  My apologies."  Do you see that?

A    Yes, sir.

Q    Now, do you recall what it was that required

you to go out of town? Was it some sort of emergency, vacation, what?

A It looks like we were scheduled to meet on a weekend. I'm not sure. It appears that way from that. So my wife could have had me doing something at the last minute or I -- something came up. I don't know what it was.

Q Well, you see this was sent on Friday, October 31st?

A Yes, sir.

Q "I just left you a message saying that we cannot meet today at 11:00"?

A Okay. Excuse me. Yeah. For some reason, I couldn't do it that -- I had to do something.

Q We don't know what it was?

A Right.

Q But can we all agree that it wasn't the Grosses' fault that you weren't able to make the meeting that day?

A That was me -- unfortunately, I had set up a time with him that I couldn't make it.

Q Well, can we agree that it wasn't the Grosses' fault that you couldn't make the meeting?

A We can agree to that.

Q All right. Good. So the next -- the email

back to you was on October 31st at 8:57, a few minutes after yours. "No problem, Doug. Just call me next week and we can reschedule. Thanks, Ken." Do you see that?

A    Yes, sir.

Q    Was Mr. Gross accommodating to you?

A    Sure.

Q    Okay. Great. Now, the next thing that happened was you actually went out and -- to look at the property, right?

A    Yes, sir.

Q    Do you recall when you went?

A    I don't. I don't know the exact day or week. Obviously, it looks like it had to be sometime in that next week, or it could have been the following week.

Q    As we sit here today, you don't know whether it was a week or a month after that day, do you?

A    I do not, no.

Q    At the time that you went out there, it was your belief -- you said, I think, that it's your -- that they had started construction?

A    No. I was positive they started construction when I went out there.

Q    I misspoke. I'm sorry. The Grosses had started construction on the addition when you went out there?

A    When I got to the house --

Q    By the time you got there?

A    -- I noticed that they had started construction

Q    Right. And as you sit here today, you can't tell -- or you can't tell us how far along they were?

A    Well, I think I can give an estimate. I mean, I think in my deposition, I thought it was about 50 percent complete, only because there were walls up. I think I -- this is -- I think this is five, seven years ago. So there was like an addition added on over maybe the garage or something, and it was walled up. And you could see they had done some roof work. So it was what we call in the business, it was weathered in. In other words, the outside was done, but none of the inside finishes were in place or anything.

Q    So it's your belief, based on your memory as you sit here today, that it was more than just framing?

A    It was -- well, I may just call it framing and roofing were in place.

Q    Okay. Now, when you were there, you walked the addition; is that correct?

A    Mr. Gross and I walked into the upper area of the construction work. Yes, sir.

Q    And you were offered an opportunity to review

the plans?

A    Yes, sir.

Q    Did you review the plans?

A    You know, sitting here today, I just remember that I was kind of in more of a state of shock because I thought I was going out to look at the -- you know, look at the plans before the construction  And now, all the sudden, the cart was in front of the horse.  I'm looking at the construction, and I haven't even seen the plans yet.  But I did look at the plans.  And did I look at them in detail?  No, I didn't look at them in great detail.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) I'm going to show what is marked as Exhibit 125, but not admitted yet.

MR. ALDOUS:  Do you want me to show you first?

THE COURT:  I take it that defense counsel has already seen it.

MR. ALDOUS:  Thank you, Your Honor.

THE COURT:  You may approach.

Q    (By Mr. Aldous) Let me show you this very unwieldy set of plans here.  And my question to you, sir, is:  Can you tell us if these are the plans you saw

on that day when you were there?

A    There is no way for me to know.  I couldn't tell you.

Q    And -- fair enough.  Let me ask it a little differently.  Is it you don't recall -- no matter what I put in front of you, you wouldn't recall?  In other words, even if I knew these were the plans, you just wouldn't recall?

A    Here's what I recall.  They were documents.  I mean, these are typical plan sizes, but Mr. Gross did have plans.  And we flipped through a couple of pages, and what was the contents I cannot recall.

Q    Okay.  So, to summarize, you looked at plans, they looked like this, but you can't tell if these are them?

A    Correct.

Q    So in the fall of 2007, did you have a child who was looking for colleges at that time?

A    He graduated -- my first child graduated high school in 2009, so the fall of 2000 -- it might be a little early, so I don't know.

Q    I'm sorry, 2008.  I said 2007.

A    Okay.  Yes, sir.  I would say in 2008 my child was probably looking to go to school somewhere.

Q    Do you recall going on some college visits with

your child?

MR. SHAW: Your Honor, I object as to relevance.

THE COURT: Mr. Aldous, what's the relevance?

MR. ALDOUS: There's a -- my clients will testify as to a specific discussion with him concerning college visits and that sort of thing, and I wanted to see if that was within the realm of what he --

THE COURT: I'll give you a little leeway.

MR. ALDOUS: Thank you.

Q (By Mr. Aldous) Were you going on college visits with your oldest child at that time?

A I would probably guess so. Yes, sir.

Q Do you recall discussing that with the Grosses?

A We did. We had some, you know, just friendly chat, but I do not recall the content of the conversation.

Q Okay. Do you recall at any point in time suggesting that you did not like the way the addition looked?

A I think my response to them was -- it was really straightforward and candid. Mr. Gross, I haven't approved these plans. You are -- you know, you've already started construction

Q   You specifically recall that?

A   I specifically recall that.  And then going from there, did we -- did we talk about the improvements and what they looked like?  We walked all around the house.  And I think maybe in a -- in a friendly sense I said, hey, this looks good, you know.  But one thing that does jump out at me is they had also done some work in -- right off the kitchen area, which was part of the existing house.  They were changing part of the existing house and not -- it wasn't new construction

It was some -- lining up some bookcases or TV cabinet or something, and that kind of jumped out at me.  And then Mr. Gross, I believe, told me he had spent maybe 40 or $50,000 more out of his pocket and wanted to know maybe is there a chance that maybe you might work with me on that.  And I did say, no, to that.

Q   Now you're sure that that conversation took place, even though the construction was still ongoing?

A   There is only -- I've only talked to Mr. Gross once to my recollection, and it was at his house on that day.

Q   Is there anything else that you specifically recall other than saying you didn't approve the plans and you saw that there's some movement in the house?

A   The only other thing I specifically recall is

being introduced to Mrs. Gross, who is in the kitchen area as we were going -- I think as Mr. Gross and I were going out the door.

Q   Now, did you ever say to Mr. Gross, you know what, I don't like the way this looks?  I would change this or that or do you have any suggestions as to what you would have done differently even as of today?

A   No.  I think -- honestly, I'm sitting there thinking, wow, did my partner, Van Shaw, approve these plans and I didn't know about it when I walked into this house.  That's what I was thinking.  And I didn't know the answer to that until I walked outside of it because I did say, Mr. Gross, you did not have me approve these plans.

Q   Did you at any point in time, even as of today, say what you believed to be a different way of or better way of doing it, the addition?

A   I don't think I would have.  I mean, everybody has got their own opinion of what they like.  I don't know that I would have said something like that.

Q   All right.  Now the plans continued.  That is, the building continued, and it was complete.  And if you would, turn to Exhibit No. 30.  Are you there, sir?

A   Yes, sir.

Q   This is dated February 23rd, 2009, sometime,

obviously, after the fall. It says, "Doug, I'm finished with the addition and just wanted your final inspection and approval. I ended up going above and beyond some of the items, including a larger wet bar," you know, et cetera, et cetera. Do you see this?

A    Yes, sir.

THE COURT:  Can the jury see behind that sign?

MR. ALDOUS:  I'm trying not to move it.

THE COURT:  No, no.  I'm talking about your --

MR. ALDOUS:  Oh, sorry.  Permission to move that?

THE COURT:  Yes, you may.

Q    (By Mr. Aldous) You see at this point in time, he says in that last paragraph, "In total, I'm approximately 20 to 25,000 over our budget. Of course, I will eat that amount but wanted approval on everything else.  In general, I would like for you to walk the property and provide your overall approval. I showed it to Phoebie and Jeff in the sales office, and they think it is really going to add value as we originally planned.  Please let me know when you can come by.  I hope all is well with you."  Do you see that?

A    Yes, sir.

Q    Now, you never went by to look at it; is that correct?

A    No, sir.

Q    You never responded to this by saying, hey, listen, you already breached the agreement by not giving me the plan?

A    I think my response maybe to the Grosses at that time was you're going to -- you're dealing with Mr. Shaw after this point. I didn't -- this probably got sent to me, and I don't know if I did forward it on to Mr. Shaw.  I presume I did, but he was going to handle it from here on out.

Q    Well, you see that this is dated February 23rd, 2009?

A    Yes, sir.

Q    I show that the -- that when you said that Van was doing it wasn't until they actually exercised the option in April, late April.  Do you have anything to show differently?

A    I don't have anything to show differently, other than I do know this.  I think I had a conversation when I left the Grosses' house after looking at the plans.  I immediately got in my car and I called Van Shaw.  And I said, "Van, did you approve the plans for the Grosses to add this addition on to the house?"

And he immediately said, no, and he then said, "Hey, Doug, let me take it from here." And that's really about when I kind of stepped out of the -- you know, the role of being the liaison on this project.

Q   Do you recall sending an email back to Mr. Gross in response to this February 23rd, 2009, email saying, "Hey, I'm not dealing with this anymore. Mr. Shaw is"?

A   I may have, but I do not recall.

Q   Let me put it this way. Well, if you will, look at Exhibit 35. You see that?

A   Yes, sir.

Q   The one on the bottom says, "Doug, I hope this message finds you well. We sent this notice via fax as well, but wanted to be sure you received this. Per our contract dated 6-12-09 to purchase the home located at 2004 White Wing Cove in Westlake, please be advised that we have hereby notified you of our decision to exercise the option to sell back the property for the original sales price of $2,851,871 on or before September 1st, 2009. As such, please advise us if you intend to market the property or if you would like to discuss any other options, including an early buyback or otherwise."

Now, it would appear from this email from Betsy Gross that they did not know at that point in time

that you were asserting that they somehow breached the agreement by not providing you plans and specifications Would you agree with that?

A    I think they would have known they breached the agreement by not giving me plans and specs because they didn't.

Q    So they just ignored that in this email?  Is that what --

A    They absolutely ignored it in the process of the contractual obligation.

Q    Okay.  Then your response on May 1st, 2009, was, "I forwarded the attached onto Van Shaw.  He is handling this matter."  Now, sir, can you tell the jury another exhibit that shows that that -- that before this date, May 1st, 2009, you told the Grosses to deal with Van Shaw?

A    I don't think I had any discussions with the Grosses to tell them to deal with Van Shaw.

Q    Whether by email or otherwise?

A    No.  I didn't have any case to talk to -- I don't think to Mr. Gross or anybody talked to me to tell them to deal with Van Shaw.

Q    All right.  So your testimony earlier when you received the final walk-through approval type letter from Ken Gross in February of 2009, I didn't see any

reference anywhere that said you had referred them to Van Shaw as a result of that email.

A    I think my response to you, sir, was that at that point in time, that this matter had already been referred to Van Shaw from my being to Van Shaw, I think is exactly what I said to you.

Q    All right. Maybe I just didn't hear it right. But what I'm asking is:  You didn't tell the Grosses February 23rd, when you received the email saying, "I'm finished.  Come look," you didn't say this matter has been turned over to Van Shaw?

A    I hate to sound redundant, but I met with the Grosses one time.

Q    Well, even if you didn't --

A    And I met with them at --

Q    -- meet with them, you could have sent them an email.

        THE COURT:  Wait a minute.  You cannot both talk at the same time.  The court reporter can only take down one person.  So show one another the courtesy of allowing the other to finish before you start.

        MR. ALDOUS:  I apologize, Your Honor.

Q    (By Mr. Aldous) Mr. Hickok, just -- whether you spoke to them directly or not, did you send them an email, a letter, a fax, anything to indicate that the

matter had been turned over to Van Shaw prior to this May 1st email that I showed you?

A    I don't believe I did.  And I don't believe I had an obligation to tell them that.  I think Mr. Shaw started communicating with them.

Q    Okay.  I just -- I'm probably not asking my questions very good.  But -- so did you respond in any way, email, voice, or otherwise to the Grosses to their request for you to come back and look at the property on final walk through in February of '09?

A    As I said, no, sir.  I did not respond to that email.

Q    Thank you.

            MR. ALDOUS:  May I approach, Your Honor?

            THE COURT:  You may.

Q    (By Mr. Aldous) Now, when you turned this matter over to Van Shaw as of May of 2009, do you know what reasons Mr. Shaw gave the Grosses as to why VSDH wasn't going to buy it back?

A    Go ahead.  Please restate that one more time.

Q    Yeah.  That probably wasn't a good question.  Let me rephrase it.  Do you know what Van Shaw told the Grosses as to why VSDH wasn't going to buy it back?

A    I do not.

Q    I believe that you were copied on this.  Turn

to Exhibit 65. Are you there?

A    Yes, sir.

Q    So on May 18th, the bottom email, it shows Betsy Gross emailing Van Shaw, May 18, saying, "Hi, Van. Thanks for your reply. I'm traveling this week," blah-blah-blah. And then there's, "As mentioned, we are very interested in discussing several options regarding the buyback and below are several possible steps. Obviously, we can follow the existing terms and consummate the buyback in September. However, we are very interested in one of several alternatives execute an early buyback with a discount off the buyback price for said early termination, execute an early buyback but include a rental agreement where we stay in the home up until September or even longer depending on the terms, C, an outright purchase by us at a discounted price. Recall, we gave full asking price at the time when a significant discount off asking price would have been realistic since the home had been sitting vacant for two years. Further, as we know too well, the economy in home sales have seriously at that time" -- I think that probably should say seriously tanked since that time, but anyway.

MR. CHAIKEN: Objection, argumentative.

THE COURT: Overruled.

Q (By Mr. Aldous) "A combination of one of the above and/or purchase of one Lot 111, which we previously mentioned to Doug but never heard back. Let me know next time you and ideally Doug will be out in this direction so we can set up a time to meet, maybe after you give Frank another run for his money on the golf course."

Now above that is Mr. Shaw's statement. "Betsy, thank you for your email today. I'm glad to talk, but I want to make sure you're aware that the entity that sold the home is not financially solvent. So that will no doubt have a huge impact on our discussion. Not sure when I will be out that way, but maybe we can meet somewhere else. I'm not sure where your office is, but that may be a possibility." Do you see that?

A Yes, sir.

Q Now at that time, was VSDH financially insolvent?

A No. I don't know what -- I don't know what Mr. Shaw is saying from a standpoint of having few assets that had some assets. Did it have any cash? It had no cash.

Q Do you have your deposition up there?

A I don't have it with me.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) So this is a copy of your deposition I'm handing you so that you can look at it and refer to it if you need to.  All right?

A    Okay.

Q    To your knowledge, has VSDH been --

THE COURT:  Mr. Aldous?

MR. ALDOUS:  I'm sorry, Your Honor.

THE COURT:  What are you attempting to do?

MR. ALDOUS:  I'm going to ask him the question again.

THE COURT:  Okay.  Page and line?

MR. ALDOUS:  Oh, this is at Page 54, Line 20, but I'm not impeaching him yet.  I'm just asking a question.

THE COURT:  I understand, but you need to show it to the Court.

MR. ALDOUS:  I'm sorry.

Q    (By Mr. Aldous) Just forget the deposition. Please answer this question.  To your knowledge, has VSDH been insolvent since the time of this transaction at any point in time?

A    You want me to answer that?

Q    Yes.

A    Absolutely not.

Q    Perfect. Do you know why Mr. Shaw was telling the Grosses that the entity that sold the home is not financially solvent?

A    I don't know if Mr. Shaw looks at it the same way I do.  There's a -- you know, if you -- you could have a hundred million dollars in property and you can't go buy a Coke because you don't have any cash.  So I don't know what Mr. Shaw is thinking.

Q    I see.  So maybe y'all just think differently and that maybe a better way to say it would have been we are cash poor at the moment?

A    That would have been more accurate.

Q    All right.  If you would, take a look at Exhibit 54.  It may not be in that notebook.  I'm sorry.

A    It is not.

MR. CHAIKEN:  I'm sorry.  I didn't hear the reference number.

THE COURT:  Fifty-four.

MR. CHAIKEN:  Five, four?  Thank you, Judge.  Forgive me. I didn't rise when I addressed the Court.  Forgive me.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  This has not been admitted

yet.

THE COURT:  You may approach.

Q   (By Mr. Aldous) Mr. Hickok, I'm handing you what's been marked as Exhibit 54.  Would you take a look at it for just a second?

A   Yes, sir.

Q   Is this a series of emails on which you were copied between the Grosses and Mr. Shaw?

A   Yes, sir.

MR. ALDOUS:  Your Honor, we move to admit Exhibit 54.

THE COURT:  Any objections?

MR. CHAIKEN:  Objection, lacks foundation, hearsay.

THE COURT:  Overruled.

Q   (By Mr. Aldous) So if we turn to the last page and start with the oldest email first on Exhibit 54, it's dated June 2nd, 2009.  Do you see that?

A   Yes, sir.

Q   By the way, on the two lines, it says Van Shaw and D. Hickok at Marquisgroup.net.  Is that one of your companies, Marquis Group?

A   Yes, sir.

Q   Okay.  So that is your email address?

A   Yes.

Q    It says, "Dear Van and Doug, I heard you guys were out here beating up on Wally last week." Now that's just a way of saying you were playing golf with him, not that you were really beating Wally up, right?

A    I believe so.

Q    I mean, you would remember if you really beat him up, right?

A    Wally's a lot bigger than I am.

Q    All right. Since you come here often, can we set up a time to get together with both of you to discuss the buyback? As you are aware, we have timely invoked the buyback option and willfully cooperate with any efforts to list the home since our listing time expired as of the buyback notice. I suspect you will want the home listed and shown, and we'll be happy to help with those efforts. It is our understanding that VSDH Vaquero Venture is still in existence; although, you have stated that it is no longer financially solvent. Regardless, both of you have personally guaranteed the buyback in the event VSDH fails to perform under the terms of the buyback option. As I'm sure you can understand, we need to start looking for a new home immediately so that we can move out by September 1, which is only 90 days away. Time is of the essence. So please let us knows when it's a good time

and place to meet." You see that?

A    Yes, sir.

Q    Now the response was from Van Shaw, and it doesn't reflect as to whether or not you actually received it. But if it was a reply, it says, "Thanks for your last email. In reply, I do not recall that Doug or I personally guaranteed the agreement as you state and do not have a copy of the same. I ask that you send me a copy of that to me. I will need to examine that and the underlying agreement you refer to." Do you see that?

A    Yes, sir.

Q    Now, first of all, you had already sent this agreement over to Mr. Shaw, hadn't you?

A    This agreement, I'm not sure what you're referring to.

Q    Well, the buyback agreement and all that.

A    Again, you're going to have to be more specific for me.

Q    Well, how many agreements did you have with the Grosses?

A    Well, I didn't even know that you were talking about an agreement with the Grosses. You said, "this agreement."

Q    I'm sorry. Let me rephrase.

A   Be more specific, please.

Q   I'll be more specific.  You had already emailed the agreement to Mr. Shaw as soon as you received the first fax saying we want to exercise a buyback?

A   Are you talking about the buyback agreement? You're saying, "the agreement."  The buyback agreement, the contract?

Q   Isn't it true, sir, that you sent both the contract and the buyback provision?

A   Mr. Shaw probably had a copy of the contract and the buyback agreement or the addendum, the whole contract from the day we closed the contract with the Grosses.

Q   Do you know why Mr. Shaw is asking for a copy of that from Mrs. Gross?

A   Well, the -- make sure I understand this correctly, Mr. Aldous.  You're talking about the contract or the agreement.  He's talking about a guarantee agreement, and there isn't a guarantee agreement that exists.

Q   There isn't?  That's interesting.

If you would turn to Page 92 -- or Exhibit 92.  I'm sorry. Do you see the email from you to Van Shaw, Gross contract for sell for your review?

A   Yes, sir.

Q    Do you see that?  Do you see the date on it, April 29, 2009?

A    Yes, sir.

Q    That's one day after they faxed you the notice that they wanted to exercise the buyback?

A    Sure.

Q    Did you see all the stuff attached to it?

A    Yes, sir.

Q    It includes the whole contract that was executed, right?

A    It does, but it doesn't include a guarantee agreement.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) On Exhibit 3 -- or you can look even on Exhibit 92, the one that you sent over to Van Shaw.  It has in the addendum, Addendum A, the specific paragraph that is shown right there in front of you on the easel. You see that?

A    I can't see the easel, but I can see the paragraph.

Q    Well, here.  I'll put it up here for you.  Doug Hickok and Van Shaw as partners in VSDH Vaquero, Ltd., each hereby personally guarantee seller's obligations under the buyback option granted from VSDH to the buyer

hereunder. In the event VSDH fails to perform fully under the terms of the buyback option, each of its partners set forth herein above shall be personally responsible jointly and severally to perform the obligations of VSDH under the buyback option. Do you see that?

A    I see the statement. Yes, sir.

Q    What do you call that?

A    A statement.

Q    Just a statement?

A    Yes, sir.

Q    Does it say that you personally guaranteed the seller's obligations?

A    It says -- it is a statement that says that, but there is no executed agreement. Mr. Aldous, I've been with real estate for a long time, and I have signed lots of guarantees. And a guarantee is a separate form. As I told Mr. Buttemiller -- I mean, we would look at guaranteeing this project, but I had to get Van to agree, Number one. And I had to have my attorney review the guarantee agreement. We never got the guarantee agreement. And, you know, Van wasn't about to guarantee this thing, and neither was I.

Q    Is that -- is it your testimony that because of your experience, you know that this isn't a proper

contract term?

A    Absolutely.

Q    Let's just run through this.  Does this at least appear to say from a contract's perspective that you and Van Shaw each personally guarantee sellers -- that is VSDH's obligation under the buyback option?

MR. CHAIKEN:  Objection, Your Honor. Calls for a legal conclusion as phrased.

THE COURT:  Overruled.  He said he's familiar with this -- this process and what a guarantee looks like.  So I'll allow him to answer based on his personal knowledge.

A    Again, restate the question.

Q    (By Mr. Aldous) Sure.  You would agree with me that at least the way this is worded, you, Doug Hickok, and Van Shaw personally -- each personally guarantee VSDH's obligations under the buyback option?

A    It -- the wording, yes, verbatim, the way you read that, that says that.  But a guarantee has to have a personal signature attached to it, and I don't think I can speak as VSDH for Mr. Shaw.  Or if it says Mr. Aldous guarantees this, that doesn't mean anything. It has to have a signature attached to it.

Q    Mr. Hickok, you're not a lawyer, are you?

A    No, sir.

Q    Did somebody tell you that you wouldn't be responsible on this guarantee if you didn't sign it in a certain way?

A    No, sir.  I knew that, that you have to have an agreement.  You have to have a guarantee agreement like the bank puts in front of me or I would put in front of anybody else that says I personally guarantee this.

Q    All right.  So that's your personal belief, right?

A    That's my personal belief.  I'm not a lawyer, though.

Q    All right.  So why didn't you just cross this out?

A    There was no reason to cross it out.

Q    Well, Exhibit No. 1, which has previously been admitted, is a letter or fax from Ken Gross to John Buttemiller dated 5-25-07.  That is during the negotiation time for this sale of this contract, right?

A    Right.

Q    And this says in here, "I've marked a insert. When completing the improvements, buyer will review with seller the plans," et cetera.  You want to rely on that one, right?

A    Okay.

Q    This says, "We would like to suggest an

addendum number 4 that reads, "Doug Hickok and Van Shaw, person -- as partners in VSDH Vaquero Venture, Ltd., each hereby agree to personally guarantee seller's obligation under the buyback option granted by VSDH to buyer hereunder."

A     Yes, sir.

Q     So, you see that it was important enough to Mr. Gross to include within the contract the addendum?

A     I didn't see the rest.  Could you put that top -- I don't even know where that document came from. Could you go all the way to the top?

Q     Yeah.

A     That's between --

Q     It's number one in your notebook if you want to look at it.

A     It's to John -- to John from who?

Q     From Ken Gross.  You see that?

A     Okay.  Now I can see the whole thing.  Okay. All right.  Right.  And Mr. Buttemiller called me about that.

Q     All right.  And then it showed up in the contract?

A     Yes, sir.

Q     And your initials are right down there at the bottom, right?

A   My initials are on behalf of the VSDH Venture just like --

Q   Well, did you --

A   -- it is on every other page of the contract.

Q   I apologize. I didn't mean to interrupt you.

But what I'm saying is, if you believe that you could not be held responsible under this personal guarantee, why didn't you cross it out and say this isn't effective?

A   I didn't have to because there's no guarantee. You have to have a guarantee agreement, Mr. Aldous. I know that much.

Q   Are you saying that you wanted the Grosses to believe that this was part of the contract when you believed that it wasn't?

A   No, sir. I'm not saying that whatsoever. I am saying that I expected to go to closing and there would be a guarantee agreement or something there at closing, and there was never a guarantee agreement.

Q   So you agreed with it, but the fact that there was no guarantee agreement meant you were off the hook?

A   No. That just means I'm not going to -- I'm not raising my hand and going I didn't -- there's no guarantee agreement here at closing. I'm just signing the documents I'm supposed to sign at closing.

Q    So is it kind of like, "You know what?  They're not going to make me do it.  Then I'm off the hook"?

A    Well, you're not giving the whole state of affairs here.  There's two things.  I told Mr. Buttemiller that Van Shaw -- I had to talk to Van Shaw.  The intent was there to guarantee this -- this --

MR. ALDOUS:  I apologize, Mr. Hickok.  But I'm going to object because that is hearsay when you're talking about what was said outside of court.

THE COURT:  Sustained.

MR. ALDOUS:  And I also move to strike and have an instruction provided.

THE COURT:  Motion to strike is granted.  The jury is to disregard any statements that Mr. Hickok says that Mr. Shaw made.

Q    (By Mr. Aldous) Sir, Mr. Hickok, I just want to know.  You knew that this was a provision in the contract that was important to the Grosses because they added it, correct?

A    It was a provision that the Grosses wanted in the contract.  Yes, it is.  Did we agree to it?  No, we never got to where we agreed to it because we never signed a document that outlines what the guarantee is all about.

MR. ALDOUS:  Objection, nonresponsive

portion after "yes."

THE COURT: Sustained. It is now 2:30. We'll take a ten-minute recess. During this recess, the jury is under the same instructions you've been previously given. You're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors.

All rise. Jury is excused.

(Jury exits the courtroom)

THE COURT: You may step down, Mr. Hickok.

We stand in recess.

(Recess taken)

MR. SHAW: Your Honor, we had a discussion a moment ago in the Court's chambers, and there was some discussion about whether or not a conflict has arisen with me as a witness. And it sounds like now that conflict has arisen. I -- the Court inquired about waiver. I cannot and VSDH will not waive that conflict. So given that, I think I need to move for a mistrial and VSDH will need to hire other counsel.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, the defense has waived any of this argument by, number one, originally getting a continuance in this court based upon the

potential for a conflict, then taking no action after the Court gave them a continuance, then having me ask them repeatedly, "Are you going to withdraw?" and then not withdraw, then have me file a motion to disqualify Mr. Shaw on the basis of his representations to the Court, and have them then file a mandamus to have it set aside, have the mandamus granted and set aside, and then come back in and sit here since the time that the Court had granted -- that is the appellate court granted the mandamus and done nothing. Whatever it is, it's been waived.

Mr. Shaw's not produced an agreement, the VSDH agreement that calls for however many votes or whatever. And there's no evidence before you as to whether or not it could have been waived or not. But the only thing we do know is this has now come up about four or five times and always been used to avoid resolution to this case, and it should be just summarily denied by the Court.

MR. CHAIKEN: May I just make one comment?

THE COURT: One.

MR. CHAIKEN: Mr. Aldous referred to the defense, okay, has done this, that, and the other thing. I have not made any motion. The only issue that is before -- that pertains to Mr. Hickok, who is my client,

is the -- as the Court indicated, there may be a conflict emerging. And it may be to a point where there needs to be a waiver of the conflict. That's what we discussed in chambers. And I would represent to the Court that Mr. Hickok -- as you would expect me to have done, I conferred with him, and there's no waiver of any such conflict. There never has been. And I've always indicated I intended to call Mr. Shaw as a witness. I think the only fact difference is that today Mr. Aldous, who had previously said he probably would not call him, also indicated that he intends to possibly call him as well.

THE COURT: All right. This is what the Court's going to do. It is now 3:17 p.m. I will recess for the afternoon. The parties will be allowed to brief the issue. I will hear it first thing in the morning.

MR. SHAW: Thank you, Your Honor.

THE COURT: All rise. Bring in the jury.

(Jury enters the courtroom)

THE COURT: You may be seated.

Ladies and gentlemen of the jury, I'm sorry that we kept you back in recess longer than anticipated, but some issues have come up that require my making some rulings before any further evidence may be presented to you. As a result of that, we're going

to recess today. You will return tomorrow morning at 9:30 outside in the hallway. Someone from the court will let you back into the jury room at that time.

During the overnight recess, you will be under the same instructions that you have been previously given. You're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors.

All rise. The jury is excused for the day.

You may step down, Mr. Hickok.

(Jury exits the courtroom)

THE COURT: You may be seated.

All right. Mr. Chaiken?

MR. CHAIKEN: Your Honor, I just want to make clear what Mr. Hickok's position is on this matter that has arisen this afternoon by explaining to the Court that it has always been and remains our position that Mr. Shaw is a witness that we intended to call. I've made that clear from day one. I've never, never retreated from that position. I've also made clear from day one that to the extent that there are any conflicts of interest arising from that situation, Mr. Hickok was not waiving any conflicts. He's not --

THE COURT: That part has not been made clear.

MR. CHAIKEN: There has been prior discussion, I believe, in connection with the disqualification where I made clear to the Court that he was not waiving any conflicts that might exist. When the Court brought the issue up in chambers a few minutes ago, I again conferred with my client. Mr. Hickok does not waive any conflicts.

Now, having said that, I object to the continuance that's been requested. We're here. We are ready to continue forward. Mr. Hickok is prepared to go forward and try the case. But what happens is a matter between the Court and Mr. Shaw, both in his capacity as a witness, as a partner in the partnership, and as counsel of record. And so I just want the Court to understand I'm not joining in the motion and I'm prepared to move forward. But we're not waiving any conflicts that arise in connection with the matter.

So I just want the Court to be aware of what Mr. Hickok's position is because Mr. Aldous tried to lump the defendants together in this matter, and we're not lumped together with respect to where we're at. Thank you.

THE COURT: Do you have anything in

response, Mr. Aldous?

MR. ALDOUS: Your Honor, I would just say that I'll be able to produce to you about ten cases that say that if you don't move to enforce a -- an issue like this that you waive it. And this has been black letter law for a long time. And although Mr. Chaiken says that they've held onto and they don't waive anything, the law says differently. And the law's going to be the same with respect to VSDH, who represents -- who is represented by Mr. Shaw. So I'll be happy to produce those cases to you, and I'm confident I will.

THE COURT: We'll see you tomorrow morning. Let's see. What time? 9:30.

MR. SHAW: All right. Thank you, Your Honor.

THE COURT: Okay. We stand in recess.

(Proceedings concluded for the day)

STATE OF TEXAS          )

COUNTY OF DALLAS        )

I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 10th day of October, 2015.

/s/ Cathye G. Moreno

Cathye G. Moreno, Texas CSR #6076
Expiration Date:  12/31/16
Official Court Reporter
County Court at Law No. 1
600 Commerce Street, Suite 550
Dallas, Texas 75202
  cathyemoreno@sbcglobal.net
(214)653-7496

# TAB 26

REPORTER'S RECORD
VOLUME 4 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

| | |
|---|---|
| VSDH VAQUERO VENTURE, LTD. | )IN THE COUNTY COURT |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| V. | ) |
| | ) |
| KEN GROSS and BETSY GROSS | )AT LAW NO. 1 |
| | ) |
| Defendants/Counter-Plaintiffs, | ) |
| | ) |
| V. | ) |
| | ) |
| EVAN L. SHAW and DOUGLAS M. HICKOK | ) |
| | ) |
| | ) |
| Intervenors/Counter-Defendants, | )DALLAS COUNTY, TEXAS |

---------------------------------------------------------

**TRIAL ON THE MERITS**

---------------------------------------------------------

On the 16th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine. Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

- AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

- AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.

**INDEX**

| **JUNE 16, 2015** | **PAGE** | **VOL.** |
|---|---|---|
| PROCEEDINGS............................. | 4 | 4 |
| MR. SHAW'S MOTION FOR MISTRIAL........... | 4 | 4 |
| GARCIA HEARING BY MR. SHAW............... | 6 | 4 |
| COURT'S RULING.......................... | 18 | 4 |

GROSSES'

| WITNESSES | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Douglas Hickok | 23, 100 121 | 35,67 115,117 | -- | 4 |
| Ken Gross | 123 | 172,194 | -- | 4 |

| | PAGE | VOL. |
|---|---|---|
| END OF PROCEEDINGS....................... | 210 | 4 |
| REPORTER'S CERTIFICATE................... | 211 | 4 |

**EXHIBIT INDEX**

**DEFENDANTS'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 115 | Luxury Home Magazine Featuring Pictures of the Property | 209 | 210 | 4 |
| 116 | Photograph of the Property | 209 | 210 | 4 |
| 125 | House Plans for Improvements | 130 | 130 | 4 |

**PROCEEDINGS**

June 16, 2015

(Off-the-record discussion held)

THE COURT:  All right.  You wanted to say something, Mr. Shaw.

MR. SHAW:  Thank you, Your Honor

Comes now VSDH and files this -- and Van Shaw as counsel files this motion to withdraw and for a mistrial on the following facts:  One, yesterday approximately 2:50 p.m. in chambers, Mr. Aldous followed by Mr. Chaiken advised the Court that they were planning to call me individually as a witness.  That was on the heels of Mr. Hickok testifying regarding VSDH and particularly about the solvency or insolvency of the same and then on the matters of dealing with the Grosses on the buyback issue and lateraling all of that communication and correspondence to Van Shaw to handle for the -- for VSDH.

I then became concerned over DR 3.08.  The Court asked the parties, particularly Mr. Chaiken and VSDH, if they would waive any objection to Van --

THE COURT:  The Court did not ask if you would waive.  The Court indicated that it might be a circumstance where waiver would be appropriate --

MR. SHAW:  I stand corrected.

THE COURT: -- or that a conflict had arisen.

MR. SHAW: I stand corrected. And Mr. Chaiken advised that Mr. Chaiken would not waive any conflict. The Court recessed so the parties could look into that issue. And I believe that the testimony that now -- Mr. Aldous today has advised the Court Mr. Aldous will not call me as a witness. Mr. Chaiken has continued to advise the Court today that Mr. Chaiken will call me as a witness. I previously had filed a motion for continuance based on 3.08. After reviewing the motion and after dealing with Mr. Aldous and the Grosses, I did not think my withdrawal was required at that time.

Mr. Aldous moved the Court for my withdrawal. The Court granted it, and the Court of Appeals subsequently ruled that the record was insufficient to require my withdrawal at that time. I did not believe my withdrawal was required until yesterday on the heels of Mr. Hickok's testimony. And I want to call Mr. Chaiken as a witness to testify as to the facts that I will be called on. May I do that?

THE COURT: Are you asking for a Garcia hearing?

MR. SHAW: Yes, Your Honor.

THE COURT: You may do so.

MR. SHAW: I'm sorry?

THE COURT: I said then you may do so.

MR. SHAW: Okay. Thank you.

Mr. Chaiken, will you please --

THE COURT: Mr. Chaiken, raise your right hand.

(Witness sworn)

MR. SHAW: Mr. Chaiken, would you please state your name?

MR. CHAIKEN: Kenneth Chaiken.

MR. SHAW: You're a lawyer for Doug Hickok in this case?

MR. CHAIKEN: I represent Mr. Hickok in his personal capacity in this case.

MR. SHAW: You have expressed an intention to call me as a witness in this case. Is that accurate?

MR. CHAIKEN: I have previously and once again expressed my intent to call you as a witness in this case. The circumstances as to why I'm calling you now are different than why I was going to call you previously and my expectation as to why I would call you previously.

MR. SHAW: Did the Court of Appeals get it wrong when they said that you had expressed an interest to call me as a rebuttal witness - possibly as a

rebuttal witness only?

MR. CHAIKEN: I'm not commenting as to whether the Court of Appeals got something right or wrong. I previously had expressed an intention to call you as a rebuttal witness with regard to specific issues.

MR. SHAW: All right. And then based on the current state of affairs and Mr. Hickok's testimony of yesterday, will you please state the inquiry that you will make of me in general?

MR. CHAIKEN: Are you asking me to describe the nature of the testimony that I am anticipating eliciting?

MR. SHAW: I am.

MR. CHAIKEN: Well, yesterday, in response to questions that were asked of him by Mr. Aldous, Mr. Hickok was referred to an email that you had written in which you had stated that VSDH Vaquero, Ltd., the entity, was insolvent at a time when you were solely and exclusively handling, for lack of a better word, responses to inquiries that were made by the Grosses regarding whether VSDH, the obligor under a buyback obligation, was going to perform the buyback that they had requested VSDH to perform.

Mr. Hickok was asked whether he agreed

with you in that statement that you had made whether VSDH was insolvent at the time that you wrote that memo, which created an adversarial response between you on that issue, at least as stated in your email, and Mr. Hickok's version as to his knowledge of what the partnership's solvency was at that time.

And because the issue relates to whether the Grosses were justified or permitted to sell the property before the buyback date and they, I expect, are going to argue that they were entitled to rely upon your statement concerning solvency as to ability to perform the buyback, meaning the partnership, I need to have you testify about the facts and circumstances that existed at the time, including any additional communications that you may have had on behalf of the partnership on the buyback issue.

And there will be a probability at the very least that your testimony, while you are serving as an advocate for the partnership, will be contrary to testimony given by the other partner. And you will be called upon to continue acting as an attorney pending a judicatory proceeding, having given testimony that is adverse to your client because it conflicts with the other member of your client and the testimony that he has given. And the purpose of the testimony relates to

the ultimate issue of, as I think you've described it, first breach.

MR. SHAW: Do you believe there's a genuine need for my testimony?

MR. CHAIKEN: You are swarming all over this issue, okay. Your conduct, okay, as the sole and exclusive actor on behalf of the partnership, has been called into question. Mr. Aldous has called a witness to contradict you, okay, and or who has contradicted you on a statement that you made that forms the basis of his client's alleged reliance and actions.

It is absolutely material for the jury to hear what happened, what you meant, why it happened the way it did, and the totality of the circumstances Otherwise, it remains completely unaddressed by the witness who -- which is you, who has the sole knowledge of those relevant facts.

MR. SHAW: Do you believe that will be material to the -- VSDH and its case and defense?

MR. CHAIKEN: I believe it will be material because VSDH has a defense, okay, that has been asserted that involves whether or not it had an obligation to buy back the property under this buyback option. And that defense is crucial to avoid any claim for breach of the buyback obligation.

Now that -- that benefits Mr. Hickok as well, okay. And so it's not only essential on behalf of VSDH, but it's also essential on behalf of my client with regard to his defense as well because those defense -- that particular defense is a common defense, a shared defense. But it's essential to establishing the defense of the partnership as well as any guarantor, the partnership obligation.

MR. SHAW: Do you believe it would be prejudicial to the interest of VSDH?

MR. CHAIKEN: Well, if you're called upon to testify on an essential fact related to that defense and your testimony is contrary to the testimony given by the partnership already, okay, by Mr. Hickok -- the question wasn't whether he was insolvent. It was whether the partnership was insolvent. Then the lawyer representing the partnership in this case is going to be called upon to continue advocating the defense having given testimony that is adverse, okay, to the partnership because it contradicts the other witness.

And if another lawyer was standing here handling that issue, then you wouldn't have the problem that is encompassed from my understanding of Rule 308. But, again, I didn't intend to call you on these issues until Mr. Hickok took the stand and Mr. Hickok was asked

to comment on whether he agreed with what you had stated in an email.

MR. SHAW: Did you anticipate that was coming?

MR. CHAIKEN: Well, I heard Mr. Aldous say that he didn't think that was a material issue. But, nevertheless, it was testimony that he elicited yesterday for a specific person.

THE COURT: Nonresponsive. Yes or no, Mr. Chaiken?

MR. CHAIKEN: I had not anticipated calling you on that issue prior to yesterday when the need arose to have you explain the email, et cetera.

THE COURT: Yes or no?

MR. CHAIKEN: I had not anticipated him prior to yesterday. No.

MR. SHAW: Pass the witness.

THE COURT: Mr. Aldous?

MR. ALDOUS: Mr. Chaiken, you said that there was a probability that Mr. Shaw will give testimony that will conflict with Mr. Hickok. Is there anything you're speaking of other than the solvency issue that was in the email that was discussed with Mr. Hickok?

MR. CHAIKEN: There is a possibility of

some other issues.

MR. ALDOUS: Exactly what do you say that is going to be elicited from Mr. Shaw that is in conflict with Mr. Hickok?

MR. CHAIKEN: I have another issue of concern. But until the testimony has been elicited from Mr. Hickok, I can't say whether or not that need arises.

MR. ALDOUS: So, as of right now, the only issue that you say that there's a conflict of evidence is relating to the issue that Mr. Shaw said that VSDH was insolvent and Mr. Hickok testified that it was not insolvent? Yes or no?

MR. CHAIKEN: I can't answer your question as a yes or no based upon the way you phrased it.

MR. ALDOUS: What about my question is somehow confusing?

MR. CHAIKEN: Well, you asked me about an issue, and then you talked about insolvency. The issue is the defense and how that testimony on insolvency relates to the defense.

MR. ALDOUS: No. Let me ask the question again because I probably didn't ask it right.

MR. CHAIKEN: Okay.

MR. ALDOUS: What fact do you expect to elicit from Mr. Shaw that is in conflict with what

Mr. Hickok said other than the issue of the solvency of VSDH on or about May 18, 2009?

MR. CHAIKEN: Well, if Mr. Hickok states what he stated in his email -- I'm sorry. Mr. Shaw states what he stated in his email, then I expect that he is going to testify directly in conflict with what his client representative, Mr. Hickok, at least representative for purposes of that testimony, testified on the question of insolvency. And I expect that there may be -- there may be some other adverse points that are raised through Mr. Shaw's testimony concerning what he had communicated to the Grosses, but I don't know specifically what those are until I ask him the questions.

MR. ALDOUS: So, to summarize, the only issue of which you're aware right now in which Mr. Shaw's testimony might be adverse to Mr. Hickok's testimony is the issue relating to the solvency of VSDH as it's reflected in the email?

MR. CHAIKEN: No, that's not correct.

MR. ALDOUS: Oh, my God. Objection, nonresponsive.

THE COURT: Sustained.

MR. ALDOUS: Can you answer the freaking question or not? Excuse me.

THE COURT: That is inappropriate, Mr. --

MR. CHAIKEN: You know, I resent that because your question was "correct or not"

THE COURT: Mr. Chaiken, I don't care if you resent it. Just answer the question.

MR. CHAIKEN: It's not correct. Your question was: Was it correct?

MR. ALDOUS: I just want to know -- so can you tell the Court -- can you articulate right now what issue you're going to elicit from Mr. Shaw that is going to conflict with Mr. Hickok's testimony, other than the issue relating to the solvency of VSDH? If you can't articulate, say you can't.

MR. CHAIKEN: At this time, that's the specific fact that I can point to that would be adverse to the interest of the partnership

MR. ALDOUS: And would you agree with me that the email that is currently in evidence that reflects that Mr. Shaw said that VSDH is insolvent in an email to the Grosses has been in this case since prior to 2013?

MR. CHAIKEN: Well, first of all, the email doesn't say that VSDH is insolvent. It says that VSDH is not solvent, which may have a different meaning than insolvency. Second of all, it has been in the

case; but my need to call Mr. Shaw to testify about what he meant didn't arise, okay, until Mr. Hickok responded to your question about insolvency yesterday.

MR. ALDOUS: So when Mr. Shaw explained what he meant in his email, how is that harmful to either Mr. Hickok or VSDH?

MR. CHAIKEN: If he testifies that the entity was insolvent, okay, on the date that he wrote that email, then he is testifying adversely to the -- and giving testimony that is adverse to the partnership because the other partner has already testified that it is not and was not insolvent at that time. So you have a conflict between the two partners, one of whom is continuing to serve as the advocate for the partnership which would be prejudicial to have the advocate testifying adversely to the interest of the partnership on a material defense.

MR. ALDOUS: Is it also possible that Mr. Shaw will give testimony which is entirely consistent with Mr. Hickok's statement that insolvency could mean cash poor as opposed to traditional insolvency?

MR. CHAIKEN: It is possible that Mr. Hickok -- I'm sorry -- Mr. Shaw will testify that what he said in the email isn't what he meant and that

the jury will perceive him to be other than truthful with respect to --

THE COURT: That's not the question.

MR. CHAIKEN: It's possible he could say a great many things. I don't know what he's going to say.

MR. ALDOUS: And is it also true that as you stand here right now there is no other fact that you believe is crucial to establish with Mr. Shaw, other than to explain his testimony concerning his email?

MR. CHAIKEN: Well, I think there are many other facts that are crucial to establish with Mr. Shaw, but none that I can think of at the moment that would be adverse to the partnership or its defense.

MR. ALDOUS: Pass the witness.

MR. SHAW: The DR speaks in terms of belief that the lawyer is or may be a witness necessary to establish an essential fact. You testified that, depending on some testimony from Mr. Hickok, there may be another area of inquiry where you would think I would be in violation of the DR. Is that accurate?

MR. CHAIKEN: I can conceive of --

THE COURT: Yes or no?

MR. CHAIKEN: Well, the answer that I gave earlier was that there may be, but I can't articulate it right now.

MR. SHAW: Okay. I pass the witness.

MR. ALDOUS: Nothing further.

THE COURT: All right. The Court has in front of it a copy of Mr. Shaw's motion for continuance filed on December 6, 2013, where Mr. Shaw specifically states that he will be prohibited from serving as trial counsel if he is called as a fact witness, and cites to Rule 3.08 of the Disciplinary Rules of Professional Conduct. A continuance was granted with respect to that.

After the testimony that arose yesterday, Mr. Chaiken, you stated on the record, "Your Honor, I just want to make it clear that Mr. Hickok's position on this matter that has arisen this afternoon, I was complaining to the Court that it has always been and remains our position that Mr. Shaw is a witness, and we intend to call him. And I made that clear from day one. I have never, ever retreated from that position. I also made clear from day one that to the extent that there are any conflicts of interest that arise from that situation, Mr. Hickok was not waiving any. He is not."

So your testimony today is that you said you were only going to call Mr. Shaw for rebuttal, but yesterday on the record what you said was that you have maintained from the beginning that you were always going

to call Mr. Shaw.

MR. CHAIKEN:  For rebuttal is what I intended.

THE COURT:  You didn't say rebuttal yesterday.

MR. CHAIKEN:  I wasn't asked that issue, that question

THE COURT:  No, that was voluntary. You made a voluntary statement.

Trial will proceed.

MR. SHAW:  Thank you, Your Honor.

THE COURT:  Also, yesterday we discussed time limits.  The Court has decided that each party will have ten hours, except the defendants will be splitting their ten hours, five hours each if you so choose, however you want to spend your ten hours since you are aligned, with the exception of that one area.

Yesterday we spent -- let's see, I have to figure how much of the time was spent on direct versus cross-examination

MR. SHAW:  He hasn't been crossed yet.

MR. CHAIKEN:  There's been no cross-examination yet.

THE COURT:  There were some objections and some -- let's see.  What else did we have?  We'll skip

the objections.  I don't think they were that significant.  It appears that we started yesterday in direct examination.  It looks like we started before lunch.  Okay.  We started with Mr. Hickok at 11:23.  We stopped for lunch at 12:15, if I'm not mistaken.  Yes.  We started after lunch at 1:22.  We took a recess at 2:30, actually 2:31.  And then after that, we did not resume any questioning.  There was discussion on the record about Mr. Shaw's motion.

MR. ALDOUS:  Your Honor, I show that is two hours and one minute.

THE COURT:  All right.  That leaves you seven hours and 59 minutes.

MR. ALDOUS:  Thank you, Your Honor.

MR. CHAIKEN:  Your Honor, may I ask for clarification on that?  The time limits are for what specifically per side; case in chief?

THE COURT:  Yes.  But if you take up an excessive amount of time on someone's cross-examination, that will count against you.

MR. CHAIKEN:  Will the Court let us know if that time's being charged against us as we go?

THE COURT:  Yes.

MR. SHAW:  So just to get this straight, the cross-exam time doesn't count against the party

itself, that's asking the cross-exam questions; is that accurate?

MR. CHAIKEN: Unless it's excessive is my understanding.

THE COURT: All right. We'll get the jury and get started. We stand in recess.

(Recess taken)

THE COURT: Mr. Chaiken, Mr. Shaw, have you determined how you will split your hours?

MR. SHAW: No, Your Honor. May we discuss it over lunch and then report?

THE COURT: You may.

MR. CHAIKEN: Your Honor, may I ask a question?

THE COURT: You may.

MR. CHAIKEN: Ultimately, does it matter how we're going to do it if it's just between the two of us to split it?

THE COURT: Yes.

MR. CHAIKEN: Okay. I was only asking because we need to declare before we -- we need to declare before we get up to our case in chief?

THE COURT: Yes. How else will I keep time?

MR. CHAIKEN: Because it's a total amount

of time in the defendants' case in chief, so the defendants' case in chief is -- the Court has indicated is a combined case in chief, so it's just running time.

THE COURT: You've had separate time for opening and you asked for separate time for close, so there will be separate time for your examination.

MR. CHAIKEN: Are we on the record?

THE REPORTER: I am. Am I not supposed to be?

MR. CHAIKEN: I would just like to interpose an objection to that time constraint. I don't believe it's an authorized time constraint under the Texas Rules of Civil Procedure. Having said that, I'll honor the Court's request.

THE COURT: So noted.

MR. CHAIKEN: And I would just observe also for the record that on the issue of opening and voir dire, the Court gave the defendants a combined amount of time to use however they saw fit without a declaration in advance of who was going to use how much time. That was the block time.

THE COURT: I did specifically ask the parties how they were going to do it. And, in fact, during voir dire, you had separate time from Mr. Shaw.

MR. CHAIKEN: Your Honor, Mr. Hagood --

Mr. Hagood took some of the blocked time that had been allocated to the defense on a combined basis, and then I just took the rest of the time. I'm sure that it was all recorded on how much time total was spent. But there had not been an advance declaration that Mr. Hagood would take X amount of time or that we would take Y amount of time.

THE COURT: I believe we had discussed that in advance, but I think the issue is --

MR. CHAIKEN: And I'm not trying to quarrel with the Court. I just want to make a record that we're --

THE COURT: And you've done it.

MR. CHAIKEN: -- that we're on the second day of trial, and we're getting a time limitation imposed that had not been previously imposed. And now the Court has asked for the defense to predict what the split of a block amount of the defense case in chief is, and I just -- I object to the request, but I'll answer it for the Court

THE COURT: All right. Dan, you may bring in the jury.

All rise.

(Jury enters the courtroom)

THE COURT: You may be seated.

You may continue, Mr. Aldous.

MR. ALDOUS:  Thank you, Your Honor.

**DOUGLAS HICKOK,**

having been first duly sworn, testified as follows:

**CONTINUED DIRECT EXAMINATION**

BY MR. ALDOUS:

Q    Mr. Hickok, we were -- when we left off yesterday, we were discussing the guarantee language that's in the contract.  I don't want to rehash that, but I do want to ask you some questions.  Now, you indicated that you're an experienced real estate investor; is that accurate?

A    Yes, sir.

Q    So you know the Secretary of State has records that reflect every time somebody opens a company or establishes a company.  You're aware of that?

A    I would say, yes, as a corporation, I think, or a limited partnership.  But not as a -- maybe as an assumed name also.  But I'm not positive on all of that. I'm not a lawyer.

Q    So, would it surprise you at all to find that you are a member or a -- in some capacity associated with over 40 entities that do real estate investing?

MR. CHAIKEN:  Your Honor, objection, relevance.

THE COURT: Relevance, Mr. Aldous?

MR. ALDOUS: Your Honor, this is relevant to whether or not he has a true belief as to whether the guarantee is effective or not.

THE COURT: I'll allow it.

THE WITNESS: Yes, I would say that's probably true.

MR. ALDOUS: May I approach, Your Honor?

THE COURT: You may.

Q    (By Mr. Aldous) When we were visiting yesterday, we talked about the three reasons why you indicated VSDH did not repurchase the home.  And one of the ones that you said and the last one that's up there is that the Grosses sold the home prior to September 1st, 2009, right?

A    Yes, sir.

Q    So if you look at Exhibit No. 3, which is in the notebook there in front of you, it has the contract, right?

A    Yes, sir.

Q    And the language that you're referring to is in the addendum that's attached to the contract and specifically the portion that is labeled B, correct?

A    Correct.

Q    The section says that if the buyer -- and

that's the Grosses, right?

A    Yes, sir.

Q    -- timely and properly exercises the buyback option, which you and I agreed yesterday that they -- they timely did it, whether or not you agree that they were entitled to it is a different issue.  But they timely did it?

A    Yes, sir.

Q    The buyer may not sell or convey any right, title, or interest into the property to any third party unless seller breaches its obligation to repurchase the property pursuant to the buyback option due to no fault of the buyer.  Did I read that right?

A    You did.

Q    Now, would you agree with me that if the jury determines that VSDH breached the obligation to buy back the property, then the Grosses were free to sell it?

A    I mean, I'm not a lawyer, but it could read that way, I guess.  It's more of a legal response probably.

Q    Now in your experience, would you agree with me that if someone says that they're not going to perform, that's the same thing as saying we're breaching the contract, if there's no excuse?

MR. CHAIKEN:  Objection, calls for a legal

conclusion.

THE COURT: Overruled.

A    I don't think I'm equipped to answer that.

Q    (By Mr. Aldous) All right. So would it be true then you don't know if -- if you tell someone -- if a contract says I'm supposed to pay you for your wages and somebody -- and then you say I'm not going to pay your wages, you don't know whether or not you have to wait until the end of the pay period to see whether they pay or if you can take their word for it?

A    Correct.

Q    All right. When we spoke earlier or yesterday, you agree with me that because of the various reasons that you had given as of May 1st, 2009, VSDH was not going to buy this property back, correct?

A    Restate the question again please.

Q    Yesterday when we were talking, I asked you, as of May 1st, 2009, when the Grosses exercised the buyback option, at that time you had already determined that VSDH was not going to perform the buyback, correct?

A    I said that -- I believe I said that the Grosses were in default of the contract. I don't know -- I'd have to -- I don't know if I said that they -- we would not buy it back.

Q    Let me ask it a little differently. Would you

agree that because of your belief that the Grosses were in violation of the contract, VSDH had no intention to honor that buyback as of May 1st, 2009?

A    I mean, I totally disagree with that.  I think we have the opportunity to look at buying it back if we want to buy it back.  We could -- you know, VSDH could do what they want to whether they were in default or not.

Q    All right.  And so it's your position now that it was at that point, that is May of 2009, it was VSDH's option to either exercise -- to go ahead and buy back the property or not?

A    VSDH could look at the situation and determine if they wanted to buy it back.

Q    Now, we also looked at the emails particularly at May of 2009, where you said that from now on Van Shaw is handling this matter on behalf of VSDH.  Do you recall that?

A    I recall looking at emails.  Yes, sir.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  I need to just make sure that this is in evidence.

Q    (By Mr. Aldous) If you would, turn to Exhibit 38.  This has previously been admitted into evidence in

this case. First of all, you see that this is from Mr. Gross to both you and Van Shaw. Do you see that?

THE COURT: Excuse me, Mr. Aldous. I think you're going to need to move this so that the jurors can see.

MR. ALDOUS: Oh, yes, ma'am.

Q (By Mr. Aldous) Do you see that?

A Yes, sir.

Q It says, "Van, per your offer yesterday to allow us to enter into an agreement with a prospective buyer, can you give us that agreement? Recall that our contract says that after May 1st, 2009, if we enter into a contract to sell the home, the buyback option goes away. Please confirm that we can enter into a contract and a sale while not altering the buyback language and responsibility as it exists in our contract. It is in everyone's best interest to list and sell the property now, thus mitigating damages."

Do you recall receiving the email that is Exhibit 38?

A I do not. No.

Q Do you recall whether or not you responded to the email that is Exhibit 38?

A I do not recall.

Q Do you recall whether or not Mr. Shaw responded

to the email that is Exhibit 38?

A    I do not recall.

Q    So, as we sit here today, you have no recollection of whether or not either you or Van said to Mr. or Mrs. Gross, "Sure, go ahead and sell the property if you feel like you need to"?

A    Not to my knowledge.  No.

Q    All right.  And would it also be true that you have no recollection of saying, "No, don't sell the property because we still might exercise the buyback option"?

A    That -- rephrase that.

Q    I said can I also assume that you have no recollection of sending an email saying to the Grosses, "Do not sell the property because we could still exercise the buyback"?

A    That's true.

Q    All right. If you would, turn to Exhibit 59. And I'm sorry.  Before you do that, I just want to put this back up here, Exhibit 38.  Do see the date on this, June 28, 2009?

A    Yes, sir.

Q    Are you aware of whether or not the Grosses had a meeting on that day with Mr. Shaw?

A    I'm not aware of that.  No.

Q   All right.  Let me go ahead and--

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q   (By Mr. Aldous) I want to go ahead and write this date on here.  So we know that in May of 2009, the Grosses exercised the buyback, right?

A   Yes, sir.

Q   And we know that as of Exhibit 38 on June 28, 2009, the Grosses said, "Will you agree to let us sell the place," right?

A   Yes, sir.

Q   All right.  Now if you would, turn to Exhibit 59.

MR. ALDOUS:  And I'm sorry, Your Honor. Can I take that down now?

THE COURT:  You may.

Q   (By Mr. Aldous) Exhibit 59 is an email, once again, from Mr. Gross to you and Van Shaw, dated August 18, 2009.  Do you see that?

A   Yes, sir.

Q   It says, "Doug and Van, as you are aware per our contract, our obligation on this home expires on 9-1-09.  Since you have stated you do not intend to perform per the contract, we have listed the home.  We had Roxann Taylor conduct an assessment of the market,

and she recommended a listing price of 2.5 million. Since listing, we have had few showings; however, someone today offered 2.415 million cash, but with a very short closing, one week.

Unless we hear otherwise by noon tomorrow from either of you, we will be moving forward with this deal, recognizing that there are still many issues that may stop this transaction: such as any counteroffer, the appraisal, short closing time, alternative living for us, inspection, including the items that you never repaired per our contract, and golf membership. If you'd like to discuss any of these issues, please call me." -- He gives his phone number -- "otherwise, we will assume you approve of this sale."

Now, do you see that, sir?

A    Sure I do.

Q    Did you respond at all to this email?

A    I don't believe I did.

Q    Do you know whether or not Mr. Shaw responded to this email?

A    I do not know.

Q    At this point in time, is it your testimony, sir, that VSDH was still willing to repurchase the home pursuant to the buyback?

A    I'm saying we were looking at the opportunity

to repurchase it.  Sure.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) Exhibit 59 is dated August 18, 2009.

MR. ALDOUS:  May I approach the witness, Your Honor?

THE COURT:  You may.  Is this a copy for the Court?

MR. ALDOUS:  Yes, Your Honor.

THE COURT:  You may approach.

MR. CHAIKEN:  Hang on just a moment, please.  You said Exhibit 63?

MR. ALDOUS:  Yes.

MR. CHAIKEN:  Your Exhibit 63?

MR. ALDOUS:  Correct.  Do you need a copy?

MR. CHAIKEN:  No.  May we approach, please?

THE COURT:  You may.

(Sidebar conference held)

THE COURT:  You may proceed.

MR. ALDOUS:  Thank you, Your Honor.

Q    (By Mr. Aldous) Now, Mr. Hickok, I'm going to hand you something that's been marked as Exhibit 63. I'm not going to admit this document, but can you tell

me if you recognize that document?

A    I think it's a legal --

MR. CHAIKEN:  Your Honor, I'll object to the response only because to preserve the record.  He was just asked whether he recognizes it, not to describe what it is.  It's not being offered into evidence.  I would object to any reference to what it is.

THE COURT:  No speaking objections.

Just answer whether or not you recognize the document.

A    I really don't recognize it.  I'm not familiar with it.

Q    (By Mr. Aldous) Sir, are you aware that you filed a case against the Grosses on July 7, 2009?

A    I mean, this has been a long proceeding.  Maybe we did.  We did file originally a case, I believe, as a plaintiff.

Q    That's right.  And do you see the file-stamp date on here?

A    Yes, sir.

Q    And when you say, "We filed a case against the Grosses," are you referring to VSDH and you, yourself, and --

A    I'm speaking directly on behalf of VSDH.

Q    All right.  Were you aware that you had filed a

petition and intervention in this case?

A     Maybe I did.  I'm just not a legal person.  I don't know what really a petition of intervention is.

Q     So you just got through telling the jury that VSDH was willing to buy the property back on August 18, 2009, but you had sued -- VSDH had sued the Grosses on July 7, 2009; isn't that right?

A     If you say so.

Q     Do you find anything inconsistent in your testimony that y'all were willing to buy back the house and the fact that you had sued the Grosses to avoid buying back the house in July of 2009?

MR. CHAIKEN:  Your Honor, argumentative and mischaracterizes the witness' prior testimony.

THE COURT:  Overruled.

A     I'm not sure that we sued the Grosses for the reasons you're stating.  I think we probably sued the Grosses because they didn't do what they said they were going to do under the terms of the contract.  That doesn't mean we would not buy back the house.

Q     (By Mr. Aldous) So as I understand it, despite the fact that --

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q     (By Mr. Aldous) On July 7, despite the fact

that VSDH sued the Grosses on July 7, 2009, it's your testimony that you were still willing to perform on the buyback?

A    My testimony is, sir, as part of VSDH had a right under the contract until September 1 of 2009 to buy back the house.

MR. ALDOUS:  I'll pass the witness, Your Honor.

THE COURT:  Mr. Shaw.

MR. SHAW:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. SHAW:

Q    Doug, give us a little background on you, please.  How old are you?

A    I'm 58 years old.

Q    What town do you live in?

A    Dallas, Texas.

Q    All right.  Are you married?

A    Yes, sir.

Q    How long have you been married?

A    Probably pushing a 30-year anniversary.

Q    And you have two children?

A    Two boys.

Q    Their ages?

A    Twenty-five and 23.

Q      All right.  Went to grade school in Dallas?

A      Yes, sir.

Q      Where did you go?

A      Well, grade school goes back to Withers Elementary, when I met you, all the way through W. T. White High School, part of the DISD.

Q      All right.  You got out of W. T. White in what year?

A      1974.

Q      And then you went to college.  Where did you go?

A      I spent one year at Texas Tech University and then I transferred from there to the University of Texas in Austin.

Q      Graduated from the University of Texas approximately when?

A      Four years later in 1974.  Excuse me, 1978.

Q      In 1978?

A      Yes, sir.

Q      All right.  The -- and then you went to work, right?

A      No, sir.  I worked my way through college, and so I worked when I was in college, as I did in high school.  But I also went to work immediately the day after I graduated.

Q   All right. Tell the jury a little bit about your working career, please.

A   Oh, goodness. I started in college as a bank teller, just, you know, learning how to -- you know, I had to fend for myself, so I had to get a job as a bank teller. If I could count, they hired me. But so I did that. And then when I graduated college, I went to work for a bank called Capital Bank here in Dallas at Mockingbird and Central. I believe I spent five years there before Citibank in New York hired me away to participate in their Dallas office here in Dallas.

Around 1986 -- and don't hold me to these exact dates. It's been a while ago. In 1986, I split off from Citibank and went to work for a real estate firm here in Dallas by the name of Hampton Partners. Hampton Partners was a small real estate firm that just basically helped finance people -- looked for financing to buy projects.

On or about 1991, our family moved to Austin just for quality of life to raise two boys -- well, one boy at the time. Our second son was born in Austin. I set up my own firm called the Marquis Group. And at that point in time I just really started on an endeavor. It was -- I mean, I was going to have to go work at McDonald's or try to make a real estate deal.

And I learned through my history of just being a banker how to try to put transactions together, and I bought my first apartment complex down in Austin adjacent to the University of Texas.

Q     All  right.   And since that time, you've been doing what?

A     Since that time, I've been a real estate investor on my own, forming partnerships with various people.

Q     You and I have been friends, we told the jury, a long time, right?

A     Yes, sir.

Q     You worked at Wolf Nursery in college.   I worked across the street at the carwash.

A     Well, that was high school, by the way; but, yes.   That was a long time ago.

Q     And my boys are the same ages as yours?

A     Yes, sir.

Q     And we've been friends forever?

A     Yes, sir.

Q     I've been an investor with you many times?

A     Yes, sir.

Q     The -- presently -- so it came about on these -- this house -- how did it come about that this house came to get built between the -- by VSDH?

A    I think you and I came to -- met one day and talked about building a couple of spec houses with a mutual friend, Paul Kramer, in that subdivision  And we decided we'd go ahead and do it.  He built quality homes and we'd get together and build a house together.

Q    And we built two next door to each other. Wally Maya owns one now and then we're talking about the one the Grosses were with; is that right?

A    Yes, sir.

Q    Okay.  The -- now let's talk a little bit, please, about the exhibits.  I want to show you the exhibit.  Can you see the screen, the front?

A    Yes, sir.

Q    Okay.  Do you have a monitor there?  Does this come up on your monitor too?

A    Yes, it does.

Q    Okay.  So we looked at this before.  This is the entity and this is the Grosses, right?

A    Yes, sir.

Q    And then this is a multi-page contract, right?

THE COURT:  Mr. Shaw, just a second

Yes, Mr. Aldous.

MR. ALDOUS:  Could you -- I just didn't know which exhibit.

MR. SHAW:  Defendant's Exhibit 6.  I mean

-- well, Plaintiff's Exhibit 6.

Q   (By Mr. Shaw) Now that thing has a signature page on it, and Mr. Aldous showed it to you earlier.  Is that right?

A   Yes, sir.

Q   Now we see the signature page.  That's Mr. Gross, that's Mrs. Gross, that's you.

A   That's me on behalf of the partnership.  Yes, sir.

Q   Right.  It's got a seller.  It's got another line if you were going to sign it individually.

MR. ALDOUS:  Objection, Your Honor, leading and legally irrelevant.

THE COURT:  Sustained.

Q   (By Mr. Shaw) All right.  Did you sign down here under seller?

A   No, sir.

Q   Individually?

A   No.

Q   Did you ever sign this document individually?

A   No form or fashion did I sign it as an individual.

Q   Now, this document also has some reference to some lawyers; is that right?

A   Yes, sir.

Q    And it had a lawyer for the Grosses, the buyer's attorney; is that right?

A    Yes, sir.

Q    Mack Zimmerman.  And it's got the seller's attorney.  That's VSDH.  And that's Hap Stern; is that right?

A    Yes, sir.

Q    All right.  Now the document also had some contact information; is that right?

A    There's notice provision.  Yes, sir.

Q    All right.  And this address here for seller, 5305 Village Creek, Plano, what's that?

A    That's my office address.

Q    All right.  Was that your office address then?

A    Yes, sir.

Q    And now?

A    Yes, sir.

Q    Continuously?

A    Yes, sir.

Q    It has your address and it has your email; is that right?  I'm sorry.  Your phone, your fax, and your email; is that right?

A    Yes, sir.

Q    So all of that information is contained in the original contract; is that fair?

A    Sure.  Yes, sir.

Q    Okay.  Then we talked about -- or at least I think I've shown this page before to the jury.  It's Page 7.  And it's got this Section 22, agreement of the parties.  Do you see that?

A    Yes, sir.

Q    Is this significant to you?

A    Very significant because it lists the other parts of the contract that are not the normal form, which is that Addendum A and Addendum, I think, B.

Q    Okay.  What about cannot be changed except by written agreement?

A    Oh, absolutely, yes.

Q    Why is that significant?

A    Well, that makes the -- that constitutes the contract.  You've got to make sure everything is in writing.

Q    Okay.  The -- and why is that important?

A    Well, I think any time you have an agreement, you want it to be in writing so there's not hearsay.

Q    Okay.  The -- and are the written terms important in your mind?

A    They are most important.

Q    Okay.  Addendum A, Mr. Aldous went over this with you some.  I want to spend a moment with you on it.

Okay?

A   Yes, sir.

Q   So Section 1, buyback, VSDH, the seller, grants the Grosses, as buyers, the option, the buyback.  You see that?

A   Yes, sir.

Q   And what's the significance, if any, to you of this September 1, 2009 date that's reflected in there?

A   Well, that's the outside date that was mutually agreed upon for the buyback.

Q   It says, "On September 1, 2009, or such earlier date as may be mutually agreed between buyer and seller."  Was there ever an earlier date that was mutually agreed between buyer and seller?

A   Not to my knowledge.

Q   So September 1, 2009, is the date; is that right?

A   Yes, sir.

Q   Okay.  Then you get down to the buyer exercises -- well, it kind of goes out of order, and I want to talk about this escrow agreement first.  Okay.  So we talked about -- or there's been some talk about the buyer and improving the property.  You remember that discussion?

A   Yes, sir.

Q   Okay.  And so it said, "Before commencing construction, buyer will review with seller the plans and specifications and receive general consent."  Was that important to you?

A   Very much so important.

Q   A multi-million-dollar house, right?

A   Yes, sir.

Q   What would you say about the quality of the house that VSDH built?

A   I think it's top quality.

Q   Okay. So why was this section important to you about -- about making sure that you generally agreed with the plans and specs of any improvements?

A   Well, to preserve the integrity of the quality of the house.

Q   All right.  What do you mean by that?

A   Well, again, I think I discussed this along the way that I wanted to make sure that there was going to be quality construction to place in that house.  I think there's -- the agreement goes on to say that I need to be -- you know, go out there and monitor it and look at the construction and so on.  But, really, it's mostly about what is going to happen in that house, what's it going to look like.

Q   Okay.  And you testified that these plans and

specs were never given to you; is that fair?

A    Absolutely, they were not.

Q    Okay.  Then it talks about this escrow agreement, right?  We talked about that a little bit.

A    Yes, sir.

Q    And it talks about -- Mr. Aldous went over with you.  There's some financial pages, right?

A    Yes, sir.

Q    Okay.  Addendum B, part of the contract, right?

A    Yes, sir.

Q    So this thing says, "The attached Addendum B is the spreadsheet of improvement costs proposed by the buyer to be made to the property." Now, is that plans and specifications?

A    It has nothing to do with plans and specifications

Q    Okay.  What are they called?  What's the contract identified as?

A    They say it's a spreadsheet of improvements and costs.

Q    Okay.  And what do they say up here they're supposed to go over with you?

A    Buyer will review with seller the plans and specifications.

Q    Okay.  So they say -- the contract says,

spreadsheet of improvements and costs, total of $156,000. It says the buyer agrees to escrow the funds with the title company and enter into an escrow agreement acceptable to the seller and buyer that outlines the proposed improvements to the property and a disbursement to such funds.

Did I read that right?

A     Yes, sir.

Q     Okay. Now, what are you talking about here? What do you understand this to mean when it says to enter into a contract with the title company acceptable to the seller and buyer that outlines the proposed improvements to the property and the disbursement Tell the jury a little bit about what that's about.

A     Well, what happens is if you have a buyer and a seller that reach an agreement that they're going to put up -- like this case it's $156,000 -- you don't want them to hold the money and they don't want me to hold the money, so it's held by a third party. In this case, it's the title company outlined in the contract. And then you enter into an agreement as to what's going to happen with this money, what is all going to take place with this money. So, in essence, that's what it is. You have a third party and an agreement between both parties, the buyer and seller.

Q   Okay.  And it talks about their -- the proposed improvements.  So if this escrow -- was this thing ever followed through with your title company?

A   No, sir.

Q   Did you ever enter into this -- it says enter into an escrow agreement acceptable to seller and buyer. Did you ever enter into an escrow agreement acceptable to seller?

A   I never entered into an escrow agreement acceptable to buyer and seller.

Q   Okay.  Were you -- was VSDH ever given that option?

A   VSDH never was given that option.

Q   Okay.  So -- and then it says, "that outlines the proposed improvements."  Now, you talked about earlier, hey, you need to know colors and textures and materials and all that kind of stuff, right?

A   Yes, sir.

Q   You've got a multimillion-dollar house, right?

A   Yes, sir.

Q   And you told us the reasons why you wanted to -- why the contract says and why you wanted the rights that you wanted?

A   Yes, sir.

Q   All right.  To preserve the integrity of that

home, and make sure it was acceptable to you -- to VSDH?

A    Well, in addition, I don't want liens filed on the house by them not paying it.  If they had the money and decided to --

THE COURT:  Give to the bailiff.

MR. SHAW:  I'm sorry?

THE COURT:  The telephone, Mr. Chaiken, give it to the bailiff.

MR. CHAIKEN:  I thought I had turned it off.  I apologize.

Q    (By Mr. Shaw) So -- but the proposed improvements, that was most important?

A    Most important, most important, yes, sir.

Q    All right. Now, going back, this is Addendum A. This is Page 2, buyer's improvements.  Now going back to Page 1.  All right.  Now it talks about the buyback, the buyer exercises the buyback option.  That's later in time, right?

A    Yes.  That's like on May 2nd, they have to exercise the buyback by that date.

Q    It's May 1st, right?

A    May 1st then.  Okay.  I'm sorry.

Q    And you've got until September 1.  VSDH has until September 1, 2009; is that accurate?

A    Yes, sir.

Q    Okay.  Now it says that the buyer -- Section B, buyer may not sell or convey any rights or interests to third parties unless seller breaches its obligation to repurchase.  Now, could you breach the obligation prior to September 1?

A    I don't think so.

MR. ALDOUS:  Objection, Your Honor.  That calls for a legal conclusion.

THE COURT:  Sustained.

MR. SHAW:  Okay.

Q    (By Mr. Shaw) Did you believe you had until September 1?

A    Yes, sir.

Q    Okay.  The -- comes down here and it says, "On or before September 1, unless buyer and seller agree upon another stated date buyer shall vacate."  Did I read that right?

A    Yes, sir.

Q    Okay.  Then it comes down here later on, it says, "Should the buyer enter into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to buyer."  Did I read that right?

A    Yes, sir.

Q    It's your understanding -- do you have an

understanding as to whether or not the Grosses entered into a contract prior to September 1, 2009, to sell the property to somebody else?

A    Yes, they did.

Q    And do you have an understanding as to whether or not the Grosses owned the property on September 1, 2009?

A    I know they did not.

Q    So, were all of those dates and everything in that contract important to you?

A    Yes, sir.

Q    That was -- was that a negotiated document?

A    Yes, sir.

Q    Between the Grosses and VSDH?

A    Yes, sir.

Q    Okay.  Now you said earlier, you said, hey, I initialed in my corporate capacity the pages of the addendum, right?

A    Yes, sir.

Q    Okay.  And you made a distinction. You said, "I did not sign that document personally."

MR. ALDOUS:  Objection, Your Honor, that's legally irrelevant.

THE COURT:  Overruled.

Q    (By Mr. Shaw) Did you say that?

A    Yes, sir.

Q    You also said that you anticipated that to --
for you to be personally liable on the buyback, you
anticipated another document?

A    Yes, sir.

Q    That's what you said?

A    Yes, sir.

Q    All right.  Now, if this -- the Grosses had a
lawyer.  We talked about that, right?

A    Yes, sir.

Q    And you anticipated another document.  Why did
you anticipate another document if you were going to be
personally liable?

A    Well, because the contract is between VSDH and
the Grosses.  It's not a contract with me.  It's not a
contract with Mr. Shaw.  It's a contract between VSDH
and the Grosses; therefore, something else has to be
signed that says that Doug Hickok's a guarantor or Van
Shaw's a guarantor, in this case both.

Q    Okay. Let's look at Addendum A again. Doug
Hickok and Van Shaw, as partners, hereby personally
guarantee seller's obligations under the buyback, right?

A    Yes, sir.

Q    Is there any document Van Shaw signed to
personally guaranty that?

A    No, sir.  Neither is there one that Doug Hickok signed.

Q    How can Van Shaw be personally responsible if Van Shaw didn't sign it?

MR. ALDOUS:  Objection, Your Honor, irrelevant.  He's not in the case.

THE COURT:  Sustained.

Q    (By Mr. Shaw) So, in your experience in personally -- you have personally guaranteed things before in your history?

A    Yes, sir.

Q    And have you ever not signed an independent document in your individual capacity if you were going to personally guarantee something?

A    You might, yes.  I probably have, but it said Doug Hickok individual guarantor outlined next to it. It might be on the same document, but 90 percent of the cases it's a separate legal document that says guarantee across the top.

Q    And when it says Doug Hickok guarantor, do you sign that Doug Hickok as guarantor?

A    You sign it Doug Hickok with guarantor underneath it.  Yes, sir.

Q    Right.  And it might be some company name that's also part of the entity -- part of the contract;

is that right?

A    Well, there would be a separate line for the company to sign.  There would be a separate line for any guarantor to sign.

Q    Okay. So when we looked at this thing, separate line for the company to sign, separate line for Hickok to sign.  That's what you're talking about, right?

MR. ALDOUS:  Objection, form, and that's not what the document says.  That's leading also, Your Honor.

THE COURT:  Sustained.

MR. SHAW:  Okay.

Q    (By Mr. Shaw) When you're talking about separate line for the company, are you saying like this?

A    Yes, sir.

Q    Okay.  And then you're saying a separate line for Hickok as guarantor.  Are you saying that would be here and it might say Doug Hickok as guarantor?

A    Yes, sir.  You probably have to cross out that seller and put in Doug Hickok as -- you'd definitely have to put Doug Hickok as guarantor.

Q    Okay.  So you were willing to sign a personal guarantee agreement if the terms were acceptable to you and Van Shaw; is that right?

A    Pursuant to my discussion with the Grosses'

agent, John Buttemiller, I needed to have Van Shaw and I both sign this agreement. In addition, I needed to have a separate agreement. I needed to review it.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, I object to the characterization as Mr. Buttemiller as being our agent. There's no facts in evidence on that.

THE COURT: Sustained.

Q    (By Mr. Shaw) Okay. So, generally, if there was going to be a buyback and Doug Hickok was going to personally guarantee it or Van Shaw was going to personally guarantee it, in this situation, who would you have expected or anticipated would prepare that document?

A    I would say the lawyers would prepare the document.

Q    The lawyers for who?

A    It probably would have been on the buyback the Grosses or our lawyer or the partnership lawyer.

Q    Okay. The Grosses' lawyer. Did the Grosses' lawyer ever send you the buyback?

A    Are you talking about the buyback?

Q    Yes. I'm sorry. Did the Grosses' lawyer ever send you a guarantee agreement?

A    No, sir.

Q    Okay.  You have things that you're doing in your life with your family and your business, right?

A    Yes, sir.

Q    Would you generally say you're a busy guy?

A    Very busy.

Q    Okay.  Do you have more things going on at one time than just one thing, one thing, one thing, right?

A    Yes, sir.

Q    When did you first realize, hey, I didn't sign a personal guarantee on this thing?  When did you first realize that?

A    I don't know  I mean, I'm thinking back on that as part of the process of this trial, and it may have come up right when we started realizing that the Grosses were in default under their contract with us when we searched back through all the documents.

Q    Okay. The -- so do you remember in May of 2009 when the Grosses wrote a letter about -- or wrote an email about wanting to institute the buyback?

A    I'm not -- that's not real fresh.  It's been placed in front of me in these proceedings, but it's not fresh in my mind  No, sir.

Q    Now that I'm thinking back for a minute, let me go off track for just a minute.  There's been some talk of the escrow agreement and the failure of the Grosses

to cite that. Do you remember that?

MR. ALDOUS: Your Honor, I'm not sure what exhibit --

MR. SHAW: Exhibit 29.

THE COURT: Defendant's or plaintiff's?

MR. SHAW: Well, it's marked here as Defendant's, Judge, but I think it was previously --

MR. CHAIKEN: That's ours.

MR. SHAW: Right. I believe that's in evidence.

THE COURT: Approach.

(Sidebar conference held)

THE COURT: You may proceed.

MR. SHAW: Thank you, Judge. I'm going to approach and ask for the witness copy, please.

Q   (By Mr. Shaw) Sir, let me have that book for a moment. Thank you, Douglas.

Okay. Now, do you remember this July 3, 2007, letter that was written from a lawyer at this Smith, Stern, Friedman & Nelms firm?

A   You'd have to show me the rest of that document there.

Q   All right. Recognize this fellow, Leonard Stern?

A   Yes, sir.

Q   Who's that?

A   Leonard Stern, nickname Hap, is my attorney.

Q   Okay.  So Mr. Stern writes this letter July 3, 2007.  The closing had just been in the end of June; is that right, June 28 or 29?

A   Yes, sir.

Q   Okay. So Mr. Stern writes and he says, "This firm represents the seller," right?

A   Sure.

Q   That's VSDH, right?

A   Yes, sir.

Q   It says, "The closing was consummated on June 29, 2007; is that right?

A   Yes, sir.

Q   And he refers to the addendum that we've been talking about that addendum, haven't we?

A   Yes, sir.

Q   Okay.  Buyer agrees to escrow $156,000 acceptable to seller and buyer.  Remember that?

A   Yes, sir.

Q   Okay.  Paragraph 2 of the addendum, "Contract further provides that buyer will obtain seller's consent to the plans and specifications applicable to the improvements?

A   Yes, sir.

Q Proposed performance standards, you see that?

A Yes, sir.

Q Okay. Now, Mr. Stern goes on. He says, "Notwithstanding the buyer failed or refused to enter into the escrow agreement. Instead, buyer breached the agreement with the mortgage, the First Horizon, to fund the cost. Please be advised seller reserves all rights under the contract, may be available, respectfully requests that buyer comply with all other aspects without limitation, obtaining seller's consent to the plans and specifications applicable to the construction improvements." Do you see that?

A Yes, sir.

Q Satisfaction of such obligation shall be a condition precedent to the buyer's right to exercise the buyback option. Do you see that?

A Yes, sir.

Q Okay. Now, did the buyer, to your knowledge, ever cure the default that Hap Stern's writing about here July 3, 2007?

A No, sir.

Q Was that important to you that that was not cured? Was that significant to you?

A It was very significant to me because that puts him in default under the contract.

Q   Okay.   And why is that significant?

A   Their default?

Q   Yes, sir.

A   Well, it basically in my mind at that time, it put the buyback in jeopardy.

Q   Okay.   And tell me about that.

A   Well, if they -- if they had done what they said they were going to do under the terms of the contract, then the contract required us to buy back the property when they asked us to buy it back.   They didn't do that; so, therefore, we have a judgment call.   We can buy it back if we want to, but we don't have to buy it back.

Q   Okay.   Now, the -- and is that what you were telling the jury earlier, that you were evaluating that issue?

A   I think we had the right to evaluate that issue until September 1.

Q   Okay.   Now let me show you Defendant's Exhibit 54, which was previously -- let me make sure it is -- which was previously shown.

MR. SHAW:   Is -- Your Honor, is Exhibit 54 in evidence?   I believe it is.   And this would be Gross 54.

THE COURT:   VSDH or --

MR. SHAW: Gross.

THE COURT: Gross, no.

THE REPORTER: It was admitted yesterday.

MR. ALDOUS: I believe that I offered it after proving it up yesterday, first time.

THE COURT: Okay.

MR. SHAW: May I show Gross 54, Your Honor?

THE COURT: You may.

Q (By Mr. Shaw) This is Exhibit Gross 54, okay, Doug. All right. Are you with me? And I believe this was gone over yesterday. Do you remember this?

A I remember the discussion about it. Yes, sir.

Q Okay. And I wrote Betsy Gross June 7, 2009, I said, "Thank you for the June 6th email. Please call to discuss." I gave my number. "I did review the enclosures you sent and note that the entity is no longer the responsible party. It does not contain any personal guarantee which is what I remembered. I look forward to speaking with you." Do you remember that?

A I remember talking about it. Yes, sir.

Q Okay. When the Grosses triggered this buyback in May, I asked you to send me the contract; is that right?

A I believe I saw something in evidence about me

sending it to you at that time

Q    Because I had forgotten exactly -- or did you remember in May exactly whether you had signed a personal guarantee or not?

MR. ALDOUS:  Well, Your Honor, I was objecting because he started out testifying, but then he changed it to a question.

MR. SHAW:  I did.  I saw him stand up and I changed it.

Q    (By Mr. Shaw) Did you remember that -- whether you had or had not personally signed a separate guarantee agreement on this buyback in early May, 2009?

A    I think I need to say that it was around -- sometime around May when my memory was reconfirmed that I did not sign --

Q    Okay.

A    -- a guarantee.

Q    You had a vague recollection that even though you expected to sign a guarantee, never came, you never signed one?

A    I -- at the time, I could not remember until I went through the files and then -- but I'm not sure at what time -- what date that was that I went through the files to determine that I did not sign one.

Q    All right.  So, the way this closing worked

where you thought another document was going to come later, a personal guarantee, and you were going to sign it, how does that work? How do these closings, particularly this one that was kind of condensed and rushed, how does that work?

A    Well, I think you -- you have a contract that's in place, right, and the contract, you know, it has certain documents or needs that have to happen at the time of the transfer of title, which is the closing date, whenever you buy something is at that point in time. So you go in -- or as I testified to, you either go in individually or you go in as both parties or they may even bring the documents to my office and they say, "Sign all this," and, literally, place documents maybe about this thick. I don't know if anybody's bought a house, but it's -- today, it's probably like this. But it's probably like that, and then you just start signing where they have their -- you know, their initials to sign.

Q    Okay. So there's a lot of documents and all of them might be there in proper order at one time or all of them might not; is that fair?

A    That's possible. Yes, sir.

Q    And sometimes there are some follow-up documents needed; is that fair?

A    Yes, sir.

Q    And in this case, there was a follow-up document needed in your mind.  You were ready to sign it, just never got it, fair?

A    I think my position was, as I've stated earlier, that I -- as I told Mr. Buttemiller, I was willing to sign a guarantee as long as Mr. Shaw agreed to sign a guarantee, as long as it was in the form acceptable to myself on my guarantee.  And then Mr. Shaw has to speak for himself.

Q    The -- there was some talk, Doug, about this, about this contract.  And you sent me the contents that was in --

THE COURT:  Do you have an exhibit number?

MR. SHAW:  I'm sorry.  Gross 92.

A    It looks like I sent you --

MR. SHAW:  Hang on just a second.  Let me make sure the judge confirms it.

MR. ALDOUS:  It's in.  I just didn't know what number he was referring to.  I'm sorry.

THE COURT:  It's just a number.

MR. SHAW:  Okay.

Q    (By Mr. Shaw) So, Doug, when this document -- you're sending me the contract; is that right?

A    Yes, sir.

Q    All right. And that's because you and I both had some foggy memory in what had happened in the last couple of years, and so we needed to see the contract to figure out what was up.  Is that fair.

MR. ALDOUS:  Your Honor, I object to --

THE COURT:  Sustained.

MR. ALDOUS:  -- to the sidebar.

THE COURT:  Rephrase, Mr. Shaw.

MR. SHAW:  Yes.

Q    (By Mr. Shaw) Did you have a good memory, Doug, of that contract when I asked you to send it to me?

A    Probably not because it was executed a couple of years earlier, so I would say, no, to that.

Q    Okay.  If you're going to approve plans and specifications on a house like this for the Grosses -- and you said you went out there in November of 2008, and you were surprised how far along it was, the condition. Remember that generally?

A    Yes, sir.

Q    All right.  Paul Kramer was the builder that built this house, right?

A    Yes, sir.

Q    All right. Would you have asked Paul Kramer to look at the plans and specs before you did anything?

A    I would have definitely asked a professional or

somebody in the business to review the plans and specs.

Q    Would somebody like Paul Kramer be the person?

A    It could have been.  Yes, sir.

Q    All right.  And why?

A    Because they do it on a day-to-day basis.  They build houses.  They understand and can read plans and specs much better than I could.

Q    Okay.  And so would you want some independent look at the plans and specs before you said okay?

A    Yes, sir.

Q    All right. Gross 38, June 28, 2009, are you with me?

A    Yes, sir.

Q    Okay.  It was written by me.  Counsel talked to you about it, right?

A    Yes, sir.

Q    It says, "Per your offer yesterday to allow us to enter into an agreement, can you give us that agreement?  Recall that the contract says that after May 1, if we enter into a contract to sell the home, the buyback option goes away," right?

A    Yes, sir.

Q    You have no knowledge of any agreement ever being given to the Grosses to enter into a buyback -- enter into a contract and keep the buyback option, fair?

A    I mean, there was no -- no agreement entered into that would have rescinded the -- you know, the buyback.

Q    All right.  And reading that document, is there any question in your mind that the Grosses recognized that?

MR. ALDOUS:  Let me just object, Your Honor, that he's asking for a speculation

THE COURT:  Sustained.

Q    (By Mr. Shaw) After looking at the contract, was your memory the same; that if the Grosses entered into a contract to sell the home, the buyback option went away?

A    That's correct

Q    And you believe that existed and was proper?

A    Yes, sir.

MR. SHAW:  That's all I have.  I pass the witness.  Thank you, sir.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  Yes, Your Honor

THE COURT:  No, stop.  It is 12:23.  We'll take a luncheon recess until 1:25.  During this recess, the jury is under the same instructions you've been previously given.  You're not to discuss this case among yourselves or with anyone else until such time as the

case has been submitted to you for your deliberations or you have been discharged as jurors. The jury is excused for recess.

(Jury exits the courtroom)

THE COURT: You may step down, Mr. Hickok.

THE WITNESS: Thank you.

(Lunch recess taken)

THE COURT: All rise.

(Jury enters the courtroom)

THE COURT: You may be seated.

Mr. Chaiken, you may proceed.

MR. CHAIKEN: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. CHAIKEN:

Q    Mr. Hickok, may I call you Doug?

A    Yes, sir.

Q    I feel kind of funny calling you Mr. Hickok. I've known you for so long. Doug, I'm going to do my best to try to cover some topics that I think need either some clarification or new material so that we don't spend too much time going over matters that have been, you know, cleared up already.

You have an exhibit book sitting in front of you, and I would like you to please turn to the document that is under Tab Number 53.

A    I do not have a 53.  I only have a 52 and it goes to 59.

THE COURT:  Are you talking VSDH exhibits or are you talking about Gross exhibits?

MR. CHAIKEN:  No, this is -- 53 is -- I apologize.  It is one of the admitted exhibits and -- well, let me just do this.

Q    (By Mr. Chaiken)  Let me show you -- can you see Exhibit 53?  Well, I can't publish it to the jury.  Forgive me.

Do you know who John Buttemiller is?

A    Yes, sir.

Q    Who is John Buttemiller?

A    I believe he's a broker or a real estate sales person with the Carroll Realty.

Q    Was he involved in the buy-sell transaction between VSDH Vaquero, Ltd. and Mr. and Mrs. Gross?

A    Yes, sir.

Q    Can you tell the ladies and gentlemen of the jury what a real estate broker does just generally in a transaction of this nature in case they are not familiar with what the broker's role is in the transaction?

A    A real estate broker functions as an intermediary or an agent.  In the case of this transaction, there was one broker.  So he was an agent

for the Grosses and also an agent for VSDH. So that is if there is something we don't converse -- the Grosses and VSDH don't converse a lot, a lot of the language, a lot of the negotiation is handled through the broker. So if they want a message delivered to me, then the broker will deliver it to me, and vice versa. VSDH will deliver it to the Grosses.

Q   In your experience in real estate transactions involving the buying or selling of real property, are there occasions when real estate brokers or agents represent just one of the parties in the transaction?

A   Yes, sir.

Q   Okay. Do you have a recollection in this particular transaction as to whether Mr. Buttemiller represented both parties or just one of the parties?

A   Represented both parties.

Q   So when -- did you deal with Mr. Buttemiller directly in the transaction?

A   I dealt with them, you know, through the contract stage. Yes, sir.

Q   So you spoke with him, right?

A   Yes, sir.

Q   Did you understand that if he was asking you something on behalf of the Grosses that he was authorized to act for them in asking you for whatever it

might be?

A    Yes, sir.

Q    He appeared to be authorized based on your understanding of the intermediary relationship; is that right?

A    Yes, sir.

Q    All right.  And I want to talk to you about a couple of aspects of the -- of the contract that you signed.  Before I do that, though, Exhibit No. 6, which you were shown yesterday by Mr. Aldous and that Mr. Shaw showed you a little while ago, spoke about a cash sales price in the new home contract with the Grosses of $2,851,871.  Do you recall seeing that?

A    Yes, sir.

Q    Right.  Now, if I understand the testimony that has been given thus far --

THE COURT:  Excuse me, Mr. Chaiken.  Would you clarify Gross Exhibit 6 or VSDH Exhibit 6?

MR. CHAIKEN:  I was referring to Mr. Hickok having been shown what is Gross 2, not 6.  I apologize.  I misspoke.

Q    (By Mr. Chaiken)  Now this is Gross Exhibit 3, and Gross Exhibit 3 has a purchase price where it scratches through the $2,851,000 number.  And it's replaced with 2,695,000; is that correct?

A    Yes, sir.

Q    All right. Can you explain to the ladies and gentlemen of the jury how the price went from 2,851,000 to $2,695,000?

A    Well, I mean, my opinion is that the 2,851, the original purchase price there is a price that we agreed to with the Grosses. And I -- in my opinion, what happened is that they were going to take the $156,000 out of that amount of money, the 2,851 and go fix up the house. And I guess something along the way, maybe their lender or something said we're not letting you take the money out. And they wanted the contract price to be 2,695,000, and the money gets placed over in with their lender. I think that's changed it. I'm not sure exactly everything that happened there, but that's just -- it was a change for some reason.

Q    I want to make sure that the ladies and gentlemen of the jury understand this concept. They were paying $2,851,000 when the contract had that as a purchase price, right?

A    Right. But I'm -- I'm going to give them out of that 2,851, I'm going to give them $156,000 back.

Q    They wanted you to give them the money back?

A    I believe that was what our original agreement was.

Q    Okay.

A    I don't have a copy of the original agreement, but -- the whole original agreement.

Q    But for whatever reason, that had an issue that required them to scale the price back so, in your understanding, they could get their loan?

A    I don't believe it was.  It would have had to have been on the Grosses' side for some reason for -- they had to change it up.

Q    Okay.  Doug, will you turn to Gross Number -- well, before we do that, I want you to look at the bottom of the first page of the new home contract.  You see right here?  You see up on the screen?

A    I'm looking at it here.

Q    Okay.  Now, there's been a lot of discussion about signatures and initials.  And you see your initial on the bottom of the first page of the contract; is that right?

A    Yes, sir.

Q    Okay.  And next to your initial, what is the word that you see?

A    Seller.

Q    And next to that going this way, you see initials next to the word, "buyer"; is that right?

A    Yes, sir.

Q   What does that mean to you?

A   Probability the initials of the buyer, which would be both the Grosses.

Q   Okay.  And when you see your initial next to the word, "seller," what do you understand the purpose or whose initial that is?

A   Well, that's an initial on behalf of the seller, which is the partnership, VSDH.

Q   All right.  And then it says -- can you read what it says here over above this TAR1604?

A   It says, "Initialed for identification by the buyer and seller."

Q   What does it mean to you to initial a document for identification in your experience as a real estate investor, seller, and person who enters into these kinds of contracts on a routine basis?

A   When you initial at the bottom of a page, just to make sure that the page doesn't get changed on you. In other words, if this was left blank and you didn't have your initials on it, somebody else could just stick another similar page in there and, say, change up the price or change up the document on the way to the title company or anything.  So you initial it to make sure it doesn't happen.

Q   And in this case, when you placed your initials

on the first page of the contract at the bottom of the document, who did you intend to initial the document for or on whose behalf did you intend to initial it?

A    Again, the partnership is VSDH, Ltd.

Q    And there's no place there for a guarantor or any individual's signature, only for the buyer and the seller; is that right?

A    Again, there is no place anywhere on this contract or anywhere for a guarantor to sign or anything.

Q    Okay.  And the second page of the exhibit and of the contract, similar situation; is that right?

A    Yes, sir.

Q    The same would be true with the third page, right?

A    Yes, sir.

Q    Okay.  And Page 4 of 9, right?

A    Yes, sir.

Q    And that would be true all the way through the page that ends -- let's see here -- 7 of 9, correct?

A    Yes, sir.

Q    See that there.  All right. Now, when you get to Page 8 of 9, you don't see any initials, right?

A    Well, first off, there's no blank at the bottom of the page for an initial.  There's just a signature

line that represents that it's been signed. So it can't be slip sheeted because it's been signed.

Q    Because it has a signature on it already?

A    Yes, sir.

Q    Okay.  And you see your signature next to the initials VP under the -- above the space that says seller, VSDH, Vaquero Venture, Ltd., right?

A    Yes, sir.

Q    All right.  And on page number -- excuse me. I'm going the wrong way here -- 9 of 9, there also is no place for initialing, right?

A    Again, because there are natural signatures on that page or natural handwriting.

Q    Now, do you recall -- and I'm going to come back to this initialing issue in a moment.  But do you recall the testimony earlier -- I think it was yesterday -- responses to some of Mr. Aldous' questions about a first amendment to the new home contract?  Remember this document?

A    Yes, sir.

Q    Now this document amended the main contract, right?

A    Yes, sir.

Q    That was your testimony.  Now you recall speaking with Mr. Shaw earlier about Paragraph Number 22

of the contract that says agreement of the parties, right?

A    Yes, sir.

Q    All right. And it says this contract contains the entire agreement of the parties. Who do you understand the parties to be?

A    The parties to the contract are VSDH, as the seller, and then the Grosses, as the buyer.

Q    Any other parties?

A    No, sir.

Q    All right. And it says, "And cannot be changed except by their written agreement." Did I read that right?

A    Yes, sir.

Q    Who do you understand the word "their" to pertain to?

A    The buyer and the seller.

Q    All right. Now, who are the parties to the first amendment to the new home contract?

A    It's VSDH Vaquero Venture, Ltd. I just call it VSDH, and then there's Ken and Betsy Gross. One's the seller, obviously, which is VSDH; and the buyer is Ken and Betsy Gross.

Q    All right. And on Page 2 of that agreement, who is the seller?

A    The seller is VSDH Vaquero Venture, Ltd.

Q    Okay.  And who signed it on behalf of the seller?

A    Well, it is -- actually, the general partners always sign on behalf of a partnership, and then I signed on behalf of that general partner, which is Doug M. Hickok as the vice president of that entity.

Q    Because the entity isn't a human being, it can't sign its name, right, so you sign for it; is that right?

A    I think it's like Mr. Shaw said with the -- like Dell Computer. I mean, it's an entity.  It's a company.

Q    And then if we look at the last page of the amendment, we see signatures by the purchaser.  And you see Ken Gross and Betsy Gross, right?

A    Yes, sir.

Q    Now, looking at the rest of the page, where does it say Doug Hickok?

A    I don't see my name on that page.

Q    Why isn't your name on either of the signature pages?

A    Well, my name is only on there on behalf of VSDH as the seller of the property.

Q    And you weren't a party to the contract, right?

A     Personally, I was not a party to the contract.

Q     Now when I say, "you," I mean you, Douglas Hickok, right?

A     Right.

Q     All right.  But if you were a party to the contract prior to this first amendment, would you agree that Paragraph 22 of the contract would have required your signature on an amendment?

MR. ALDOUS:  Your Honor, I object.  That calls for a legal conclusion.

THE COURT:  Sustained.

Q     (By Mr. Aldous) Paragraph 22 we just talked about, right?  It says the contract contains the entire agreement of the parties and cannot be changed except by their written agreement, right?

A     Yes, sir.

Q     Did you ever sign any amendments or changes to the contract?

A     If you're talking about me personally --

Q     When I say, "you," I mean you.

A     Okay.  Me personally, no.  I never signed anything related to this transaction personally.

Q     Is that because you weren't a party?

A     I'm not a party to the contract.  I'm not the buyer.  I'm not the seller.

Q    Now I want to go back to the addendum to the contract.  And this is the fist page of Addendum A that's received a lot of attention, right?

A    We've talked about it a lot.  Yes.

Q    And on the first page of Addendum A, which contains the buyback option, or at least until it continues on to the next page, we see the same initials that we saw on the -- in the blocks of the pre-printed contract, the form contract, for seller and for buyer, right?

A    Yes, sir.

Q    Right.  And why was this page initialed by you?

A    Well, again, it's part of the original -- it's all part of the whole contract.  And although they didn't have a little seller and a buyer blank there, you can see I, kind of, under my initial, I put a line.  So it's kind of like I put a line on behalf of the seller, and the seller, again, is VSDH. That is initialed only as VSDH.

Q    So it's basically continuing the practice that was on the form?

A    Yes.  It's on every page of the contract.

Q    Except those that were signed by somebody?

A    Yes.  Yes, sir.

Q    Okay.  And, of course, this page, Addendum A,

talks about the Grosses and the VSDH seller's obligations under the buyback option, right?

A    Yes, sir.

Q    And so you initialed it on whose behalf?

A    I initialed on behalf of the seller, and the Grosses initialed on behalf of the buyer.

Q    Okay.  And when we get to the next page of the addendum, we see your initials and the Grosses' initials again at the bottom; is that right?

A    Yes, sir.

Q    Okay.  And when you initialed this page, on whose behalf were you initialing; your own or the partnership?

A    Again, I never initialed or wrote my name as an individual.  I only wrote it on behalf of the partnership, and those were initials at that point in time.

Q    All right.  Now I want to call your attention to the last page of the addendum.  And you see right here where it says, In addition, in Paragraph 15 in the body of the contract under default, seller reinstates language stricken.  And then it says in quotes, seek such other relief as may be provided by law or both, end quote.  Did I read that right?

A    Yes, sir.

Q   All right.  So were you the seller?

A   Yes, sir.

Q   You, Doug Hickok, were the seller?

A   No, not me personally.  Of course, not.  Again, I said it so many times.  No, VSDH is the seller.

Q   Okay.  And where does it say in this language that Doug Hickok or Van Shaw, guarantors, reinstate language stricken?

A   Again, you don't see that anywhere on this contract.

Q   So now, let's look at, if we may, Paragraph 15 of the contract.  And you see Paragraph 15 right here on Page 5 of the contract that says default.  All right?

A   Yes, sir.

Q   Are you with me right over here?

A   I am.

Q   Okay.  Now, it has some typewriting on there right?  There's text that was typed into the form --

A   Sure.

Q   -- that talks about default, right?

A   Yes, sir.

Q   All right.  And then you see starting right here, okay, going all the way down to here and then over here cross-throughs.  Do you see that?

A   Yes, sir.

Q    Is that the stricken language that was referred to at the end of the addendum that seller reinstated?

A    Yes, sir.

Q    Okay.  Now, what is your understanding of the cross-throughs that are contained in Paragraph 15 where the language is blacked out?

A    Well, I have to read it real quick.  Excuse me.

Q    In other words, what was the purpose of blacking it out?

A    Oh, the purpose of blacking it out is to make it no longer a part of the contract.

Q    Okay.

A    Then the buyer and the seller initial off to the side, which you can see out there that they're in agreement for the blackout.

Q    So, in other words, they initial that change; is that right?

A    Yes, sir.

Q    All right.  And when you initialed that change, you were initialing it on whose behalf?

A    On behalf of the seller.

Q    All right.  Now, this contract originally said that -- and let me get to the part here, right here where it says -- beginning with, "If seller."  You see that part there?

A     Yes, sir.

Q     So it says, "If seller fails to comply with this contract for any other reason," and "other reason" would refer back up to the language above, except for the fault of the buyer.  It says, "Seller will be in default and buyer may" -- and then you see that line right here?

A     Yes, sir.

Q     Okay.  You go over to this line and it says what?  Can you read what that says?

A     It says, "As it's sole and exclusive remedy entered" -- I can't see.

Q     Either.  Does it look like "either"?

A     Okay.  Either.

Q     Either.  And then you go back to, a, enforce specific performance.  And then we see a strike-through, right?

A     Yes, sir.

Q     "Or terminate this contract and receive the earnest money thereby releasing both parties from this contract."  Did I read that right?

A     Yes, sir.

Q     And before this part was stricken out where it says -- it said, "seek such other relief as may be provided by law or both," right?

A     Yes, sir.

Q     All right.  And the seller, based upon the portion of the addendum that we read a little while ago, reinstated seek such other relief as may be allowed or provided by law or both, right?

A     Yes, sir.

Q     Doug Hickok never did that, right?

A     No, sir.

Q     Guarantor never did that, if there was a guarantor?

A     No, sir.

Q     Van Shaw never did that, did he?

A     No, sir.

Q     All right.  Do you understand that you are being sued for damages in this case?

A     Are you saying me personally --

Q     Yes, sir.  Have you been sued?

A     -- or VSDH?

Q     The Grosses are suing you to recover damages, right?

A     Right.  Me, personally, yes, sir.

Q     Okay.  Now I want to talk to you about the whole idea of a personal guarantee in this transaction. All right?  And so yesterday, in response to some questions that were asked of you by Mr. Gross -- I mean

-- I'm sorry -- Mr. Aldous on behalf of Mr. and Mrs. Gross, there was discussion about exhibit, Gross Exhibit 1, which was a May 25th, '07, it looks like a memo or a letter from Mr. Gross to Mr. Buttemiller, right?

A     Yes, sir.

Q     And what you have here is Mr. Gross telling this realtor, this broker, "Here's our proposed changes." And he says, "In addition to the corrected copy, please insert the following." All right? And it says, "Where I have marked A, insert, 'When completing the improvements, buyer will review with seller the plans and specifications and receive general consent, consent not to be unreasonably withheld to proceed with the improvements'" Did I read that right?

A     Yes, sir.

Q     And it says, "Seller understands that buyer has the right to make minor changes and decisions during the process of completing the improvements provided they are in the best interest of completing the improvements in the most logical and reasonable manner." Did I read that right?

A     Yes, sir.

Q     All right. Now I want to look at -- and this is language that Mr. Gross wrote and asked

Mr. Buttemiller to insert into the contract, right?

A    Yes, sir.

Q    All right.  Now, what I wanted to do is I want to look at the language on that topic that actually got into the contract.  And this is Paragraph 2, entitled buyer improvements.  All right.  And it be starts off by saying, "Before commencing construction, buyer will review with seller the plans and specifications and receive general consent, consent not to be unreasonably withheld to proceed with improvements."  Did I read that right?

A    Yes, sir.

Q    So what Mr. Gross had proposed was when he was doing it and he was completing it, he will review with the seller the plans and specifications and receive general consent, right?

A    Yes, sir.

Q    But what the Grosses agreed to in the contract was to review with the seller the plans and specifications and receive general consent to proceed with the improvements before commencing construction, right?

A    Yes, sir.

Q    And I believe you've testified ad nauseam at this point that before commencing construction, the

buyer did not review with the seller the plans and specifications or receive general consent, right?

MR. ALDOUS: Objection, Your Honor, leading.

THE COURT: Sustained.

Q (By Mr. Chaiken) Well, before commencing construction, did the Grosses review with the seller the plans and specifications and receive general consent before commencing that construction?

A They did not.

Q Okay. Now, Mr. Gross also told Mr. Buttemiller via his May 25th, '07 message, "We would like to suggest a new addendum Number 4 that reads" -- and then we see what it says there, right?

It says, "Doug Hickok and Van Shaw, as partners in VSDH Vaquero Venture, Ltd., each hereby agree to personally guarantee seller's obligations under the buyback option granted by VSDH to buyer hereunder." And we can read the rest of it.

Now that language was suggested by Mr. Gross to Mr. Buttemiller, right?

A Correct.

Q It wasn't suggested by a lawyer acting for Mr. Gross, right?

MR. ALDOUS: Let me object, Your Honor.

He's not demonstrated personal knowledge of that.

Q   (By Mr. Chaiken) Let me ask him.  Do you have personal knowledge of whether a lawyer ever recommended that letter -- that language to Mr. Buttemiller?

A   I do not.

Q   All right.  Now I want to talk to you about your -- your impression and your perception of what happened after -- well, let me ask you this question.

How did you find out about this whole proposed guarantee issue?  Who told you?

A   Mr. Buttemiller.

Q   And when Mr. Buttemiller told you that, in what capacity did you understand he was acting?

A   He was acting as agent for the Grosses.

Q   Okay.  And did he call you and talk to you about a guarantee idea?

A   He did call me.  Yes, sir.

Q   All right.  And tell me and tell the jury what that conversation was like to the best of your recollection

A   Well, to give you the full background, there was originally --

MR. ALDOUS:  Your Honor, I would object. That's hearsay.

MR. CHAIKEN:  Your Honor, it's an

exception under 803.1 or 3, and it's also not hearsay under 801(E)(2)(C) Or (D) because it is a statement of a person authorized by the party for making statements or by an agent concerning the subject matter in the scope of the agency.

THE COURT: Overruled.

MR. ALDOUS: Well, Your Honor, he hasn't established what the scope of the agency is, other than to say that he is a real estate agent. And I believe that this real estate agent was agent for both parties.

THE COURT: That's the testimony thus far. So you'll need to lay a foundation before you can go into that issue more specifically.

Q (By Mr. Chaiken) When Mr. Buttemiller called you to talk about a guarantee issue, okay, who did you understand he was acting for in communicating with you?

A He was acting for the Grosses.

Q And did you understand that communication to be within the scope of his agency for the Grosses?

A Sure.

Q Okay. Was there any doubt in your mind that he was authorized to speak about the subject matter of a guarantee on behalf of the Grosses with you?

A I thought for sure he was authorized to do so.

Q So tell us what he told you.

A     Well, there was originally a different Addendum A that didn't have this language in there about a guarantee, and so this came to me as a surprise. He called me on the phone and asked me would you and Van be willing to guarantee this -- this buyback. And my response was real simple. Okay. I didn't have a problem with the concept of guaranteeing it, but I certainly couldn't speak for Mr. Shaw. So, therefore, I had to get Mr. Shaw's approval.

And I also had to look at what the guarantee said. I wanted to see what the guarantee agreement said. So I asked him for those two things; one, to get a copy of the guarantee agreement and, two, I needed to talk to Mr. Shaw before I could really respond.

Q     And when you say that you told him you needed to see a copy of the guarantee agreement, were you referring to a particular type of document?

A     A guarantee agreement is what I was referring to. It's actually a document that shows what -- it literally may be two, three, five pages long that says here's what you're guaranteeing. Here's all the, you know, covenants and everything of the guarantee.

Q     And would it be an agreement that was set up for signature by whoever the guarantor or guarantors

were?

A    Absolutely.

Q    Okay.  So you had asked him to provide you a proposed guarantee in that format, one that set out who the guarantors were, what the scope of the guarantees were and had signatures that you were being asked to sign; is that right?

A    Yes, sir.

Q    And that Mr. Shaw was going to be asked to sign, right?

A    Yes, sir.

Q    And you communicated to Mr. Buttemiller what about Mr. Shaw?

A    That I communicated -- I'm not sure what your question is.

Q    You said you told him that you had to run it by Mr. Shaw; is that right?

A    Yes.  I can't speak on behalf of Mr. Shaw

Q    Okay.  And did you ever get a proposed guarantee form of the nature you just described from Mr. Buttemiller?

A    No, I didn't.  I'm not sure that this conversation didn't happen a few days -- I don't know when exactly it happened.  It happened evidently sometime between the date of this memo and the date we

signed the contract and put it in the title company.

Q    Did Mr. Buttemiller tell you that he'd get you the guarantee form so that you could run it by Mr. Shaw?

A    He told me he would, absolutely. I would get a guarantee form.

Q    Okay. And did he ever -- did anybody else -- excuse me -- on behalf of the Grosses ever provide you with a guarantee form that they wanted you and/or Mr. Shaw to sign as guarantors?

A    I didn't get one from Mr. Buttemiller, I didn't get one from Mr. Gross, and I didn't get one from the Grosses' lawyer.

Q    Okay. And is that effectively where the conversation about guarantees ended?

A    There was not another word said about a guarantee.

Q    Okay. And when you got to the closing, did anybody have a guarantee form there for you or Mr. Shaw to sign?

A    As I said earlier, I'm not sure if I did or didn't sign a guarantee at closing because there was a stack of documents like this. I don't remember until I went back preparing -- well, back when we got into the dispute with the Grosses and we looked through all the

documents, I realized we didn't have a guarantee.

Q   So you were never given a guarantee to sign at closing; is that right?

A   I -- no, because there's nothing in the file.

Q   Okay.  I want you to please look with me at Gross Exhibit No. 15, which has already been admitted into evidence.  This exhibit is entitled construction loan agreement.  Do you see that?

A   Yes, sir.

Q   And it says at the top, the construction loan -- "This construction loan agreement is made and entered into on the 27th day of June by and between Kenneth Gross and Betsy Gross herein after called borrower and First Horizon Home Loans, a division of First Tennessee Bank National Association hereinafter called lender."

And it says, "Impact Health, Inc, d/b/a Impact Estates, hereinafter called contractor, is executing this agreement, not as a contract party hereto entitled to any benefits, but for representations and warranties and indemnities," and it goes on and says what it says.  See that document?

A   Yes, sir.

Q   Okay.  Now, do you remember the date on which the purchase and sales transaction where VSDH sold the residence to the Grosses closed?

A    I thought it was on June 29th of 2007. I would have to look at the --

Q    All right. But it was right around the time period of the date of this document, right?

A    Right.

Q    Okay. Now, let me show you Page 3 of this agreement, okay? All right. Now I want you to look right here, Mr. Hickok, under Paragraph D(2) (H), this part right here.

A    Yes, sir.

Q    Let's see if we can read this together. Do you want to read it?

A    Sure. It says, "Unless otherwise specifically approved in writing by lender, construction on the project will commence on or before 15 days from the date of this agreement and borrower and/or contractor will cause the construction of the project to be completed on or before December 23rd, 2007, in accordance with the plans and specifications approved by the lender free and clear of all liens or claims from liens or for liens for material, supplies and/or labor performed in connection with the construction of the project."

Q    Okay. Now, did Mr. or Mrs. Gross ever tell VSDH or you that they had signed an agreement with their lender that required them to commence construction on

the property on or before 15 days from the date of this agreement, which, as we just talked about, was June 27th of 2007 and complete construction on or before December 23rd, 2007?

A    No, sir.  They did not.

Q    Did they tell you at any time in the transaction that they had to complete that construction within that time period in accordance with plans and specifications approved by the lender?

A    No, they did not.

Q    Did they ever tell you why they did not commence construction within -- on or before 15 days from the date of their agreement with their lender that required them to do so -- commence within 15 days?

A    No, sir, they didn't.

Q    Did they ever tell you why they didn't complete it on or before December 23rd of 2007?

MR. ALDOUS:  Your Honor, I object. There's no relevance to the agreement between the Grosses and their bank.

THE COURT:  What's the relevance, Mr. Chaiken?

MR. CHAIKEN:  Your Honor, the relevance of this document is that they -- that they had obligations to their lender to start and complete the construction

in accordance with the plans and specifications that they never delivered to VSDH. And I want to show that they had an obligation not only to have them but to have them done and approved within a certain period of time.

THE COURT: How is that relevant to the cause before the Court?

MR. CHAIKEN: Well, because they have argued that they commenced construction in accordance with the -- with approval at a visit that occurred much later.

THE COURT: I'm going to sustain the objection. Do you have any further questions?

MR. CHAIKEN: I do, Judge. I was just looking for my next exhibit here. I'm sorry, Judge. I'll move rapidly here.

Q (By Mr. Chaiken) I want to talk to you briefly, Doug, about the buyback option in a second here. You've given some testimony -- well, let me ask you. You were asked by Mr. Aldous whether VSDH intended to buy back the property as of May of 2009 when the Grosses sent a letter saying they wanted you to buy it or VSDH to buy it back. You recall that testimony?

A Yes.

Q Okay. Now I believe you've testified that at that point in time, VSDH had a question about whether or

not it was obligated to buy the property back under the buyback option. Was that your testimony?

A Yes, sir.

Q Okay. And what was VSDH doing about the buyback option, other than you telling Mr. Shaw to handle it, during the period of time from the May 1st declaration date and the September 1st, 2009 buyback date?

A You have to rephrase that question for me.

Q Yeah. Was VSDH Vaquero Venture, Ltd., thinking about whether to proceed to buy the property back on September 1st, 2009, notwithstanding the fact that the Grosses -- or that VSDH believed that the Grosses already had breached the contract?

A Yes.

Q Okay. And you had -- I believe you said earlier you had the option to do so if you wanted to; is that right?

A Yes, sir.

Q When did you, Doug Hickok, ever communicate to the Grosses or to anybody else that VSDH was not going to perform the buyback obligation on -- I'm sorry -- the buyback on September 1st, 2009, the buyback date?

A There was never any communication from VSDH, Doug Hickok, to -- that basically said we were not going

to perform the buyback.

A    Now, you've read this addendum A, the buyback option, while you've been sitting on the stand for the past day and a half now, correct?

A    Yes, sir.

Q    Can you point to me where in that buyback obligation -- or the buyback option language -- excuse me -- there is any obligation on the part of VSDH to tell the Grosses, yes, we're going to do it, no, we're not going to do it on September 1st 2009 after they sent their declaration date notice?

A    It doesn't exist.

Q    So there was no obligation in the contract for VSDH to tell the Grosses, yes, we're going to do it, no, we're not going do it; is that right?

A    That's correct.

Q    All right. Were you and Mr. Shaw receiving lots of emails from the Grosses shortly after the declaration date of May 1st, 2009, pressing you to find out whether you're going to do it, meaning VSDH was going to do it or not going to do it?

A    Yes. I believe Mr. Shaw handled most of those. I've been revisiting them today in court.

Q    And in the June to July timeframe, were the Grosses telling you that if you didn't do it and you

didn't tell them you were going to do it, they were going to go the legal route?

A    I absolutely saw that in one of their emails to us that they were going to -- which meant, to me, they're going to sue us.

Q    Did you see any emails written by Mr. and Mrs. Gross and sent to you and Mr. Shaw before the September 1st, 2009 date that were copied to people that you knew or understood were lawyers other than Mr. Shaw?

MR. ALDOUS:  Your Honor, I would invoke the best evidence rule, saying that if he's going to testify about the contents of the document, he needs to produce the document.

THE COURT:  Sustained.

Q    (By Mr. Chaiken) At any time prior to September 1st, 2009, did you on behalf of VSDH feel as if the Grosses were threatening you with litigation if you did not commit to the buyback option and to buying the property back?

A    I think that was the underlying theme, absolutely.

Q    Did you personally feel as though Mr. and Mrs. Gross were threatening you personally with litigation or a lawsuit if you didn't say you personally would buy it back if VSDH did not?

A    Again, I believe that was the underlying tone.

Q    Did you appreciate those -- that tone or those threats?

MR. ALDOUS:  Your Honor, I object.  That's irrelevant.

THE COURT:  Sustained.

MR. CHAIKEN:  Your Honor, I will reserve the rest of my questions for Mr. Hickok until the defendants' case in chief.  Pass the witness at this time.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Thank you, Your Honor.

May I sit over here?

**REDIRECT EXAMINATION**

BY MR. ALDOUS:

Q    Sir, Exhibit 15 that you refer to, the construction loan agreement between the Grosses and their bank, VSDH is not a party to this agreement, are they?

A    No, sir.  That's a tri-party agreement between them, their contractor, and their bank.

Q    And the contractor was Mr. Grosses' company, Impact Estates, correct?

A    I'm not sure of that.

Q    So would it be true that the first time that

you looked at this construction loan agreement was in connection with this case?

A    Yes, sir.

Q    And so this construction loan agreement that your counsel brought out, Exhibit 15, had nothing to do with any action you took prior to the time of this lawsuit?

A    That's true.

Q    Now, you indicated that there was never a communication from you, yourself, or VSDH that they were not going to honor the buyback clause of the contract; is that what you said, sir?

A    Yes, sir.

Q    Isn't it true that you turned over to Mr. Shaw the issue relating to the buyback after May of 2009?

A    Yes, sir.

Q    Isn't it true that Mr. Shaw had authority to act for you and VSDH with regard to the buyback provision?

A    No, sir.

Q    So you turned the matter over to VSDH -- you represented to the Grosses that you were turning this matter over to Van Shaw and in reality had no authority to act on behalf of VSDH?

A    No, sir.  That's not what you said.  You said

on my behalf and on VSDH's behalf. He had the authority to act on behalf of VSDH, not on my behalf.

Q   All right. I apologize.

A   Okay. Thank you.

Q   Would you agree with me that Van Shaw had the authority to act on behalf of VSDH with regard to the Grosses and the buyback after May of 2009?

A   Yes, sir.

Q   And if Mr. Shaw told the Grosses that VSDH was not going to perform on the buyback, that came with the authority of VSDH; do you agree with that?

A   I agree with that.

Q   All right. Now on Exhibit 3, whatever the contract is, Exhibit 3 under the tab -- the Gross Exhibit 3. You were asked some questions about paragraph No. 5 and the little blurb that comes after that in the addendum on Page 35.

A   In the addendum, okay.

Q   Yes, sir. I will give you just a second to get there.

A   You've got it up on the screen?

Q   I do. Okay. I'm going to ita little bit bigger. Oh, the other way.

Now you see in there it says you were asked some questions about whether you, Doug Hickok,

agreed to this particular provision that says, "In addition," in Paragraph 15 in the body of the contract under default, "Seller reinstates language stricken, seeks such other relief as may be provided by law or both," correct?

A    Correct.

Q    And you agree with me that VSDH agreed that that was going to be a term of the buyback agreement?

A    I agree that VSDH agreed to that, but not Doug Hickok.

Q    Well, why don't you just try to answer the question I'm asking you.  The question I'm asking you is:  VSDH agreed that that blurb would be a term of the buyback option, right?

A    You're going to have to restate that for me because I'm not sure what exactly you're saying.  The term of the buyback option, I don't understand what you're saying.

Q    Well, you indicated that when you initialed this, that this became a term that you agreed to as part of VSDH, right?

A    Only on behalf of VSDH.

Q    I don't know how I can make my question any clearer, sir.  Did VSDH agree that this particular part of the addendum would be a term of the buyback?

A    Yes, sir.

Q    Okay.  VSDH Exhibit 6, do you have that up there?

A    No, sir.  I just have 5.

MR. CHAIKEN:  It was Gross 6. It was really 2.  Excuse me.  I think it's what you're referring to.  I'm trying to be helpful here.  Excuse my interruption

MR. ALDOUS:  Let me just put it on the screen for you.

Q    (By Mr. Aldous) This has already been admitted into evidence as VSDH Exhibit 6.  Do you see the new home contract there?

A    Yes, sir.

Q    Do you see it has the $2,851,871 figure?

A    Yes, sir.

Q    Now you agree that later on that changed, right?

A    Yes, sir.

Q    All right.  Now, if you turn to the addendum -- and you don't have to turn because you don't have it.  I do.  Do you see here's the addendum that we've been talking about?

A    Yes, sir.

Q    And you see that it's pretty much the same as

what eventually got signed off on, but there's a couple of changes, right?

A    Yes, sir.

Q    For instance, Exhibit 3 Gross shows that there's handwriting in there that says, "declare the buyback option becomes null and void." Do you see that right there at the bottom, casualty? Do you see --

A    Yes.

Q    -- that little interlineation?

A    Yes.

Q    Now if you look at it here, that's also a part of this. So there was no change really to the casualty portion of this, right?

A    Correct.

Q    Now, did you strike out the part that says seller may, at its option, object to either declare the buyback -- that portion that's struck out?

A    I couldn't tell you.

Q    Is it an appropriate way to deal with language in the contract that you disagree with to strike it out and make an initial?

A    Yes, sir.

Q    And that's one of the ways you let the other party know you don't agree with that?

A    Yes. The two parties to the contract. Yes,

sir.

Q    Right.   And then if you look at Exhibit 6, VSDH Exhibit 6, you see that this has virtually no handwriting on it, including the portion related to the escrow agreement on Paragraph 3. Do you see that?

A    Yes, sir.

Q    That changed, didn't it?

A    Yes, sir.

Q    So when you look at the one that was -- the contract that actually ended up, you see that in the escrow agreement somebody's taken a black magic marker and marked through a whole sentence?

A    Yes, sir.

Q    Do you see that and added the language that says "at closing"?

A    Yes, sir.

Q    Do you know who did that?

A    I do not.

Q    Was it one of the parties to the agreement trying to tell the other party to the agreement, hey, I don't agree with that?

A    Or it could have been the agent.

Q    Agent at somebody's suggestion?

A    Yes, sir.

Q    But the agent wouldn't do it without a

direction from either VSDH or the Grosses, right?

A    I believe so.

Q    The part that was stricken out, do you see the part that is blacked out there?

A    Yes, sir.

Q    It's after the sentence of property.  If you look at this, it says what was stricken out is a total of 156,871 of these improvements have been incorporated into the 2.851 sales price.  Do you see that?

A    Yes, sir.

Q    That's what you were referring to earlier, right?

A    Yes, sir.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  I forgot I don't have to approach.

Q    (By Mr. Aldous) If you look at Exhibit 105, which is already in evidence --

A    Okay.

Q    -- you see that that's an email from you to John Buttemiller and Gary Sommerfelt, Hap Stern, and Van Shaw, basically the VSDH side of the equation, right?

A    Yes, sir.

Q    And it's dated June 20, 2007.  Do you see it?

A    Yes, sir.

Q    It says, "Per your request on behalf of the buyer, I have reduced the purchase price by removing the amount of the escrow funds in the contract to 2,695." That's exactly what you talked about, right?

A    Yes, sir.

Q    The buyer requested this, right?

A    Yes, sir.

Q    In addition, in Paragraph 3 of Addendum A, the appropriate language was removed and inserted, "Please see the attached," right?

A    Yes, sir.

Q    And you say, "Hey, look, if this looks good, please sign off"?

A    Yes, sir.

Q    And that's the way it's handled, right?

A    Yes, sir.

Q    And there's nothing unusual about this?

A    Well, it was -- no, I don't think there was anything unusual about it.  No.

Q    When somebody suggests a change, if you agree to it, you try to incorporate the change into the agreement and let everybody know that the agreement has now been changed?

A    Yes, sir.

Q   So, Mr. Hickok, this Paragraph 4 of the Exhibit 3, Paragraph 4, what do you call that?  I want to use your language.  What do you call that paragraph?

A   It's a -- it's a portion of the contract inserted there between VSDH and the Grosses.  It's a paragraph.

Q   Okay.  In your mind, what is this paragraph meant to accomplish?

A   I think it's meant to accomplish that in the perfect world, I think from your standpoint, the Grosses' standpoint, is to have Doug Hickok and Van Shaw guarantee this.  That was what the Grosses wanted to have happen.

Q   And so you recognize that at least the way this paragraph is worded, it says that you and Van Shaw personally guarantee the seller's obligations under the buyback option, granted from VSDH, the seller, in the event VSDH fails to perform fully under the terms of the buyback, each of its partners set forth above shall be personally responsible, personally responsible, right?

A   That's what it says.

Q   So you recognize that this was meant to be a personal guarantee?

A   Well, it may have meant to be, but it can't.

Q   So here's my question to you.  I think the jury

wants to know. Why didn't you just black through that?

A Well, probably because it -- this was already in the title company. It's not -- I don't have a copy of the contract.

Q Well, before when it was -- originally came in, you said it was suggested to and put in there by Mr. Buttemiller. You were expecting another document. You didn't get it, but why didn't you just strike through that and say it didn't work?

A Well, I didn't get the document. If you would have delivered -- if they would have delivered me a guarantee agreement with this in the title company, we could have then looked at signing the guarantee agreement. We never got that. My intent -- okay.

Q Let me just make sure. I want to make sure what you're telling me. Now, you're not a lawyer, correct?

A No, sir.

Q And you have -- you don't have the ability to testify to what the legal ramifications of a document are, correct?

A No, sir.

Q You agree with what I said?

A Yes, sir.

Q We had a double negative.

A    Yeah.

Q    So, although you recognize that this was a --
this Paragraph 4 was a purported personal guarantee, you
did not strike through it in any form or fashion?

A    Correct.

Q    All right. Now you indicated in your testimony
that -- and I wrote these down. And if I say it wrong,
would you let me know?

A    Okay.

Q    I wrote down that you said the written terms of
the contract are most important?

A    Yes, sir.

Q    That everything in a contract is important and
that's why you read it?

A    Yes, sir.

Q    So -- and, in fact, you said, I believe, the
reason that you initialed all these pages is so that you
don't get slip sheeted?

A    Correct.

Q    Now, to me slip sheeted, that's kind of like a
term of art, right? That means somebody slipped a sheet
in and tried to get some extra terms that weren't agreed
to?

A    Well said.

Q    And that's why you initial every one of these

pages?

A    Correct.

Q    And when you initialed this page, Addendum 4 right there and you put the line underneath it --

A    Yes, sir.

Q    -- you put your initials and you didn't indicate one way or the other whether or not that was for VSDH or for you personally.  Agreed?

A    Well, it could only have been for VSDH. They're the only party to this contract.

MR. ALDOUS:  Objection, nonresponsive, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Aldous) Let me just ask you again.  On this page where your initial is, it doesn't say Doug Hickok personally; it doesn't say Doug Hickok as representative of VSDH?

A    Correct.

Q    Now you indicated that -- I asked you this question before only with respect to Exhibit 59.  And it's dated August 18, 2009.  This is the one where the Grosses got a contract, they're willing to sell it, they reach out to you and say, "Hey, one more time, let us know."  And I think you said, "I didn't respond to this," right?

A   I don't believe I did.

Q   Right.  And we talked about the fact that you guys had already sued the Grosses.  Do you recall that?

A   I don't remember the exact date, maybe.

Q   July 7, 2009.

A   Okay.  I'll take your word for it.

Q   Okay.  Here's my question for you.  Had you guys at VSDH gone out and gotten like a loan approval or something to buy back the home so that you could do it by September 1st as of August 18th?

A   Didn't get a loan approval, no.

Q   Did you ever on behalf of VSDH seek to get a loan approval to buy this house back?

A   No, sir.

Q   You had some testimony about how important it was to you that the addition, to the extent that it happened, that you made sure that it didn't have purple walls and things like that.  Do you recall that?

A   I do.

Q   And that that's one of the reasons that you wanted to make sure that you had some approval and that sort of thing, right?

A   Correct.

Q   Now I showed you earlier where when the Grosses -- the Grosses got done with the addition, they sent you

a thing and said, "Hey, come on out and take a look."
If it was so important to you what the -- and you didn't
know what the addition was going to look like, wouldn't
you want to go see, see what they built to see whether
or not it matches up with the rest of the house?

A When it was all finished?

Q Yes, sir.

A The answer to the question is, yes, except for
the fact that they had already violated the agreement.

Q But I thought you told us that it was still
your option and if you guys wanted to, you could buy
this house back?

A Sure, we could. We had until September 1 to go
look at those improvements if we chose to.

Q So you didn't go look at them and you really
were willing to buy it back, but you had no idea what
the addition looked like?

A Had not -- I was more concerned about the
estimated prices outlined in the Grosses' emails to us
as -- I think this came up in our discussion was, wow,
did this house get devalued because of the improvements?

MR. ALDOUS: Objection, Your Honor,
nonresponsive.

THE COURT: Sustained.

Q (By Mr. Aldous) Mr. Hickok, do you recall in

2008 that the United States experienced somewhat of a financial downturn?

A    Sure.

Q    Did you in the real estate business experience a downturn?

A    Some forms and fashions, yes; others, no.

Q    Do you think maybe that the drop in value of the real estate prices had anything to do with the economy going down?

A    Again, that's a pretty general statement.

Q    I'm asking for a general answer.

A    Well, I think in specific locations, no, and other locations, yes.

Q    But at the end of the day, despite the invitation to go take a look at this addition, you didn't take it, right?

A    No, sir, we did not.

MR. ALDOUS:  I'll pass the witness, Your Honor.

THE COURT:  Mr. Shaw?

MR. SHAW:  Thank you.

**RECROSS EXAMINATION**

BY MR. SHAW:

Q    There was some talk about -- this is out of VSDH Exhibit 6, the addendum -- some talk about Section

4 and well, why didn't you strike it? Were you opposed to Section 4 at the time you signed this contract?

A No.

Q Was VSDH opposed to this at the time it signed the contract?

A No.

Q You had, as I understand it, two things you wanted. You wanted to see the personal guarantee agreement; is that right?

A Yes, sir.

Q And you wanted my agreement to personally guarantee?

A Yes, sir.

Q You wanted me to sign something and you wanted to see the terms?

A Yes, sir.

Q And you to sign something?

A Yes, sir.

Q All right. Those three things and you never got that document?

A No, sir.

Q All right. Now, I have been a lawyer many years and you've been --

MR. ALDOUS: I feel an objection coming on. I just thought I would stand up right now.

THE COURT: I think you ought to rephrase that question, Mr. Shaw.

MR. SHAW: All right.

Q (By Mr. Shaw) You didn't get a loan on this house in 2009, fair? You didn't get a loan?

A I didn't get one. No. I didn't get one.

Q All right. Did you have an understanding that I had the financial ability to close on this home without a loan?

A Yes, sir.

Q So I could have bought it without a loan --

A Yes, sir.

Q -- is what you understood?

MR. SHAW: Okay. Pass the witness.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: Yeah, I've just got a couple of clarifications.

**CROSS-EXAMINATION**

BY MR. CHAIKEN:

Q Mr. Aldous a few minutes ago stated in the beginning of a question to you something along the lines of VSDH was willing to buy it back, but wouldn't go out there and look at it in response to the Grosses' invitation. You recall that?

A Yes, sir.

Q    Prior to September 1st of 2009, had VSDH decided whether it was willing to buy the property back or not?

A    It had not decided.

Q    Did it still have time left up until September 1st, 2009, to make that decision?

A    Yes, sir.

Q    To make the decision as to whether Mr. Shaw would put up the money, that was the buyback price or some other price that may have been part of what the Grosses were discussing with you-all as a possible way to resolve the buyback issue?

A    Yes, sir.

Q    And were you considering -- when I say "you", VSDH -- was VSDH considering alternatives that the Grosses were proposing in order to accelerate this whole buyback concept?

A    Yes, sir.

Q    But no agreement was ever reached, right?

A    No, sir.

Q    Now why did VSDH sue the Grosses in July of 2009?

MR. ALDOUS:  Well, Your Honor, I object to that because he indicated he had no personal knowledge of it.

THE COURT: Sustained.

MR. CHAIKEN: I'll address that later with Mr. Shaw.

Q    (By Mr. Chaiken) Last thing I want to talk to you about, and I would make this brief, is Exhibit No. 24, which is the October 18th, 2008 letter from Mr. Gross to you. Okay? And, specifically, the language that says I am beginning construction of the addition and wanted to show you the plans for approval. And it says if you give me an address, I'll be happy to send them to you for your review, right?

A    Yes, sir.

Q    And yesterday, Mr. Aldous said in forming a question to you, "I've never seen a document that gave the Grosses an address"; do you remember that conversation?

A    I do remember that.

Q    And then he said, Well, when did they get a document that had the address?" Remember all that?

A    Yes, sir.

Q    Okay. Now, I want you to look at -- this is from Exhibit No. 3, and it is the contract right here. And it says, "All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered, or transmitted facsimile or electronic

transmission as follows to seller." And then you've already talked about this with Mr. Shaw. But there's an address, right?

A    Yes, sir.

Q    And that was the address for the seller, VSDH, in the contract, right?

A    Correct.

Q    It's an address that never changed, right?

A    No, sir.

Q    And that Mr. Gross was aware of when he and his wife signed this contract with that address in it, right?

A    Correct.

Q    All right. So he didn't need you to give him an address; he already knew where to send it, right?

A    Correct.

Q    All right. Now, when Mr. Gross said in his letter, "I am beginning construction of the addition," did you come to find out that that statement was not true?

A    I did. I mean, when I read this, I -- I was under the impression they were thinking about beginning construction And I found out they were well along with construction when I went out there.

Q    So the correct statement in here would have

been, "I've begun construction and wanted to show you the plans for approval," correct?

A   Correct.

MR. CHAIKEN:  Now I will reserve the balance of my questions until the -- of Mr. Hickok until the defendants' case in chief if necessary. Thank you, Judge.

THE COURT:  So this is your second reservation?

MR. CHAIKEN:  Well, it is.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Thank you, Your Honor.

**FURTHER REDIRECT EXAMINATION**

BY MR. ALDOUS:

Q   Mr. Hickok, you just said that the October 16, 2008, that the Grosses must have started construction, but you didn't even go out there until weeks later, right?

A   Of course.  But when I went out there, they were well along with construction

Q   Well along and you -- but you can't tell us when you went out there, so you don't know what had happened on 10-16, do you?

A   I can actually say on 10-16 from my professional opinion that they were at least two months

or more along with construction and probably a six-month construction period.

Q    Did it take you two months to show up out there to take a look?

A    I don't think so.

Q    You don't think so?

A    No, sir, I don't.

Q    Are you sure maybe that it's just you're not speculating on that?

A    I think I would have received another email from the Grosses wanting me out there tomorrow or the next day.  They would have kept on trying to email me to get me out there.

MR. ALDOUS:  Okay. I'll pass the witness.

THE COURT:  Mr. Shaw?

MR. SHAW:  Nothing further. Thank you.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  Same reservation, Judge. Thank you.

THE COURT:  All right.  Are there any questions from the jury?  Anybody write down any questions for this witness?

All right.  We will take a recess until 3:00 o'clock  During this recess, the jury is under the same instructions you've been previously given.  You're

not to discuss this case among yourselves or with anyone else until such time as this case has been submitted to you for your deliberation or you have been discharged as jurors.

All rise. The jury is excused.

(Jury exits the courtroom)

THE COURT: You may step down.

We stand in recess.

(Recess taken)

THE COURT: All rise.

(Jury enters the courtroom)

THE COURT: You may be seated.

You may call your next witness, Mr. Aldous.

MR. ALDOUS: Your Honor, we would call Ken Gross.

THE COURT: Raise your right hand, please.

(Witness sworn)

**KENNETH GROSS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. ALDOUS:

Q First of all, Ken, don't lean back so far in that chair because it will eject you right out the back.

State your name please.

A    Ken Gross.

Q    Ken, so you've been sitting in here in the
courtroom.   I guess you're the Ken Gross that everybody
has been talking about, right?

A    Yes, sir.

Q    So tell me, are you married?

A    Yes, sir.

Q    Is this your wife right here?

A    Yes, sir.

Q    Is that Betsy?

A    Yes, sir.

Q    How long have you guys been married?

A    Twenty-seven years.

Q    I shouldn't have put you on the spot.   Sorry.

A    Twenty-seven years.

Q    So do you have any kids?

A    Yes, sir.

Q    Tell me about it.

A    A daughter, Alison.

Q    And then do you have some other daughters from
your previous marriage?

A    Yes, two.

Q    And where do they live?

A    They live in Indiana.

Q    Is that where you're originally from?

A   Yes, sir.

Q   So tell me about your work history.

A   I started out in the medical industry in pharmaceutical sales and then moved up into sales management, and then about ten years ago, I moved into the building industry.

Q   How did you get started in that?

A   Lightening had hit our house and we had a house fire and it was a significant fire. And I couldn't find anybody to rebuild the house, so I ended up doing it myself and then just sort of started from there.

Q   What type of work does Betsy do?

A   She's in medical sales as well.

MR. ALDOUS: Your Honor, is it okay if I get him some water?

THE COURT: You may.

Q   (By Mr. Aldous) So you're kind of a soft-spoken guy. You're going to have to speak up and make sure you speak up loud -- loud enough for everybody to hear. Will you do that for me?

A   Yes, sir.

Q   I'd like to take you back to 2007 and please tell us how it is that you began looking in Vaquero and why.

A   My wife and I had looked around at

opportunities to grow the business and were looking at developments where we could build a spec home and showcase our work as part of my career. And the Westlake development was appealing because it was just in the initial phases of development.

Q And when you say, "our business," what are you referring to?

A My building business.

Q What is it called?

A Impact Estates.

Q And when you were going and looking in this area, did you have an idea of where you might want to build a model home?

A Yes. We found a lot in the development in 2005 and purchased that lot, and then it subsequently flooded. We were unaware that it had a flooding problem. And in 2007 when we had real heavy rains, the property flooded.

Q And when you say, "the development," what are you referring to?

A Vaquero.

Q So at some point in time, did you identify this house, that is the one on White Wing Cove, as a potential?

A Yes, sir. When the one property flooded, we

realized that we weren't going to be able to build on it, so we were looking for a home that we could move into for an approximate two-year period of time while we found another lot and then built a home of our own to move into.

Q   So how did it all come about where you identified this house and you decided that you would do some kind of deal on it?

A   Having bought the lot, I was fairly familiar with the development, and I saw these two homes from actually when they were under construction   And then they were finished and sat vacant for, I think, over two years and realized that these homes weren't selling for a reason.   And the one home that we ended up purchasing in particular did not have a guest room downstairs and it did not have an elevator.   So for a home in this price range to have an elderly parent or somebody have to navigate stairs and not have a guest room downstairs, I felt was probably one of the reasons why the home wasn't selling.

Q   And in terms of being able to sell in this type of area -- I mean, price range, did you believe that it had to have that feature?

A   Yes, sir.   It was that and also at that time a lot of media rooms were very popular, and this home

didn't have a media room either.

Q   Now, were you familiar with the Vaquero sales people that were out there who -- the real estate agent that was part of Vaquero?

A   Yes, sir.

Q   And how did you become familiar with him?

A   Well, there was one gentleman who transacted the sale of the lot that flooded and he subsequently left and then Mr. Buttemiller, who was referred to earlier, replaced him.   And he was the one -- Mr. Buttemiller was the person that I contacted about purchasing the home on White Wing.

Q   So tell us -- take us through how it happened that you actually got into the home and started making the proposal.

A   Well, originally, we were thinking about renting, but I thought that possibly there might be an objection to renting a home of that price range.   So I wondered if there would be an opportunity to buy the home, take it off their hands for a couple of years, and then buy it back from us, helping them and also helping us.

Q   How were you helping them?

A   Well, they wouldn't have had anymore carrying interest.   I believe they mentioned earlier that they

were paying for the carrying interest on a couple million dollar loan.

Q    And what about the addition?

A    Well, the addition I felt was something that was needed in order to sell the home.  That's why I thought it hadn't sold.  So my proposal was that I would put on a guest room, an outdoor guest room, like casita I think they're called, and a pool bath, and then above that a media room.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) Let me show you what's been marked as Exhibit 125.  And before saying what it is, just say do you recognize this?

A    Yes.

Q    Thank you.

MR. ALDOUS:  Your Honor, would you like to look at it before I give it to them?

THE COURT:  Show it to them first.

You may approach.

Q    (By Mr. Aldous) Mr. Gross, is Exhibit 125 -- could you tell us what it is?

A    Those are the plans for the improvements on White Wing Cove, the home that is in discussion.

Q    Are these the plans that you had created?

A    Yes, sir.

MR. ALDOUS:  Your Honor, we move to admit Exhibit 125.

THE COURT:  Any objection?

MR. CHAIKEN:  Objection, failure to properly authenticate under 901.  The instrument purports to be prepared by somebody else.  It would also constitute hearsay and have hearsay within hearsay.

THE COURT:  Response, Mr. Aldous?

MR. ALDOUS:  Well, Your Honor, I don't know how to respond to say that it's hearsay.  I'm not saying that it speaks for the matter -- for the truth other than they just are plans.  And he authenticated them as the plans he received.

THE COURT:  Overruled.

Does that have an exhibit number?

MR. ALDOUS:  125, Your Honor.

THE COURT:  Exhibit 125 is admitted.

Q    (By Mr. Aldous) Now, Ken, these are not the easiest things to haul around, but there is one part of it that I want to look at, which is on the first page. And I'll have to really back up on this.  All right. Do you see the part of -- the first page of Exhibit 125 shows a plot plan.

A    Yes, sir.

Q   Can you tell us what that is?

A   That's the existing home and the garage and the proposed remodel on the top.

Q   Now, the garage, is the garage this area that I'm pointing to with my finger?

A   Yes, sir.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  I apologize.  I'm sorry. It's kind of hard because the paper keeps rolling up on me.

Q   (By Mr. Aldous) The existing home is exactly what it means.  That's where the house was?

A   Yes.

Q   And the proposed remodel, is that the casita type bedroom, pool bath that you're referring to?

A   Yes.

Q   Over here on this side, on the left-hand side of the home, what was over here?

A   Master bedroom.

THE COURT:  Excuse me just a minute, Mr. Aldous.

For those of you seated in 3 through -- 4 through 6, if you think you could see better in the back row, you're free to move back there.

You may proceed.

MR. ALDOUS:  Thank you, Your Honor.

Q    (By Mr. Aldous) So, Ken, why wouldn't you put the proposed remodel on the left-hand side of the home over here?

A    Well, the left side was the master bedroom, so you really wouldn't put a guest bedroom off the master bedroom.

Q    Just from your standpoint as the builder, is there any -- in your opinion, would any builder put an addition with a guest room off the master bedroom?

A    No.

Q    On this side of the home over here where the proposed remodel was, what was over there?

A    The kitchen was behind the garage, and the laundry room was behind the kitchen.  So where you see the proposed remodel, to the left of that is a covered porch.  Right underneath that porch, as we look at the picture, was where the laundry room was.

Q    And then what was above the garage?

A    Above the garage was a game room that had a sloped ceiling.  It was just an open room that they were calling a game room.

Q    Now when you were suggesting the proposed remodel, were you extending the game room?

A    Yes.  It was really a great set up for this

addition. And the casita, as they're called, or guest bedroom, was perfect in that it offered a lot of privacy. It was somewhat imperfect, you could say, because you had to go outside to get to it. But some people really like that. So pros and cons there. And the pool bath was right off the covered area that I just mentioned earlier. So you had a pool bath and a guest bath that could be used for privacy. And then above it with the game room being where it was located, it was just a natural to have the media room off the game room.

Q   Was this area right here where the pool was?

A   Yes, sir.

Q   All right.

MR. ALDOUS:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q   (By Mr. Aldous) These sheets, that is the following sheets, are a little bit bigger. And I'd like for you to hold that end of it and see if you can describe for us what is shown on this page. That is the second page of Exhibit 125.

A   This is the upstairs. These are the stairs going up. This was the existing game room that I referred to and the exiting roof. And then this is where the media room was located upstairs, and then

below that was the guest bedroom.

Q    And what is shown over here on the right?

A    That is basically the foundation or slab area.

Q    All right. So you had to actually add some foundation?

A    Yes, sir.

Q    Now the third page, which refers to manufacturing specifications and so forth, can you explain to us what this shows?

A    Yes, sir.  This is the existing utility room I spoke about, but then I was going outside of the home. You have a covered porch, a nice double door, a large guest bedroom or office or whatever it would be used for in the future, pool bath, shower, wet bar, and a huge walk-in closet.  It also had its own foyer entry so if it were used as a teenage room or an in-law suite or something, they would have their own private access to the area and not interrupt.

Q    Now the next page, what does that show?

A    That shows the media room.  This was the existing game room, so I came up with a plan to add an additional bathroom up there because I felt that it probably needed it.  If you had this type of set up again in this quality of home, you would not use an upstairs bathroom, one of the children's bathrooms.   So

we put in a bathroom, a wet bar. It's showing a closet, but I went above and beyond and made it a wet bar with a microwave. And then the media room is off that area.

Q So rather than having to leave the game room or the media room to go to the restroom or to get to the bar, you could stay in that area?

A Yes, sir.

Q Can you tell us what the elevations show?

A Yes. This is the remodel. This is the existing laundry room that they're kind of showing, and that as you look at this new part, this is the covered entry that I was referring to where the guest room was, and the media room was above.

Q Now this on the bottom here, what is that, the rear of it?

A That's the rear view and that's a side view.

Q All right. And then the final page?

A This was the existing garage. And you can see we built off the garage, kept these dormers exactly the same, put in a similar window, and then had its own separate entry as I mentioned earlier

Q Now, Ken, these plans have a date on them, and the date on them is August 23, 2007. Do you see that?

A Yes, sir.

Q Are these the first set of plans that you had?

A   No.

Q   How is it -- is it typical to just have one set of plans that are created and that's it?

A   Well, you work toward a final plan, but there's typically multiple drafts along the way.

Q   Is it your practice to retain the roof -- the previous versions once you get the revision?

A   No.  I always throw them out for fear that I would have an old version and give it to a subcontractor and it would be incorrect.

Q   Now, in June of 2007, when you were going to try to make the pitch to build this addition, did you have any meetings with anybody at the house?

A   Yes, sir.

Q   Who did you meet with?

A   I met with John Buttemiller and Mr. Hickok.

Q   Did Mr. Hickok come by the house where you were proposing to do the remodel?

A   He sure did.

Q   And that was before you ever contracted to buy that house?

A   Yes, sir.

Q   Why did you feel that was necessary?

A   One, I wanted to make sure that everybody was in agreement; and, two, we were in the process -- we

hadn't come to a contractual agreement. So how could you or any prospective party agree on what would be in a contract for a purchase and a remodel without discussing it beforehand, looking at the property, walking it?

Q  Tell us what happened at the meeting with Mr. Hickok and Mr. Buttemiller.

A  They came out. It was a hot day. I remember it. We walked outside, walked inside, and I basically laid out for Mr. Hickok that, as I said earlier, the home lacked a couple of things and that I could make the improvements and it might benefit everybody. So we walked the back of the property. We walked around the garage. We discussed in detail.

I had even drawn out on a piece of paper the proposed addition where it would go, what the plan would be for the guest room, for the upstairs media room. Doug was in agreement. He asked Mr. Buttemiller his thoughts, and we ended the meeting with let's, you know, proceed. He was going to contact Mr. Shaw, but then we were going to proceed with potentially putting together the deal.

Q  Now, do you know whether or not you had drawn plans at that time?

A  When I met with Mr. Hickok, no. But I did have a drawing on paper of where things would go, and really

it was the only logical place that it could go because the pool took up the rest of the place and the master.

Q When you had your meeting with Mr. Hickok and Mr. Buttemiller, was there any question as to what you were proposing?

A No.

Q Mr. Hickok testified something like, well, you'd want to know what the specifications are because you want to make sure they don't have purple walls or anything like that. Did y'all have any discussions about what the addition would be like with respect to the rest of the house?

A We did. He was concerned, I would think, that, as he said -- and I believe him on this -- that it would be of quality construction. And I guaranteed to him that it would. For example, the home had mahogany doors. They're very expensive doors. The home had hand-forged hardware where normally you could go into Home Depot and buy a nice lock for $20. These hand-forged locks were $300. It had an old Spanish flat tile roof that I found out came off an old home in Houston. It was about 80 years old. So one of the discussions that we had was making the improvements in like kind to the rest of the house and using a similar quality and materials.

Q    What does that mean to a builder when you say "like kind"?

A    Mahogany doors, the oak wood floors.

Q    It means doing the same thing that's in the house?

A    Yes, sir.

Q    After your meeting with Mr. Hickok and Mr. Buttemiller, who drafted the contract?

A    They did.

Q    When you say, "they," who are you referring to?

A    I'm assuming it was their lawyer.

Q    In other words, you didn't draft the contract?

A    No, sir.

Q    And when you received the contract, was there anything that you thought of that was very important to you with respect to this potential deal?

A    Yes, there were two issues. One was that the home would have to have some type of personal guarantee in the event that their legal entity went belly up. And the other was that if we were going to agree on what the improvements were, then consent should not be unreasonably withheld.

Q    Now, are you testifying that you showed Mr. Buttemiller or Mr. Hickok drawn plans other than the handwritten plan that you had for this project prior to

closing?

A    No.

Q    Do you know when you showed them plans for the first time?

A    Well, I had a drawn-out plan the first time we met.  The formal plans were drafted subsequently, and copies were provided to Buttemiller.  I had to give copies to the HOA.  I had to give copies to the homeowners association  Excuse me.  I had to give copies to the city for approval. We had an issue with the home was over the building setback line on one side. So the homeowners association had to approve that, and so did the city.

Q    You had to get a variance?

A    Yes, sir.

Q    So as I understand it, at the time of closing, that is you guys wrote up the contract and that's Exhibit 3, and we've talked about that, right?

A    Yes, sir.

Q    And you then went out and you were getting a loan where the bank was going to hold the money in escrow for the building of the addition, right?

A    Yes, sir.

Q    Would the bank loan you money if you didn't have plans and specifications at that time?

A    No.

Q    So prior to the time of closing, you had plans and specifications?

A    Yes.

Q    In fact, you recall that they showed Exhibit 15, which was the construction loan agreement between you and the bank, right?

A    Yes.

Q    Did that agreement require you to build this thing in accordance with plans and specifications?

A    Yes.

Q    Does that mean that you submitted plans and specifications to the bank?

A    Yes.

Q    Up there is the notebook that contains the exhibits that have been admitted.

MR. ALDOUS:  Thank you, Your Honor.

Q    (By Mr. Aldous) And if you look at Exhibit 1, it is your fax to Mr. Buttemiller dated May 25, 2007.

A    Yes.

Q    Now, with respect to that date, the fact that you're sending this on that date means that you've already looked at a form of an agreement, right?

A    Yes.

Q    The language that you asked them to submit into

the part where it says, "Where I marked insert A." Do you see that?

A   Yes.

Q   What part did you add to that?

A   That was the improvements will be -- receive general consent, consent not to be unreasonably withheld to proceed with the improvements

Q   What was your thinking on adding that in?

A   I didn't want to get into a situation where they were delaying me and/or holding me up over, you know, door knobs or minor issues.

Q   Did you think that that language was going to take care of that?

A   Yes, sir.

Q   Then you had down below that, it said, "We would like to suggest a new Addendum 4 that reads," and then you have what I'm going to refer to as the personal guarantee?

A   Yes, sir.

Q   And why is it that you wanted the personal guarantee there?

A   As I said earlier, in the event that the business went bankrupt or belly up or was insolvent, that I would have some guarantee that the home would be purchased back, personally.

Q    In other words, that not just the business, but the people would also be responsible?

A    Yes.

Q    Did all of the suggestions that you made in Exhibit 1 get incorporated into the agreement?

A    I believe so.

Q    Now, there were some questions from Mr. Chaiken to Mr. Hickok about your agreement with the bank and the fact that the agreement with the bank said you were supposed to start construction at a certain period of time?

A    Yes.

Q    Did you and the bank reach some sort of agreement as to starting later?

A    Yes.

Q    Tell me about that.

A    Well, honestly, I was unaware that the contract said you had to start in 15 days.  There was a broker who was representing --

MR. SHAW:  I'm going to object to hearsay and narrative because I don't know where this is going in particular.

MR. CHAIKEN:  I join in the objection of hearsay.

THE COURT:  Overruled.

Q    (By Mr. Aldous) You can answer.

A    Oh, what's the question again?  I'm sorry.

Q    You just -- now you're putting it back on me to remember what the question was?

THE COURT:  We can have the court reporter read it back.

MR. ALDOUS:  That's all right, Your Honor. I do remember.

Q    (By Mr. Aldous) So, with respect to the agreement that I asked if you and the bank agreed to allow you to start later, and you said -- I believe you said, "I didn't realize that there was a 15 day" --

A    Yes.  There was -- that was just an oversight on my part.  But the bank never contacted me either. And it's been so long ago.  I can't remember  But there was a broker who represented, you know, the bank and us as the intermediary. And he never brought it to my attention, so it wasn't really until I think almost a year later that the bank called and said, hey, you've got to start this construction  And then at that --

MR. CHAIKEN:  Your Honor, I object and motion to strike where he's testifying to what the bank said.  That is hearsay.

THE COURT:  Sustained. Rephrase your question, Mr. Aldous

Q  (By Mr. Aldous) Did the bank allow you to start later than what was called for in the construction loan agreement?

MR. CHAIKEN:  Same objection, hearsay --

THE COURT:  Overruled.

MR. CHAIKEN:  -- what the bank allows. Calls for hearsay.

THE COURT:  Overruled.

A  Yes.

Q  (By Mr. Aldous) When you and Betsy closed this contract in June of 2007, did you actually physically sign the closing documents at the same time as VSDH and Mr. Hickok?

A  No.

Q  Tell us how that happened.

A  We went to the closing first.  It was their title company.  They provided the title company, so we went down there and closed.  And then I assume they closed sometime thereafter.

Q  When you say, "we closed," what do you mean?

A  Signed all the documents and the loan was funded.

Q  Now, attached to the contract, which is Gross Exhibit 3, are several pages of Addendum B, which are the 2004 White Wing -- no, 1,082 square-foot addition

casita with FR bedroom and shared pool bath. Did you prepare this document?

A Yes.

Q Can you describe for us what it is?

A Basically it's the specifications of what will go into the construction of the improvements.

Q And so if you would, just take a couple of entries, whatever they are, and describe for us what they mean. For instance, under concrete, it says slab. Then it says unit 546. What does that mean?

A 546 square feet of concrete. You'll see, for example, the framing. We got labor of 15,000. We got material, 10,000. I've got cedar pergola for the porch that I mentioned earlier of $2,000. I have my roofing material and labor in there, windows, gutters.

Q Now, so some of it -- when you say units, some of it is just how many you need for that space, but some of it's based upon square footage; is that right?

A Yes, sir.

Q So when you say electrical down towards the bottom where it says electrical under mechanical, it says 1092. Is that the same thing as saying for -- that much square footage you had to -- we're going to pay that much?

A Yes.

Q   On the next page, there's additional material that is referred to.  And it says, for instance, stone materials, tons.  And it says 25.  Does that mean 25 tons of stone?

A   Yes, sir.

Q   And is that based upon how much you thought you were going to have to cover?

A   Yes.

Q   And then so all of these related to what you measured out as being necessary to complete a 1,092 square-foot addition that you proposed?

A   Yes.

Q   All of this was attached to the contract as Addendum B?

MR. SHAW:  Your Honor, the leading continued.  I need to object to it.

THE COURT:  Rephrase, Mr. Aldous.

Q   (By Mr. Aldous) Was Addendum B attached to the contract at the time of closing?

A   Yes, sir.

Q   Did anybody request this document that is Addendum B?

A   Yes.  Mr. Hickok and Mr. Shaw requested it through John Buttemiller as part of the contract, it be produced.

Q   There's some statements about whether or not these particular items that are listed in the Addendum B constitute specifications  In your mind, are they?

A   Yes.

Q   There was an indication that specification means type and color of paint and so forth.  Do you agree with that?

A   Perhaps under a commercial construction, which Mr. Hickok was referencing, you might have office buildings painted eggshell. In this case, we were matching the interior colors of the home.  We were matching the wood floor, which was oak.  We were matching the stone, which was an Austin chop.  So it was pretty obvious to, I thought, everyone involved of what the specifications were.

Q   Let me ask it a little differently.  Were you under any confusion as to what was expected in terms of the addition as it related to the original house?

A   No, sir.

Q   Is it your belief that anyone else involved in the transaction was somehow confused as to what it meant when you said "like kind" in terms of the new addition?

MR. CHAIKEN:  Objection, calls for speculation about what somebody else believed or was confused.

THE COURT: No speaking objections.

MR. CHAIKEN: Speculation

THE COURT: Overruled.

A   No, sir.

Q   (By Mr. Aldous) Did anyone involved with this transaction, be it Mr. Buttemiller, Mr. Hickok, or anyone else, express to you that they were confused by your Addendum B and what was anticipated in terms of the addition?

A   No, sir.

Q   There's also a part in the closing that's been referenced by Mr. Hickok and it relates to the escrow. Do you recall that testimony?

A   Yes.

Q   Let me put up on the screen the provision relating to the escrow. So did you seek, you know, or look into whether or not your lender would agree to escrow funds with the title company?

A   Yes.

Q   What did they -- what was the result?

A   The result was that our lender was not going to fund the loan or loan us the money unless the money was held in their account since they're the ones with the risk.

Q   So if -- by the way, did you -- were you ever

-- did anyone ever connected with the transaction object to that?

A    No.  In fact, I contacted Mr. Buttemiller and that's why the contract was changed and agreed to from the 2.851 to the 2.695 number that was discussed earlier.

Q    So, as I understand it, your bank, the one that's loaning you the money to buy the home and do the addition, is not going to let someone else hold the money for the addition, right?

A    Correct.

Q    And if that's a condition of closing, would you have been able to close if, for instance, VSDH said, hey, we're not going to do it unless you put the money in with the Chicago Title?

A    No.

Q    In other words, the deal wouldn't have gotten done?

A    Yes.  Correct, yes.

Q    At that point in time -- so VSDH, is it your understanding they could have said, "I'm sorry.  That doesn't comply with the contract; and, therefore, we're going to just keep your earnest money and go on our way"?

A    They could have, but they modified the contract

to accommodate that.

Q   All right.  And so when you hear somebody say that you violated or breached the agreement as a result of not escrowing the funds at the title company, what's your response?

A   I don't see how that's true whatsoever.

Q   Was it your belief that everybody had agreed to it and that's how the deal got closed?

A   Yes, sir.

Q   In the terms -- so when you're building a home for somebody else and you -- you're using their funds, whether it be through the bank or whatever, as the builder, you don't get 100 of that right off the bat, do you?

A   No.

MR. SHAW:  Your Honor, the leading continues, and I need to object to it.

THE COURT:  Sustained.  Be careful how you phrase your objections, though, Mr. Shaw.

MR. SHAW:  I'm sorry, Your Honor.

Q   (By Mr. Aldous) How is a typical transaction when there's going to be a builder who's building a house on behalf of somebody?

A   The bank holds the money and they call it a draw against the construction process.  So if you

complete the foundation, you're paid for the foundation, the framing.

Q   And is it the draw -- are the draws limited to the amount of work that's been completed?

A   Yes and inspected.

Q   Is that the way that the, I guess, the borrowers protect and make sure the builder does what he says he's going to do?

MR. SHAW:  Objection, leading Your Honor.

THE COURT:  Overruled.

THE WITNESS: Yes, sir.

Q   (By Mr. Aldous) In this transaction, it was -- was it a bit different than that typical transaction?

A   No.  The lender, First Horizon, which then became Met Life, had the same requirements.  We could not draw upon the funds until the work was completed and the property was inspected for the work -- said work for the draw.

Q   All right.  Now I want to turn to the part about in 2008.  First of all, under Section 2, before commencing construction, buyer will review with seller the plans and specifications and receive general consent -- do you see that -- consent not to be unreasonably withheld?

A   Yes.

Q   So you heard Mr. Hickok and his statement as to he thinks that you violated that.  Do you agree?

A   No.

Q   Why not?

A   Well, from the very beginning, there was agreement on what was being constructed  We knew it was going to be a guest room and a media room. I had produced plans for the lenders.  We talked about Mr. Buttemiller had plans, and then when we were commencing construction, I tried to get ahold of Mr. Hickok to come review the plans with difficulty in getting cooperation

Q   What do you mean by that?

A   Well, we -- I tried calling him on multiple occasions, and he never returned my calls. I finally ended up having to fax him to get his attention.  And then it was several days that passed before we communicated  We set up a time to meet.  Again, he couldn't meet right away, but it was like another two weeks.

So this was already almost a month that had gone by.  We were set to meet on -- it was Halloween, October 31.  I get an email he can't meet. He's out of town.  Another couple of weeks go by.  So it was a protracted process to get them to approve the

plans.

Q    Well, at that time, were you concerned at all about whether or not there was going to be any kind of disagreement with the plans?

A    No.

Q    Why not?

A    Again, we were in agreement that it was going to be a guest bedroom down, a media room up.  The specifications were all spelled out, what it was.  It was in like kind, using the same materials.  So there was no -- no disagreement from my perspective at that point in time.

Q    Now, when Mr. Hickok did finally come out to the house, he testified that you were halfway done.  Is that accurate?

A    No, sir.

Q    Tell us how far along you were and why you started.

A    Well, we started because the bank had notified us that we had to finish construction by the beginning of the following year, which only gave me about three, four months to complete the process.  So when Mr. Hickok came out, I had the foundation poured and most of the --

MR. CHAIKEN: Your Honor, I'm sorry.  I have to interpose an objection and move to strike on the

grounds of hearsay. He's testifying as to what the bank told him he had to do.

THE COURT: Overruled.

Q (By Mr. Aldous) So Mr. Hickok came out and you had the foundation and what?

A The foundation came out and the home was partially framed. It wasn't completed. The roof was not on for sure.

Q So what do you mean by partially framed? Just describe for me what that means.

A Well, first phase is the foundation. The second phase is the framing, and that means just, you know, all the walls, closing everything in, putting the roof on. And then once the frame is complete, then you start to do the electrical. We call it the mechanicals; the heat, air-conditioning

Q Now you said that the roof was not on. It wasn't weathered in; is that right?

A Yes, correct.

Q So what does that mean, "weathered in"?

A That means if it rains, water can get into the improvements and damage. You know, if you were to put the drywall up without it being weathered in, you would destroy the drywall.

Q So take us through the visit from Mr. Hickok

and what occurred.

A    When he finally did come out, it was a very cordial discussion.  I toured him around the bottom half first, the outside, which was the guest room, the pool bath.  We looked at the plans.  We then went upstairs.  We had to go through the home to go upstairs.  He looked at the upstairs, the media room area that was framed.  And we came downstairs and had a great discussion with Betsy about our children both looking for colleges, and it was very cordial.  And we specifically asked him how things looked.  He said, "Great."  I said, "So I can proceed?"  He said, "Yes."

Q    At any point in time, did he say to you, "Oh, you didn't call me before you started construction," or, "you didn't show me the plans before you started construction"?

A    No.

Q    Did he make any complaint that you had breached the contract by starting what had happened?

A    No, sir.

Q    If Mr. Hickok said to you, "Hey, dude, I don't like what you've done. You need to redo this," what would you have redone?

A    If it was something reasonable, like if I had put a wall in the wrong location, yes, I definitely

would have moved it.

Q    If he would have made any kind of suggestion that he thought it was important for you to comply with, would you have done it?

A    Yes.

Q    Within reason?

A    Yes.

Q    If he told you to put in purple walls, you wouldn't have done that, right?

A    Probably not.

Q    So after that visit, what else occurred after that?  Did you hear back from Mr. Hickok after that visit?

A    Never heard anything, and we just continued on with the construction of the property.

Q    So let me show you -- or take a look at exhibit -- hold on just a second -- Exhibit 30 in the notebook. Do you see that?  Are you there?

A    Yes.

Q    So this is an email that you sent to Mr. Hickok on February 23rd, 2009.  Do you see that?

A    Yes.

Q    Based upon what you're saying here, can you tell us where you were in the construction on the project?

A    We were, I think, basically finished.

Q    If you would, just walk us through and tell us what some of this stuff means.  It says, "I'm finished with the addition and wanted your final inspection and approval. I ended up going above and beyond with some items, including a larger wet bar, including refrigerator and microwave in the upstairs game room."

A    Yes.  As I mentioned earlier, we spent about 20 to 25,000 extra.  There were just things that I thought would benefit the home and would make the improvements better overall.  For example, Number 4, marble in the pool bath versus the slate that was in the specifications, I just thought it would be a natural and it would be a, you know, higher quality overall.

Q    Well, it says here, "I ended up going above and beyond with some items."  You went above and beyond what?

A    The specifications

Q    Was that the Addendum B that we talked about?

A    Yes, specifications were Addendum B.

Q    And you're saying that these items were over and above what was in Addendum B?

A    Yes, sir.

Q    Is it your belief that these items were an upgrade from what was reflected in Addendum B?

A    Yes.

Q    What did it mean when you say upgraded mahogany crown in the downstairs guest room?

A    Just putting in extra materials that were above and beyond what was in the specifications

Q    Well, the crown molding, was it specified to be something less than mahogany?

A    I can't remember. I think the -- I think the molding in the house was paint grade, and I think we went with mahogany in the downstairs guest room. I can't recall. There are pictures that we have that would show exactly what we ended up with. That was probably a somewhat minor thing. But, you know, some of the major things, like moving -- I don't know if it's in here. I moved all the AC equipment. It was right by the guest room door. And you know how air-conditioners are loud, so I spent like two or $3,000 extra to move it to the other side of the addition so that you wouldn't have air-conditioners right by the entry door.

Q    What else do you remember that was something that was -- what you consider to be significant?

A    Well, the wet bar upstairs, the microwave, making that more of an entertaining area than just having a closet.

Q    Number 10 says, "I put in media room equipment,

and this was not in the budget, but will take it with us in the event we move."

A    Yes.

Q    Why was that important as far as you're concerned?

A    It was about $10,000 worth of media room equipment.

Q    In terms of the house and the addition, is a media room without the equipment as effective in marketing a house as one with equipment?

A    We ended up -- the buyer ended up requesting that it be left, so we ended up leaving it with the purchaser of the home.

Q    Well, is it -- just from a builder's perspective, is it easier to market a house with the media room that actually has the equipment in it?

A    Yes, yes.  I'm sorry.  Yes.

Q    Did you ever receive a response from Mr. Hickok saying that he would like to come over and take a look at the house and what you'd done?

A    No.

Q    The next thing that occurred was Exhibit 34, which is the 4/27/2009 buyback option exercise.

A    Yes.

Q    So what was the plan that you and Betsy come up

with in terms of the house?

A    Well, we knew we were only going to choose to live there for a couple of years and that we were going to exercise the buyback.  On top of that, the market crashed.  The economy crashed.  And we decided we were going to exercise the buyback.  So we notified Doug and Van that we were doing so.

Q    In response to your email or your letter, did you receive a response from Mr. Hickok?

A    Yes.  It was to the effect that he was no longer handling the issue and that Mr. Shaw would be handling the issue.

Q    Let me show you what has been marked as and admitted as Exhibit 65. This is an email after Mr. Hickok said y'all need to talk to Van.  All right?

A    Yes.

Q    Now you see her email there on the 18th --

A    Yes.

Q    -- where she says, hey, there's some potential options here?  And do you see Mr. Shaw's response, "Betsy, thank you for your email today.  I'm glad to talk, but I want to make sure you're aware that the entity that sold the home is not financially solvent. So that will no doubt have a huge impact on our discussion.  Not sure when I will be out that way, but

maybe we can meet somewhere else. I'm not sure where your office is, but that may be a possibility. Please let me know where you suggest"? Do you see that?

A Yes, sir.

Q Now, I don't want to go through all these other emails and things. But up until the time that you guys put the house on the market, did Van Shaw or Doug Hickok ever contact you and say, hey, you breached the agreement; therefore, we're not going to follow through?

A No.

Q However, did Van Shaw tell you that they were not going to perform the buyback?

A Yes.

Q Tell us that about that.

A We had a phone conversation in which he told me about that. We arranged a meeting.

Q Told you what?

A That the company was insolvent and that they could not buy the property back.

Q What else did he tell you?

A He said that they might be able to get us a lot in return or in exchange. And the lot that he was discussing was worth way less than what we were looking at as a potential loss on their breach.

Q At any point in time up to, let's just say,

June 28th, did you -- of 2009, did anybody ever suggest to you that you were in breach of this agreement?

A    No.

Q    Now you saw earlier the letter that came from Hap Stern -- I think it was Exhibit 29 -- that said something to the effect of, "Hey, you didn't do this escrow and we reserve all rights." You saw that?

A    Yes.

Q    Do you recall whether or not -- I mean, what did that mean to you?

A    Honestly, I was scratching my head with regard to it. They closed. They took the money. We signed first. They closed. They knew that we had to change that. So I was surprised. In hindsight, I could see why. But at the time, it was just -- it was sort of inconsequential

Q    Now let me just turn to Exhibit -- I hate getting old because that means I've got to use reading glasses when the light's low.

THE COURT:  Would you turn on the lights?

MR. ALDOUS:  Thank you.

Q    (By Mr. Aldous) I'm missing an exhibit, but forget that. Let me just show you what -- if you recall -- do you recall having a meeting on June 28, 2009, with Mr. Shaw?

A    Yes.

Q    What took place at that meeting?

A    It was basically a re-summarization of what he had prior told us; that they were not going to perform under the buyback clause, that they were not personally guaranteed, and that, you know, they -- really, that was it. I mean, nothing that they were going to do.

Q    Were you upset?

A    Yeah. It was our worst fear to be honest.

Q    Let me show you what has previously been admitted as Gross Exhibit 59. On August 18th, you had already put the house on the market. Why did you put the house on the market?

A    They told us they weren't going to perform, so we had really no other option but to try to sell it ourselves.

Q    And Exhibit 59, you received an offer, right?

A    Yes, sir.

Q    Tell us about what happened.

A    Well, Roxann Taylor -- Roxann Taylor met with us and she showed us the comps in the neighborhood, and we agreed on a price based on the comps and the market, you know, that had crashed. And so we agreed on a price at 2.5. The home sat for, you know, a month or two with virtually no showings. There might have been one or two

showings. It was not optimistic.

And lo and behold, a buyer came along and offered us a cash deal through Roxann Taylor. But we had to be out within a very short period of time. She wanted the closing to be whenever it was, August 21st or a couple of weeks before September 1st. We asked her, through Roxann, whether she would wait until after September 1. And she said, "No. If you do that, the deal is off."

Q   This exhibit where you sent the email to Mr. Hickok and Mr. Shaw, was this kind of like your last attempt?

A   Yes, sir.

Q   Did you ever get a response to this?

A   Nothing.

Q   Were you aware at the time you sent this that -- that VSDH, Mr. Hickok, and Mr. Shaw had sued you --

A   No.

Q   -- and Betsy in this court?

A   No, sir.

Q   When they filed that case in July 7th of 2009, did they ever have you served up and to this point, August 18?

A   No, sir.

Q   So at no point in time did they inform you that

they had sued you?

A    No, sir.

Q    I'd like to look at some photographs here that we have that have previously been admitted as Exhibit 116. First of all, can you tell us where these photos came from?

A    Yes. They're from the home at 2004 White Wing.

Q    Well, I mean, I know that. But I mean --

A    Oh, you mean the location within. That's a picture of the back patio area looking toward the laundry room.

Q    Okay. I'm not doing very good. I mean, who took these pictures and for what purpose?

A    Roxann Taylor did as part of the listing agreement and marketing of the property.

Q    So now, going to -- where is this looking?

A    That's looking at the rear -- off the rear patio.

Q    And the rear patio being the rear patio where the addition was?

A    No. That's looking at the laundry room. The addition is behind it to the left.

Q    Okay. What do you got here?

A    That's the pool with the addition to the right.

Q    So the part that you built on is the part over

here that you can see a structure?

A    Yes.  And we also -- I believe this was at our expense.  We tore out -- that whole area that you see in front was some big blocks of squares of concrete that had mondo grass, and you could trip over it.  So we tore all that out and put in flagstone.

Q    Right here?

A    Yes, sir.  I think we made that much more beautiful, and then we created a flagstone walkway back to the guest bedroom that you can see.

Q    All right.  What you got here?

A    That's the addition.  You can see the porch that I talked about, the covered entryway.  You can see that the cedar beams, support posts, match the other existing of the first picture you showed.  There's the stone.  There's the tile roof.

Q    The next photograph?

A    That was the library, which was unchanged.

Q    That was part of the original house?

A    Yes.  This was taken at the time we listed the property.

Q    All right.

A    The upstairs foyer or entryway to my daughter's bedroom.  And then to the left would go back to the game room, but that is existing.

Q   Okay.

A   I think that's a pretty good shot of the addition on the left and the existing home on the right. You can see the tile roof.

Q   Is this the addition here?

A   Yes, sir.

Q   And when you say the tile roof, you're saying how it matched up with that?

A   Yes, sir.  Same windows.

Q   This is the grass that you grew?

A   That's looking off the backside of the addition.  Yes.

Q   Okay.

A   One of the bedrooms, unchanged.

Q   Okay.

A   Bathrooms.  Excuse me.  Again, similar, unchanged bathroom.  Unchanged bedroom.  Again, unchanged, that was my daughter's bedroom.

Q   All right.  Let me see if I can get to the part where it changed.

A   Yes.  That's the guest casita or office.  You can see we've got the same hardwood floors.  We have the mahogany doors to your right.  There's the mahogany crown.

Q   When you say, "crown," you're talking about the

molding?

A    Yes, the crown molding.

Q    As opposed to the Crown Royal or anything like that?

A    Yeah.  Same color paint that the rest of the house had.

Q    And this, what is this?

A    That was an area that we added as well.  That was at our expense. I believe if you go back to the specifications-- I didn't mention it earlier, but there was a column that had "other."  Those were items that we agreed to do on our own; and, yet, were seeking approval to do those so that Mr. Hickok and Mr. Shaw would not be surprised by any of the improvements.  But that was a front outdoor courtyard patio that we entered -- that we constructed.  Excuse me.

Q    Is this the entrance to the bedroom downstairs?

A    No.  That's an entrance to what was -- what is the kitchen.

Q    Oh, okay.  And just -- there's a front photo of the house?

A    Yes, sir.

Q    And then what do we got here?

A    That's the game room.  And off in the distance you can see -- when you go through the arched opening,

we have the wet bar on the right.  And then looking through is the media room.

Q    What you got there?

A    That's the media room.

Q    All right.  Now in addition to the photos that were prepared and shown on Ms. Taylor's website for the sale, was there also a brochure that she created?

A    Yes, sir.

Q    We previously have admitted Exhibit 115. That's not the house, right?

A    No.  That was the cover of the edition --

Q    Oh.

A    -- the edition of the magazine that it was in. That's it.

Q    And then the photos down below of the portion of it as she was trying to sell it, right?

A    Yes.  And you can see that the existing matched.

Q    Sorry?

A    For example, the room on the middle right there is the great room.  You can see where we matched the mahogany doors, the paint color, the oak floor.

Q    Is this what you're referring to?

A    Yes, sir.

Q    All right.

MR. ALDOUS: Thank you, Your Honor.

THE COURT: Dan?

Q (By Mr. Aldous) I kind of want to ask you. So during this whole process before you exercised the buyback option, did you consider there to be any kind of animosity or combativeness with VSDH and Mr. Shaw or Mr. Hickok?

A Other than the letter that their attorney sent after the closing, there was really little interaction, but certainly no animosity. Betsy had, I think, run into Mr. Shaw on a couple of occasions and had a very cordial discussion or discussions with him as well.

Q Now your next-door neighbor, Mr. Maya --

A Yes.

Q -- were you aware that he was friends and, slash, an investor with Mr. Hickok?

A Yes.

Q Did they -- were they in the home before?

A Yes.

Q Had you had them into the home after the addition was done?

A I can't say for certain, but I would think they would. We had dinners together. We were neighbors.

MR. ALDOUS: All right. I think I'll pass the witness now, Your Honor.

THE COURT: Mr. Shaw?

MR. SHAW: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. SHAW:

Q    Mr. Gross, let me get started kind of at the top and work through it with you please. You said -- what's your business?

A    Yes, sir.

Q    Yes, sir. Your business is what?

A    Home building, remodeling.

Q    What did you say the name was?

A    Impact Estates.

Q    Now, that's not the only business you've got, is it?

A    At this point in time, no.

Q    All right. Tell us what other businesses you have.

A    Just one other.

Q    Which is?

A    Carabela Custom Homes.

Q    So there's a different home building company you've got?

A    Yes, it's inactive. I mean, it's active from the secretary of state, but I've not -- I have not done a project under that name.

Q    Well, you're involved with Impact Health, Inc., aren't you?

A    Yes.  That's the S corp and the Impact Estates is doing business as, which is under the umbrella of Impact Health.

Q    You're involved with Impact Luxury Estates; is that right?

A    Yes.

Q    You're involved with Impact Concrete; is that right?

A    That was an old business that we tried to start in the concrete business.

Q    You're involved with Impact Concrete Solutions; is that right?

A    They were basically the same entities where we were trying to get into the concrete business.

Q    And Carabela Custom Homes, Inc., when did you start that?

A    I think we registered it a couple of years ago.

Q    How long have you been a home builder?

A    Since our fire, 2000 and -- about 2000, the year 2000.

Q    Fifteen years?

A    Yes, sir.

Q    And you've built more than six, $2 million

homes; is that right?

A    No, sir.

Q    How many have you built?

A    Probably around six, but they weren't over two million.  They were million-dollar homes, but I built a couple in Las Colinas that were maybe under a million.

Q    You're a sophisticated home builder, right?

A    Yes.  Whatever sophisticated means.

Q    Well, you agree you're sophisticated, fair?

A    Yes.

Q    You had the means to buy a $2.6 million home in 2007, right?

A    Yes.

Q    The -- now, you sold your prior home to Dr. and Jodi Lash; is that right?

MR. ALDOUS:  Your Honor, I would object and I would ask to approach the bench.

THE COURT:  You may approach.

(Sidebar conference held)

THE COURT:  You may proceed.

MR. SHAW:  Thank you, Your Honor.

Q    (By Mr. Shaw) Now you said you had a lot in Vaquero when you bought this home in that same development; is that accurate?

A    Yes.

Q    And you had a -- some property that you said was flooded?

A    Yes.

Q    And what happened as a result of that?

A    Well, the rain --

MR. ALDOUS:  Objection, Your Honor.  What happened as a result of that is -- doesn't allow me to sufficiently object.  I'm not sure what he's asking.

THE COURT:  Rephrase.

Q    (By Mr. Shaw) You said you couldn't or didn't build on that property?

A    Yes.

Q    Why?

A    Because it flooded and the homeowners association would not allow us.  We submitted plans for construction, and they said we could not put the home up until the flooding issue was resolved.

Q    So what did you do to resolve that issue?

A    Ultimately, we made about $200,000 in improvements to correct it and then subsequently sold the property.

Q    And how long was it after when you did the improvements?

MR. ALDOUS:  Your Honor, I object as relevant.

THE COURT: Sustained.

Q (By Mr. Shaw) So you bought the home here. And how long did you think it was going to take you to build on that lot that you had wanted to that had been flooded?

A We -- I don't know if I quite understand your question. But it would take us about a year-and-a-half to two years to construct any home in that development with the planning process taking about six to nine months for drawing plans and submission for approval.

Q And what kind of home did you want to build, what price range?

A On which lot?

Q On the flooded lot.

A I think we had plans for a large home that was around 2 million. I can't remember the final. It's been so long ago.

Q When you say a "showcase home," what is that?

A Just a home that we could show the quality of construction

Q The -- so you decided that you will look for a home and you find the home we're here about; is that right?

A Yes.

Q And you had a lawyer as part of this

transaction, right?

A    Yes.

Q    Mack Zimmerman?

A    Yes, sir.

Q    Why do we see paperwork where you're coming up with terms for the contract instead of your lawyer?

A    He drafted the language and I presented it to John Buttemiller.

Q    Okay.  Why didn't your lawyer present it?

A    I think it was just an order to expedite the transaction

Q    You have a position that you would not have purchased the property if myself and Mr. Hickok were not personally liable?

A    Yes, sir.

Q    No doubt about it, right?  That's your position?

A    Yes, sir.

Q    You had a lawyer?

A    Yes, sir.

Q    You never got a signature from me at all, did you?

A    We closed first.  You closed after, and you did not sign it.  Your title company should have caught that, but they did not.

Q   What should they have done?

A   I would think they would have -- you picked the title company.  I would have thought or hoped that they would have asked you to consummate the contract.

Q   Did your lawyer pick that up?

A   No.  My lawyer was only involved in the language.

Q   Okay.  What language?

A   The language you just referred to, the buyback.

Q   So why wasn't your lawyer involved in the rest of it?  Who stopped your lawyer from being involved?

A   No one.  He could have been.  In hindsight, he probably should have been, but we had no reason to believe that things weren't going to proceed as we had agreed upon.

Q   Okay.  Exhibit 16, VSDH Exhibit 6, where was Shaw going to sign?

A   Right below that.

Q   Where?

A   Seller.

Q   Well, Shaw wasn't a seller, was he?

A   Well, you were a seller and -- well, you were supposed to be.  VSDH was the seller, and you were supposed to personally guarantee it.

Q   So saying seller wouldn't have been right for

Shaw to sign, would it?

A    Yes.

Q    How would Shaw be a seller, if VSDH --

A    Your --

Q    -- Ltd., owned it?

A    Aren't you a partner of VSDH or --

Q    No.  I'm -- that's an entity.  That's like Dell Computers.  And Michael Dell -- when Michael Dell isn't an owner -- isn't personally liable for what Dell Computers does.  Do you understand the distinction?

A    Not really.

MR. ALDOUS:  Your Honor, I object he's asking him legal --

THE COURT:  Sustained.

Q    (By Mr. Shaw) Let's look.  Your name is typed in, Ken Gross?

A    Yes.

Q    Mrs. Gross' name is typed in?

A    Yes.

Q    Vaquero Venture, Ltd.'s name is typed in?

A    Yes.

Q    Where is Shaw's name or Hickok's name typed in?

A    You guys prepared the contract.  I did not.

Q    You guys, who is you guys?

A    You're a lawyer.  I'm assuming Hap Stern.

Q    Your testimony to this jury is Hap Stern prepared the contract?

A    No.

Q    Okay.  Wait a second.  Let's make sure we're clear on things then because when you say something, I'm going to hold you to it.  Okay?

MR. ALDOUS:  Objection, Your Honor, to the sidebar comment.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Hap Stern's going to be here to testify.  Okay?  So your testimony is -- you've now retracted.  You're not saying Hap Stern prepared the contract, are you?

MR. ALDOUS:  Objection, Your Honor, sidebar comment.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Who are you saying prepared the contract, sir?

A    Mr. Buttemiller presented us with the contract.  So who prepared it from your side, I don't know  Our attorney added the buyback language.  And I added, with my attorney's approval, the consent language, not to be reasonably withheld.

Q    Who did Mr. Buttemiller represent?

A    He represented both parties

Q   Who?

A   You and --

Q   Well, who's "you"?

A   Van Shaw and Mr. Hickok, as well as VSDH.

Q   Now, are you saying Van Shaw had an agreement with Mr. Buttemiller to represent Van Shaw?

A   On the personal guarantee side, I'm assuming he did.  He was the one who was -- I don't know what the word is.

Q   You're assuming.  Do you know whether or not Mr. Buttemiller and I ever discussed anything about this matter?

A   I'd assume he did since he was representing you.

Q   Do you know is what I'm asking.

A   I don't understand the question.

Q   Do you know whether Mr. Buttemiller and I ever had discussion one about anything dealing with this matter, including personal liability?

A   No.  I can't -- I can't testify to what you discussed with Mr. Buttemiller.

Q   Okay.  Are you familiar with this intermediary --

A   Yes, sir.

Q   -- notice?

A    Yes, sir.

Q    That's between Vaquero, the Grosses; is that right?

A    Yes, sir.

Q    And that says that -- somewhere in here that Mr. Buttemiller is representing both parties?

A    Yes, sir.

Q    It never says Mr. Buttemiller is representing Van Shaw or Doug Hickok, true?

A    I guess.

Q    Okay.  So you never talked to me about personal liability at all, did you?

A    No, sir.

Q    When you signed the contract, my name never appeared anywhere on their signature line, did it?

A    No, sir.

Q    Doug Hickok's name never appeared anywhere on a signature line, did it?

A    Yes, it did.

Q    When you signed the contract, where did Doug Hickok's name appear?

A    It says seller.  Then his line I'm assuming is his signature.

Q    I thought you said you signed this first?

A    We signed this.  I don't know whether you

signed it first or we signed it first, but this is -- this is the document that ultimately ended up going to the title company. We closed first.

Q    I never signed this, right?

A    No.

Q    You said you signed this first. I never signed this.

A    No, no.

Q    Okay.

A    I didn't mean that.

Q    Now, are you saying that Mr. Hickok's name appears under VSDH Vaquero, Ltd., before you signed your name?

A    I can't remember

Q    Well, you said you signed -- you went to the title company, you signed first, and so you assumed the title company would have me sign it. Is that what you said?

MR. ALDOUS: Your Honor, I object because that assumes fact not in evidence.

THE COURT: Sustained.

Q    (By Mr. Shaw) What did you say about what you expected the title company to do regarding my signature or Mr. Hickok's signature?

A    I thought they would have had you execute the

document before funding -- given you guys the money.

Q    Where would I have executed the document?

A    Where it says seller.

Q    Okay.  Now did you ever go over that with Mr. Zimmerman and say, "Mr. Zimmerman, here's what needs to happen," or did Mr. Zimmerman ever tell you words to that effect?

MR. ALDOUS:  Your Honor, I object as to attorney-client stuff.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Should you have had your lawyer more involved?

A    I didn't see any reason to.  I thought we agreed on everything, and we were going to be gentlemen about it and live up to our agreement.

Q    Sir, I never -- I never talked to you before this closing, not once in my life, right?

MR. ALDOUS:  Your Honor, I would object to if he's testifying,

THE COURT:  Counsel, approach.

(Sidebar conference held)

THE COURT:  You may proceed.

Q    (By Mr. Shaw) Sir, let me get back to that. Have you and I ever talked ever before this deal?

A    No, sir.

Q   So when you said, "I thought we were going to be gentlemen," et cetera, you were not referring to any communications or dealings with me at all; is that accurate?

A   Yes.

Q   Now looking back on it in hindsight, should your lawyer -- should you have had your lawyer more involved?

A   I thought you were going to live up to the personal guarantee.  I thought the title company was going to assume -- was going to take the responsibility for making sure the documents were executed correctly.  They were not.  And you're not a party, I don't think, to the lawsuit, so you're -- we're not -- I don't think we're here today to discuss whether or not you're liable.  I think we're here to discuss whether Mr. Hickok is.

Q   Looking what -- given what we know now, we're in trial, we're going through this, do you wish you would have had your lawyer more involved?

MR. ALDOUS:  Your Honor, I object as relevance.

THE COURT:  Sustained.

Q   (By Mr. Shaw) How many separate homes have you bought or sold in your career?

MR. ALDOUS: Objection, Your Honor, relevance.

THE COURT: Sustained.

Q   (By Mr. Shaw) Did you think that prior to contracting for this home that the contracts were flying around in a -- kind of a rapid change procession?

A   No.

Q   Were the contracts flying around as to the addendum?

A   No.  There was some communication back and forth, but I just viewed it as normal parties trying to come to final agreement on what the language would be.

Q   The -- when you had the conversation with Doug pre-purchase that you testified to, are you telling us that you had those plans that you've got here?

A   No, sir.

Q   The -- you were adding a foundation to this home; is that right?

A   Yes, sir.

Q   Was the foundation engineered by a soil engineer?

A   Yes, sir.

Q   Who was the soil engineer?

A   I believe I used Graham-Martin in --

Q   Graham-Martin is a structural engineer, not a

soil engineer.

A    Oh, soil engineer.  I can't recall whether we used a soil engineer.  I know that a soil test was conducted, so I'm almost positive that we had a soil engineer, but --

Q    Did you share that with Mr. Hickok?

A    Before --

Q    At any time, did you ever show Mr. Hickok the soil report for the addition?

A    No.  That wasn't part of the agreement.

Q    Did you ever show Mr. Hickok the structural design of the foundation or the building?

A    I believe that was all onsite when he came out and viewed the plans.

Q    What was all onsite?

A    I had all the engineering plans.  I had the foundation plans, the structural -- I mean, the plans you saw today.  He could have asked for them.  I would have been happy to produce them.

Q    Did you show them to him is what I asked.

A    I can't recall.  They were all out. I do remember going through -- I had the complete set of construction plans.  The city requires you to keep everything onsite, the engineered foundation plan, everything that's submitted.  It was all there.

188

Q   The city requires a permit.

MR. ALDOUS:  Your Honor, I would ask that he allow him to finish his answer before he interrupts him with another question.

THE COURT:  Please allow him to finish, Mr. Shaw.

Q   (By Mr. Shaw) Were you finished?

A   No.

Q   Okay.  Please finish.

A   The city requires us to submit all plans as part of the approval process.  They don't necessarily require a foundation plan if you don't want to do one. But in this case, there was a foundation plan with a foundation engineer, so it became part of the city approved plan.

Q   In order to do this work, you have to go to the city and get a permit?

A   Yes, sir.

Q   And you have to be honest with the city about what you're doing?

A   Yes, sir.

Q   Were you honest with the city about what you were doing?

MR. ALDOUS:  Objection, Your Honor, relevance.  And I also ask to approach.

THE COURT:  You may approach.

(Sidebar conference held)

THE COURT:  You may proceed.

Q    (By Mr. Shaw) Sir, when you got -- you went and asked for a permit from the city, right?

A    Yes.

Q    And you paid for that, right?

A    Yes.

Q    And The city wants to know what the value of the improvement is, right?

A    Yes.

Q    What did you tell the city the value of the improvement was in this case?

A    I can't recall.

Q    Did you tell them the value of the improvement was what you're telling the jury you spent on this improvement?

MR. ALDOUS:  Objection, Your Honor.  If he's asking him a question about a document, he needs to show him the document.

THE COURT:  Do you have a document, Mr. Shaw?

MR. SHAW:  I'm not asking him about a document.  I'm asking him about his dealings with the city.

THE COURT: Are you asking if he had a conversation with someone from the city or did --

MR. SHAW: I'm asking him what he represented to the --

THE COURT: -- did -- let me finish, Mr. Shaw.

MR. SHAW: Okay.

THE COURT: Are you asking him if he had a conversation with someone from the city or if he had a document exchanged with the city?

MR. SHAW: Either way. I don't know

THE COURT: Clarify then.

MR. SHAW: Okay.

Q    (By Mr. Shaw) Are you --when you dealt with the city as to value, did you deal with them orally or in writing?

A    Typically it's in writing and it's an estimated value.

Q    What did you think the value was going to be for the work?

A    It's hard to -- well, the value -- I know what the cost of the improvements were, but that's different than what the estimated value is of a home based upon it's resale.

Q    So the city wants to know what the value of the

work is and not what the cost of it is; is that what you're telling us?

A    That's the way I interpret it.

Q    Okay.  So, if you were spending -- what was the cost of the improvements you were anticipating?

A    $156,000 on the contract.

Q    And what was the value of that improvement you were anticipating?

A    I have no idea what I put on the paper. Typically, it would be less than what the costs are.

Q    Why would you tell the city less than what you were --

A    Because you don't know what the value of the improvements are.  It's speculative until you sell the home or it's re-appraised with the improvements.

Q    So your testimony is you never represented to the city what the cost of the improvement is, fair?

A    They asked for what --

            MR. ALDOUS:  Objection, Your Honor.  Once again, I'm going to re-urge my objection to the best evidence rule.

            THE COURT:  Sustained.

Q    (By Mr. Shaw) Did the city ever ask you for the cost of the improvement?

A    No.

Q    Has any city -- in your dealings with -- what is the -- city of Westlake?

A    Yes, sir.

Q    Has the city ever asked you for that?

A    Most cities ask for the estimated value.  And, as I just said, the value is subjective.  And certainly at that time it was very subjective because the improvements -- the value of the home was far less than -- even with the improvements.

Q    Now, did you believe that Mr. Buttemiller had any legal training?

A    I don't know.  I can't speak for that.

Q    Did you have any legal training?

A    No.

Q    Why did you move into this property before you bought it?

A    We had set a closing date with Mr. Hickok and you through Mr. Buttemiller and move-in date.  And then when the title company changed -- excuse me -- when my bank changed the holding of the improvements, it delayed the contract.  So it was an approximate two-week period of time, and we were supposed to be out of our home.  So I asked Mr. Buttemiller if it would be okay to ask you guys to take up residence.  And he said, "Not a problem. I'll check with those guys."  He got back to us and we

moved in. He said it was okay.

Q So who did Mr. Buttemiller tell you he spoke to?

A I don't recall whether it was you or Doug or -- I don't know

Q Is there any paper trail you've ever seen about this?

A The only paper trail I saw is that we subsequently agreed that I would pay you 8,500 for the two weeks that we were in the home.

Q When you say, "you," who are you referring to?

A I'm sorry. You and Mr. Hickok and VSDH.

Q I'm confused. Me, Mr. Hickok, or all three of us?

A All three.

Q Why do you think I'm individually involved in this?

A In hindsight, you're not. But at the time -- you asked at the time, so that was my assumption at the time.

Q You constructed the improvements between October 16th, 2008 and February 2009; is that right?

A That sounds correct. Yes, sir.

Q And you built a casita, you built a guest room, you built a media room above it; is that right?

A    The casita was the guest room, yes.  And then a media room was above, correct.

Q    What else did you do?

A    That was it -- the wet bar.

Q    When did you put on the front patio?

A    I think it was around the same time.

Q    The whole issue -- did you know that the contract had a provision that said the terms could only be altered by written agreement?

A    Yes.

Q    Did you always know that existed?

A    Yes.

MR. SHAW:  I'll pass the witness.  Thank you.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  We're just going to switch so I'm closer in case I need the overhead.

**CROSS-EXAMINATION**

BY MR. CHAIKEN:

Q    Good afternoon, Mr. Gross.

A    Good afternoon.

Q    You know who I am, right?

A    Yes, sir.

Q    And you know who I represent, right?

A    Yes, sir.

Q    If I understood your testimony a short while ago, you testified that you expected the title company to have Van Shaw sign documents at closing.  Do you recall giving that testimony just a few short minutes ago?

A    Yes.

Q    All right.  And one of the things you expected the title company to have Mr. Shaw sign at closing would have been a guarantee, a personal guarantee, right?

A    Yes, sir.

Q    Okay.  And, likewise, you expected the title company to have Douglas Hickok sign a personal guarantee at closing, right, just like you expected of Mr. Shaw?

A    No.  I believe his signature was already on it as I mentioned earlier.

Q    His signature was already on it and that's your testimony?

A    Yes, sir.

Q    Okay.  Now you own a company called Impact Homes, right?

A    Impact Estates.

Q    Impact Estates.  Is it a corporation, an LLC, a limited partnership?

A    It's a DBA.

Q    It's a DBA for what?

A    For Impact Health.

Q    Impact Health is what?

A    S corp.

Q    It's a corporation, right?

A    Yes, sir.

Q    Ever sign documents as an officer of Impact Health?

A    Well, whenever I sign a contract, if it was under Impact Estates, I guess it would be as an officer of Impact Health.

Q    Okay.  And you would certainly designate your capacity as an officer of Impact Estates, right?

A    Yes.

Q    So there was no confusion that the party signing was Impact Health and not Ken Gross personally, right?

A    We weren't -- the agreement was between Ken and Betsy Gross and VSDH.

MR. CHAIKEN:  Objection, nonresponsive

THE COURT:  The question was, "So there was no confusion that the party signing was Impact Health and not Ken Gross personally, right?"

THE WITNESS:  And I --

THE COURT:  That's the question he was asking.

THE WITNESS: That's the way understood it. I don't understand the question because the agreement wasn't with Impact Health. It was with Ken and Betsy Gross.

THE COURT: I think you need to rephrase, Mr. Chaiken.

Q (By Mr. Chaiken) My question was -- you just finished telling me that there are times when would sign an agreement as an officer of ImpactHealth, right?

A Yes.

Q And when you did that, you would identify yourself as an officer of ImpactHealth, right?

A Yes, sir.

Q A corporation, right?

A Yes, sir.

Q And the reason that you would sign an agreement on behalf of Impact Health as an officer of Impact Health was because a human being would have to sign a document for Impact Health, right?

A Yes, sir.

Q You understood that concept, right?

A Yes.

Q Okay. And you likewise understood that the reason you would identify yourself as -- were you the president, vice president, or what were you?

MR. ALDOUS:  Your Honor, Mr. Gross' corporate dealings are irrelevant to this proceeding.

THE COURT:  Sustained.

MR. CHAIKEN:  Your Honor, may we approach?

THE COURT:  You may.

(Sidebar conference held)

THE COURT:  Ladies and gentlemen of the jury, the testimony is probably going to be for another 35 minutes.  So we'll take a five-minute recess now.

During this recess, you're under the same instruction you've been previously given.  You're not to discuss the case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors.

All rise.  The jury is excused.

(Jury exits the courtroom)

THE COURT:  You may step down, Mr. Gross.

We stand in recess.

THE WITNESS:  Thank you, Your Honor.

(Recess taken)

THE COURT:  You may bring in the jury.

All rise.

(Jury enters the courtroom)

THE COURT:  You may be seated.

You may proceed, Mr. Chaiken.

Q   (By Mr. Chaiken) Mr. Gross, do you know the rule called the statute of frauds?

A   No.

Q   You never heard of that rule before?

MR. ALDOUS:  Your Honor, I just don't get the relevance.

THE COURT:  What's the relevance?

MR. CHAIKEN:  I believe that he has -- well, I don't want to comment in front of the jury.  May we approach?

THE COURT:  You may.

(Sidebar conference held)

THE COURT:  You may proceed.

Q   (By Mr. Chaiken)  Mr. Gross, have you ever heard the concept about just agreeing in principle?

A   Yes.

Q   Do you understand that in order to sell a piece of property, the agreement has to be in writing?

A   Not always, but in this case it was.  In most cases it probably is, but --

Q   Do you know that rule of the statute of frauds that an agreement regarding the sell of writing -- I'm sorry -- the sell of real estate has to be in writing?

MR. ALDOUS:  Your Honor, that's asking him

for a legal conclusion.

THE COURT: Sustained.

Q    (By Mr. Chaiken)  And you're not aware, correct?

A    No, sir.

Q    You had a lawyer in the transaction, correct?

A    On that one part, yes, sir.

Q    And you don't know what the legal effect is of an individual signing his name to a contract designating his capacity as an officer of an entity, correct?

A    I have an opinion, but I'm not a lawyer.

Q    Okay.  And in this case, you will agree -- referring to Gross Exhibit 3, this is the signature page on the contract; is that right?

A    Yes, sir.

Q    That's the only place that we see the parties' signatures, right?

A    Yes, sir.

Q    And the parties -- the parties were buyer, Kenneth P. Gross, and that's you, right?

A    Yes, sir.

Q    And you were acting as an individual, right?

A    Yes.

Q    So you just signed your name, right?

A    Yes.

Q    All right.   Then it says buyer, Betsy D. Gross. Do you see your wife's signature there?   Recognize it?

A    Yes.

Q    And she was a buyer, right?

A    Yes.

Q    And she was acting in her individual capacity, right?

A    Yes.

Q    And so she signed it personally.   You understood that, right?

A    Yes.

Q    And then you see seller, VSDH Vaquero Venture, Ltd.   Then it says VSDH Homes, comma, Inc., GP, right?

A    Yes.

Q    And above that line you see a signature, right?

A    Yes, sir.

MR. CHAIKEN:  May I proceed, Judge?

THE COURT:  There was no reason for you to stop.

MR. CHAIKEN:  Your Honor was coughing.

THE COURT:  You may proceed.

MR. CHAIKEN:  Thank you.

Q    (By Mr. Chaiken) And you see next to Mr. Hickok's signature the initials VP, right?

A    Yes, sir.

Q   All right.  And you understood that VP meant vice president, right?

A   Yes.

Q   All right.  And you don't see Mr. Hickok's signature anywhere on Exhibit 3 -- feel free to look at that.  It's there -- in any other capacity other than as vice president of the seller, VSDH Vaquero, Ltd., and it's general partner, VSDH Homes, Inc., GP, correct?

A   I wouldn't agree with that.  No.

Q   You see his signature someplace else on the document?

A   No.  I see it on that page.

Q   The exhibit is in front of you, Number 3.

A   Yes.

Q   Where else do you see Mr. Hickok's signature?

A   I thought you asked where do I see his signature as VP.  I see his signature, which to me represented that he was signing it under both VSDH and personally guaranteeing

MR. CHAIKEN:  Objection, nonresponsive Move to strike.

THE COURT:  Overruled.  I think he's explaining what he thought he heard you asking.  I think you might need to ask another question or re-ask it.

Q   (By Mr. Chaiken)  My question to you,

Mr. Gross, is: Where do you see a signature by Mr. Hickok, other than the one that we're looking at on the screen right now that says VP of the seller, VSDH Vaquero, Ltd., VSDH Homes, Inc., GP?

A Right there, yes. That's the only one.

Q That's the only signature, right?

A Yes, sir.

Q You don't see a signature anywhere on that document that looks like yours, where it says Douglas M. Hickok, correct?

A No, sir.

Q Above a line that says Douglas M. Hickok, right?

A No, sir.

Q And Mr. Hickok's signature as vice president of the seller, VSDH Vaquero Venture, Ltd., and VSDH Homes, Inc., GP is a lot like those signatures that you put on documents in your capacity as an officer for Impact Homes when you are signing in a corporate capacity, correct?

MR. ALDOUS: Objection, Your Honor. He's asking this witness for a legal conclusion as to the effect of his signature.

MR. CHAIKEN: I'm not asking for the effect.

THE COURT: Sustained.

Q (By Mr. Chaiken) Mr. Gross, when you are signing your name to a document on behalf of Impact Homes, the corporation that you identified, as an officer, you sign it to identify yourself as an officer just like Mr. Hickok did in this instance, correct?

A No, sir.

Q You don't?

A No, sir.

Q You just sign your name personally?

A Yes, sir.

Q Okay. But here Mr. Hickok didn't sign his name personally. He signed it as VP of VSDH Vaquero Venture, Ltd., right?

MR. ALDOUS: Objection, Your Honor. He's asking the witness for a legal conclusion.

MR. CHAIKEN: Not a legal conclusion.

MR. ALDOUS: The effect of his signature.

MR. CHAIKEN: I'm not asking for the effect.

THE COURT: Hang on. Rephrase your question, Mr. Chaiken.

Q (By Mr. Chaiken) You testified earlier in response to Mr. Shaw's questions that the documents were not prepared properly. Remember giving that testimony?

A   Yes.

Q   And that is your belief, correct?

A   If those were -- I don't know if those were my exact words, but I had hoped that you two --

MR. CHAIKEN:  Your Honor, I move to strike anything after, "Those were not my exact words."

THE COURT:  Are you addressing the Court?

MR. CHAIKEN:  My apologies.  I move to strike the attempt to answer beyond the answer to the question as nonresponsive  He said --

THE COURT:  I'm looking at what he said.

MR. CHAIKEN:  Okay.

THE COURT:  Let him finish his answer. Then I'll consider your objection.

THE WITNESS:  Could you rephrase the question, please?

Q   (By Mr. Chaiken)  In response to Mr. Shaw's questions earlier, referring to the guarantee issue, you stated the documents were not prepared properly. Remember giving that testimony?

A   Yes.

MR. CHAIKEN:  Reserving the right to call Mr. Gross in the defendants' case in chief if necessary. At this time I pass the witness.

THE COURT:  It is now 5:14.  We will

recess for the day.

MR. ALDOUS: I have no further questions of this witness.

THE COURT: Okay. The witness is excused. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: I repeat. We will recess for the day. It is now 5:14 p.m. The jury will return tomorrow at 9:30 a.m.

During this overnight recess, you're under the same instructions you have been previously given. You're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors. The jury is excused for the evening.

All rise.

(Jury exits the courtroom)

THE COURT: All right. We stand in recess for the evening.

Just so that you know what your totals are at this point in time, the plaintiff has used -- as I stated before, 3 hours and 39 minutes. Defendants have used 2 hours and 32 minutes.

MR. CHAIKEN: Two, 20, right?

THE COURT:  Two hours and 32 minutes.

MR. ALDOUS:  The Grosses would offer Exhibits 115 and 116, which -- I apologize to the Court. I didn't realize they were not admitted.

THE COURT:  Mr. Shaw?

MR. SHAW:  May I see them, Judge?  The photos themselves, I don't have any objection to. I want to see if there's other information on them.

THE COURT:  They're just photos.

MR. ALDOUS:  Just photos.

MR. SHAW:  Okay, just photos, I have no objection, Your Honor. Well, I do have an objection, Judge.  When they say -- they say this information They have information on them other than being just --

THE COURT:  The jury's gone.  You may speak at a normal volume.

MR. SHAW:  Okay.  I have an objection.  I don't have any objection to the photos, but the text I do have objection to.

THE COURT:  Where it says Westlake, 2.5 million?

MR. SHAW:  Price and the whole thing.

THE COURT:  The problem is the jury's already seen it

MR. SHAW:  Yeah, but it's sure not

admitted into evidence.

THE COURT: And you didn't object to it before.

MR. SHAW: I didn't, but it wasn't offered in evidence.

THE COURT: Well, that's because everybody assumed it was and --

MR. ALDOUS: Do you mind if I ask counsel because with regard to the pre -- what are you referring to?

MR. SHAW: Any of this, any of it, anything other than the photo.

MR. CHAIKEN: You know, I have a problem as well. I mean, it's not authenticated and it appears to be printed off the Internet by Cooper & Scully. And, I mean, there's all kinds of comments with regard to -- it's not been authenticated Nobody has proven them up.

THE COURT: It was authenticated.

MR. SHAW: I'm not worried it fairly and accurately represents. I would agree to that part of it.

THE COURT: The witness authenticated it when he said that these are pictures of the property, and he --

MR. CHAIKEN: That's what he said that

they're pictures of the property

THE COURT: -- talked about the improvement that they made. He talked about the location.

MR. ALDOUS: He said what they listed it for, and he said they listed it with Roxann Taylor.

MR. SHAW: He did.

MR. ALDOUS: So, I mean, I offer it.

THE COURT: All right. So your objections, Ms. Shaw.

MR. SHAW: My objections are to the text included with any of the photos is objectionable because there's no predicate to support the text. And if there is, it's hearsay.

THE COURT: And the text that you're referencing would be the location of the property --

MR. SHAW: Well --

THE COURT: -- and the listed value and the name of the realtor?

MR. SHAW: Yes, Your Honor, anything like Westlake, two and a half million, you know, that sort of thing. I don't think it's the end of the world, but --

THE COURT: I believe there was testimony as to that, though.

MR. SHAW: Well, there was, but --

THE COURT: Okay.

MR. SHAW: -- I'm not saying that's anything new. It's just --

THE COURT: You just don't like it?

MR. CHAIKEN: I would withdraw my objection.

THE COURT: All right. Exhibits 15 and 16 are admitted --115 and 116 are admitted.

And I would admonish the parties. Please be careful because there is a large number of exhibits. And it's possible to inadvertently, as in this instance, present something.

(Proceedings concluded for the day)

STATE OF TEXAS            )

COUNTY OF DALLAS          )

I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 12th day of October, 2015.

/s/ Cathye G. Moreno

Cathye G. Moreno, Texas CSR #6076
Expiration Date:  12/31/16
Official Court Reporter
County Court at Law No. 1
600 Commerce Street, Suite 550
Dallas, Texas 75202
  cathyemoreno@sbcglobal.net
(214)653-7496

# TAB 27

REPORTER'S RECORD
VOLUME 5 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD.          )IN THE COUNTY COURT
                                    )
    Plaintiff/Counter-Defendant,    )
                                    )
V.                                  )
                                    )
KEN GROSS and BETSY GROSS           )AT LAW NO. 1
                                    )
    Defendants/Counter-Plaintiffs,  )
                                    )
V.                                  )
                                    )
EVAN L. SHAW and DOUGLAS M.         )
HICKOK                              )
                                    )
    Intervenors/Counter-Defendants,)DALLAS COUNTY, TEXAS

--------------------------------------------------------

**TRIAL ON THE MERITS**

--------------------------------------------------------

On the 17th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.  Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

    - AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

    - AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.

**INDEX**

| **JUNE 17, 2015** | | | **PAGE** | **VOL.** |
|---|---|---|---|---|
| PROCEEDINGS............................... | | | 4 | 5 |
| STIPULATION AS TO ATTORNEY FEE SUBMISSION | | | 4 | 5 |

GROSSES'

| WITNESSES | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Betsy Gross | 11,106 | 30,99,110 | -- | 5 |
| Roxann Taylor | 114,134 | 128,131,136 | -- | 5 |

| | PAGE | VOL. |
|---|---|---|
| THE GROSSES REST....................... | 137 | 5 |
| HICKOK'S MOTION FOR DIRECTED VERDICT..... | 140 | 5 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 155 | 5 |
| VSDH'S MOTION FOR DIRECTED VERDICT....... | 156 | 5 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 158 | 5 |
| BILL OF EXCEPTIONS BY MR. SHAW.......... | 159 | 5 |

HICKOK'S

| WITNESS | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Evan Lane Shaw | 167,198 | 187 | -- | 5 |

| | PAGE | VOL. |
|---|---|---|
| END OF PROCEEDINGS...................... | 204 | 5 |
| REPORTER'S CERTIFICATE.................. | 205 | 5 |

**EXHIBIT INDEX**

**GROSSES'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 36 | June 15, 2009 email from Ken Gross to Hickok and Shaw | 82 | 82 | 5 |

**PROCEEDINGS**

June 17, 2015

THE COURT: All right. Mr. Aldous, you may approach.

MR. ALDOUS: Thank you, Your Honor. I would like for us to put our agreement on the record regarding submission of attorney's fees to Your Honor.

THE COURT: You may do so.

MR. ALDOUS: It's my understanding that the attorneys --all parties have agreed that the attorney's fees issue will not be submitted to the jury, but will be decided by the Court in a form and fashion that the Court desires, with at least an opportunity for everybody to submit affidavits related to the attorney's fees on the same day and with each party an opportunity to respond to those affidavits.

MR. SHAW: Agreed by VSDH.

MR. CHAIKEN: That's agreed.

THE COURT: So noted for the record.

MR. ALDOUS: Thank you.

(Brief recess taken)

THE COURT: We are on the record.

You may proceed, Mr. Aldous.

MR. ALDOUS: Your Honor, there's been a suggestion by counsel for VSDH that he's going to call

two separate types of witnesses; one being Ms. Lash to testify as to a lawsuit the Lashes were involved with in terms of the Grosses and, according to Mr. Shaw, that a finding by a jury of civil fraud. That evidence is inadmissible for the purpose of Rules 404 through 406 and 607 through 609, because it is only offered to show that he committed a fraud in another unrelated matter; and, therefore, he's a bad guy in this case.

The rules, as set forth, do not allow evidence of another wrong to be used to show that someone acted in conformity therewith. And to the extent that it would be potentially admissible under any exception to that, it would have to be so closely related to be part of the same scheme or is only admissible if they are so connected with the transaction at issue that they may all be parts of a system, scheme, or plan.

In this situation, that involved the sale of the Grosses' home, and it related to some -- an allegation of water leaking through the windows of the Grosses' home. It had nothing to do with this transaction; and, therefore, any evidence that would be offered in that regard would be violative of those rules.

The second type of evidence that Mr. Shaw

indicated to the Court was that he would call witnesses to talk about the truthfulness or untruthfulness or whatever character traits of Mr. Gross. That evidence is likewise inadmissible. The only time that that is admissible is if a person is charged with an action involving moral turpitude and he introduces evidence of his moral character to fight that, then the defense -- or the other side can bring up evidence of specific acts in cross-examination.

Even if it's in cross-examination, no extrinsic evidence of that can be -- of specific acts can be offered unless it's a conviction of a crime. And that's not the issue here. So for those reasons, none of that's admissible. And if Mr. Shaw's represented to the Court that that's the purpose for calling those witnesses, then they need not be called.

THE COURT: Mr. Shaw?

MR. SHAW: I appreciate Mr. Aldous telling me who I should and shouldn't call to trial, but I'm going to respectfully decline to follow his advice. I have prepared a brief. As I sit here looking at Mr. Aldous' brief, I will call witnesses that will provide --

THE COURT: Did you give him a copy of this?

MR. SHAW: No, Your Honor. I didn't know I was going to file a brief until I read Mr. Aldous' brief.

MR. ALDOUS: Thank you, Your Honor.

MR. SHAW: The facts --

THE COURT: Let's give him a minute to look at it. We gave you a minute to look at his.

Did you file your brief electronically?

MR. SHAW: I did not. I just had that in my notebook. I just had that on my person, so I thought it might be a good proof.

THE COURT: Give me a minute to look at this.

MR. SHAW: Yes, Your Honor.

THE COURT: All right. You may proceed.

MR. SHAW: I plan to call --

THE COURT: Wait until Mr. Aldous gets here. I'm sorry.

MR. SHAW: I plan to call several witnesses to testify as to opinion and reputation, which is admissible under Rule 404 of the Texas Rules of Evidence. And so the -- Mr. Aldous' claims that opinion and reputation are not viable evidence is in error and not in compliance with the Texas law. Those rules exist to support the claim that when the truth of a person is

at issue, then you can call opinion and reputation witnesses, and that's what I plan to do.

THE COURT: Mr. Aldous?

MR. ALDOUS: I appreciate Mr. Shaw telling me what Texas law says. But, likewise, I will point out that Rule 404 says when a reputation or character evidence is admissible, I agree that if it is admissible, it's admissible in different ways. But you have to get to the first part. That is, "Is it admissible?" Rule 404 controls this.

Evidence of a person's character is not -- or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion except if the character of an accused -- that being in a criminal -- by an accused in a criminal case or by the prosecution to rebut this thing or by a party accused in a civil case of conduct involving moral turpitude or by the accusing party to rebut the same.

So what that means is if VSDH had accused Mr. Gross of some -- by pleading of fraud or something of that nature and we had offered evidence of character traits that he's not fraudulent, then they could have cross-examined him on that. This is not the character of a victim in a criminal case and is not referring to the character of a witness under Rule 607 through 609.

Furthermore, evidence of other crimes, wrongs, or acts are not admissible to prove the character of a person to show action and conformity therewith.

So you first have to get to the -- the issue is: Is it admissible? So in every civil case, what Mr. Shaw is saying, is that any time that somebody -- the jury has to weigh the credibility of the witnesses, you can call people in to say, "No, I know that sorry SOB, and he is not truthful." And we know that that's not the law. The jury is the sole judge of the credibility of the witnesses. And unless it has become an issue based upon the law, you just don't get to get into it.

THE COURT: Mr. Shaw?

MR. SHAW: I don't have to prove, and I'm not going to prove, Mr. Gross' actions. A specific instance that I am allowed to prove is opinion, opinion and reputation in the community, and that's what I'm going to do. When Mr. Gross takes the stand and wants the jury to believe him and brings his case, he puts his truthfulness and veracity at issue. The only way a jury can properly measure that is to hear from witnesses who know of Mr. Gross' truthfulness or veracity by opinion or reputation.

Plaintiff -- VSDH would be prejudiced if

it was not allowed to bring community people to testify about the opinion and reputation of Mr. Gross as the statements that Mr. Gross makes in his case about the facts are key. And this case turns out to be a swearing match, and Mr. Gross' veracity is at issue because of that.

THE COURT: Okay. I'm not going to allow the character witness testimony. You can make your offer of proof and bill of exceptions --

MR. SHAW: Thank you, Your Honor.

THE COURT: -- at an appropriate time.

MR. SHAW: Okay. Thank you. What about -- is that for both opinion and reputation, Your Honor?

THE COURT: Opinion as to?

MR. SHAW: The truthfulness of Mr. Gross. I was offering it for two separate -- two separate ways to talk about the veracity of Mr. Gross, by opinion and by reputation.

THE COURT: It is for both, because it appears that that's what the rules address, both opinion and reputation testimony.

MR. SHAW: All right. Thank you.

THE COURT: Are we ready now to bring in the jury?

MR. ALDOUS: Yes, Your Honor.

THE COURT:  Mr. Shaw?

MR. SHAW:  Yes, Your Honor.

MR. CHAIKEN:  Yes, Your Honor.

THE COURT:  You may bring in the jury.

All rise.

(Jury enters the courtroom)

THE COURT:  You may be seated.

Mr. Aldous, you may call your next witness.

MR. ALDOUS:  Your Honor, I would call Betsy Gross.

THE COURT:  Raise your right hand, please.

(Witness sworn)

THE COURT:  You may be seated.

You may proceed.

**BETSY GROSS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. ALDOUS:

Q    Could you introduce yourself, please?

A    Betsy Gross.

Q    Betsy, I know that we've covered a lot of stuff and you've been in the courtroom, so I'd like to just get to the part where we start talking about this situation.  First of all, were you involved in the

negotiations with VSDH, Mr. Hickok, and Mr. Buttemiller before you guys purchased the house?

A    No.

Q    All right. So the house I'm talking about, you know, of course, is 2004 White Wing Cove. So from now on, if I say, "the house," that's the one I'm talking about. Okay?

A    Uh-huh.

Q    Did you know -- well, so what was your role with Ken in terms of the house, in buying it?

A    So, I was fully aware of all of his discussions and that he was having meetings and that, you know, as a family, that was a group decision. But he was managing all the interactions between John Buttemiller and Doug Hickok and anyone else. That was more his -- you know, as a couple, you kind of -- you do this and I do other things. And I was working and so that was his.

Q    By the way, what is your job?

A    I am head of reimbursement for a medical device company.

Q    What's the name of the company?

A    Intersect ENT.

Q    Now back to the house. So, although you were up to date on stuff, you weren't the one that directly dealt with Mr. Buttemiller or Mr. Hickok in terms of

buying the house?

A    Correct.

Q    Did you have any specific desire to have the personal guarantee part -- language part of the contract?

A    Absolutely.  That was something that we had discussed.  And I said I would only feel comfortable doing the deal if there was some language in there that protected us that included a personal guarantee.

Q    And from the time that you guys bought this house, what was your plan over the next couple of years in terms of what you were going to do?

A    So this was -- it was always intended to be a short-term thing.  We wanted to invest in this house as a business deal for his building business.  It was an opportunity for him to build up a reputation, show the quality of work that he could do.  But it was always intended to be a short-term investment, nothing long term.

Q    Now, after you guys moved -- first of all, there was a statement about you guys moving into the house before being permitted to by Mr. Hickok.  Did you guys break into the house and go live there?

A    No.

Q    Tell us how that happened.

A    So we asked for permission and John Buttemiller gave us the key.  And there was an alarm system on the house, so that would have had to have been disengaged. So we were given a key, and there were discussions that happened between Ken and John about giving us temporary ability to live in the house until the deal was --

MR. CHAIKEN:  Your Honor, I object to the hearsay portion of it.

THE COURT:  Overruled.

Q    (By Mr. Aldous) Go ahead.

A    -- until the deal was consummated in terms of the details of the rent that we were going to pay, which it was a high amount of rent per day.

Q    Okay.  Now the -- after you guys moved into the house, did you occasionally run into either Mr. Shaw or Mr. Hickok?

A    Yes.

Q    Tell us about that, please.

A    There were a few different occasions I can think of that I ran into either Mr. Shaw or Mr. Hickok. One is I remember it was -- so we moved into the house around June or July, and I remember meeting --

Q    Of 2007?

A    I'm sorry.  Of 2007.  And I remember meeting doctor or -- doctor, sorry.  I deal with doctors all the

time. I remember meeting Mr. Shaw for the first time at a Christmas party, and he was introduced to me. And I said something along the lines of, "Oh, it's so nice to meet you. I'm so glad we're doing this deal together and Ken's going to build a great house and it's going to be great." And he was very complimentary and, oh, yeah, you know, we're looking forward to doing this too and yahoo, you know, everything was great.

Q  Just very cordial?

A  Sure.

Q  After the addition was started, did you bump into Mr. Shaw again?

A  Uh-huh.

Q  Is that a "yes"?

A  Yes. I'm sorry.

Q  It's hard to type down, "uh-huh."

A  My apologies. So on another occasion, it was actually in Mexico on a spring break. I was with my daughter and her friend and her mother and happened to be walking down the street and ran into Van Shaw on the street and said, "Van, Hi. How are you?" And he said something along the lines of, "Where's Ken?" And I said, "Oh, he's back working on the house, you know." And he said, "Oh, you ought to come out to our yacht," he said.

Q   Very cordial?

A   Very cordial.

Q   All right.  After the -- you heard testimony from both Ken and Mr. Hickok about the visit that Mr. Hickok made to the home after the construction was started on the addition; is that right?

A   Yes.

Q   Could you tell us what you recall about that visit?

A   I distinctly remember that day.  And Ken --

Q   Why do you distinctly remember it?

A   Well, a few things.  It was the first time that I had ever met Doug.  And I remember that Ken really wanted me to be there and I was running late.  And so by the time I got there, they had already finished touring most of the property.  And so I ran into them when they were in the kitchen and the plans were sprawled all over the kitchen counter and the kitchen table.  And so Ken introduced me to Doug.

And somehow we got into a cordial conversation about kids and college, and he had just gotten back from a trip.  And I distinctly remember they had seen University of Georgia, University of Alabama, and he talked about University of Texas and how his son was looking at different schools.  And we were just

sharing notes about college tours because we were at that stage as well.

Q   During that entire visit, did Mr. Hickok at any time say, "I can't believe you guys started this thing without us"?

A   Absolutely not.  To the contrary, I remember saying to him, "Doesn't everything look great?  You just saw everything."  "Oh, yeah.  It looks great, looks fantastic."

Q   Any complaints that he raised at that time?

A   Absolutely not.

Q   Did Mr. Hickok say, "You guys have already breached the contract"?

A   Absolutely not.

Q   In your mind, was there any -- in your mind, was there any -- ever any question as to what the addition was going to look like in terms of the finish out?

A   No.  There wasn't any question to me, for sure, because it was a beautiful house, and we couldn't exactly put something low quality on top of it.  And that wouldn't help Ken's business if he built -- he wanted to use this to market his business.  So he's not going to build an addition that looked ugly and cheap. He had to match the existing quality of the home.

Q   And was that always the plan from your perspective?

A   Yes.

Q   Now after the visit and then completion of the home, you and Ken sent the notice saying we're going to exercise the buyback; is that right?

A   Correct.

Q   And I notice that you were on some of those emails.  Were you now more involved at this point in terms of the buyback?

A   Yes.

Q   So when you exercise -- or when you sent the notice on the buyback, what do you recall?

A   I remember we had had many conversations, Ken and I had had many conversations about, well, we have to make a decision.  Do we want to stay here and buy the house?  Do we want to exercise the buyback?  What do we want to do?  And we together made the decision; no, we need to stick with the original plan.  As much as it's a beautiful house, this is not the original plan. We really can't continue to stay here.  We need to exercise the buyback.  So let's make sure we notify them.

And I don't remember why it is that I took the initiative to send the email, but I did.  I probably just said, "If you want, I'll be happy to send it."  And

I typed it and sent it separately via Federal Express.

Q    All right.   And did you get a response that was satisfactory, I guess, to you?

A    I got a response that was shocking, but I --

Q    What was that?

A    I think it was shown in here, but it was the response basically that the company was bankrupt.

Q    They used the term insolvent?

A    Insolvent.  I'm sorry.

Q    So just in terms of how this went, after you guys exercised the buyback, who, if anybody, at VSDH did you deal with?

A    So my memory is that any communication -- which I have had very little communication with Doug Hickok at all throughout all of this, but any communication at that point really ceased.  And now the only communication that existed was between -- was with Van Shaw.

Q    All right.  And did you personally speak with Mr. Shaw?

A    Yes.

Q    Can you -- do you remember when?

A    I don't think any phone conversation between me and Mr. Shaw ever happened, but there was a meeting where Ken and I went and met with him at the Vaquero

Real Estate office to talk about other options because we said, "Okay. Well, if you're bankrupt, then is there something else we can come up with? Let's be creative. Is there some way we can make this work out among ourselves? And so --

MR. SHAW: Your Honor, may we approach?

THE COURT: You may.

(Sidebar conference held)

THE COURT: You may proceed.

MR. ALDOUS: Thank you, Your Honor.

Q (By Mr. Aldous) So, Betsy, irrespective of what was actually discussed. When you and Ken left the meeting with Mr. Shaw, did you have an impression about whether or not VSDH or its members would honor the buyback part of the contract?

A They made it clear that they were not going to.

Q At some point in time after that, you guys hired Roxann Taylor and put the house on the market; is that right?

A Yes.

Q When you guys put the house on the market originally, did you get very much in terms of interest from the purchaser --any purchasing public?

A No.

Q When you -- did you eventually get an offer?

A    We eventually did.  Yes.

Q    And what is your recollection of that offer?

A    I remember that it was -- the price was pretty good given the market was very slow and that it was going to require us to have to find somewhere else to live and move out in ten days.

Q    You remember the ten-day part?

A    I remember that.

Q    Just a moment.  Do you have the notebook up there with you?

A    Yes.  Which one?

Q    It would be the Gross Exhibits, Exhibit 47.  It's previously been admitted into evidence.  And the handwriting on here is atrocious.  Or maybe it's just my eyes are atrocious because I can see it pretty good right now.

If you see, this is the contract between you and Ken and Melissa Browning.  Do you see that?

A    Yes.

Q    And the purchase price, the price that she agreed to pay there is $2,415,600?

A    Yes.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  Your Honor, would you mind if

I put it over there?

THE COURT: That's fine.

MR. ALDOUS: Because then that way it's -- everybody can see it and I don't kill Cathye. I'll try not to kill anybody.

Q (By Mr. Aldous) Now have you gone and looked at the settlement statement that is Exhibit 42, the settlement statement from your guys sale of the house to Ms. Browning to determine the damages that you believe you guys suffered as a result of the non-buyback and the breach of contract?

A Yes.

Q Exhibit 42 is the settlement statement for that sale, right? Do you have it up there in front of you?

A I don't have it. Oh, that's 42?

Q Yeah. Sorry.

A Yes, I have it.

MR. ALDOUS: All right. May I approach again, Your Honor?

THE COURT: You may.

Q (By Mr. Aldous) Now you remember from the --

THE COURT: You need to move that forward just a little bit.

MR. ALDOUS: This way?

THE COURT: Yes.

MR. ALDOUS: All right.

Q    (By Mr. Aldous) The price that they agreed to buy it back from -- that is VSDH was $2,851,871, right?

A    Correct.

Q    I'm going to write that there. Okay?

A    Okay.

Q    Now in terms of the sales price that you guys got, you got $2,415,600, right, that's reflected?

A    Correct.

Q    Now, but that's not the end of the story, is it? Didn't you guys have to pay a bunch of fees and things like that in the sale with Ms. Browning?

A    Correct. So since we had to sell the house since they didnt buy it back, then we had to pay all the realtor's fees and the closing cost.

Q    All right. So if we look at Exhibit 42, for instance, the realtor fee is reflected on here. Well, so if you see on the right-hand side, it says summary of seller's transaction. Do you see that?

A    Correct.

Q    And that summary of the seller's transaction starts with the amount that -- the contract sales price, right?

A    Correct.

Q    And then after that, you had to pay $108,000

for the -- $108,702 for the realtor's fee, right?

A    That's right.

Q    And that is reflected on Line Number 703 on the second page, right?

A    Correct.

Q    In addition to that, you had to pay the title -- a title fee.  And I don't know if that's title insurance or what.  Do you know what that is?

A    It looks like title insurance of $11,863.

Q    And that's on Line 1108?

A    Yes.

Q    I have to write better.

Now in addition to that, you have, for instance, the Texas certification from HUD or tax certification I guess is what it is, which is only $45.11.  But all of these are listed on Exhibit 42, right?

A    Correct.

Q    So the tax certification is $45.11 and then you have the release fee -- I'm sorry, the guarantee fee from HUD, which is $5.  And then you had the -- what's the next fee?

A    I'm not sure which order you want to go in, but there was a government recording and transfer charge of $48.

Q    Right.  Okay.

A    There is a home warranty.  She wanted a home warranty on the home for $950.

Q    All right.

A    There's a transfer fee to the homeowner's association of $925.

Q    Okay.

A    There's homeowner's association dues.

Q    Well, you wouldn't have had to pay -- you only paid for the dues up to the time you used it, right?

A    Right.  Correct.

Q    What about a resale certificate from HUD for $274?

A    Oh, yeah.  I'm sorry.  I missed that one.

Q    And then you also had the escrow?

A    Of $2,500.  There was a pool -- it was a minor pool repair issue of $658.

Q    All right.  Now if you add up all those and you take it from the sales price or actually added back into this, the number comes outs to be approximately $562,241.55, right?

          MR. CHAIKEN:  Leading.  I'm sorry. Objection, leading.

          THE COURT:  Rephrase.

Q    (By Mr. Aldous) So we did the math earlier so

that we don't have to do the math now. Do you recall what the math said?

A    I remember that the math was somewhere around $562,000.

Q    Do you recall if the number would have been $241?

A    That number sounds approximately correct.

Q    All right. So at the end of the day, the failure or the refusal of VSDH to buy back in accordance with what you guys thought you had agreed and what you ended up getting out --

MR. CHAIKEN:  I'm sorry, Your Honor. Objection, leading.

THE COURT:  He hasn't finished the question yet.

MR. CHAIKEN:  He began by leading.

THE COURT:  Overruled.

Q    (By Mr. Aldous) And the -- less what you got on the sale, adding back in all the fees you had to pay, what is the total damages that you guys suffered?

A    As a result of them not buying -- as a result of VSDH not buying the property back as they originally said they would, our loss was about $562,000.

Q    Now, in addition to the $562,000 that you guys lost in the sale, did you also have some additional

things that ended up that you had put into the house that you ended up not being able to get anything back for it?

A    So there was like as part of the sale, the person who purchased the house also said they wanted to buy all the media equipment that was in the movie room, which was not surprising. And that was about $10,000 worth of equipment and screens. And then there was the furniture in the -- so the addition that we put on, they loved all the furniture that we put in. So they wanted all the media furniture, so there was about $10,000 worth of furniture that she purchased from us.

Q    Now in terms of -- when you say, "purchased," there was no extra money that she gave you?

A    No. She said as part -- I'll buy the house for this price and I want you to throw in those things." So we had paid for those things, and then she said it was kind of a contingency of her offer.

Q    I see. Now, Mrs. Gross, reviewed in your perspective, would you have, as a spouse, agreed to do this deal without the personal guarantee language being in the contract?

A    Never.

Q    And if they'd come back to you, that is VSDH, to you and your husband and said, "No, we're not

personally guaranteeing this," what would you have done?

A    Bought another house.

Q    A different house?

A    Correct.  There are many options available.

MR. ALDOUS:  All right.  Thank you for your time.  I'll pass the witness.

THE COURT:  Mr. Shaw?

MR. CHAIKEN:  Can you switch places with me?  Thank you.

Can you give us just a moment, Your Honor.

THE COURT:  So you're going to go next instead of Mr. Shaw?

MR. CHAIKEN:  Yes, Your Honor.  I think I'm going to proceed here.

MR. ALDOUS:  Your Honor, do you mind if I move the easel so that if they have to exit --

THE COURT:  You may.

MR. ALDOUS:  -- the jury room, I don't want them to run into it and hurt themselves.

MR. CHAIKEN:  May I approach?

THE COURT:  You may approach.  And he's willing to let you use his easel.  You may do so.

MR. CHAIKEN:  It doesn't matter to me which easel we use.  Can I set it up over there --

THE BAILIFF:  Same place.

MR. CHAIKEN:  -- if that's okay with you.

THE COURT:  That's fine.

MR. CHAIKEN:  May I go place this on the easel?

THE COURT:  You may.

MR. CHAIKEN:  Thank you.

MR. ALDOUS:  Your Honor, a couple of the jurors are raising their hands

THE COURT:  Yes.

JUROR ONE AND TWO: May we move up to the top?

THE COURT:  Yes.

You need to move that over further to the right and a little forward, Mr. Chaiken.

MR. CHAIKEN:  Oh, sure.  Move it over?

THE COURT:  A little to the right and a little forward.

MR. CHAIKEN:  To the right and forward. I'm happy to do exactly that.  I got it.

THE COURT:  Can you see that, Mrs. Gross?

THE WITNESS:  Yes.

THE COURT:  Yes, that's fine.

MR. CHAIKEN:  Can the jurors see it?  Oh, good.

THE COURT:  You may approach.

MR. CHAIKEN:  May I proceed, Your Honor?

THE COURT:  You may.

MR. CHAIKEN:  Thank you.

**CROSS-EXAMINATION**

BY MR. CHAIKEN

Q    Good morning, Mrs. Gross.

A    Good morning.

Q    You and I have never actually personally met; is that correct?

A    Correct.

Q    Other than in passing here in the courtroom when we've been down here from time to time. You didn't give a deposition in this case or anything of that nature, correct?

A    Correct.

Q    You just finished testifying in response to Mr. Aldous' questions about a sale of the house that we've been talking about to a third party, right?  You and Mr. Gross made a voluntary decision to sell the house to a lady by the name of Melissa Browning, correct?

A    No.  I would not call it voluntary.

Q    Somebody put a gun to your head and say, "Sell the house"?

A    Not a gun to my head; although, that did happen

to me two weeks ago, by the way. But --

Q    That's terrible. I'm sorry.

A    Yeah.

Q    So Mrs. Gross --

A    But --

Q    Mrs. Gross, excuse me, Mrs. Gross.

A    Sorry.

Q    The -- you-all hired a real estate broker named Roxann Taylor to list the property for sale, correct?

A    Correct.

Q    Okay. And that was prior to September 1st of 2009, right?

A    Correct.

Q    And that was a conscious decision that you and your husband, Ken Gross, made sometime in July or August of 2009, right?

A    Correct.

Q    Okay. And you and your husband had been involved in building houses and selling houses to other people, right?

A    I'm not involved in the building and selling of houses that Impact Estates builds.

Q    But your husband is, right?

A    That's his business. Yes.

Q    Okay. And he markets those properties and

sells those properties, right?

A    Correct.

Q    And if you had wanted to do so, when you decided -- your husband decided to voluntarily sell the house back in 2009 before September of 2009, you could have sold it by owner or through Impact Estates if you wanted to, correct?

A    Impact Estates is not a real estate company, so I would think you have to be a real estate company to sell a house.  We could have done a "for sale by owner," but --

Q    But you elected not to do so?

A    -- I don't think that's required

THE COURT:  Mr. Chaiken, let her finish her answers before you --

MR. CHAIKEN:  Forgive me.  I didn't mean to interrupt.

THE COURT:  And then she will show you the same courtesy, okay?  Only one person can talk at a time.

You may finish, Mrs. Gross.

THE WITNESS:  Thank you.

Q    (By Mr. Chaiken) Now, bottom line is you and your husband, just like you made a conscious decision to sell the house before September 1st of 2009, made a

conscious decision to hire Ms. Taylor to list the property and sell it, right?

A    We were forced to do that.  Yes.

        MR. CHAIKEN:  Objection, nonresponsive

        THE COURT:  Overruled.

Q    (By Mr. Chaiken)  You made the decision with your husband, correct?

A    Correct.

Q    VSDH didn't tell you, "Go sell the house," right?

A    They told us they were not going to buy back the house.

Q    Okay.  And you chose the timing of the sale of the house, correct, you and your husband?

A    Yes.

Q    Okay.  You chose when to list it, right?

A    Yes.

Q    You chose when to have it marketed by Ms. Taylor?

A    Yes.

Q    You decided and chose to pay Ms. Taylor -- is it Miss Taylor or Mrs. Taylor -- a commission if she sold the house, right?

A    Correct.

Q    These were decisions that you and your husband

made on your own, correct?

A    We chose to do that when we were forced to do that.  Yes.

Q    I understand that it's your contention that you were forced to do it, okay?  The point I'm making is these were decisions that you and your husband made on your own, correct?

A    Based on the response from VSDH, that is the decision that we made. Yes.

MR. CHAIKEN:  Your Honor, object to the nonresponsive portion.  Move to strike.

THE COURT:  Overruled.

Q    (By Mr. Chaiken) Mrs. Gross, you just finished testifying to this jury that in May or late April of 2009, you and your husband made a decision that you were going to exercise the buyback option so that you could move to another house.  It was part of your plan.  Do you recall that testimony?

A    Yes.

Q    You also just told the ladies and gentlemen of the jury that you sold the house to Ms. Browning, correct?

A    Yes.

Q    And you sold it when you did because you were trying to facilitate that plan to move someplace else,

correct?

A   Can you restate your question?

Q   Yes.  You and your husband decided you were moving someplace else, and you wanted to be rid of the house that you-all had purchased from VSDH, right?

A   We wanted to exercise the buyback option, yes.

Q   So that you could move to another house, right?

A   Correct.

Q   Okay.  And you did move to another house, right?

A   Correct.

Q   Are you still in that house?

A   No.

Q   Okay.  Now you voluntarily entered into a contract with Ms. Browning to sell the house to her for whatever the purchase price was, correct?  You and your husband agreed this is what we will sell the house to this woman for, right?

A   After asking VSDH whether or not --

Q   Right or wrong?

A   -- we should --

Q   Right or wrong?

THE COURT:  Mr. Chaiken, let her finish her answer.  If you don't like it, you can object to it.

MR. CHAIKEN:  I will.

A     We asked VSDH if they -- we gave them an option as to whether or not we should move forward with the deal.  They never responded; therefore, we saw there was no other option other than to protect ourselves and sell the home.

Q     When did you offer VSDH the opportunity to buy the property for 2.4 -- whatever the price you sold it to Ms. Browning for?

A     We had a buyback option agreement with VSDH at a set price that we all agreed to.  So --

Q     Maybe -- oh, I'm sorry.  I didn't mean to interrupt.  Please continue.

A     We had a buyback agreement with VSDH that VSDH would buy back the house at a certain price.

Q     Right.  And the agreement that you had, the buyback agreement, was that VSDH, if it was obligated to do so under the buyback agreement, would pay $2.8 something million on September 1st, 2009, right?

A     Yes.  But we had to notify them on May the 1st of that decision.

Q     Right.  And prior to that date 9-1-09, you and your husband made a decision to enter into a contract with Ms. Browning to sell the property to her for just under $2.5 million, right?

A     But we never would have done that if -- yes, we

did. But we never would have done that if VSDH had honored the buyback agreement.

MR. CHAIKEN: Your Honor, I object to the nonresponsive portion of the question.

THE COURT: Overruled.

MR. CHAIKEN: I didn't ask her why she did it. I asked her whether she did it.

THE COURT: Overruled.

Q (By Mr. Chaiken) And my question to you earlier -- and I appreciate your telling me -- is: When did you offer -- prior to September 1st, 2009, when did you offer VSDH the opportunity to buy the house before September 1st, 2009 for the same price that you agreed to sell it to Ms. Browning?

A We didn't offer that option to them.

Q Okay.

Q Now you were in the courtroom yesterday when your husband testified, right?

A Yes.

Q Okay. Now do you recall that your husband right at the end of his testimony yesterday told the jury that the documents, the closing documents -- and he had referred to a guarantee -- had not been prepared correctly? Remember that testimony at the very end of his -- of his examination yesterday?

A    I don't remember exactly what he said.  No.

Q    Okay.  And if the documents were not prepared correctly, you and Mr. Gross nevertheless decided to close the transaction when you bought the house, right, whether the documents were correct or incorrect?

A    Can I answer that question with more than a "yes" or "no"?

Q    No.  I'd just like you to answer my question. did you close the transaction?

A    Did we -- we signed the documents before they signed the documents.

Q    I understand.

A    That is correct.

Q    And whatever documents were prepared, were not prepared or correctly prepared or incorrectly prepared, you closed the transaction anyway, right?

A    We thought the documents were prepared correctly at the time that we signed them.

Q    Okay.  So you disagree with your husband who testified yesterday that the documents were not prepared correctly?

MR. ALDOUS:  Your Honor, I would just object to asking this witness whether she recalls what the testimony was yesterday.  I mean, I don't have a problem with asking if she disagrees or not, if he said.

THE COURT: Rephrase, Mr. Chaiken.

Q  (By Mr. Chaiken) If your husband testified to the jury yesterday that the documents were not prepared correctly, you would disagree with him, right?

A  I'm not sure the context in which he answered that question. I don't know exactly how the question was phrased and exactly how the question was answered.

Q  Thank you.

A  It would not be the first time I would disagree with my husband.

Q  I bet.

A  Well, that wasn't nice.

Q  You have a book up there. And I'd like you -- and it's what we've been referring to as the Grosses' Exhibits. And that's the book you were talking with Mr. Aldous about a few minutes ago. I'm sorry. Give me one second here. My book came apart.

Now, you were in the courtroom when Exhibit No. 1, this document right here, was discussed with your husband, right?

A  Yes.

Q  And you recall, don't you, that your husband acknowledged that the language that we see here in terms of an addition to the -- to the addendum to the contract was language that he wrote and he proposed, right?

A     No.  I disagree with that.

Q     He didn't write that language and he didn't propose it in his email to Mr. Buttemiller?

A     He sent that email to John Buttemiller with that language which was recommended by an attorney with whom he consulted.  And the attorney wrote the language and gave it to Ken, and Ken then in turn said to John Buttemiller this is language which I want to have added to the contract.

Q     Okay.  But VSDH and its lawyers didn't put this language in the contract, right?

A     Well, VSDH wrote the contract and the language is in the contract.

Q     So is it your testimony that VSDH or its lawyers put this language in the contract, that they -- that this was their language and they wrote the contract with this language in it?

A     No.  What I'm saying is we submitted, as is proven in this email, we said we want this language in the contract.  And that language is, in fact, in the contract.  How it got in there, I don't know, but it's in there.

Q     Okay.  Well, yesterday your husband testified that the contract was written by VSDH and its lawyers.  And you just testified to the same thing a moment ago.

MR. ALDOUS: Your Honor, I object on relevance in terms of whether she remembers the testimony from yesterday. That's irrelevant.

THE COURT: Sustained.

Q (By Mr. Chaiken) You just testified a moment ago that the contract was prepared by VSDH and its lawyers, right?

A That is my understanding

Q That's your understanding So you have an understanding as to who prepared the contract?

A Yes.

Q "They," meaning VSDH and its lawyers, did not prepare this language. This was language that was prepared and proposed by your husband through Mr. Buttemiller, correct?

A Yes. That was proposed and it's in the contract.

Q Your husband's not a lawyer, right?

A Correct.

Q All right. Now, I want to talk to you about this situation regarding the meeting that you have testified about occurring over at the house, the one that you said Doug Hickok attended that you walked in on after the tour had been provided by your husband. You know the meeting I'm talking about?

A    Yes.

Q    When did that meeting occur?  Do you know the date?

A    It was sometime in the fall.

Q    Sometime in the fall, all right.  And you were unaware of any prior meeting that Doug Hickok had with your husband or anybody else at the house prior to that meeting, correct?

A    No.  That's not correct.

Q    All right.  Now the meeting was set up by invitation by your husband, right?

A    Correct.

Q    And Mr. Hickok did come out there, right?

A    Correct.

Q    And so yesterday were you -- do you recall the testimony from your husband about how he kept asking and asking and asking for Mr. Hickok to come out to the property and he kept -- he was being put off and put off and put off?  Remember that testimony?

A    I do.  I remember that happening --

Q    Okay.

A    -- because Ken really wanted me to be there, and he had tried to schedule it several times before.

Q    Now, your husband is a very competent user of email.  Would you agree?

A    I guess.  I don't get a lot of emails from him.

Q    You don't?  Okay.  Do you see him doing a lot of emailing, got his face in the phone or whatever?

A    I think most people these days send a lot of emails.

Q    Okay.  And you're aware of your husband's practice of confirming things in email, right?

A    No, I'm not.  I don't know the nature of his emails.

Q    Okay.  I'm sorry.  Give me a second here to find where I am trying to go.  All right. I'm there now.

So, I want to show you what's been marked as Exhibit 24.  You saw it up there yesterday when you were sitting in the courtroom.  And you understand that this is an October 16th, '08 letter from your husband to Mr. Hickok inviting Mr. Hickok to come out and look at the plans for approval, and reporting some other information about what y'all were going to possibly do with regard to roofing materials and complaining about Paul Kramer, right?

A    Well, complaining about the fact that Paul Kramer never fixed the repairs that were part of the purchase agreement of the house.  Yes.

Q    All right.

A    Not Paul Kramer personally.

Q    Got it.  Now, I've never seen another written invitation by you or your husband to Mr. Hickok or anybody else to come out to the house prior to this one which is dated October 16, '08.  Have you?

A    The only emails that I've seen are in the testimony over the past few days.

Q    All right.  So October 16, '08 is in the fall of '08, right?

A    Correct.

Q    All right.  Now I want to show you Exhibit No. 27.  All right.  Exhibit No. 27 is two emails.  You see it?

A    Yes.

Q    And right here we have an email from Mr. Hickok that is dated October 31st at 8:43 a.m., right?  And it says, "I just left you a voice message informing you that I cannot meet today at 11:00.  Unfortunately, I'm out of town this weekend.  In summary, I will give you a call early next week to schedule a time to get together." And then it says, "My apologies," right?

A    Correct.

Q    Now, you agree with me that if Mr. Hickok was writing this at 8:43 a.m. on the 31st to talk about a meeting that had been scheduled that day, the meeting

had been scheduled at some time prior to his writing that email, right?

A    Correct.

Q    It could have been a day before.  It could have been three days before.  It could have been five days before.  You don't know, right?

A    Correct.

Q    All right.  But what you do know from reading this email that was authored by Mr. Hickok on the 31st is that he responded to your husband's request to schedule a meeting, right?

A    Yes.

Q    All right.  Now, when Mr. Hickok told -- and, by the way, have you ever seen any other emails or documents about scheduling the meeting because I haven't?  I was just wondering if you ever have.

A    Not that I recall.

Q    All right.  And when Mr. Hickok on the 31st sent this email to your husband apologizing for being unable to get there that day and committing to scheduling next week to -- a time to get together, your husband's response was this email right here, right?  And it says, "No problem, Doug.  Just call me next week and we can reschedule.  Thanks, Ken," right?

A    Yes.

Q   Now, your husband didn't say, "Well, Doug, you keep putting me off, you keep putting me off.  We need to schedule this thing.  This is urgent," nothing like that, right?  What he said was, "No problem, Doug.  Just call me next week and we can reschedule."  That's what he said, right?

A   Yes.  It was a cordial response.

Q   Yes, it was.  And he had no problem with the fact that it had to be rescheduled.  He didn't say anything about any urgent need to have the meeting, nothing like that, right?  You don't see anything like that in this email, right?

A   Not in this email, no.

Q   Okay.  And you were in the courtroom yesterday when your husband testified that your lender had, around this time period, put him under the gun a little bit and said, "Hey, you need to start this construction now and you need to finish it by the end of the year."  Remember that?

MR. ALDOUS:  Your Honor, I would object to -- on relevance with regard to what she recalls and whether she was in the courtroom when the testimony happened.

THE COURT:  Sustained.

Q   (By Mr. Chaiken)  In October of 2008, were you

aware that your lender had demanded that you and your husband start the construction and demanded that it be done by the end of the year?

A    I wouldn't characterize it as a demand.

Q    Let me rephrase it then.  Were you aware that the lender had contacted your husband and it said, "You need to start the construction," and they complained about his failure to do so earlier and that you and your husband on the one hand and the lender on the other hand reached an agreement to start the construction at about that time and finish it by the end of the year?

A    I wouldn't characterize it as a complaint.

Q    What about the rest of it?  Would you agree that there was an agreement made to start it and to finish it by the end of the year?

A    What I would say is I know that there was a discussion that happened between the bank after the bank had merged saying, "Hey, by the way, what's the status of the construction?  What are your timelines?  When's it going to be finished," and that Ken and the bank reached an agreement of what was going to happen and we lived up to that agreement.

Q    Okay.  And did you happen to hear your husband's testimony yesterday on when it was that he agreed that the construction was going to be finished?

A    I don't recall what -- exactly what he said.

Q    Okay.  Do you see anything in Exhibit No. 25 -- I'm sorry -- 27, which is still up here on the overhead that says, "Hey, Doug, I've got to get this construction started right away because I've got to get it finished by the end of the year"?

A    It does not state that in this email.  No, it does not.

Q    All right.  And just so we're clear, sometime in the fall, Mr. Hickok came out to the house, met with your husband, and then you joined them in having a pleasant conversation about kids and everything else, right?

A    And how good the house looked.

Q    You're testimony is that he told you how good the house looked, right?

A    I remember saying to him, "Everything looks great, doesn't it?"  And he said, "Yeah, it looks terrific."

Q    Now, when you were testifying in response to Mr. Aldous, I wrote down that you testified that -- when referring to -- you were describing how you ran into Van in Mexico and that -- and then the next thing you remember -- you knew about was this meeting that occurred where Doug came out to the house.  And you said

after construction had started, right? So when Mr. Hickok came out, construction had already started, right?

A    Yes.

Q    All right. And you understood that -- that your husband was inviting Mr. Hickok to come out, according to Exhibit No. 24, to look at the house, okay, because he wanted to show Mr. Hickok the plans for his approval, right? Right?

A    That's what it states in here. Yes.

Q    All right. So when I read that, that indicates to me that -- that when somebody is saying, "I want to show you the plans for approval. Come on out to the house," that person has never previously shown this person the plan for approval. And so -- so I'm not seeing any other communication from your husband saying, "Here are the plans. Please approve them." Have you ever seen anything like that?

A    The fact that that's not in this email doesn't mean that that conversation never took place.

MR. CHAIKEN: Objection, nonresponsive

THE COURT: Sustained.

Q    (By Mr. Chaiken) My question to you was: Have you ever seen another communication from your husband or anybody acting for him to Mr. Hickok saying, you know,

"Here are the plans, you know, for your approval"?

A    I don't recall if there -- if I've seen something else that says that.  I'd have to look through all the other documents.

MR. CHAIKEN:  All right.  Your Honor, may I approach the board?

THE COURT:  You may.

Q    (By Mr. Chaiken)  I want to see if we can list some points of agreement, okay?  You will agree with me that as of the meeting date -- we'll call that meeting date -- we don't know when the meeting date was -- construction already began, right?

A    Yes, that's true.

Q    All right.  And before -- before the meeting, your husband invited Doug Hickok -- I'll call him DH, okay -- to review the plans for approval.  Are we in agreement on that?

A    Yes.  How many times he did, I'm not sure.

Q    Okay.  That's what I'm saying, as of the meeting.  Oh, and just so we're clear, when I say, "before the meeting," this one was on 10 --

MR. CHAIKEN:  Van, what's the date of the letter there?  Can you slide that down for me?

MR. SHAW:  10-16.

Q    (By Mr. Chaiken) 10-16.  Excuse me.

And the other thing we can agree upon is that you have never seen another writing asking Mr. Hickok to review the plans for approval, you? That's what I'm saying.

A    I don't know if I can state that I've never seen another email that he has -- or any other communication  I don't know that I can say that.

Q    Can you point to any, a written communication?

A    My inability to point to something doesn't mean that I've never seen it --

Q    Okay.

A    -- or that it doesn't exist.

Q    We'll just leave that blank.  We can't agree on that issue.

Now, let's see if we can agree on one other point with respect to this issue.  Exhibit 1 is -- right here is language about completing the improvements and the buyer reviewing with seller the plans and specifications, right?  This is your husband's language to Mr. Buttemiller.

A    What's your question again?  I'm sorry.

Q    You agree that that's -- here is evidence of your husband proposing language about when completing improvements, the buyer will review with the seller the plans and specifications?

A    Before proceeding.

Q    Right.  And this was a -- this was a concept that was raised by your husband in his May 25, 2007, email to Mr. Buttemiller, right?

A    Correct.

Q    All right.  And then the contract, which is Exhibit 3 if you want to look at it, with the addendum was --

THE COURT:  Three Gross or 3 VSDH?

MR. CHAIKEN:  Three Gross.

Q    (By Mr. Chaiken) -- signed, right?  And it had your initials on it as a buyer right here at the bottom. See them right there?

A    Yes.

Q    And then your initials right up here on the escrow agreement clause, right?

A    Yes.

Q    All right.  And you were a party to this.  You were one of the two buyers, right?

A    Yes.

Q    Okay.  And you understand that when this contract talks about "buyer," it's talking about you, right?

A    Correct.

Q    And your husband?

A   Correct.

Q   Right.  And so the language that ended up in the contract that you and your husband signed regarding buyer improvements was language that says, "Before commencing construction, buyer will review with seller the plans and specifications and receive general consent to proceed with the improvements," right?

A   Well, you forgot some words in there about consent not to be unreasonably withheld

Q   Right.  Consent not to be unreasonably withheld, right?

A   Right.

Q   Okay.  So in order for somebody to consent or not consent or whatever, they have to be given the opportunity to look at what it is so that they can consent or not consent, right?

A   Correct.

Q   And in this particular instance, what you and your husband agreed to do in the contract was to review the plans with Mr. -- I'm sorry -- with VSDH, the seller, right -- you knew they were the seller -- before commencing construction and receiving general consent to proceed with the improvements, right?

A   Yes.

Q   Okay.  And you'll agree with me that the only

invitation in writing --

THE COURT: Would you like to approach?

MR. CHAIKEN: I'm sorry. I should ask before I stand up.

THE COURT: You may approach.

MR. CHAIKEN: May I approach? Thank you.

Q  (By Mr. Chaiken) Can we agree that the only written invitation that we see, okay, in this courtroom to VSDH, the seller, to come out, look at the improvements, review the plans for approval would be the October 16, '08 letter that we just spent time talking about?

A  No, I disagree.

Q  Okay. But you can't show me another written invitation to review the plans, right?

A  I don't know if it exists in any of these binders. And even if it doesn't exist in one of these binders, I can't say that it doesn't exist at all.

Q  So we can't agree on that point is what you're telling me?

A  No.

Q  All right. Because you don't know, right?

A  Correct. I don't know --

Q  Okay.

A  -- if it exists or not.

Q    Fair enough.  I'm just trying --

A    There could be a dozen --

Q    -- to see what we can agree on --

A    -- emails.

Q    -- and what we can't agree on.

THE COURT:  Mr. Chaiken, you can't both talk at the same time.

MR. CHAIKEN:  Okay.

THE COURT:  You may be seated.

MR. CHAIKEN:  Forgive me.

Q    (By Mr. Chaiken) Mrs. Gross, did you read the contract when -- or before you signed it?

A    I can't say I read every last word, but there were certain parts that I definitely read very closely.

Q    Okay.  So, some people read every word; some people don't read every word.  It kind of happens, right?

A    Correct.

Q    So if you're not a lawyer and you're reading a contract, you know, you might miss something in the contract, right?

A    Sure.

Q    You might not realize something's written in, right?

A    Correct.

Q   And that's true of you, right?

A   Sure.

Q   And that could be true of Mr. Hickok, right?

A   Correct.

Q   All right.  And I want to ask you whether when you read this contract before you signed it, you were aware of this Provision Number 21 that says, "All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows."  And then it talks about to seller.  It gives his address, phone number, facsimile and an email address.  You see that?

A   Yes.

Q   Okay.  Were you aware of that information when you signed the contract?

A   I probably didn't pay attention to that.

Q   Okay.  Did you and your husband keep a copy of the contract?

A   Sure.

Q   So you had that information at your home after you closed so that if you or he wanted to send the plans to VSDH -- and you had them and you might have had them a year earlier.  You might have had them six months earlier, whatever, or even on October 16 when the

invitation to approve them, okay, by your husband was sent. It could have been sent by mail; it could have been sent by facsimile or email, right?

A Yes, but I don't know whether that address is a business address, a home address. I know that Mr. Hickok has several homes in multiple states.

Q But you had an address to talk about what the seller's address was, right?

A Yes, but I just -- I don't know whose address that is.

Q Well, it's seller's address, right?

A But it -- it also has, though -- the email address underneath that is for Marquis Group. So is that Marquis Group's address or is that Doug Hickok's personal address or is that VSDH's address? I don't know.

Q Mrs. Gross?

A It just has an address.

Q Mrs. Gross, you see this address right here?

A Yes.

Q Okay. And it's in a notice provision and it talks about where notices in writing that have to be sent in writing to be effective, and it talks about where it should be delivered to either of the parties. Okay. And what it says here is to seller. You just

told me you know who the seller was, right?

A   Right.

Q   And that's VSDH, right?

A   Right.  So now looking at that, you're right.
That makes sense.

Q   That would make sense.

A   That would be VSDH's address.

Q   Right.  And this is the email address that VSDH
provided in case you wanted to deliver by email instead
of mail or hand-delivery or other electronic
communication, right?

A   Got it.  Yes.

Q   Right.  And you had a fax machine -- a fax
number there too, right?

A   Yes.

Q   So at any time, okay, prior to October 31 of
2008, you or your husband wanted to send the plans to
VSDH, the seller, for approval before beginning
construction, you could have sent it in any of those
ways to any of those places, right?

A   In theory, yes.

Q   All right.  And I'm focusing on this question
specifically, okay, which is this Paragraph Number 21,
because -- you see where it says, "All notices from one
party to the other must be in writing and are effective

when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows"? You see that?

A Yes.

Q All right. And back to the things that we could agree upon. Let's see if we can. Can we at least agree that you are not aware of any written notice to VSDH sent by mail, hand-delivery at the address listed in the contract, by facsimile or electronic transmission that included the plans for approval? All I'm asking you is: Can we agree that you're not aware of any?

A Not aware of -- for clarification, "not aware of" makes it sound as though I don't know of any. Am I not aware? I don't know if there are -- I don't know if there are and I don't know if there weren't.

Q Okay. So, in other words, you would agree with me that you don't know of any, okay --

A But that doesn't --

Q -- but there might have been; you just don't know. Can we agree on that?

A Correct. There might have been.

Q Okay. Let's see if we can agree on one more thing on this point, and then we'll move along. By the way, are you okay? You need water or anything?

A No, I'm fine.

Q   Sure.  Okay.  I know this is kind of tedious. And I misspoke.  I'm actually asking two things, not one.  Okay?  First thing I'm going to ask about is:  Can we agree that the October 16th, '08, letter from your husband inviting Doug Hickok to review the plans for approval, okay, at the house sometime after that date is not sending those plans to Mr. Hickok or VSDH for such an approval?  Can we agree on that?

A   We can agree that it does not appear that plans were attached to that email.

Q   Okay.  And asking somebody to come somewhere to look at the -- at the plans, other than their own office address, in this case would not be sending the plans in writing to that person to seek their approval at their address, right?  Can we agree on that?

A   Your question is a little confusing, but --

Q   Let me try to make it less confusing, okay?  I don't want to confuse you.

In his letter, your husband said, "If you give me an address, I'll be happy to send them to you for your review," right?

A   Right.  He was trying to cordially say, confirm which address you'd like me to send them to, is how I read that.

Q   Right.  What he was really saying is, is that I

understand I have an obligation under the contract to send you the plans for your review under the notice provision of the contract, right?

A    I think that's taking a lot of latitude with your statement, but --

Q    Is it unreasonable latitude?

A    I think all this says is, I'd like to review the plans with you. How are you doing? Tell me where to send them. Do you want it sent to your house in Colorado or your house here? Where would you like them sent? That's all that's saying.

Q    All right. Okay. Now I just want to cover that last point I told you that I was going to cover on this issue, and here it is in the addendum. I want to make sure that everybody understands what the contract obligations were here. Paragraph 2, buyers improvements, it says again, "Before commencing construction buyer will review with seller the plans and specifications and receive general consent, consent not to be unreasonably withheld, to proceed with the improvements." I read that right?

A    Yes.

Q    Okay.

MR. ALDOUS: Your Honor, that -- I object, repetitive.

MR. CHAIKEN: Well --

MR. ALDOUS: Cumulative.

THE COURT: Sustained.

MR. CHAIKEN: Okay. I'll move on.

Q    (By Mr. Chaiken) Now, do you see anywhere in this paragraph any -- any requirement for the buyer after commencing construction to seek approval of the plans? Feel free --

A    State that again.

Q    Feel free to read --

A    What's your question?

Q    Show me where in Paragraph Number 2 right here, in Exhibit 3, the contract, the addendum, where it says that the buyer, which is you and your husband, are required to review with seller plans and specifications and receive consent after construction has already occurred?

A    It says buyer will periodically update seller regarding progress and timelines. And so I would interpret that as along the way, we will provide updates.

Q    Provide updates, but he doesn't have to review the plans and specifications and obtain approval of them, right?

A    No. But I think it's -- no, it does not state

that.

Q    So, once you present the plans and specifications to VSDH for approval --

A    Uh-huh.

Q    -- okay, and you get the approval of the plans and the specifications under the contract, you don't have to ask for plans -- for approval of those plans after you start the construction, right?

A    It says you're supposed to review the plans and specifications.

Q    Before construction, right?

A    Before commencing.

Q    Right.  And then after that, you're not required to get consent to the plans and specifications from the seller, right?  You can give them periodic updates.  You can tell them how things are coming along.  But you don't have to give the concept to the plans and specifications, right, for their approval?

A    It doesn't state that in that paragraph.

Q    So, in other words, once you have presented the plans to the seller and the seller has given you concept or approval of the plans, then there would be no need to call upon the seller to -- to review the plans and approve them, right, under the contract?

A    Yes.  But I think that the approval already

occurred.

Q    Right.  That's my point.

A    They already approved the plans and specifications

Q    All right.  So let's see if we can agree on this concept.  All right?  You and your husband contend, because you've now testified to it and your husband testified to it yesterday, that the seller had approved the plans and the specifications prior to this meeting that occurred, right?

A    Yes.

Q    Well, if that is true, there would have been no need to send an invitation to the seller in October of '08 inviting them to approve the plans and specifications at the beginning of construction, right?  If it had already been done, why are you doing it again?

A    Because their nonresponsiveness and their uncooperation was causing concern that led to us wanting to start putting everything in writing since they would not respond to phone calls, would not respond to requests for meetings.  And so while there were conversations about here's where the house is going to be, here's what it's going to look like, here's what the plans are.  There was a detailed list in the contract of exactly what the house was going to include.  There was

a meeting on site to say, "Here's what it's going to include." Now, all the sudden, the fact that they wouldn't respond to calls, wouldn't respond to meetings, wouldn't respond to anything, all the sudden it was, we'd better start putting things in writing.

Q   So, let's see if we can agree on this. Okay? The reason your husband sent Exhibit No. 25, this October 16th, '08, letter to Mr. Hickok in inviting him to review the plans for approval because he's beginning construction and saying that he'd be happy to send them for review, is because there had never been a review of the plans by the seller and an approval of those plans before that date?

A   I disagree.

Q   Certainly, there's no writing that evidences that it ever occurred, right? Can we agree on that, none that you're aware of at least?

A   Not that I have seen.

Q   Okay. All right. Now, are you in the habit of recording telephone conversations?

A   No.

Q   Is your husband in the habit of doing so?

A   I have no idea.

Q   Are you aware of your husband ever recording telephone conversations?

MR. ALDOUS: Your Honor, I object and request for permission to approach.

THE COURT: You may approach.

(Sidebar conference held)

THE COURT: You may proceed.

Q    (By Mr. Chaiken) So I want to see if we can agree on something else, okay, based upon the testimony that you've just given, okay, about this need to start putting everything in writing because the seller was nonresponsive and the seller was putting you off and they weren't, you know, responding to you-all when you were asking them for things and so on and so forth, okay?  That was all before you sent your buyback notice, right?

A    Correct.

Q    So I'm guessing things were not as amicable from your perspective prior to the -- to sending out the buyback notice as your husband described yesterday right up until the buyback notice?

A    I would disagree.  I feel like we were getting mixed messages, you know.  When I ran into Van Shaw and he's like, yeah, everything's great. It's going to be great.

Q    Okay.  But all the sudden, you felt the need to start documenting everything, right?

A    Well, especially on the execution of the buyback option.  It was very clear.  And because of the magnitude of that decision --

Q    Sure.

A    -- that had to be in writing.

Q    Everything had to be in writing with respect to that, right?

A    Well, on the buyback option --

Q    Sure.

A    -- it was very clear in the contract.

Q    So, I'm a little confused, Mrs. Gross.  If everything had to be in writing with regard to the buyback option, okay -- and I'll take you at your word that that's what you believed was necessary -- why are you telling us that everything had to be in writing in October of '08, which was, what, eight months before the buyback option was triggered by you?

A    Say that again.

Q    You just finished telling the jury that all the sudden, everything needed to be in writing in October of '08, okay?  And then you started saying, well, it all needed to be in writing at the time of the buyback option.  So the relationship from your perspective had changed, okay, as of October of '08, necessitating that everything be put in writing, right?

A     What I'm saying is in October '08, after numerous attempts at Ken trying to get Doug Hickok to come out to the house, he likely -- I can't speak for him. But it certainly appears and my recollection is that he said, "I better put something in writing because maybe this will get them to respond."

Q     Got it.

A     "And we better have something in writing."

Q     All right.

A     But we also didn't want to have a contentious relationship with what we thought was amicable parties.

Q     All right. I want to turn our attention now to the issue of the escrow agreement, okay? You were in the courtroom when there was a discussion about the escrow agreement, right?

A     Yes.

Q     All right. So let's see what we can agree to, okay? Can we agree that the escrow agreement provision of the contract as written and as signed by you and your husband as the buyer said, "Buyer agrees to escrow funds totaling $156,871 with the title company and enter into an escrow agreement acceptable to seller and buyer that outlines the proposed improvements to the property and the disbursement of such funds"? Can we agree that that's what the contract says?

A     That's what it says.

Q     Can we agree that you and your husband understood that's what the contract said when you signed it?

A     Yes.

Q     All right. Can we agree that the escrow that occurred, as testified to by your husband, was one that put those funds with your lender, not the title company?

A     Because it was required by the lender. That is true.

Q     Okay. So let's see if we can agree on the following.

MR. CHAIKEN: Your Honor, may I approach?

THE COURT: You may.

Q     (By Mr. Chaiken) We'll call this escrow issue. First thing we're going to say is that Grosses put escrow money with their lender, not the title company. We're in agreement with that, right?

A     We're in agreement that the lender required us to put the funds with them and not -- so the funds were escrowed but the bank required that they hold the funds, not the title company.

Q     Right. And so the reason that the Grosses, you and your husband, put the escrow funds described in Paragraph of the addendum with your lender, instead of

the title company, is because lender required it?

A   Correct.  And we notified the seller.

Q   Okay.  Lender required this.  And so you had a contract that said the funds go to the title company. We have agreed on that, right?  And rather than put up with the title company, for whatever reason, you put it with your lender, right?

A   The lender required it, and we notified the seller that the lender required it.

Q   Okay.  And you -- you entered into an agreement with the lender with regard to those escrow funds?

A   Yes.

Q   Okay.  So you had an agreement with lender, okay.  Now, you had an agreement with the lender regarding this escrow arrangement.  When did you enter into an escrow agreement acceptable to VSDH and you that outlines the proposed improvements to the property and the disbursement of such funds?

A   I seem to recall seeing a document in the last 48 hours that was very clear that we communicated to VSDH that the funds had to be held with the bank and not with the title company.

        MR. CHAIKEN:  Objection, nonresponsive

        THE COURT:  Sustained.

Q   (By Mr. Chaiken)  My question, Mrs. Gross, is:

When did you and your husband enter into an escrow agreement acceptable to VSDH and to you and your husband that outlined the proposed improvements to the property and the disbursement of escrow funds?

A    I'm having a hard -- I have to think about how to answer your question because we entered into that agreement with VSDH when VSDH was made known of the fact that that was a requirement by the lender.

Q    So it's your testimony to this jury that you and your husband signed an escrow agreement and that VSDH signed an escrow agreement that was acceptable to both of you and it outlined the proposed improvements to the property and the disbursement of the funds?  Is that your testimony?

A    Well, the fact that the funds were held by someone other than the title company certainly didn't stop them from cashing the check.

MR. CHAIKEN:  Objection, nonresponsive

THE COURT:   Overruled.

Q    (By Mr. Chaiken) Did you and your husband sign your names to a written agreement with VSDH that outlines the proposed improvements to the property and the disbursement of the escrow funds; yes or no?

A    To the first half of your question, yes.  The proposed improvements to the property are fully detailed

in one of the addendums to the contract. As to the escrow agreement, we notified VSDH of the lender's requirement.

Q So the answer is, no, you did not enter into the escrow agreement?

A So the answer is, no -- what's your question?

Q You didn't enter into the escrow agreement acceptable to seller and buyer that outlined the proposed improvements to the property and the disbursement of the funds?

A We did not enter into an escrow agreement with the title company.

Q Okay.

A That's correct.

Q Not with the title company, with the seller.

A Which line are you referring to, sir?

Q I'll ask the question again. Did you and your husband sign an agreement with VSDH that out -- an escrow agreement, okay, that outlines the proposed improvements to the property and the disbursement of such funds or not?

A I don't know.

Q Okay. So we can agree --

MR. CHAIKEN: May I approach, Your Honor? I'm sorry.

THE COURT: You may.

Q (By Mr. Chaiken) So can we agree that you don't know whether you signed such an agreement? Can we say that?

A What we can agree on is that we entered into an agreement that all parties signed and --

MR. CHAIKEN: Your Honor, objection, nonresponsive

THE COURT: Overruled.

Q (By Mr. Chaiken) Can we agree that you are not --

THE COURT: I overruled it.

MR. CHAIKEN: I'm asking another question.

THE COURT: She didn't finish her answer. She started to tell you what they -- what she could agree to. You're asking her to agree and she said, "We can agree to --and then didn't finish it. So allow --

MR. CHAIKEN: I thought she stopped speaking.

THE COURT: her to -- we can't talk at the same time, Mr. Chaiken. You objected, which is why she stopped. She can finish her answer.

A I don't remember the question.

MR. CHAIKEN: I'll move along.

Q (By Mr. Chaiken) Did you have an understanding

as to what the purpose of Paragraph 3 here in the escrow agreement was?

A   Yes.

Q   Would it be fair to say that one of the purposes of the requirement to enter into an escrow agreement with the seller that outlined the proposed improvement to the property and the disbursement of the funds was so that you had a signed agreement after this contract that we're talking about here, okay, that actually outlined the proposed improvements in that document along with the disbursement schedule?

A   My understanding was that the purpose of the escrow agreement is to make sure that the person who's going to do these improvements follows through with doing those improvements --

Q   Okay.

A   -- and spends the money on those improvements and not on a trip to Vegas.

Q   Right.  And one of the other purposes was to outline proposed improvements in a signed written agreement between the two parties, right?

A   It would -- yes, that there would be a signed agreement of what's going to happen and --

Q   Right.

A   -- the escrow agent would monitor the

disbursement of funds.

Q    Got it.  Now, you and your husband have testified that VSDH consented to that arrangement, had no problem with it, right?  That's what you're telling the jury.  When I say, "that arrangement," instead of signing the agreement that was called for by the contract, escrowing the money instead with the lender pursuant to an agreement with the lender?

MR. ALDOUS:  Objection, Your Honor.  Calls for a legal conclusion as to what is required by the contract.

THE COURT:  Rephrase your question, Mr. Chaiken.

MR. CHAIKEN:  Sure.

Q    (By Mr. Chaiken)  Your testimony to this jury is that VSDH was okay with you escrowing the escrow funds with your lender and not signing the specific escrow agreement with VSDH, right?

A    My testimony is that they were aware that an escrow agreement with the bank was required instead of with the title company.

Q    Were they okay?

A    And, yet, they still moved forward with the agreement and cashed the check.  That's my testimony.

Q    Okay.  Because I thought I heard you tell the

jury that they were okay with it; they knew about it and everything was just fine?

A    That's what I just said a second time.  They were aware of it.  They moved forward with the agreement and they cashed the check.

Q    Got it.  The check meaning the check for the purchase price that you owed them to buy the house?

A    That we agreed to pay them, yes.

Q    Okay.

A    The fact that the funds were held somewhere else certainly didn't stand in the way of them cashing that check and moving forward.

Q    Got it.  And then, of course, you found out about how VSDH felt about that arrangement on July 3rd of 2007, when you received what's marked as VSDH's Number 29, which is a letter from a lawyer named Mr. Stern, who told you that you and your husband had not complied with the addendum's requirement to escrow the funds with the title company and escrow -- I'm sorry -- and sign an agreement, an escrow agreement, with the seller, right?  You got this letter?

A    I had forgotten about it until I saw it yesterday.  Yes.

Q    Got it.  And you knew at that time, can we agree, that the seller did not approve of the

arrangement that you and your husband agreed to with your lender, okay, instead of doing what was stated in the contract, which was escrowing the money with the title company and entering into a specific escrow agreement outlining the plans and specifications, right?

A    I remember being very surprised by receiving that letter because we had notified them that we had to do the escrow agreement with the bank instead; and, yet, they still moved forward with the deal and still cashed the check.

Q    Well, they never told you, "Yeah, that's okay. Go ahead.  Do it that way"?

A    By them signing the agreement, to me, with knowledge that we had to do it with the bank, my understanding was that they didn't disagree with it. They didn't have a problem with it.

Q    They signed the agreement before the escrow situation arose and you-all changed the plan.  In other words, the escrow agreement requirement was in the contract when you signed the contract of purchase and sale, right?  It was supposed to happen later, right?

A    Right.

Q    Right.  Okay.  And so that's the only agreement that they signed, right?

A    Right.

Q    All right.   I'm glad we could clarify that. Please look, if you will, at Exhibit No. 30, which is your Exhibit No. 30, Grosses' Exhibit No. 30.   And I just want to briefly talk with you about something here. This is a February 23, 2009, memo from your husband to Mr. Hickok.   And he says, "I finished with the addition and just wanted your final inspection and approval." Did I read that right?

A    Yes.

Q    Okay.   So he, is asking for approval of things at this point that were already done, right?

A    They had been completed.   Anything is changeable, but they had been completed.   Yes.

Q    So you didn't get approval of the things that are listed here before construction of them, right?

A    I'm -- I don't know whether he got approval of doing those things beforehand or not.

Q    Okay.   And the plans and specifications that deal with all of these ten items, they were -- as your husband I think described them, they were things above and beyond what the plaintiff required, right?

A    Correct.

Q    So, number one, your husband hadn't finished construction of the improvements by the end of 2008, which is what his agreement was with the lender to do,

right, because he didn't finish until February of 2009?

A    I don't know what the agreement was with the lender.  But I do know that the lender has never come back to us and said that they have any problem --

Q    Got it.

A    -- with the finish date.

Q    And this Exhibit No. 30 has your husband asking for VSDH's approval after the fact of a change in the plans and specifications or an addition to the change (sic) and specifications, right?  They're already done, right?

A    Yes.

Q    Okay.

A    I can't imagine anyone objecting to $20,000 worth of free upgrades; but, yes, they were already done.

Q    Well, while we're on the topic of objecting to free upgrades or upgrades or the type of construction, whatever, let's see if we can agree on this.  What you think is a beautiful home and beautiful construction may not be what somebody else thinks is a beautiful home and beautiful construction, right?

A    True.

Q    Everybody has different tastes, right?

A    True.

Q    And you understand that the reason that consent from VSDH for approval of the plans and specifications before construction was so that VSDH could determine whether what you and your husband might have thought was beautiful and good construction was beautiful and good construction from their point of view in case they were in a position to have to buy the property back, right?

A    Sure.

Q    Okay.  So while you might have unilaterally with your husband decided we're going to put these things in and we're going to do it this way, okay, what you wanted to do and what you did might not have been acceptable to VSDH, right?

A    That's true.  It might not have been.

Q    But you-all went ahead and did those things anyway and then asked for approval after the fact, right?

A    We moved forward based upon comments from Doug Hickok saying everything looks great, everything looks terrific, and based upon the fact that we had received no communication whatsoever at any point in time saying, "Stop, cease.  What you're doing is unacceptable." We had absolutely zero signal from anyone saying that what we were doing was not okay.

Q    My question was a little different.  My

question was that with regard to these above and beyond items, you and your husband made a unilateral decision to do these things in a house that you were planning, a couple of months later, to try to sell back to VSDH. And you told them about it after the fact, and you sought their approval after the fact, right?

A    And the reason why we did that is because if there was anything that they did not like between February 23 and May 1st, we could have easily changed it back.

MR. CHAIKEN:  Your Honor, objection, nonresponsive

THE COURT:  Overruled.

Q    (By Mr. Chaiken) All right.  Let's move on to another topic.

THE COURT:  How much longer do you think you'll be, Mr. Chaiken?

MR. CHAIKEN:  I have a bit to go, maybe another hour.

THE COURT:  Then we'll take a luncheon recess.  It's now 12:15.  The jury is under the same instructions you've been previously given.  During this recess, you're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or

you have been discharged as jurors.

All rise. The jury is excused for lunch.

(Jury exits the courtroom)

THE COURT: You may be seated.

MR. ALDOUS: Can she step down, Your Honor?

THE COURT: Yes, you may step down.

(Lunch recess taken)

THE COURT: All right. Counsel, approach.

Okay. We'll go on the record.

Mr. Chaiken?

MR. CHAIKEN: Your Honor, during the break, Mr. Aldous and I spoke about a document on the Grosses' exhibit list, which was the subject of a deferred ruling by the Court, which was Exhibit No. 36. And we've agreed that that document may be admitted and we would request the admission of Exhibit No. 36 at this time.

MR. ALDOUS: No objection.

THE COURT: All right. Exhibit 36 is admitted.

MR. CHAIKEN: And, Your Honor, so in keeping with the Court's procedures, I don't know if you have the exhibit in front of you, but I have an extra copy of it if you'd like it during the examination

THE COURT: It's a one-page document?

MR. CHAIKEN: It's a one-page document. You already have it?

THE COURT: Gross 00472?

MR. CHAIKEN: That would be correct, Your Honor. So you have it already.

THE COURT: All right. If there's nothing further, we'll bring in the jury.

All rise.

(Jury enters the courtroom)

THE COURT: You may be seated.

All right. Mr. Chaiken, you may proceed.

MR. CHAIKEN: I appreciate it, Your Honor.

Q (By Mr. Chaiken) Good afternoon, Mrs. Gross.

A Hello.

Q I hope you had an enjoyable lunch?

A Uh-huh.

Q I want to talk to you about a couple of things before I turn you over to Mr. Shaw. Can you tell the ladies and gentlemen of the jury who Jana Reist is and Brent Cooper, who those two people are?

A They're attorneys.

Q Okay. So is it fair to say that as of June of 2009, you and your husband had enlisted the help of attorneys Reist and Cooper to help you-all in dealing

with the -- I'll call it a situation involving the buyback option after you had sent notice of the exercise of it?

A    We did retain them at one point, but I can't remember the exact date.

Q    Okay.   But -- so you did retain them; you just don't remember when?

A    Correct.

Q    Okay.   And were these lawyers that you had a relationship with?

A    No prior relationship   No.

Q    Now, I want to ask you a couple of questions and I'm going to request that you -- that you answer, "yes," or, "no," to these questions.   Okay?

All right.   The first question is:   I'm going to show you what is Exhibit 36.   It's Grosses' 36. Does exhibit -- Exhibit No. 36, is it dated June 15th, 2009?

A    Yes.

Q    Is it written by -- whose Kenny G?  Is that your husband?

A    Yes.

Q    Okay.   And is it sent to Doug Hickok with a copy to Van Shaw --

A    Yes.

Q    -- and you?

A    Yes.

Q    All right.  And it's also blind copied to Jana Reist and Brent Cooper, right?

A    Yes.

Q    And does it say that -- does it say the following?  And I'll point to the language here.  I know you -- this is to Doug, right?  And it says, "I know you previously said that you were referring this matter to Van, but he cannot speak to your personal intentions. Only you can do that," right?

A    That's what it says.

Q    Okay.  And that was your understanding as of June 15, 2009, that with regard to personal intentions of Mr. Hickok, only Mr. Hickok could speak, right?

A    Yes.

Q    And if I understood your testimony earlier, after the trigger of the buyback, okay, when you sent notice of the buyback date or the buyback election, Van Shaw is the only person who you actually communicated with about the buyback situation, right?

A    Because Doug Hickok said I'm turning this matter over to Van Shaw.  So, yes, that is true.

Q    And, again, I'd like you to answer "yes" or "no" to these questions, okay?

THE COURT: She's allowed to give a complete answer, Mr. Chaiken.

MR. CHAIKEN: All right.

Q   (By Mr. Chaiken) But the answer is, is that Mr. Shaw was the one who was communicating the information that you believed related to the question of whether VSDH would buy back the contract -- buy back the house or not, right?

A   It was my understanding that Van -- that Doug Hickok said, "I'm turning this matter over to Van Shaw and that Van Shaw was going to speak on behalf of VSDH."

Q   On behalf of VSDH, but not Doug Hickok, right?

A   Correct.

Q   All right.  And when Van Shaw communicated to you whatever it is he communicated to you about whether VSDH would buy or not buy it back, he was speaking for VSDH, right?

A   Van Shaw, yes.

Q   Okay.  And you never had any communications of any kind with Doug Hickok about his personal intentions, correct?

A   We tried to.

Q   But you never had them, right?

A   Other than him turning over the matter to Van Shaw, no.

Q   Okay.  Let's see if we can agree on a couple of other points, okay?  The words of the contract, Exhibit 3, say that all -- and I'm talking about Paragraph 21 here.  "All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows."  And then you have the information below.  That's the words of the contract, right?

A   Yes.

Q   So we can agree on that.  Can we agree on the following:  There is no written document by VSDH, authored by VSDH, stating these words, "VSDH will not perform a buyback of the property"?

A   I disagree.

Q   What writing is there that has those words in it?

A   There's an email from Van Shaw stating that the company is insolvent, and that implies that the company is not going to perform.  And that implication was echoed by the comments stated verbally by Van Shaw when we met with Van Shaw.

MR. CHAIKEN:  I object to the nonresponsive answer.  Excuse me.  I object to the nonresponsive answer.

THE COURT: Overruled. She says there's an email.

MR. CHAIKEN: I'm sorry?

THE COURT: I said overruled. She said there was an email.

Q (By Mr. Chaiken) My question to you, Mrs. Gross, is: Is there a writing that used the precise words that I'm about to say; VSDH will not perform the buyback of the property?

A To my knowledge, those exact words were not used, but the message was still communicated using other language.

Q So we're talking about implications now, right?

A Or semantics.

Q Okay. Let's see if we can agree on another concept. Paragraph 22 of the contract says, "This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. That incorporates, "Addenda which are" --

THE COURT: Yes, Mr. Aldous.

MR. ALDOUS: Your Honor, I object to this question as asking this witness the way it was phrased to interpret the contract.

THE COURT: What was the rest of your question, Mr. Chaiken?

MR. CHAIKEN: I hadn't finished reading the sentence from the contract. But I believe I asked whether this contract says these things.

THE COURT: I was asking what the rest of your question was.

Q (By Mr. Chaiken) -- addenda, which are a part of this contract are -- and then it says check all applicable boxes. Is that what it says?

A Yes. It does say that. And the box that is checked is Addendum A and Addendum B.

Q Okay. Now, let's look at the buyback option. The buyback option says that there is a grant by VSDH to you and your husband of an option to put the property to the seller. It says, i.e., requires seller to re-purchase the property for the original sales price of 2,851,871. See that?

A Yes.

Q Now I just want to ask you a quick question about that. The sales price of the contract that you closed on was $2,695,000, correct?

A Correct.

Q All right. Now the buyback says that on or before May 1st, 2009, buyer must exercise the buyback option by delivering written notice thereof to seller, which you did before May 1st, 2009, right?

A    Correct.

Q    All right. And then in Exhibit B, it tells us what happens if you send that notice, right?

A    Yes.

Q    Okay. Can you show me anywhere -- well, let's do it this way.

Have you read that Exhibit B recently, that portion of that Paragraph B?

A    Yes.

Q    All right. And you would agree with me, would you not, that no place in there are there words that say that VSDH after receiving your declaration notice is required to tell you one way or the other whether they're actually going to buy the property back? No words in the contract that say they've got to tell you, right?

A    It doesn't say that they're required to --

Q    Okay.

A    -- but they did tell us that they weren't going to.

Q    All right. So let's just see if we can agree on one simple concept. Whether they did or didn't, the agreement doesn't say that they're required to tell you one way or the other. Can we agree on that?

A    Yes,

Q    All right.  Now, after you sent VSDH the declaration notice, you and your husband very shortly thereafter reached out to VSDH, and you asked VSDH on many occasions whether VSDH was going to buy it back or not, right?

A    Correct, because they wouldn't respond to any email, so we kept trying to get them to answer the question.

Q    And you even got to the point of engaging a lawyer to help you with regard to your quest to get an answer as to whether they were or were not going to buy the property, right?

A    Yes.

Q    Okay.  And you were unhappy about the fact that VSDH would not tell you one way or the other whether it would or it would not buy back the property, right?

A    It was very frustrating because there were great implications to us if they -- if we waited until September 1st and then all the sudden they said, oh, well, I guess we're not going to.  Then we would have lost precious time to be able to protect ourselves.

Q    But all along, you understood that VSDH was not under any contractual requirement to tell you one way or the other whether they would buy the property back on or before the buyback date, which is September 1st, 2009;

you understood that, right?

A    I under -- well, now I understand as you're pointing out the language that they were not under a contractual obligation to.  We had hoped that they would do the right thing and tell us what they were going to do.

Q    All right. Now --

A    And they did tell us.

Q    Let's see if we can agree on the following statements.  See if you agree that this is true.  After you sent the buyback notice to VSDH, you and Ken Gross proposed a buyback by VSDH to occur prior to September 1st of 2009?

A    After we sent the declaration and after they told us the company was insolvent and after we met with them to brainstorm about multiple options, yes, we did communicate as was shown in the document yesterday that as being one of many options that we would have been more than happy to consider.

Q    Okay.

A    There were multiple things that we would have been happy to reach an agreement --

Q    Okay.

A    -- if they would only respond.

Q    And they were responding to you -- to those

proposals, right, about those options? You were talking.

A    I don't know if -- there was very, very, very little communication

Q    Okay.

A    It was very one-sided.

Q    Now, there was never an agreement reached between you and your husband on the one hand and VSDH on the other hand to accelerate the buyback date; in other words, make it earlier, right?

A    Correct.

Q    All right. And VSDH had the right not to agree to move the buyback date to an earlier date, correct?

MR. ALDOUS: Objection, Your Honor. It calls for a legal conclusion.

THE COURT: Sustained.

Q    (By Mr. Chaiken) Are you aware of any requirement in the contract for VSDH to agree to move the buyback date to an earlier date?

A    I'm not sure if that's in there or not.

Q    Okay. Now, you and your husband entered into a contract to sell the property to Melissa Browning prior to September 1st of '09, correct?

MR. ALDOUS: Objection, Your Honor, cumulative, asked and answered.

THE COURT: Sustained.

Q (By Mr. Chaiken) And when you offered -- I'm sorry -- entered into the contract with Ms. Browning to sell it to her, it was after May 1st of 2009, right?

A Yes.

Q So it was after you sent the buyback notice, right?

A And it was also after we sent an email to VSDH saying we were happy to not consummate this deal if you would like to --

MR. CHAIKEN: Your Honor, objection to the nonresponsive portion of the answer

THE COURT: Overruled. Let her finish her answer, and then you can object to it after she's finished it.

You may finish your answer.

A And it was also after we sent an email to VSDH saying we have an offer, we don't have to accept it, and you have 24 hours to respond. But this is a great deal, and this could meet everybody's needs, and -- but we don't have to do this deal, so just let us know. And they never responded.

MR. CHAIKEN: Objection to the nonresponsive portion of the answer.

THE COURT: Overruled.

Q    (By Mr. Chaiken)  When you and your husband entered into a contract with Melissa Browning to sell her the property after May 1st, 2009, and before September 1st of 2009, you understood that the contract said that should the buyer enter into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to buyer, right?

A    I see those words in there and that explains why the language in our email to them said what it said, because I remember from yesterday it said something about if you don't respond and if we proceed, that should not in any way remove the buyback responsibility or something along those lines.  I remember it saying that.

Q    Right.  But when you entered into a contract with Ms. Browning, you were aware that the contract said that if the buyer enters into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to buyer, right?

A    We -- yes, that was in there.

Q    Okay.  And you went ahead and you entered into the contract with Ms. Browning before the 09-01 buyback date, right?

A    Yes.

Q   Okay.  You sold the property to Ms. Browning before 09-01 of '09, right?

A   After they did not respond and say they wanted us to stop the deal; yes, we did move forward with the deal.

Q   The answer is you sold it after 09-01-09, right -- I'm sorry, before 09-01-09?

A   When we did not receive a response from them, yes, we did sell the property before 09-01-09.

Q   Regardless of why you sold it before that date?

A   Yes.

Q   We can agree on that, right?

A   Yes.

Q   All right.  Your reason for selling it before September 1st, '09 -- and when I say, "selling it," I mean selling it to Mrs. Browning -- was because VSDH would not commit to buying it back on or before September 1st of '09, right?

A   Because they told us they were not going to buy it back, yes.

Q   And they wouldn't commit to doing it, right?

A   Correct.

Q   All right.  On September 1st of 2009, would you agree that on that date no one could buy the property from you and Ken Gross?

A    That's true.

Q    And why is that true?

A    Because since they had not responded, we moved forward with the transaction and sold it and it was now owned by Mrs. Browning.

Q    So, in other words, when September 1st came around, you and your husband couldn't sell the property to VSDH, right?

A    Correct.  It was no longer owned by us at that time.

Q    And you couldn't sell it to Doug Hickok, right?

A    Correct.  But we had also offered him the opportunity and VSDH the opportunity to stop that transaction at any point in time.

Q    To stop the transaction, okay.  Was there an obligation in the contract for them to stop a transaction?

MR. ALDOUS:  Objection, Your Honor.  That calls for a legal conclusion.

THE COURT:  Sustained.

Q    (By Mr. Chaiken)  Are there words in the contract that offered VSDH the ability to stop a transaction if you entered into a contract to sell it to somebody else?

A    We stated in our email to them we can stop this

-- something along the lines of we can stop this transaction You just have to let us know. There might be some implications, but we can. And we made that very clear.

Q Maybe you're not understanding my question. Are there words in the contract, this document right here, that says, "If we enter into a contract, okay, with somebody else to sell the property to them before September 1st, '09, you can stop it"?

MR. ALDOUS: That's still asking the witness for a legal conclusion.

MR. CHAIKEN: I'm not asking for a legal conclusion.

MR. ALDOUS: I'm sorry. I object. That asks for a legal conclusion.

MR. CHAIKEN: I was asking her if there were words in the contract that say that.

THE COURT: Which would mean she'd have to interpret it, correct?

MR. CHAIKEN: No. She just has to look and see whether those words are there.

THE COURT: Move on, Mr. Chaiken. You have beaten this horse to death.

MR. CHAIKEN: I will pass the witness, Judge.

THE COURT: Mr. Shaw?

MR. SHAW: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. SHAW:

Q    Mrs. Gross, just a few, please. You said that when Doug Hickok came to the property in the fall of 2008, you were present; is that right?

A    For part of that meeting, yes.

Q    All right. And we know from the email train that the meeting that Mr. Hickok had at the house was after October 31, 2008; is that fair?

A    That is a fair conclusion based on the email dates. Yes.

Q    All right. Now, you said in response to your lawyer -- I wrote it down. You said, "Doug said the house looked great and it looked fantastic." Do you remember that?

A    Yes.

Q    Okay. Then when Ken asked you some questions you said, "Doug said it looked terrific." You remember that?

A    I do.

Q    All right.

A    And I don't know which words he chose, but I remember that the language was complimentary.

Q   Okay.  Now, when Doug got there, your husband, I thought, testified that the only thing that existed on the work was that there was a concrete slab and some sticks nailed to the concrete slab.  There was no roof, there were no windows, there were no doors, there were no walls, there was no nothing.  It was some sticks and concrete.  Am I wrong about that?

A   When are you saying that he said that?

Q   When Doug -- I'm saying when Doug was present, was there more than sticks and concrete?

A   No.  That's not what you said immediately before that.  You said that when --

Q   This is what I'm asking you --

A   When are you claiming that Ken said that?

Q   When Doug was present, was the construction more than sticks and concrete?

A   As Ken said yesterday, at the time that Mr. Hickok came to the property, there was -- he didn't use the term sticks.  There was foundation and there was framing and -- I know there was a foundation and framing.  I know there was not drywall.  I distinctly remember that.

Q   Was there a roof?

A   How much more was there? There might have been a plywood roof, but I know there was not the cement tile

roof. But beyond that, I can't remember.

Q Let me show you what I've drawn. It's kind of rough. I'm not a real good artist. But that's -- what I've drawn is a slab and some sticks. That -- is that part of the frame of the home?

A First of all, that's not anything like what any stage of construction would look like because you can't just have two-by-fours vertically standing up without anything connecting to them on the top.

Q Well, there wasn't a --

A So it definitely didn't look anything like that.

Q All right. Your husband said there was no roof, right? So at any rate, this thing was two stories, right? Is it two stories?

A Yes.

Q Okay. If there's no roof --

A It still wouldn't have looked like that.

Q -- what else is there? So there's going to be some sticks coming across here, some wood; is that right?

A It still would not have looked like that.

Q Well, here's what I'm driving at. What could Mr. Hickok have seen if it was just wood and concrete?

A He could have seen a lot.

Q     What could he have seen if there was no walls, there was no roof, there were no doors, there was no windows, there was no drywall, there was no paint, there's no nothing.  What could he have seen that --

A     There's a lot he could have seen.

Q     Okay.  What?

A     For example --

Q     What?

A     So, he would have been able to see all of the walls and where the rooms laid out within the foundation.  He would have because that would have -- if there -- I know that there was framing that was done.

Q     Okay.

A     So all of the framing would have been done outlining where each of the rooms would have been.  He also would have seen where the media room upstairs connected to the game room and the fact that it was contiguous; therefore, the style would have to be replicated from one room to the next.  So he would have been able to see where the entry doors were.  He would have been able to see where the bathroom was.  He would have been able to see where the bathroom and the little wet bar was downstairs.  He would have been able to see where the windows would be.

Q     So how far along was construction approximately

when Doug was there?

A    I can't state percentages. But what I recall was that there was certainly foundation and framing. And that would mean all of the framing, interior and exterior framing.

Q    So a lot?

A    And I don't remember-- a lot, but not that anything -- I mean, anything could have been changed. But the framing would have been completed, and there would have been at least a plywood roof of some sort on it.

Q    So in your mind, there was substantial construction?

A    I would call that initial stages of construction personally.

Q    So you wouldn't call it substantial?

A    Substantial is a very subjective term.

Q    Well, I'm asking you your term. Is that what you would call it?

A    There was significant construction, all of which was still modifiable.

Q    Well, how do you modify concrete?

A    You take a jackhammer and you jackhammer it up and you get rid of it or you add to it.

Q    You just -- you've done that before where

you've taken a whole area that's built and take the whole concrete and the foundation that's engineered by an engineer out?

A    Me personally? No.

Q    Well, no.  I mean, you've --

A    But have I seen it done?  Absolutely.

Q    All right. Do you have any legal or accounting experience?

A    No.  I'm a nurse by training.

Q    Okay.  Now, the contract, we've been through it.  And I just want to make sure I understand one thing.  You say that the spreadsheet is specifications. Did I get that part of it right?

A    I think it reads as specifications to me.

Q    Okay.  Now this is from VSDH Exhibit 6, and this is the -- part of the addendum.  We've talked about this, right?

A    Yes.

Q    Okay.  So down here in Section 3, it talks about spreadsheet, right?

A    Yes.

Q    Okay.  And then it says that the buyers agree to enter into an escrow agreement acceptable to seller that outlines the proposed terms of improvements and property.  So they say -- this is a future event.  The

buyer agrees to enter into escrow funds title, enter into an escrow contract acceptable to buyer that outlines the proposed improvements. So this seems to say something different than what the spreadsheet contemplates. Would you agree with me on that?

A    Well, the words are different. It doesn't mean that the same document could not have been used for the same purpose.

Q    Okay. Let's look at above. The buyer -- we've talked about this. The buyer will review with seller the plans and specifications. Now it never says spreadsheet there, does it?

A    No, it does not.

Q    But whatever the contract said, whatever it says, you agree to live by; is that fair?

A    I -- when I signed the agreement, I was responsible for living by it and did.

MR. SHAW: I pass the witness.

THE COURT: Mr. Aldous?

MR. ALDOUS: Thank you, Your Honor. May I approach the court reporter, Your Honor?

THE COURT: You may.

MR. ALDOUS: And, Your Honor, can we approach?

THE COURT: You may.

(Sidebar conference held)

THE COURT: All right. You may proceed.

**REDIRECT EXAMINATION**

BY MR. ALDOUS:

Q   Okay.  Mrs. Gross, here are VSDH's exhibits. Okay?  I'm going to direct you to Number 57.

A   Okay.

Q   Do you recall being asked questions about whether or not you gave Doug Hickok the opportunity to do something personally himself?  Do you recall those questions?

A   Yes.  Vaguely.

Q   Say it -- I'm sorry?

A   Vaguely.

Q   So -- I've got all kinds of mess here.  If you'll give me one second.  It appears as though I've misplaced an exhibit. Shocker. Ah-hah, I have it.

Let me show you what's been previously marked and is in evidence as Exhibit 36.  Do you recall being questioned about this email from your husband to Doug saying, you know, I know you said Van's going to speak for you, but, you know, are you going to do personally?

A   Yes.

Q   What -- why did you guys send this?

A    Well, because Doug had made it clear that Van Shaw was taking over representation for anything related to VSDH, but we had personal guarantee in the contract. And so only Doug could respond as to whether or not he was going to honor the personal guarantee that he signed in the contract.

Q    Now, if you would, turn to the other, Exhibit 57, that is up there. Mr. Hickok actually responded to your email, didn't he?

A    Yes.

Q    And let me show you what his response was. This is June 17th, approximately two days after your email. And what does he say there? "I've been out of the office for the past week plus. As I stated in the past, Van is handling the resolution of this matter. Unfortunately, he's out of the country but will be returning this weekend. I'm confident that he will be in touch with you shortly thereafter. My apologies for not addressing your concerns. However, I must reiterate that Van is the point person." Is that what that says?

A    Yes.

Q    Based upon that, did you take it that Van Shaw had the ability to react -- to answer for Doug Hickok?

A    Yes.

MR. CHAIKEN:  What exhibit number was

that?

MR. ALDOUS: 57, your 57.

Q (By Mr. Aldous) The only other thing I want to ask you about is you testified that in, I guess, late May or June of -- when you believe that you were not getting responses from the other party to let you know or to make you feel confident. And that's when you suggested to Ken that he put stuff in writing.

A Yes.

Q Do you recall that?

I want you to turn to the Gross Exhibit 35. Let me make sure this is in. It's already admitted. And you see the bottom of it is your email to Doug saying, "I hope this finds you well. We have sent this notice via fax. We wanted to make sure you received this per our contract," and then it goes on to say, "We are exercising our sell back option," right?

A Right. And even down below, it says, "If you want to discuss any other options, including an early buyback or otherwise."

Q All right. Then his -- Mr. Hickok's response to you was, "I forwarded the attached onto Van Shaw. He's handling this matter," right?

A Correct.

Q And your response to Ken is what I wanted to

refer you to. It says, "FYI, at least now we have the confirmation we were seeking. However, this makes me nervous." What did you mean?

A It made me nervous that they were going to try to get out of the deal that they had signed. We had made an agreement with them, and now they were turning this into a legal matter. And they weren't going to live up to what they said they were going to do.

Q Before that time where you said to Ken, "Maybe you ought to start writing stuff down," were you guys operating like that?

A I didn't feel like we were. We tried numerous occasions to meet with them. We had cordial interactions with them. They led us to believe everything was okay based upon the nature of their responses. We were trying to act -- provide options, come up with solutions.

Q Before May of 2009, were you anticipating that you'd ever be in the courtroom right now having somebody else resolve this?

A Absolutely not.

MR. ALDOUS: I'll pass the witness

THE COURT: Mr. Chaiken?

MR. CHAIKEN: May we approach, please?

THE COURT: You may.

(Sidebar conference held)

THE COURT: You may proceed.

**RECROSS-EXAMINATION**

BY MR. CHAIKEN:

Q    Mrs. Gross, Mr. Aldous was talking to you a few moments ago about this Exhibit No. 57, and he showed you this email right here. And do you see the subject line of the document there? It says, "Re, for settlement purposes only, confidential." Do you see that?

A    Yes.

Q    Okay. And Mr. Hickok, can you tell by looking at this, was responding to some other email that he had gotten?

A    It appears that way. Yes.

Q    Okay. And what Mr. Hickok was saying here is, "I've been out of the office for the past week plus. As I stated in the past, Van is handling the resolution to this matter. Unfortunately, he is out of the country but will be returning this weekend. I'm confident that he will be in touch with you shortly thereafter. My apologies for not addressing your concerns. However, I must reiterate that Van is the point person." Did I read that right?

A    Yes.

Q    And when you got this and when your husband got

this and showed it to you, you both understood that Mr. Hickok was referring you back to Van Shaw for a possible resolution of whatever was going on between you-all, right, as of June 17th of 2009?

A    To discuss a possible resolution.   Yes.

Q    Okay.  And, in fact, Mr. Shaw did get back in touch with you to talk about potential options and resolutions to whatever it was that you-all were seeking a resolution for, right?

A    Yes.

Q    Okay.  But in June of -- June 18th of 2009, in response to Mr. Hickok's message, your husband reiterated that since there are issues that impact -- "There are issues that impact you," meaning Doug, "individually, since Van is stating that a personal guarantee does not exist and he cannot speak for you," right?  That's what your husband wrote?

A    You said it was 57.  I just want to read the bottom of that page again.  "There are issues that impact you individually since Van is stating the personal guarantee does not exist and he can't speak for you."  Yes, it does say that.

Q    So, once again, your husband is expressing his understanding.  And this message is signed Ken and Betsy, right?

A     Written by Ken, but signed Ken and Betsy, yes.

Q     Okay.  So he's expressing once again yours and his understanding that Van cannot speak for Doug on the personal issues, right?

A     Yes, which is confusing; but, yes.

Q     Okay.  And then it says over here, "It's just not right, not to mention the legal ramifications."  Did I read that right?

A     Yes.

Q     Was -- were you and your husband at that time threatening Doug Hickok with legal ramifications if -- and this was on -- on June 18th, 2009?

A     Not threatening, just stating the obvious that if they weren't going to honor the buyback agreement, there would be some legal ramifications to that that we would have to explore.

Q     And you were -- you were mentioning to them that you would possibly be exploring those legal ramifications, correct?

A     That we would have to explore what our rights were, what we needed to do, what it meant.

Q     So at least as of June the 18th, you were envisioning yourself being in a courtroom, right?

A     No.  This is a nightmare.  I would never want to envision myself having to go through five years of

this.  No.

Q    This is a nightmare.  What, litigation is a nightmare?

A    Yes.

Q    Okay.  Why is litigation a nightmare?

MR. ALDOUS:  Objection, Your Honor. That's irrelevant and it's also not material.

THE COURT:  Sustained.

MR. CHAIKEN:  Pass the witness.

MR. SHAW:  Nothing further.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Nothing, Your Honor.  I'm sorry.

THE COURT:  The witness is excused. You may step down.

You may call your next witness.

MR. ALDOUS:  Is it all right if I step out in the hall and call her, Your Honor?

THE COURT:  You may.

MR. ALDOUS:  Your Honor, it appears that the witness went on a walkabout.  I'm going to have to find her.  Her coat's still there.  She may have just stepped in the women's restroom.

THE COURT:  All right.  Ladies and gentlemen of the jury, you can stand and stretch if

you'd like.  We'll just stand in recess.

During this recess, you're under the same instructions you've been previously given.  You're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors.

All rise.  The jury is excused for recess.

(Recess taken)

THE COURT:  You may bring in the jury.

(Jury enters is the courtroom)

THE COURT:  You may be seated.

You may call your next witness.

MR. ALDOUS:  Yes, Your Honor.  We would call Roxann Taylor.

THE COURT:  Raise your right hand, please.

You may be seated.

THE WITNESS:  Thank you.

THE COURT:  You may proceed.

MR. ALDOUS:  Thank you, Your Honor.

**ROXANN TAYLOR,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. ALDOUS:

Q    So, Ms. Taylor, if I refer to some of these

exhibits, you see it's got on the little tabs, the numbered tabs, and if you want to look at them, you can look at them. All right? I will let you know.

A    Okay. I didn't bring my glasses.

Q    That's all right.

A    Thank you.

Q    First of all, tell the -- would you introduce yourself to the jury?

A    Hi, my name is Roxann Taylor and I'm a real estate broker. I own a real estate company with an office in Southlake and one in Flower Mound.

Q    How long have you been selling real estate, Ms. Taylor?

A    In two years, it will be 40 years.

Q    And during that entire time, have you been involved in some way in the real estate business?

A    Yes, sir.

Q    How long have you had your own company?

A    Since the 1990s.

Q    Are you a licensed real estate agent?

A    Yes, sir.

Q    Are you also a licensed broker?

A    Yes, sir.

Q    What's the difference between a license for a broker and an agent? Or what's it mean to people in

the business, I guess?

A    The buck stops with me.  I'm responsible for the people that I sponsor underneath me.  I make the decisions for the business, and my fiduciary duty is higher.  And I've got to make sure that everybody's doing everything right.

Q    So in terms of, I guess, the hierarchy, the agents report to the broker who has their license and holds their license?

A    Uh-huh, that's correct.

Q    Okay.  And you are the broker for your firm?

A    Yes, sir.

Q    Is there a -- what's the name of your firm?

A    Engel & Volkers Dallas Southlake.

Q    Now, are you familiar with the -- Ken and Betsy Gross?

A    Yes.

Q    How did you meet the Grosses?

A    I met them originally in 2002 when they had a home that they wanted to sell in Southlake, and I sold their home for them.

Q    Later on, did you also list and work with them on 2004 White Wing Cove in Vaquero?

A    Yes, on the sale of it.

Q    Okay.

MR. ALDOUS: May I approach, Your Honor?

THE COURT: You may.

Q (By Mr. Aldous) So let me turn this to 52 for you. Sometimes it's just faster for me to do it. There you go.

Ms. Taylor, do you recognize Exhibit 52?

A Uh-huh, it has my handwriting all over it.

Q All right. What is Exhibit 52?

A It's a copy of a listing agreement agreeing to market the property at 2004 White Wing Cove?

A Is this the sort of agreement that you sign with someone who's a seller who wants your help in trying to sell a home?

A Yes, sir.

Q Now, typically in a listing agreement, do you agree as to what price the property will be offered for?

A Yes, sir.

Q On the second page of Exhibit 52, of Gross Exhibit 52, is a listing price that's handwritten in there of $2,500,000. Do you see that?

A Yes, sir.

Q Is that your handwriting, ma'am?

A Yes, sir.

Q Are you the one that made the recommendation to have the house placed on the market for $2,500,000?

A     The Grosses and myself went through all the numbers, and I'm quite familiar with the numbers if you want me to get into that at all.

Q     I do, but let me approach.

MR. ALDOUS:  Your Honor, may I approach?

THE COURT:  For what purpose?

MR. ALDOUS:  I have another exhibit that has been deferred.

THE COURT:  Okay.  So you'll need to show it to opposing counsel first, then to the Court before you approach.

You may approach.

MR. ALDOUS:  Thank you, Your Honor.

Q     (By Mr. Aldous) Ms. Taylor, do you recognize Exhibit 41?

A     It's like a market analysis sheet.

Q     Is this something that your office prepared?

A     Yes.  It looks like that it is from my office.

Q     Is this the type of report that you would prepare in an effort to determine what price to list a home that's going on sale?

A     Yes.  And it has some of the Zs on here.

Q     What does the Z stand for?

A     We don't do it anymore.  Two years ago, the board had us stop Z'ing out the final sales price of a

property. They wouldn't let us do it anymore; that once you sell a property for a particular price, you have to publish it if it was in the Multiple Listing Service. At the time that we went to put the Grosses' home on the market, there -- almost half of the sales were Z'd out where you couldn't tell how much they sold for.

MR. ALDOUS: Your Honor, we move to admit Exhibit 41.

THE COURT: Any objection?

MR. CHAIKEN: Your Honor, objection. And we have a disclosure issue, and I'd request an opportunity to approach.

THE COURT: You may approach.

(Sidebar conference held)

MR. ALDOUS: Your Honor, I withdraw the request.

THE COURT: All right. It's withdrawn.

Q    (By Mr. Aldous) Ms. Taylor, did you perform a comparative market analysis of the south Westlake area, the Southlake area, prior to coming up with a price that you thought should be offered for the -- or should be put on the market for the house at 2004 White Wing Cove?

MR. CHAIKEN: Your Honor, I object to the question, and it is seeking to elicit an undisclosed expert opinion. May we approach?

THE COURT: You may approach. In the future, I will remind you again, Mr. Chaiken, to not make speaking objections.

(Sidebar conference held)

THE COURT: You may proceed.

Q    (By Mr. Aldous) Ms. Taylor, my question to you was: Did you perform a market analysis with regard to the area surrounding this home prior to the time that you recommended to the Grosses what to -- you know, what your recommendation would be for the listing?

A    Yes, sir.

Q    Now when you do a market analysis of that kind, tell us what you do.

A    First of all, I'm looking at -- everything's about location and where the property is located. Mr. Grosses' home was located in Vaquero, which is a private, gated, guarded community of which I have a lot of knowledge of since before it was even built. The developer had me drive across the piece of land with him and I helped him come up with some of the original plans. I was one of the first realtors to market the area. I watched every road go in, every home be built, and I continue to market the place because I know I have my fingers on the pulse of what's going on.

In 2008, when we went into the recession,

the sales were not that good. That piece of paper, that brought back a lot of memories when you just showed that to me because there were a lot of homes on the market, and they weren't selling. The nine sales that had happened in the previous year to when we put a price tag on the property, four of them were Z'd out that we could not get the information But there were five properties that we were able to obtain the information on and what they had sold for, and they had sold anywhere from 142 a foot to 244 a foot, except for one property that I actually had just sold myself the previous month. It was similar in size, similar builder, similar lot size, same year built.

MR. SHAW: Your Honor, we would just object to the narrative nature.

THE COURT: Sustained.

A    That is a market analysis.

Q    (By Mr. Aldous) So, Ms. Taylor, when you say the price per foot, are you referring to the price per square foot?

A    Yes, sir.

Q    So if a home has 7,000 square feet, you put whatever the -- what you believe to be the going rate for per square foot for that area for that house from what you can get, and then that's how you come up with a

listing price?

A    And then I add some to it so there's some wiggle room for negotiation

Q    All right.  You were talking about a previous sale that you were involved with where you actually sold a home that was very similar to this one.

A    Uh-huh.

Q    Is that right?

A    We have a couple of builders in the area that are very well respected.  The original builder, I believe, of this home was Paul Kramer; is that correct?

A    Yes.

Q    And there's another builder by the name of Scott Simmons that builds very high-quality homes and very respected in the area.  The home that I had just sold was a Scott Simmons home.  It was within 100 feet of being the same size.  It was -- had a four-car garage, had similar amenities on the inside, built the same year.

MR. SHAW:  Your Honor, I'm going to object to the narrative nature.  May we approach?

THE COURT:  You may.

THE WITNESS:  Does that mean I can't talk anymore?

THE COURT:  Not until I finish talking

with them.  For whatever reason, they love this little corner.

(Sidebar conference held)

THE COURT:  You may proceed.

MR. ALDOUS:  Thank you, Your Honor.

Q  (By Mr. Aldous) So, Ms. Taylor, where we were at was you were saying that you had just sold a home from another builder that was of similar size and location to the home, the Grosses' home.

A  It was two blocks away

Q  When you -- and you had said that that home actually sold and closed?

A  It was a closed sale, probably about three weeks before we listed Ken's.

Q  And when you -- so you knew, obviously, what that house actually sold for per square foot?

A  304 something a foot -- $304 a foot, which nothing had sold above $200 something a square foot.

Q  Based upon all the factors that you knew of and your own personal experience, do you believe that the price that you recommended to be put on the market for this house was the best price that you could recommend?

A  Yes, sir.

Q  Now, subsequently to the -- to the listing agreement, you received an offer on the home; is that

correct?

A   Yes, sir.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

THE WITNESS:  Probably a couple of months later.  I wish it was sooner.

MR. ALDOUS:  That's all right.

Q   (By Mr. Aldous) If you would, take a look at Exhibit 47, which is already in evidence.  Is that a contract offer that you received as the agent on behalf of the Grosses?

A   Uh-huh.  And, in actuality, what -- on when I received it because it was written by an agent in my own firm.  I had Mrs. Zarazan represent the Grosses.

Q   So you had a different agent in your office represent the Grosses for the purpose of the contract and any closing?

A   Yes, sir.

Q   Is that so that you can make sure that both sides remain fair to one another?

A   Yes, because there was another agent in my office that represented the buyer.

Q   All right.  So the Exhibit 47, which is the contract for sale, has a sales price of $2,415,600?

A   Yes, sir.

Q    Were there any other parts of this that -- other than just the price that from an agent's perspective, particularly at this period of time, you thought was important?

A    It was cash.

Q    Tell us what you mean by that and why it's important to you.

A    Because it means we're going to have a real sale.  Working through the appraisal market today and obtaining mortgages during that time period in the middle of a recession, it was difficult for borrowers to get financing.  I mean, The scenario couldn't have been any better.  It was a wonderful thing.

Q    Just so that I can understand what you're saying, you're saying at that period of time where this house was going under contract, it was difficult to get loans to buy houses?

A    Yes, sir.

Q    And so when you say a, "cash offer," that means there was no loan involved?

A    That's correct.

Q    Based upon your training and your experience and all your years in the real estate business, did you recommend that Ken and Betsy sell at this price?

A    There was some negotiations that were going on.

The buyer, from what I understood, expected to get a little bit off because they were paying cash.

Q   Right.

A   And they knew that that was a good thing for them.  Maggie shared with me that the Grosses wanted to be able to get the most that they could because they had put a lot of money into the property.

Q   All told, do you believe that this was -- this deal that's reflected by Exhibit 47 was in the best interest of the Grosses?

A   Absolutely.

Q   The last thing I want to ask you about was the closing on this -- on the sale of the Grosses' house was a fairly quick process, right?

A   Yes, sir.

Q   Is it typical for a closing to be that quick?

A   No, sir.

Q   Why do you say that?

A   Because there's always obstacles to go through. I call them hurdles.  You've just got to fall over them or go around them.

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q   (By Mr. Aldous) Ms. Taylor, if you'll take a look at Exhibit 42, which has already been admitted into

evidence, is that a settlement statement relating to the sale of the Grosses' property?

A    Yes, sir.

Q    Now, according to the settlement statement, that reflects generally all the charges that get made against, for instance, the borrower or the -- I mean, the seller or the buyer, correct?

A    Yes, sir.

Q    One thing I wanted to ask you about is on the second page.  It is a line item Number 703.  It says, "Commissions paid at settlement."  The charge for your work on this was $108,702; is that right?  And when I say, "yours," I mean your firm.

A    My firm, yes.

Q    And is that a standard going rate for what you were doing back then?

A    No.

Q    Is it a better rate?

A    Much better.  I only charged them four and a half percent instead of six percent.  They were a multiple-time client of mine.  And the Grosses had indicated that they were in a situation where they needed to sell and every penny counted, and I was willing to participate

MR. ALDOUS:  Thank you, ma'am.  I'll pass

the witness, Your Honor.

THE COURT:  Mr. Shaw?

MR. SHAW:  Thank you.

**CROSS-EXAMINATION**

BY MR. SHAW:

Q    Ms. Taylor, I get to ask you some questions now.  The other work for the Grosses, what have you done?

A    In 2002, I sold a home for them that they owned on Fairway View Terrace.

Q    Is that in Southlake?

A    In Southlake in Timarron.  And then a couple of years later, I sold another home for them on Eagle Bend Drive, also in Timarron.

Q    Okay.

A    And then I sold them a lot in Vaquero, a different parcel.  And subsequent to this one, I sold them another property.

Q    Where was that?

A    In Vaquero.

Q    What street in Vaquero?

A    It's a lot that was -- somebody was desperate to sell it for a very little amount of money.

Q    All right.  Now you mentioned two witnesses, two people that are going to be witnesses in this case

One is Paul Kramer and one is Scott Simmons.

A    They are going to be witnesses?

Q    Yes, ma'am.

A    Oh.

MR. ALDOUS:  Your Honor, let me object to the sidebar comment.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Will you tell the jury a little bit about -- you said that they were builders; is that right?

A    Yes, sir.

Q    And high-quality builders?

A    Both Paul and Scott are.  They've had extremely good reputations.

Q    And the quality of product they build is what?

A    Very high quality.  They have been in demand.

Q    Did you ever see any contract that the Grosses signed with the -- who they bought this White Wing home from?

A    I did not.  I wasn't part of the purchase at that time, and I was not aware of any of the other things that this is about today until 2011 when I got this little thing in the mail.

Q    Now, as a licensed real estate broker --

A    Uh-huh.

Q    -- are you allowed to provide the appraised value for a property?

A    What do you mean an appraised value?

Q    Well, are you able to perform an appraisal of or provide an opinion of value for real property?

A    I can give a BPO, which is a broker's price opinion.  But I can't do a licensed appraisal unless I was a licensed appraiser.

Q    And are you a licensed appraiser?

A    No, I am not.

Q    If somebody goes to the bank and wants to buy some real estate -- let's say it's some real estate you're selling or buying for a client -- does the bank require a formal appraisal?

A    Appraisal, yes.

Q    And that's different than what you do in terms of evaluation?

A    We were basically looking at the same information

Q    What do those people have that are able to do an appraisal in the state of Texas that you don't have?

A    A license.

Q    Okay.  And do you know what they have to do to get that license?

A    No, I do not.  I have never been interested in

being an appraiser.

Q   All right.  Ms. Taylor, I appreciate your time.

MR. SHAW:  I pass the witness.

THE WITNESS:  Thank you.

THE COURT:  Mr. Chaiken?

**CROSS-EXAMINATION**

BY MR. CHAIKEN:

Q   Hi, Ms. Taylor.  How are you?

A   Hi.

Q   You and I have never had an opportunity to meet prior to this moment.  My name's Ken Chaiken.

A   Hi.

Q   And I'm a lawyer in this case, and I represent Doug Hickok.  You know Doug over there?

A   You know something?  I've heard the name, but I've never met the man.

Q   Okay.  So you know of Mr. Hickok?

A   I've heard the name before.

Q   I just have a couple --

MR. SHAW:  Your Honor, that's Scott Simmons.  And the rule's been invoked and he's a witness.

THE COURT:  Sir, you'll need to stay out in the hallway until we call you in for testimony.

MR. CHAIKEN:  Thanks, Judge.

THE COURT: You may proceed.

Q (By Mr. Chaiken) Ms. Taylor, if I understood your testimony a couple of minutes ago, you didn't know anything about the events in this case until sometime in 2011; is that right?

A Uh-huh.

Q So, in other words, somebody reached out to you and said there's a lawsuit between the Grosses and VSDH, and that's the first time you became aware of any issues between the Grosses and VSDH Vaquero, Ltd., right?

A Yeah. I couldn't -- I mean, I got served this little notice and somebody handed me a dollar bill.

Q And you didn't know anything else about there being some disagreement or some issue or some concern between the parties back when the house was sold in August of 2009, right?

A I didn't even know about this relationship or this corporation or something that Mr. Shaw is in. I didn't even know until today that Van was one of the parties in it. I mean, I just don't know anything about it.

Q And when the Grosses enlisted your services --

A Uh-huh.

Q -- to sell the property, they didn't tell you that they were selling the property in order to rapidly

sell it prior to a buyback date that was in a contract with somebody else?

A    No.   They were selling it because they needed to sell it.

Q    And why would they need to sell it?

MR. ALDOUS:  Objection, Your Honor.

A    I mean, I don't --

THE COURT:  Sustained.

A    They just told me they needed to sell --

THE COURT:  Wait, wait, wait.  When there's an objection, you have to wait until I make a ruling.  If I sustain the objection, that means you don't get to answer.  If I overrule the objection, then you do get to answer.  Okay?

THE WITNESS:  Okay.

THE COURT:  And I sustained the objection, so now he has to ask you a different question.

THE WITNESS:  Okay.  Thank you.

Q    (By Mr. Chaiken) Did the Grosses tell you what the reason was that they were selling the house?

MR. ALDOUS:  Objection, Your Honor.  I just objected to that very exact same question.

THE COURT:  Let's see.

THE WITNESS:  Am I waiting for someone to tell me?

THE COURT: Yes. You're waiting for me to make a ruling.

THE WITNESS: Okay.

THE COURT: It's basically the same question. The ruling is the same, sustained.

MR. CHAIKEN: Thank you, Ms. Taylor.

**REDIRECT EXAMINATION**

BY MR. ALDOUS:

Q   Ms. Taylor, I had another question and I totally forgot about this. Did you -- as part of your actions on behalf of the Grosses, did you, of course, look at the house and tour the house and all the parts of it?

A   Yes, sir. I'm extremely thorough.

Q   Right. Thank you. With regard to the addition, the casita, were you aware that Mr. -- that Mr. Gross was the general contractor on the addition of the casita?

A   Yes. He had told me that he had built it.

Q   From your personal view, do you have any kind of opinion as to what sort of construction went on or at least from an aesthetic standpoint with regard to the casita that you witnessed and looked at?

A   You mean how it was constructed?

Q   Yeah. You know, that's probably a better

question.  What did the casita look like?  Did it look good?

A    It looked great.

Q    Was there -- I mean, did you think that it looked like the rest of the house?

A    It looked as great.  I thought it would have maybe an appeal to a buyer that had a returning child home or some other use.  I was somewhat concerned that sometimes you don't get full value if something -- because somebody has to have a need to have that extra space because it wasn't connected on the first floor.

Q    I see.  So you're saying like the in-law suite sort of situation --

A    Yes.

Q    -- or something like that?  But just in terms of if you looked at it, was there anything that you looked at and you said, "Oh, my.  This needs to be corrected or this isn't good," in terms of the way it looked construction wise?

A    Absolutely not.  It was beautiful.

Q    All right.

A    I mean, I was willing to press the envelope on trying to get them more money than the other one.  I had just sold the other one for 2.3.

MR. ALDOUS:  Thank you for your time.

I'll pass the witness, Your Honor.

THE COURT:  Mr. Shaw?

MR. SHAW:  Nothing, Your Honor.

THE COURT:  Mr. Chaiken?

**CROSS-EXAMINATION**

BY MR. CHAIKEN:

Q    (By Mr. Chaiken)  I have just one more question, I think one more question for you, Ms. Taylor. When you say you were willing to press the envelope to get them more money, they decided how much money that they were going to sell this house for; is that right?

A    The seller is always the one that makes the decision.  But they do it by asking guidance and having facts and figures.  You know, it's my decision then if I want to take the listing or not.

Q    Sure.  And, ultimately, you understood that they were selling the property because they had some need to do so, correct?

A    Uh-huh.

Q    And you didn't know what that need was?

A    When somebody says they need to sell their property, they need to sell their property.

MR. CHAIKEN:  Thank you.

MR. ALDOUS:  That's it, Your Honor.

THE COURT:  All right.  The witness is

excused. You may step down. You're free to go.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

All right. All right. You may call your next witness, Mr. Aldous.

MR. ALDOUS: Your Honor, at this point, considering the stipulations that we've already put on the record, plaintiff rests.

THE COURT: All right. Mr. Shaw, you may call your first witness.

MR. SHAW: We will --

THE COURT: Why is everybody standing up? Planning to go somewhere?

MR. SHAW: Your Honor, I don't know if --

THE COURT: Got a party that we've not been invited to?

MR. SHAW: I don't know if you want to entertain a motion at this time. Otherwise, we'd call Scott Simmons.

MR. ALDOUS: And, Your Honor, I believe that we had already had a discussion about this particular witness.

THE COURT: All right. So at this time, ladies and gentlemen of the jury, we're going to take another recess to deal with some matters outside of your

presence. Feel free to enjoy your time in the jury room.

All rise. The jury is instructed you're not to discuss this case among yourselves or anyone else until such time as this case has either been submitted to you for your deliberations or you have been discharged as jurors. The jury is excused.

(Jury exits the courtroom)

THE COURT: All right. Counsel, you may approach the bench.

Everyone else may be seated. Feel free to move around the cabin.

(Brief interruption)

MR. ALDOUS: Your Honor, so Mr. Shaw is now calling this builder not because he knows anything about this deal or because he knows anything about the house but because he was in litigation with Mr. Gross, and he wants to call him to come in and say something about how he must be a bad person because he sued me and all this other stuff in an unrelated case. And my --

THE COURT: So are you calling him for the purposes of making a bill of exceptions or an offer of proof?

MR. SHAW: I am going to call him on opinion and reputation. And so if the Court won't allow

me to do that in personal, I would like to make a bill on it.

THE COURT: Okay. You may do so. You may do it right now.

MR. SHAW: All right. Thank you.

MR. CHAIKEN: Your Honor, but before we --

THE COURT: Always, always, Mr. Chaiken, you could never justlike let it go, right? You always have to like add a little --

(Everybody talking at once)

THE REPORTER: I can't get everybody. So, are we on the record because everybody is talking

THE COURT: Evidently so because Mr. Chaiken wants to make some kind of a motion about what?

MR. CHAIKEN: The plaintiff just rested, okay, and so I believe I have a right under Rule 268 to make a motion for directed verdict.

THE COURT: You do. But, you know, perhaps you should have said that at the same time that Mr. Shaw said that he wanted to make a motion.

MR. CHAIKEN: He said that there were motions that needed to be made.

THE COURT: No, he said he had a motion that he wanted to make.

MR. CHAIKEN: Okay. And I have a motion that I would like to make.

THE COURT: All right. You may make your motion then before we do Mr. Shaw's offer of proof.

MR. CHAIKEN: Okay. At this time, Your Honor, on behalf of Douglas Hickok, Mr. Hickok orally moves for --

THE COURT: Mr. Chaiken, remember the voice. The jury can hear through the doors, and your voice is very booming.

MR. ALDOUS: You do have a big voice.

THE COURT: You have a stage voice.

MR. ALDOUS: I think you should be on stage.

MR. CHAIKEN: Mr. Hickok makes a motion for total or partial directed verdict --

THE COURT: Total or partial?

MR. CHAIKEN: In the alternative

THE COURT: Okay.

MR. CHAIKEN: -- and does so for the following specific reasons: Number one, Mr. Hickok has been sued for the recovery of damages resulting from the alleged failure on the part of VSDH to buy back the residence in question and for personally not buying it back. The problem that necessitates that a directed

verdict be granted in his favor is that the Grosses struck through the contract remedies allowing them to pursue other remedies at law and stated that their sole and exclusive remedies would be, in the event of a default by the seller, which was VSDH, a pursuit of specific performance or termination of the contract.

The sole and exclusive remedies provision, via the addendum to the contract, which at the time, according to the Grosses, Mr. Hickok was a party to personally, although there's some dispute about whether he was or he wasn't. They contend that he was. It did contain some language in the addenda that reinstated the remedy of such other relief as may be provided by law or both, meaning they could seek specific performance or such other relief as may be provided by law.

But the only party in the addendum to the contract that reinstated the language was the seller, and that is VSDH. VSDH is not Mr. Hickok and Mr. Hickok is not VSDH. And Mr. Hickok is not the seller. So to the extent that Mr. Hickok was the -- was, via his signature or representative capacity and/or his initialing of the addendum, a party to the contract for limited purposes or otherwise, Mr. Hickok never agreed to reinstate the stricken remedies and is entitled to rely upon the sole and exclusive remedies provision of

Paragraph 15 of the contract, which precludes the pursuit of damages.

Moreover, the evidence in this case is that if Mr. Hickok was a party, he was only party to a purported guarantee; although, he denies that he was a party to such a guarantee or that such a guarantee is enforceable against him as a matter of law. But if the Court were to find that the guarantee existed and that he was a party to the guarantee, the guarantee is at most a guarantee of performance, meaning that he only guaranteed the buyback of the property in accordance specifically with the buyback option language.

The buyback language specifically provided that the buyback date was September the 1st of 2009. And if Mr. Hickok was a guarantor and if Mr. Hickok were suing as a guarantor and there's a finding of that, although, he continues to deny that, he would have had no ability to perform his guarantee obligation, his only guarantee obligation, which is not a guarantee of payment. It's not a guarantee of damages. It's not a guarantee of anything other than to buy back the property if on September 1st, '09, VSDH failed to do so.

By September 1st of 2009, the Grosses already had sold the property to another person. And Mrs. Gross admitted on the stand that on September 1st,

2009, Mr. Hickok could not have purchased the property back; i.e., performed the purported guarantee obligation to buy the property back if VSDH failed to do so on that date in that he did not sign any agreement of indemnity. He did not sign any agreement or guarantee of payment. The guarantee that is purported -- or the purported guarantee speaks nothing about his obligation to pay any financial obligations on the part of VSDH.

He cannot be held liable either for damages or he cannot be held liable for any purported failure by the Grosses -- I'm sorry -- by VSDH to purchase the property if it was obligated to do so because that obligation would have accrued on the 1st of September of '09, and on that date the property could not be sold or, if stated differently, could not be purchased by Mr. Hickok if he stepped up and tried to buy it.

There is also no evidence that he refused to buy it in the record or that he ever communicated his intent not to buy it. The only evidence is that Mr. Shaw told him -- told the Grosses that there was no personal guarantee. And the sole evidence is that on behalf of VSDH, Mr. -- I'm sorry -- Mr. Shaw communicated that VSDH was insolvent. And never was there any evidence that Mr. Hickok communicated to

anybody that he would not perform. But his obligation to perform, if at all, if he had one, if we find in this case that he did have a guarantee obligation, he only owed it after September the 1st. And at that time, his ability to perform was frustrated and rendered impossible by the Grosses' prior sale of the property to a third party.

Now, in addition, even if all of that were not correct, Mr. Hickok would only be liable under a guarantee if there was an enforceable guarantee against him, which we contend there was not, and if VSDH had actually defaulted on its obligation to buy back the property on 09-01 of 2009. But there's no evidence of a default by VSDH, thus no -- no default of that nature could trigger any purported guaranteed liability.

In addition, Mr. Hickok has been sued for fraud in a real estate transaction via their third amended counterclaim, which, of course, is styled as a counterclaim because at the time they were in the position of being a defendant. The Grosses' alleged that Hickok committed statutory fraud in the real estate transaction in violation of Section 27.01 of the Texas Business and Commerce Code.

The elements of that cause of action are as follows: There was a transaction involving real

estate or stock. During the transaction, the defendant made a false representation of fact, made a false promise, or benefited by not disclosing that a third parties' representation or promise was false, the false representation or promise was made for the purpose of inducing the plaintiff to enter into the contract, the plaintiff relied on the false representation or promise by entering into the contract, and the reliance caused the plaintiff injury.

And I cite Section 27.01 of the Texas Business and Commerce Code and Schlumberger Tech versus Swanson, 959 S.W.2d 171 at Page 182, which is a Texas 1997 Supreme Court case.

THE COURT: Do you have a copy of it?

MR. CHAIKEN: I don't have a copy of the Schlumberger case, but I can provide it to the Court.

Here, there's no evidence of one or more of -- and let me emphasize that there has to be proof on all five of those elements because there is an "and" provision, okay, not an "or" provision in the stated cause of action in the Business and Commerce Code.

Here, there is no evidence that during the transaction Mr. Hickok made any false representation of fact. There's no evidence that he made any false promise or that he benefited by not disclosing that a

representation or a promise made by a third party was false. In order for a representation or promise to qualify as actionable under 27.01(a)(2) capital (A) and (A)(2)(B) of the Texas Business and Commerce Code --

THE COURT: Do you have a written motion that you're reading from?

MR. CHAIKEN: No, I'm reading from some notes that I have, memos that I've typed from prior motions.

There is -- I'm sorry. The promise or representation at issue must be false at the time it was made. The only evidence of any promise or representation made by Mr. Hickok was that he would communicate with Mr. Shaw, and that was in response to a request tendered to him by the broker, Mr. Buttemiller. And he would ask Mr. Shaw whether he would agree to personally guarantee the transaction, and they would consider doing so if a guarantee was provided to them to sign mutually. The only -- there's no evidence of any actual false representation or promise that Mr. Hickok made for the purpose of inducing the Grosses to enter into the contract.

In fact, the only evidence that the Grosses introduced is that because there was a denial of the guarantee after the fact, there was -- there was

some type of false representation or promise. But because -- but a denial made after the fact is not a false promise or representation to induce the entry of a contract. There's no evidence that the Grosses relied on any false representation or promise by Mr. Hickok in entering into the contract. And there's certainly no evidence that they -- that there was any injury or damage in that they sold the property to a third party, depriving VSDH and, if VSDH defaulted, Mr. Hickok of any opportunity to buy the property back on or after the buyback date. And they did so in lieu of pursuing the remedies of specific performance that they expressly had reserved in the contract as their sole and exclusive remedy.

In addition, Mr. Hickok cannot be held liable as a matter of law based on the evidence in the record, being the contract itself in Paragraph 22 of the contract, which is a merger clause. A merger clause is one that bars a claim for purported representations or agreements allegedly made. And there's been no representations made. There's an allegation that an agreement was made by Mr. Hickok before the contract was signed that he and Mr. Shaw would guarantee that they would buy back the property pursuant to the buyback option if the partnership did not.

According to the Grosses, they relied on -- I'm sorry -- the contract -- excuse me -- states that the -- and it's the first amendment to the contract itself, which was introduced into evidence in Paragraph C at Page 2. The amendment embodies the entire agreement and understanding between the purchaser and seller with respect to its subject matter and supercedes all prior agreements and understandings, written or oral, between purchaser and seller related to that subject matter. This amendment may be amended, waived, or discharged only by an instrument in writing executed by the party against which enforcement of the amendment, waiver, or discharge is sought.

Furthermore, there is no evidence that there was any reliance or justifiable reliance upon any representation or promise made by Mr. Hickok because no representation or promise was identified as being relied upon with regard to an inducement of the contract.

Consequently, for each and any of those reasons, Mr. Hickok moves for a directed verdict, dismissing the claims of breach of contract against him and dismissing the fraud in a real estate transaction against him and, furthermore, dismissing any claim for damages against him given the sole and exclusive remedies provision of the contract, which the Grosses

allege he became a party to. Thank you, Judge.

THE COURT: Well, let's see. That was 14 minutes nonstop. Did you breathe?

MR. CHAIKEN: Yeah, I was breathing. I can talk and breathe at the same time.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, to take a line from O Brother Where Art Thou, that don't make no sense. First of all is the guarantee -- just with regard to the contract portion of the guarantee agreement -- sets forth that Mr. Hickok personally guarantees seller's obligation. And in the event VSDH fails to fully perform under the terms of the buyback option, each of his partners set forth here shall be personally responsible. Mr. Hickok, therefore, guaranteed the obligations and performance of the terms of the agreement.

One of the terms of the agreement was that they struck through -- that the language that was stricken through was, "Seek such other relief as may be provided by law or both: That means that the principal obligor, being VSDH, agreed to that. That means that Mr. Hickok has guaranteed that portion of it.

As a result, the question is really whether or not VSDH breached its agreement to purchase

the property back. The answer to that is there's plenty of evidence both ways. And the evidence specifically is that Mr. Shaw said that they unequivocally would not perform, which -- as an anticipatory breach of contract, which is the same as breach of contract. That means that under the agreement itself that if VSDH breached the agreement, a party is relieved from any further responsibility under a contract once the other party's breached, meaning we didn't have to sit there on our hands and wait and see whether or not they were going to admit that they breached the agreement. We could sell it right away. And/or the jury has sufficient evidence to make that decision as to who breached first.

Two, with regard to the issue of whether or not there's any evidence of a breach -- I mean, I'm sorry -- of fraud in a real estate transaction, Mr. Hickok admitted that this was -- a purports to be -- addendum purports to have a guarantee agreement that he believed he was not responsible for it because of some other document that he had to sign. He was aware it was in the document. He did not strike through it. Contrary to counsel's assertion, I don't need to get Mr. Hickok to -- I don't have to have him admit it that it was a fraudulent statement. But there's sufficient evidence to say that it was done with intent.

In fact, as you can recall, his -- once he referred the matter to Van Shaw for response, Mr. Shaw's response was nobody guaranteed this; although, the agreement specifically sets forth a personal guarantee. So there's plenty of evidence of a fraudulent statement made and that it was known to be fraudulent at the time. I believe these issues are just for the jury to decide.

THE COURT: Then there's the damages issue.

MR. ALDOUS: I'm sorry?

THE COURT: Damages.

MR. ALDOUS: Was that with regard to specific performance versus --

THE COURT: No, damages.

MR. ALDOUS: My understanding of what his argument was is that we were limited to specific performance, which is clearly not the case. Once a party has breached, you no longer have to worry about -- and you can immediately sue for damages. The black letter law says as soon as they said, "We're not going to perform," that is a breach. We can sue them for money damages, and that means the guarantor as well.

There is absolutely nothing in the contract that says the guarantor must be given any sort of allowance for him to then go back and say, "Wait a

minute. I demand specific performance." Even if that was true in this case, he punted the whole issue to Mr. Shaw, who said, "We will not perform." So there's plenty on that. And so the way I understand it is he's tying that in, but clearly that is the specific performance and damages.

But with regard to the way this is set up is they agreed to pay 2,851,000 to buy -- purchase the property back. I've demonstrated that they didn't do that, which is a breach. They said they weren't going to do it. We relied on it. We moved forward. We sold the house at a loss, a loss that we wouldn't have sustained but for their failure to comply with the contract and to comply with the guarantee and then fraud, of course, on the same damages.

And I will say, Your Honor, that I look at those two causes of action as -- obviously, I don't think that I could elect to win under both, you know.

THE COURT: It's only one recovery.

MR. ALDOUS: Right. So -- but there's clearly evidence of both.

MR. CHAIKEN: May I respond?

THE COURT: Briefly, Mr. Chaiken, briefly. You've already -- just so you know, he responded in five minutes to your 14.

MR. CHAIKEN: That's good. The problem is his response is inadequate, and let me explain why. Mr. Aldous just made a statement that is patently, okay, incorrect. And it is expressly contrary to what the contract itself says. First of all, he said that the purported guarantee language was a guarantee to perform all of VSDH's obligations under the contract and that he tried to link that to the obligations of the seller with regard to what remedies can and cannot be pursued.

The problem with that argument is that if this is a guarantee, and it's not because under the statute of frauds in order for it to be a guarantee, it would have to be a -- it's a personal -- allegedly a personal undertaking to answer for a default of another, it would have to be in writing and signed personally in a personal capacity by the guarantor. That is a question of law, which at this point is not the basis of the motion for directed verdict.

But the language of the purported guarantee itself in no way purports to obligate the purported guarantors to perform all of seller's obligations under the contract. To the contrary, all it obligates, if anything, the purported guarantors to do is to guarantee the partnership's obligations under the buyback option. That's it. Okay?

And it's only in the event that the -- that VSDH fails to perform under the specific terms of the buyback option at which time the putative guarantors agree to be personally responsible to perform the obligations of VSDH under the buyback option, okay, not to pay damages if VSDH fails. It's not an indemnity, and it's certainly not an obligation to perform any other of VSDH's obligations under the contract.

Consequently, as a matter of contract construction and as a matter of law, the only party that agreed to reinstate stricken language allowing for the pursuit of remedies as may be provided by law, okay, is the seller. There's nothing but evidence that the seller and Mr. Hickok are not one in the same. There's no mention of Mr. Hickok, guarantors, or anybody else agreeing to reinstate the stricken language. The addenda is part of the contract, and the contract says that the sole and exclusive remedies available to the Grosses if the seller fails to comply with the contract for any other reason, okay, and the seller is in default.

Okay. So, in other words, they're going to attribute the default to a guarantor. Okay. The buyer may, as a sole and exclusive remedy, enforce specific performance, terminate the contract, and

receive the earnest money, thereby releasing both parties from this contract. They never sued for specific performance  They waived by striking the -- the other remedies provided by law by virtue of a failure to perform. It doesn't reinstate what has been stricken -- what has been contractually agreed upon as waived, okay, in the way of remedies. And so, at most, they could have sued Mr. Hickok for specific performance, not damages, if he was a guarantor under this agreement.

And the only other comment that I'll make is that there is no evidence of the specific elements of fraud in a real estate transaction, being the five elements. And they all must be proven, specified in Texas Business and Commerce Code Section 27.01 and the Schlumberger Tech versus -- Technology versus Swanson case. And Mr. Aldous' statement that there's just evidence of fraud does not identify the evidence in support of each of those elements. And for those reasons, Your Honor, we would request that the directed verdict be granted in favor of Mr. Hickok.

THE COURT: The Court is disinclined to grant directed verdict at this point in time; however, the Court is not opposed to reconsidering it after the defendants present their case in chief.

MR. SHAW: Your Honor, without waiving this, I'd like to move as well. I'll be brief.

THE COURT: All right.

MR. SHAW: Thank you. Your Honor, I believe that VSDH -- I'm looking at the third amended counterclaim of the Grosses -- are sued under three causes of action. Roman numeral 5 on Page 6, it's out of the declaratory judgment cause of action. That cause of action is barred because VSDH, Hickok, and Shaw filed suit in 2008 initially. Once the case is at the Court, a party is then not in a counterclaim allowed to bring a declaratory judgment action because the matters are already before the Court and pending. And this case --

THE COURT: What case in 2008?

MR. SHAW: 2009, I'm sorry. The original petition filed in this case was by VSDH, followed shortly thereafter by interventions of Shaw and Hickok. And so once those appearances were made to the Court and the cause of action was teed up, the Grosses were not allowed thereafter to file a declaratory judgment action and seek to invoke the remedies allowed for under the Declaratory Judgment Act. So we move for directed verdict on that.

On the fraud in the real estate transaction, the Grosses seek damages against and

liability against VSDH based on that cause of action. There is no evidence or certainly insufficient evidence to support any finding of fraud against VSDH. There was -- along the same lines as Hickok, there was a discussion that -- that VSDH would personally guarantee the buyback, would guarantee the buyback and it did. And that's what we're here about. But there is no fraud as to VSDH. And so we move for a directed verdict on that count as well.

Finally, on the breach of contract cause of action, we move for directed verdict because the contract clearly provided that once the Grosses entered into a contract with another party, the buyback provision was terminated. Further, the contract provided that the Grosses -- that VSDH had until 09-01-2009 to execute the buyback. The Grosses sold the property by that time. And, as such, the Grosses have waived any rights that -- for liability or damages against VSDH. So we move for directed verdict on all three of those.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, with regard to the declaratory judgment action cause of action, his argument is a legal one. It's not based upon the evidence that was produced in trial. So, I don't think

-- and I'll firmly state on the record, I don't believe the Court has to decide that on directed verdict. But it can be dealt with at a later time. And with respect to the breach of contract and the fraud portion of it, I would state that the representations -- the false representation of Mr. Hickok were made both individually and as a representative of VSDH. And so they would apply as well. I'll rest on my other arguments that I made with regard to the breach of contract.

MR. SHAW: I don't understand the false representations that were referred to with Hickok that would impugn any fraud on VSDH.

MR. ALDOUS: The law is pretty clear, I think, that an agent of a company that commits fraud is responsible. Both the company to which he responds to is vicariously responsible, and he is personally responsible as well. Irrespective of the fact that it relates to a guarantee, it has everything to do with whether or not he made a false statement, knowing it was false at the time. And so that's what I would say.

THE COURT: The Court repeats its previous ruling, disinclined to grant a declaratory -- I mean, excuse me -- a directed verdict at this time, but is open to considering it after the defendant has presented -- or defendants have presented their case in chief.

MR. SHAW:  Thank you, Your Honor.

MR. ALDOUS:  Can we have a moment for a restroom break?

THE COURT:  You may.

(Recess taken)

THE COURT:  Raise your right hand.

(Witnesses sworn)

**JAMES SIMMONS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SHAW:

Q    All right.  Sir, will you please state your full, legal name?

A    James Scott Simmons.

Q    How old are you?

A    Forty-four.

Q    You presently live in Dallas?

A    Yes.

Q    And before that you -- I'm sorry -- before that you lived in Southlake?

A    Before that, I lived in Vaquero in Westlake.

Q    Okay.  In the last 15 years, tell us where you've lived generally, please.

A    Last 15 years, I lived in Southlake and in Westlake and in Dallas.

Q    All right.  Westlake is where Vaquero is?

A    Yes.

Q    And your profession, please?

A    I'm a home builder.

Q    How long have you been a home builder?

A    Twenty-five years.

Q    And in your business dealings, have you had an opportunity to meet a guy named Ken Gross, who's the movant in this lawsuit?

A    Yes.

Q    Generally, when did you first meet Mr. Gross?

A    It was around 2006.

Q    And what did that --how did you come to know him?

THE COURT:  You can speak a little bit louder, just not much.

MR. SHAW:  Okay.

THE COURT:  Cathye's straining over there.

MR. SHAW:  Yes, Your Honor

Q    (By Mr. Shaw) And how did you come to know him?

A    Mr. and Mrs. Gross owned a property that was next door to me.

Q    That was in Vaquero?

A    Yes.

Q    And that was a raw piece of land?

A    Vacant lot.

Q    And so you had -- you were living next door to that little vacant lot; is that right?

A    Yes.

Q    And, generally, what was the business or the dealings you had with Mr. Gross regarding his lot or your home?

A    Well, my wife and I got sued personally over us living downhill from the Grosses' vacant lot.  I think, in my opinion, we were the first people in the state of Texas that's probably ever happened to, and it cost us a lot of money and a lot of agony and a lot of years of going through a lawsuit.  And we finally went to a -- to a head and got settled.  They didn't live up to their end of the bargain they were supposed to.

Q    Okay.  So Gross sued you for generally what?  What did -- that you understood was he suing you for?

A    They basically sued me and my wife to try to get money from us.

Q    And it ultimately settled?

A    Yes.

Q    And as a result of the settlement, was Mr. Gross required to undertake certain activities?

A    Yes.  He was regarding that lot.

Q    His vacant lot?

A    Their vacant lot.

Q    And did Mr. Gross undertake the activities he was required to undertake per the settlement agreement?

A    Not during the -- I'm sorry.  Excuse me.  Not per the settlement agreement.

Q    Not timely?

A    Not timely.

Q    And what happened then?

A    I had a countersuit.

Q    You had a countersuit?

A    We had a countersuit to force them to do their end of the bargain of the settlement.

Q    All right.  And approximately how many years did this go over?

A    It took almost five years for this to go through and about $200,000 worth of attorney fees to my wife and myself.

Q    And this was 2006 to 2011, or what years would you say it was?

A    Yes.  I believe it was completed in maybe '13.

Q    Okay.  So 2013?

A    2012, maybe, 2012 at the end.

Q    It started when approximately, the lawsuit?

A    It started around 2007.

Q    Did you have dealings with Mr. Gross before the

lawsuit was filed?

A    Yes, before it was filed.

Q    Okay.  And he -- you and he conferred about various matters?

A    We thought we were going to try to work this out together against the developer and try to get the developer and the civil engineer to work through it.  And for whatever reason, they elected to sue my wife and I.

Q    Mr. Gross did --

A    Yes.

Q    -- and his wife?  And so have you had any other dealings with Mr. Gross?

A    No.  I never want to.

Q    Did you form an opinion about Mr. Gross' character for truth -- his propensity for truthfulness?

A    Yes.

Q    And what opinion did you form?

A    My opinion is he does not live up to what he's supposed to do.  He's untruthful and unethical.

Q    Did you have lawyers and there were other parties in that case as well; is that right?

A    Yes.

Q    And have you spoken to those people about Mr. Gross and about how Mr. Gross conducts himself

generally?

A     Yes.

Q     And have you determined from people in that community if Mr. Gross has a reputation?

A     Yes.

Q     Does Mr. Gross have a reputation?

A     He absolutely does.

Q     Is his reputation good or bad?

A     It's not good.

Q     Would you say it's bad?

A     I'd say it's pretty bad, yes, extremely bad.

Q     Extremely bad   The -- and would that be an extremely bad reputation for telling the truth?

A     Yes.

Q     Do you believe that that's the reputation that Mr. Gross holds in the community?

A     Yes.

Q     Who do you -- do you know some specific people that hold that reputation of Mr. Gross?

A     Yes.

Q     Who are they,  some of them?  Just list some.

A     My attorney, both of my attorneys, John Sloan, Jim Moore, Roxann Taylor, who I saw in the hallway walking out of here.  She's the first one that told me to watch out for him.

Q    All right.  I -- Mr. Simmons, I appreciate you coming.

MR. SHAW:  I pass the witness.  Counsel may ask you some questions.

**CROSS-EXAMINATION**

BY MR. ALDOUS:

Q    Mr. Simmons, my name is Steven Aldous.  You and I have never met before; is that right?

A    Correct.

Q    You understand that I represent the Grosses in this matter?

A    Yes, sir.

Q    I don't want to argue with you about whether or not you're right or wrong, but would you agree with me at least that your experience in the legal system with Mr. Gross has effected the way you see Mr. Gross?

A    Absolutely.

Q    Would you agree with me that you have no knowledge of the dispute that's ongoing between VSDH and the Grosses related to 2004 White Wing Cove?

A    I have no knowledge.

MR. ALDOUS:  Pass the witness.

**REDIRECT EXAMINATION**

BY MR. SHAW:

Q    You do have -- know the reputation of

Mr. Gross, though?

A     Yes.

Q     Do you know the facts of this case?

A     I don't know the facts of this case.

MR. SHAW:  All right.  Pass the witness.

Your Honor, we offer -- we offer that testimony.

THE COURT:  Court's ruling remains the same.

MR. SHAW:  Scott, I certainly appreciate you coming.

All right, Your Honor.  We have a second witness ready, Hap Stern, the lawyer.  He's here in the hall.

THE COURT:  For the same purposes?

MR. SHAW:  No, no.

THE COURT:  So you're ready to bring in the jury?

MR. SHAW:  That's the only one for that. Yeah.

THE COURT:  Okay.  All rise. You may bring in the jury.

MR. CHAIKEN:  Your Honor, could I have two minutes to confer with Mr. Shaw?

THE COURT:  You may.

MR. CHAIKEN: We might move this along faster if we have this conversation.

(Jury enters the courtroom)

THE COURT: I'm sorry. Ladies and gentlemen of the jury, go back in the jury room please.

(Jury exits the courtroom)

(Brief recess taken)

THE COURT: All rise. You may bring in the jury.

(Jury enters the courtroom)

THE COURT: You may be seated.

You may call your next witness.

MR. CHAIKEN: Your Honor, defense calls Van Shaw.

THE COURT: Raise your right hand, please.

(Witness sworn)

THE COURT: You may be seated.

You may proceed.

MR. CHAIKEN: Thank you, Judge. And I will sit down. I promise.

**EVAN LANE SHAW,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. CHAIKEN:

Q   Good afternoon, Mr. Shaw.

A     Good afternoon.

Q     State your full name for the record.

A     Evan Lane Shaw.

Q     You've heard testimony and you have yourself acknowledged that you are one of the limited partners of VSDH Vaquero Limited Partnership, right?

A     That is correct.

Q     Tell the jury a little bit about yourself, your background, and your education, and what you've been doing for the past 35 years.

A     I was born in Dallas Baylor.  I graduated from W.T. White High School in Dallas in 1974.  Like Mr. Hickok, I went to Texas Tech and stayed six months, and then I transferred to the University of Texas at Austin.  I graduated in 1978 with an accounting degree. I went directly to law school at SMU.  I graduated from that school with a law degree in 1981.

Along the way, I -- at Texas, I was an accounting major.  I was going to be a tax lawyer, was my plan.  And I obtained my Certified Public Accountant designation while I was in law school.  So my plan was to have my designation, get out, and be a tax lawyer.  I did that for a year.  I went to Chicago with U.S. Steel, and I was a tax lawyer in Chicago for that company.

That wasn't really a good fit for me and

found out a little too late tax law probably wasn't where I was going to be interested. And so I came back to Dallas in 1982 and been here ever since. I worked for a friend of mine's dad who was a lawyer until 1990. From 1990 forward, I had my own firm. I've got two lawyers that work for me, Collen Meyer, a 30-year-old fellow. He's been with me about four years. And I've got Janet Randle. Janet's probably 62 --

THE COURT: She would not appreciate that, Mr. Shaw.

MR. SHAW: She would not. And she doesn't look it, though.

A But she's been with me about eight years and we do a lot of civil trial litigation. I'm married. Got married in 1988 and 27 years ago. I have two children, 25 and 20 -- just turned 25 and 23, two boys, the same age as Mr. Hickok's. And so they're out of the house now, and so it's just my bride and I and my work.

Q Mr. Shaw, can I call you Van? Is that okay?

A Why not.

Q It's hard for me to call you Mr. Shaw. Van, you have already spoken at length in this case sitting over here, and one of the things that you testified to -- not testified, but you mentioned in a question was that back in the September of 2009 timeframe, you had

the money, if it was needed, to put up to buy the property that we're talking about back from the Grosses, and -- you know, if there was an obligation to perform the buyback. Do you recall that testimony?

A I do.

Q Now, is there any secret that you've been a successful attorney and real estate investor?

A I don't know about any secret about it. I certainly don't blab anything about it, but I've done well.

Q And I'm not asking you to brag about it, but, I mean, you've been involved in a lot of transactions over the years, right?

A Certainly.

Q And a lot of legal cases, right?

A A lot.

Q You have a law license, right?

A I do.

Q Law license is in good standing, always has been?

A Yes, sir.

Q Okay. And explain to the ladies and gentlemen of the jury what one of the major requirements of holding a law license is in terms of dealing with other people. Do you have to be truthful?

MR. ALDOUS: Your Honor, let me object to this line of testimony. First of all, this witness has not been listed as any kind of expert witness, and it's improper bolstering to use the code of ethics as a witness.

THE COURT: Sustained.

Q    (By Mr. Chaiken) Mr. Shaw, there's been some testimony in this case that after Ken and Betsy Gross exercised the buyback option in the contract we've been talking about here for several days that you were communicating with them on behalf of VSDH. Do you recall that testimony?

A    Certainly.

Q    And you were present this morning, were you not, when Mrs. Gross testified that -- that you had made some comments about the solvency of VSDH in June of 2009 that she believes implied that VSDH would not perform the buyback obligation. Did you hear that testimony?

A    I did.

Q    Okay. So what I'd like you to do is I'd like you to explain to the jury when you were communicating -- first of all, when you were communicating with Mrs. Gross and Mr. Gross back in the June of '09 timeframe, this is before the buyback date but after the notice that they wanted you to buy -- or VSDH to buy it

back, why were you talking to the Grosses at all?

A     Well, the Grosses inquired and I didn't have any reason not to talk to them.

Q     Under the contract -- and you reviewed the contract, right?

A     I did in -- right at the end of April or 1st of May 2009.  I had not seen it for several years.

Q     And when you got the contract, did you determine whether or not there was any obligation in it for VSDH -- or any language in it that called for VSDH to tell the Grosses one way or the other whether it would perform the buyback obligation?

MR. ALDOUS:  Objection, Your Honor.  That's calling for expert testimony concerning the contents of the contract from a witness who's not been designated as an expert.

THE COURT:  Sustained.  Just remember, no speak objections, Mr. Aldous.

MR. ALDOUS:  Sorry, Your Honor.

THE COURT:  I have admonished Mr. Chaiken.  It's only fair that I should admonish you as well.

MR. ALDOUS:  Thank you, Your Honor.  I apologize for my passion.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  I'm just waiting to see if

he'll apologize for the bad joke.

THE COURT: You may proceed.

Q (By Mr. Chaiken) Now during the June of '09 timeframe, were you and Mr. and Mrs. Gross talking about options that might be available in response to their anxiousness, if you will, to find out what was going to happen with this buyback?

A We discussed some.

Q And why did you comment to Mr. and Mrs. Gross in the June of '09 timeframe that VSDH was -- was not solvent at that time?

A Well, VSDH had until September 1 to close. I was concerned whether VSDH was going to financially have the money to close if it wanted to close. So I didn't want to surprise the Grosses at the end if VSDH wanted to close and did not have the money. So I wanted to make sure that they knew, you know, where we were on that.

Q Now, the Grosses have indicated that you indicated to them that VSDH was going to go bankrupt. Did you ever tell them it was going to go bankrupt?

A Never did.

Q And when you were describing the concept of insolvency -- let me rephrase. You were in the courtroom when Doug Hickok was on the stand and Doug was

174

asked in June of '09 was -- was VSDH insolvent. You remember that testimony?

A    I do.

Q    Okay.  And his answer to the question was, "It absolutely wasn't insolvent."  Recall that testimony?

A    Certainly.

Q    So when you were reporting to the Grosses that in June of '09 VSDH was not solvent, what did you mean by that?  What were you -- what were you communicating to them?

A    I'm a CPA.  I know what solvency means.  I don't -- Mr. Hickok's a smart guy, but I don't know if he knows the definition of solvency, at least the same definition that I know.  But solvency to me means that you don't have the cash readily available to meet your obligation.  That's all it means.  It means you don't have the cash readily available.  It doesn't mean anything other than that.

Q    Now, were you -- were you at some point during the June, July, or August timeframe, end of September timeframe, were you developing any concerns about whether there was a legal fight on the horizon with the Grosses?

A    I saw the Grosses hire attorneys and engage in activities.  I knew that was certainly a problem.

Q    And were you concerned about it?

A    Well, I mean, I'm a lawyer so I don't know -- when you say, "concerned," I don't know what you mean exactly by that.  You know, I certainly didn't want one if I -- you know, that's -- I wasn't looking forward to it.  But I didn't think from a liability or damage standpoint --

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Chaiken)  When I was asking about whether you were concerned about it, I mean, were you concerned that the conversations were developing increasing intention and that it sounded like, you know, hey, the Grosses are talking about litigation, not whether it was liability or anything, but was there litigation.  You know, here comes litigation.  If you don't do what we want, here's litigation.  Did you have that concern?

A    I did.

Q    Okay.  And is it fair to say that hairs on your back of your neck started to rise with respect to that?

A    Well, I don't know exactly what you mean by that.  I mean, did I -- did I get the idea there was -- the Grosses were lawyered up and litigation was coming? Yeah, I got that idea.

Q    All right.  Now I want to show you an exhibit that has been discussed and that has been previously marked as Gross Exhibit 83.  And I'm going to start -- because it's an email chain, I'm going to start backwards and then move to the front page, okay?

A    That's all right.

MR. ALDOUS:  Could I get an exhibit number?

MR. CHAIKEN:  Yes, 83.

THE COURT:  I'm sorry?

MR. CHAIKEN:  Eight, three

THE COURT:  83 Gross or 83 VSDH?

MR. CHAIKEN:  It's Gross.

Q    (By Mr. Chaiken)  And, see here, you've got this May 14th, 2009 email from Betsy Gross to you talking about it's been a while since she bumped into you walking up the street in Cabo.  Were you on a yacht in Cabo?

A    I don't really like the water.  I've never owned a yacht, never been on one but once.  So, no.

Q    And then Mrs. Gross says we went to Jamaica this year for spring break.  Instead, it talks about how Doug had directed her to you to discuss the next steps with the house in Vaquero and it talks about how they had notified Doug of the desire to exercise the buyback

clause. And Mrs. Gross says, "However, we would really like to chat with you regarding various options, which could be mutually beneficial. Is there any chance you'll be out in this area sometime soon so we could discuss? If not, can you provide some options for getting on the phone ASAP?"

And you responded, "Good to hear from you. Hope all is well. I am planning to review the documentation and am glad to talk. I want to let you know that the entity that sold the home is not financially solvent, so that will no doubt impact where this goes. Please call me when you can." Did I read that right?

A    You did.

Q    Is that your email?

A    What's the date of my email, please? What's the top of that?

Q    Your email is May 17 -- excuse me. I'm sorry. I should have pulled that down when I was reading from it. May 17th of 2009.

A    Okay.

Q    Okay? Now, when you were communicating to Mrs. Gross --

A    May I make one comment?

Q    I'm sorry?

A    This is in all caps.  I'm not yelling.  I just see better in all caps.

Q    I see.  Okay.  Thank you.

MR. ALDOUS:  I'm sorry, Your Honor.  I didn't hear him.  Could you speak up?

MR. CHAIKEN:  You want to hear in all caps?

MR. ALDOUS:  I apologize.

Q    (By Mr. Chaiken)  And so when you told Mrs. Gross that the entity's financial solvency will no doubt have impact where this goes, were you referring to the discussion of the options that she wanted to chat with you about?

A    I was.

Q    Okay.  And Mrs. Gross responded to you shortly thereafter with an email dated May 18th, 2009.  And she talked about you coming out to see the changes to the house.  And then she talked about a couple of options.  You see the options that are there?  One of which is, "We can follow the existing terms and consummate the buyback in September."  And then she says, "However, we are very interested in one of several alternatives."  And then the first one is, "Execute an early buyback with a discount off the buyback price for said early termination"  You see that?

A    I do.

Q    And then it says something about a rental agreement or an outright purchase by the Grosses of the property at a discounted price. And then it talks about a combination of one of the above or a purchase of another lot. Did I read that right? Did I read that correctly?

A    Are you under C?

Q    Right here.

A    You said right here.

Q    I'm just saying --

A    I'm looking on my screen. Maybe it shows -- I'm looking at my screen. Is that where you are?

Q    Did I just properly characterize what Mrs. Gross was doing was she was offering settlement options?

A    There were several options there.

Q    Okay. And when you fast forward it to the August of 2009 timeframe, you were told that the Grosses might sell the property to somebody else, right?

A    There's an email, I believe, that says that.

Q    And what did you understand that the consequences might be under the contract if the Grosses -- at the time if the Grosses entered into a contract with somebody else and sold the property to somebody

else before the buyback date?

A    Well, I didn't see that email for a day or two. So when you say, "at the time," what -- what are you saying?

Q    What I'm saying is that in August of 2009 when -- when the Grosses were giving notice that they were going to sell the property to somebody else and that they had a buyer in mind, did you understand what the contract said if they sold the property to somebody else?

A    Yeah.

Q    And did you have an understanding as to what would happen to the buyback option if that happened?

A    Yes.

Q    Okay.  What was your understanding based upon your review of the contract?

MR. ALDOUS:  Objection, Your Honor.  That calls for expert testimony regarding the effectiveness of the contract.

THE COURT:  Sustained.  Rephrase it.

Q    (By Mr. Chaiken)  I'm going to show you the buyback option.  And this is from Gross Exhibit 3.  And is this the provision that you reviewed with regard to what might happen under the contract to the buyback option if the Grosses entered into a contract to sell

the property to somebody else? Can you see that?

A   Is this Gross 3?

Q   Yes. It's the contract, Gross 3.

A   It's easier -- I can't see it that well. Let me go get my glasses. Okay. Yes, sir. I see it.

Q   Okay. And in reviewing the contract at the time and this provision at the time, what did you understand the contract said would happen? If the Grosses, as the buyers, entered into a contract to sell the property, what would happen to the buyback option?

A   Well, I didn't look at it in August of 2009.

Q   Okay.

A   But I had looked at it in May of 2009.

Q   Forgive me. Okay. With that qualification, what did you come to understand would happen if they entered into a contract with somebody else?

A   Well, I knew that the -- that the document said, "should buyer enter into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to the buyer." That was in a letter from the Grosses as well.

Q   All right. Now, I want to show you -- and this document is already in evidence. But forgive me because I don't recall what number it is. But somebody will be able to tell me here in a moment.

MR. ALDOUS: Well, Your Honor, I object.

MR. CHAIKEN: Okay.

MR. ALDOUS: You can't do that. I'm sorry.

MR. CHAIKEN: Fair enough. I want to make a record of what it is, but --

Q    (By Mr. Chaiken) Do you recall seeing an email that's been put up and is in evidence where the Grosses were asking you if they could go ahead and sell the property to somebody else but reserve the buyback option?

A    Yes. I think that may be the same one I just referred to that referred to that language.

Q    Okay. And what would have been problematic about agreeing to let them sell the property while reserving the buyback option?

A    Well, if the property was sold, then there would be no possibility of performance.

Q    And if they entered into a contract with somebody else under the language of Addendum A that you just referred to, by doing so, they would invalidate the buyback option, right?

A    Yes, sir.

Q    So, in essence, they were asking you for -- were they asking you kind of for their cake and eat it

too to let us sell it and we can come back to you?

MR. ALDOUS:  Objection to the sidebar.

THE COURT:  Sustained.

MR. ALDOUS:  Thank you.

MR. CHAIKEN:  I'll move along.

Q   (By Mr. Chaiken)  Now I want to go back to Exhibit 83, Van.

A   Okay.

Q   Okay.  And in response to --I found the exhibit.  This is Exhibit Gross 38.

A   Okay.

Q   So this email says -- it was written to you by Mr. Gross.  And it says, "Per your offer yesterday to allow us to enter into an agreement with a prospective buyer, can you give us that agreement?  Recall that our contract says that after May 1st, 2009, if we enter into a contract to sell the home, the buyback option goes away."  Did I read that right?

A   Yes, sir.

Q   Okay.  So if I read this correctly, was this telling -- was this confirming that you had previously told them the day before that they could go ahead and enter into an agreement with a prospective buyer, but that you wouldn't waive the -- the going away with the buyback option if they did?

MR. ALDOUS: Objection, Your Honor, leading.

THE COURT: Sustained.

Q   (By Mr. Chaiken) Well, what did you tell them the day before about entering into an agreement with the prospective buyer?

A   I didn't tell them they could enter into an agreement with a prospective buyer.

Q   Well, did you ever tell them that they could enter into a prospective buy --agreement with the buyer and not have the buyback option go away? Was there any time that you told them that?

A   I want to make sure I'm clear what you're asking me. Did I ever tell them they could enter into a contract and the buyback option would still exist?

Q   Yes. Did you ever tell them that?

A   I never did. No.

Q   And did you understand that's what they were asking of you in the second paragraph of Exhibit 38 where they asked you, "Can we enter into a contract and a sale while not altering the buyback language responsibilityas it existed in our contract?"

A   I think generally that's right.

Q   All right. Now, back to Exhibit Number 83, after Mrs. Gross sent you her email talking about

several options and next steps, you wrote her back and you restated that the entity was not financially solvent, so that will no doubt have a huge impact on our discussion. And then it said not sure when I will be out that way, but maybe we can meet somewhere else. I'm not sure where your office is, but that may be a possibility. Please let me know when and where you suggest. Did I read that right?

A    Well, I misspelled, "please." I want to apologize for that; but, otherwise, you did.

Q    And so you were telling the Grosses, you know, notwithstanding the financial position of -- what were you telling them about the plans of VSDH notwithstanding its financial condition with regard to not really having cash at that time  Were you telling them -- continue talking to them?

A    Yeah.

Q    Were you willing to talk to them?

A    Certainly.

Q    Okay. And did you ever send anything in writing to the Grosses that you know of that said VSDH is not going to perform the buyback obligation?

A    Did not.

Q    Now, $64,000 question, everybody wants to hear what Van Shaw has to say about it. The Grosses say that

you talked to them on the telephone and you told them VSDH will not perform under the buyback option. Did you ever tell them that, Mr. Shaw?

A   Never, ever.

Q   Is there any doubt in your mind about that, Van?

A   I know I never told them that.

Q   How do you know?

A   Because VSDH was considering what to do.

Q   And when did VSDH believe that it had the ability to continue considering that until -- what time?

A   It knew what it had. It had until September 1.

Q   Now during the conversations that you had with the Grosses, you told them there was no personal guarantee by you or Doug Hickok in the transaction. Do you recall seeing -- hearing discussion about that and seeing emails that you wrote to that effect?

A   Yes, sir.

Q   Okay. Why did you tell the Grosses there was no personal guarantee in the transaction?

A   Because when I looked at the document in May of 2009, there was no personal guarantee.

Q   And what caused you to conclude there was no personal guarantee?

MR. ALDOUS: That's objectionable. That

calls for legal conclusion.

THE COURT: Sustained.

MR. CHAIKEN: Van, thanks.

I pass the witness.

MR. ALDOUS: Sir, are you --

I'm sorry, Your Honor.

THE COURT: Mr. Aldous, you may proceed.

**CROSS-EXAMINATION**

BY MR. ALDOUS:

Q    Are you telling this jury that you were straight up with the Grosses when you just said that you never once told them that VSDH wasn't going to perform?

A    I never told them VSDH was never going to perform.

Q    You see this email right here? I'm having a little trouble with this, Mr. Shaw. It says, June 15, 2009. It's Exhibit 36. It's an email that's directed to both you and to Doug Hickok. Do you see it?

A    I'm going to appreciate it if you'll give me a little courtesy when you talk to me.

THE COURT: Mr. Shaw, it's not so nice on the witness stand.

MR. SHAW: It is not. I take that back. Okay. I've got it in front of me.

Q    (By Mr. Aldous) Do you see on here that it's

directed to both you and to Mr. Hickok?

A    I do.

Q    Do you see in here where it says, "Doug, I called and left a message on your voicemail regarding our contract with 2004 White Wing Cove. I spoke to Van and he said that VSDH does not have enough money to honor our contract and buy back the house.  Thus, VSDH does not intend to perform our contract.  Do you see that?

A    I read that.

Q    Did you ever once respond by email or otherwise and say, "You know what?  That's not accurate"?

A    I don't know if I responded.

Q    Until you got up on that witness stand?

A    Certainly I've said that before.

Q    Where is it?

A    Thus VSDH does not intend to perform is nothing I ever said, never, ever.

Q    I'm saying, why didn't you just extend the courtesy and say, "You know what?  You guys got it wrong.  Mr. and Mrs. Gross, that is not what I said." You didn't ever do that, did you, sir?

A    This wasn't written to me, counsel.

Q    Do you see your name attached to it up there?

A    I see where I was copied.  Whether I read it,

got it, reviewed it, I don't know. It's directed to Doug.

Q   Doug, your partner in VSDH?

A   Doug was my partner in VSDH.

Q   Now when you got this statement, did Mr. -- did Mr. Hickok call you up and say, "Van Shaw, did you tell them that VSDH wasn't going to perform? "

A   You know, this was in 2009, six years ago. I'm not going to be able to tell you if he called me up and what he said. But I can tell you I never told them that.

Q   Well, here's my question: Although you're now telling the jury that you don't recall ever saying that to them, I'm saying where is your response to this particular email to say, "You know what, folks? You just have it wrong"?

A   There was no -- I don't recall not sending it to them because I never said it to them.

Q   Okay. Well, this is in June -- I'm sorry, June 15 of 2009; is that right?

A   Yes, sir.

Q   Now if you will, go to Exhibit 38. Do you see that this is an email? Also, this one's directed to you. It's dated June 28, 2009.

A   I do.

Q    And do you see that it says, "Per your offer yesterday to allow us to enter into an agreement with a prospective buyer, can you give us that agreement? Recall that our contract says that after May 1st, 2009, if we enter into a contract to sell the home, the buyback option goes away."  Now my question to you, sir, is:  Did you ever respond to this email in writing?

A    They had a lawyer.  I don't know if I responded to this in writing.  But when they get lawyered up, that changes things.

Q    Is that every man for himself?

A    That was not every man for himself. But it certainly changes things when they have a lawyer representing them.  And, here, they're trying not to let me know they've got a lawyer representing them, but I knew it.

Q    Was that the way, because it was a bcc on there?

A    That's right.

Q    So you knew that they were lawyered up.  So that prevented you from responding to the email and saying "Hey, I didn't tell you that.  I want to make sure you understand?"

A    Here's what I'm thinking.  I'm thinking they're writing things because they're looking down the road and

they've got a lawyer that says, "Write them this. Write them that. Write them this. Let's set up Shaw for this, this, and this. Let's do that. Let's set him up and then let me, as the lawyer, hide behind the scene and then orchestrate stuff so it looks like it's just Shaw and the Grosses when it's not."

I'm not going to play that game. I'm not going to let them get me into that game, sir. That's not proper. It's not fair. If the lawyer wants to come out front, let's talk. But I'm not going to do that.

Q  Well, VSDH had a lawyer all along. That was you, right?

A  My lawyer was disclosed. I'm there in the wide open. I'm not having Mr. Hickok write letters and bcc me, "Doug, write this. Write that. Do this." I'm not doing that.

Q  You would like it if you were the only lawyer in the deal and it upset you that the Grosses hired a lawyer?

A  It didn't upset me at all, counsel.

Q  Well, tell us if you would --

(Talking at the same time)

THE COURT: Wait a minute, gentlemen. You can't talk over one another.

A  What upset me is that they're trying to set me

up with the lawyer hiding in the bushes. I never hid in the bushes, never, ever. That's not my style.

Q (By Mr. Aldous) Right. And so your response to this email -- since you're not hiding in the bushes, your response to this email that says, "You know what? I never told you that I would let you sell this house."

A Counsel, this is written for a setup for this day. That's what this is written for. Get the lawyer. Get him out front and let's talk. But to do this -- I never said that. And let me ask you this. If I said it, why does it say, "Per your offer yesterday to allow us, can you" --

THE COURT: Mr. Shaw?

MR. SHAW: I'm sorry, Your Honor.

Q (By Mr. Aldous) Mr. Shaw, is there any reason that you would not respond to this, other than the fact that you believe that it was a lawyer and it was a setup for you?

A I knew it was a setup, Counsel. And that's why I didn't respond.

Q Is there any reason why you didn't just respond to say, "You can sell the home, but the contract is what the contract says, and we're going to rely on it"?

A Counsel, it was a setup. That's why I didn't respond.

Q    Let me ask you this.  So on Exhibit 59, when you got the email from -- on August 18, 2009 that asked you about selling the home, you didn't respond to that either?

A    Sir, this is a setup.  All of this communication, the Grosses were fully represented

MR. ALDOUS:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Aldous) Let's talk about setups.

THE COURT:  Wait a second.  What is the document?  You have to provide a copy.

MR. ALDOUS:  Can I just see if it's in the notebook real quick?

THE COURT:  Yes.  You may approach.

MR. ALDOUS:  Thank you, Your Honor.

Q    (By Mr. Aldous) Mr. Shaw, let me hand you, just for refreshing your memory, exhibit -- that's been marked Gross Exhibit 64.  Is that the original petition that you filed in this court against the Grosses?

A    It is.

Q    And you signed this as the lawyer on behalf of VSDH.  That's Vaquero Venture, Ltd., right?

A    I did.

Q    And it's dated July 5th, 2009, correct, on the file stamp?

A    I think that's two, but I'm not sure

Q    My bad.  July 2nd, 2009, correct?

A    Yes, sir.

Q    And then you also at the same time filed -- or shortly thereafter filed petitions in intervention on behalf of yourself; is that correct?

A    I did.

Q    And on behalf of Mr. Hickok; is that correct?

A    I did.

Q    And one of the things that you do after you file a lawsuit is you serve the opposing party; isn't that right?

A    That's the process.  I don't personally do that.

Q    Right.  You hire somebody, typically a process server, and do that?

A    Or the sheriff.

Q    And sometimes if you know that they're represented -- the other side is represented by a lawyer, sometimes you can just call the lawyer and say, "Will you accept service?"

A    That's right.

Q    Now, did you ever before August 18th, 2009, have a process server serve the Grosses with this lawsuit?

A    I issued service.

Q    I'm sorry.  Maybe I -- let me rephrase it.  Did you hire a process server to serve the Grosses prior to August 18th of 2009?

A    I'm sure we did.  I don't handle that part of it at my office.

Q    Are you aware that the Grosses had no idea that they had been sued as of August 18, 2009?

A    I heard Mr. Gross testify to that two days ago.

Q    Do you understand that maybe they wouldn't be sending you an email on August 18th, 2009, asking you to agree to this if they'd known they'd been sued?

A    I don't believe-- I believe they knew they'd been sued because when you get -- file suit, it shows up on a record.  And their lawyers were in Dallas.  And they get a record of what suit's filed, who the plaintiff is, who the defendant is, and what court it's in.  They get that the next day.

Q    You mean if you subscribe --

A    Electronically

Q    -- to the service

A    That's right

Q    And if you subscribe --

A    They were at Cooper & Scully.

THE COURT:  You can't talk at the same

time, gentlemen.

A   They have that service.

Q   (By Mr. Aldous) Now are you testifying as a matter of fact here today, Mr. Shaw, that you know that they had that service?

A   They --

Q   I'm talking about their lawyers.  You know their lawyers were subscribed to that service?

A   In the past, I have known that their lawyers were subscribed to that service because I'll be called after I file a lawsuit.  And they'll call me and say, "Hey, I saw you did this."  It's a big firm.  Somebody will call me on it.

Q   Did you do anything to serve the lawyers with that lawsuit?  In other words, you already know -- you say it's a setup.  Did you send any of the petitions over to the lawyers and say, "You know what?  I sued y'all.  I know y'all are out there.  Come on out"?

A   Well, I already knew it.  I didn't have to send them anything.

Q   Let me just see if I can get to the end of this.  Would you agree with me that you never sent an email to the Grosses, whether they'd lawyered up or not, retracting your statement that VSDH was insolvent?

A   I never sent an email and said it was solvent,

if that's what you're saying.

Q    Or saying that my previous email saying it was insolvent is not accurate?

A    I never sent an email saying if it's insolvent, it's inaccurate.

Q    And isn't it true, sir, that ever since the beginning of this time, every email that you said -- you've said that no personal guarantee existed in this contract?

A    I don't know about every email I ever sent. But certainly my opinion was there was no personal guarantee.

Q    And in terms of your representations to the Grosses, you've always maintained that there was no personal guarantee by you or Mr. Hickok in this case?

A    When you say, "always maintained," I don't know how many times. We talked about that at least once. And I told them I looked at the document and there was no personal guarantee.

Q    All right.

A    I don't -- I don't know. I certainly never said that every time we talked to them or anything like that.

Q    Well, let me flip it over. Let me flip it over. You never sent them an email saying that my

previous statement that there was no personal guarantee is not right?

A My personal -- my previous statement was right. There is no personal guarantee.

Q I'm sure that my tricky lawyer question is probably a little bit hard to understand, but let me ask it again. You never sent an email to the Grosses saying, "My previous statement that there is no personal guarantee in this contract is hereby withdrawn or changed or different"?

A I never changed my mind, so I'm not going to write the Grosses and say I changed my mind when I hadn't changed my mind.

MR. ALDOUS: I'll pass the witness, Your Honor.

THE COURT: Mr. Chaiken?

**REDIRECT EXAMINATION**

BY MR. CHAIKEN:

Q All right. Van, just a couple more questions here.

A What exhibit is that, please?

Q Actually, let's do it this way. This is Number 59, okay? On August the 18th, Mr. and Mrs. Gross are telling you that they have a contract to sell the property or somebody had offered $2,415,000 in cash with

a short closing. You see that?

A    I do.

Q    So they're telling you somebody else did so. And what time did Mr. Kenny G -- I'm sorry -- Kenny G, 3558, Mr. Gross, what time did -- does it look like he sent that email to you on August the 18th?

A    The email reflects 7:24 p.m.

Q    Okay. And then it says, "Unless we hear otherwise by noon tomorrow from either or both of you, we will be moving forward with this deal. Recognize that there are still many issues that may stop the transaction," you know, so on and so forth.

And then it said, "If you would like to discuss any of these issues, please call me at this number. Otherwise, we will assume you approve of this sale." You see that?

A    I'm looking for the "otherwise."

Q    Right over here. Right there, see, "otherwise."

A    Okay. I'm with you.

Q    "We will assume you approve of this sale."

A    Yes, sir.

Q    So at 7:24 in the evening on August 18th, which is after business hours, and you don't know where you were that day and whether you were even reading emails,

right?

A     Kind of.

Q     Okay.  What's, "kind of"?

A     Well, I think I was enrolling my oldest one in college at that time out of town.

Q     All right.  And --

MR. ALDOUS:  I'm sorry.  I didn't --

THE WITNESS:  Out of town, enrolling my oldest one in college.

MR. ALDOUS:  Oh, you said enrolling my oldest one in college.  Okay.  I'm sorry.  I just didn't hear.

Q     (By Mr. Chaiken)  And the Grosses are stating to you, "Unless we hear otherwise by noon tomorrow from either or both of you, we're going to go forward with the deal," right?  That's what it says.

A     It says, "Otherwise, we will assume you approve of this sale."

Q     They didn't give you much time to approve or disapprove, did they?

MR. ALDOUS:  Objection, leading.

THE COURT:  Sustained.

Q     (By Mr. Chaiken)  Did they give you a reasonable amount of time to respond to that if they really expected a response from you?

A    No.

Q    And -- and they told you, if we don't hear from you -- we don't know if we will -- we're just going to assume that it's okay, that you approve it, right?

A    That's what it says.

Q    Now here's the question. Did you ever approve the sale?

A    No, I never approved the sale.

Q    And did they ever offer you the opportunity, prior to the buyback date, to buy the property for $2,415,000 in cash?

A    They did not.

Q    Would you have considered such an offer if they had made it to you?

A    I would have.

Q    Is it something you might have considered doing?

A    I don't know at this stage, you know, six years ago. I was certainly -- I'm open to looking at it, certainly. And I was investigating along -- you know, some of what was going on. So I don't know

Q    And they went ahead and they did it, right? They entered into a --

A    I've learned that now

Q    -- contract with that buyer, right?

A   I learned that now.

Q   Okay.  And you had never told them they could do so and keep the buyback option in force and effect, right?

A   I never agreed that they could enter into a contract and maintain the buyback option.

Q   And they asked you that, right, if you would?

A   If this is what we talked about earlier, I'm not changing my testimony.

Q   All right.  Now, I want to ask you a real quick question here, which is:  When you filed a lawsuit against the Grosses on behalf of VSDH, what was the lawsuit complaining about?

MR. ALDOUS:  Objection, Your Honor, relevance.

THE COURT:  What's the relevance, Mr. Chaiken?

MR. CHAIKEN:  He opened the door to the filing of lawsuit.

THE COURT:  What's the relevance?

MR. CHAIKEN:  The relevance is that he filed the lawsuit for a reason, not -- not as a posturing maneuver. And I'd like him to explain what the reason he filed the lawsuit was to the jury.

THE COURT:  I'll allow it.  I will also

point out to you that it is 5:23 p.m.

MR. CHAIKEN: Just about there.

A    The reason was the failure of the Grosses to obtain approval for the construction

Q    (By Mr. Chaiken) And when you filed that lawsuit, Mr. Aldous asked you, well, why didn't you -- why didn't you send a copy over to the lawyers, the Grosses' lawyers? At that point in time, did you even know who the lawyers were?

A    I think I did.

Q    Okay. And how did you come to know?

A    I had met with the Grosses prior to that, and I think I had learned it then.

Q    Okay. And I last want to talk to you about Exhibit 36. It says -- Mr. Aldous talked to you about it. It says, "Mr. Gross wrote Mr. Hickok and told him that he had spoken to you and you said that VSDH does not have enough money to honor our contract and buy back the house; thus, VSDH does not intend to perform per our contract."

Now, is there any doubt in your mind about whether you told Mr. Gross what is written there?

A    Well, I certainly told the Grosses that the company had solvency issues. I never ever said it wasn't going to buy back the property.

Q    And did you ever tell the Grosses that VSDH does not intend to perform per our contract?

A    I never said that.

MR. CHAIKEN:  I will pass the witness

THE COURT:  Mr. Aldous?

MR. ALDOUS:  I have nothing further, Your Honor.

THE COURT:  The witness is excused. You may step down unless you wish to question yourself.

MR. SHAW:  No.

THE COURT:  All right.  It's now 5:25 p.m. We will recess for the day.

During this overnight recess, the jury is under the same instructions that you've been previously given.  You're not to discuss this case among yourselves or with anyone else until such time as the case has been either submitted to you for your deliberations or you have been discharged as jurors.

All rise.  The jury is excused for the evening.  You'll return tomorrow morning at 10:00 a.m.

(Jury exits the courtroom)

THE COURT:  All right.  We stand in recess for the day.

(Proceedings concluded for the day)

STATE OF TEXAS            )

COUNTY OF DALLAS         )

          I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

          I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

          WITNESS MY OFFICIAL HAND this the 16th day of October, 2015.

                    /s/ Cathye G. Moreno

                    Cathye G. Moreno, Texas CSR #6076
                    Expiration Date:  12/31/16
                    Official Court Reporter
                    County Court at Law No. 1
                    600 Commerce Street, Suite 550
                    Dallas, Texas 75202
                      cathyemoreno@sbcglobal.net
                    (214)653-7496

# TAB 28

REPORTER'S RECORD
VOLUME 6 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD.          )IN THE COUNTY COURT
                                    )
    Plaintiff/Counter-Defendant,    )
                                    )
V.                                  )
                                    )
KEN GROSS and BETSY GROSS           )AT LAW NO. 1
                                    )
    Defendants/Counter-Plaintiffs,  )
                                    )
V.                                  )
                                    )
EVAN L. SHAW and DOUGLAS M.         )
HICKOK                              )
                                    )
    Intervenors/Counter-Defendants,)DALLAS COUNTY, TEXAS

-----------------------------------------------------------

**TRIAL ON THE MERITS**

-----------------------------------------------------------

        On the 18th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

        Proceedings reported by computerized stenotype machine.  Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

- AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

- AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.

**INDEX**

| **JUNE 18, 2015** | | | **PAGE** | **VOL.** |
|---|---|---|---|---|
| PROCEEDINGS............................ | | | 4 | 6 |

| VSDH'S WITNESSES | <u>Direct</u> | <u>Cross</u> | <u>Voir Dire</u> | <u>Vol.</u> |
|---|---|---|---|---|
| Paul Kramer | 11 | 36 | 25 | 6 |

| | PAGE | VOL. |
|---|---|---|
| ALL PARTIES REST AND CLOSE.............. | 39 | 6 |
| GROSSES' MOTION FOR DIRECTED VERDICT..... | 41 | 6 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 54 | 6 |
| COURT'S RULING ONDIRECTED VERDICT MOTION | 61 | 6 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 76 | 6 |
| HICKOK'S MOTION FOR DIRECTED VERDICT..... | 79 | 6 |
| GROSSES' MOTION FOR A TRIAL AMENDMENT.... | 84 | 6 |
| COURT'S RULING ON THE TRIAL AMENDMENT.... | 88 | 6 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 91 | 6 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 96 | 6 |
| COURT'S RULING ON DIRECTED VERDICT MOTION | 99 | 6 |
| FORMAL CHARGE CONFERENCE................. | 106 | 6 |
| COURT'S CHARGE TO THE JURY.............. | 123 | 6 |
| CLOSING ARGUMENT BY MR. ALDOUS.......... | 136 | 6 |
| CLOSING ARGUMENT BY MR. SHAW............. | 149 | 6 |
| CLOSING ARGUMENT BY MR. CHAIKEN......... | 158 | 6 |
| END OF PROCEEDINGS...................... | 177 | 6 |
| REPORTER'S CERTIFICATE.................. | 178 | 6 |

**EXHIBIT INDEX (NONE)**

**PROCEEDINGS**

June 18, 2015

THE COURT: All right. Counsel may approach.

(Jury is not present in the courtroom)

THE COURT: Mr. Chaiken?

MR. CHAIKEN: Can we go on the record?

THE COURT: You're on the record.

MR. CHAIKEN: I didn't see her hands moving.

Judge, yesterday during one of the bench conferences, I heard -- well, maybe I didn't hear. I'm not sure what I heard that requires a little clarification. One issue that concerned me is whether I call any additional witness or not. Mr. Aldous made a statement during one of the bench conferences that the Court has already decided the issue of whether Mr. Hickok is a party to the contract and/or that the Court has decided that he is a guarantor.

I'm not aware of the Court having made that finding on either of those issues. But if the Court has made that finding, then I would like a record of the fact that it happened so it will dictate the course of how we continue our defense.

And, secondly, if the Court has not made

that finding, then I don't -- I have not had a clarity as to whether the Court is of the opinion that those issues are the questions for the Court to decide as opposed to questions to be submitted to the jury. And that also dictates the course of the continuation of our defense. So can I get some guidance on those two points, please, or at least some clarification?

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, it's my understanding that the time for me to make a motion for directed verdict with respect to any of the claims raised by them is after they've rested, which I intend to do. It's my understanding the Court has told us that the real issue for jury determination is whether the underlying contract was breached, but that the law is that the guaranty is clear and unambiguous -- in other words, not a jury issue -- that the signatures of Mr. Hickok in any capacity and the initialing is sufficient as a matter of law to bind him on a guaranty.

So the issue really for the jury to decide is whether or not the underlying agreement was breached; and, therefore, whether or not the guaranty has come into fruition. And I intend to make a motion in that regard.

THE COURT: Okay. Any rulings that would

substantiate that? I know that I denied summary judgment, but I don't know that I made any specific determinations. But it's been a while, so...

MR. ALDOUS: I don't believe that Your Honor has made a ruling in that regard.

MR. CHAIKEN: And I don't believe so either, but the second component of my -- so that takes care of the first of my two concerns because I've now got clarification that that hasn't been decided at this point.

The second concern that I have, though, was what it is that the Court has told us is to be tried to the jury, and -- and, again, I don't -- I don't have the same degree of clarity that Mr. Aldous believes he has with regard to whether, a, the question of whether Mr. Hickok is a party to the contract is an issue to go to the jury or whether the Court believes is a legal question. And when I say, "party," I mean, did he execute the contract; and then, secondly, whether the issue of whether he -- there's a sufficient guaranty to have an enforceable guaranty obligation in the contract.

And so I do know that under the statute of fraud, 2701, the question of whether or not a party who undertook -- did, in fact, undertake in accordance with the requirements of the statute of fraud to answer for a

default for another is a question of law. And so I don't think there's any dispute with regard to the fact that the Court made a decision as to whether or not if Mr. Hickok is a party to the contract. There is -- whether there is or isn't a guaranty, that's an enforceable event. But on the question of whether he is a party by virtue of signature, I don't share Mr. Aldous's clarity.

THE COURT: Are you talking about in his individual capacity?

MR. CHAIKEN: I'm talking about in his individual capacity, is he a party to the contract?

THE COURT: I don't know that that's ever been an issue that's been raised.

MR. ALDOUS: Only with respect to the guaranty. It's whether or not his signature is sufficient to bind him to the guaranty. I don't characterize it the same way he does.

MR. CHAIKEN: Well, that -- the issue --

MR. ALDOUS: I think that's a --

MR. CHAIKEN: Well, the issue is founded upon signature and whether he signed it or not, and I believe that's a fact question. I didn't put it in my proposed charge due to this ambiguity that I left the court with yesterday based on the comments that were

made. But -- but in terms of whether that's an issue the Court believes is a legal question or not, you know, I -- because there is -- there is in the PJC, there is an opportunity in a breach of contract case to submit a question as to whether Party A and Party B entered into an agreement. Okay.

Well, the elements of entering into an agreement are that they sign the agreement, you know, especially if it has to be in writing. And so the question is: Are we submitting that question to the jury, or is it a legal question for the Court to decide?

THE COURT:. I think that's an issue that arises after we get to the charge conference.

MR. SHAW: Okay.

MR. CHAIKEN: Okay.

THE COURT: But as of this point in time, there is no pleading that I'm aware of that says that Mr. Hickok in his personal capacity was a party to the contract, but there is a pleading I'm aware of that says that he, in his personal capacity, is liable as a guarantor.

MR. CHAIKEN: Right. Okay. As long --

THE COURT: That's what's being tried before the Court.

MR. CHAIKEN: Well, but -- and just for

one other point of clarity, okay --

THE COURT: Your three minutes have passed.

MR. CHAIKEN: He has an affirmative defense in the case, okay, denying execution. Okay. And it's a verified defense under Rule 94. And so that issue is in play by virtue of his defense either way. Okay. And so I just -- the reason I'm raising all of this is because I heard Mr. Aldous say yesterday that the Court has already decided that these were legal questions and not jury questions.

I heard him say it again just a moment ago, and I don't believe the Court has decided that one way or the other. And I just want to make sure that I know where we stand on that issue.

THE COURT: The Court stands where the Court just said it stood.

MR. CHAIKEN: Okay. Fair enough.

THE COURT: Is there anything else before we bring in the jury?

MR. ALDOUS: Your, Honor, do you need the flash drive with the charge on it or was my email sufficient?

THE COURT: The email is sufficient.

MR. CHAIKEN: I'm going to -- I'm going to

offer one amendment to what I submitted this morning, but I'll do that afterwards.

THE COURT: Okay. You may bring in the jury.

All rise.

(Jury enters the courtroom)

THE COURT: You may be seated.

MR. CHAIKEN: Your Honor, I apologize in advance. I've got something going on with my throat. And so I do have water, but I keep coughing nevertheless.

THE COURT: All right. Mr. Shaw?

MR. SHAW: Your Honor, we call Paul Kramer.

THE COURT: All right. Is he in the hallway?

MR. SHAW: Yes.

THE COURT: Would you please raise your right hand?

(Witness sworn)

THE COURT: You may be seated.

You may proceed.

MR. SHAW: Thank you.

**PAUL KRAMER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SHAW:

Q    Sir, your full legal name?

A    Paul James Kramer.

Q    How old a man are you?

A    Sixty-three.

Q    What town do you live in?

A    Colleyville.

Q    What is your profession?

A    I'm employed as a builder.

Q    The -- give us a little history on you, please. Where were you raised?

A    California.

Q    And when did you come to Texas on a full-time basis approximately?

A    Late 1980s.

Q    What was the reason?

A    I accepted a position with a plastic manufacturing firm based in Grand Prairie.

Q    And what was your position?

A    My initial position was salesman.

Q    How long did you stay with them?

A    From about 1987 until 2000.

Q    When you left, in what position were you?

A    I was president of the company.

Q     And when you -- since you left, generally tell the jury what you've been doing for employment.

A     Building homes, high-end residential homes.

Q     What part of Texas have you done that in generally?

A     Most of it in northeast Tarrant County, Colleyville, Southlake, Westlake, a few in Dallas.

Q     The jury might not be generally familiar with where Colleyville is. Where is it from here generally?

A     Colleyville's about 20 minutes from here.  It's between Dallas and Fort Worth, southwest of the airport.

Q     Southwest of the airport?

A     Yes.

Q     All right.  And you said you're presently employed by a company?

A     Yes.

Q     What's your position?

A     Manager.

Q     What's the name of the company?

A     Shawco Construction, LLC, d/b/a Paul Kramer Construction

Q     That has kind of a ring to it, Shawco.  What is my relation to that company?

A     You own it.

Q     And how long have I owned the company you work

for?

A    Since late 2012.

Q    The -- tell the jury a little bit.  When did you first meet me approximately?

A    I met you, I believe, in the early or mid-1980s.  You did legal work for the plastic company that I eventually went to work for.

Q    All right.  And did I continue in that legal work all the way through the time you left the company?

A    I believe so.

Q    Okay.  And then after you left the company, you and I developed a friendship while you were there; is that right?

A    That's correct.

Q    And after you left the company, you were building homes for yourself; is that right?

A    I built homes.  I owned a company myself that I built homes and I built spec homes and built homes for clients.

Q    All right.  Approximately how many homes have you built?

A    130.

Q    And, generally, what price range would you say most of those were in?

A    The average is a little bit over

three-and-a-halfmillion. The range is about 800,000 to 9 million. Really, only a couple of them were under a million.

Q    Did you know of or do you know of any builder, certainly in your area, that has the experience of building homes in that price range more than you?

A    Not that I'm aware of.

Q    So you started building in 2000 or around there and --

A    I started building before that. I started building when I was still employed with the plastic company.

Q    Okay. And was that kind of a hobby or moonlight or what was that?

A    Initially, I built a home for my family. And based upon the amount of time I had put in that endeavor, my wife at the time and I decided to start building some homes to make up additional income for our family.

Q    In the early 2000s, did you start building in the development called Vaquero?

A    Yes.

Q    And at some point in time, did you understand that Mr. Hickok and I owned some land in Vaquero?

A    Yes. There was a time I think between you that

you owned about 12 residential lots.

Q    And you knew Doug from me and from -- socially?

A    Yeah.

Q    So how did it -- you built the home we're here about; is that right?

A    Yes.

Q    What entity did you use to build this home?

A    I believe it was under Castlegate Homes.

Q    Is that a name of a building entity that you used regularly?

A    Yes.

Q    And so tell the jury a little bit about how it came about that VSDH, the entity Doug and I owned this lot in, and you came about building this home?

A    Well, I was doing quite a bit of building right in that area at the time, and I suggested that there was very hot.  It was a very desirable area.  And since you had those lots that we build a couple of spec homes wherein I would build them and you and Mr. Hickok would put the lots in the deal and obtain the combination of cash or financing.  But, ultimately -- well, I didn't have to put any money in, and then we would split any profit.

Q    And did you build two homes next door to each other, the Gross home that we're here about and the one

next door to that?

A    That's correct. Yes.

Q    So when you went about building the Gross home, briefly tell the jury what you did in order to make sure that you were building a quality product that you were going to be happy with?

A    I hired someone that I believed to be one of the top architects in the metroplex, Richard Drummond Davis. Actually, on those two homes, what I did is -- I didn't want to have to spend a couple of years designing the home, which is how long that process tended to take. And I had Mr. Davis suggest some plans or homes that he had designed before that he was really pleased with the results and that would work on these lots and ultimately picked two houses. And then we took those plans and adapted them to fit, you know, on these two pieces of property.

Q    Well, why did you think -- is Mr. Davis out of Dallas?

A    Yes.

Q    Why did you think he was such a good architect?

A    When I built my first house, I researched architectural firms for about two years, and my research resulted in me having a very short list of three or four top architects. And the other main one was Larry

Boerder. And at that point, I had had Richard Davis design a couple of houses for clients, at least a couple, maybe more, and the same for Mr. Boerder. In my research into becoming a builder told me that having strong architecture was a very, very important component of building quality houses.

Q And is that kind of a rule you've lived by?

A Yes.

Q The -- generally, what would you say is -- other than -- well, along with strong architecture, what's kind of important to you in building a quality product?

A Well, the site that it's built on, the -- is the quality of the lot or the land and the specifications of the house, not just the design, but the finish-out specifications and the mechanical specifications that they're all detailed to result in an extraordinarily high quality product and then the use of the best labor possible, which for many years, I employed a lot of the subcontractors myself. My firm employed as employees trim carpenters and tile installers, masons and -- and painters.

MR. SHAW: Okay. Your Honor, may I have the overhead, please?

Q (By Mr. Shaw) All right. Let's start with,

Mr. Kramer, is that a picture of the exterior, front exterior of the home? And these are from Gross Exhibit 116.

A    Yes.

Q    Okay.  And are you happy with the way that home ended up looking?

A    Ended up looking when I finished building it?

Q    Yes, sir.

A    Yes.

Q    Okay.  Another photo from 116, is that another front picture?

A    Yes.

Q    The -- describe, please -- all these photos are going to be from Exhibit 116.  Describe, please, what this is.

A    That's the foyer, the -- I guess you could call it the entry.  You see that the front door was hand-carved. We built that -- my own employees built that door by hand, and all the carvings were done by hand.  The stair newel is, you know, not what you would see in a typical home.  And then it has the --

Q    Is this the newel?

A    Yes, sorry.  And then paneling that you see on the wall on the left side of -- yes -- the staircase is all, you know, nicely detailed.  It has stained

baseboards, which is the -- the piece of trim that you could see at the bottom of each side of the entry door there.  Right.  And it has a base cap.  It's a two-piece trim.  It's just pretty typical of an entry in a home of this size and price range that we would build; the lighting, the sconces.  I don't really recall if those were antiques or if I bought them new, but I would have taken a lot of time to select those.

Q    All right.  Thank you.  What is this, please?

A    That's the kitchen.

Q    Okay.  I may have a better picture of that. And tell us about the quality and detail in there, please.

A    Well, the cabinetry is what's called beaded inset, which is kind of hard to see from these pictures. But the cabinet doors have to fit exactly in the opening and have a little beaded trim as opposed to an overlay door.  Overlay doors, the cabinet door kinds of laps over the opening.  These cabinets in person look just a lot nicer.  They're a lot harder to make.  They all have Blum undermount drawer glides, which is a special drawer glide so you don't see drawer glides on each side of the drawer and the drawer closes by itself.

The cabinets themselves, the crown molding on the top is something I designed several years ago.

That's just different and a little more substantial than the standard crowns that are sold. Most of the -- the appliances are pretty typical high-end appliances that you're going to see in a house this range. The tile and the back splash is a heavy relief tile that I picked out. But overall it's just -- it's good quality. It's got exceptionally good quality cabinets and just finish elements, like the trim.

Q   All right. What's that, please?

A   I'm not sure which area that is. It looks like a butler's pantry or bar.

Q   All right. There, again, this is another kitchen -- another view from the kitchen; is that right?

A   Yes. You can't see it real well in the picture, but the crown molding where the ceiling and the wall intersect, if -- you can see it above the cabinets. But that was a multi-piece crown that -- that we designed for my own home a few years before. And I think it was three or four pieces of trim melded together to just give a very distinctive look.

Q   How thick is it? I mean, how --

A   Well, it encroaches on -- part of it's on the ceiling; part of it's on the wall. I'm not really sure.

Q   All right.

A   Maybe 10 or 12 inches.

Q   Okay.  What's that, please?  It says master bath on the photo.

A   Right.  Master bathroom, similar style of cabinets. The trim is the -- similar but it's smaller because the room really couldn't handle the same trim. I think we removed a couple of pieces probably but used essentially the same -- the same lookin there.  In this picture, you can see something I didn't notice on the other picture.  If you look at those doors that are to the left of the shower, the trim that goes around it is sitting on plinthblock.  That's a piece of trim that we use.  The casing, which is the trim around the door, is sort of like the legs on each side  But instead of just coming down to the floor, they sit on these blocks, and it helps the baseboard tie into it.  It's just a detail that you really have to see in person to appreciate.

Q   What's that?

A   That's a library.  Again, you'd see extensive trim work, which is, I think, one of the many features of the homes I built that -- it has the wood paneling that's all stained.  Then the ceiling is -- it has a coffered ceiling and if --

Q   What did you say?

A   Coffered ceiling where there's -- it looks like beams up above in the ceiling.

Q   Right.

A   And in between the beams, it has a dental mold, which is a molding.   They call it dental because it's sort of like teeth.   It's notched, but -- and they sell dental mold in different sizes, but none of them really have much time style to them.   We designed a piece of trim that's a -- that's used as a -- sometimes as a chair rail, and we cut it with a chop saw into individual little blocks.   So each of these little bumps you see in the ceiling, rather than it be one big piece of trim, each individual piece is nailed on.   It has to be spaced out separately.   It just looks completely different than just buying a stock piece of trim.

Q   For a lot of what you've done here, did you find something you like and copy it, or how did this come about?

A   A combination   Some of these elements I learned from either Larry Boerder or Richard Davis, these architects.   Many of them I found old homes and copied it.   I didn't really technically design any of them.   I'm a really, really good copycat, though.

Q   So, overall, would you say this is -- pictures the high quality that you wanted and built into that home?

A   Yes.

Q   Okay.  Now, the -- are you aware that the home has been altered?

A   Yes.

MR. SHAW:  Your Honor, may I approach? And I don't know the exhibit number of the plans that Mr. Aldous put into evidence.

THE COURT:  You may.  I believe that that is Exhibit Number --

MR. ALDOUS:  125, Your Honor.

THE COURT:  Okay.

MR. SHAW.

Q   (By Mr. Shaw) Okay.  Mr. Kramer, you've not seen these before, have you?

A   No, I have not.

MR. ALDOUS:  Your Honor, I object at this point.  Counsel has not designated this witness in any expert capacity to hand him a set of plans and to ask his opinion

THE COURT:  Okay.  Counsel, approach.

(Sidebar conference held)

THE COURT:  You may proceed.

MR. SHAW:  Thank you.

Q   (By Mr. Shaw) Mr. Kramer, are you familiar with that?  Who designed those plans?

A   It appears they were generated by Paragon

Planning d/b/a Paragon Design Group.

Q    Are you familiar with that group?

A    Yes.

Q    Is that a group you would have used?

MR. ALDOUS:  Objection, Your Honor.  That calls for opinion testimony, and he hasn't been designated.

THE COURT:  Overruled.

A    I would not have used him.

Q    (By Mr. Shaw) Is that an architect group?

A    No.

Q    What is it?

A    In the state of Texas, you don't have to be a licensed architect to design a home.  Anybody can design a home.  This firm, I believe the gentleman that owns it's name is Robert or Richard Leeper.  He does not have an architectural degree or he's not an architect.  He learned how to draw on some software and --

MR. ALDOUS:  Objection, Your Honor.  I'd like to take --

THE COURT:  Sustained.

Q    (By Mr. Shaw) Does he have the quality of experience and -- that you would use?

MR. ALDOUS:  Objection, Your Honor.  That calls for a hearsay response.  I will take the witness

on voir dire to demonstrate that.

THE COURT: All right. Ladies and gentlemen of the jury we're going to take a brief recess. We've got some matters to discuss outside of your presence. During this recess, you're under the same instructions that you have been previously given. You're not to discuss this case among yourselves or with anyone else until such time as the case has either been submitted to you for your deliberations or you have been discharged as jurors.

All rise. The jury is excused.

(Jury exits the courtroom)

THE COURT: You may be seated.

You may proceed, Mr. Aldous.

**VOIR DIRE EXAMINATION**

BY MR. ALDOUS:

Q    Mr. Kramer, the fellow that you said owns Paragon, how do you know what his training or experience is?

A    I was involved in two projects that he was involved in.

Q    Would it be true, sir, that it's only because of what he told you or what you read about his qualifications outside of court?

A    I'm sorry. I didn't follow you.

Q    So, how do you know what his qualifications are?  Did somebody tell you?

A    He told me that he was not an architect.

Q    All right.  And he told you that way back during the time that you worked with him, right?

A    Yes.

Q    Is the only basis of your knowledge of what his training and experience is related to your conversations with that particular individual?

A    No.

Q    Did you also read about him on the website?

A    No.

Q    How else do you know about it?

A    Because every single architect that generates plans would show their AIA designation that they were an architect and they would stamp the plan with an architectural seal.

Q    Let me rephrase my question. I'm not asking you about whether or not specifically he is known to you to be an architect, but whether or not you have knowledge of his training and experience without regard to whether he's a licensed architect.  Is the source of that information from the individual you spoke with?

A    I don't recall.

Q    Is it from something else you read?

A    No.

Q    Would it be fair to say that whatever knowledge you have of this individual's training and experience came from sources other than your personal observation?

A    Well, they come from my personal observation in the two projects that I was involved in that he did work on.

Q    Right.  But what I'm saying is during that -- during that time, you learned about it from someone. You didn't watch him go to school?

A    Of course not.

Q    And you didn't grade his papers in school?

A    No.

Q    All you know about what his training is is what he represented to you or what you believe to be true based upon other information you got outside of this courtroom?

A    Yes.

MR. ALDOUS:  Okay.  That's it, Your Honor. I renew my objection as to hearsay.  He's testifying about the qualifications of somebody who's not here.

THE COURT:  Any response, Mr. Shaw?

MR. SHAW:  He's testifying -- would -- and would you have used him; if not, why?  He's testifying because he -- Kramer believes this guy is not X Y, or Z.

THE COURT: So he's testifying based upon hearsay knowledge.

MR. SHAW: What he believes only, not for the truth of the matter, only what Kramer believes.

THE COURT: His beliefs are based on the information he acquired --

MR. SHAW: Right.

THE COURT: -- through hearsay --

MR. SHAW: That's right.

THE COURT: -- which is not subject to cross-examination

MR. SHAW: Hearsay's not --

THE COURT: So you'll move on to another topic area.

MR. SHAW: All right.

THE COURT: All rise. You may bring the jury back in.

MR. ALDOUS: Your Honor, is my -- is the objection sustained?

THE COURT: Yes, the objection is sustained.

MR. ALDOUS: Thank you.

(Jury enters the courtroom)

THE COURT: You may be seated.

You may proceed

MR. SHAW: Thank you.

**CONTINUED DIRECT EXAMINATION**

BY MR. SHAW:

Q Mr. Kramer, would those plans have been acceptable to you?

A No.

Q The -- what are specifications?

A Specifications are generally just as the name would indicate. They're details, by example, of the specifications on a complete set of plans for a new home would show what type of material to be used, what type of framing material to use. It would show what piece of trim to use in every area. It would show what the flooring was. It would show whether the door was a hollow-core door, a solid door, or how many panels the door had.

It would show what type of electrical wiring to use. It would show what type of electrical panel to use. It would show what type of plumbing lines to run, whether copper or plastic, and it would show the size of the water meter, the size of the main water line. It would show what the paint colors would --

Q Very, very detailed?

A It would show -- the specs and plans are like a road map. You give the map to somebody, and they can

get to the location. They can -- it tells them everything they need to do to build a house.

Q   All right. VSDH Exhibit 6, is this spreadsheet -- would you consider this -- and let me show it to you a little better.

MR. ALDOUS: Your Honor, I'm going to go ahead and object at this time

THE COURT: Sustained.

MR. ALDOUS: Thank you.

Q   (By Mr. Shaw) If you were given this document, Mr. Kramer, would this be the road map, Exhibit 6, that you could use to build that home?

MR. ALDOUS: Your Honor, same objection.

THE COURT: Sustained.

Q   (By Mr. Shaw) Would you have used Exhibit 6 --

MR. ALDOUS: Objection.

MR. SHAW: -- to build that home?

MR. ALDOUS: Objection, Your Honor.

THE COURT: Sustained.

Q   (By Mr. Shaw) Why are specifications important?

A   Well, without them, the general contractor wouldn't know what they're supposed to build without obtaining the specifications from the general contractor for their portion of the work, a subcontractor wouldn't know the scope of the work. They wouldn't know what to

do.  The trim supplier wouldn't know what type of trim to send out.  The sheetrock contractor wouldn't know how to finish the sheetrock, whether it was smooth or textured.  The sheetrook supplier wouldn't know whether to send out half-inch board or five-eights board.  I mean, it's -- it's the directions.  It's everything.

Q    Would you have built the plan that is before you?  It's an additional casita and video room above it.  I think they call it a -- what do they call a video -- what do they call a movie room?

MR. CHAIKEN:  Media room.

Q    (By Mr. Shaw) Media room  Would you have built that plan, a media room on top and a guest room below it?

MR. ALDOUS:  Objection, Your Honor, calls for --

THE COURT:  Sustained.

MR. SHAW.

Q    (By Mr. Shaw) If you were given that plan, would you recommend the implementation-- would you have followed it?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Let me ask you this, Mr. Kramer.  These are from Exhibit 116 of Gross.  This is the casita

room that Mr. Gross built that we're talking about here. Do you see that?

A    Yes.

Q    Okay.  Do you see a like, kind room to what you built?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Does this photograph have the molding that you built?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Overruled.

A    I can't tell from the picture.  It looks similar to some parts of the house, obviously not the parts of the house we just looked at.

Q    (By Mr. Shaw) How about the baseboards?

A    I can't really tell from the picture.

Q    Let's look at the media room.  Does that look similar?

A    Well, it's just plain walls.  I mean, it looks identical to the finish-out of the garage probably.

Q    This room?

A    Except for the wood floors.

Q    Okay.  How about this room?

A    Same thing.  I mean, it's -- it's plain walls with -- I can't tell if the baseboards are the same.  It

could be. It's just -- it's just more simplistic.

Q    Would that be something that you would say matched your quality?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Shaw) The back of the home, when you completed your work, Mr. Kramer, where did the construction stop?

A    I'm sorry.  Could you repeat that?  I'm not sure if I understand the question.

Q    When you completed your work on the home before this addition, where did your work stop on this back, if you can tell at all?

A    Are you asking me where the original house stopped?

Q    Yes.  Yes, sir.

A    Okay.  If you -- if you point up to the left side of the pool, right there.  Now go up from there, up higher to the left.  I can't remember exactly.  It's been a while.  I think that probably was the laundry room.  So that would have been -- I think the laundry room was the very back of the house, somewhere right around there.  The part to the left of there where the additional porch is, that's all added for sure, and the dormers above it I believe are added.

Q    What is important in a backyard?

A    My experience in homes, 2 million and above certainly is the size of the property.  People almost universally want at least an acre lot, if not two.  But one acre is the real common desire and having -- having a sizable amount of property.  This house was fairly tight on the lot to start with because it wasn't -- I believe it may be three-quarters of an acre. It was a pretty good sized house.  The addition, in my view --

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Shaw) Does the addition take up land?

A    Yes.

Q    And is that something that you think is a benefit?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

Q    (By Mr. Shaw) In 2009, this home -- the Grosses sold this home, okay, August 2009.  Did you sell any similar property in 2009?

A    In 2009, I sold a spec house that I had built. It was not in Vaquero.  It was in a much lesser neighborhood in Colleyville.  It wasn't a neighborhood that had a golf course and any amenities that I believe is very close in size to the subject house after the

add-on, within a couple hundred square feet.  I sold that in December.

MR. ALDOUS:  Let me just object.  I believe he's gone beyond the question.

THE COURT:  Sustained.

MR. SHAW:  All right.

Q    (By Mr. Shaw) Did you sell a similar home?

A    Yes.

Q    And how much?

A    $2,850,000.

Q    In the same year?

A    December 2009.

Q    A lesser community?

A    Much lesser.

Q    The -- do you think that the work by Mr. Gross added value or decreased value to the home we're here about?

MR. ALDOUS:  Objection, Your Honor.

THE COURT:  Sustained.

MR. SHAW:  I'll pass the witness.  Thank you, sir.

THE WITNESS:  Yes.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Thank you.

**CROSS-EXAMINATION**

BY MR. ALDOUS:

Q   Mr. Kramer, my name is Steve Aldous and we just -- we haven't met before today, but I'm here representing the Grosses.   All right?

A   I understand.

Q   Let me just ask you.   Have you built spec homes before that you were very proud of?

A   Sure.

Q   And in terms of some of those spec homes, some sell quicker than others.   Would you agree with that?

A   Yes.

Q   Would you agree that, although you were proud of the way you built this home, that it did not sell as quickly as you would have hoped?

A   It was too long ago for me to really say what my expectation would be, but I can tell you that in building spec homes, I have never had an expectation they were going to sell real fast because I price them at a price level that wasn't necessarily designed for it to sell real fast.   But certainly I would agree that it didn't sell quickly.

Q   And that could be for any number of reasons; just maybe you didn't find the right buyer during that period of time, right?

A   Absolutely.

Q    Sometimes economic factors play into it.   Would you agree with that?

A    I don't think in this case it applies, but it could.

Q    Well, for instance, do you still do business under Kramer Construction, LLC.?

A    The entity is -- exists, but I do not do business.   I work for Shawco.

Q    So did you used to build houses under Kramer Construction, LLC?

A    Yes.

Q    And now you work for Mr. Shaw?

A    Yes,

Q    So why was the change from Kramer Construction, LLC, to working for Mr. Shaw?

A    I lost about $9 million in investment money.

Q    Was some of that loss related to homes that -- or neighborhoods that you were planning?

A    What did you say I was -- I'm sorry

Q    Let me rephrase that.

A    It's okay.

Q    That was a terrible question.   Were some of your losses related to investments in real estate?

A    Yes.

Q    And just for whatever reason, that made it to

where you could no longer do business as Kramer Construction?

A   No.  I could have.  I chose not to.

Q   As a result of your losses, were you -- did you need someone to help in terms of investing in your livelihood?

A   I wouldn't say that because my -- the entity was still operating, and it could have continued to operate.  And it operated right up until the time I went to work for Mr. Shaw.  I didn't want to run a business anymore.  I had lost a lot of money.  I feel I'm a lot better at building homes than running the financial aspects of business.

Q   How long have you known Mr. Shaw?

A   Twenty-five years.

Q   Are you grateful for him for giving you the job with Shawco?

A   Sure.

MR. ALDOUS:  All right.  Thank you, sir. I'll pass the witness.

THE COURT:  Mr. Shaw?

MR. CHAIKEN:  Your Honor, I have no questions.

MR. SHAW:  I have nothing further.

THE COURT:  The witness is excused.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

Any further witnesses from VSDH?

MR. SHAW:  VSDH rests, Your Honor.

THE COURT:  All right.  Mr. Chaiken?

MR. CHAIKEN:  Your Honor, Mr. Hickok rests.

THE COURT:  All right.  Mr. Aldous, does plaintiff close?

MR. ALDOUS:  Close.

THE COURT:  Mr. Shaw?

MR. SHAW:  Close.

MR. CHAIKEN:  We close as well, Your Honor.

THE COURT:  All right.  Ladies and gentlemen of the jury what we're going to do at this time is take a luncheon recess because it's lunchtime. It's going to be a little bit longer recess because we will be preparing the charge of the Court in this matter.  After the charge is prepared, the charge will be read to you and closing arguments will begin. So the jury should return at 2:30.

All rise.  During this luncheon recess, the jury is under the same instructions that you've been previously given.  You're not to discuss this case among

yourselves or with anyone else until such time as the case has been submitted to you for your deliberations or you have been discharged as jurors. You're free to go.

(Jury exits the courtroom)

MR. ALDOUS: Your Honor, I will have a motion to present.

THE COURT: Just wait until the jury is gone.

MR. ALDOUS: I wanted to make sure you knew.

THE COURT: Do we want to let the alternate go after the arguments?

MR. SHAW: Fine with me.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: I have no objection.

THE COURT: Mr. Aldous?

MR. ALDOUS: That would be fine, Your Honor.

THE COURT: Okay. You said that you wanted to make a motion.

MR. ALDOUS: I did, Your Honor. I mean, I do.

MR. CHAIKEN: Your Honor, as do I after he's --

MR. SHAW: As do I.

MR. ALDOUS: Your Honor, I'd like to make a motion for a directed verdict on three issues. First is the motion for directed verdict on the guaranty of one of the elements of the guaranty. To prove the guaranty, you have to have showed the existence of the guaranty, the terms of the underlying contract, conditions giving rise to liability, and the failure of the guarantor to perform.

I'm moving with respect to the existence of a guaranty. The evidence is conclusive that the guaranty language in the contract, which is Paragraph -- is Paragraph 4 of the Addendum A, which is an Exhibit 3 of the Grosses, is clear and unambiguous in that it calls for a personal guaranty by Doug Hickok under the -- of the seller's obligations under the buyback.

The -- my understanding is the disagreement, to the extent that it exists, is whether or not the signature of Mr. Hickok, either in the manner in which he signed it for VSDH or in his initial, somehow absolves him from the plain language of the contract. And the case law is pretty clear, Your Honor, and -- with respect to that. First of all, in Dann versus Team Bank from the Fifth Court of Appeals in the top right-hand corner of the copy I gave you is Page 3 of 5. This case involves a guaranty.

The Court said on the right-hand side just above Headnote 2, "The thrust of Damn's appeal is that she is not liable in her individual capacity under the guaranty. We disagree. Under normal circumstances, a written collateral undertaking given to secure a corporate debt will be rendered meaningless if the primary debtor is found to be the sole party liable thereunder."

THE COURT: Where are you reading that?

MR. ALDOUS: Oh, I'm sorry. Headnote 3, right after where it says Headnote 3. Then continuing, "To circumvent this result, the corporate designations appearing after signatures on documents of this type are considered to be only descriptio personae." That'd be Latin. "Descriptio personae is the use of a word or phrase merely to identify or point out the person intended and not as an intimation that the language in connection with which it occurs is to apply to him only in the technical character which might appear to be indicated by the word."

And then the Court goes on to further explain that to treat, you know, the guarantor as -- I mean, the actual signer as the guarantor -- the borrower as the guarantor defeats the purpose of the guaranty. And if you turn to Page 4 of 5, the last sentence of the

first full -- or the first paragraph, it says, "We conclude, therefore, that Dann signed the guaranty in her individual capacity and that the designation of her corporate capacity was merely descriptio personae. In other words, the addition of the words 'president, Cetcon Corporation,' to Dann's signature was merely to identify Dann and was not intended to apply in a technical character."

This case is also supported by another Dallas Court of Appeals opinion, Long versus Motheral And turning to Page 6 of 7, the first full paragraph starts, "Long contends there was no meeting of the minds because he never signed the application in his individual capacity. He stated in his affidavit, 'I never intended to personally, individually, guarantee any debts of any corporation, including Envy Publications.'"

And then it goes on to say, "However, the law presumes a party signing a contract understands and agrees to the contents of the contract." Now it goes on to the next paragraph that says, "Long signed the two-page document twice, one indicating that his title was President & CEO, and the other without an indication of a title. The second, untitled signature was after the personal guarantee paragraph, which includes

statements that I personally guarantee all indebtedness hereunder, and I will within five days from the date," et cetera, et cetera.

As the Court will recall, the guaranty in this particular case has Mr. Hickok's admitted initials immediately below the guaranty paragraph. The next paragraph over on the other side says, "Here, the language of the personal guaranty paragraph creates a personal obligation in addition to the application for credit on behalf of the corporation. Long signed the credit application and guaranty twice, once indicating his title and once without. Even if title had signed" -- by the way, I think this is like a misprint -- "had signed the guaranty indicating his corporate office, that would not change his individual liability on the guaranty. The guaranty would be meaningless" -- and I think that should say "without" -- the corporation was purporting to guaranty its own open account."

And it goes on. It cites to the Dann case that I just provided to Your Honor. And then it says, "A corporate designation in this case would be only descriptive of his position; it would not change the capacity in which he signed." And this is a 2012 case, and there is -- no petition was filed.

In fact, Your Honor, all cases that I was

able to find recite the same thing. If the contract specifically designates that it's a personal guaranty and is clear and unambiguous, a signature in any capacity of the individual changed in the guaranty will be sufficient to bind him because the description is considered -- that Latin phrase that I threw out there that I can't remember what it says.

So, that's the first issue that I am seeking a resolution. And the reason being is because, as the Court is aware, they've sought -- put on evidence, you know, that he didn't intend to be bound and so forth. And my contention, based upon these cases, is that matter is a matter of law for Your Honor.

THE COURT: Response, Mr. Shaw? Oh, let's start with -- let me ask. Is this a directed verdict as to VSDH or as to Hickok or as to both?

MR. ALDOUS: This is only with respect to the guaranty signed by Mr. Hickok.

THE COURT: All right. So Mr. Chaiken, you may respond.

MR. CHAIKEN: May I have one moment just to look at this case? I was looking at the first case, and I want to just look at the second case real quickly.

MR. ALDOUS: The Dann versus Team Bank case is reported at 788 SW.2d 182 Tex. App Dallas 1990.

And I believe it's writ review -- no writ. And then the other case that I brought is Long versus Motheral, M-o-t-h-e-r-a-l Printing Co. And it is cited at 2012 Tex. App. Lexis 5736. And it's Dallas Court of Appeals 2012, no petition authored by Justice Moseley.

MR. CHAIKEN: Your Honor, we oppose the motion for directed verdict, and there are a number of grounds for it. Number 1, I would note that the Long versus Motheral Printing case is factually distinguishable and legally distinguishable on several points. One, if the Court looks at Page 6 of 7, the description of the facts in that case are, first, that this was not a guaranty of a real estate related contract.

And, second, the individual Long signed the document in question once indicating that his title was president and CEO and the other without indicating a title. He actually signed his name, the second untitled signature. The second untitled signature, meaning not indicating a representative capacity, was after the personal guaranty paragraph, which includes statements that I personally guaranty all debts, et cetera. Long did not indicate this signature, excuse me, was in any representative capacity.

In this case, we don't have a factually

similar situation. There is no signature by Mr. Hickok that doesn't have his designated representative capacity. And so for two reasons this case is not controlling of the facts and circumstances of this one. Number one is because of that factual distinction, and the other is there's no discussion of the implications of the statute of frauds, which is Texas Business & Commerce Code Section 26.01.

Similarly, the other opinion offered by Mr. Aldous, the Dann versus Team Bank case, is likewise distinguishable. The -- in that case, you didn't have any discussion of Business & Commerce Code Section 26.01 that I could find. And, furthermore, in that case, it appears that Dann, the purported guarantor, was also the individual obligor. So there's a question as to whether that individual intended to be liable for the debt in question.

The law in Texas has always been quite clear, and I have yet to find a single case -- I'm representing to the Court that I've looked carefully -- where you had the operative facts being a guaranty of performance of a contract of a real estate where all you had was the signature of a purported guarantor in a specifically representative capacity. In this case, Mr. Hickok, the evidence is undisputed he signed a

document. His signature is in a representative capacity. All of the evidence, all of the evidence likewise is that his initials were in a representative capacity on behalf of the seller.

Under Section 26.01 of the Business & Commerce Code, a promise or an agreement not covered by the statute is not enforceable unless the promise or agreement is in writing and signed by the person, not somebody in a representative capacity, but the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. There's no evidence that a partnership can sign an undertaking for an individual partner. The reverse could be true, but not that.

And under Subsection (b) of 26.01, the requirement that there be a writing and that it be signed by the person to be charged with the promise or the agreement, it includes a promise by one person to answer for the default of another person. As a matter of statutory law, statutory law, in order for there to be a guaranty agreement or any obligation on the part of Mr. Hickok personally under the new home contract, which is where the purported guaranty language exists, because he's being charged with the authority to a guaranty in particular, he would have to personally sign in a

non-representative capacity the writing in question indicating his intent personally to be bound.

In the absence of that personal signature, there is no personal signature on the document. He cannot be held liable as a matter of law. And he would actually cross-move on directed verdict on that issue, as a matter of law, that he is not a party to the new home contract and he is not -- cannot be held to be a guarantor. Nor can the Court find as a matter of law that there is a guaranty agreement or in particular an enforceable guaranty agreement.

THE COURT: Briefly, Mr. Aldous?

MR. ALDOUS: Yes, Your Honor. I'm going to hand the Court a case from the Houston Court of Appeals, called 84 Lumber Company versus Powers, which directly does away with Mr. Chaiken's statute of frauds case or claim. This, again, was a guaranty issue. If you'll turn to Page 4 of 7 under the paragraph marked Number 3, "Powers argues that the credit application was signed in a dual capacity and is, thus, ambiguous." The Court, after reviewing the law and saying that the construction of an unambiguous contract is a question of law for the Court, it goes down to state that -- on the next paragraph -- I mean, the next column over, last sentence, "The instrument standing alone will usually be

deemed to fully express the intention of the parties because it is the objective, not subjective, intent that controls."

"The El Paso Court of Appeals was presented similar contract language in the case of Austin Hardwoods. There, as here, immediately above the signature line of the credit application was recited." And it has the guaranty language. "The corporate officer signed the application in his capacity as vice-president. Thereafter, the corporation went into bankruptcy and the creditor company made demand on the officer."

If you go down to the following paragraph, "In light of the signature under the personal guaranty language, the El Paso Court of Appeals failed to see how the above-cited guaranty clause rendered the agreement susceptible to more than one meaning. The language of the agreement was not unclear or indefinite. It clearly evidences application for credit by a corporation guaranteed by the individual signing the application"

Now, if you go down to the next paragraph with the sentence that starts, "However, as the guaranty paragraph stipulates, in addition to the creation of a corporate liability, the signing individual further covenants to be individually liable for the debt, again

the very essence of the guaranty agreement."

If you turn to the next page, which is Page 5 of 7, there is a heading referred to as statute of frauds. "David Powers argues further that the guaranty is deficient because it does not meet all the requirements of the statute of frauds." Similar to what Mr. Chaiken just told the Court. The law under the paragraph, it says, "A guaranty agreement is subject to the statute of frauds."

And then if you go down to where it says headnote 5, "That a signature is followed by a corporate designation does not necessarily serve to relieve the signatory of individual liability. A signature followed by corporate office will result in personal liability where the individual is clearly designated within the instrument as personal surety for the principal."

Your Honor, this directly deals with his statutory case claim. And the case law is clear from both the Dallas Court of Appeals and Houston Court of Appeals that if the contract language says, "I, Doug Hickok, guaranty this," and he signed it in any capacity, that defense of, "I didn't mean to. I didn't intend to," is gone.

So the next portion of my motion is related to --

MR. CHAIKEN: Do I get to respond to that?

THE COURT: He's not finished yet.

MR. ALDOUS: That's all I have on that element.

THE COURT: Okay. Then you may respond.

MR. CHAIKEN: Judge, we -- first of all, I would note that the Houston Court of Appeals is not controlling. The Dallas Court of Appeals has spoken on a related issue. I mean, under the Dallas Court of Appeals, it doesn't apply because the facts and circumstances in the case per the Dallas Court of Appeals.

THE COURT: Which case are you talking about?

MR. CHAIKEN: The two that he cited previously, authority, distinguishable and -- Mr. Aldous turns to the 84 Lumber case out of the Houston Court of Appeals, which is not controlling. But, more importantly, this case does not involve, okay -- at least that I can see -- the secondary consideration that I mentioned earlier, which is that -- that there was a contract touching real estate. This case involves a general credit application. It looks like it's a negotiable-instrument-type situation instead of an obligation to guaranty performance for a real

estate related obligation, a purchase obligation.

The statute of frauds goes on in addition to identify that a person must personally sign an agreement, okay, if he is going to -- when it involves a promise to answer for debt or default or miscarriage of another person. But also a contract of the sale of real estate must likewise be in writing personally signed by the person in charge of any obligations in that contract. And that is Subsection (b)(4) of the Statute of Frauds, which is Section 26.01 of the Business & Commerce Code. And, furthermore, an agreement which is not to be performed within one year from the date of making the agreement -- and we know that this purported guaranty obligation -- or I should say the buyback obligation that it supposedly guarantees was not performable within a year.

Also, it has to be signed personally by the person in a non-representative capacity, the person himself. There is no case which deals with Subsection 2, I'm sorry, (b)(2), (b)(4), (b)(6), not a single one. And because it is indisputable and undisputed that the new home contract was an agreement -- I'm sorry -- a contract for the sale of real estate and because it is undisputed and indisputable that it was an agreement which was not to be performed within one year from the

date of making the agreement. Okay.

And, thirdly, because it purports to be a promise by one person to answer to the default of another person, it must be signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. And these cases that we've talked about are obviously very factually dependant. They deal with the nature of the debt or the alleged debt in question. And none of them deal with a real estate contract, an agreement to be performed -- not to be performed in one year.

MR. ALDOUS: Just for Cathye's purpose, Your Honor, the 84 Lumber case is 393 S.W.3d 299 Tex. App. Houston, First District, 2012, no petition.

THE COURT: I'm going to grant the directed verdict on the existence of a guaranty

MR. ALDOUS: Thank you, Your Honor. The next issue is the failure to mitigate defense that I believe is raised both by VSDH and Mr. Hickok. I don't believe that there's any evidence from which the Court could submit that to the jury. It is just an instruction. But it's the defendant's burden, that is, who's acting as the VSDH and Hickok's burden to prove failure to mitigate as its affirmative defense. In order to do that, the defendant must offer evidence

showing not just that the plaintiff's lack of care -- in other words, that the plaintiff lacked care and failing to avoid harm, but also the amount by which the damages were increased by such failure to mitigate.

And that comes from a Tyler case, and it's in the PJC under 115.8. As it stands right now, there's just no evidence that the -- it's on Page 298. It's under, "defendant's burden of proof." The -- my argument really relates to two things; one, they have offered no evidence that it was unreasonable in this situation to offer the --

THE COURT: I'm sorry. What was the number again?

MR. ALDOUS: The number of --

THE COURT: PJC.

MR. ALDOUS: 115.8. Are you in the 2012 book?

THE COURT: No. I'm in the 2014 book.

MR. ALDOUS: Well, there you go. I didn't know there was a '14 out.

THE COURT: You may continue.

MR. ALDOUS: There is just -- there simply is no evidence that the Grosses acted unreasonably with respect to the sale or how much that -- even if there was evidence, how much that ended up being part of the

500 and something thousand dollars that we've pled. And I just don't think there's any evidence of it. And what I -- by putting the instruction in, although it appears to be harmless, it allows the defense to argue something for which they have no evidence. They'd say, you know, something to the effect of, well, they bought it two years before for this amount and they sold it for this amount, and there's no way it should have been less and that sort of thing.

So, Your Honor, I move for a directed verdict on that particular defense.

THE COURT: Mr. Shaw?

MR. SHAW: Evidence that the Grosses failed to mitigate is from the Grosses' own testimony that the Grosses voluntarily decided to sell the home. The Grosses testified nobody had a gun to their head, that it was all a voluntary decision. Kramer testified that a similar house in a lesser neighborhood sold for 2.85 million in the immediate timeframe. So I think that those two things require the submission of failure to mitigate. The -- further, the lack of the Grosses to obtain the approval of the plans and specifications is an element of failure to mitigate.

THE COURT: Let me make sure I understand you. The house sold for how much originally before --

before the additions?

MR. SHAW:  2.6 something.

THE COURT:  Okay.  And after the additions, it sold for?

MR. SHAW:  2.415.

THE COURT:  You may continue.

MR. SHAW:  That was what I had on the mitigation, Judge.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  Yes.  Thank you.  I think there's a -- there's clearly more than a scintilla of evidence proving that the actions of the Grosses, in whole or in part, in selling the property were unreasonable, which relates to some or all of their claimed injuries or damages.  For example, the evidence was that they voluntarily sold the property prior to the buyback date.  That evidence came in several forms.  One, it was testified to by Mr. and Mrs. Gross.  They tried to argue they were forced, but they also admitted that they unilaterally made the decision to do so.

Secondly, they admitted that they voluntarily chose to sell the property through a realtor.  They weren't required to do so.  There was nothing that required them or compelled them to do so.  And that, of course, gave rise to approximately $159,000

worth of damages claim that could have been avoided without the use of a realtor. Ms. Taylor, the realtor, testified --

THE COURT: So you're saying they could have sold it themselves and saved the real state commission; is that --

MR. CHAIKEN: Certainly, it could have saved the real estate commission. Sure. And Ms. Taylor testified that she actually tried to get Mr. and Mrs. Gross more money, but they made the unilateral decision to sell the property for less. In fact, she said that she had -- she had recently sold another property in -- that she considered comparable, I guess, that was a different size but sold in proximity to this sale at a higher price per foot, but that the Grosses were desperate to sell the property. They wanted a cash deal, and they made the unilateral decision to sell it for less than what it might have otherwise brought.

And there's also evidence that at the time that they chose voluntarily to sell the property, they -- you know, prior to the buyback date, they -- they had at one time proposed the possibility of selling it to VSDH at a discount. But when they actually got an offer and were marketing the property, they did not offer the opportunity to VSDH or to Mr. Hickok or to Mr. Shaw to

purchase the property for the price that had been proposed by the ultimate buyer, Ms. Browning.

And, of course, had they done so, there might not have been a real estate commission attached to that as well or the closing costs that were incurred. And finally you'll recall that the Grosses' position was that they sold the property because they felt some compulsion to do so. The -- and that it related to this transaction But the realtor testified, Ms. Taylor, that she had no idea, okay, that their need -- there was a need for them to sell. They were anxious to sell the property in a hurry. They -- they set the price on their own. They made no mention whatsoever with regard to the -- to anything having to do with this situation, meaning the reason for the sale.

And when asked what the reason was, Mr. Aldous rose, objected, said it wasn't relevant what the reason was. The Court sustained the objection and so all the jury was left to hear is that there was a need, and it didn't relate to this issue. And the formation of their argument with regard to why they sold is it that it did relate to this issue. So their actions at the time were -- at least there's evidence that they did not constitute efforts to be reasonable in the mitigation of their damages.

THE COURT: So you're alleging that the property was not sold for fair market value.

MR. CHAIKEN: Well, that's another issue, which is there was no evidence as to what the fair market value --

THE COURT: That's a yes-or-no question.

MR. CHAIKEN: I am alleging that as well.

THE COURT: Okay. To get to fair market value, you have to look at what a reasonable buyer -- I mean a reasonable seller would pay a reasonable buyer in a situation where neither is under any compunction to sell, correct? And as far as the real estate agent was concerned, there was no compunction to sell.

MR. CHAIKEN: No. The real estate agent actually testified that there was an undisclosed need to sell the property. And, furthermore, so did the Grosses. The Grosses have testified that they were under a compulsion to sell the property by virtue of the facts and circumstances of this case. Moreover, fair market value and evidence of fair market value was not what the realtor testified to. She gave no testimony with respect to fair market value. In fact, she could not give testimony on fair market value and only an expert can. Nobody -- there's no evidence of fair market value in the record.

THE COURT: Okay. If we have no evidence of fair market value, then how do we have evidence of failure to mitigate?

MR. CHAIKEN: That is -- that is the evidence of failure to mitigate, failing to sell the property for its fair market value, okay, is evidence of a failure to act reasonably to mitigate damages.

THE COURT: But we'd have to know what the fair market value was, correct?

MR. CHAIKEN: We would have to know what it was --

THE COURT: And we don't.

MR. CHAIKEN: We don't know what it is.

THE COURT: Okay. I'm going to grant directed verdict on the failure to mitigate.

MR. ALDOUS: The last item that I have on my list, Your Honor, is the lack of consideration allegation on behalf of Mr. Hickok. The allegation, as I understand it, is that there was no consideration that flowed to Mr. Hickok from signing the guaranty agreement because the home was sold by the company as opposed to him. The Long versus Motheral case that I previously gave the Court and counsel deals with this also on Page 7 of 7.

MR. CHAIKEN: I can make this easy for

you.  I'm not asking for submission on failure of consideration or lack of consideration

MR. ALDOUS:  With that understanding, if he's withdrawing that as a defense being asserted in this case, then I will end my motion by saying thanks.

THE COURT:  Are you withdrawing it, Mr. Chaiken?

MR. CHAIKEN:  Yes.  There is no -- no basis on the consideration issue.

THE COURT:  Okay.

MR. SHAW:  Judge, I want to move for directed verdict as well.

THE COURT:  Well, let me ask you.  I have not forgotten.

MR. SHAW:  All right.  I'm sorry.

THE COURT:  That's everything you have, Mr. Aldous?

MR. ALDOUS:  That is, Your Honor.

THE COURT:  All right.  Now, Mr. Shaw.

MR. SHAW:  Thank you, Your Honor.

THE COURT:  You want to move for directed verdict.  Hang on.

MR. SHAW:  I do.

THE COURT:  All right.

MR. SHAW:  I re-urge my motion for

directed verdict on two causes; one, the declaratory judgment cause, but, more importantly, the fraud cause. There is no evidence of fraud against VSDH that would support any jury submission in this case. The evidence is that there was an agreement and that VSDH never even dealt with -- frankly never dealt with the Grosses; only dealt through the mutual agent. And

THE COURT: Which one are you arguing about?

MR. SHAW: I'm sorry. The fraud claim.

THE COURT: Okay. And you're finished with the declaratory judgment?

MR. SHAW: Yes. On the declaratory, I'm just going to re-urge what I urged previously, which was you cannot -- the Grosses could not add a declaratory judgment case or cause of action to their counterclaim and make it viable because the case that the declaratory judgment dealt with was already before the Court, and the law does not allow that addition. So that's --

THE COURT: So what case law are you citing to for that?

MR. SHAW: I don't have the case law, but I'll get it.

THE COURT: That would be helpful.

MR. SHAW: It would. It's pretty bedrock,

but I'll get that, Judge.

THE COURT: That's the one that's a legal issue anyway, correct? So it's not going to show up on the jury charge.

MR. SHAW: Right.

MR. ALDOUS: I think that's correct, Your Honor.

THE COURT: So I'll give you an opportunity to brief it post trial.

MR. ALDOUS: And I have no objection to that. I mean, in other words, I won't assert some sort of waiver or some other junk if it's not ruled on until post trial because that's -- I think that's appropriate.

THE COURT: All right. So let's talk about the fraud now.

MR. SHAW: Okay. There is no proof of any element that would support a fraud submission against VSDH or Douglas Hickok. The --

THE COURT: Are you arguing for Mr. Hickok?

MR. SHAW: No. I was just throwing that in because I --

THE COURT: A little gratuitous argument.

MR. SHAW: A little gratuitous. But I don't -- I don't think that the record supports any

fraud. Certainly Betsy Gross's testimony didn't support any fraud because Mrs. Gross testified that Mrs. Gross wasn't involved in this transaction at the contracting stage. Mr. Gross complained ultimately that VSDH did not buy back the home, but that's not evidence of fraud.

Certainly with the breaches that Mr. Gross undertook along the way started initially with failing to escrow the money and ending with failing to wait until September 9 to sell the home -- September 1 to sell the home and/or to contract to sell the home. So given that, I don't believe there's any evidence to support a fraud submission.

THE COURT: Mr. Aldous?

MR. ALDOUS: I'd like to have a candid conversation with the Court and opposing counsel right now because -- so the fraud claim is based upon the guaranty language and the fact that Mr. Hickok testified that he never intended to honor that because he had -- he thought something else was required. Based upon the rulings of the Court if he did -- if, in fact, the guaranty is signed and is effective and irrespective of what he may have said, I don't -- I mean --

MR. CHAIKEN: There is no fraud claim.

MR. ALDOUS: Well, so clearly there is a claim for a false statement of material fact that was

known to be false at the time it was made in connection with a real estate transaction  And there's no question that the fact that Mr. Hickok was acting in a capacity as a corporate representative would also bind the corporation or the company.  The real question that I have and what I don't know the answer to is if you have now ruled that the guaranty agreement that Mr. Hickok sought to avoid is no longer -- he cannot avoid it by saying I didn't intend to do it.  That was the intent I relied upon to file the fraud claim.  If the Court's ruling is such that the -- the false nature of the statement is now taken away, does that eliminate the cause of action?

MR. CHAIKEN:  It absolutely does.

MR. ALDOUS:  I appreciate --

THE COURT:  Are you the Court?

MR. ALDOUS:  -- Mr. Chaiken's help, but --

MR. CHAIKEN:  I didn't hear you say it's the Court's opinion.  I thought you said you didn't know whether it does

THE COURT:  If the Court's ruling is such that the false nature of the statement is now taken away, does that eliminate the cause of action?

MR. CHAIKEN:  I thought -- I'm sorry.  I thought I heard him say he didn't know the answer to the

question, whether the Court's ruling on the existence of the guaranty takes away the fraud cause of action.

THE COURT: That was a question to the Court.

MR. ALDOUS: I don't know how you handle this.

THE COURT: Well, frankly, it's never arisen before. I believe what you asked for directed verdict on was the existence of a guaranty, whether or not there was --

MR. ALDOUS: Which is correct.

THE COURT: And I granted you directed verdict on that

MR. ALDOUS: That's right.

THE COURT: There was, indeed, a guaranty. So the question in fraud is whether or not there was an intent to mislead.

MR. ALDOUS: Well --

THE COURT: Plaintiff must establish that there was a false statement -- a false misrepresentation of material fact.

MR. ALDOUS: That's where I get it.

THE COURT: Made a promise to do an act or benefited by not disclosing that a third-party's representation or promise was false.

MR. ALDOUS: Right. But so, to me, it's not the intent. The intent's there because he testified to it. The real issue is: Is it any longer a misstatement of fact? In other words, our problem was that he --

THE COURT: I think that the answer comes from: What was the intent at the time that the agreement was entered into? You don't make that decision after the fact. You make it at the time --

MR. ALDOUS: That's true.

THE COURT: -- that the transaction took place. And that's what would guide that issue.

MR. ALDOUS: So -- and I like to kind of simplify this a little bit in my own mind because of its feeble nature. But if somebody -- if I sued because they represented that the marble was blue and they said, no, it was red and I thought it was red the whole time, but the Court eventually rules that it's blue, is it any longer a misrepresentation, no matter whether you had the intent or not?

THE COURT: Well, I think fraud is based on intent.

MR. ALDOUS: I agree with that.

THE COURT: And so you have to determine the intent at the time that the transaction was entered.

You don't do it subsequent to it.

MR. ALDOUS: Okay. And then in that case it would still get submitted.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: First, I would say that it would have to still constitute -- regardless of what the intent was -- and we can come back to that issue in a minute -- it would still have to constitute a misrepresentation, and it wasn't a misrepresentation if, in fact, he entered into the guaranty. In other words, the argument that he's making is that there was a denial of the existence of the guaranty.

Now, let me tell you. There's a more fundamental problem on the issue. And in this regard, we -- Mr. Hickok moves for a directed verdict. And let me explain why. Mr. Aldous made a fundamental misstatement of what the claim is for fraud in the Grosses' live pleading. The Grosses' live pleading states -- and this is the --

THE COURT: You want to give me the date of the pleading you're referencing?

MR. CHAIKEN: Yes. Well, I think I can. It is -- what I can tell you is that I don't have a file-marked copy, but I have one that has a --

THE COURT: Mr. Aldous, what's the date of

your live pleading.

MR. CHAIKEN: It was around the 15th day of April 2013. It wasn't signed by Mr. Aldous, which --

THE COURT: Well, that doesn't matter. I just want to know when the live pleading was.

MR. ALDOUS: I don't know which one he's referring to.

MR. CHAIKEN: It's counter-plaintiff's third amended counterclaim against second amended third-party petition, which is the live -- last pleading that I've ever seen in this case filed against Mr. Hickok by the Grosses. And what's important about that is --

THE COURT: Hang on. I need to find it.

MR. CHAIKEN: Okay.

THE COURT: The date again?

MR. SHAW: April 2013.

MR. CHAIKEN: April 2013, it looks like around the 15th, tax day. That's the service I'm getting anyway.

THE COURT: Which paragraph?

MR. CHAIKEN: It's Paragraph Roman numeral VII beginning on Page 10. And what it states is --

THE COURT: Let Mr. Aldous get back.

(Brief interruption)

THE COURT: You may continue.

MR. CHAIKEN: Thank you, Judge.

Mr. Aldous said that the basis of the fraud claim was the lack of intent to honor a guaranty. And if the Court looks at Page 10 of the counter-plaintiff's third amended counterclaims and second amended third-party petition, which is the live pleading of the Grosses, the Court will see that they state the following beginning in Paragraph 29. "The Grosses will show that counter-defendants' and third-party defendants' conduct constitutes fraud in a real estate transaction as defined by Section 27.01 of the Texas Business & Commerce Code."

And for the record, counter-defendants and third-party defendants are collectively identified in this pleading as VSDH Vaquero Venture, Ltd., Evan L. Shaw, and Douglas M. Hickok, who are the counter-defendants and VSDH Vaquero Homes, Inc. and VSDH Homes, Inc. is named as a third-party defendant.

And it says, "Counter-defendants and third-party defendants made a false representation that they would buy the property back pursuant to the buyback option in order to induce the Grosses to enter into the contract. The Grosses entered into the contract and purchased the property at the full listed price of

$2,851,000" -- I'm sorry -- $2,851,871, even though the property had been listed for two years due to the fact the counter-defendants and the third-party defendants made the false representation that they would buy the property back pursuant to the buyback option.  The Grosses' reliance directly and proximately caused them substantial injury as set out above for which they seek appropriate relief."

This allegation relates to a -- the Court sets forth that there was a false representation concerning whether there would be a buyback of the property, not whether there would be entry into a guaranty.  So the claim, okay, that has been brought against Mr. Hickok that would underlie the so-called fraud claim is only related to whether or not he made a representation that he would buy the property back pursuant to the buyback option.  His only obligation would be under the guaranty.  There's no mention of the guaranty in this fraud claim.  Consequently, there is no fraud claim of the nature that Mr. Aldous just represented

THE COURT:  On his directed verdict motion?

MR. CHAIKEN:  In his directed -- in his motion for directed verdict, which is one of the reasons

why I'm actually --

THE COURT: No. Actually, this is Mr. Shaw's motion.

MR. ALDOUS: That's right.

MR. CHAIKEN: And this was one of the reasons why Mr. Hickok specifically joins in the motion for directed verdict.

THE COURT: Well, you get your chance in a minute.

MR. CHAIKEN: Okay.

THE COURT: Right now, this is Mr. Shaw's motion.

MR. CHAIKEN: And then the second issue that I need to address in terms of Mr. Aldous' response, okay, which is what I was just doing, is that, you know, there has to be a --

THE COURT: This is not as to your client at this point in time.

MR. CHAIKEN: Okay. Fair enough.

THE COURT: You'll get a chance.

MR. CHAIKEN: Well, okay.

THE COURT: This is between Mr. Shaw and Mr. Aldous because it's as to VSDH, and it's Mr. Shaw's motion.

MR. CHAIKEN: Okay. Fair.

THE COURT: You represent Mr. Hickok. You'll get your chance to argue --

MR. CHAIKEN: Sure. Go ahead

THE COURT: -- and make your motion with regard --

MR. CHAIKEN: Go ahead.

THE COURT: We can't talk at the same time, Mr. Chaiken.

MR. SHAW: Well --

THE COURT: Okay. Let's go back and look at what your motion was, Mr. Shaw, because there's been a lot of discussion.

Do you have that Cathye?

Okay. I found it. What Mr. Shaw said was, "There is no proof of any element that would support a fraud submission against VSDH or Mr. Hickok." And then we talked about Mr. Shaw not representing Mr. Hickok. And he says, "I don't think that the record supports any fraud. Certainly Betsy Gross's testimony didn't support any fraud because Mrs. Gross testified that Mrs. Gross wasn't involved in this transaction at the contracting stage. Mr. Gross complained ultimately that VSDH did not buy back the home, but that is not evidence of fraud. Certainly with the breaches that Mr. Gross undertook along the way start initially with

failing to escrow the money and ending with failing to wait until September 9 to sell the home-- September 1 to sell the home and/or to contract to sell the home. So given that, there's any evidence to support a fraud submission." So that's what Mr. Shaw said.

And then Mr. Aldous said he wanted to have his candid discussion, and we talked about when fraud would be determined. And I don't think you ever responded to Mr. Shaw's motion, Mr. Aldous.

MR. ALDOUS: Your Honor, with respect to Mr. Shaw's motion, the only evidence of their intent not to perform the buyback is the subsequent non-performance that -- and I'm not sure that it would get to the point of being fraud with respect to just the buyback, not the guaranty. If I'm limited to the statement in this third- amended petition that the fraud is only related to the -- that they made the false representation they would buy the property back pursuant to the buyback option, then I would agree that with respect to that allegation that there is insufficient evidence of the intent of the parties, that is VSDH and Doug Hickok, to perform on that. So, but if the -- well, I'll just stop there.

THE COURT: Okay.

MR. ALDOUS: This is only with regard to

Mr. Shaw's motion because I would like to oppose Mr. Chaiken's motion just because it's Mr. Chaiken's.

THE COURT: Okay. So I will grant your motion for directed verdict, Mr. Shaw, on the issue of fraud with relation to the buyback provision.

MR. SHAW: And that's the only claim of fraud in this case. So I'm -- I want to make sure that I'm moving for a directed verdict on any and all fraud allegations.

THE COURT: Well, I think that would depend on what was tried by consent.

MR. SHAW: I don't think so. They have to -- how could you try that by consent when --

THE COURT: If you addressed the issues during the course of examination, direct and cross, that would constitute --

MR. SHAW: The only thing I was addressing was whether or not the -- I admitted the company agreed to the buyback, and the company --

THE COURT: No. We're talking beyond the buyback.

MR. SHAW: Okay. But the company agreed to the personal guaranty. That's the only evidence of that. The company always agreed to --

THE COURT: Any evidence of what?

MR. SHAW: There wouldn't be any evidence to support fraud because the only -- even if you say it was tried by consent, because the only evidence was the company always agreed that there was going to be a personal guaranty.

THE COURT: I don't know. I'm saying that that is a possibility--

MR. SHAW: Okay. All right.

THE COURT: -- that's out there. I'm not making any rulings.

MR. SHAW: Okay. I just want to make sure I'm moving for directed verdict on all the fraud allegations. I understand from the pleading there's only one, and it relates to the buyback.

THE COURT: So with respect to what is set out in the pleadings --

MR. SHAW: Okay.

THE COURT: -- I'm granting your motion --

MR. SHAW: All right.

THE COURT: -- for directed verdict

MR. SHAW: All right. Thank you.

THE COURT: That doesn't mean that somebody can't bring up that other issue.

MR. SHAW: Okay.

THE COURT: And I suspect it will come up,

but maybe I'm wrong

THE COURT: Okay. Now --

MR. CHAIKEN: May I ask a question on that one point, though? On that ruling that you just made, I understood that Mr. Shaw was moving for a directed verdict on that allegation and claim as it was against both VSDH and Mr. Hickok.

THE COURT: No, he wasn't. That's why you're here, Mr. Chaiken.

MR. CHAIKEN: Okay.

THE COURT: But Mr. Aldous has conceded that that issue applies to your client as well.

MR. CHAIKEN: So would the ruling then granting directed verdict on that aspect of the fraud claim apply to Mr. Hickok is my question.

THE COURT: Yes.

MR. CHAIKEN: Thank you. That was the only --

THE COURT: Mr. Aldous has already conceded that.

MR. CHAIKEN: Well, but I didn't get a ruling from the Court on that specifically, and I just wanted to --

THE COURT: You didn't let me finish.

MR. CHAIKEN: Okay. Thank you. I

appreciate that.

THE COURT: All right. Do you have another motion, Mr. Shaw, or is that it because you just had two?

MR. SHAW: That's right.

THE COURT: Okay. All right. Now it's your turn, Mr. Hickok.

MR. CHAIKEN: Okay. I'm Mr. Chaiken for Mr. Hickok, but I'm happy to be called Mr. Hickok.

THE COURT: You're just happy to be called.

MR. CHAIKEN: I'm just happy to be called.

Obviously, the first argument Mr. Hickok moves for directed verdict on is that he was not sued for any claims of fraud relating to the -- to the entry into the -- of the guaranty agreement. The only fraud claim brought against him specifically was the one that we just discussed, which was related to performance of the buyback. But for the same reasons that that claim for fraud would fail, so does the -- so does the -- any alleged claim -- well, let me just start with that.

There is no claim for fraud; therefore, there's nothing to submit with respect to entry into the guaranty on a fraud claim. There's been no pleading of that nature, and there's been no allegation of fraud

related to the guaranty. So we would move for directed verdict on that one alone.

THE COURT: Do you have any other thing you're going to move for directed verdict? I'd like the list.

MR. CHAIKEN: Yes. So number one is no claim of fraud via guaranty. Second would be that there is also -- if -- were the Court to find that there was such a claim of fraud, there would be a need on the part of the Grosses to introduce and establish evidence of a false representation of a past or existing material fact when the representation is made.

The only allegation, you know, with regard to any aspect of a guaranty-related fraud would be that there was a representation made regarding a future act of performance at the time that the contract was entered into, and it was made for the purpose of inducing the party to enter into the contract which they entered into because of the presence of the so-called guaranty language in it. There would also have to be evidence of reliance on that -- on that issue -- I'm sorry -- that representation supposedly.

THE COURT: So is that your third claim?

MR. CHAIKEN: The reliance is -- well, this is also related to fraud, but it's -- but it's

reliance.

THE COURT: Is it your third issue for directed verdict?

MR. CHAIKEN: Yes, reliance. There's no evidence of reliance on any promises regarding the guaranty, specifically because the testimony was clear that what Mrs. Gross expected was a -- was a guaranty by Mr. Hickok and Mr. Shaw. And never did they expect that there would be only a personal guaranty by Mr. Hickok. And so -- so the -- and the language that was in the contract spoke to a joint and several guaranty, which the Court found, as a matter of law, did not apply to Mr. Shaw; but, nevertheless, they got what they asked for. And so there would be no reliance.

They got language of a guaranty. Enforceability is a different question. But they didn't rely on anything to their detriment, and there's no evidence that they did, in entering into the contract. And so -- and there was actually no evidence that there was any offer to enter into a guaranty that was made with no intention of fulfilling that promise.

Indeed, to the contrary, all the evidence was that Mr. Hickok, when talking about the possibility of a guaranty, said he would do it if Mr. Shaw did it, which is exactly what was requested by the -- by the

Grosses and that the documents were prepared. The document had a guaranty in it. While he didn't believe it was legally enforceable, nevertheless, it was there.

And so they entered into a contract that, according to the Court's ruling, gave them exactly what they wanted, at least in part, which was -- was a -- well, no, in whole actually. It was a -- it was a guaranty language in the -- in the contract itself by both Mr. Shaw and by Mr. Hickok, which is what they requested; although, it wasn't enforceable as to Mr. Shaw. So if anybody defrauded them, it would be Mr. Shaw by not signing the guaranty, but not Mr. Hickok. And so --

THE COURT: Do you agree, Mr. Shaw?

MR. SHAW: Well, I think -- I think there is something to what he's saying. I mean --

THE COURT: That you defrauded them?

MR. SHAW: No. I never talked to them, so what would be --

THE COURT: Well, he said -- but you're saying that that's correct; if anybody defrauded, it would have been you.

MR. SHAW: Well, I'm saying it's kind of odd that they say they were defrauded by me not being personally liable on it. They never talked to me. And

I think I've told them it depended on what I said.

MR. CHAIKEN: So on this issue, aside from the fact that there's no claim --

THE COURT: Is there anything else, other than reliance?

MR. CHAIKEN: Well, no -- yes. What I'm saying is --

THE COURT: No. I'm getting your list.

MR. CHAIKEN: I'm giving it to you. I just want to summarize what it is under the statute so you will understand what I'm saying.

THE COURT: No, because you'll get to go back and do that. That's why I want a list.

MR. CHAIKEN: Yeah, the list --

THE COURT: I want to define the universe.

MR. CHAIKEN: The list is all the elements of Section 27.01(1) -- I'm sorry, (A)(1) and (A)(2) and that -- and (A) -- no, sorry -- and (C) -- excuse me -- and (D). All right. So we got the whole statute, all the elements of the claim.

THE COURT: And that's the entirety of your list of a directed verdict?

MR. CHAIKEN: That's the list, and I can explain each one of those in detail.

THE COURT: You already have.

MR. CHAIKEN: Okay.

THE COURT: All right. Mr. Aldous, you may respond. Let's start first with fraud with respect to the guaranty.

MR. ALDOUS: Your Honor, I would move at this time for a trial amendment to add to that paragraph that they've referenced the existence and denial of existence of a guaranty. I'd be happy to dictate it into the record. Or if the Court would give me approximately 45 minutes, I could bring it back to you.

THE COURT: And tell me the basis for moving for a trial amendment.

MR. ALDOUS: Okay. Judge, if you have the 2015 version, I'm at Page 773.

THE COURT: 2015?

MR. ALDOUS: Yes, ma'am.

THE COURT: Response?

MR. CHAIKEN: Well, I haven't -- I haven't heard the grounds for the -- for the trial amendment, so we oppose it.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, we would offer on -- in Paragraph 29 where it states the Grosses will show the counter-defendant's and third-party defendant's conduct constitutes fraud in a real estate transaction

as defined by Section 27.01 of the Texas Business & Commerce Code, the next sentence should read -- my proposed amendment would read, "The counter-defendant's and third-party defendant's made a false representation that they would guaranty the performance of VSDH in the buyback provision of the contract," comma. And that -- then it continues on from there.

The live pleading, as it exists on Page 4, Paragraph 15, sets forth the factual basis that they agreed to a guaranty and that they denied the existence of a guaranty. The trial amendment is sought to conform to the evidence. And because it was omitted unintentionally and that the grounds are that the -- the defendant and cross -- I'm sorry. VSDH and Mr. Hickok are neither surprised, nor prejudiced by this amendment.

THE COURT: Okay. Now, Mr. Chaiken?

MR. CHAIKEN: Sure. Well, I would note that throughout the course of the trial when there was discussion regarding intent to perform the guaranty, we objected to the questions; and the Court ruled on those objections. So we certainly have preserved our objection to the issue being presented. And, certainly, we have likewise made our objection here today on the basis that the question or the issue is not supported by the pleadings.

And, consequently, there -- there's no ground for the -- the granting of a trial amendment. While issues may be developed and they may relate to other issues that are pled, you know, just by virtue of the nature of the transaction and the mere introduction of some evidence on an unpleaded issue that is not fully developed, it is not fully developed in terms of all of the elements -- for example, those which I mentioned previously in the statute itself -- then there is no trial on that issue. And, consequently, there will be no grounds for a trial amendment on that point.

THE COURT: Mr. Shaw?

MR. ALDOUS: Your Honor, before we do that, do you have any objection to me taking my coat off?

THE COURT: No.

MR. SHAW: I'm confused. Is the trial amendment a request to amend the petition to claim that VSDH defrauded the Grosses by Shaw not being personally liable?

MR. ALDOUS: No, Your Honor.

THE COURT: No. It's based on the facts that are set out in the pleading that --

MR. SHAW: Okay.

MR. ALDOUS: If you recall, there was a

summary judgment granted for Mr. Shaw on the issue of this a long time ago. So it's only relating to VSDH and Hickok.

MR. SHAW: Okay. But it's -- it's saying that VSDH and Hickok defrauded the Grosses because -- I'm not sure of the "because." That's what I'm trying to understand.

THE COURT: Mr. Aldous?

MR. ALDOUS: Because the agreement recited a personal guaranty of Mr. Hickok, and that personal guaranty was -- the intent was to never comply with that personal guaranty by Mr. Hickok. That misrepresentation was made by Mr. Hickok both individually and as a representative of VSDH.

MR. SHAW: Well, respectfully, Hickok testified Hickok intended to be personally guarantying and intended for Shaw to be personally guarantying, but needed a separate document, was anticipating a separate document, and was going to sign a separate document. So to claim that Hickok committed some type of fraud can't -- isn't supported by the record.

One, Hickok never spoke to Gross about that matter; and, two, the only evidence is that Hickok intended to comply with the personal guaranty. VSDH intended to comply with the personal guaranty, but no

additional document came forward.

THE COURT: So you're saying they intended to comply with the guarantees that were not a part of the agreement that the parties entered into?

MR. SHAW: Hickok said, "I anticipated there would be another document and I would sign it. But this document doesn't personally guaranty me because I didn't sign it." But Hickok also testified, "I told Buttemiller we agree to the personal guarantees. We need to see the other document and no other document ever came." And even Gross testified, "Hey, the title company messed up by not giving another document."

THE COURT: Okay.

MR. CHAIKEN: Can I go one step further and simplify it?

THE COURT: No.

MR. CHAIKEN: I can't? Okay.

THE COURT: No. I think it's pretty simple. The question is: Is there any testimony in the record with regard to the issue of whether or not the guaranty was entered into and whether or not there was reliance on it? So I'm going to allow the trial amendment. Now --

MR. SHAW: I'm going to move --

THE COURT: -- there may be other concerns

with regard to that, but the trial amendment will be granted because none of the grounds for denying it have been set out for the Court.

MR. SHAW: Well, I would say we were surprised. I'm surprised by this allegation because I don't think there's any testimony to support it. I don't think that came into the record. So I don't know how we could have tried it by consent because it wasn't -- there wasn't anything in the record on this. It was only Hickok's agreement to personally --

THE COURT: The petition, the last live document, though, specifically stated, "Further, according to Paragraph 4 of addendum A, Hickok and Shaw both agreed to be personally responsible, jointly and severally, in the event VSDH Vaquero, Ltd., does not fully perform under the terms of the buyback provision. Neither Hickok nor Shaw conditioned his personal guaranty on the other being liable as well."

And so it's in that pleading, which is why I'm saying it's tried by consent.

MR. SHAW: Okay.

THE COURT: You did address those issues.

MR. SHAW: All right. And I would like to move for directed verdict on that.

THE COURT: Well, you're not there yet.

MR. SHAW: Okay.

MR. CHAIKEN: Your Honor, one other thing is that --

THE COURT: Wait a minute.

MR. CHAIKEN: Okay.

THE COURT: I think it was Mr. Aldous' opportunity to respond to the fraud and the guaranty. Is that where we were? Because you had already made your argument about it.

MR. CHAIKEN: About?

THE COURT: Asking for a directed verdict on fraud with regard to the guaranty.

MR. ALDOUS: My -- do you want me to proceed, Your Honor? My recollection of the evidence is different than Mr. Chaiken's. My recollection of the evidence is the Court knows the agreement has the guaranty in it. Mr. Hickok testified that he did not believe that he was liable on that, and he did not intend to comply with it unless he got a separate document and that he was not going to honor that.

And then post breach, then they followed that up with an email saying that nobody personally guaranteed it. So I believe that the evidence is sufficient of the fraudulent part of that.

MR. CHAIKEN: May I respond?

THE COURT: You may respond.

MR. CHAIKEN: First of all, there's absolutely no evidence in the record that Mr. Hickok ever testified that he never intended to perform the guaranty and certainly that he never intended to perform any guaranty at the time that -- that he entered into the contract.

To the contrary, the only evidence is -- and the only evidence that he testified to was that he didn't sign it. He didn't believe he signed it in a personal capacity but that he was willing to sign a guaranty. He was willing to do a guaranty, that he would sign an extra document at closing, provided that Mr. Shaw also guaranteed and signed such a document.

So he never denied any intent to perform a guaranty. What he denied is, is that the elements and the actions necessary to create the guaranty had ever occurred.

THE COURT: Okay. I'm going to make my ruling on that. I think there's enough evidence to submit that to the jury to make a determination So with regard to Mr. Hickok's motion for directed verdict on fraud of a guaranty, denied.

All right. Let's move on to false representation of defendant.

MR. CHAIKEN: Your Honor, the only other thing is we haven't talked about the absence of evidence on the specific elements of the claim itself. Okay. And I haven't been given the opportunity to argue those specific points.

THE COURT: Of the guaranty?

MR. CHAIKEN: That's correct

THE COURT: You spent an excessive amount of time, Mr. Chaiken, going through when I asked you to just give me your list.

MR. CHAIKEN: I gave you a list

THE COURT: You said that -- you didn't give me a list. You gave me a synopsis of your argument.

MR. CHAIKEN: No.

THE COURT: So we're moving along to the false representations of defendant. That's item two in Section 27.01 of your directed verdict motion.

MR. CHAIKEN: So I just want to be clear.

THE COURT: That is clear.

MR. CHAIKEN: Item two in my directed verdict motion?

THE COURT: Yes. You said false representation of defendant. But you said that your -- that your directed verdict motion was based on Business

& Commerce Code, Section 27.01, Fraud in a Real Estate Transaction. You said Section A(1); you said Section 2, I believe; and then Section C and D.

MR. CHAIKEN: (A)(1), (A)(2) and C and D, so --

THE COURT: So we are now on to A(2).

MR. CHAIKEN: A(2), okay. There is no evidence that there was any false promise to do an act when the false promise was material, made with the intention of not fulfilling it, made to a person for the purpose of inducing that person to enter into a contract, and relied upon that person in entering into that contract. To the contrary, the evidence and the only evidence is that Mr. Hickok said that he was willing to enter into exactly what Mr. Gross said he wanted, which was a joint and several -- I'm sorry -- a guaranty by both him and Mr. Shaw, provided that Mr. Shaw was also a guarantor.

The language was in the contract. The -- although, it -- and it purports to be a guaranty by both of them; although, there's been a determination that one aspect of that guaranty was not enforceable against Mr. Shaw. There -- so exactly what Mr. Gross relied upon in entering into -- Mr. and Mrs. Gross relied upon in entering into the contract, which was if they get a

personal guaranty, okay -- they got it in part. They got at least a guaranty, based on the Court's rulings, from Mr. Hickok.

The fact that he denied that it was -- that it was his personal signature and that it was legally unenforceable does not reflect upon whether or not he intended to perform the guaranty at the time that he entered into the contract that had the guaranty language in it, which is a necessary element of the Court's finding that he was, in fact, a guarantor; that by signing the document, it evidenced his intent to be a guarantor. So -- so for that reason, under (A)(2), there is -- there's no evidence and there's insufficient evidence to meet each of those four elements in (A)(2), (a), (b), (c), and (d). And if that is true, then the claim under subsection (A) of 27.01 fails as a matter of law and for back of evidence.

THE COURT: Response?

MR. ALDOUS: Your Honor, the -- both Mr. and Mrs. Gross testified they would not have entered into the contract without the requested guarantees. The defendant knew that it was a negotiated term because it was submitted by the Grosses to the contract through Mr. Buttemiller to Mr. -- to VSDH and to Mr. Hickok. And Mr. Hickok was aware that this was a term that they

wanted, and Mr. Hickok specifically said in the -- I wrote in my notes that he said, "It's not my job to tell them if their documents are deficient." And that's really the way it -- he went about it. And, to me, those meet the elements of fraud.

MR. SHAW: Your Honor, may I comment on this?

THE COURT: No. We haven't gotten to you yet.

MR. SHAW: All right.

THE COURT: Or did we already get to you? No, we haven't gotten to you yet. This is Mr. Chaiken's turn because you've already had your directed verdict

MR. SHAW: All right.

MR. CHAIKEN: Your Honor, that argument actually proves that a directed verdict is warranted. They said they would not have entered into the transaction without the guaranty. They got the guaranty when they entered into the transaction. It's the same guaranty the Court has found exists. And all Mr. Hickok is accused of having said is that the documentation of the guaranty is insufficient.

Okay. He didn't say that he didn't intend to perform the guaranty. And there's no evidence, a, that he didn't intend to perform the guaranty at any

point in time, including when he entered into the transaction  So, consequently, this is no different than an argument that, well, because he didn't perform the guaranty, he committed fraud.  And that's the same argument that they made and that the Court granted directed verdict on with regard to the buyback issue. So this is all forward looking as opposed to past and existing material fact.  And so --

THE COURT:  The ruling on Number 2 is the same on Number 1, overruled.  Let's move on to Number 3, Item (C), 27.01.

MR. CHAIKEN:  "A person who makes a false representation or false promise with actual awareness of the falsity thereof commits the fraud described in Subsection A of this section and is liable to the person defrauded for exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness"

THE COURT:  That means that you are going too fast.

MR. CHAIKEN:  Sure.  Under Subsection D.

THE COURT:  We're at Subsection C

MR. CHAIKEN:  I understand, but they relate.  They are a joint provision, okay.  Section D

requires evidence that Mr. Hickok had an actual awareness of the falsity of a representation or a promise made by himself or another that he failed to disclose the falsity of the representation or promise to the person allegedly defrauded and that he somehow benefited from the false representation or promise that -- that he committed.

And -- and so, consequently, in this instance, there was no benefit from the false representation, if he made one, in the past because the guaranty was there. And -- and they got exactly what they relied upon and what they requested. And there's no evidence that he had an actual awareness of the falsity of the representation because he never represented that he wouldn't perform a guaranty. He said to the contrary that he would as long --

THE COURT: Just not the one that was in the agreement that the parties signed?

MR. CHAIKEN: No, he never said he wouldn't perform that guaranty. In fact, he said he -- specifically he would perform that guaranty if it was a guaranty by Mr. Shaw and by Mr. -- by Mr. Hickok both. And that's what the -- exactly that language says. Now the fact that it was unenforceable against Mr. Shaw does not render it fraudulent as to Mr. Hickok.

He -- you have found that he entered into that agreement that that guaranty always existed and that it was legally enforceable against him. So he -- and he never said he wouldn't perform it. There was no evidence that he said he wouldn't perform it.

THE COURT: Mr. Aldous?

MR. ALDOUS: I really disagree with that. Mr. Hickok put Mr. Shaw in charge of the matter. Mr. Shaw represented by email, which is currently in front of the Court, that there is no personal guaranty when clearly there was. That relates back to Mr. Hickok's own testimony where he said that he did not believe that he was responsible because of the fact that he just said; that is because it wasn't mutually agreed to even though the Court's already ruled it's a joint and several obligation.

So I believe all the evidence comes out there where Mr. Hickok knew what the representation was and the parties' agreement. He knew that he did not intend to comply with it, for whatever reason, that he was actually aware of it, and that he knew that we relied on it.

MR. CHAIKEN: The problem with the argument here and the evidence is that what Mr. Aldous is saying is that there was evidence that Mr. Shaw,

after -- excuse me -- after -- after the contract was signed, not as part of the inducement, but after the matter was signed said there was no guaranty. He never said there was no intent to perform it. He just said there was no guaranty, okay, and so that's number one.

Number two, if you look at Subsection (D) and you look at all of Section 27.01, it has to be a false representation of a past or existing fact at the time the representation was made, not after the fact of the representation. So, consequently, there can be no actual awareness of the falsity of a representation or promise made in the past, okay, which is the -- the inducement aspect of it, by looking at evidence of what somebody else said after the fact. And so, consequently, there can be no fraud on that basis as well.

THE COURT: I'm going to let the jury decide on that.

All right. Mr. Shaw?

MR. SHAW: Your Honor, I move for directed verdict on the granted leave to amend plaintiff's petition regarding what I now understand to be a claim of fraud regarding the personal guarantees of -- I assume it's just Hickok.

THE COURT: If it's just Hickok, then you

don't get to make a directed verdict. If it's VSDH --

MR. SHAW: It's VSDH, but the claim, as I understand it, is VSDH is liable because -- I'm sorry. VSDH is liable on the claims that it misrepresented that Hickok would be personally liable on the guaranty. And so that's what I understand the fraud claim.

The fraud claim, as I understand it, is, hey, VSDH, you knew Hickok wasn't personally liable on the guaranty; and, therefore, and -- but you entered into -- you told the Grosses otherwise is what I understand the state of the pleading to be.

THE COURT: Is that your assertion, Mr. Aldous?

MR. ALDOUS: Yes, Your Honor.

THE COURT: Okay. So, we're all on the same page.

MR. SHAW: Okay. All right. Now, on the state of the assertion of the pleading, there is no evidence to support a fraud submission because Hickok was very clear.

THE COURT: A fraud submission as to VSDH?

MR. SHAW: Right.

THE COURT: Okay. Because Hickok was clear --

MR. SHAW: It was clear that Hickok fully

intended to sign the document to be personally liable. And Hickok fully intended and believed a follow-up document was going to be sent that required -- that was separate and Hickok would sign.

THE COURT: Did he express that --

MR. SHAW: He did.

MR. CHAIKEN: Of course, he did.

THE COURT: -- to the Grosses at the time that they entered the agreement?

MR. SHAW: He told it to John Buttemiller.

MR. CHAIKEN: To their agent.

MR. SHAW: He never talked to the Grosses. He only talked to Buttemiller. And Hickok said --

THE COURT: So he never talked to the Grosses?

MR. SHAW: Right.

MR. CHAIKEN: He talked to them through their agent.

THE COURT: Mr. Chaiken, sit down. You've had your turn. Sit down. It's too hard for you to not jump in. So, please, sit down.

MR. SHAW: Okay. So Hickok did -- Hickok testified, "I told Buttemiller we'll sign it, but you've got to send me a separate document and Shaw's got to sign." And that's -- and Hickok -- that was specific.

THE COURT: So that's sort of a fact issue?

MR. SHAW: Well, I think it's undisputed that -- so I don't think there's any evidence to submit the fraud because there is no dispute as to that fact. So if there's no -- if that fact exists unrebutted, then there can be no fraud.

THE COURT: Mr. Aldous.

MR. ALDOUS: I'm not sure. Maybe I didn't hear the -- what remains unrebutted?

MR. SHAW: The fact that Hickok told Buttemiller, send me a document -- a separate document that sets out the personal guaranty and Shaw -- and I will sign it and Shaw will sign it.

MR. ALDOUS: Well, I understand that he's arguing the flip side of the evidence that's conflicting before the jury related to whether or not fraud occurred. That may be his excuse for why he didn't alert the parties and strike through the language that he knew to be a misrepresentation. But that doesn't mean there's not a fact issue for the jury to resolve on that particular issue.

The reality is that he said that he knew at the time of closing when they went through with it that there was a representation in there that he had --

was guarantying and that he did not -- was not liable because of the fact that all these other documents and Mr. Shaw had not been signed. He did not intend to follow through with that guaranty and so that's -- that's the evidence.

MR. SHAW: But that is not the evidence. The evidence was he intended to follow through with it.

THE COURT: Okay. Let me tell you where I have my concern, Mr. Shaw. You're saying that Mr. Hickok intended to follow through in a separate document.

MR. SHAW: Right.

THE COURT: And that's what I understand your argument is.

MR. SHAW: That's right.

THE COURT: I don't recall that he ever testified that he told the Grosses that or that the Grosses testified that he told them that.

MR. SHAW: He never told the Grosses.

THE COURT: And the issue of whether -- okay. Well, then he definitely did not tell them.

MR. SHAW: He talked to Buttemiller, their agent.

THE COURT: I think that's a fact that the jury gets to construe, whether or not the agent was told

that; and if he was told that, whether or not he conveyed it to the Grosses.

MR. SHAW: Okay. But where -- okay

THE COURT: So that's a fact issue

MR. SHAW: I got you. But where is the intent? Where's the intention of fraud?

THE COURT: The jury may find that there is no intent, but it's still an issue that needs to go to them for determination

All right. So that's all of our directed verdicts. Okay.

MR. CHAIKEN: No, I had some more.

THE COURT: No.

MR. CHAIKEN: Is the Court --

THE COURT: Put them in writing.

MR. CHAIKEN: I'm sorry?

THE COURT: Put them in writing. It is now 1:44. We told the jury to come back at 2:30. We need to get the charge done.

MR. CHAIKEN: I need to make a record.

THE COURT: You can make your directed verdict in writing

MR. CHAIKEN: I don't have the opportunity to make the directed verdict at the time that I'm making it in writing. Okay.

THE COURT: I gave you an opportunity, Mr. Chaiken  I asked you for all of the elements of your directed verdict.  I gave you -- I asked you to give me a list.

MR. CHAIKEN: You said on the fraud claim, and that's what I did.

THE COURT: No.  I did not say on the fraud claim  I said give me a list so that I can go through all of them so that I know what the universe is.  You gave me your universe.

MR. CHAIKEN: No.  I didn't give you the universe, Your Honor, and I object to that.  I think the record will reflect that all I gave you was the motion on the fraud claims.  Okay.  And you offered me an opportunity, okay, when I made a directed verdict motion yesterday at the conclusion of the plaintiff's case in chief to re-urge the motions for directed verdict that I'd made yesterday.  Okay.  And --

THE COURT: I said -- I didn't offer you an opportunity. I said that you could make the -- that I would not prevent you from making or re-urging the --

MR. CHAIKEN: And I would like to re-urge and urge further those motions because at the conclusion of all the evidence, there's grounds for granting a directed verdict on all of those points.  And I would

like to make my motion.

THE COURT: Your motion has already been made. Your motion is in the record. Since you're re-urging what was already urged before, the motion is denied.

MR. CHAIKEN: So the Court is not going to allow me to urge the motion at this point based upon the conclusion of the trial and the conclusion of the trial evidence? Is that -- I just want to have a record of that.

THE COURT: The Court has allowed you to make your -- to re-urge your motion, and I'm denying it.

MR. CHAIKEN: I haven't gotten the opportunity to re-urge it.

THE COURT: You've already urged it. The urging is in the record. There is evidence of what it was, so it is being denied.

Now, you have 15 minutes for lunch recess, and then we'll do the charge conference -- the informal charge conference in my office.

MR. SHAW: Yes, Your Honor. 2:00 o'clock?

THE COURT: 2:00 o'clock.

(Lunch recess taken)

THE COURT: All right. This is the formal charge conference. It's taking place outside of the

presence of the jury. Are there any objections to the charge from the plaintiff?

MR. ALDOUS: No, Your Honor.

THE COURT: Any objections to the charge from defendant, VSDH Vaquero Venture, Ltd.?

MR. SHAW: There are, Your Honor.

THE COURT: Any objections to the charge from defendant Doug Hickok?

MR. CHAIKEN: There are, Your Honor.

THE COURT: I'm sorry, Mr. Shaw. Did you say there are or there --

MR. SHAW: There are.

THE COURT: I'm sorry. Okay. Mr. Shaw?

MR. SHAW: Your Honor, VSDH objects to Question No. 1 in that it includes Doug Hickok in the question and alternatively includes an instruction for purposes in answering this question, you are instructed that the Court has determined that Paragraph 4 of Addendum A to the new home contract constitutes Doug Hickok's personal guaranty, et cetera. I believe that that is a comment on the weight of the evidence, even though that's a legal ruling, and that should be omitted and Doug Hickok's name should be omitted from that question. Any question regarding Doug Hickok should be submitted separately.

Question No. 2 --

THE COURT: Well, let's just deal with the number one first.

MR. SHAW: All right.

THE COURT: Response, Mr. Aldous?

MR. ALDOUS: Your Honor, I believe the way it's submitted is appropriate

THE COURT: All right. The objection to Question No. 1 is overruled

MR. SHAW: Your Honor, while we're doing that, can we have the agreement on the record that --

THE COURT: Yes, we do need to do that.

MR. SHAW: An oral request for alteration or instruction or question will be acceptable to all parties, won't be objected to on appeal.

MR. CHAIKEN: And it's sufficient to preserve error.

MR. ALDOUS: Can I restate it?

MR. SHAW: Please.

MR. ALDOUS: The parties have agreed that they do not need to submit in writing a proposed instruction in a correctly-worded form or a question in correctly-worded form in writing, but may state it on the record and there will be no objection and argument in the Court of Appeals that they waived by failing to

submit it in writing and submitting it orally on the record.

MR. SHAW:  Okay.  Thank you.

THE COURT:  Is that correct, Mr. Shaw?

MR. SHAW:  Agreed, Your Honor.

THE COURT:  Mr. Chaiken?

MR. CHAIKEN:  Yes.  And, Your Honor, on the individual questions, would the Court hear my objections to those as well because the Court ruled --

THE COURT:  Is your objection the same one?

MR. CHAIKEN:  My objection to Question No. 1 is the same, yes.

THE COURT:  Okay.  It's overruled.

MR. SHAW:  Objection to Question No. 2, Judge.  Given that Question No. 1 -- given that Question No. 1 includes Doug Hickok's name, which I find objectionable, I don't believe Question No. 2 should be submitted because of his name.  There should be a different question addressing Doug Hickok's failure to comply, if any.

THE COURT:  And that question would be?

MR. SHAW:  I don't -- I'm submitting it for Doug Hickok, so I just think he should be taken out of the VSDH, Ken Gross issues.  And the Hickok and Gross

issues should be between Mr. Aldous and Mr. Chaiken.

THE COURT: Mr. Aldous?

MR. ALDOUS: I disagree. I believe the way the Court has submitted it is appropriate.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: I agree with Mr. Shaw. And I have a proposed instruction -- a proposed question. In lieu of No. 2 as it is stated, which would, of course, change the numbering thereafter; or we could call it 1(A). My proposed request is that given that we object to Doug Hickok being included in Question 1, a follow-up question should read as follows: If you answered "yes" as to -- as to VSDH in Question No. 1, then answer this Question No. 2," or whatever we would call that subsequent question. "Otherwise, do not answer that question," and that question specifically would be:

Did Doug Hickok fail to comply with the guaranty in the new home contract? The grounds of that request would be that Mr. Hickok's liability, if any, under the new home contract is limited to guaranty liability, which is predicated upon a finding of a default by VSDH; and, therefore, the jury is confused by including him in Question No. 1, causing the possibility of an inconsistent result; namely, that there could be a

finding of "no" in Question No. 1 for VSDH and a finding of "yes" for Mr. Hickok, which would be an impossibility legally.

THE COURT: Are you finished?

MR. CHAIKEN: I am finished.

THE COURT: Overruled.

We'll go off the record for a minute.

(Brief recess taken)

THE COURT: Go back on the record.

Question No. 3. I'm sorry, Mr. Shaw. Your next objection.

MR. SHAW: No objection to Question No. 3, Your Honor.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: One objection, which is the failure to include an instruction among the instructions following the question, which would be pursuant to PJC 101.6 in the Hohenberg Brothers versus George Gibbons case, 537 S.W.2d 1 and 3 -- at Page 3 -- I'm sorry -- Texas Supreme Court 1976. Conditions precedent to an obligation to perform are acts or events that are to occur after the contract is made and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty.

Failure to comply is waived by the other

party's failure to satisfy a condition precedent to the first party's obligation to perform. We believe that that instruction is proper and should be added to the instructions in Question No. 3 and would tender that instruction at this time

THE COURT: Mr. Aldous?

MR. ALDOUS: I disagree, Your Honor. I believe the way the Court has submitted it is appropriate.

THE COURT: What was that PJC reference again?

MR. CHAIKEN: The PJC reference, Your Honor, is 101.6 Hohenberg Brothers versus George E. Gibbons.

THE COURT: I just asked for the PJC, not for the cite.

MR. CHAIKEN: Sorry. That's in the PJC specifically.

THE COURT: And you're saying that's in relation to Question No. 3?

MR. CHAIKEN: Yes. I think it --

THE COURT: Overruled. So that instruction is denied.

MR. SHAW: VSDH objects to Question No. 4, Your Honor, as there's no evidence or insufficient

evidence to support a fraud submission against VSDH and particularly with the guaranty in the home contract because VSDH did not make a guaranty for the home contract.

Further, this submission would change the -- is violating -- is a violation of the economic loss doctrine. It's an attempt to turn a breach of contract case into a tort case, which is not proper. It's not supported by the evidence or the facts. So we object to this submission of Question No. 4 and the inclusion of VSDH in that submission for those reasons.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, VSDH made a misrepresentation in the contract through its agent, Mr. Hickok; and, therefore, I believe that the question is appropriate.

THE COURT: All right. Overruled.

Mr. Chaiken?

MR. CHAIKEN: Yes. Mr. Hickok objects to the first paragraph of Question No. 4. Did any of those listed below commit fraud against Ken and Betsy Gross with regard to the guaranty in the new home contract? My understanding of the allegation, which is an allegation that has been made by way of a trial amendment permitted this afternoon by the Court, is that

-- and I quote, defendant made a false representation that they would guaranty performance of VSDH and the buyback provision of the contract.

And then it cites -- or the trial amendment cites or recites back to Paragraph 15 of the -- of the live pleading of which is counter-plaintiff's third amended counterclaims and second-amended third-party petition, which speaks only to the fact that they were alleged of guaranteed and then they denied having guaranteed --I'm sorry -- having denied the existence of the guaranty. And there's been no pleading and there's been no allegation of any type of fraudulent conduct.

And at most --and then in addition to that, we would object to the inclusion of everything starting with "or" under Subsection C of "fraud occurs when," and everything underneath that in that the allegation, via the trial amendment, is specifically related to a representation. And there's no allegation of a false promise.

Consequently, to submit on a false promise would be an improper comment on the cause of actions not supported by the pleading. So we would ask for the striking of everything beginning -- everything after Subsection C where it says, Fraud occurs when limiting

it to a representation and striking any action regarding a false promise.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, I simply disagree and believe that the way the Court has submitted it is appropriate.

THE COURT: Overruled.

Anything else, Mr. Shaw?

MR. SHAW: Yes, Your Honor. VSDH objects to Question 5 for the same reasons, the limitations of the economic loss doctrine and a failure to have evidence and/or insufficient evidence to support and have evidence sufficient to support the submission of Question No. 5 and ask that it be stricken.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, I believe that the way the Court has submitted the question is supported by the evidence and is appropriate.

THE COURT: Overruled.

Mr. Chaiken?

MR. CHAIKEN: Yes. Mr. Hickok objects to the inclusion of the words, "or promise," in the Question No. 5, given that the pleading that resulted from a trial amendment today fails to mention anything about a promise or a false promise and is limited to

alleging a false representation And, consequently, the question is not -- does not conform to the pleadings and the allegations of fraud that are contained therein.

THE COURT: Mr. Aldous?

MR. ALDOUS: Your Honor, I simply disagree. The evidence and the trial amendment are appropriate and this question is appropriate.

THE COURT: Overruled.

Number 6.

MR. SHAW: Your Honor, VSDH objects to Subpart A in Number 6, the definition of loss of the benefit of the bargain. The same creates a -- has a definition that instructs the jury on what the difference in the benefit of the bargain is. It's not a proper instruction in that it -- for one, it includes the Grosses' real estate fee, which the Grosses elected voluntarily to incur. It doesn't give the jury the ability to determine what losses, if any, the Grosses incurred and instead provides an instruction to the jury about how to do so. So plaintiff objects to the same and believes that the loss of the benefit of the bargain definition should be, "You can consider the following."

THE COURT: Plaintiff?

MR. SHAW: I'm sorry. Yes, I'm sorry. Yes. On H, it should say loss of benefit of the

bargain. The jury can consider the difference between the amount agreed to by the parties upon completion of the buyback option and the new home contract, comma, and the amount received by the Grosses --

THE COURT: You misunderstood me, Mr. Shaw.

MR. SHAW: I'm sorry, Your Honor?

THE COURT: You said, "So plaintiff objects to the same"

MR. SHAW: I'm sorry, Your Honor. Defendant, VSDH.

THE COURT: Okay.

MR. SHAW: And the amount received by the Grosses upon their sale of the property following the breach; however, you are entitled to determine what expenses were reasonable, if any.

THE COURT: Mr. Aldous?

MR. ALDOUS: That part is taken care of in Subsection B, which is expenses of mitigation. And it's limited to reasonable and necessary expenses incurred. And the defense can argue that the hiring of a real estate agent wasn't reasonable; therefore, the way it's submitted is appropriate.

THE COURT: The objection is overruled.

Mr. Chaiken?

MR. CHAIKEN: Yes. Mr. Hickok objects to Question No. 6, first, on the language in the second sentence beginning with, "or answered, quote, VSDH Vaquero Venture, Ltd., or Doug Hickok, close quote, in response to Question No. 2." And -- I'm sorry, Your Honor. I'm looking at the wrong place here. And answered "no" for VSDH Vaquero Venture, Ltd., or Doug Hickok in response to Question No. 3.

And it goes on. It says, "Then answer the following question; otherwise, do not answer the following question." The -- that language is confusing and will confuse the jury. It also constitutes an improper comment on the evidence and on the weight of the evidence. And, furthermore, it is not a necessary instruction. The jury can be permitted to simply -- if they answered "yes" as to VSDH Vaquero Venture, Ltd., or Doug Hickok in response to Question No. 1, proceed to answer the question without a reference to any other conditions.

Secondly, Mr. Hickok objects to Subsection A, loss of the benefit of the bargain. The definition that is there reads, "the difference between the amount agreed to by the parties for completion of the buyback option in the new home contract and the amount received by the Grosses upon their sale of the property following

the breach."  Mr. Hickok believes that the proper measure of that loss and measure of damages would be the difference between the amount of the buyback option and the fair market value of the property at the time that the Grosses sold it following the alleged breach.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Your Honor, I believe that that's an inaccurate statement of the law, and I believe the way the Court submitted it is appropriate.

THE COURT:  Number 6 is overruled.

Mr. Shaw, anything further?

MR. SHAW:  Your Honor, I've got my same objection to 7 that I placed for 6.

THE COURT:  The Court will overrule the same objection.

Mr. Chaiken?

MR. CHAIKEN:  Your Honor, Mr. Hickok believes that there is a question that should be inserted prior to Question No. 7 or immediately thereafter, but properly before.  And the proposed and requested question would --

THE COURT:  Could you move the microphone, please?

MR. CHAIKEN:  -- and instruction would be as follows:  Do you find that Ken Gross and/or Betsy

Gross waived their right to recover damages from Douglas Hickok?

Then it would be followed by an instruction that reads: In answering this question, consider that waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right. And then there would be an answer, "yes" or "no." The basis of that requested instruction or question and instruction is, as the Court is aware, there was exclusive remedies provision, sole and exclusive remedies provision in the contract that while -- while modified by the seller was not modified by Mr. Hickok as a guarantor.

The Court has found that he is a party to the contract, but he never agreed to the reinstatement of damages remedies; and, therefore, there is a waiver in the contract of the Grosses' ability to pursue the recovery of damages from Mr. Hickok.

THE COURT: Mr. Aldous?

MR. ALDOUS: The principal obligor gave -- granted that right; and, therefore, the submission by the Court is appropriate.

THE COURT: Overruled.

No. 8, are there any objections, Ms. Shaw?

MR. SHAW: VSDH objects, Your Honor.

MR. CHAIKEN: I'm sorry. And then I was going to add that Mr. Hickok objects to Question No. 7 on the same grounds as stated with regard to loss of the benefit of the bargain in Question No. 6.

THE COURT: Overruled.

MR. SHAW: Question No. 8, VSDH objects that there's no evidence or insufficient evidence to submit the clear and convincing question to the jury and, further, for the same economic loss limitations and -- that I've previously objected to the other tort submissions. Ask that that question be stricken.

THE COURT: Mr. Aldous?

MR. ALDOUS: The Court's submission is appropriate.

THE COURT: Overruled.

Mr. Chaiken?

MR. CHAIKEN: Yes, Your Honor. Mr. Hickok objects to Question No. 8 on the same grounds as VSDH has just enunciated and, furthermore, objects to the inclusion of everything after item C regarding false representation on the grounds that the case and pleadings -- I'm sorry -- that the pleading, as amended by the trial amendment today, does not speak about false promises in any manner and solely speaks to false

representations.  And, thus, the question does not conform to the pleadings; and the jury's being asked to resolve a matter that has not been placed in controversy.

THE COURT:  All right.  The Court will note that Question No. 8 is missing a blank for an answer.

MR. ALDOUS:  I just noticed that.

THE COURT:  And so the space will be entered that says, "Answer yes or no."  And a space will be left for that.  Other than that, the objections to No. 8 are overruled.

MR. SHAW:  VSDH objects to Question 9, Your Honor, for the same reasons that it posed for Question 8 and ask that that question be stricken.

THE COURT:  Mr. Aldous?

MR. ALDOUS:  Same response, Your Honor.

THE COURT:  Overruled.

Mr. Chaiken?

MR. CHAIKEN:  Yes.  Mr. Hickok objects to the inclusion of Question No. 9 in its entirety given the absence of any evidence with regard to any predicate for exemplary damages

THE COURT:  Mr. Aldous?

MR. ALDOUS:  I believe the Court's

instruction is appropriate.

THE COURT: Overruled.

All right. Anything further? If not, we'll bring in the jury.

MR. SHAW: Can I get a new charge when you redo it or re-print it? May I get a full new one, please?

THE COURT: We're not going to re-print it. This is the fix.

MR. SHAW: Okay. Is there an extra copy laying around because I wrote all over mine?

THE COURT: You have that original copy that we used in chambers. That should be exactly the same.

All right. Mr. Aldous, are you going to need the overhead?

MR. ALDOUS: Yes, Your Honor.

THE COURT: All rise. You may bring in the jury.

(Jury enters the courtroom)

THE COURT: You may be seated.

Ladies and gentlemen of the jury, I apologize for keeping you waiting so long. It took us longer to prepare the charge than we anticipated. After everyone has received a copy, I will read the charge of

the Court in this case to the jury.

Please listen carefully as I read the charge to you. The original will be placed on the table in the jury room when you retire to begin your deliberations upon the verdict in this case.

Ladies and gentlemen of the jury, this case -- after the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room. Remember my previous instructions.

Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I have given you a number where others may contact you in case of an emergency.

Here are the instructions for answering the questions: Number 1: Do not let bias, prejudice, or sympathy play any part in your deliberations.

Number 2: Base your answers only on the

evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

Number 3: You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions

Number 4: If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper, legal definition.

Number 5: All the questions and answers are important. No one should say that any question or answer is not important.

Number 6: Answer "yes" or "no" to all questions unless you were told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term, "preponderance of the evidence" means the greater weight of credible evidence presented

in this case If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

Number 7: Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

Number 8: Do not answer questions by drawing straws or by any method of chance.

Number 9: Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

Number 10: Do not trade on your answers. For example, do not say, "I will answer this question your way if you will answer another question my way."

Number 11: Unless otherwise instructed, the answers to the questions must be based on the decision of at least five of the six jurors. The same

five jurors must agree on every answer. Do not agree to be bound by a vote of anything less than five jurors even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of jury misconduct; and I might have to order a new trial and start this process over again. This would waste your time and the parties' money and would require the taxpayers of the county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

Definitions and instructions: The jury is instructed that a fact may be established by direct evidence or circumstantial evidence or both. A fact is established by direct evidence when proved by a witness who saw the act done or hear the words spoken or by documentary evidence. A fact may be established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Question No. 1: Did any of the following parties fail to comply with the new home contract? Answer "yes" or "no" for VSDH Vaquero Venture, Ltd., Doug Hickok, Ken Gross, and Betsy Gross.

For purposes of answering this question, you are instructed that the Court has determined that

Paragraph 4 of Addendum A to the new home contract constitutes Doug Hickok's personal guaranty of VSDH Vaquero Venture, Ltd's obligation under the buyback options granted from VSDH Vaquero Venture, Ltd. to the Grosses.

Question No. 2: Who of those above whom you have found to have failed to comply with the contract failed to comply with the contract first? Answer for VSDH Vaquero, Ltd., Doug Hickok, Ken Gross, and Betsy Gross.

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include: One, the extent to which the injured party will be deprived of the benefit which he reasonably expected; two, the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; three, the extent to which the party failing to perform or to offer to perform will suffer forfeiture; four, the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances; five, the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair

dealing.

Question No. 3: Was the failure of any of the parties listed below excused? Answer "yes" or "no" for each: VSDH Vaquero Venture, Ltd., Doug Hickok, Ken Gross, and Betsy Gross.

For purposes of answering this question, you are instructed that a failure to comply by one party is excused by the other party's prior repudiation of the same agreement.

A party repudiates an agreement when the party indicates, by the party's words or actions, that the party is not going to perform its obligations under the agreement in the future, showing a fixed intent to abandon, renounce, and refuse to perform the agreement.

For purpose of answering this question, you are instructed that a failure to comply with an agreement by one party is excused by the other party's prior failure to comply with a material obligation of the same agreement.

Failure to comply by a party is excused if compliance is waived by the other party. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Question No. 4: Did any of those listed below commit fraud against Ken and Betsy Gross with

regard to the guarantee in the new home contract?

Fraud occurs when, a, there is a false representation of a past or existing material fact and, b, the false representation is made to a person for the purpose of inducing that person to enter a contract and, c, the false representation is relied on by the person in entering into that contract; or, a, a party makes a false promise to do an act and, b, the promise is material and, c, the promise is made with the intention of not fulfilling it and, d, the promise is made to a person for the purpose of inducing that person to enter into a contract and, e, that person relies on the promise in entering into that contract.

Answer "yes" or "no" for each: VSDH Vaquero Venture, Ltd., or Doug Hickok.

If you answered "yes" to either question -- to either party in Question No. 4, then answer Question No. 5; otherwise, do not answer Question No. 5.

Question No. 5: Did any of those listed below have actual awareness of the falsity of the representation or promise you found to be fraud in Question No. 4?

Actual awareness may be inferred where objective manifestations indicate a person acted with actual awareness.

Answer "yes" or "no" for each: VSDH Vaquero Venture, Ltd., Doug Hickok.

Question No. 6: If you answered "yes" to VSDH Vaquero Venture, Ltd. or Doug Hickok in response to Question No. 1 or answered VSDH Vaquero, Ltd. or Doug Hickok in response to No. 2 and answered "no" for VSDH Vaquero Venture, Ltd. or Doug Hickok in response to Question No. 3, then answer the following question. Otherwise, do not answer the following question.

What sum of money, if any, if paid now in cash would fairly and reasonably compensate Ken and Betsy Gross for their damages, if any, that resulted from the failure to comply you found in answer to Question No. 1?

Consider the following elements of damages, if any, and none other: A, loss of the benefit of the bargain; B, expenses of mitigation. Do not add any amount for interest on any damages, if any.

Answer separately in dollars and cents for damages, if any, for, A, loss of the benefit of the bargain, the difference between the amount agreed to by the parties for completion of the buyback option in the new home contract and the amount received by the Grosses upon the sale of the property following the breach; B, expenses of mitigation, reasonable and necessary

expenses incurred by Ken and Betsy Gross in selling the property following the breach. And there's a space for an answer there.

If you answered "yes" to any of those listed in Question No. 4, then answer the following question. Otherwise, do not answer the following question.

Question No. 7: What sum of money, if any, if paid now in cash would fairly and reasonably compensate Ken and Betsy Gross for their damages, if any, that resulted from the fraud you found in answer to Question No. 4?

In answering questions about damages, you must answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Consider the following elements of damages, if any, and none other: A, loss of the benefit of the bargain; B, expenses of mitigation; C, incidental damages. Do not add any amount for interest on damages,

if any.

Answer separately in dollars and cents for damages, if any, for A, loss of the benefit of the bargain, the difference between the amount agreed to by the parties for completion of the buyback option in the new home contract and the amount received by the Grosses upon the sale of the property; B, expenses in mitigation, reasonable and necessary expenses incurred by Kenneth Gross and Betsy Gross in selling the property following the breach; C, incidental damages, reasonable and necessary expenses incurred by Kenneth Gross and Betsy Gross to construct the addition above in the amount of $156,871.

Answer the following question only if you have unanimously answered "yes" to any party in response to Question No. 5. Otherwise, do not answer the following question. To answer "yes" to any part of the following question, your answer must be unanimous. You may answer "no" to any part of the following question only upon a vote of five or more jurors. Otherwise, you must not answer the following question.

Question No. 8: Do you find by clear and convincing evidence that the harm to Ken and Betsy Gross resulted from fraud?

"Clear and convincing evidence" means the

measure or degree of proof that produces a firm belief or conviction of the truth of the allegation sought to be established

Fraud occurs when, A, there is a false misrepresentation-- excuse me -- a false representation of a past or existing material fact and, B, the false representation is made to a person for the purpose of inducing that person to enter into a contract and, C, the false misrepresentation is relied on by the person entering into that contract; or, A, a party makes a false promise to do an act and, B, the promise is material and, C, the promise is made with the intention of not fulfilling it and, D, the promise is made to a person for the purpose of inducing that person to enter into a contract and, E, that person relies on the promise in entering into that contract.

Answer "yes" or "no."

Answer the following question only if you have unanimously answered "yes" to any party in response to Question No. 5. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

Question No. 9: What sum of money, if any, if paid now in cash should be assessed against

those listed below and awarded to Ken and Betsy Gross as exemplary damages, if any, for the conduct found in response to Question No. 4?

"Exemplary damages" means an amount you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are: One, the nature of the wrong; two, the character of the conduct involved; three, the degree of culpability of those listed below; four, the situation and sensibilities of the parties concerned; five, the extent to which such conduct offends a public sense of justice and propriety; six, the net worth of those listed below.

Answer in dollars and cents, if any, for each: VSDH Vaquero Venture, Ltd. and Doug Hickok.

Mr. Aldous, you may proceed.

MR. ALDOUS: Thank you, Your Honor. Your Honor, did I ask you to give me a five-minute warning?

THE COURT: Yes, you did.

MR. ALDOUS: Thank you.

THE COURT: You're going to need to move that more to an angle. I can't see it.

MR. ALDOUS: Sure. How's that?

THE COURT: That's fine.

MR. ALDOUS: Okay. Sorry.

Ladies and gentlemen of the jury, I appreciate all the time and effort that you've put into this. And now I don't have very much time, but this is one of the last chances we get to talk to you. So as I was sitting here thinking, you know, one of the things the Judge told you that you read is that you guys are the sole judges of the credibility of the witnesses and the facts of this case. And what that means is you've got to use your common sense in what you've learned in everyday life to see who was telling the truth and who isn't, because you really have been given two separate choices.

One are the Grosses, who say, you know what, we were acting like this was all, you know, an agreed deal. We all knew what was going on. We weren't upset about it or concerned about it until in May when they were not answering our phone calls, and then we became concerned about it. Or you have their version of the events, which is, oh, we had all these problems where they didn't comply with the contract; although, we never said that.

So I was thinking about how in the world can we, you know, reach that decision where we decide, well, you know, who's right and who's wrong. And, you

know, if there's a -- I think the best way to look at it is: Who said what before they ever came to court. And what I mean by that is everybody in this -- you saw all these emails that everybody sent around. And who was consistent with the way they testified here as to what they had in their emails? And that's the Grosses.

If you remember, Exhibit 24 was the email that -- or the -- I'm sorry -- the fax that Ken Gross sent over to Mr. Hickok. And he said, Mr. Hickok, you know, I'm starting construction on this addition, and I'd like for you guys to come on out and take a look at it and take a look at the plans and all of that.

And then Mr. Hickok's response was -- after a couple of phone calls and then this fax was to make an appointment, and they cancel on the day of the appointment. That's Exhibit 27. He just decided that, you know, it wasn't important enough for him to come that day, and so he decided to come sometime later.

Now the reason that that's not a big issue for us in the way it was back then is because we were not planning on trying to work up a case or anything like that, well, like I believe they were. And, instead, we were just operating because we -- everybody knew what was going to be built from the day the deal was done, from the day that Ken walked around and showed

Mr. Hickok exactly what he was proposing.

Now to believe Mr. Hickok, this experienced real estate broker, he entered into a deal on a $2.8 million house for an addition to be built and them to buy it back without knowing what was going to happen. Is that something that we can accept, that this businessman that has over 40 businesses with separate real estate holdings is all the sudden, he doesn't -- he's not going to find out it wasn't specific and he didn't need it? Well, it's in the contract. I mean, and he kind of said that too. He said the contract itself had the listing of what was going to go into the addition.

But now -- and then, of course, there's tons of emails that were exchanged over time that you guys saw where the issue of the buyback came up. And not one time is there an email, letter, or anything else from the VSDH side of the equation back to the Grosses to say, you know what? You've already breached the agreement, so we don't have to do anything.

It wasn't the way it was. The correspondence from Mr. Shaw was always the same; good to hear from you. Hope all is well. Planning to review the documentation, and I'm glad to talk. I want to let you know that the entity that sold the home is not

financially solvent so that you will -- that will no doubt impact where this goes. Please call me when you can.

It was his consistent statement every time. That's Exhibit 84. Exhibit 65, Betsy, thank you for your email today. I'm glad to talk, but I want to make sure you're aware that the entity that sold the home is not financially solvent. Not one time did anybody say, you know what, you guys already breached the agreement because, number one, you didn't let us come out there and take a look at the plans beforehand, not once. Not once did they say, you know what, we would have put the other thing on the other side. We would have put the -- you know, the bathroom on the other side. We would have not put granite on the -- on the bar. They didn't say any of that.

In fact, at no point in time did they raise anything about this deal, other than the fact that VSDH was insolvent. Now, Mr. Shaw might have come in here to the courtroom and said he had the cash to be able to buy this house, but you'll look in vain for any email where he said that to the Grosses. Look, don't panic. Don't sell it. Even though VSDH is insolvent, I've got the ability to take care of it. That's no where in there. At no point in time did he ever say

that.

In addition, here's Exhibit 88, a letter from Van Shaw, June 7, 2009.  Dear Betsy, thank you for your June 6th email.  Please call me.  I did review the enclosure you sent and note that the entity is the only responsible party.  It does not contain any personal guaranty, which is what I remember.  So not only are they saying the guarantees that were in the contract, they really don't exist, but now they're saying that we're not going to -- the personal guarantees aren't there, and the entity that you're dealing with is bankrupt.

It was interesting to me that Mr. Chaiken suggested that why didn't you call us and offer us the deal that you were having to do because we breached the agreement to buy the home back.  That's kind of --it's kind of interesting  I'm going to breach the agreement, but I want to get a better deal.  So if you'll give me the deal that you're going to have do so that I can -- so you can avoid some of your damage, that would be good for us.

Exhibit 36, June 15th from Ken and Betsy Gross, Doug, I called and left a message on your voicemail.  I spoke to Van and he said that VSDH does not have enough money to honor our contract and buy back

the house; thus, VSDH does not intend to perform our contract. Where's the response to that saying, wait a minute; that's not right?

Now Mr. Shaw contends that's because everybody was conspiring against him and they had lawyered up, without recognizing that he had been the only lawyer making statements about what the law is or is not during the whole deal. So you have one party who says the same thing that they've said all along. That's the Grosses. And then you have the defense, who has come in here and has now raised all these objections and supposedly breaches of an agreement that they never raised until we got to this courtroom.

Now they're going to point to that letter from Hap Stern who said, oh, you didn't escrow this stuff and we're going to rely on the contract. We don't waive anything. The reality is they did waive it. They had an opportunity to do something, and they chose not to do it. So if you look at the charge, the questions that have been asked of you, starting with Question No. 1, you were asked if any of the following parties failed to comply with the new home contract.

I'd submit to you the answer is "yes" for VSDH and "yes" for Doug Hickok and "no" for Betsy and Ken Gross. And the reason I say this is, you remember

all the testimony that we got into about, well, I didn't mean to sign that individually and there was no guaranty, it had to come in a different -- in a different document. Well, the Court's now ruled and instructed you that for the purposes of answering this question, the Court has determined that Paragraph 4 of the addendum to the new home contract constitutes a personal guaranty by Doug Hickok of VSDH's obligations under that agreement.

All that testimony means nothing. The question is: Did VSDH breach? If they breached, then Doug Hickok breached. And that's why I say "yes," "yes," and then, "no." So you might say, well, why are you saying "no" as to Ken and Betsy Gross? Well, the instruction under Question No. 2 tells you what a material breach is. A material breach is one that the parties really, really wanted and cared about. That escrow agreement that you -- that you heard, their complaint is not that the agreement -- I mean that the money was held in escrow, because it was. Their complaint is that it wasn't held with the title company that they picked.

Now, if you're an escrow agent, it doesn't matter who you work for; you're an escrow agent, and you're bound to do what the escrow agreement says.

MR. SHAW: Your Honor, he's arguing outside of the evidence.

THE COURT: Careful, Mr. Aldous.

MR. ALDOUS: Yes, Your Honor.

The point is the escrow agreement there -- was there to make sure that the money, the bank loan to the Grosses, was used to build the addition. The money was used by the Grosses to build the addition. It went exactly like it was supposed to go. What that is is a made-up breach to come in here and argue as a way to get out of their responsibility. You say, okay. Well, what about the issue of the plans and specifications? Same thing.

Those plans -- those specifications-- and, you know, they can say they're not specifications all you want, but when they know it's supposed to be the same like and kind as the rest of the house -- and, by the way, not every room is supposed to look like the foyer or the library with all that elaborate, you know, woodwork and everything like that. I guarantee you that if you had pictures of every one of the bedrooms in there, not one of the bedrooms --

MR. SHAW: Your Honor, I'm going to object. He's arguing outside of the evidence.

THE COURT: It's argument, Counsel

MR. SHAW: All right. But there's no evidence to support what he's saying.

THE COURT: Mr. Shaw, no gratuitous sidebar, please.

MR. ALDOUS: You'll be able to look at the photographs. They're in evidence, and you can determine for yourself. But even Mr. Kramer admitted that not every room was the same. And so the real issue here is: Is this an important, material thing for them? Was it important? And the answer's, "no." They knew what was going to be built. When we asked them to come out and take a look, sure we did because we're being cordial. We didn't know that they were planning every way they could to get out of it. But we were being cordial. Come on out. Take a look.

Mr. Hickok sends a message two weeks later on the day he's supposed to show up, hey, I'm not going to be there. It if was important to him, he would have been there. If it was important to him --if he didn't know, he would have come. Now, he did come out and he took a look. And this is why I know it wasn't important to him; because, although he said now that I told him, you know, you should have called me out before you started, that's not what the Grosses recall.

But the most important thing is: What did

he ask that needed to be changed. What did he say? You know what, that's wrong. Don't do it that way. You need to do this. No, wait a minute. You need to use different materials, not a bit. Give me those plans. I need to take them over to somebody else back -- back then let them take a look at them. It never happened. And why? Because it wasn't material. It wasn't important.

The one thing that is interesting is they say that we breached the agreement by selling this on September -- before September 1st, 2009. Despite the fact that we continued to ask them, hey, look. We're going to have to sell this because you've said you're not going to perform. Now they've come into court and they've said, oh, we never said we weren't going to perform. We could have performed. We may have performed. I didn't -- I never went to get a loan, but I didn't have to get a loan because I had Mr. Shaw's capability to give me cash. They have all sorts of excuses to say here in this courtroom that they sold it early by selling it before September 1st, 2009.

But when you look back at what they were selling back then, the only thing they were selling was VSDH is insolvent. Not one time did they say, hey, you know what, just give us a little bit of time. We may

buy it back. Now Mr. Shaw stood up on that stand and tried to tell everybody that these folks were trying to set him up. I submit to you the only people that were getting set up right here were the Grosses. They started planning their defense the day the market crashed and they were going to have to buy this back. Ever since then, they've been planning a way and scheming a way to try to get out of paying what they need to pay under this contract. That's been the whole thing.

And you know what? Truthfully, the only people that can stop them are y'all. I can't.

THE COURT: Four minutes.

MR. ALDOUS: The judge can't, only you. So the question here is -- on No. 2 is: Who of those above have you found to have failed to comply first? And it has to be VSDH. They failed to comply first. Doug Hickok's then supposed to take up their slack for the guaranty and he didn't.

Question No. 3 is: Was the failure of the parties listed below excused? And the answer for -- from my perspective, there is no excuse for VSDH or Doug Hickok. If you found that some other thing that the Grosses did was a breach -- for instance, if you say, you know what, you did breach by selling it early

because that's what the contract said.

But you can also find that this -- that they repudiated the agreement. What that means is you don't need to wait for them to not perform. Once they say to you, "I'm not going to do it," you are free to act on their word. And that's what it says right here. You're instructed that a party repudiates an agreement when the party indicates by the party's words or actions that he's not going to perform its obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

And then above that it says one party is excused by the other party's prior repudiation. So what happens is once they tell -- I mean, and this is just standard. This is what everybody knows. Once that somebody tells you, hey, I'm not going to do it, it's like going out -- I'm going to go on a cruise ship. You get three weeks before you're about to leave on the cruise ship. They call you up and say the cruise ship is -- the cruise line is bankrupt. Well, should I go get another one, or should I wait until I find out if you've got a boat in the dock? It makes no sense.

Question No. 4 is: Did they commit fraud? And this really goes to their continual and consistent representations that they didn't guaranty anything when

for sure they did. It's in the contract. It says so bigger than Dallas. The answer is "yes" to both of these.

Question No. 5: Did they have actual awareness of what they were doing? You heard Mr. Hickok on the stand saying, yeah, I knew there was a guaranty in there, but, hey, you know what, if they didn't make me sign the right documents, that's not my problem. Actual awareness. He worked for VSDH and he was himself.

The next question is the benefit of the bargain damages. And that's why I have the -- the thing clipped over here. If you remember, we went through those; the difference in the price of the top two. And that would go in this blank here, and then the expenses of the sale will go down below that. The total for both of those is 562,241 bucks.

On Question No. 7, the same number is going to end up going for these two. The additional number really goes to -- if you recall the additional expenses that we had of $20,000 related to the construction of the addition. So that's -- 20,000 would go over here.

And then the last two questions relate to whether or not you find by clear and convincing evidence

-- there should be a blank down here -- that the fraud damaged them. And you heard from both Ken and Betsy that they wouldn't have entered into this deal without the guarantees. So the answer, as far as I'm concerned, is, "yes."

And then finally the last one is: What sum of money, if any -- and, of course, this is all -- this is all up to your discretion. But, you know, a lot of times people think of it in terms of, well, I want to make sure these folks don't do this again. And that's what you need to operate on. What will it do? And you can use all the character, the conduct, the nature of the wrong, whether they've taken advantage or what.

Now, ladies and gentlemen, my time is up. I will get a chance to talk to you briefly again after they go, but I appreciate your time and attention in this matter. Thank you.

THE COURT: Mr. Shaw?

MR. SHAW: Thank you, Your Honor.

Ladies and gentlemen, Mr. Aldous said it all when he said, let's see what the parties said before they ever came to court. Let's see what the parties said before they ever came to court. That's what he says is important, is the most important. And what they said was set out here in this contract, Exhibit 3. So,

what we know is if you want precisely to enforce a contract, you have to precisely honor a contract from the get go.

We had the Grosses agreeing to do certain things. Mr. Aldous wants to make it like it's not important, these things for the Grosses were not important. But that is not true. That is not accurate. We've been through this ad naseum. We've been through the start. They were supposed to have escrowed $156,000 with the title company and enter into an escrow agreement acceptable to the seller and buyer. Never, ever, never did. We know that unequivocally.

Exhibit 29, lawyer writes immediately July 3, 2007. It says we represent the seller. The buyer agrees to escrow. The contract further provides. But the buyer will obtain the seller's consent to the plans and specifications. That's what they agreed to immediately, and that's what they breached immediately. A lawyer tells them the buyer failed and refused to enter into the escrow. Seller reserves all of its rights. No reply, no response, no nothing.

Now, you came here this week and you did your duty. You were required to precisely perform your obligations. You did that admirably, and we appreciate it. You showed up on time. You stayed the entire time.

You were attentive. You did that because, as an American citizen, you get your freedom because you have the rights, as American citizens, to freedom; but you have obligations.

And one of them is what you fulfilled this week. And if you don't precisely fulfill your obligations, bad things can happen. You can go to jail; you can get tickets, worse. That's why there are obligations. That's why there's duties. Look at these other agreements that Mr. Aldous talks about. There's some writings. And Mr. Aldous says, well, you know, Shaw said there was an agreement to -- that we could sell the house. We could sell the house. And Shaw said there was an agreement.

So after these people, the Grosses, lawyered up, they write a letter. And you tell me if this letter makes any sense. Per your offer of yesterday to allow us to enter into a contract with a prospective buyer, can you give us that agreement? Well, if I had already given them the agreement, why are they writing me for the agreement? And who were these people that are copied here?

Cooper & Scully is a firm, a law firm. They're not telling me. They're trying to hide from the fact that they've got these lawyers. And they're

writing these letters and they're making these things up so that one day they can be in front of you.

And then let's look at this one, Exhibit 59. They write a letter August 18. And they tell you at 7:24 p.m., and they tell you we're going to sell this house tomorrow. We're going to list -- we're going to sign a contract tomorrow. And we will assume you approve unless you tell us in three business hours, email three business hours by noon the next day that that's what they're going to do. And sure enough, they did it. And why? We don't know. You don't know. I don't know. We don't know.

We know that Mrs. Gross said they were forced to. We don't know what that means. If they wanted you to know, they would have told you.

MR. ALDOUS: Objection, Your Honor. That's a comment on objections.

THE COURT: Sustained.

MR. SHAW: Why don't we know what the force was?

MR. ALDOUS: Objection, Your Honor. That violates a previous order of the Court.

THE COURT: Sustained.

MR. SHAW: The contract said that they were going to wait until -- if you'll remember, they

were going to wait, and they were not going to -- they were going to wait until September 1, 2009. And why not? Why didn't they wait? And then they said that they were going to -- should the buyer enter into a contract to sell the property, the buyback option will immediately terminate. They knew that. It's in their emails. So they elected voluntarily to undertake that action. And why is this stuff important? Why were the plans and specs important? Why was all this important?

Let's talk about something else for a minute. Tony Romo signed a contract with the Cowboys a couple of years ago. He had back problems, significant back problems. I don't know the terms of his contract. But let's assume the terms were we're going to pay you some money. As part of this money for the contract, we want to work out a plan with you for you to work out. We want to know where you're going, when you're going, and how many hours.

Tony says, fine, and I'll agree to give you that workout plan. And Tony says -- and they say you need back surgery. And Tony says, yeah. And they say we want you, Tony, to post $156,000 with us or an escrow agreement, and we want to set out some plans and specifications for your surgery. We want to know what doctor's doing your surgery, where, what is the surgery

you're getting. And we want to have the right to approve that surgery because we're investing a lot of money in you, and we want to have that right.

And, by the way, we want to give you your money back. If you fulfill your obligations, we give your $156,000 on September 1, 2009. But if you enter into a contract with another team before that time, if you don't honor the escrow agreement, if you don't honor the plans and specifications, if you don't wait until September 1, it's all over. Everything's out the door.

And it's reasonable for the Cowboys to do that because they've invested in him. They want to know is he going to a hack for his surgery; is he going to the top-qualified doctor that -- they've got doctors on staff that all get vetted and approved. And that's what this thing was about.

The Grosses agreed to get the plans and specifications The Grosses don't hire the top-notch architect that designs --

MR. ALDOUS: Objection, Your Honor. That's outside the record.

THE COURT: Sustained.

MR. SHAW: The Grosses hire some fellow out of Southlake to do it. Why didn't they hire the top-notch architect to do it? Why not? The Grosses

then don't do it like the original house is. The addition is not like the original house.

MR. ALDOUS: Objection, Your Honor. That's outside the record.

THE COURT: Sustained.

MR. SHAW: What we know is that yard is important; that the Grosses' addition took up yard space. We know that. And for buyers in this quality of home, we know that that's a negative. What we also know is if it wasn't a negative, how could the house go from a $2,800,000 house to a $2,400,000 house after some $200,000 was added? If everything was so beautiful and everything was so copasetic, how could that house get devalued like that in that short of period of time?

Because what we know is, Defendant's Exhibit 2, is that the house was appraised by an appraiser in June of 2007. And we know that the appraisal of the home -- let me find it here -- showed that the home in 2007, when the Grosses bought it and before the Grosses performed one bit of construction, was worth $2,855,000. The day they bought it an independent state certified appraiser determined that was the value of that house.

And now they want to say after they did all these improvements, which were so great and were so

beautiful and matched the house, the thing decreased in value more than $400,000. Impossible, impossible if those improvements were of that quality. And why -- why, if this was the right price, they wanted to sell the house? Why not wait? If it was the right price, why would some buyer contract and close in six days?

The only reason some buyer would contract and close in six days is because that was a deal. That was a bargain because there's no other reason that someone's going to do -- act like that. I've never heard of it. I bet you've never heard of it, anybody closing in six days on a home from start to finish.

Why did the Grosses pay $180,000 to Ms. Taylor --

THE COURT: Three minutes.

MR. SHAW: -- for that kind of work? And I have some other questions that I want to know about. I want to know, where was Ms. Browning, the buyer? Where was the buyer to say that she got fair market value? Why did she close? We've talked about that, why the buyer wanted to close, why Mrs. Gross -- why they were forced to. We talked about that.

Where is the escrow agreement with this bank if they had one? Where's the draw request with this bank if they had one? Where's the evidence of why

the original home designer was not hired?

Mr. Gross said this was for showcase purposes. Where's the photographs or the videos of construction so he could show people what he did? When Mr. Hickok got there, Mr. Gross says there was nothing hardly done; but, yet, Mr. -- that was November and Mr. Gross had to be through by December 31. Mrs. Gross said, well, no, there were things done more than that. But where are the photographs? If Hickok was wrong, where are the photographs on that?

When Hickok was there, they say, well, you know, he said it was great. There was no sheetrock, no floor, no walls, no windows, no doors, no lighting, no paint, no roof, no nothing. What could he say was so great, terrific, or fantastic? What would there be? How could Mr. Gross complete the job on December 31 if he was barely through in November? Where are the photographs? Where's the testimony of Mr. Gross's lawyer, Mr. Zimmerman? Where's the testimony from Buttemiller, the agent? Where's the testimony from the title company? Mr. Gross blames all these --

MR. ALDOUS: Your Honor, that violates the previous order of the Court.

THE COURT: Sustained.

You have one minute remaining, Mr. Shaw.

MR. SHAW: Thank you, Your Honor.

What we know is that you've got to precisely honor if you're going to precisely enforce. There was no reason otherwise in this case, and the Grosses are not entitled to recover. Thank you.

THE COURT: Mr. Chaiken?

MR. CHAIKEN: Thank you, Your Honor.

Ladies and gentlemen, I take very seriously what I do here in the courtroom, especially when a client of mine, a friend of mine, has been sued in a manner that I think is inappropriate, in a manner that I think is unjust, and more importantly when there is --

MR. ALDOUS: Your Honor, I'm going to object to personal opinion statements.

THE COURT: Sustained.

MR. CHAIKEN: -- and when a client of mine is accused of something as serious as fraud. Fraud is a serious thing. And so when I'm here, I may get a little excited in trying to passionately defend my client. And I'm going to show you why Doug Hickok did not do anything wrong that justifies finding him liable in this case from the claims against him.

Let's begin with the simple and obvious thing. Mr. Gross asked for -- I'm sorry -- I'll do it

this way -- through his real estate agent, not himself, a guaranty. And it looks just like that, and you've seen it a million times. And he said -- actually, Mrs. Gross said, well, we wouldn't have done this deal without it. Okay. We wouldn't have done the deal without that guaranty right there, that language right there. And, you know, we are harmed because, you know, we didn't get -- if we didn't get the guaranty. If we didn't get the guaranty, we were harmed. Okay. We were misled, all these kinds of things.

Well, here's what we know. We know we got the guaranty the same guaranty that they asked for before the contract was signed when Mr. Buttemiller asked for it. They got it in the contract. It's right there, exactly what they asked for. So what they said they needed and that they would be harmed if they didn't have, they got it. So, no harm.

Now, the evidence in this case is that Mr. Hickok was asked about a guaranty, exactly that guaranty. But it required two people's guarantees, his and Van Shaw's. So Mr. Hickok said, no, no, no. I can't promise you that I'm going to do this guaranty that you're asking for. I've got to go ask Mr. Shaw, and he did. Okay.

And you know Mr. Hickok's come in here and

he has asked the Court to answer a question, which is: Is this form a guaranty, this piece of paper here? Is it sufficient to constitute a guaranty? Okay. And, yeah, after the transaction, there was a question about whether it was. And Doug wasn't the only person who had a question about whether that document was a guaranty, okay, a proper form of guaranty.

The gentleman right over there, Mr. Gross, sat up here and testified "I expected that all the necessary documentation was going to be provided at the title company. And there was a problem with the documentation with regard to the guarantees." He stood right up there and told you. That was the last thing he testified to, that there was a problem with the documents. It didn't get done right. So that wasn't the only person who had a question about whether or not there was actually a legal guaranty. So did Mr. Gross.

And in the end, Mr. Gross still got -- Mrs. Gross got exactly what they asked for, which was the exact guaranty that they requested. And you know what? The only thing Mr. Hickok said about the whole guaranty issue is: I've got to make sure that the guaranty is in a proper document, okay, a document to be signed in the future, a form of guaranty just like Mr. Gross did.

Is there any evidence in this record, any evidence shown to you that when Doug Hickok said, "Yeah, we'll do the guaranty. I'll go talk to Mr. Shaw," et cetera, there was never an intention to perform the guaranty back then when he said he would do it? No evidence whatsoever. To the contrary, okay, Doug was trying to get the guaranty. He signed the guaranty in the document.

And, ultimately, when you're asked, was he aware of false statements that he made way back when, a misrepresentation or a false promise, the answer is clearly, "no." He couldn't be aware of it. Do you want to know why? He didn't say anything false. What he said was true. I'll get the guaranty. I've got to go get the right form of document, okay. I'll do it, sign the document. When there was a question about whether or not that document is a guaranty, Judge said it's a guaranty. All right. They got the guaranty. They got what they wanted. No harm.

Well, here's something else. You know, the Grosses talk about how everybody should have complied with the contract and, you know, based upon alleged phone calls and meetings that have never been documented and so on and so forth, you know, they had an excuse for why they went off and sold the house. Okay.

And they sold it before the buyback date, September 1st of 2009.

But you know what was interesting? Roxann Taylor sat up here yesterday, the real estate agent, and you heard her say that the Grosses told her that they needed to sell the house. They needed to sell the house. But you know what she also testified to? She said she had no idea that that need had anything whatsoever to do with an alleged failure or refusal by VSDH or anybody else to buy back the property.

So they come here and they say, oh, we sold the property early because of all the bad things VSDH and Doug Hickok did. But when they were telling the real estate agent why they wanted to sell the house, they didn't make any mention of it, none whatsoever, none whatsoever. And then when they asked the real estate agent, who confirmed they were very anxious to sell the house, to help them out -- and they didn't have to, by the way. They didn't need a real estate agent. They didn't need to incur commission and all that costs related to hiring a real estate agent -- they didn't even accept her advice on what to sell the property for.

You know, she said, I could have gotten them more money. I wanted to get them more money. I sold a house down the street, you know, for more money.

It was, you know, a different size house, but more per foot. You know, I could have gotten them more money. But, no, no, they just -- they were anxious. They wanted to sell.

But for no reason related to what they're telling you the reason was -- well, while we're on the topic of, you know, supposed telephone conversations and meetings that were not documented before the contract and after -- you know, the contract tells us very clearly, the contract -- the same contract that they wanted to enforce against everybody here says there are no understandings and no agreements, anything outside of the agreement itself. It's got to be right there. It's got to be in writing. It can't be changed except by the written agreement. It's all right here in the document.

The Grosses come in and say, no, no, no, we want to rely on stuff. That's not documented anyplace. Notices have to be in writing. Deliveries have to be in writing, you know. They don't want to rely on any of that.

Now, you have seen the addendum in the contract on a bunch of occasions. And all you need to know, and when answering questions about whether Doug Hickok did anything wrong, is the buyback date was on September 1st of 2009. If the -- if the Grosses timely

exercised the buyback option, they may not sell or convey any right and title to the property to anybody else until there's been a breach of the buyer or the seller of its obligation to re-purchase.

Well, a breach of the obligation to re-purchase means that VSDH didn't buy the property back by September 1st or on September 1st to designate a buyback date. And we know that because, well, there was an option to do it earlier. You have to have both parties agree to do it earlier. But as the Grosses admitted, everybody knows there was no agreement to do it earlier.

And the other thing is, you know, when you're talking about complying with contracts, you've got this language right down here. And, you know, it says, "Should the Grosses enter into a contract to sell the property, the buyback option will immediately terminate and will no longer be available to the buyer."

So, yet, they come in here and they're asking you, well, we sold the property early. We entered into a contract with Mrs. Browning to sell the property before the buyback date. But forget about what the contract says. That buyback option shouldn't have terminated even though the contract says it should have.

Well, again, if you're going to come into

court and enforce a contract and sue on a contract, you've got to comply with it. And that contract right there says that the buyback option will immediately terminate and will no longer be available to the buyer.

Now I want to talk about the guaranty language in the contract. Okay. It's really simple, okay. What it says is, is that the guarantors -- and there only ended up being one of them, even though the guaranty talks about both of them -- shall be personally responsible to perform the obligations of VSDH under the buyback option, okay, in the event VSDH fails to perform fully under the terms of the buyback option.

So let's just assume that Doug Hickok got this guaranty out there, and it was, okay, according to the judge, and September 1st rolls around. Okay. September 1st rolls around. And let's assume that the buyback option hasn't terminated already as a result of the early sale and the early contract by the Grosses to Ms. Browning. How is Doug Hickok going to perform the obligations of VSDH under the buyback option, which is to buy back the property? He couldn't.

You heard Mrs. Gross sit up on the stand here and say, well, nobody could have bought it on 9/1 of '09 because we didn't own it anymore. So there's no way Doug Hickok could have -- could have bought the

property when his only liability to do so, if ever, would have been on or after September 1st of '09 if VSDH didn't do it. That assumes VSDH was required to. And if VSDH was not required to, then neither was Mr. Hickok, ever.

And that brings me to the last point about the contract that I want to talk to you about. The contract, the one that was signed by Mr. and Mrs. Gross, Mr. and Mrs. Gross, the same people come into this courtroom and who sued Mr. Hickok seeking damages from him -- they're asking for damages, money. They want money from him. They don't want performance of the buyback obligation, which is what he agreed to do if VSDH didn't do it. They want money.

But what the contract said when they signed it was that their sole and exclusive remedy in the event VSDH, the seller, was in default -- meaning didn't buy back the property on the buyback date -- was to sue -- terminate the contract -- excuse me -- or, right here, enforce specific performance. See that right there? Enforce specific performance.

And what that means is you can come to Court and you can say, Judge, make them perform. Make them buy back the property. But the Grosses didn't do that. They didn't avail themselves of that remedy.

They sold the property off to somebody else before that obligation ever came due, if it ever came due. And instead, they come in here and they say, well, we're suing for money damages.

THE COURT: Two minutes.

MR. CHAIKEN: And you know when they -- when they look at their -- at the contract, the contract said, yeah, you know, this addendum, the seller will reinstate that remedy, you know, about seeking other relief, like damages. Mr. Hickok didn't. The Grosses say, well, you know, we're coming in here anyway. Forget about what the contract says. We're going to sue Mr. Hickok for damages anyway.

When you answer the questions of the Court in the charge that's being presented to you and you're asked whether Mr. Hickok failed to comply with the contract, the answer must be, "no," because he was never given the opportunity to do so and because the Grosses couldn't sell him the property if he ever had an obligation to buy it. All right.

And if VSDH's defaults, if any, were excused or their failures to comply were excused, so were Mr. Hickok's. And, you know, Mr. Aldous stands up there and says, you know, when they said they wouldn't perform the guaranty, you know that's fraud.

When you look at the instructions of the Court and the definitions of fraud in this document and you look at all that, you will see that in order for there to have been any fraud, Mr. Hickok would had to have said something that wasn't true before the contract was signed, okay, indicating that he never had any intention to -- to guaranty the contract. And you already know that that isn't what happened. So when you're asked whether there was fraud, the answer to that question is clearly a big, no, no, in red.

And when you're asked whether there were any damages for fraud, the answer is, "no." You know why? Because Mr. and Mrs. Gross said the only way they would have been harmed with regard to the guaranty is if there wasn't one, because they wouldn't have entered into the transaction. But because there was one, they couldn't have suffered any harm.

Ladies and gentlemen, I really do thank you for your time and your attention, and I look forward to seeing you deliberate and seeing the results of your deliberations.

THE COURT: Mr. Aldous?

MR. ALDOUS: Thank you, Your Honor.

When I started out, I said, you know, deceive, delay, deny; and it's continued in this

courtroom. It's amazing to me. Mr. Shaw stood up there with a list of things I wish I knew. I wish I knew. We don't know this. We don't know that. We didn't get this. You saw on the witness stand when he secretly went out and sued the Grosses, but didn't tell them. That was July of 2009, almost six years ago. For six years, he could have answered every one of those questions and he didn't.

How many times did they go to that house to even look at the things to say, you know what, this is crappy work? Not one time. Instead, they brought the original builder in here, who hadn't been in the house since 2007, and said, hey, let me ask you these questions. Did they go out and take any photographs? Did that even matter to them? No.

Why? Because they would rather come in here and raise innuendos and raise possibilities because they know the truth. The truth is it's good. The truth is that there was an economy that tanked, and that's why. They don't want the truth. They wanted innuendo. They want to try to sell you a bag of goods. That's what they want.

You know, they sit there and they say -- and it just kills me. They say his -- the Grosses' real estate agent is the one who did this and that. Well,

you know what, let's take a look at the actual contract. You see where it says Vaquero Residential Realty, the listing broker, that means that they worked for VSDH. They're acting like, oh, that was our broker and everything he did was on us. Well, it was their broker. They say that -- that if you want to precisely enforce a contract, you must precisely perform.

Let me ask -- let me translate that. If you've got a lawyer who's determined to get out of a contract and he's working with his partners and then they get another lawyer in here, they can raise as many objections to that contract as could be raised. And if -- they will sell it as hard as they can sell it, but you have to buy it in order for it to work because that's what it is. It is a -- it is a sell job and that's it.

There's not one bit -- they said, oh, we don't even know what the -- what the fair market value was. Well, that's right, because the fair market value doesn't have anything to do with it. The question is: Was it reasonable for Betsy and Ken to hire a real estate agent to sell the house?

Well, it was sure reasonable when they wanted to sell the house. They had Vaquero Realty as their agent. Well, sure, it's reasonable. Was it

reasonable to pay her that? You know what? People charge money for what they do, and she charged less than what she normally charges. Yeah, it was reasonable. All these other charges, not one of them that they mentioned, other than the real estate fee. And all they did was argue innuendo. Not one time did they come out here and show you with any evidence that that was unreasonable.

Mr. Chaiken was up here telling you, you know, there's no fraud here. There's no fraud. They got exactly what they asked for in the guaranty. Well, you know what, we didn't have that until 30 minutes ago when the judge made the ruling. And you know that because during this trial, Mr. Chaiken continually is asking Mr. Hickok, "Isn't it true you signed this in your personal capacity? You didn't mean to."

And the judge said that that's not good. Legally, you're stuck, even though you tried to deceive us, even though you said on the witness stand, "Hey, it's not my problem if they don't give you the right documents."

I'm telling you, they're selling you a bill of goods, and you have to buy it in order for it to work. I don't know -- it's got to be difficult because, you know, a committed lawyer and his partners can really

raise some problems with a contract. And if you give them three years like they had to make up their defenses, you know it's going to happen. And that's what you got here. You've got a bunch of made-up defenses in an effort to avoid a responsibility that they had.

And why was that? Well, let me tell you something. The reason that escrow agreement didn't really mean anything to them is because, you see this on Exhibit 98, which is the settlement statement from them -- do you see that money, Gross amount due from the seller of $2,695,017? They didn't get that money unless they closed. And I'll tell you what happened

I don't want to guaranty this. That's okay, man. Just sign it and we'll get out of it. That's what it was. You don't worry about that buyback. If we've got to do that to get rid of these carrying costs on all this money that we have -- remember, we have this loan of a million nine. We need to get rid of that. We'll worry about this other stuff later.

If we do it right and we don't respond and we pretend -- we just say, "Be quiet. Don't do anything," maybe they'll screw up. That's what happened. They wanted the money. They've got the money. Now they're raising a bunch of defenses, and

it's because they're saying this is a final stage of their defense, the final stage of their made-up idea.

It's going to be I -- I've now played it out over five-and-a-half years. What we need to do, we just be quiet when they ask us questions and we'll just say they did it. When we say, hey, we're going to have to sell this because of financial conditions, whatever, because it's a good offer -- which is the only evidence you heard from Roxann Taylor; it was a good offer because it was cash. And during that period of time, nobody was getting loans. That's what she said.

Now Mr. Shaw stood up here and said, well, you know, that thing -- that house went down in value. It must have been the addition, because Lord knows they must have devalued the property. He said that with no evidence. Did anybody come in here and say that it was devalued because of that?

To the contrary. But like I said, this is just the last stage in their defense and their effort to avoid their promises and their responsibilities. It's the last stage. And they said -- and you know what? They're rolling the dice with you. They're saying I hope you pick up -- I hope you -- just one little thing, just let us off a little bit, and it'll be all worth it. That's what they're saying.

If you don't do 100 percent of justice, you've helped them. You've helped them avoid their responsibilities. If you don't award every bit of that, $1 off, and they say it was worth it. One dollar off and they have -- they won, because that has been the plan all along. The plan is just give them money, close it, move on. We'll take the profit. We'll move on.

Of course, I get worked up about this stuff too, and I appreciate y'all listening and hearing us out. But just remember that when you step back there, you're the only ones who can write in the answers to these questions. And it's got to be based upon what you think the evidence is, not what I think, not what they think. But don't be -- don't be misled by fancy lawyer arguments about the contract says this or that. Do what's right.

Thank you, Your Honor.

THE COURT: Ladies and gentlemen, when you go into the jury room to answer the questions, the first thing you will need to do is to choose a presiding juror. The presiding juror has these duties: A, have the complete charge read aloud if it will be helpful to your deliberations; B, preside over your deliberations, meaning manage the discussions and see that you follow these instructions; C, give written questions or

comments to the bailiff who will give them to the judge; D, write down the answers you agree on; E, get the signatures for the verdict certificate; and, F, notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me so now. I assume that you do based on the noddings of your heads.

Instructions for signing the verdict: Number 1, unless otherwise instructed, you may answer the questions on a vote of five jurors. The same five jurors must agree on every answer in the charge. This means you may not have one group of five jurors agree on one answer and a different group of five jurors agree on another answer.

Two: If five jurors agree on every answer, those five jurors sign the verdict. If all six of you agree on every answer, you are unanimous and only the preceding juror signs the verdict.

Number 3: All jurors should deliberate on every question. You may end up with all six of you agreeing on some answers while only five of you agree on other answers. But when you sign the verdict, only those five who agree on every answer will sign the verdict.

Does everyone understand these questions? If not, please let me know now.

All right. Ladies and gentlemen of the jury, at this time, all of the evidence, the charge of the Court, and the closing argument of counsel are before you. I'm going to hand to the bailiff the charge of the Court applicable to the law in this case along with a verdict form. The bailiff will lay this on the table in the jury room. Once all members of your jury are present and assembled in the jury room, the case is formally submitted to you and you may begin your deliberations.

All rise. Please step down from the jury box and accompany the bailiff into the jury room.

(Jury retires to the jury room)

THE COURT: Anything further from the plaintiff?

MR. ALDOUS: Just a question, Your Honor, but nothing further with regard to trial stuff.

THE COURT: From defendant, VSDH?

MR. SHAW: Nothing, Your Honor.

THE COURT: From defendant, Hickok?

MR. CHAIKEN: Not at this time, Your Honor.

THE COURT: All right. We stand in recess

until the jury returns.

(Recess taken)

(Alternate juror was released)

THE COURT: All rise.

(Jury enters the courtroom)

THE COURT: All right. Ladies and gentlemen of the jury, I understand that you would like to go home now and come back tomorrow morning at 9:00 a.m. You're certainly free to do that. I just want to remind you that during this overnight recess, you're under the same restrictions that you've been previously given. You're not to discuss this case among yourselves or with anyone else until such time as you have completed your deliberations in this case and have been discharged as jurors.

You're free to go. We'll see you tomorrow morning.

(Proceedings concluded for the day)

STATE OF TEXAS          )

COUNTY OF DALLAS        )

     I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

     WITNESS MY OFFICIAL HAND this the 24th of October, 2015.

               /s/ Cathye G. Moreno

               Cathye G. Moreno, Texas CSR #6076
               Expiration Date:  12/31/16
               Official Court Reporter
               County Court at Law No. 1
               600 Commerce Street, Suite 550
               Dallas, Texas 75202
               cathyemoreno@sbcglobal.net
               (214)653-7496

# TAB 29

REPORTER'S RECORD
VOLUME 7 OF 10 VOLUMES
**CAUSE NO. CC-09-05232-A**

VSDH VAQUERO VENTURE, LTD.          )IN THE COUNTY COURT
                                    )
  Plaintiff/Counter-Defendant,   )
                                    )
V.                                  )
                                    )
KEN GROSS and BETSY GROSS           )AT LAW NO. 1
                                    )
  Defendants/Counter-Plaintiffs, )
                                    )
V.                                  )
                                    )
EVAN L. SHAW and DOUGLAS M.         )
HICKOK                              )
                                    )
  Intervenors/Counter-Defendants,)DALLAS COUNTY, TEXAS

------------------------------------------------------------

**TRIAL ON THE MERITS**

------------------------------------------------------------

On the 19th day of June 2015, the following proceedings came on to be heard within the presence of a jury in the above-entitled and -numbered cause before the Honorable D'METRIA BENSON, judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine. Reporter's Record produced by computer-aided transcription.

**APPEARANCES:**

**MR. STEVEN E. ALDOUS**
SBN 00982100
Forshey Prostok, LLP
500 Crescent Court
Suite 240
Dallas, Texas 75201
(214)716-2100
ATTORNEY FOR DEFENDANTS/COUNTER-PLAINTIFFS
KEN GROSS and BETSY GROSS

    - AND -

**MR. KENNETH B. CHAIKEN**
SBN 04057800
Chaiken & Chaiken, PC
Legacy Town Center III
5801 Tennyson Parkway
Suite 440
Plano, TX 75024
(214)265-0250
ATTORNEY FOR INTERVENOR/COUNTER-DEFENDANT
DOUGLAS M. HICKOK

    - AND -

**MR. EVAN LANE (VAN) SHAW**
SBN 18140500
Law Offices of Van Shaw
2723 Fairmount Street
Dallas, Texas 75201
(214) 754-7110
ATTORNEY FOR PLAINTIFF/COUNTER-DEFENDANT
VSDH VAQUERO VENTURE, LTD;
INTERVENOR, VAN SHAW; and
THIRD-PARTY DEFENDANTS
VSDH VAQUERO HOMES, INC. AND
VSDH HOMES, INC.

**INDEX**

| JUNE 19, 2015 | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS............................. | 4 | 7 |
| VERDICT OF THE JURY.....…............. | 4 | 7 |
| END OF PROCEEDINGS...................... | 6 | 7 |
| REPORTER'S CERTIFICATE.................. | 7 | 7 |

**EXHIBIT INDEX (NONE)**

**PROCEEDINGS**

June 19, 2015

THE COURT:  All right.  Bring in the jury.

(Jury enters the courtroom)

THE COURT:  You may be seated.

Would the presiding juror please stand?

Is this your unanimous verdict?

PRESIDING JUROR:  Yes, ma'am, it is.

THE COURT:  You may be seated.

I will now read the verdict into the record.

Question No. 1:  Did any of the following parties fail to comply with the new home contract?

VSDH Vaquero, Ltd:  Answer, no.

Doug Hickok:  Answer, no.

Ken Gross, Betsy Gross:  Answer, yes.

Question No. 2:  Who of those whom you have found to have complied -- failed to comply with the contract failed to comply with the contract first?

VSDH Vaquero Venture, Ltd:  No.

Doug Hickok:  No.

Ken Gross and Betsy Gross:  Yes.

Question No. 3:  Was the failure of any of the parties listed below excused?

VSDH Vaquero Venture, Ltd:  Yes.

Doug Hickok:  Yes.

Ken Gross and Betsy Gross:  No.

Question No. 4:  Did any of those listed below commit fraud against Ken and Betsy Gross with regard to the guarantee in the new home contract? Answer "yes" or "no" for each.

VSDH Vaquero Venture, Ltd:  No.

Doug Hickok:  No.

Question No. 5 was not answered because it was predicated upon a "yes" answer to Question No. 4.

Question No. 6 was not answered because it was predicated on "yes" answers to Questions No. 1 and No. 2.

Question No. 7 was not answered because it was predicated on a "yes" answer to Question No. 4.

Question No. 5 was not answered because it was predicated upon a "yes" answer -- excuse me. Question No. 8 was not answered because it was predicated upon a "yes" answer to Question No. 5.

Question No. 9 was not answered because it was predicated upon a "yes" answer to Question No. 5.

Anything further from the plaintiff?

MR. ALDOUS:  No, Your Honor

THE COURT:  From defendant, VSDH?

MR. SHAW:  No, Your Honor

THE COURT: From defendant, Hickok?

MR. CHAIKEN: No, Your Honor.

THE COURT: All right. Ladies and gentlemen of the jury, the Court has previously instructed you that you should observe strict secrecy during the trial and during your deliberation. I am now about to discharge you. And after you're discharged, you will be released from your secrecy. You will then be free to discuss the case and your deliberations with anyone; however, you are also free to decline to discuss the case and your deliberations if you wish.

After you are discharged, it is lawful for the attorneys or other persons to question you to determine whether any of the standards for jury conduct that I have given you during the course of this trial were violated and to ask you to give an affidavit to that effect. You are free to discuss or not to discuss these matters and to give or not to give an affidavit.

Thank you for your service. You are free to go.

All rise. The jury is excused.

(Proceedings concluded)

7

STATE OF TEXAS          )

COUNTY OF DALLAS        )

I, Cathye Moreno, Official Court Reporter in and for the County Court of Dallas County, Texas, County Court At Law Number One, State of Texas, do hereby certify that to the best of my ability the above and foregoing contains a true and correct transcription of all portions of evidence and proceedings requested in writing to be included in the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 24th of October, 2015.

/s/ Cathye G. Moreno

Cathye G. Moreno, Texas CSR #6076
Expiration Date:  12/31/16
Official Court Reporter
County Court at Law No. 1
600 Commerce Street, Suite 550
Dallas, Texas 75202
  cathyemoreno@sbcglobal.net
(214)653-7496